**Juan C. Chavez**, OSB #136428
**Brittney Plesser**, OSB #154030
**Franz Bruggemeier**, OSB #163533
**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB # 862984
Sugerman Law Office
707 SW Washington St Ste 600
Portland OR  97205
Tel: 503-228-6474
Facsimile: 503-228-2556

**Benjamin Haile**, OSB #04066
Oregon Justice Resource Center
attorneyhaile@gmail.com
P.O. Box 2581
Portland, OR  97208
Telephone: 503-212-4434
Facsimile: 801-650-2299

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; MICAH RHODES; and SHERYL LYNN SUBLET, *individually, on behalf of a class of other similarly situated*, | Case No. 6:20-cv-00570 |
| Plaintiffs, | COMPLAINT |
| v. | Civil Rights Action (42 U.S.C. § 1983) |
| KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; and KEN JESKE, | |
| Defendants. | |

This is a civil rights action against the above-named parties for the willful and/or deliberately indifferent medical care being granted to prisoners of the Oregon Department of Corrections (hereafter "ODOC"). Across Oregon, and across the world, people are suffering from the pandemic spread of Novel Coronavirus, or COVID-19. This pandemic poses an acute danger to ODOC prisoners, for whom Defendants are responsible.

While ODOC has adopted some policies in response to COVID-19, it has largely neglected critical measures to prevent outbreaks of the virus at ODOC facilities and the likely severe illnesses and deaths that have accompanied, and continue to accompany, outbreaks in congregate living facilities. A successful and adequate response to this pandemic cannot be accomplished with half-measures that undermine positive changes. ODOC has, thus, willfully and wantonly ignored the public health threat caused by this global pandemic. COVID-19 is most likely to cause serious illness or death to older adults and those with certain underlying medical conditions. Plaintiffs fall into those categories of persons with heightened vulnerability. Moreover, the risk of serious illness or death from COVID-19 is greatly increased where people

are not provided the medical care and facilities to properly treat the infection. Because

Defendants choose to ignore that threat by creating a health care system that denies to Plaintiffs

appropriate access to prevention, proper testing, and treatment for COVID-19, and because

Defendants continue to make and enforce policies that create a likely risk of a rapid outbreak of

COVID-19 in all of their institutions, they are in violation of the Constitutions of the United

States of America and Oregon.

## JURISDICTION

1.      This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C.

§ 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (4).

## VENUE

2.      Venue is proper within the District of Oregon because all of the events giving rise to this

claim occurred in this judicial district and all defendants reside in this judicial district. 28 U.S.C.

§ 1391(b). The acts and practices alleged herein have occurred and continue to occur in prisons

operated by ODOC in many counties across the State of Oregon.  The acts pertaining to the

seven named Plaintiffs occurred in Marion County, Washington County, Umatilla County, and

Multnomah County, Oregon. The main policy and operational decisions made by ODOC occur

in Marion County, Oregon.

## PARTIES

3.      Plaintiff Paul Maney is a prisoner at Oregon State Correctional Institution (hereafter

"OSCI") in Salem, Oregon. Mr. Maney is 62 years old. Due to his age, he is at an increased risk

of a serious COVID-19 infection and death.

4.      Plaintiff Gary Clift is a prisoner at OSCI in Salem, Oregon. Mr. Clift is 76 years old. He

has a chronic stomach condition that caused much of his stomach to be removed.  He is housed

in Unit 11. Due to his age and serious medical condition, he is at an increased risk of a serious COVID-19 infection and death.

5.      Plaintiff George Nulph is a prisoner at OSCI in Salem, Oregon. Mr. Clift is 68 years old. He has been diagnosed with Myeloproliferative Disease and Thrombocythemia.  He is housed in Unit 13. Due to his age and serious medical condition, he is at an increased risk of a serious COVID-19 infection and death.

6.      Plaintiff Theron Hall is a prisoner at the Oregon State Penitentiary (hereafter "OSP") in Salem, Oregon. Mr. Hall is 35 years old.  He has been diagnosed with Sarcoidosis and Asthma. Mr. Hall lives in the E Block unit of OSP. Due to his serious medical condition, he is at an increased risk of a serious COVID-19 infection and death.

7.      Plaintiff David Hart is a prisoner at OSP in Salem, Oregon. Mr. Hart is 53 years old and has a respiratory condition. Mr. Hart lives within the A Block unit in OSP. Due to his serious medical condition, he is at an increased risk of a serious COVID-19 infection and death.

8.      Plaintiff Micah Rhodes is a prisoner at Columbia River Correctional Institution (hereafter "CRCI") in Portland, Oregon.  Mr. Rhodes has asthma and is HIV positive. Mr. Rhodes takes Biktarvy as a retroviral. Due to his serious medical condition, he is at an increased risk of a serious COVID-19 infection and death.

9.      Plaintiff Sheryl Lynn Sublet is a prisoner at Coffee Creek Correctional Facility (hereafter "CCCF") in Wilsonville, Oregon.  Ms. Sublet is 63 years old has Chronic Obstructive Pulmonary Disease (COPD), asthma, and is HIV positive.  To control her asthma, she takes Symbicort by inhaler, two puffs twice per day.  She takes Jenvoya as an antiviral every day.  Due to her age

and serious medical conditions, she is at an increased risk of a serious COVID-19 infection and death.

10.     Defendant Kate Brown is the Governor of the State of Oregon and retains ultimate executive authority over ODOC. Additionally, under ORS 401.168(1), "[d]uring a state of emergency, the Governor has complete authority over all executive agencies of state government and the right to exercise, within the area designated in the proclamation, all police powers vested in the state by the Oregon Constitution in order to effectuate the purposes of this chapter"; "has authority to suspend provisions of any order or rule of any state agency, if the Governor determines and declares that strict compliance with the provisions of the order or rule would in any way prevent, hinder or delay mitigation of the effects of the emergency"; and "has authority to direct any agencies in the state government to utilize and employ state personnel, equipment and facilities for the performance of any activities designed to prevent or alleviate actual or threatened damage due to the emergency…"  Furthermore, under ORS 401.236, the Governor is "authorized to make rules and regulations necessary to carry out the purposes" of the declared emergency and her powers under ORS 401.165 to ORS 401.236. At all times relevant, Kate Brown was acting under color of law and is sued in her official capacity.

11.     Defendant Colette Peters is the Director of the Oregon Department of Corrections and is directly responsible for ensuring that ODOC's prison health program complies with State and Federal laws. Oregon Department of Corrections operates 14 facilities in the State of Oregon, where prisoners are held after sentencing if the length of sentence is over one year. At all times relevant, Colette Peters was acting under color of law and is sued in her official capacity.

12.     Defendant Heidi Steward is the Deputy Director of the Oregon Department of Corrections and is directly responsible for ensuring that ODOC's prison health program complies with State and Federal laws. At all times relevant, Heidi Steward was acting under color of law and is sued in her official capacity.

13.     Defendant Mike Gower is the Assistant Director of Operations for the Oregon Department of Corrections and is directly responsible for the operations of ODOC's prisons. At all times relevant, Mike Gower was acting under color of law and is sued in his official capacity.

14.     Defendant Mark Nooth is the Eastside Institutions Administrator for the Oregon Department of Corrections and is directly responsible for the operations of six ODOC prisons: Eastern Oregon Correctional Institution (hereafter "EOCI"), Two Rivers Correctional Institution (hereafter "TRCI"), Snake River Correctional Institution (hereafter "SRCI"), Powder River Correctional Facility (hereafter "PRCF"), Deer Ridge Correctional Institution (hereafter "DRCI"), and Warner Creek Correctional Facility (hereafter "WCCF"). At all times relevant, Mark Nooth was acting under color of law and is sued in his official capacity.

15.     Defendant Rob Persson is the Westside Institutions Administrator for the Oregon Department of Corrections and is directly responsible for the operations of eight ODOC prisons: CCCF, CRCI, South Fork Forest Camp (hereafter "SCCF"), OSCI, Santiam Correctional Institution (hereafter "SCI"), OSP, Mill Creek Correctional Facility (hereafter "MCCF"), and Shutter Creek Correctional Institution (hereafter "SCCI"). At all times relevant, Rob Persson was acting under color of law and is sued in his official capacity.

16.     Defendant Ken Jeske is the Administrator for Oregon Correctional Enterprises (hereafter "OCE") and is directly responsible for the operations of OCE's facilities within the Oregon

Department of Corrections. Oregon Correctional Enterprises have operations in nine ODOC facilities throughout the State: EOCI, TRCI, SRCI, DRCI, WCCF, CCCF, OSCI, OSP, and MCCF. At all times relevant, Ken Jeske was acting under color of law and is sued in his official capacity.

## CLASS ACTION ALLEGATIONS

17.    Plaintiffs bring this action pursuant to Rules 23(b)(1), 23(b)(2), and, in the alternative, 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situation individuals.

