IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL MANEY; GARY CLIFT; GEORGE
NULPH; THERON HALL; DAVID HART;
MICAH RHODES; and SHERYL LYNN
SUBLET, individually, on behalf of a class of
others similarly situated,

                 Plaintiffs,

       v.

KATE BROWN; COLETTE PETERS;
HEIDI STEWARD; MIKE GOWER; MARK
NOOTH; ROB PERSSON; and KEN JESKE,

                 Defendants.

Case No. 6:20-cv-00570-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

       Plaintiffs Paul Maney, Gary Clift, Gary Nulph, Theron Hall, David Hart, Micah Rhodes,

and Sheryl Lynn Sublet (collectively, "Plaintiffs"), adults in custody ("AIC") at four Oregon

Department of Corrections ("ODOC") institutions, bring this civil rights action pursuant to 42

U.S.C. § 1983 against defendants Kate Brown, Colette Peters, Heidi Steward, Mike Gower,

Mark Nooth, Rob Persson, and Ken Jeske (collectively, "Defendants").

///

Before the Court is Plaintiffs' motion for a temporary restraining order and preliminary injunction. (ECF No. 14.) All parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636, and the Court held an all-day evidentiary hearing on Plaintiffs' motion on May 29, 2020. For the reasons discussed herein, the Court denies Plaintiffs' motion.

## INTRODUCTION

"If I look at the mass, I will never act. If I look at the one, I will."[1] Mr. Steven S. ("Steven") testified by phone at the hearing on Plaintiffs' motion. He is a 52-year-old man suffering from heart disease that has resulted in a pacemaker and implanted defibrillator and 30 trips to the hospital since 2016. He is immunosuppressed and currently housed in a dorm-style facility with 80 other medically vulnerable individuals where he sleeps three feet away from others. Steven is scheduled to be released from state custody in 14 days.

Every expert who provided testimony in support of, or in opposition to, Plaintiffs' motion agrees on one thing: the only meaningful way to save lives in prison during the pandemic we are facing is to reduce the prison population. Without a reduction in the number of human beings in Oregon's prisons, it is impossible for those in custody safely to socially distance at all times:

- "[C]ompliance with [CDC and local public health agency] recommendations alone is not enough to create a carceral setting that fully protects the health and safety of the people incarcerated there. . . . For this reason, it is also important to reduce the number of persons incarcerated." (Decl. of Mark F. Stern ("Stern Decl.") ¶¶ 20, 22, ECF No. 16.)

- "[A] prison at or near full capacity simply cannot medically segregate populations to control the spread of infection." (Decl. of Jeffrey A. Schwartz ("Schwartz Decl.") at 7, ECF No. 17.)

---

[1] Samantha Power, *The Education of an Idealist* (2019) (quoting Mother Teresa).

- "It is not possible to maintain six feet of social distancing between all persons present in a facility at all times with the current physical layout of the institutions and the AIC population." (Decl. of Heidi Steward ("Steward Decl.") ¶ 51, ECF No. 83.)

- "The idea of releasing AICs in order to establish and maintain social distancing also has a sound evidentiary basis, and is likely to result in harm reduction: i.e., decrease of COVID-19 spread within an institution, resulting in a lesser likelihood of a vulnerable AIC being infected and experiencing severe morbidity and death." (Decl. of Daniel Dewsnup ("Dewsnup Decl.") ¶ 56, ECF No. 84.)

- "There is no denying that a reduction in prison population would provide more options for isolation and quarantine and increase our ability to implement social distancing measures. . . . [but] [t]he policy decision to conduct such a mass release of AICs . . . is well outside the discretion of ODOC." (Decl. of Gary Russell ("Russell Decl.") ¶¶ 106-07, ECF No. 85.)

- "[Amici public health experts] respectfully submit this brief to offer their view that facilities like those run by ODOC should work with state and local health officials to release from incarceration individuals to whom COVID-19 poses a high risk of serious infection and to ensure that jails and prisons across the state take immediate steps to better protect those individuals who do remain in custody during the pandemic." (Br. of *Amici Curiae* Public Health Experts, at 3, ECF No. 74.)

The experts agree that smart, swift, and evidence-based decarceration is the most effective way to save the lives of our family members, friends, and neighbors in prison, but that is a solution this Court cannot provide. The law is clear that this Court cannot order the release of categories of individuals, or even a single individual, nor may it order transfers to underutilized or unused facilities to spread out the numbers, in response to Plaintiffs' claims.

When asked in early April 2020 to develop a range of release options to improve social distancing in our prisons, ODOC provided several population management scenarios, including identifying 73 "most vulnerable" individuals, 269 "vulnerable" individuals, and 324 individuals age 60 or older, all of whom are serving sentences for non-measure 11 offenses. (Steward Decl. Ex. 11 at 4-6.) ODOC also identified 2,584 individuals who are scheduled for release within six

months,[2] the majority of whom are serving sentences for "non-person" crimes. (Steward Decl. Ex. 11 at 7.) However, as of June 1, none of these individuals have been released early.

Looking at one individual at a time, like Steven, makes it clear that there are medically vulnerable individuals in custody who could go home a few weeks or a few months early without risking public safety. At this juncture, neither ODOC's policies nor this Court's pen can reduce the prison population to save lives. Only the Governor has that power.[3]

With that context in mind, the question currently before this Court is not whether ODOC has responded perfectly to the COVID-19 pandemic, nor even whether it could do more to keep AICs safe. The question before the Court is whether ODOC has acted with *deliberate indifference* toward the health risks that COVID-19 poses to those currently in custody. As the Court learned, quite the contrary is true.

ODOC was focused on the COVID-19 threat even before the virus reached the United States. ODOC put its leading experts in charge of its efforts, and those individuals have been working around the clock to develop, and continuously improve, procedures to fight the spread of COVID-19 in our state prisons. ODOC has enforced various social distancing measures, purchased 60,000 cloth masks for staff and AICs, widely distributed educational information to AICs, prohibited visitors and contractors, guaranteed a supply of soap at no cost to AICs, established respiratory clinics in every institution, conducted widespread symptom interviews,

---

[2] Another AIC who testified at the hearing from the Oregon State Penitentiary ("OSP") is currently suffering from COVID-19 and struggled to testify due to shortness of breath. His parole date is in August 2020.

[3] "It has long been said that a society's worth can be judged by taking stock of its prisons. That is all the truer in this pandemic, where inmates everywhere have been rendered vulnerable and often powerless to protect themselves from harm. May we hope that our country's facilities serve as models rather than cautionary tales." *Valentine v. Collier*, --- S. Ct. ---, 2020 WL 2497541, at *3 (2020) (statement of Justice Sotomayor, joined by Justice Ginsburg).

tested symptomatic AICs, contact traced any AIC who tested positive, quarantined AICs who have been exposed, placed any COVID-19 positive AICs in isolation in negative pressure rooms and, if necessary, in local hospitals, and conducted antibody testing. When ODOC became aware that AICs viewed medical isolation as punitive, it took steps to ensure that AICs kept their belongings and privileges in isolation, including purchasing portable DVD players for those in isolation. When AICs at one institution were frustrated by correctional officers' inconsistent mask wearing, ODOC encouraged the formation of an "inmate council" to communicate more effectively with prison officials.

Of course, ODOC policies rely on effective implementation and enforcement on the ground, and dozens of AICs have voiced legitimate concerns about correctional officers not wearing masks, a lack of social distancing, and inadequate testing and care, among other things. In response, ODOC has started making unannounced visits to each facility to audit compliance with its COVID-19 policies. ODOC was transparent about its first audit at OSP, and acknowledged room for improvement.

To date, 157 AICs have tested positive for COVID-10 in four of ODOC's 14 facilities, and one AIC has died. To be sure, ODOC's efforts have not kept COVID-19 from entering and spreading in its prisons, and despite ODOC's best efforts, the numbers will likely continue to rise. But the question is not whether ODOC can do better, the question is whether ODOC has acted with *indifference* to the risks posed by COVID-19. ODOC has not acted with indifference. On the contrary, the evidence that Defendants presented made it clear that ODOC officials are already doing their best in response to this unprecedented crisis.

Plaintiffs are rightfully terrified of being trapped in prison during a global pandemic, and ask this Court to hold Defendants accountable. Although today the Court denies Plaintiffs' motion for preliminary injunctive relief, this case will remain pending.

## BACKGROUND

### I.    COVID-19

COVID-19 is a "novel respiratory virus" that "spreads primarily through the droplets generated when an infected person coughs or sneezes, or through droplets of saliva or discharge from the nose." (Stern Decl. ¶ 7.) Currently there is no vaccine or cure for the virus, and no one is immune. (Stern Decl. ¶ 7.) For now, the only way to control the spread of the virus is through preventative strategies, such as social distancing. (Stern Decl. ¶ 7.)