18.    The class that Plaintiffs seek to represent is defined as all prisoners currently or who will in the future be held in ODOC custody who, according to the Centers for Disease Control (hereafter "CDC") and Prevention, the World Health Organization (hereafter "WHO"), and the Oregon Health Authority (hereafter "OHA"), are most at risk of dying or suffering from severe illness from COVID-19. The class includes those prisoners incarcerated in ODOC institutions who are at greater risk of death or severe illness because of their age and/or because they have one or more of the following serious medical conditions:[1]

- People with chronic lung disease, including asthma or chronic obstructive pulmonary disease (chronic bronchitis or emphysema) or other chronic conditions associated with impaired lung function or that require home oxygen;

---

[1]    The Oregonian, *List of underlying conditions putting people at higher risk of coronavirus illness, according to Oregon health officials*, (Mar. 22, 2020), https://www.oregonlive.com/coronavirus/2020/03/list-of-underlying-conditions-putting-people-at-higher-risk-of-coronavirus-illness-according-to-oregon-health-officials.html (stating people over 60 are at greater risk and providing list of health risks from OHA); Centers for Disease Control and Prevention, *People who are at higher risk for severe illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (stating "older adults," over 65 are at greater risk and list of health risks); Alexa Lardieri, *WHO: Nearly All Coronavirus Deaths in Europe Are People Aged 60 and Older*, US News, (Apr. 2, 2020), (citing statement of WHO director stating that 95% of the people who died from coronavirus infection in Europe were over 60 years old).

- People with compromised immune systems (immunosuppression) (e.g., seeing a doctor for cancer and treatment such as chemotherapy or radiation, receiving an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications, HIV with a CD4 count <200);

- People with blood disorders (e.g., sickle cell disease or on blood thinners);

- People with chronic kidney disease;

- People with chronic liver disease;

- People who are currently or were recently pregnancy (in the last two weeks);

- People with diabetes, or other endocrine disorders;

- People with metabolic disorders (such as inherited metabolic disorders and mitochondrial disorders);

- People with heart disease (such as congenital heart disease, congestive heart failure and coronary artery disease); and

- People with neurological and neurologic and neurodevelopment conditions.

19.     As of March 1, 2020, ODOC has 1,119 people in its custody who are over the age of 60 and 3,471 people between the ages of 46 and 60.[2] Most of those 3,471 are above age 50.

20.     Prison conditions "often accelerate the onset and progression of many chronic conditions associated with aging," meaning that "old age in prison typically commences at ages 50 or 55 years."[3] When referring to prisoners, 50 is the age most commonly used to characterize the beginning of the life stage of "elderly," and the National Institute of Corrections and the National Commission on Correctional Health Care define the life stage of "elderly" as beginning at age 50

---

[2]     OREGON DEPT OF CORRECTIONS, *Inmate Profile for 03/01/2020*, available at: https://www.oregon.gov/doc/Documents/inmate-profile.pdf (accessed March 31, 2020).
[3]     Kimberly A. Skarupski et al., *The Health of America's Aging Prison Population*, EPIDEMIOLOGIC REVIEWS 40:157–165 (2018).

or 55.[4] In studies, average prisoners have shown to be physiologically 10 to 15 years older than their community counterparts.[5]

21.     Prisoners age 50 and above are also more likely than younger prisoners to have the chronic conditions that put them at risk of illness and death from COVID-19.[6]

22.     The CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (hereafter "CDC Guidelines") emphasize "that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages."

23.      The prevalence of chronic medical conditions, such a liver disease, lung problems, and heart conditions, is "significantly higher" in incarcerated populations relative to the general population. Studies suggest a "strong link between incarceration and poor health that are statistically independent of prior and current stressful life experiences."[7]

24.     The poorer health of prisoners may be due in part to the conditions inherent to living in correctional facilities, such as overcrowding, isolation, exposure to communicable diseases, inadequate ventilation, poor nutrition, and restricted physical activity.[8]

---

[4]     Kathryn M. Nowotny et al., *Growing Old Behind Bars: Health Profile of the Older Male Inmate Population in the United States*, JOURNAL OF AGING AND HEALTH, Vol. 28(3) 935–956 (2016).
[5]     R.G. Falter, *Elderly inmates: An emerging correctional population*, CORRECTIONAL HEALTH JOURNAL, Vol. 1 No. 3, 52–69 (2006).
[6]     Kimberly A. Skarupski et al., *The Health of America's Aging Prison Population*, EPIDEMIOLOGIC REVIEWS 40:157–165 (2018).
[7]     Tomoko Udo, *Chronic Medical Conditions in U.S. Adults with Incarceration History*, HEALTH PSYCHOLOGY Vol. 38, No. 3, 217–225 (2019).
[8]     Michael Massoglia & William Alexander Pridemore, *Incarceration and Health*, ANNUAL REVIEW OF SOCIOLOGY 41:291–310 (2015).

25.     ODOC does not keep electronic records in its prison system. This makes it difficult to track trends in healthcare and, presumably, to search for and identify those prisoners with chronic conditions that put them at higher risk of complications and death from COVID-19.[9]

26.     The class period commences on April 6, 2020 and extends to the date on which ODOC is enjoined from, or otherwise ceases, enforcing their unconstitutional policy, practice, and custom of refusing or failing to provide proper and adequate prevention, testing, and treatment for COVID-19. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

27.     This action has been brought and may properly be maintained as a class action under Federal law and satisfies numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

28.     Joinder is impracticable because: (1) the class members are numerous; (2) the class is fluid because it includes future members who will be prisoners in ODOC facilities and current class members who will leave ODOC facilities during the class period; (3) the class members are incarcerated, making their abilities to institute individual lawsuits limited; and (4) the class supports judicial economy.

29.     Upon information and belief, there are at least 1,400 prisoners in ODOC custody who are members of the proposed class.

30.     Common questions of law and fact exist as to all members of the class, in that they all have a right to be administered appropriate and effective COVID-19 prevention, testing, and treatment measures.

---

[9]     Noelle Crombie, *Layoffs, hiring freeze follow $60 million shortfall at Oregon Corrections Department*, THE OREGONIAN (Mar 26, 2020), available at: https://www.oregonlive.com/politics/2020/03/layoffs-hiring-freeze-follow-60-million-shortfall-at-oregon-corrections-department.html.

31.    Plaintiffs' claims are typical of the claims of the class members. The harms Plaintiffs

suffer, as a result of Defendants' courses of conduct, are typical of the harms suffered by class

members.

32.    The representative Plaintiffs have the requisite personal interest in the outcome of this

action and will fairly and adequately protect the interests of the class. Plaintiffs have no interests

adverse to the interests of the class. Plaintiffs retained counsel with experience and success in the

prosecution of civil rights litigation. Counsel for Plaintiffs know of no conflicts among class

members or between counsel and class members.

33.    Plaintiffs seek injunctive and declaratory relief. As such, prosecuting separate actions

would create a risk of inconsistent or varying adjudications with respect to individual class

members that would establish incompatible standards of conduct for the party opposing the class.

Further, any injunction requiring Defendants to address their constitutional violations would

prevent other litigants from seeking a different injunction. Plaintiffs seek class certification under

Fed. R. Civ. P. 23(b)(1).

34.    This action, in part, seeks declaratory and injunctive relief. As such, in addition to

certification under Rule 23(b)(1) and in the alternative, Plaintiffs seek class certification under

Fed. R. Civ. P. 23(b)(2), in that all class members are subject to the same constitutionally-

deficient medical care. In short, Defendants act on grounds generally applicable to all class

members.

35.    In the alternative, Plaintiffs also seek partial certification under Fed. R. Civ. P. 23(c)(4).

///

///

**FACTUAL ALLEGATIONS**

36.     Since 2019, Novel Coronavirus, or COVID-19, has ravaged the world, country to country. The extensive body of evidence regarding COVID-19 demonstrates that it is a highly communicable virus that spreads through close-contact. It is a pandemic,[10][11] and it has been declared a national and state emergency.[12]  As of 4:20 on the date of this filing, in only a few months, 1,341,907 people worldwide have been diagnosed with COVID-19, and more than 74,470 of those people have died. Over 330,000 Americans have tested positive for COVID-19, while the number of deaths has risen to at least 8,900, including 338 in Washington state and 29 in Oregon.[13] Those numbers are growing rapidly every day. There is no vaccine or cure for COVID-19. No one is immune.

**COVID-19 transmission continues to grow exponentially with heightened risk in prisons.**

37.      The transmission of COVID-19 has grown exponentially and is expected to continue to grow exponentially.  The United States now has the most confirmed cases of COVID-19 in the world.  Nationally, projections by the CDC indicate that over 200 million people in the United

---

[10]     Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, Wall St. J. (Mar. 11, 2020, 11:59 PM), available at https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794.
[11]     Pandemics occur when a new virus emerges to infect people and can sustainably spread between people. Because there is little to no pre-existing immunity against the new virus, it spreads easily amongst humans.
[12]     Derek Hawkins et al., *Trump Declares Coronavirus Outbreak a National Emergency*, Wash. Post (Mar. 13, 2020, 10:46 AM), available at https://www.washingtonpost.com/world/2020/03/13/coronavirus-latest-news/; Lizzy Ackerman, *Gov. Kate Brown declares coronavirus state of emergency, announces 7 new Oregon cases*, The Oregonian, (Mar. 9, 2020, updated Mar. 9, 2020), available at https://www.oregonlive.com/coronavirus/2020/03/7-new-coronavirus-cases-in-oregon-officials-say-gov-kate-brown-declaring-state-of-emergency.html.
[13]     Johns Hopkins University and Medicine Coronavirus Resource Center, *Coronavirus COVID-19 Global cases by the Center for Systems Science and Engineering*, (last visited Apr. 6, 2020, and updated daily), https://coronavirus.jhu.edu/map.html; Centers for Disease Control and Prevention, *Cases in U.S.*, (last visited Apr. 6, 2020, and updated daily), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html; Washington State Department of Health, 2019 Novel Coronavirus Outbreak (COVID-19) (last visited Apr. 6, 2020, and last updated Apr. 5, 2020 at 4:55 PM), https://www.doh.wa.gov/Emergencies/Coronavirus; Oregon Health Authority, *COVID-19 Updates*, (last visited Apr. 6, 2020, and updated daily), https://govstatus.egov.com/OR-OHA-COVID-19.