COVID-19 presents itself in humans in different ways. For some, it comes on "very rapidly" and creates "serious symptoms and effects." (Stern Decl. ¶ 8.) Others experience "the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that." (Stern Decl. ¶ 8.) Or, "symptoms might appear after two weeks of infection or not at all." (Stern Decl. ¶ 8.) Troublingly, infected people who "transmit the virus without being symptomatic" account for a "significant amount of transmission[.]" (Stern Decl. ¶ 8.)

Vulnerable individuals are subject to serious risks if infected with COVID-19. (Stern Decl. ¶ 9.) When vulnerable people are infected by COVID-19, they may "experience severe respiratory illness, as well as damage to other major organs." (Stern Decl. ¶ 10.) Treating vulnerable COVID-19 patients "requires significant advanced supports, including ventilator assistance for respiration and intensive care support." (Stern Decl. ¶ 10.)

## II.    PARTIES

Paul Maney ("Maney") is a 62-year-old AIC at Oregon State Correctional Institution ("OSCI") in Salem, Oregon. (First Am. Compl. ("FAC") ¶ 3.) Gary Clift ("Clift") is a 76-year-old AIC at OSCI (FAC ¶ 4), and George Nulph ("Nulph") is a 68-year-old AIC at OSCI. (FAC ¶ 5.) Theron Hall ("Hall") is a 35-year-old AIC at OSP (FAC ¶ 6), and David Hart ("Hart") is a 53-year-old AIC at OSP. (FAC ¶ 7.) Micah Rhodes ("Rhodes") is an AIC at Columbia River Correctional Institution ("CRCI"). (FAC ¶ 8.) Sheryl Lynn Sublet ("Sublet") is a 63-year-old AIC at Coffee Creek Correctional Facility ("CCCF"). (FAC ¶ 9.) Each plaintiff has an underlying medical condition or conditions, and Hart is currently suffering from COVID-19. (FAC ¶ 7.)

Kate Brown is the Governor of the State of Oregon (hereinafter, "Governor Brown"). (FAC ¶ 10.) Colette Peters is the Director of ODOC. (FAC ¶ 11.) Heidi Steward is the Deputy Director of ODOC. (FAC ¶ 12.) Mike Gower is ODOC's Assistant Director of Operations. (FAC ¶ 13.) Mark Nooth is ODOC's Eastside Institutions Administrator and is responsible for operations at six ODOC institutions (FAC ¶ 14), and Rob Persson is the Westside Institutions Administrator and is responsible for the remaining eight ODOC institutions. (FAC ¶ 15.) Ken Jeske is the Oregon Correctional Enterprises ("OCE") Administrator. (FAC ¶ 16.)

## III.    GOVERNMENT RESPONSE TO COVID-19

On March 8, 2020, Governor Brown declared a state of emergency to slow the spread of COVID-19 in Oregon. (Steward Decl. ¶ 13.) On March 11, 2020, the World Health Organization designated COVID-19 as a global pandemic. (*Id.*) The next day, Governor Brown issued Executive Order No. 20-05, prohibiting large gatherings of 250 people or more. (*Id.*) Governor Brown's guidelines followed updated guidance from the U.S. Center for Disease Control and

Prevention ("CDC"), released on March 10, 2020. On March 13, 2020, the President of the United States declared a national emergency arising from COVID-19. (Steward Decl. ¶ 14.)

On March 27, 2020, the CDC issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (hereinafter, "CDC Correctional Guidelines"). (Schwartz Decl. at 5.) The CDC Correctional Guidelines attempt to assist facilities to prepare for potential COVID-19 cases, prevent its spread, and manage confirmed and suspected cases. (Steward Decl. Ex. 1 at 5.) The CDC Correctional Guidelines recommend keeping six feet between individuals, making masks and personal protective equipment ("PPE") available, staggering recreation and dining times, and making medical examination rooms available near each housing unit. (Schwartz Decl. at 5.) The CDC Correctional Guidelines acknowledge that social distancing "strategies will not all be feasible," and therefore the Guidelines provide tailored advice on how best to achieve social distancing depending on the area (common areas, recreational areas, dining hall, housing, and medical areas). (Steward Decl. Ex. 1 at 11.)

On April 5, 2020, the Oregon Health Authority ("OHA") issued guidelines for responding to the COVID-19 pandemic. (Steward Decl. Ex. 2 at 1.) The guidelines include recommendations for correctional settings with respect to communications, social distancing, visitation, PPE, screening measures, healthcare evaluation for confirmed and suspected cases, and considerations for those at higher risk of severe disease from COVID-19. (Steward Decl. Ex. 2 at 2-3.) The OHA acknowledges that not all social distancing "strategies will be feasible in all facilities." (Steward Decl. Ex. 2 at 11.) However, the OHA offered guidance on how best to implement social distancing to the extent possible by adopting measures such as increasing space between AICs in line movements, staggering recreation and meal times, limiting group activities,

rearranging bunks so AICs sleep "head to foot," and designating a medical room near each housing unit. (Steward Decl. Ex. 2 at 11-12.)

## IV. COVID-19 IN OUR STATE PRISONS

Prisons are "congregate environments" that a pose a heightened risk of COVID-19 infection. (Stern Decl. ¶ 14.) AICs live, eat, and sleep in close proximity, and therefore "infections like COVID-19 can spread more rapidly." (Stern Decl. ¶ 15.) Prisons are more dangerous than other congregate settings, like cruise ships, because they are not closed systems, and "staff and visitors travel from the facilities back to their homes[.]" (Stern Decl. ¶ 17.)

The parties agree that maintaining social distance at all times is impossible in a prison setting. *See, e.g.,* Steward Decl. ¶ 51 ("It is not possible to maintain six feet of social distancing between all persons present in a facility at all times with the current physical layout of the institutions and the AIC population."); Decl. of Jacob Strock ("Strock Decl.") ¶ 8, ECF No. 30 ("[T]here is no social distancing . . . . Regardless of how much [prison officials] are trying to do, it's impossible for real social distancing to happen."). As outlined above, the experts who weighed in on this motion agree that it is "important to reduce the number of" AICs in order to allow for social distancing. Any reduction in the population "will permit greater flexibility when prisons have outbreaks and require space to isolate and/or quarantine people" and will "permit those people remaining in prison to have greater opportunities to physically distance themselves to prevent transmission[.]" (Stern Decl. ¶ 24); *see also* Br. of *Amicus Curiae* at 10 (explaining that the current crisis "will be dangerously exacerbated if jails and prisons do not act immediately to reduce their populations and contain the spread of the virus").

## V.     PLAINTIFFS' EVIDENCE

Plaintiffs submitted over fifty declarations describing the current conditions in ODOC facilities.[4] *See* ECF Nos. 15-60, 92-100. Each declaration is based on the AIC's individual experience in various institutions, but there are common concerns among all of the AIC's declarations.

### A.     Social Distancing

Throughout the declarations, most AICs report an inability to social distance. *See, e.g.,* Decl. of Brandon A. Borba ("Borba Decl.") ¶ 5(e), ECF No. 20 ("In the dining hall we sit six people to a table, elbow to elbow. There is no social distancing in the chow hall[.]"); Decl. of Christopher Mitchell ("Mitchell Decl.") ¶ 13, ECF No. 21 ("I am never six feet or more from another person."); Decl. of Daniel White ("White Decl.") ¶ 23, ECF No. 24 ("We now have split tiers in our unit, which does limit the amount of people in any given area, but still doesn't allow for social distancing. We are still in close proximity to one another, and we still feel unsafe."). Both AICs who testified at the hearing also shared their concerns about the inability to socially distance.

### B.     Fear to Report Symptoms and Fear of Getting Tested

Many AICs express reluctance to get tested, or to report that they are experiencing COVID-19 symptoms. AICs believe that if they test positive, they will be quarantined in a segregation unit, which they view as a punitive measure. *See, e.g.,* Decl. of Corey Constantin ("Constantin Decl.") ¶ 5(b), ECF No. 22 ("We were all scared to get tested for COVID19

---

[4] Defendants dispute many of the allegations set forth in the AIC declarations. *See* Russell Decl. ¶¶ 32-100 (providing specific information in response to many of the AICs' allegations); Decl. of Brandon Kelly ("Kelly Decl."), ECF No. 88 (same); Decl. of Ken Jeske ("Jeske Decl."), ECF No. 86 (same).

because we knew we would be put in segregation[.]"); Decl. of Gavin Pritchett ("Pritchett Decl.") ¶ 5(b), ECF No. 29 ("I have not reported these symptoms to medical staff because I am afraid of being isolated, kept from my property, and getting transferred to another facility[.]"); Decl. of John L. Preston II ("Preston Decl.") ¶ 4, ECF No. 33 ("I did not report these symptoms because I was afraid of being sent to the hole (Disciplinary Segregation Unit).").