States could be infected with COVID-19 over the course of the pandemic without effective

public health intervention, with as many as 1.5 million deaths in the most severe projections.[14]

38.    COVID-19 is a particularly contagious disease. A recent study showed that the virus

could survive for up to three hours in the air, four hours on copper, twenty-four hours on

cardboard, and two to three days on plastic and stainless steel.[15] Another study of an early cluster

of COVID-19 cases in Wuhan, China, revealed the dangers of indirect transmission resulting

from infected people contaminating common surfaces—in the study, it was a communal mall

bathroom.[16]  Research also shows that controlling the spread of COVID-19 is made even more

difficult because of the prominence of asymptomatic transmission—infection transmission by

people who are contagious but exhibit limited or no symptoms, rendering ineffective any

screening tools dependent on identifying symptomatic behavior ineffective.[17]

39.    COVID-19 has been especially dangerous in areas of close confinement, like cruise ships

and assisted living facilities. It follows that jails and prisons are particularly vulnerable to an

outbreak.[18]  In fact, jails and prisons are at a greater risk.  Prisoners must share cells or dorms,

dining halls, common areas, and bathrooms, where opportunities for droplet transmission are

---

[14]    Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), available at https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7mdead.html.
[15]    Marilynn Marchione/AP, *Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show*. TIME, (Mar. 11, 2020), available at https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/.
[16]    Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020*. 26 Emerg Infect Dis. 6, (2020), available at https://doi.org/10.3201/eid2606.200412 (last visited Mar. 20, 2020).
[17]    Chelsea Ritschel, *Coronavirus: Are People Who Are Asymptomatic Still Capable of Spreading COVID-19*? Independent, available at https://www.independent.co.uk/life-style/health-and-families/coronavirus-symptoms-asymptomatic-covid-19spread-virus-a9403311.html (last visited Mar. 20, 2020).
[18]    *See* Matthew J. Akiyama, M.D., Anne Spaulding, M.D., Josiah D. Rich, M.D., *Flattening the Curve for Incarcerated Populations—Covid-19 in Jails and Prisons,* N Engl J Med (Apr. 2, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

plentiful.[19] The use of dining halls contrasts sharply with the statewide prohibition against all on-premises food consumption at restaurants, bars, taverns, cafes, food courts, or other similar establishments since March 17th. Prisons and jails are often poorly ventilated, "which promotes the highly efficient spread of diseases through droplets."[20]  They also house a large proportion of medically vulnerable people[21] and offer scant medical resources.  In Chicago, Illinois, within a week of confirming its first coronavirus positive in a correctional officer, Cook County Jail had 134 confirmed cases, with nine negative tests, 93 outstanding tests, and 12 correctional officers also testing positive.[22]  In the Daenam inpatient psychiatric ward in South Korea, where conditions of confinement are similar to those of an American jail, 101 out of 103 inmates became infected with COVID-19, and, as of February 29, 2020, seven patients had died of complications from the disease.[23] Experts predict that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[24]

40.    Jails and prisons all over the country and world are releasing people with the aim of preventing massive outbreaks of severe illness and death from COVID-19.[25] Plaintiffs do not

---

[19]    Declaration of Dr. Jaimie Meyer, *Velesaca v. Wolf, et. al.*, Dkt. 42 at ¶ 9, USDC of SDNY Case No. 1:20-cv-01803-AKH (S.D.N.Y. March 16, 2020).

[20]    *Id.*

[21]    *Active case finding for communicable diseases in prison*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lanet/article/PIIS0140-6736(18)31251-0/fulltext. ("People in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.")

[22]    Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, Chicago Sun Times (March 30, 2020). https://chicago.suntimes.com/coronavirus/2020/3/29/21199171/cook-county-jail-coronavirus-positive-134-cases-covid-19

[23]    Min Joo Kim, *How a South Korean Psychiatric Ward Became a 'Medical Disaster' When Coronavirus Hit*, THE WASHINGTON POST (February 29, 2020) https://www.washingtonpost.com/world/asia_pacific/how-a-south-korean-psychiatric-ward-became-a-medical-disaster-when-coronavirus-hit/2020/02/29/fe8f6e40-5897-11ea-8efd-0f904bdd8057_story.html.

[24]    Evelyn Cheng and Huileng Tan, CNBC, note 11.(quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

[25]    BBC, *US jails begin releasing prisoners to stem Covid-19 infections*, (Mar. 19, 2020), https://www.bbc.com/news/world-us-canada-51947802 (discussing that some US cities have released hundreds of people from their jails and that Iran has released over 85,000 people to combat the pandemic).

seek the remedy of reducing the population and density of prisoners through court ordered

release at this time due to statutorily prescribed procedures that the court must exhaust before

ordering release of prisoners.  However, the fact that release is widely viewed as necessary in

other jurisdictions, but there is no indication that it is being considered by the Defendants, is

relevant to the urgency of implementing other remedies and the short timeline available to give

these remedies a chance to work before moving on to additional remedies that may include

release.

41.     The following U.S. states and counties are making efforts to reduce their jail and prison

populations: Jefferson County Jail in Kentucky,[26] Mobile County Metro Jail[27]  and three other

counties[28] in Alabama, Spokane, Washington,[29] Mercer County, Ohio,[30] Jefferson County,

Texas,[31] Hillsborough County, Texas,[32] Mecklenburg County, North Carolina,[33] Cook County

---

[26]    Andrew Wolfson, *More than 100 pretrial defendants are being released*, Courier Journal (March 17, 2020) https://www.courier-journal.com/story/news/2020/03/17/kentucky-releasing-some-pretrial-defendants-due-coronavirus/5074206002/.
[27]    Chris Best, *Some inmates to be released from Metro Jail due to coronavirus*, WKRG News (March 18, 2020) https://www.wkrg.com/health/coronavirus/some-inmates-over-65-to-be-released-from-metro-jail-due-to-coronavirus/
[28]    Marty Roney, *Coronavirus: County jail inmates ordered released in Autauga, Elmore, Chilton counties*, Montgomery Advertiser (Mar. 18,2020)
https://www.montgomeryadvertiser.com/story/news/crime/2020/03/18/county-jail-inmates-ordered-released-autauga-elmore-chilton-counties/2871087001/
[29]    Chad Sokol, *Dozens released from Spokane County custody following Municipal Court emergency order*, The Spokesman Review (March 17, 2020) https://www.spokesman.com/stories/2020/mar/17/dozens-released-from-spokane-county-custody-follow/.
[30]    WFMJ News, *Mercer County Jail releases low-level inmates amid coronavirus pandemic* (March 18, 2020) https://www.wfmj.com/story/41912067/mercer-co-jail-releases-low-level-inmates-to-make-room-for-medical-isolation-cells-amid-coronavirus-pandemic.
[31]    Kiera Sam, Jordan James, *Jefferson County jail cancels visitation, releases some inmates amid coronavirus concerns*, 12News (March 18, 2020) https://www.12newsnow.com/article/news/local/jefferson-county-jail-cancels-visitation-releases-some-inmates-amid-coronavirus-concerns/502-f7e9e268-e131-46af-a478-95553f309bf8.
[32]    Tony Marrero, *Sheriff announced the release of 164 people from his jail*, Tampa Bay Times (March 19, 2020) https://www.tampabay.com/news/hillsborough/2020/03/19/hillsborough-sheriff-releases-164-county-jail-inmates-to-reduce-coronavirus-risk/
[33]    Michael Gordon, Ames Alexander, *Mecklenburg begins releasing jail inmates to avoid cellblock outbreak of COVID-19,* The Charlotte Observer (March 19, 2020)
https://www.charlotteobserver.com/news/coronavirus/article241279836.html.

Jail in Illinois,[34] Sacramento, California,[35] Alameda County, California,[36] New York City,[37]

Allegheny County, Pennsylvania,[38] Lexington County, South Carolina,[39] Jefferson County,

Colorado,[40] New Jersey,[41] Iowa,[42] North Dakota,[43] Rhode Island,[44] Colorado,[45] California,[46] and

Washington County, Oregon.[47]

---

[34]    David Struett, *Cook County Jail releases several detainees who are 'highly vulnerable' to coronavirus*, Chicago Sun Times (Mar 17, 2020) https://chicago.suntimes.com/coronavirus/2020/3/17/21183289/cook-county-jail-coronavirus-vulnerable-detainees-released-covid-19

[35]    Kristopher Hooks & Ja'Nel Johnson, *Some non-violent, low-level inmates being released from Sacramento jails amid coronavirus pandemic*, ABC10 (Mar. 18, 2020), https://www.abc10.com/article/news/health/coronavirus/sacramento-inmates-being-released-from-amid-coronavirus-pandemic/103-d10ab80d-81d6-41c1-bc47-e6643e1e0d7e

[36]    Da Lin, *Coronavirus Pandemic: Over 300 Alameda County Jail Inmates Approved For Early Release,* KPIX News (March 19, 2020) https://sanfrancisco.cbslocal.com/2020/03/19/coronavirus-pandemic-247-alameda-county-jail-inmates-approved-for-early-release/.