### C.    Inadequate Treatment and Testing

Many AICs complain that ODOC's medical response to COVID-19 has been inadequate. *See, e.g.,* Decl. of Aaron Delicino ("Delicino Decl.") ¶ 5(b), ECF No. 19 ("When I got sick in March a bunch of other people on my unit also got really sick. I self-quarantined because medical wasn't doing anything for us. After 9 days of being sick a nurse came and checked my temperature – it came back 103 degrees and then later that day 104 degrees. The nurse I saw gave me salt packets and told me to gargle with saltwater."); Decl. of Mathew Maddox ("Maddox Decl.") ¶ 5(a), ECF No. 43 ("I almost went to the hole trying to get medical treatment because I had to insist on getting treatment. I was seen on or about the 7th of March by medical. The nurse took my temperature, confirmed to be 104 degrees, and told me to get plenty of rest. She gave me Theraflu."); Decl of Michael Garrett ("Garrett Decl.") ¶ 5(g), ECF No. 45 ("Currently people in my unit are coughing, running fevers, and displaying other COVID19 symptoms. Nobody is getting temperature checks and no medical staff are coming through the unit.").

Several AICs report that testing is either unavailable, or ODOC medical staff are reluctant to test AICs. *See* Pritchett Decl. ¶ 5 ("Near the end of March 2020, I asked for a COVID-19 test. I was told no tests were available."); Decl. of Kerry Crockett ("Crockett Decl.") ¶ 5(g), ECF No. 37 ("I still have not been tested. I asked roughly three weeks ago to be tested and they said they didn't have any tests. They haven't offered since.")

## VI.    DEFENDANTS' EVIDENCE

ODOC has been monitoring COVID-19 since before the first confirmed case in the United States. (Steward Decl. ¶ 7.) Two ODOC employees have been present at the State Emergency Coordination Center ("ECC") since March 2, 2020, to ensure that ODOC is connected with the statewide response and that ECC understands ODOC's needs. (Steward Decl. ¶ 10.) On March 4, 2020, ODOC activated the Agency Operations Center ("AOC") to fight the spread of the virus, led by Health Services Administrator Joe Bugher and ODOC's Chief of Security Garry Russell. (Steward Decl. ¶ 11.) The AOC has been working around the clock, meeting with representatives from each of the correctional facilities and medical services each day, and reporting to Director Peters and Deputy Director Steward at the end of every day. (Steward Decl. ¶ 12.)

### A.    ODOC Actions in Response to COVID-19

ODOC reports that it is following both the CDC and OHA guidelines. (Russell Decl. ¶ 17; Steward Decl. ¶¶ 16-17.) ODOC has diagnosed COVID-19 cases in four of ODOC's fourteen facilities, and of those four, one (TRCI) has had no additional cases since its only infected AIC recovered. (Russell Decl. ¶ 18.)

#### 1.    Six Key Components

ODOC reports that its response to COVID-19 includes six key components.

##### a.    Education and Tracking

ODOC institutions are communicating daily with all AICs by holding meetings, sending AICs letters with information, placing signs with information around facilities, and providing information on ODOC television. (Steward Decl. ¶ 23.) "ODOC is also conducting targeted outreach to AICs who are particularly vulnerable to COVID-19" and has "implemented a plan to track and manage medically vulnerable AICs." (Steward Decl. ¶ 25.) Each weekday, a message

goes out via voice message and tablet services to share information with AICs regarding COVID-19 positive statistics and helpful tips. (Russell Decl. ¶ 30.) The ODOC television channel provides constant educational information about COVID-19 and prevention. (Russell Decl. ¶ 30.) ODOC is taking steps to educate its staff, and "[e]ach worksite has a Critical Incident Stress Management team that is used to providing timely, comprehensive, and confidential peer-to-peer assistance to ODOC employees and their families." (Russell Decl. ¶ 14.)

### b.     Sanitation, Hygiene, and PPE

All ODOC institutions increased cleaning efforts, to include commonly touched and high traffic areas. (Steward Decl. ¶ 28.) ODOC provides every AIC with free access to soap and water, sinks, and handwashing stations. (Steward Decl. ¶ 31.) ODOC added additional handwashing stations throughout many of its institutions. (Steward Decl. ¶ 31.) ODOC provided two cloth masks to all AICs, and to anyone entering the facility, and to date, ODOC has purchased 60,000 cloth masks (Steward Decl. ¶ 33), and OCE has produced over 200,000 masks for ODOC. (Jeske Decl. ¶ 31.)

### c.     Testing and Medical Care

ODOC health care providers screen any AIC presenting COVID-19 symptoms. (Steward Decl. ¶ 37.) ODOC follows the CDC and OHA guidance on appropriate criteria for testing. (Steward Decl. ¶ 38.) If an AIC tests positive, ODOC conducts contact tracing to determine the extent of the infection, and then strengthens preventative measures accordingly. (Steward Decl. ¶ 40.) Medical care for individual AICs is directed by ODOC providers, who are available at each institution. (Steward Decl. ¶ 44.) Correctional staff are not gatekeepers to medical services. (Steward Decl. ¶ 44.)

ODOC also identifies and tracks medically vulnerable AICs. (Decl. of Joe Bugher ("Bugher Decl.") ¶ 6, ECF No. 87.) As of May 20, 2020, ODOC had identified 823 vulnerable AICs. (*Id.*) ODOC identified plaintiffs Clift, Rhodes, and Sublet as vulnerable. (Bugher Decl. ¶ 7.)

### d.    Social Distancing

ODOC recognizes the importance of social distancing to reduce the spread of COVID-19, but acknowledges that social distancing in its institutions is largely impossible. (Steward Decl. ¶ 51.) That said, ODOC has taken multiple steps to facilitate social distancing: (1) closing its doors to non-essential visitors, (2) limiting the number of AICs in common areas at any given time, (3) limiting chapel attendance, (4) keeping AICs together by unit, (5) marking six foot spaces on the ground where line movements take place, (6) eliminating group activities in the yard and limiting the number of AICs in the yard at one time, (7) staggering dining times when possible, (8) modifying dorms, and (9) postponing non-essential medical trips. (Steward Decl. ¶ 52.)

### e.    Medical Isolation and Quarantine

ODOC quarantines newly transferred AICs for fourteen days, when possible. (Steward Decl. ¶ 54.) ODOC places AICs who test positive for COVID-19 in negative pressure rooms (where medical staff closely observe and monitor the AIC) or medical isolation (single or double cells with solid walls and a solid door that closes). (Steward Decl. ¶ 54.)

ODOC recognizes that "it is essential to treat quarantine and medical isolation [as] nondisciplinary" and therefore it provides "amenities of regular housing to the extent possible consistent with the purpose of quarantine or medical isolation and the resources of the particular institution." (Steward Decl. ¶ 55.) In order to differentiate medical isolation from disciplinary segregation, ODOC "expanded television access and other amenities." (Steward ¶ 58.) ODOC purchased portable DVD/TV players for AICs in medical isolation, and provides access to an

extensive video library. (Russell Decl. ¶ 48.) ODOC allows AICs to keep their personal property in medical isolation and allows them to use the phone whenever possible. (Russell Decl. ¶ 48.)

### f. Tiered Screening Protocol

Finally, ODOC screens everyone who enters their institutions for COVID-19 symptoms, including checking temperatures. (Steward Decl. ¶ 61.) ODOC has a five-tier system that dictates the level of screening in accordance with the institution's number of COVID-19 cases. (Steward Decl. ¶¶ 61-71.)

To date, ODOC officials are "surprised and encouraged by the AICs' compliance" with ODOC's COVID-19 policies. (Russell Decl. ¶ 110.) "In general, AICs understand that ODOC is not implementing the COVID-19 response as a punitive measure, and that the entire world is facing increased restrictions" and ODOC has "seen a decrease in disturbances, fights, misconduct, and other security issues since the pandemic began." (Russell Decl. ¶ 110.)

### 2. ODOC Job Sites

OCE helps "ODOC meet its constitutional mandate to ensure that AICs [in] state correctional facilities work or receive on-the-job training for 40 hours a week." (Jeske Decl. ¶ 5.) ODOC has implemented measures to reduce the spread of the virus for AICs at work. For example, "[a]ll staff and adults in custody in [OCE] are required to wear face masks." (Steward Decl. ¶ 33(b).) AICs who work in the laundry "have additional PPE requirements and AICs are screened before being allowed to work." (Steward Decl. ¶ 33(b).) OCE provides hand soap, sanitizing materials, and PPE for its workers, as recommended by OHA and CDC guidance. (Jeske Decl. ¶ 10.) At many ODOC facilities, OCE provides AICs with sack lunches to eat in their cubicles. (Jeske Decl. ¶¶ 14, 17, 20, 23.)

To encourage social distancing in the laundry facilities, OCE marked the "floor every six feet" at TRCI and OSP, and reduced the numbers of workers present in the laundry facilities.

(Jeske Decl. ¶¶ 29, 36.) At SRCI, soiled laundry sorting carts are "set up so only two workers are working each set of carts instead of four" to provide "for additional social distancing." (Jeske ¶ 37.) AICs at work are instructed to maintain social distancing. (Jeske ¶ 34.)

## B. Accountability

"ODOC recognizes that COVID-19 prevention policies . . . must be implemented in the institution level to be effective." (Steward Decl. ¶ 73.) ODOC is now implementing an Infection Prevention Readiness Assessment Tool for COVID-19 to evaluate each facility's compliance with ODOC policies. (Steward Decl. ¶ 74.)