[37]    Julia Marsh, Ben Feuerherd, *NYC to begin releasing inmates amid coronavirus outbreak*, New York Post (March 18, 2020) https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/

[38]    Bob Mayo, *Release of up to 100 Allegheny County Jail inmates a day underway as coronavirus precaution*, WTAE News (March 19, 2020) https://www.wtae.com/article/release-of-up-to-100-allegheny-county-jail-inmates-a-day-under-way-as-coronavirus-precaution/31787878.

[39]    Meera Bhonslé, *Jail numbers affected by judicial coronavirus directives*, Cola Daily (March 19, 2020) https://www.coladaily.com/communities/lexington/jail-numbers-affected-by-judicial-coronavirus-directives/article_bb2df04e-6a22-11ea-a187-f3aec5c6ac7d.html.

[40]    Jenna Carroll, *Inmates being released early from JeffCo Detention Facility amid coronavirus concerns*, KDVR News (March 19, 2020) https://kdvr.com/news/coronavirus/inmates-being-released-early-from-jeffco-detention-facility-amid-coronavirus-concerns/.

[41]    S.P. Sullivan, *N.J. releasing some non-violent inmates from jail this week to fight coronavirus outbreaks behind bars*, NJ Advance Media (March 23, 2020) https://www.nj.com/coronavirus/2020/03/nj-will-start-releasing-some-non-violent-inmates-from-jail-this-week-in-effort-to-stop-outbreak-behind-bars.html.

[42]    Linh Ta, *Iowa's prisons will accelerate release of approved inmates to mitigate COVID-19*, Times-Republican (March 23. 2020) https://www.timesrepublican.com/news/todays-news/2020/03/iowas-prisons-will-accelerate-release-of-approved-inmates-to-mitigate-covid-19/

[43]    Arielle Zionts, *DOC, Noem not planning special coronavirus releases from prisons*, Rapid City Journal (March 21, 2020) https://rapidcityjournal.com/news/local/crime-and-courts/doc-noem-not-planning-special-coronavirus-releases-from-prisons/article_d999f510-7c7c-5d19-ab3a-77176002ef99.html

[44]    Katie Mulvaney, *R.I. prisons looking to reduce inmate numbers due to virus*, The Providence Journal (March 25, 2020) https://www.southcoasttoday.com/news/20200325/ri-prisons-looking-to-reduce-inmate-numbers-due-to-virus

[45]    John Herrick, *Colorado places a moratorium on new prison intakes during pandemic*, The Colorado Independent (March 26, 2020) https://www.coloradoindependent.com/2020/03/26/colorado-moratorium-prisons-inmates-covid-19-cspii/

[46]    Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, The Los Angeles Times (March 31, 2020) https://www.latimes.com/california/story/2020-03-31/coronavirus-california-release-3500-inmates-prisons

[47]    Noelle Crombie, *Oregon courts, jails respond to coronavirus: Washington County jail to release 60 inmates; court hearings see widespread delays*, The Oregonian (March 16, 2020), https://www.oregonlive.com/coronavirus/2020/03/oregon-courts-jails-respond-to-coronavirus-washington-county-jail-to-release-60-inmates-court-hearings-see-widespread-delays.html

42.    The United States Department of Justice has expedited transfer of Federal prisoners to home detention because "'emergency conditions' created by the coronavirus have affected the ability of the [Bureau of Prisons] to function."[48]

43.    Courts in other jurisdictions have ordered release to preempt harm to prisoners from COVID-19. *People ex rel. Stoughton on behalf of Little et al. v. Brann*, Index No. 260154/2020 (Sup. Ct., Bronx Cty. March 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any inmate in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction).  In addition, many courts have ordered release of people from immigration detention.[49]

///

///

///

///

---

[48]    Katie Benner, *Barr Expands Early Release of Inmates at Prisons Seeing More Coronavirus Cases*, The New York Times (April 3, 2020) https://www.nytimes.com/2020/04/03/us/politics/barr-coronavirus-prisons-release.html

[49]    On March 23, 2020, a panel of Ninth Circuit judges ordered a detained person released "[i]n light of the rapidly escalating public health crisis." *Xochihua-Jaimes v. Barr*, 18-71460, Doc. No. 53 (9th Cir. Mar. 23, 2020)(unpublished).  *See also Castillo v. Barr*, 20-cv-605 (C.D. Cal. Mar. 27, 2020) (ordering that petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *Jimenez v. Wolf*, Docket No. 507, 18-cv-225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *Coronel v. Decker*, 20-cv-2472 (S.D.N.Y. March 27, 2020) 2020 WL 1487274 (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); *Basank v. Decker*, 2020 WL 1481503 (granting release of ten petitioners who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19" from immigration detention and explaining "'public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions.").

**COVID-19 in Oregon**

44.      In Oregon, where testing was slow to begin and has not been readily available, 1,132

people have tested positive and 29 people have died.[50] Those numbers continue to grow daily. If

full social distancing is practiced, the number of cases is projected to peak in Oregon between

April 21st and May 5th.[51] Both nationwide and in Oregon, a large and disproportionate

percentage of the people who have tested positive for the virus have lived in congregate-living

facilities, which accounts for the disproportionately large number of deaths in Washington state.

Because of that greater risk to persons in congregate living settings, Governor Brown's office

has stated that the state's second-highest priority for testing, behind only those persons with

symptoms who work in critical infrastructure, is for anyone with symptoms in correctional

facilities, hospitals, and other high-risk congregate settings.[52]

45.      On March 8, 2020, Governor Kate Brown of Oregon declared an emergency under ORS

401.165 et seq. due to the public health threat posed by COVID-19.

46.      On March 10, 2020, based on recommendations from OHA, the Oregon Department of

Human Services imposed restrictions and protective measures to limit visitors to long term care

facilities to only essential personnel.

---

[50]      Shane Dixon Kavanaugh, *Coronavirus in Oregon: 3 more dead as known cases climb to 213, health officials say*, The Oregonian, (Mar. 25, 2020), available at https://www.oregonlive.com/coronavirus/2020/03/coronavirus-in-oregon-3-more-dead-as-known-cases-climb-to-209-health-officials-say.html (including chart on testing); Oregon Health Authority, *Situation in Oregon: COVID-19 Cases in Oregon*, (updated daily with numbers of tested, positive, and deaths), https://:govstatus.egov.comOR-OHA-COVID-19.

[51]      Institute for Health Metrics and Evaluation, University of Washington, *COVID-19 projections assuming full social distancing through May 2020*, (April 4) https://covid19.healthdata.org/projections. *See also* Oregon Health Authority | COVID-19 Updates https://govsite-assets.s3.amazonaws.com/8arHLJI7QrqywZlmFH1X_Oregon-COVID-19-Projections-2020-03-30.pdf.

[52]      Brad Schmidt, *Oregon prioritizes who can be tested for coronavirus -- with the tests it doesn't have*, The Oregonian (Mar. 19, 2020) https://www.oregonlive.com/coronavirus/2020/03/oregon-prioritizes-who-can-be-tested-for-coronavirus-with-the-tests-it-doesnt-have.html

47.     On March 11, 2020, WHO announced that COVID-19 is a global pandemic.

48.     On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency.

49.     On March 17, 2020, Governor Brown prohibited gatherings of 25 or more people, banned on-site consumption of food and drink at food establishments statewide, and extended school closures until April 28, 2020.

50.     On March 19, 2020, Governor Brown ordered the postponement of non-urgent health care procedures, in order to conserve personal protective equipment and hospital beds for the state's COVID-19 emergency response efforts.

51.     On March 23, 2020, Governor Brown issued an Executive Order titled "Stay Home, Save Lives." In it, Governor Brown ordered Oregonians to shelter-in-place and to take precautions to keep a distance of at least six feet between individuals.

52.     Stay Home, Save Lives mandated the closure of facilities that provide a transmission environment for COVID-19 similar to prisons. These include gyms, indoor and outdoor malls, theaters, yoga studios, and youth clubs.