On May 20, 2020, ODOC conducted its first COVID-19 Infection Prevention Assessment at OSP. (Steward Decl. ¶ 78.) ODOC found that the results were largely positive, but it also identified several areas for improvement. (Steward Decl. ¶ 78.) AICs and staff socially distanced when possible, used PPE, and cleaned surfaces, and appropriate educational materials were available throughout the facility. (Steward Decl. ¶ 78.)

## C. COVID-19 Cases to Date

ODOC maintains a publicly available tracking tool that lists the total number of COVID-19 tests and COVID-19 positive AICs. (Bugher Decl. ¶ 8.) As of June 1, 2020, 157 AICs had tested positive for COVID-19, and one AIC had died as a result of COVID-19. (*See* COVID-19 Status at Oregon Department of Corrections Facilities, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited June 1, 2020).)

## D. COVID-19 Grievance Process

"An AIC may file a single grievance concerning any incident or issue regarding institutional life that directly and personally affects that AIC." (Decl. of Jacob Humphreys ("Humphreys Decl.") ¶ 8, ECF No. 89) (citing Or. Admin. R. ("OAR") 291-109-210(3)). For example, an AIC may grieve the "misapplication of department policies, rules, or other

directives;" "[u]nprofessional actions of employees, volunteers, or contractors[;]" and "[i]nadequate medical or mental health treatment[.]" (*Id.*)

ODOC has received hundreds of grievances from AICs about all aspects of its response to COVID-19. (Humphreys Decl. ¶ 10.) ODOC continues to process these grievances, and has generally accepted the ones related to unprofessional behavior in response to the pandemic, health concerns, or other essential services. (Humphreys Decl. ¶ 11.) However, ODOC does not accept certain grievances, and as Plaintiffs also report, ODOC has "denied the majority of the grievances it [] received concerning the COVID-19 response." (Humphreys Decl. ¶ 12.)

ODOC explains that the grievance denials are appropriate because AICs may only grieve the misapplication of a rule, policy, or administrative directive. (Humphreys Decl. ¶ 12.) Accordingly, ODOC has denied grievances related to emergency operations relating to Governor Brown's executive order because an AIC cannot grieve any matter outside the jurisdiction of ODOC, and any grievances regarding ODOC's general COVID-19 response do not relate to a personal or direct effect on an AIC. (Humphreys Decl. ¶ 12.) ODOC does not accept "general grievances regarding social distancing, isolation, and quarantine of other AICs, or modified operations such as the visiting shutdown" because doing so is "inconsistent with ODOC's rules." (Humphreys Decl. ¶ 14.)

As of May 18, 2020, ODOC had accepted only 14 of 216 grievances related to COVID-19. (Humphreys Decl. ¶ 15.) The accepted grievances concerned: unprofessional staff behavior, inadequate hygiene or cleaning products, denials of property related to COVID-19 operational changes, and ODOC's failure to enforce social distancing policies. (Humphreys Decl. ¶ 16.)

///

///

# ANALYSIS

## I. LEGAL STANDARDS

### A. Preliminary Injunction[5]

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (citations omitted). The elements of the test are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d. 1127, 1131 (9th Cir. 2011) ("For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."). "When the government is a party, [the] last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).[6]

_____

[5] Although styled as a motion for a temporary restraining order and preliminary injunction, Plaintiffs acknowledged at oral argument that the appropriate relief at this stage of the litigation is a preliminary injunction.

[6] The Ninth Circuit also provides an alternative preliminary injunctive relief test: the "serious questions" test. *Alliance for the Wild Rockies*, 632 F.3d at 1131-32. Under this test, "'serous questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Under this test, a court may grant a preliminary injunction "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156 (D. Or. 2018) (quoting *M.R. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012)). However, where, as here, Plaintiffs seek a mandatory injunction, courts decline to apply the "serious questions" test. *See P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1135 (C.D. Cal. 2015) ("Plaintiffs seek a mandatory injunction, the Court declines to interpret the 'serious questions' standard for purposes of the Motion as inconsistent with the Ninth Circuit's guidance that a mandatory injunction not issue in 'doubtful cases' and not be granted 'unless the facts and law clearly favor the moving party.'"); *Guerra v W. L.A. College*, No. CV 16-6796-MWF (KSx), 2016 WL 11619872, at *4 (C.D. Cal. Nov. 2, 2016) (same).

## B.    Mandatory Injunction

A "mandatory injunction orders a responsible party to take action" and "is particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation and quotation marks omitted). The "already high standard for granting a TRO or preliminary injunction is further heightened when the type of injunction sought is a 'mandatory injunction.'" *Innovation Law*, 310 F. Supp. 3d at 1156 (citing *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)). A plaintiff requesting a "mandatory injunction" must "establish that the law and facts *clearly* favor her position, not simply that she is likely to succeed." *Id.* (quoting *Garcia*, 786 F.3d at 740).

## C.    Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") imposes additional restrictions on a court's ability to grant injunctive relief. Any such "[1] relief must be narrowly drawn, [2] extend no further than necessary to correct the harm the court finds requires preliminary relief, and [3] be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). The PLRA requires that courts "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity[.]" *Id.* Preliminary relief relating to prison conditions "shall automatically expire on the date that is 90 days after its entry, unless the court makes findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.*

## II.    DISCUSSION

Plaintiffs assert that Defendants' response to COVID-19 violates their Eighth Amendment right to reasonable protection from severe illness or death. Plaintiffs ask the Court to: (1) direct Defendants to "take every action within their power to reduce the risk of COVID-

19" in all of ODOC's institutions; (2) require Defendants to "reduce prisoner population to levels" to enable social distancing; (3) appoint an expert to effectuate that reduction; (4) provide safe and non-punitive separation housing for infected AICs or those at risk of being infected with COVID-19; and (5) comply with CDC and OHA guidance. (Mot. Prelim. Inj. at 2.)

Defendants responds that Plaintiffs cannot establish a likelihood of success on the merits of their claim, irreparable harm, or balance of the equities and public interest in their favor. Defendants also argue that this Court does not have the authority to order the release of AICs, and Plaintiffs do not have standing for the sweeping relief they seek.

## A.    Threshold Issues

### 1.    PLRA's Exhaustion Requirement

The Court must first determine whether Plaintiffs may proceed on their claims without satisfying the PLRA's exhaustion requirement.

#### a.    Applicable Law

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement has a built-in exception by requiring that plaintiffs exhaust administrative remedies that are "available." 42 U.S.C. § 1997e.

In *Ross v. Blake*, the Supreme Court described three circumstances when a remedy is not "available" and therefore a plaintiff need not exhaust administrative remedies before filing suit: (1) the procedure "operates as a simple dead end" because the "relevant administrative procedure lacks authority to provide any relief" or "administrative officials have apparent authority, but decline ever to exercise it[;]" (2) the "administrative scheme [is] so opaque that . . . no reasonable prisoner can use them[;]" or (3) when "prison administrators thwart inmates from

taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 St. Ct. 1850, 1859-60 (2016) (citations omitted).

In the wake of the COVID-19 pandemic, federal courts are split on the issue of whether an AIC must exhaust administrative remedies before filing suit. Some courts reason that the irreparable and time-sensitive harm plaintiffs face in light of the virus renders all grievance procedures inherently unavailable, and therefore courts should not require exhaustion. *See, e.g., Sowell v. TDCJ*, No. H-20-1492, 2020 WL 2113603, at *3 (S.D. Tex. May 4, 2020) ("Where the circumstances present an imminent danger to an inmate, TDCJ's time-consuming administrative procedure, which TDCJ may choose to extend at will, presents no 'possibility of some relief.'" (citing *Ross*, 136 S. Ct. at 1859))); *United States v. Vence-Small*, --- F. Supp. 3d ---, 2020 WL 1921590, at *5 (D. Conn. 2020) ("In light of these emergency circumstances, some judges have [waived exhaustion requirements,]" (citing *United States v. Russo*, --- F. Supp. 3d ---, 2020 WL 1862294, at *6 (S.D.N.Y. 2020) and *United States v. Haney*, --- F. Supp. 3d at ---, 2020 WL 1821988 (S.D.N.Y. 2020))).

Other courts have found that COVID-19 does not inherently render grievance procedures unavailable and that AICs must exhaust the administrative process unless one of the three categories outlined by *Ross* applies. *See Bell v. Ohio*, 2:20-cv-1759, 2020 WL 1956836, at *4 (S.D. Ohio Apr. 23, 2020) ("Plaintiff failed to properly exhaust his administrative remedies before seeking judicial relief . . . . [T]he exhaustion requirements of the PLRA are mandatory and may not be altered for special circumstances." (citing *Ross*, 136 S. Ct. at 1856-57)); *Nellson v. Barnhart*, No. 1:20-cv-21457-KMW, 2020 WL 1890670, at *5 (D. Colo. Apr. 16, 2020) ("The Court finds that plaintiff has failed to exhaust his administrative remedies before seeking judicial

relief . . . . [T]he Court may not alter the mandatory requirements of the PLRA for COVID-19 or any other special circumstance." (citing *Ross*, 136 S. Ct. at 1856-57)).