**<u>COVID-19 Prevention</u>**

53.     The best way to prevent illness is to avoid exposure to the virus that is spread person to person who are in close contact with one another. The virus is transferred through respiratory droplets produced by breathing, speaking, coughing, or sneezing. To prevent those droplets from exposing a person to the virus, people should wash their hands regularly, clean and disinfect

frequently touched surfaces, and stay at least six feet from others. The virus can be spread by

people who are not showing symptoms of infection.[53]

54.    Without implemented appropriate measures, ODOC is not only putting Plaintiffs, its

employees, and its contractors at risk, it also risks the health and lives of the communities

surrounding ODOC's 14 prisons.[54]

**Plaintiffs Belong to a Class of Persons with a Higher Risk of Serious Infection.**

55.    COVID-19 is more likely to cause serious illness and death for older adults and those

with certain underlying medical conditions, including lung disease, heart disease, chronic liver or

kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension,

compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood

disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental

delay, and pregnancy. These underlying medical conditions increase the risk of serious COVID-

19 disease for people of any age. For elderly people or people with medical conditions that

increase the risk of serious COVID-19 infection, symptoms such as fever, coughing and

shortness of breath can be especially severe. Plaintiffs fall into these two categories of

heightened vulnerability.[55]

---

[53]        Centers for Disease Control and Prevention, *How to Protect Yourself & Others*,
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html
[54]        *See* Amicus Brief of Dr. Mary T. Bassett, et al., Committee for Public Counsel Services and Massachusetts
Association of Criminal Defense Lawyers v. Chief Justice of the Trial Court, No. SJ-2020- (Supreme Judicial Court
for the County of Suffolk, Mar. 24, 2020), available at
https://www.aclum.org/sites/default/files/field_documents/amici_letter_-_public_health_experts_-
_cpcs_macdl_v._chief_of_trial_court_1.pdf.
[55]        Medical information in this and the paragraphs that follow are drawn from the expert testimony of two
medical professionals filed in a recent filed federal case in Washington State, as well the website of the Harvard
Medical School. *See* Expert Declaration of Dr. Marc Stern, *Dawson, et. al. v. Asher, et. al.*, USDC of W.D. Wash
Case. No. 2:20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020), https://www.aclu.org/legal-document/dawson-v-
asher-expert-declaration-dr-marc-stern; Expert Declaration of Dr. Robert Greifinger, *Dawson, et. al. v. Asher, et. al.*,
USDC of W.D. Wash Case. No. 2:20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020)

56.    The COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs, including the heart and liver. Patients with serious cases of COVID-19 require advanced medical support, including negative pressure ventilation and extracorporeal mechanical oxygenation in intensive care. Patients not killed by serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.

57.    Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

58.    Most people in higher risk categories who develop serious disease will need advanced supportive care requiring highly specialized equipment that is in limited supply, such as ventilator assistance, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. That level of support can quickly exceed local health care resources.

---

https://www.aclu.org/legaldocument/dawson-v-asher-expert-declaration-dr-robert-greifinger ; Expert Declaration of Dr. Jonathan Golob, *Dawson, et. al. v. Asher, et. al.*, USDC of W.D. Wash Case. No. 2:20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020), https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-jonathan-golob?redirect=dawson-vasher-expert-declaration-dr-jonathan-golob; HARVARD MEDICAL SCHOOL, CORONAVIRUS RESOURCE CENTER, *As coronavirus spreads, many questions and some answers*, https://www.health.harvard.edu/diseases-andconditions/coronavirus-resource-center (last visited Mar. 19, 2020).

59.     Patients in high-risk categories should expect a prolonged recovery, including the need for extensive rehabilitation to accommodate profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.

60.     The need for care—including intensive care—and the likelihood of death is much higher from COVID-19 than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. According to preliminary data from China, a much greater percent of people in high-risk categories who contracted COVID-19 died.[56]

61.     The only known, effective measures to reduce the risk for vulnerable people of serious illness or death caused by COVID-19 are social distancing and improved hygiene, which have led to unprecedented public health measures around the world.[57]

///

///

///

---

[56]     World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019* (COVID-19), at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv, at 5, (Feb. 27, 2020), https://www.medrxiv.org/content/10.1101/2020.02.25.20027664v1.full.pdf (finding that even after adjusting for age and smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, the number for two comorbidities was 2.59); Fei Zhou et al., *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, Lancet (March 11, 2020), tb. 1, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext (finding that among hospital patients, who tended to be older, of those who had COVID-19 and died, 48% had hypertension, 31% had diabetes, and 24% had coronary heart disease).
[57]     Governor Kate Brown's Executive order No. 20-12 (Mar. 23, 2020), available at https://www.documentcloud.org/documents/6817687-Stay-Home-Save-Lives.html.

**ODOC and Oregon hospitals are not equipped to handle a COVID-19 prison outbreak.**

62.     On March 26, 2020, ODOC announced a $60 million shortfall.[58]  It planned to lay off 24 employees, institute a hiring freeze, reduce supplies and travel, and reduce training. ODOC claimed the shortfall was largely a result of the health issues of its aging and medically vulnerable prison population.[59]  Almost one quarter, or $14 million, of the shortfall is attributed to "expensive specialty and off-site medical treatments for complex health conditions."[60]  And over one third, or $21.6 million, is attributed to Hepatitis C care. Defendant Peters said, "The need for these staff cuts could not have come at a worse time."[61] ODOC does not keep sufficient electronic health records to help identify and track trends in medical care.[62] Additional medical costs required to test and treat COVID-19 will further balloon ODOC's shortfall.

63.     ODOC relies on outside facilities, such as hospitals and emergency departments, to provide intensive medical care not available in the prisons.  In general, "[d]uring an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity[.]"[63]  Oregon Health Authority has stated as much when it announced that Oregon hospitals have only 291 ICU beds and 765 ventilators.[64]  While COVID-19 preliminary trends in Oregon show the health system will not become overrun if Governor Brown's March 23, 2020 order is "strictly adhered

---

[58]     Noelle Crombie, *Layoffs, hiring freeze follow $60 million shortfall at Oregon Corrections Department*, The Oregonian (March 26, 2020) https://www.oregonlive.com/politics/2020/03/layoffs-hiring-freeze-follow-60-million-shortfall-at-oregon-corrections-department.html
[59]     *Id.*
[60]     *Id.*
[61]     *Id.*
[62]     *Id.*
[63]     *See supra* n. 19 at ¶ 3.
[64]     Oregon Health Authority, *Oregon COVID-19 SITUATIONAL STATUS  REPORT*, (March 31, 2020) https://govsite-assets.s3.amazonaws.com/ykvrsKEtQXOSWxqjLD8Y_Oregon-COVID-19-SitStat-03-30-2020-FINAL.pdf

to,"[65] those trends do not purport to know "the current extent of social distancing, testing

policies, and compliance with new interventions."[66]  "[W]ithout a sustained intervention to keep

the number of patients under control, capacity will likely be overwhelmed."[67]

**ODOC's Response to COVID-19**

64.     On or about March 13, 2020, ODOC announced that it was "coordinating with the

Oregon Health Authority[], and following the [CDC] recommendations to prevent the spread

[sic] COVID-19."[68]  ODOC suspended visiting and limited institution access to essential staff at

all 14 facilities.[69]

65.     On March 27, the CDC put out The Interim Guidance on Management of Coronavirus

Disease 2019 (COVID-19) in Correctional and Detention Facilities (CDC Guidelines).[70]

66.     The CDC Guidelines fall far below community standards of preventative medical care.

They fall short of the standards set by the Governor of Oregon (and the governors of neighboring

states) to reduce the transmission of COVID-19 among the general public.  They fall short of the

CDC guidelines to reduce transmission among the general public. This shortfall is particularly

acute due to heightened transmissibility of COVID-19 within prisons. And, finally, they fall

short of the recommendations of experts in prison healthcare and epidemiology.[71]

---

[65]     Cliff Kerr, Brittany Hagedorn, Dina Mistry, Daniel Klein, *Working paper: Projected COVID-19 epidemic trends and health system needs for Oregon*, at pg. 5, Institute for Disease Modeling (March 23, 2020) https://govsite-assets.s3.amazonaws.com/VooxlwVoTey3aArqqFkG_Oregon-COVID-19-Projections-2020-03-23.pdf

[66]     *Id.* at 1.

[67]     *Id.* at 5.

[68]     Oregon Department of Corrections, https://www.oregon.gov/doc/covid19/Pages/default.aspx (last visited 4/1/2020).

[69]     Oregon Department of Corrections, https://www.oregon.gov/doc/covid19/Pages/default.aspx (last visited 4/1/2020).

[70]     Though issued on March 27, these interim guidelines were based on what was known about the transmission and severity of COVID-19 as of March 23, 2020, two weeks before the filing of this Complaint.  The CDC noted at the beginning of the document that its recommendations might need to be revised as more information becomes available.

[71]     *See supra* n. 19, 56, 57.

67.     Some experts even dispute the adequacy of a 6-foot social distancing range, believing it to be "not safe."[72]

68.     Based on Plaintiffs' observations, Defendants have failed to substantially follow even the minimal standards of the CDC Guidelines:

    a.   "If an individual has symptoms of COVID-19 (fever, cough, shortness of breath): require the individual to wear a face mask, ensure that staff who have direct contact with the symptomatic individual wear recommended PPE, place the individual under medical isolation and refer to healthcare staff for further evaluation, …"

       i.   Plaintiff Hart has had COVID-19 symptoms but was not required to wear a face mask, nor was he put into medical isolation.

    b.   "If an individual was in close contact of a known COVID-19 case (but has no COVID-19 symptoms), quarantine the individual and monitor for symptoms two times per day for 14 days."

       i.   Inmates in A Block at OSP were not placed in quarantine for 14 days, despite being in contact with a Correctional Officer with positive symptoms.  *See* para 67.

      ii.   Inmates at CRCI have observed inmates being transferred from A Block at OSP not being placed in quarantine, but they were instead put into general population, on or about April 1, 2020.