On May 14, 2020, Justices Sotomayor and Ginsburg provided additional guidance in *Valentine*. Although the Supreme Court denied the plaintiffs' application to vacate the Fifth Circuit's stay of the district court's preliminary injunction, Justice Sotomayor wrote a statement respecting the denial. Joined by Justice Ginsburg, Justice Sotomayor took issue with the Fifth Circuit's outright rejection of "the possibility that grievance procedures could ever be a 'dead end' even if they could not provide relief before an inmate faced a serious risk of death." *Valentine*, 2020 WL 2497541, at *3. Instead, Justice Sotomayor reasoned that districts courts could find grievance procedures unavailable where "a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19 . . . much in the way they would be if prison officials ignored the grievances entirely." *Id.* Justice Sotomayor explained that it was "difficult to tell whether the prison's system fits in that narrow category, as applicants did not attempt to avail themselves of the grievance process before filing suit." *Id.* Ultimately, Justice Sotomayor cautioned "that in these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance process cannot or does not answer, the PLRA's textual exception could open the courthouse doors where they would otherwise stay closed." *Id.*

*Valentine* reinforces the reasoning of district courts like *Bell* and *Nellson* that COVID-19 does not automatically render a prison's grievance system unavailable, therefore exempting a plaintiff from the PLRA exhaustion requirement. Instead, Justice Sotomayor suggested that courts conduct a fact-based inquiry, and determine whether the "grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19[.]" *Id.*

###### b.    Analysis

Plaintiffs have demonstrated that ODOC's grievance process is currently unavailable to grieve the systemic COVID-19 issues that Plaintiffs challenge in this case. (Mot. Prelim. Inj. at 55-56.) Importantly here, Defendants acknowledge that ODOC is not accepting grievances relating to COVID-19 emergency operations, nor "general grievances regarding social distancing, isolation, and quarantine of other AICs, or modified operations such as the visiting shutdown" because doing so is "inconsistent with ODOC's rules." (Humphreys Decl. ¶ 14.) As of May 18, 2020, ODOC had accepted only 14 of 216 grievances related to COVID-19.[7] (Humphreys Decl. ¶ 15.)

Based on the current record, the Court concludes that ODOC's administrative grievance procedure is currently unavailable for the relief Plaintiffs seek in this case, and therefore exhaustion is not required for Plaintiffs to proceed on their Section 1983 claims. *See Valentine*, 2020 WL 2497541, at *3 ("[I]f a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19, the procedures may be 'unavailable' to meet the plaintiff's purposes[.]"); *see also McPherson v. Lamont*, --- F. Supp. 3d ---, 2020 WL 2198279, at *9-10 (D. Conn. 2020) (holding that the "imminent health threat that COVID-19 creates has rendered DOC's administrative process inadequate to the task of handling Plaintiffs' urgent complaints regarding their health" and "[i]n this context, the DOC's administrative process is thus, 'practically speaking, incapable of use'

---

[7] Plaintiffs submitted questionnaires from 24 AICs regarding, among other things, each AIC's ability to file a grievance related to COVID-19, and the AIC's reports are generally consistent with Defendants' acknowledgement that ODOC is not accepting grievances relating to ODOC's response to COVID-19. (Decl. of Althea Seloover ("Seloover Decl.") Att. 1, at 5, ECF No. 15.)

for resolving COVID-19 grievances") (citing *Ross*, 136 S. Ct. at 1859 and *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010)).

### 2. PLRA's Release Order Prohibition

Defendants argue that the PLRA prohibits the Court from granting Plaintiffs' motion to the extent Plaintiffs are asking the Court to order the release of AICs to reduce the prison population. Plaintiffs acknowledged in their reply, and at oral argument, that the Court does not have the authority to order the release of AICs. The Court agrees.

In civil actions concerning prison conditions, federal district courts cannot order the release of individuals in custody unless the "court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right" and "the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(i)-(ii). Furthermore, "[a] 'prisoner release order' may be issued only by a three-judge court." *Plata v. Newsom*, --- F. Supp. 3d ---, 2020 WL 1908776, at *10 (N.D. Cal. 2020) (citing § 3626(a)(3)(B)). If the plaintiff meets the requirements of § 3626(a)(3)(A)(i)-(ii), "a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered." 18 U.S.C. § 3626(a)(3)(D). A three-judge panel may only order release if it "finds by clear and convincing evidence that 'crowding is the primary cause of the violation of a Federal right' and 'no other relief will remedy the violation.'" *Money v. Pritzker*, --- F. Supp. 3d ---, 2020 WL 1820660, at *10 (N.D. Ill. 2020) (quoting 18 U.S.C. § 3626(a)(3)(E)(i)-(ii)).

In *Coleman v. Newsom*, --- F. Supp. 3d at ---, 2020 WL 1675775 (N.D. and E.D. Cal. 2020), the plaintiffs recently sought an order modifying a 2009 population cap and requiring the State of California to reduce the population in crowded congregate living spaces to a level that

will permit social distancing in response to COVID-19. The three-judge panel denied the motion, explaining that the panel's original release order in 2009 was "never designed to address" the defendants' response to COVID-19. *Id.* at *7. The panel invited the plaintiffs to "go before a single judge to press their claim that Defendants' response to the COVID-19 pandemic is constitutionally inadequate." *Id.* The panel explained that from there, if a single judge found a constitutional violation, she could "order Defendants to take steps short of release necessary to remedy that violation[,]" and "if that less intrusive relief proves inadequate[,]" the plaintiff could request, or the district court may order, "the convening of a three-judge court to determine whether a release order is appropriate." *Id.* (citing 18 U.S.C. § 3626(a)(3)).

The Court agrees with the parties that it lacks the authority to order the release of AICs from ODOC custody, as Plaintiffs request.[8] Furthermore, the PLRA's prohibition of "prisoner release orders" applies to any order "that has the purpose or effect of reducing or limiting a prison population, or that directs the release from or nonadmission of prisoners to a prison[.]" 18 U.S.C. § 3626(g)(4). Accordingly, the PLRA necessarily also prohibits the court from ordering the transfer of AICs from one institution to another, ordering a moratorium on ODOC accepting new AICs, or requiring that ODOC develop a process for release. *See Money*, 2020 WL 1820660, at *13 (finding that the plaintiffs' effort to "shift[] the focus from an order directly releasing [vulnerable individuals in custody] to an order imposing a court-ordered and court-managed 'process' for determining who should be released . . . does not place this case outside of

---

[8] Plaintiffs acknowledge that the appropriate path for a release order is for the Court to find that Defendants' response to COVID-19 is constitutionally inadequate, order a preliminary injunction that stops short of release, and then convene a three-judge panel to consider release if Defendants do not comply with the Court's injunction. *See* Pls.' Reply at 27 ("The PLRA does not require that the Court place [release as a] remedy in a black box never to be identified as a solution. It merely states that it cannot be the first response ordered to ameliorate [a] constitutional violation, as absurd of a proposition as that is in a global pandemic.").

Section 3626(a)(3)" because "[t]he 'purpose' of any order compelling the State to engage in that process would be to reduce the prison population, and the 'effect' of its successful implementation would be the same, albeit indirectly"); *but see Cameron v. Bouchard*, No. 20-10949, 2020 WL 2569868, at *27-28 (E.D. Mich. May 21, 2020) (holding that the PLRA "do[es] not apply to an order releasing medically-vulnerable inmates" because "[t]he inability to socially distance in the jail setting has nothing to do with the capacity of the facility"). Thus, this Court does not have the authority to order any relief that would directly or indirectly require ODOC to reduce its prison population.

### B. Preliminary Injunction

The Court must evaluate the four factors outlined by the Supreme Court in *Winter* to determine if Plaintiffs have established the need for preliminary injunctive relief: (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of equities, and (4) the public interest. *See Winter*, 555 U.S. at 20.

### 1. Likelihood of Success on The Merits

Plaintiffs allege that Defendants' response to the COVID-19 pandemic is violating the Eighth Amendment.[9] "A public official's 'deliberate indifference to a prisoner's serious illness or injury' violates the Eighth Amendment ban against cruel punishment." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). A plaintiff must establish that he was "confined under conditions posing a risk of 'objectively, sufficiently serious' harm and that the officials had a 'sufficiently culpable state of mind' in denying the proper medical care." *Id.* (citing *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995)). "Thus,

---

[9] Plaintiffs also allege that Defendants are violating Art. 1 Sections 13, 15, and 16 of the Oregon Constitution, but only move for preliminary relief on their Section 1983 claims.

there is both an objective and a subjective component to an actionable Eight Amendment violation." *Id.*

To satisfy the objective prong, a plaintiff must "show a serious medical need by demonstrating that failure to treat [the] prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Hopton v. Fresno Cty. Human Health Sys.*, No. 1:20-cv-0141-NONE-SKO, 2020 WL 1028365, at *5 (E.D. Cal. Mar. 3, 2020) (citing *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012)). "The subjective component requires the inmates to show that the officials had the culpable mental state, which is deliberate indifference to a substantial risk of serious harm." *Clement*, 298 F.3d at 904 (citation and quotation marks omitted).