---

[72]     Aimee Green, *6 feet of social distancing not nearly enough: CDC's recommendation driving some experts 'nuts,'* The Oregonian (April 5, 2020) https://www.oregonlive.com/coronavirus/2020/04/6-feet-of-social-distancing-not-nearly-enough-cdcs-recommendation-driving-some-experts-nuts.html

c.  The CDC Guidelines note that social distancing is a cornerstone of reducing transmission of COVID-19 and recommend that all prisons "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons."

   i.  All Plaintiffs report that they have no reasonable opportunity to increase physical space between each other. This does not happen in their dormitories, in their chow hall, in the lines to and from the recreation yard, or to the canteen.

d.  "Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility."

   i.  OCE workers are still going to and from each facility to work.

e.  "If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending…"

   i.  Inmates at OSP report that changes in Management strategies only occurred after reports of a positive test came to light, even though the officer who tested positive had not been to work for nearly two weeks. Prior to this, few changes were made to the operation of their cell blocks. Inmates at OSCI have not seen any meaningful changes to management, despite the threat of exposure. *See* para 67.

f.  "If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population."

    i.   Inmates at CRCI report that new transfers are not being quarantined, even though they are coming from facilities with documented COVID-19 infections.

    ii.   The buses transported inmates from OSP's A Block also stopped at other facilities on its way to CRCI.

g.   "As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals…"

    i.   Despite having symptoms consistent with COVID-19, Plaintiff Hart was not provided a face mask and was not placed under medical isolation. He was instead returned to his cell.

    ii.   Plaintiffs have observed inmates with coughs or flu-like symptoms not being provided face masks.

h.   "Hard (non-porous) surface cleaning and disinfection. If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection. For disinfection, most common EPA-registered household disinfectants should be effective."

    i.   Plaintiff Maney is required to use Waxie Solsta 710 as a disinfectant, and it is used through the institution. Waxie Solsta 710 is not an EPA-registered disinfectant effective against the virus that causes COVID-19.[73]

---

[73]    Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, (April 1, 2020)  https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited April 2, 2020).

      i.  "Incarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days."

          i.  Despite having come into contact with COVID-positive persons, persons in A Block at OSP were not placed into quarantine for 14 days.

**COVID-19 at OSP and SCI, and the Public Response**

69.    On April 1, 2020, ODOC revealed that an employee of Oregon State Penitentiary (OSP) tested positive for COVID-19.[74]

70.    It stated that ten prisoners tested negative, and three tests are pending. ODOC is not able to say whether other employees have tested positive for COVID-19. ODOC would not provide any information about the employee, including their position at OSP. ODOC notified people who had been in close contact with the employee.  ODOC's chief medical officer said that ODOC prisons have opened respiratory triage clinics and are increasing testing. Dr. Christopher DiGiulio, chief of medicine for the Department of Corrections, said, "[m]edical staff have identified the system's most medically vulnerable inmates and placed them in single cells 'if at all possible[.]' Those prisoners total 817.  A newly formed 'hygiene committee' is also reaching out to 'each and every unit' to provide basic information on how people can protect themselves from the disease."  ODOC stated that if someone has flu or COVID-10 symptoms, 'they will be tested as healthcare providers direct.' Dr. DiGiulio also stated that if someone develops COVID-19, they will be isolated and those awaiting results are held in 'respiratory isolation conditions.'[75]

---

[74]    Noelle Crombie, *Prison employee is first confirmed coronavirus case in Oregon Department of Corrections*, The Oregonian (April 1, 2020) https://www.oregonlive.com/coronavirus/2020/04/prison-employee-is-first-confirmed-case-of-covid-19-in-oregon-department-of-corrections.html.
[75]    *Id.*

71.     On April 2, 2020, ODOC confirmed that an ODOC prisoner housed at Santiam

Correctional Institution (SCI) contracted COVID-19.[76]

72.     On April 6, 2020, ODOC's website lists three additional confirmed cases—one officer

and two SCI prisoners.[77]

73.     While ODOC has implemented some policies in response to the pandemic, they are

woefully inadequate and do not even comport with the CDC's relaxed recommendations for

correctional facilities compared to the CDC recommendations for people in the general public.

74.     In an interview with the Portland Mercury, a spokesperson for ODOC admitted that its

"institutions were not designed with a pandemic in mind. We weren't designed to keep people six

feet away from each other. We can't just place people in extra classrooms or corridors to create

distance, we're a correctional facility […]"[78]

75.     Stacy Chamberlain, executive director of the American Federation of State, County and

Municipal Employees in Oregon, which represents some ODOC employees, stated on April 1,

2020 that she is "particularly concerned that the prison system lacks personal protective

equipment, calling it 'one of the big issues we have been yelling about for weeks and the lack of

it and the supply of it is a concern in prisons.'"[79]

---

[76]     Jayati Ramakrishnan, *First inmate in the Oregon prison system tests positive for coronavirus*, The Oregonian (April 3, 2020) https://www.oregonlive.com/coronavirus/2020/04/first-inmate-in-the-oregon-prison-system-tests-positive-for-coronavirus.html
[77]     COVID-19 Status at Oregon Department of Corrections Facilities, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited Apr. 6, 2020).
[78]     Alex Zielinski, *Q&A: Department of Corrections' Chief Medical Officer on Treating COVID-19 in Oregon Prisons*, Portland Mercury (April 1, 2020). https://www.portlandmercury.com/blogtown/2020/04/01/28231039/qanda-department-of-corrections-chief-medical-officer-on-treating-covid-19-in-oregon-prisons
[79]     *See supra* n. 74.

76.    While ODOC has stated that they have implemented changes to prevent COVID-19

spread, the experience of people living in these facilities tells a different story. With every stride

toward compliance, ODOC undermines itself by not being able to implement social distancing

and other basic preventative measures. COVID-19 will exploit these breaches, as it has already.

77.    Prisoners at CRCI have reported that they cannot proceed on administratively grieving

ODOC's shortcomings:

> "I just got a notice back that the DOC would not accept any
> grievances that are related to social distancing or following the
> governor's orders. I don't understand: How are we going to have
> our voices heard if we can't use the one system we're given to raise
> concerns?"[80]

78.    Fearing retaliation, many other ODOC prisoners are afraid to complain about the

conditions in their facilities. Each of the named Plaintiffs recall times when they personally have

experienced or witnessed retaliation in the form of transfers to facilities far away from their

family members or other relations, loss of privileges, discipline, solitary confinement,

curtailment of speech rights, and even physical retribution.

79.    To date, ODOC has been unable to provide masks to its prisoners.  ODOC plans to

distribute masks, produced by EOCI prisoners, to its incarcerated population. These masks will

not be of medical quality, and the virus will be able to penetrate the masks when the wearer

inhales.

**Oregon State Correctional Institution's Failure to Act**

80.    On information and belief, Defendants have failed to take appropriate and prompt steps to

adequately prevent, test, and treat COVID-19 in OSCI.

---

[80]    Alex Zielinski, *Q&A: Two Oregon Prison Inmates on Facing COVID-19 Behind Bars*, Portland Mecury
(April 3, 2020)  https://www.portlandmercury.com/blogtown/2020/04/03/28240231/qanda-two-oregon-prison-
inmates-on-facing-covid-19-behind-bars

81.     In particular, with respect to preventative and management measures, Defendants have

failed to provide:

      a.   adequate space to socially distance from other inmates and staff;

      b.   laundry services frequent and consistent enough to sanitize cells;

      c.   adequate cleaning materials to clean and sanitize cells;

      d.   adequately clean and sanitized public areas, including CDC recognized
          disinfectant;

      e.   medical checks within an hour of demonstrating symptoms of COVID-19;

      f.   quarantined rooms with negative air pressure (air being sucked out of room as to
          prevent spread outside of the room); and/or

      g.   masks to wear when demonstrating symptoms of COVID-19.

82.     On information and belief, Defendants continue to feed inmates and provide recreational

activities, clothing exchange, showering, and line movements in groups and within spaces that

require less than six feet of interaction with other inmates and staff.

83.     On information and belief, Defendants have failed to require the screening of correctional

staff and other individuals entering the institutions for COVID-19 symptoms.

84.     Unit 13 is designated as a medical unit, where individuals reside with severe medical

conditions that increase their risk of severe disease from COVID-19. It houses approximately 60

prisoners at any given time. Prisoners sleep in a dormitory with beds spaced approximately 30

inches apart. They rarely spend time as much as six feet from each other. The shower, toilets,

and sinks are provided in a communal area.

85.     Plaintiff Maney is 62 years old and is housed in Unit 13. For nearly three decades, has

been assigned to the hazard cleanup work crew at OSCI. His job requires him to clean up vomit,

blood, and other bodily fluids. Mr. Maney has received no training or protective gear (other than

gloves) for the clean-up fluids from COVID-19 patients. The disinfectant Mr. Maney is required to use and is used through the institution, Waxie Solsta 710, is not an EPA-registered disinfectant effective against the virus that causes COVID-19.[81] OSCI has failed to provide Mr. Maney any information about the risks of COVID-19 specific to his age group or prevent his exposure to COVID-19.