"Deliberate indifference" is established only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,'" and "prison officials who act reasonably cannot be found liable[.]" *Farmer*, 511 U.S. at 844-45 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). Importantly here, "prison officials who actually know of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### a. Objective Prong

Plaintiffs argue that "[b]ecause of [their] health conditions, [they] are at serious risk for severe illness or death from COVID-19" and therefore satisfy the objective prong of the deliberate indifference test. (Mot. Prelim. Inj. at 40.) Defendants do not dispute the objective prong (Defs.' Opp'n at 17 n. 10), and the Court agrees that Plaintiffs are currently confined

under conditions posing a risk of objectively serious harm. *See Frazier v. Kelley*, No. 4:20-cv-00434-KGB, 2020 WL 2110896, at *6 (E.D. Ark. May 4, 2020) (finding that "it cannot be disputed that COVID-19 poses an objectively serious health risk to named plaintiffs . . . given the nature of the disease and the congregate living environment" and that the risk is heightened "given plaintiffs' allegations regarding their susceptibility to contracting COVID-19 and experiencing worsened symptoms"); *Coreas v. Bounds*, --- F. Supp. 3d ---, 2020 WL 1663133, at *9 (D. Md. 2020) ("As to the objective prong, the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk, particularly for high-risk individuals[.]"); *see also Basank v. Decker*, --- F. Supp. 3d ---, 2020 WL 1481503, at *3 (S.D.N.Y. 2020) (taking judicial notice that "for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality").

### b. Subjective Prong

The parties dispute whether Plaintiffs are likely to establish the subjective prong. It is clear that Defendants are aware of the serious risk that COVID-19 poses to AICs. *See Awshana v. Adducci*, --- F. Supp. 3d. ---, 2020 WL 1808906, at *8 (E.D. Mich. 2020) ("There is no doubt that [defendants] are aware of the grave threat posed by the pandemic and the exacerbated risk caused by the close quarters of the detention facilities."); *see also Valentine v. Collier*, No. 4:20-CV-1115, 2020 WL 1916883, at *10 (S.D. Tex. Apr. 20, 2020) ("The risk of COVID-19 is obvious."). However, Plaintiffs must also demonstrate that Defendants are disregarding the risk.

Plaintiffs argue that Defendants are disregarding the serious risks posed by COVID-19 by: (1) failing to implement social distancing; (2) undertesting; (3) failing properly to categorize vulnerable AICs; and (4) failing to provide adequate medical care. (Pls.' Reply at 6-16.) Defendants respond that the "aggressive and ongoing measures by ODOC officials to prevent the

spread of COVID-19 is the very opposite of indifference—deliberate or otherwise." (Defs.'
Opp'n at 17.) The Court agrees with Defendants.

### 1) Social Distancing

Plaintiffs argue that until Defendants "accomplish[] social distancing for the people
entrusted into their care, they are deliberately indifferent." (Pls.' Reply at 7.) Plaintiffs explain
that the policies Defendants detail in their response are not being implemented at ODOC
institutions. (Pls.' Reply at 7.) Although the parties agree that social distancing cannot be
implemented at all times in ODOC institutions, AICs report that even when social distancing is
possible, like during mealtimes or line movements, it is not being enforced. *See, e.g.,* Decl. of
Jeffrey Parnell ("Parnell Decl.") ¶ 5, ECF No. 18 ("[L]ine movements are not socially
distanced."); White Decl. ¶ 6 ("When we go to lunch, or 'chow,' there was no social distancing.
We were 6 to a table, elbow to elbow. Only one day did they tell us to scatter and keep a
distance."); Constantin Decl. ¶ 5(x)) (explaining that at the vending line, staff does not enforce
social distancing).

Defendants respond with evidence describing their social distancing policy objectives and
efforts to date. First, Defendants assert that they are following CDC's Correctional Guidelines,
and while it is impossible to "maintain six feet of separation between all persons" they are
"committed to achieving maximum social distancing within the current population and physical
layout" of ODOC institutions. (Steward Decl. ¶ 51.) Second, Defendants describe the specific
implementation of their social distancing policy in ODOC institutions: closing doors to all
visitors, modifying line movements, limiting the number of AICs permitted in common areas
like the yard and chow hall, marking six feet on the ground for line movements, staggering meal
times, modifying dorms to the extent possible, and postponing non-essential medical trips.
(Steward Decl. ¶ 52(a)-(j).) Defendants acknowledge that "social distancing is challenging to

PAGE 29 – OPINION AND ORDER

practice in" their facilities, but that it is the "cornerstone of reducing transmission" of COVID-19. (Dewsnup Decl. ¶ 11.)

By way of a few examples of ODOC's current social distancing efforts, at CCCF, AIC access to the dayroom and yard is limited to allow for social distancing, medical lines are done on the housing unit, and unit schedules are modified to ensure units are as segregated as possible. (Russell Decl. ¶ 37.) At CRCI, recreational time is segregated by unit and there is tape to indicate a six-foot distance in the diabetic medicine line. (Russell Decl. ¶ 46.) At EOCI, there are markers showing six-foot distance in the chow hall lines, and the dining schedule is spread out to create more space in the chow hall. (Russell Decl. ¶ 54.) At MCCF, there are social distancing markers and announcements regarding social distancing. (Russell Decl. ¶ 59.) At PRCF, staff moved half of the dining chairs from the chow hall to ensure chairs are six feet apart, the walls are painted with lines to denote six feet between individuals waiting in line for food, and staff removed milk and water dispensers where AICs typically congregate. (Russell. Decl. ¶ 69(a).) PRCF staggers meal and recreational times and positioned bunks "head-to-toe." (Russell Decl. 69(b)-(c).) At SRCI, AICs may not participate in group sports, and units attend yard time on a staggered schedule. (Russell Decl. ¶ 74.) At SCI, staff posted flyers to promote social distancing. (Russell Decl. ¶ 79.) At SCCI, staff brings meals to AICs in their units, and units are assigned separate recreation and chapel times. (Russell Decl. ¶ 83.) At TRCI, units are split and fed by tier, and only half of the units are out at a time during daylight hours to reduce crowding. (Russell Decl. ¶ 95.) At OSP, staff modified line movements to limit the number of AICs in common areas, units are segregated, and group activities, like chapel, are suspended. (Kelly Decl. ¶ 22.) OSP also posted flyers all over its institutions reminding AICs and staff to socially distance, and frequent email reminders are sent to staff. (Kelly Decl. ¶ 23.)

The Court finds that both sides' evidence is credible.[10] The issue before the Court is not whether ODOC's policies or implementation of those policies has been perfect. On the contrary, the Court must determine if Defendants have acted with indifference to the risks of COVID-19. The Court finds that based on the current record, Plaintiffs are unlikely to establish that Defendants acted with deliberate indifference.

In so finding, the Court notes that ODOC's response has evolved, and improved, with time, new information, and data. Perhaps most importantly, ODOC has recognized that any policy is only as good as its implementation, and therefore ODOC is making unannounced visits to its prisons to evaluate compliance with its social distancing and other measures. The Court cannot fault ODOC, which has no control over the number of AICs sent to ODOC's institutions, for failing at the impossible task of maintaining six feet between all AICs at all times. *See Wragg v. Ortiz*, --- F. Supp. 3d. ---, 2020 WL 2745247, at *22 (D. N.J. 2020) ("That physical distancing is not possible in a prison setting, as [Plaintiffs] urge, does not an Eighth Amendment claim make and, as such, Petitioners are not likely to succeed on the merits."); *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (rejecting district court's conclusion that failure to implement social distancing would establish the subjective component because "the inability to take a positive action likely does not constitute a state of mind more blameworthy than negligence") (citation and quotation marks omitted); *Plata v. Newsom*, --- F. Supp. 3d ---, 2020 WL 1908776, at *5 (N.D. Cal. 2020) (finding that where defendants did not implement social distancing, they were not deliberately indifferent because they "implemented several measures to promote increased physical distancing, including reducing the population, transferring inmates out of

_____

[10] At the hearing on Plaintiffs' motion, two AICs testified and, although they communicated credible concerns about ODOC's social distancing efforts, they also corroborated several of the social distancing measures that ODOC asserts it has taken.

dormitory housing to less crowded spaces, restricting movement, eliminating mixing of inmates from different housing units, and placing six-foot markers in communal areas").