86.      Plaintiff Nulph is 68 years old and is housed in Unit 13. He has a compromised immune system and cannot live in the general population due to his medical condition. Until March 30, 2020, OSCI had taken minimal steps to protect him or other inmates within Unit 13 from exposure to COVID-19. Prisoners and staff freely entered and exited Unit 13. Mr. Nulph was required to eat his meals in general population. OSCI has failed to provide Mr. Nulph any information about the risks of COVID-19 specific to his age or medical condition or prevent his exposure to COVID-19.

87.      Until on or about April 1, 2020, Plaintiff Gary Clift was housed in Unit 13 at OSCI due to his serious medical condition. Since March 8, 2020, he has observed a number of sick individuals within Unit 13 showing COVID-19 symptoms. As an example, he has personally witnessed a prisoner who said he could not breathe and did not have the strength to dress himself. Mr. Clift has not observed any prisoners showing COVID-19 symptoms within Unit 13 wearing facemasks or other protective gear. In Mr. Clift's opinion, under the current conditions of Unit 13, including the lack of space between beds, he fears he would likely contract COVID-19 and die. OSCI has failed to provide Mr. Clift any information about the risks of COVID-19 specific to his medical condition or prevent his exposure to COVID-19.

---

[81]      Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, (April 1, 2020)  https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited April 2, 2020).

88.     On or about April 1, 2020, OSCI transferred all OCE workers at its facility into Unit 11. Mr. Clift was moved from Unit 13 to a dorm in Unit 11. The dorm houses approximately 45 general population inmates, closely spaced in double bunks, with a single toilet and sink for all to use. The dorm was not designed to be used for housing people and, as a result, lacks proper ventilation. Mr. Clift believes that his risk of possible exposure to COVID-19 is greater now that he is living in Unit 11.

89.     Plaintiff Gary Clift is housed in Unit 13 due to his serious medical condition. Since March 8, 2020, he has observed a number of sick individuals within Unit 13 showing COVID-19 symptoms. As an example, he has personally witnessed a prisoner who said he could not breathe and did not have the strength to dress himself. Mr. Clift has not observed any prisoners showing COVID-19 symptoms within Unit 13 wearing facemasks or other protective gear. In Mr. Clift's opinion, under the current conditions of Unit 13, including the lack of space between beds, he fears he would likely contract COVID-19 and die. OSCI has failed to provide Mr. Clift any information about the risks of COVID-19 specific to his medical condition or prevent his exposure to COVID-19.

**Oregon State Penitentiary's Failure to Act**

90.     On information and belief, Defendants have failed to take appropriate and prompt steps to adequately prevent, test, and treat COVID-19 in OSP.

91.     With respect to preventative and management measures, Defendants have failed to provide:

        a.   adequate space to socially distance from other inmates and staff;

        b.   laundry services frequent and consistent enough to sanitize cells;

        c.   adequate cleaning materials to clean and sanitize cells;

    d.   adequately clean and sanitized public areas, including CDC recognized disinfectant;

    e.   medical checks within an hour of demonstrating symptoms of COVID-19;

    f.   quarantined rooms with negative air pressure (air being sucked out of room as to prevent spread outside of the room); and/or

    g.   masks to wear when demonstrating symptoms of COVID-19.

92.    On information and belief, Defendants continue to feed prisoners and provide recreational activities, clothing exchange, showering, and line movements in groups and within spaces that require less than six feet of interaction with other inmates and staff.

93.    On information and belief, Defendants have failed to require the screening of correctional staff and other individuals entering the institutions for COVID-19 symptoms.

94.    On or about March 13, 2020, an OSP employee ceased working after showing signs of COVID-19. On April 1, 2020, OSP announced on its website that it had confirmed that the employee had COVID-19. On information and belief, because the employee worked within the A Block of OSP, Defendants ordered that all inmates on A Block be locked down until further notice.  On information and belief, A Block was locked down until April 3, 2020.

95.    On information and belief, Defendants announced to the general prison population that COVID-19 was within OSP.

96.    Between March 13, 2020, and April 1, 2020, Defendants failed to take reasonable steps to protect the prison population from COVID-19 infection, despite knowing that an employee had taken leave after showing signs of COVID-19.

97.    On information and belief, on April 1, 2020, a number of inmates from A Block who came into contact with the infected officer were transferred from OSP to CRCI. In contradiction

to CDC Guidelines, those inmates were not quarantined. On information and belief, the transport for those inmates from A Block picked up inmates from other institutions before arriving at CRCI, potentially exposing inmates and officers from those institutions to the virus.

98.     Plaintiff David Hart lives within A Block. He suffers from a serious respiratory condition. On or about March 21, 2020, Mr. Hart became very ill, experiencing a high fever, dry cough, lethargy, and coughing up blood and other fluid.

99.     On or about March 23, 2020, Mr. Hart was tested positive for Influenza. OSP medical staff told him to remain on bed rest. OSP medical declined Mr. Hart's request to be tested for COVID-19.

100.    On or about March 24, 2020, Mr. Hart was seen by OSP Dr. Mills, who ordered medicine and bed rest. Again, Mr. Hart asked for a COVID-19 test. Dr. Mills informed him that he did not meet the requirements for testing.

101.    On or about March 26, 2020, Mr. Hart continued to experience a lack of breath, headache and coughing due to his illness. On that date, Dr. Mills informed Mr. Hart that he should remain quarantined until March 28, 2020, one week after he began feeling ill, after which he should not be contagious. Despite being ordered quarantined, Mr. Hart was still required to get his meals with general population. In addition, his cellmate remained housed with him and was required to continue working.

102.    On or about April 1, 2020, Mr. Hart requested a mask. OSP medical staff denied his request. Although Mr. Hart is now feeling better, his lungs continue to hurt.

103.    Plaintiff Hall resides in the E Block of OSP. He suffers from a serious respiratory condition that causes him a tightness of breath and other difficulty breathing. Due to his medical condition, he is at a greater risk of serious illness or death as a result of COVID-19 infection.

**CRCI's Failure to Act**

104.    On information and belief, Defendants have failed to take appropriate and prompt steps to adequately prevent, test, and treat COVID-19 in CRCI.

105.    At CRCI, a living unit of approximately 80 prisoners share three toilets, two urinals, four showers, and five sinks, with a single shared soap dispenser. Upon information and belief, some of the toilets at CRCI do not flush, and some spray water and waste out of the bowl when flushed.

106.    On information and belief, each unit's bathroom at CRCI is cleaned four times daily by orderlies who earn $25 per month. These orderlies are not approved or trained to work with hazardous materials. Upon information and belief, orderlies use the same rags and sponges to clean all of the sinks within a unit.

107.    Upon information and belief, prisoners in a single living unit at CRCI are given a daily ration of cleaning material for their bunks and common area. If the allotment of cleaning material runs out, then there is no more available for at least that day.

108.    Upon information and belief, the yard at CRCI is still open, with up to 158 prisoners at a time sharing the space and using common recreational equipment.

109.    At CRCI, beds in a dormitory unit are spaced approximately thirty inches apart. A person in bed, lying on his back, can reach out and touch his neighbor to either side.

110.    Upon information and belief, at CRCI and other institutions, prisoners breathe air that is recycled between cells and between tiers.

111.    Upon information and belief, prisoners who work canteen are still put into daily contact with prisoners from several different units during their shifts.

///

**CCCF's Failure to Act**

112.    On information and belief, Defendants have failed to take appropriate and prompt steps to adequately prevent, test, and treat COVID-19 in CCCF.

113.    At CCCF, at least 40 prisoners who are at high risk of severe illness or death from COVID-19 share a dorm with 78 others.  Plaintiff Sublet lives in that dorm with 117 other women, where the beds are three feet apart.  The facility continues to place new intakes in that dorm unit.

114.    Plaintiff Sublet and other persons with greater vulnerability continue to eat meals shoulder-to-shoulder with others in the dining hall.

115.    In the medical line, people stand within roughly one arm's length from one another.

116.    Upon information and belief, few if any substantive steps have been taken by CCCF to protect those vulnerable persons housed in the dorm.

**TRCI's Failure to Act**

117.    On information and belief, Defendants have failed to take appropriate and prompt steps to adequately prevent, test, and treat COVID-19 in TRCI.

118.    At Two Rivers Correctional Institution, a prisoner recently delivered canteen orders to prisoners in a unit that was on lockdown due to health concerns, entering and leaving that unit without PPE.

119.    Upon information and belief, the laundry service at TRCI recently received its first load of hospital linens marked "COVID-19." The material arrived in bags meant to be water soluble, so the entire bag can be thrown into a washer without any workers having to unpack and touch its contents. However, the bags have not been dissolving in the wash, so

workers must open the bags by hand, exposing themselves to the potentially contaminated material.

120.    Upon information and belief, no one at TRCI cleans the washing machine between washing material labelled "COVID-19" and washing prisoners' clothes.

**<u>Oregon Correctional Enterprises has not taken adequate measures to prevent the spread of COVID-19.</u>**

121.    Upon information and belief, OCE still draws workers from ODOC facilities.

122.    These workers have not been trained how to avoid the spread of COVID-19 while on the job and are not given opportunities to remain outside of close contact from one another.

123.    Workers from different living units are required to share the workplace. After working in close contact with another, OCE workers are then returned to their living units.

124.    Plaintiff Hart lives with an OCE worker in his cell. Despite Mr. Hart's respiratory condition, his cell mate is still permitted to return to his OCE jobsite.