In addition, Plaintiffs do not cite to any evidence to establish that Defendants "subjectively believed the measures they were taking were inadequate." *Swain*, 958 F.3d at 1089; *see also Sanchez, et al. v. Dallas Cty. Sheriff Marian Brown*, No. 3:20-cv-00832-E, 2020 WL 2615931, at *16 (N.D. Tex. May 22, 2020) ("Plaintiffs did not present evidence that Defendants subjectively believed their actions in response to the COVID-19 situation were inadequate . . . . [and] the evidence in this record does not meet the high burden required to demonstrate deliberate indifference[.]"); *Wragg*, 2020 WL 2745247, at *21 ("Petitioners' clear concession that 'Respondents may subjectively believe their containment measures are the best they can do,' *supra*, should alone settle the score: Petitioners admit they cannot show at this juncture a likelihood of success on their Eighth Amendment claim. That is, Petitioners acknowledge they have no evidence of Respondents' liable state of mind."). The opposite is true here, as the record demonstrates that ODOC has made a valiant effort to date to respond to the COVID-19 pandemic. *See Money*, 2020 WL 1820660, at *18 (finding that the "record simply does not support any suggestion that Defendants have turned the kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for the inmates' welfare") (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).

### 2) Testing

Plaintiffs also assert that ODOC is acting with deliberate indifference by not testing a sufficient number of AICs. (Pls.' Reply at 15.) The Court disagrees.

Plaintiffs submit declarations from eight AICs who requested a COVID-19 test, but did not receive one. *See* Decl. of Brandon Plunk ("Plunk Decl.") ¶ 4(b), ECF No. 92 ("I asked for a test and the nurse told me I don't have enough symptoms."); Decl. of Kevin McCormack

("McCormack Decl.") ¶ 4(b), ECF No. 100 ("I sent a kyte to medical asking to be tested for COVID-19. I got a reply that they're not going to test anyone that doesn't have serious enough symptoms."); Delicino Decl. ¶ 5(c) ("I asked for a COVID19 test sometime between the 5th and 15th of April and was told I didn't need one."); Constantin Decl. Att. 1 at 3 (explaining that he asked for a test but was told only people "who desperately need them will get them"); Decl. of Jesse Patterson ("Patterson Decl.") ¶ 15, ECF No. 32 (explaining that he showed no symptoms, asked for a test, and was denied); Preston Decl. ¶ 5 ("I asked for a COVID-19 test. I was told no tests were available."); Decl. of Kerry Crocket ("Crocket Decl.") ¶ 5, ECF No. 37 (describing that he was coughing and had a dry throat but was refused a test). Six AICs requested a test and had to wait for the test (AICs Maddox, Garret, White, Hall, Walls, and Hart). Seven AICs asked for a test and received one right away (AICs Horner, Seck, White, Larson, Lee, Gardea, and Astorga). Six AICs stated that they have not requested a test (AICs Borba, Mitchell, Pritchett, Weis, Kirk, and Richardson). The remaining declarants did not mention whether they asked for a test.

Defendants present evidence describing their testing policy, and data showing how many AICs they have tested to date. As of June 1, 2020, ODOC had tested 591 AICs (and re-tested 64). *See* https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited June 1, 2020). ODOC does not test every AIC, but has followed CDC and OHA guidance on the appropriate criteria for testing. (Steward Decl. ¶ 38; Dewsnup Decl. ¶ 32 ("ODOC is not conducting mass prevalence testing at this time as it is not recommended by either OHA or the CDC. Identification of all positive, asymptomatic AICs is not possible using present testing methodologies, and thus could not be expected to result in complete eradication or prevention of COVID-19 within any facility.").)

If an AIC tests positive, ODOC conducts "targeted concentric tracing of asymptomatic AICs" which involves "testing the close contacts of the positive AICs to determine the extent of the infection[.]" (Steward Decl. ¶ 40.) Some of the confirmed cases "come from testing [] symptomatic AICs" but the majority "come through contact tracing and daily health checks conducted by Health Services." (Steward Decl. ¶ 41.)

Defendants' current testing policy, consistent with the CDC's Correctional Guidelines, does not rise to the level of deliberate indifference. The Court is sympathetic to AICs who are scared, and for whom a negative test would ease their worry, but Defendants' testing protocol is based on the current standard of care and does not constitute deliberate indifference. *See Wragg*, 2020 WL 2745247, at *21 (finding that where a "prison only tests those inmates who exhibit symptoms and are then determined eligible for testing by medical staff[,]" officials were not deliberately indifferent); *cf. Savino v. Souza*, --- F. Supp. 3d ---, 2020 WL 2404923, at *10 (D. Mass. 2020) (finding that the defendants' failure to test more than twenty detainees by May 1, 2020, or conduct any contact tracing, would likely qualify as deliberate indifference); *Coreas*, 2020 WL 2201850, at *2 (finding that the "lack of any testing for COVID-19" constituted deliberate indifference because the defendant had not "actually tested anyone to date").[11]

### 3) Identifying Vulnerable AICs

Plaintiffs argue that Defendants' definition of AICs it considers to be "vulnerable" is too narrow. *See* Pls.' Reply at 15. Plaintiffs argue that in the prison context, AICs fifty and older

_____

[11] In addition, ODOC cannot be faulted for an AIC's fear of taking a test because a positive test will result in transfer to a medical facility or isolation, where isolation is the appropriate response to a positive test. The Court notes that ODOC has taken important measures to ensure that the condition of isolation units is not punitive, but it could do a better job of communicating to AICs that the conditions of medical isolation are not the same as disciplinary segregation.

should be considered "vulnerable." *See* Pls.' Reply at 15; Stern Decl. ¶ 12. Plaintiffs assert that "ODOC's improperly narrowed category of vulnerable prisoners prevents Defendants from appropriately and reasonably providing the care required for vulnerable people" and rises to deliberate indifference. *See* Pls.' Reply at 16; Stern Decl. ¶ 12 ("[I]t is well known in correctional health sciences that individuals in jails are physiologically comparable to individuals in the community several years older.").

ODOC considers "individuals who are 65 years and older" to be "vulnerable." (Dewsnup Decl. ¶ 24.) The CDC Correctional Guidelines do not explicitly define an age category as "vulnerable," and instead explain that "COVID-19 is a new disease, and there is limited information[,]" but "[b]ased on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk[.]" (Steward Decl. Ex. 5 at 6.) Although ODOC categorizes AICs who are 65 and older as vulnerable, ODOC also considers AICs with the following medical conditions to be vulnerable: chronic lung disease or moderate to severe asthma, serious heart conditions, immunocompromised condition, severe obesity, diabetes, chronic kidney disease requiring dialysis, and liver disease. (Dewsnup Decl. ¶ 24(a)-(g).)

Although there exists reasonable disagreement on the appropriate age of vulnerability to COVID-19, ODOC's position that AICs age 65 and up are the most vulnerable does not amount to deliberate indifference, especially in light of the fact that ODOC also takes into account each AIC's other comorbidities. *See Money*, 2020 WL 1820660, at *18 ("[Defendants' plan] may not be the plan that Plaintiffs think best; it may not even be the plan that the Court would choose . . . . But the Eighth Amendment does not afford litigants and courts an avenue for de novo review of the decisions of prison officials[.]"); *cf. Gomes v. U.S. Dep't of Homeland Sec.*, No. 20-cv-452-

LM, 2020 WL 2514541, at *13 (D. N.H. May 14, 2020) (holding that the defendant institution's failure to identify *any* vulnerable detainees constituted deliberate indifference).

#### 4) Medical Treatment

Plaintiffs argue that Defendants are not providing appropriate health care services to its COVID-19 positive AICs, citing plaintiff Hart's experience. (Pls.' Reply at 17.) Hart alleges that he was initially refused a test despite having symptoms, but on May 15, 2020, Hart tested positive for COVID-19 and ODOC moved him to a disciplinary segregation unit for medical isolation. (Suppl. Decl. David Hart ("Hart Suppl. Decl.") ¶ 22, ECF No. 99.) Hart received medical checks from a nurse multiple times a day. *See* Decl. ¶ 34 ("During the morning medical check . . . . Later in the day when I had another check . . . ."). Defendants confirm that "Hart is now in the COVID-19 isolation unit at OSP. He is seen frequently (multiple times per day) by ODOC Health Services, who continue to monitor his symptoms." (Dewsnup Decl. ¶ 53.)

Plaintiffs also point to AIC Astorga's experience. On May 15, 2020, Astorga developed a fever and body aches, and sought medical attention. (Decl. of Jose Sanchez Astorga ("Astorga Decl.") ¶ 4(b), ECF No. 94.) That same day he saw a nurse, who did not speak English, and there was no interpreter present during his consultation. (Astorga Decl. ¶ 4(c).) Astorga perceived that the nurse reluctantly listened to him and decided to test him for COVID-19. (Astorga Decl. ¶ 4(c).) The nurse tested Astorga on May 21, 2020, and staff sent him to isolation on May 22, 2020. (Astorga Decl. ¶ 4(a).) Staff informed Astorga that he will be quarantined for twenty-four days. (Astorga Decl. ¶ 4(e).) Three days into his quarantine, he did not have a towel, new sheets, pillow covers, pants, or more than two shirts per week. (Astorga Decl. ¶ 4(f).)