125.    Upon information and belief, other similarly situated persons as to Plaintiff Hart come into contact OCE workers regularly.

126.    Plaintiff Sublet works at two jobs for OCE, sorting clothes hangers for a department store, and filling commissary orders for inmates at several prisons. To be transported to work at the first job, she boarded a small van with 11 other OCE workers from different units within CCCF to be transported within the facility. In the van, Sublet could not distance herself from fellow workers. She was recently laid off from this job due to a lack of hangers to sort.

127.    Her job filling commissary orders continues. This job occurs at an off-site facility in Salem. Last week she was required to board a bus with 58 other prisoners from multiple housing

units to get to work. Staff informed her that this week ODOC will transport half that number of

inmates at a time on the bus.

128.     At the work site, social distancing is impossible. Workers from multiple housing units

move throughout the commissary shelves gathering items to fill orders and loading them into

boxes. Latex gloves quickly fall apart while handling the boxes. The break room is small and

crowded.

**Reducing the number of prisoners in custody is urgent.**

129.     Courts, public health experts, and corrections professionals agree that significantly

downsizing prison populations is the most important tool to combat the spread of COVID-19

among residents, staff, and the greater community.

130.      Dr. Marc Stern, the former Assistant Secretary of Health Care for the Washington State

Department of Corrections puts it plainly: "Downsizing jail populations serves two critical public

health aims: (1) targeting residents who are at elevated risk of suffering from severe symptoms

of COVID-19 and (2) allowing those who remain incarcerated to better maintain social

distancing and avoid other risks associated with forced communal living."[82]

131.     After reviewing the specific conditions in numerous jails and prisons Dr. Stern was

"firmly convinced that downsizing the inmate population as much as possible will reduce the risk

of contraction and transmission of COVID-19 — and the attendant risks of serious harm and

death."[83] In Dr. Stern's expert opinion, downsizing the population of the jail will "help to 'flatten

the curve' overall—both within the jail setting and without."[84] That is because, given the churn

---

[82]     *See supra* n. 55 at ¶ 13.
[83]     *Id.* at ¶ 11.
[84]     *Id.* at ¶ 14.

of people — residents, staff, visitors — through Defendants' facilities, the outbreak of COVID-19 in the jail will be impossible to confine to the DOC facilities.

132.    Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine and former Infectious Disease physician for York Correctional Institution in Connecticut, also reviewed the spread of COVID-19 in many facilities came to the same conclusion: "Reducing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large."[85] Dr. Meyer emphasized the risks that prisoners like the plaintiffs and proposed class members would contract COVID-19, and the risk that they would suffer serious illness and death from the infection.[86] Because of the "significantly higher risk" to prisoners, Dr. Meyer writes that, "from a public health perspective," she is "strongly of the opinion that individuals who are already in those facilities should be evaluated for release."[87]

133.    The New England Journal of Medicine published, "Flattening the Curve for Incarcerated Populations—Covid-19 in Jails and Prisons," which advocates for "releasing as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm[.]"[88] Decarceration "will help to flatten the curve of Covid-19 cases among incarcerated populations and limit the impact of transmission both inside correctional facilities and in the community after incarcerated people are released. Such measures will also reduce the burden on the correctional system in terms of stabilizing and transferring critically ill patients, as well as the burden on the community health care system to which

---

[85]    *See supra* n. 19 at ¶ 34.
[86]    *Id*. at ¶ 33.
[87]    *Id*. at ¶ 35.
[88]    *See supra* n. 18.

such patients will be sent."[89]  "To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world."

134.    Defendants can comply through a number of mechanisms to ensure that unduly dangerous prisoners remain in custody.  These include establishing selection criteria based on criminal history, disciplinary history, and current physical capacity.  Procedures include early release to supervision of the Board of Parole and Post-Prison Supervision, advancing release dates of prisoners with severe medical conditions or who are elderly and permanently incapacitated pursuant to ORS 144.126, compassionate release, clemency, temporary furlough, and temporary release to house arrest.

135.    To vindicate Plaintiffs' and proposed class members' rights under the Eighth Amendment, this Court may find it necessary, if other relief is insufficient to avert outbreaks and provide appropriate and effective prevention and medical care, to request the convening of a three-judge court to determine whether a prisoner release order should be entered. In so doing, the Court would join the legion of other jurisdictions that have recognized what public health experts and correctional professionals have explained is the soundest way to avoid a constitutional and community crisis: to rapidly and thoroughly downsize the populations at correctional institutions.

---

[89]    *Id.* at 3.

136.    Across the world, country, and Oregon, extraordinary and unprecedented measures affecting every aspect of life are being taken in the name of protecting people from this pandemic. Because of the particular threats to Plaintiffs' health as members of the groups of people most at risk for severe COVID-19 illness and death, Plaintiffs should be provided the adequate care recommended by health experts, including their release, if safe.  ODOC and the individual Defendants cannot leave people in prisons to suffer and die.

## CAUSES OF ACTION

### Claim 1
### Unlawful Violation of Eighth Amendment
### (42 U.S.C. § 1983)

137.    Plaintiffs Class Members being held post-trial hereby reallege and incorporates paragraphs 1-136.

138.    The U.S. Constitution's Eighth Amendment, as incorporated against States via the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and unusual punishment by State actors. Here, the State actors required to provide adequate healthcare to the medically vulnerable Plaintiffs have been deliberately indifferent to the serious risk COVID-19 poses to them.

139.    ODOC facilities have neither the capacity nor ability to employ adequate COVID-19 prevention, testing, or care and cannot provide for the safety of the Plaintiff Class.

140.    Defendants' actions and inactions result in the confinement of the Plaintiff Class in their facilities where Defendants do not have the capacity to treat, test, or prevent COVID-19 outbreaks, which is a violation of Plaintiffs' constitutional rights to treatment and adequate medical care.

141.    By operating the ODOC facilities without the capacity to treat, test, or prevent a COVID-

19 outbreak, Defendants, as direct participants, and the ultimate policy makers for the ODOC

facilities, have violated the rights of Plaintiff Class members under the Eighth Amendment to the

United States Constitution.

**Claim 2**

**Unlawful Violations of Art. 1 §§ 13, 15, and 16 of the Oregon Constitution**

142.    Plaintiffs reallege and incorporate paragraphs 1-141.

143.    The Oregon Constitution protects the rights of the incarcerated through three sections of

Article 1 of the document:

> **a. "Section 13. Treatment of arrested or confined persons.** No person arrested, or
> confined in jail, shall be treated with unnecessary rigor."

> **b. "Section 15. Foundation principles of criminal law.** Laws for the punishment of
> crime shall be founded on these principles: protection of society, personal responsibility,
> accountability for one's actions and reformation."

> **c. "Section 16. Excessive bail and fines; cruel and unusual punishments; power of
> jury in criminal case…** Cruel and unusual punishments shall not be inflicted, but all
> penalties shall be proportioned to the offense."

144.    ODOC's denial of access to adequate preventative measures for COVID-19, testing and

diagnostics for COVID-19, and/or treatment for symptoms of COVID-19 is disproportionate to

the offense (Or Const Art. 1 § 16), creates unnecessary rigor (*Id.* at § 13), and the punishment is

not tied to the "protection of society, personal responsibility, accountability for one's actions and

*reformation*" of him (*Id.* at § 15) (emphasis added). Because of this, Plaintiffs' confinement is

unlawful under the Oregon Constitution.

**Injunctive Relief**

145.    Defendants' actions and/or inactions have injured Plaintiffs' rights as outlined above.

146.    Plaintiffs are entitled to injunctive relief requiring that Defendants provide adequate

COVID-19 prevention, testing, and care, including:

    a.    mandate adequate spacing of at least six feet or more between inmates in ODOC

        facilities so that social distancing can be accomplished to prevent the spread of

        the virus;

    b.    if other remedies prove inadequate after the Defendants have had a reasonable

        time to comply, a three judge panel should reduce the number of prisoners so that

        adequate social distancing, quarantining of suspected cases, medical isolation of

        confirmed cases, and safe housing for class members can be accomplished;

    c.    institute a safety plan to prevent additional COVID-19 outbreaks;

    d.    allow readily available and reasonable access to disinfecting solutions for the

        purpose of cleaning and disinfecting frequently touched objects, cells, common

        areas, dormitories, laundry, and eating areas;

    e.    provide COVID-19 testing for Plaintiffs;

    f.    provide COVID-19 testing for all persons in ODOC who have coronavirus-like

        symptoms and for all of those who have had close contact with those persons in

        the recent past;

    g.    waive all medical co-pays for those experiencing coronavirus-like symptoms;

    h.    waive all charges for medical grievances during this health crisis;

    i.    enjoin Defendants and their agents from retaliating against adults-in-custody for

        reporting symptoms, or seeking redress either administratively or from the Court;

    j.    provide single-cell quarantine of persons who have come into contact

        with persons known to have coronavirus, isolation with proper medical checks for

those who are experiencing coronavirus-like symptoms, and safe

housing for Class Members as appropriate and without incorporating disciplinary

characteristics to those preventive housing moves; and

k.       any other remedy the Court sees just and fit to address the constitutional

violations outlined above.

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.       For injunctive relief;

B.       For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

C.       Such other relief as the court deems just and proper.

DATE:  April 6, 2020.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Attorney for Plaintiff