Defendants respond that "AICs presenting with symptoms of COVID-19 are screened by ODOC's health care providers." (Steward Decl. ¶ 37.) ODOC's Chief Medical Officer and its infectious disease specialist are primarily responsible for coordinating the medical care for

confirmed and suspected COVID-19 positive AICs. (Steward Decl. ¶ 42.) "ODOC has varying
levels of medical care available at each institution" and while "[s]everal institutions have 24/7
medical care and infirmary level care[,]" "[e]very medium and maximum security institution has
at least one healthcare provider on site at all times." (Steward Decl. ¶ 46.) CCCF and SRCI have
around-the-clock care facilities. (Steward Decl. ¶ 46.) While the minimum-security institutions
do not have appropriate treatment facilities, ODOC has "established hospital locations and
services for each institution and is prepared to transfer AICs to a higher level of care if needed."
(Steward Decl. ¶ 48.) ODOC screens AICs in medical isolation at least daily. (Steward Decl. ¶
46); *see also* Pritchett Decl. ¶ 5(c) ("I have my temperature checked every day with the rest of
my unit, C2."); Decl. of Micah Rhodes ("Rhodes Decl.") ¶ 22, ECF No. 44 ("Currently, nurses
are coming by our unit to see how specific AICs are doing.").

   Many AICs who test positive for COVID-19 are asymptomatic or have mild symptoms,
and they are generally instructed to rest and hydrate while being monitored by nursing staff.
(Dewsnup Decl. ¶ 47.) ODOC transfers any vulnerable AICs who test positive to CCCF, where
there is around-the-clock on-site oxygen, IV fluids, IV antibiotics, adequate isolation conditions,
and access to medical professionals equipped to deal with serious COVID-19 cases. (Dewsnup
Decl. ¶ 48.) If an AIC cannot be treated at CCCF, he or she will be hospitalized in the
community. (Dewsnup Decl. ¶ 49.)

   Plaintiffs' evidence to date does not demonstrate that ODOC has been deliberately
indifferent in providing medical care relating to COVID-19. *See Camacho Lopez v. Lowe*, --- F.
Supp. 3. ---, 2020 WL 1689874, at *7 (M.D. Penn. 2020) (finding that the defendants, who
placed the AIC in isolation shortly after he developed symptoms and was assessed by medical
staff throughout the day, did not act with deliberate indifference).

### 5) Summary

In sum, the Court finds that to date, Defendants have responded reasonably to the serious risks posed by the COVID-19 pandemic, and Plaintiffs are therefore unlikely to succeed in demonstrating that Defendants acted with deliberate indifference. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."); *see also Garcia*, 786 F.3d at 740 ("Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we 'need not consider the remaining three [*Winter* elements].'" (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013))).

### 2.  Likelihood of Irreparable Harm

Although the Court's analysis could end there, it nevertheless examines the remaining *Winter* factors. The second *Winter* factor "requires plaintiffs . . . to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (noting that the "possibility" of irreparable harm is insufficient). Plaintiffs argue that Defendants' inadequate response to COVID-19 makes it "likely that some Plaintiffs have been infected and that many others will be infected" and "[i]t is also likely that because of their vulnerability to serious infection and death, Plaintiffs will suffer severe illness, permanent bodily injury, or death." (Mot. Prelim. Inj. at 50.) The Court agrees.

Even if a plaintiff cannot establish a likelihood of success on the merits, he may still establish the likelihood of irreparable harm. *See Alvarez v. Larose*, --- F. Supp. 3d ---, 2020 WL 2315807, at *5 (S.D. Cal. 2020) (finding that the plaintiffs did not establish a likelihood of success on the merits of their claim, but that it is undisputed that medically vulnerable AICs face "a heightened risk of serious injury or death upon contracting COVID-19"). Indeed, "[e]ven in

the early days of the pandemic, and with few exceptions, courts did not hesitate to find irreparable harm as a result of potential COVID-19 exposure in prison and detention, including in facilities where there had not been a confirmed case" and "[a]t this stage of the pandemic, the threat is even clearer." *Fraihat v. U.S. ICE*, No. EDCV 19-01546-JGB (SHKx), 2020 WL 1932570, at \*27 (C.D. Cal. Apr. 20, 2020).

Plaintiffs live, work, sleep, and eat in a congregate environment that poses significant, if not absolute, challenges to social distancing. There can be no reasonable dispute that Plaintiffs are at an increased risk of COVID-19 infection in prison, especially in light of their underlying medical conditions and age. Accordingly, the Court finds that Plaintiffs have established that they are likely to suffer irreparable harm. *See Bent v. Barr*, No. 19-cv-06123-DMR, 2020 WL 1812850, at \*6 (N.D. Cal. Apr. 9, 2020) (finding that the plaintiff established he would suffer "irreparable injury to his health and safety" because the plaintiff had "at least two high-risk conditions" that put him " at a heightened risk because of COVID-19"); *see also Coronel v. Decker*, Case No. 20-cv-4272 (AJN), 2020 WL 1487274, at \*3 (S.D.N.Y. Mar. 27, 2020) ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19."); *Thakker v. Doll*, --- F. Supp. 3d ---, 2020 WL 1671563, at \*4 (M.D. Penn. 2020) ("Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns . . . we therefore find that Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable."); *cf. Habibi v. Barr*, No. 20-cv-00618-BAS-RBB, 2020 WL 1864642, at \*6 (S.D. Cal. Apr. 14, 2020) ("Petitioner is a 23-year-old with no stated preexisting or underlying medical conditions that make him high-risk due to COVID-19. Petitioner's claim that his mere presence in [the detention facility], absent any underlying conditions, is therefore insufficient to state

a *likelihood* that he will suffer severe illness or any other irreparable harm as a result of his continued detention.").

### 3.     Balance of Equities and Public Interest

Balancing the public interest and equities here invokes important interests on both sides of the dispute.

On the one hand, preventing the spread of COVID-19 in ODOC facilities will both save lives of AICs and reduce the risk of spread to the community. *See Frazier*, 2020 WL 2110896, at *10 ("[The] public interest is served by protecting plaintiffs . . . . from COVID-19 both within [defendants'] facilities and among communities surrounding and interacting with those facilities[.]").

On the other hand, "[s]tates have a strong interest in the administration of their prisons[,]" and the Supreme Court has cautioned "that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons[.]" *Id.* at *9 (quoting *Woodford v. Ngo*, 549 U.S. 81, 94 (2006)). The "public interest also commands respect for federalism and comity" and the "Court should approach intrusion into the core activities of the state's prison system with caution." *Id.* at *10; *see also* 18 U.S.C. § 3626(a)(2) ("The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity[.]").

Any injunctive relief this Court could order would implicate important federalism and separation of powers concerns. *See Money*, 2020 WL 1820660, at *16-19 (explaining that "running and overseeing prisons is traditionally the province of the executive and legislative branches" and that "the public interest also commands respect for federalism and comity, which means that courts must approach the entire enterprise of federal judicial intrusion into the core activities of the state cautiously and with humility"). Indeed, "courts are 'ill equipped' to

undertake the task of prison administration, which is within the province of the legislative and executive branches of government." *Valentine*, 2020 WL 1916883, at *14 (quoting *Turner v. Safley*, 482 U.S. 78, 84-85 (1987)). This Court respects that ODOC is run by correctional experts with many years of experience and in-depth knowledge, and court involvement runs the risk of disrupting ODOC's current COVID-19 response. *See Mecham v. Fano*, 427 U.S. 215, 228-229 (1976) (warning against court involvement in "the day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges"); *but see Valentine*, 2020 WL 2497541, at *1 ("[W]hile States and prisons retain discretion in how they respond to health emergencies, federal courts do have an obligation to ensure that prisons are not deliberately indifferent in the face of danger and death.").

Given the weighty considerations on both sides, the Court concludes that the public interest and equities factors balance roughly equally between the parties. *See Frazier*, 2020 WL 2561956, at *36 (finding that the balance of equities and public interest factors were neutral where there were "strong considerations that favor both sides in th[e] dispute").

### 4. Weighing the factors

Weighing all of the *Winter* factors here, the Court concludes that preliminary injunctive relief is not warranted at this time.[12] *See Winter*, 555 U.S. at 20 (explaining that a party seeking preliminary injunctive relief must establish all four factors); *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (staying district court's preliminary injunction requiring officials immediately to implement additional COVID-19 prevention efforts, and noting that "even assuming there is a substantial risk of serious harm, the Plaintiffs lack evidence of the

---

[12] In light of this holding, the Court does not address Defendants' argument that Plaintiffs do not have standing for the broad injunctive relief they seek.

Defendants' subjective deliberate indifference to that risk"); *Swain*, 958 F.3d at 1090 (staying district court's preliminary injunction requiring officials immediately to implement additional COVID-19 prevention efforts, because where "the defendants adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures, the defendants' actions likely do not amount to deliberate indifference").

## CONCLUSION

For the reasons stated, the Court DENIES Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 14).

**IT IS SO ORDERED.**

DATED this 1st day of June, 2020.

_____
STACIE F. BECKERMAN
United States Magistrate Judge