**Juan C. Chavez**, OSB #136428
**Brittney Plesser**, OSB #154030
**Franz Bruggemeier**, OSB #163533
**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Tel: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB # 862984
Sugerman Law Office
707 SW Washington St Ste 600
Portland OR  97205
Tel: 503-228-6474
Facsimile: 503-228-2556

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; MICAH RHODES; and SHERYL LYNN SUBLET, individually, on behalf of a class of other similarly situated, <br> Plaintiffs, <br> v. <br> KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; and KEN JESKE, <br> Defendants. | Case No. 6:20-cv-00570-SB <br><br><br> PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT <br><br> Oral Argument Requested |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs submit this Brief in Opposition to Defendants' Motion for Summary Judgment.

Plaintiffs support this brief with 10 additional declarations of Oregon Department of Corrections

(ODOC) Adults In Custody (hereinafter AICs), and a Declaration of Investigator Althea

Seloover. Plaintiffs will rely upon and incorporate here the previously submitted AIC

Declarations, Declaration of Dr. Marc Stern, Declaration of Jeffrey Schwartz, Ph.D., Declaration

of former ODOC Corrections Officer Jeffrey Parnell, Declaration of Dr. Mark Baskerville, and

Declaration of Investigator Althea Seloover. Plaintiffs requests that this Court **DENY**

Defendants' Motion.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. **6**

II. SUMMARY OF FACTS ...................................................................................... **8**

    A. Before The Fires ............................................................................................... 9

    B. Screening And Testing For COVID-19 ........................................................... 9

    C. PPE Inconsistencies ........................................................................................ 11

    D. Dangerous AIC and Staff Movements ........................................................... 12

    E. Out of the Petri Dish and Into the Fires ......................................................... 13

III. STANDARDS FOR SUMMARY JUDGMENT ............................................. **15**

IV. ARGUMENT ..................................................................................................... **16**

    A. Qualified Immunity Is Legally Impermissible In This Context.................... 16

    B. Qualified Immunity Does Not Bar Plaintiffs' Suit........................................ 17

        1. Qualified Immunity Was Developed To Protect Officials Making Split-Second Decisions—Not in Deliberative Processes like Addressing a Pandemic ............. 20

        2. Clearly Established Law Gave Defendants Fair Warning To Protect People In Their Custody From Heightened Exposure To COVID-19 ……………………...21

        3. Defendants Continue To Violate Plaintiffs' Constitutional Rights To Be Free From Harm From Exposure To COVID-19 …………………………………………...25

            a. This Court's Preliminary Injunction Ruling Does Not Preclude A Ruling Denying Qualified Immunity…………………………………………...28

            b. Ongoing Factual Disputes Render A Ruling Allowing Qualified Immunity Premature…………………………………………………………...29

    C. Defendants Have Not Satisfied Their Burden To Establish A Discretionary Immunity Defense…………………………………………………………………………...30

        1. Defendants' Decision Not To Implement Social Distancing Measures In ODOC Facilities Is Not Protected By The Discretionary Immunity Statute ................... 32

        2. ORS 30.265 Does Not Protect The Subsequent Decisions Of Defendants' Employees And Agents…………………………………………………………...33

    **CONCLUSION** .................................................................................................. **36**

## TABLE OF AUTHORITIES

**Cases**

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................ 21

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ..................................................... 15

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011) ............................................................ 19

*British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371 (9th Cir. 1989) ........................................................................................... 16

*Brousseau v. Haugen*, 543 U.S. 194 (2004) ............................................................. 19

*Brown v. Plata*, 563 U.S. 493 (2011) ....................................................................... 23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 16

*Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) ............................................... 18, 22

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ........................................................... 17

*DeShaney v. Winnebago County Dep't. Soc. Servs.*, 489 U.S. 189 (1989) ........... 21, 22

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................... 21, 22

*Farmer v. Brennan*, 511 U.S. 825 (1994). ......................................................... 22, 24

*Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974) ....................................................... 23

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................... 18, 19, 20

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................................................. 17, 18, 19

*Helling v. McKinney*, 509 U.S. 25 (1993) ........................................................... passim

*Hines v. Youseff*, 914 F.3d 1218 (9th Cir. 2019) ................................................. 22, 23

*Hope v. Pelzar*, 536 U.S. 730 (2002) ....................................................................... 19

*Hope v. Pelzer*, 536 U.S. 730 (2002); ..................................................................... 18

*Hughes v. Wilson*, 345 Or. 491 (2008) ............................................................... 31, 33

*Hunter v. Yates*, 2009 WL 233791 (E.D. Cal. Jan. 30, 2009) .................................. 23

*Hutto v. Finney*, 437 U.S. 678 (1978) ................................................................ 21, 22

*Leisek v. Brightwood Corp.*, 278 F.3d 895 (9th Cir. 2002) ...................................... 16

*Lowrimore v. Dimmitt*, 310 Or. 291 (1990) ............................................................. 31

*McBride v. Magnuson*, 282 Or. 433 (1978) ............................................................. 34

*Mosley v. Portland School Dist. No. 1J*, 315 Or. 85 (1992) ................................. 31, 34

*Mullenix v. Luna*, 136 S. Ct. 305 (2015) ................................................................. 19

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ....................................... 6, 17, 18

*Pierson v. Ray*, 386 U.S. 547 (1967) ....................................................................... 20

*Pottenger v. Potlatch Corp.*, 329 F.3d 740 (9th Cir. 2003) ..................................... 15

*Ramirez v. Hawaii T&S Enters., Inc.*, 179 Or. App. 416 (1984) .......................... 31, 32

*Stevenson v. Dep't of Transp.*, 290 Or. 3 (1980) ..................................................... 32

*Tennessee v. Garner*, 471 U.S. 1 (1985) ............................................................ 18, 19

*Tolan v. Cotton*, 572 U.S. 650 (2014) ...................................................................... 19

*Trop v. Dulles*, 356 U.S. 86 (1958) .......................................................................... 25

*Turner v. State ex rel. Dep't of Transp.*, 270 Or. App. 353 (2015) ......................... 31

*Valentine v. Collier*, 2020 WL 5797881 (S.D. Texas 2020) .................................... 24

*Westfall v. Or. Dep't of Corrections*, 355 Or. 144 (2014) ................... 31, 32, 33, 35

*White v. Pauly*, 137 S. Ct. 548 (2017) ............................................................... 18, 19

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ................................................................ 16

**Statutes**

42 U.S.C. § 1983 ................................................................................................. 16, 17

ORS 30.265 ................................................................................................. 32, 33

**Other Authorities**

Alex Zielinski, *Inmates at Portland Prison Accuse Staff of Retaliation for COVID-19 Lawsuit*, Portland Mercury (June 5, 2020), ............................................................... 9

CDC, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities* ................................................................................................................ 10

Conrad Wilson, *Oregon prisoners describe 'insane' fire evacuation, looming COVID-19 threat*, OPB (Sept. 16, 2020) ............................................................................... 13

Dept. of Corrections, *COVID-19 Tracking* ................................................................ 8

Jayati Ramakrishnan, *Governor commutes sentences for 66 more inmates, including 10 considered vulnerable to COVID*, THE OREGONIAN (Sept. 29, 2020) ...................... 8

Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 60–61 (2017) ................. 17

*Saucier v. Katz*, 533 U.S. 194, 201 (2001) .............................................................. 18, 19

Stephen Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219 (2015) ... 17

William Baude, *Is Qualified Immunity Unlawful*, 106 Cal. L. Rev. 101 (2018) ........................ 17

**Rules**

FRCP 56 ....................................................................................................... 15

# I. INTRODUCTION

It is not a "novel" proposition that Defendants are constitutionally responsible for protecting the individuals they hold in their custody from known dangers. In their Motion, to avoid facing a jury, Defendants assert early defenses under the theories of qualified immunity and discretionary immunity. Neither theory is availing. There are material facts in dispute, and Plaintiffs' case raises questions that demand a jury weigh the evidence and determine whether Defendants violated the rights of AICs to be free from contracting a virus from which they were not sentenced to suffer.

A bare recitation of the facts shows the stark issues of material fact that have developed since Plaintiffs' filed for preliminary injunction. Since this Court's June 1, 2020, opinion and order on Plaintiffs' motion for a preliminary injunction, at least eight AICs have died. More than 1,000 AICs and over 250 corrections officers have tested positive for COVID-19 at nine ODOC institutions. On June 1, COVID-19 had only infected 157 AICs at four ODOC prisons, and one AIC had died from COVID-19. These numbers jumped after ODOC loosened what Plaintiffs asserted were already lax preventive measures. ODOC prisons remain overcrowded and unequipped to handle the COVID-19 pandemic. These numbers paint a harrowing picture of what is happening in ODOC, but also show that, at this juncture, too many questions of material fact exist to permit a dispositive ruling from the Court. *See* FRCP 56(c).

Defendants' Motion fails on several fronts. First, with respect to qualified immunity, Defendants cannot succeed on the first prong of the *Saucier/Pearson* analysis, which asks whether the facts alleged show that Defendants conduct violated a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232, 234 (2009). This pandemic is ongoing, as are Defendants' constitutional violations. As the new and supplemental declarants make clear, for all of

Defendants' claims that efforts were made and strides taken in combatting this disease, the reality is a wholly different matter. AICs continue to suffer, and the deliberate choices made by Defendants were the primary factor in these outcomes.

Nor can Defendants prevail on the second *Saucier/Pearson* prong: whether the right to be free from a serious, communicable disease is "clearly established." While Defendants argue "[t]here is no clearly established law mandating the appropriate response to *this* pandemic," Dkt. 115 at 6 (emphasis added), Eighth Amendment jurisprudence is comprehensive on this point—failure to take clear and obvious precautionary public health measures to prevent an outbreak of a serious, communicable disease constitutes deliberate indifference to serious medical needs.

Finally, with respect to discretionary immunity, Defendants failed to satisfy their burden. Defendants have an affirmative duty to provide individuals in their custody with conditions of reasonable health and safety, and to protect them from contracting a highly infectious and deadly disease. Their liability for their failure to fulfill that duty cannot be escaped by invoking discretionary immunity in this case.  Moreover, even if Defendants' decision to issue guidance aimed at preventing the spread of COVID-19 in ODOC facilities generally would give rise to immunity, their employees' later decisions not to implement that guidance do not. ODOC employees and agents failed to apply Defendants' policies in the manner that Defendants directed.

This Court should deny Defendants' Motion because Plaintiffs have alleged and shown facts that Defendants violated their Eighth Amendment right to be free from conditions that pose an unreasonable risk to their future health, because that right is clearly established, and because Defendants have not met their burden to establish a discretionary immunity defense.

## II. SUMMARY OF FACTS

Since the June 1, 2020 Opinion and Order denying Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (herein after, "TRO/PI"), the circumstances under which Plaintiffs' complaint was filed have worsened significantly.  Plaintiffs submit 11 additional declarations in support of this response. Plaintiffs also incorporate the facts in their Second Amended Complaint, Motions, and supporting Declarations into this response, including Plaintiffs' preliminary injunction motion, Dkt 14, and their Reply, Dkt 90, and all of the declarations in support of their Motion. Those facts have been and remain in dispute regarding the differences between what Defendants claim to be doing to provide prevention and treatment for COVID-19 in ODOC facilities and the conditions and policies in the facilities that Plaintiffs and other AICs have experienced.

Under Defendants' care and responsibility, nine people with COVID have died. One thousand two-hundred and sixty-nine (1,269) people have contracted COVID-19 in nine prisons, including two-hundred and sixty-three (263) staff members.[1] Four-hundred and thirteen (413) of those people are housed at the state's largest prison by population, Snake River Correctional Institution.[2]  Since the beginning of this pandemic, the Governor has granted only 123 people early release,[3] creating no opportunity for COVID-19 prevention, including when four prisons were evacuated due to wildfires in September.  People from three prisons, housing approximately 1,431 people, were placed in Oregon State Penitentiary, packed together like cattle in a slaughterhouse.

---

[1] Dept. of Corrections, *COVID-19 Tracking*, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx
[2] *Id.*
[3] Jayati Ramakrishnan, *Governor commutes sentences for 66 more inmates, including 10 considered vulnerable to COVID*, THE OREGONIAN (Sept. 29, 2020), available at: https://www.oregonlive.com/pacific-northwest-news/2020/09/governor-commutes-66-more-inmates-sentences-including-10-considered-vulnerable-to-covid.html

### A. Before The Fires

Following this Court's order, AICs began reported laxing of COVID-19 restrictions within ODOC. Defendants' Supplemental Bugher Declaration admits as much. Dkt 116 ¶ 14. Witnesses in this matter were retaliated against.[4] Staff mask-wearing was inconsistent, even after Defendant Steward's July 13 masking mandate. Dkt 116-2. When AICs grieved these inconsistencies, retaliation followed.[5] AICs became demoralized.

Social distancing never improved and remains largely as it was described in Plaintiff's Motion for TRO/PI. The other conditions that Defendants touted as their cure-all for not accomplishing social distancing come to bear here. Plaintiffs will cover these areas in four parts. Each area, per our health experts, who both submitted declarations, Dkt. 16 (*Stern Dec.*), Dkt. 91 (*Baskerville Dec.*), and testified before this Court in the TRO/PI hearing, is essential for combatting COVID-19, and failure to meet these necessarily leads to a finding of deliberate indifference. Each of these components worsened during the fire evacuations, which will be described last.

### B. Screening And Testing For COVID-19:

Declarants report that because of poor screening and contact tracing, testing remains unattainable for many. People exposed to others who tested positive for COVID-19 and people exhibiting symptoms are not being consistently tested. The CDC's Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities states that (1) "Testing is recommended for all close contacts of persons with SARS-CoV-2 infection" and (2) "Consistent with CDC's recommendations, individuals . . . with COVID-19 signs or symptoms should be

---

[4] Alex Zielinski, *Inmates at Portland Prison Accuse Staff of Retaliation for COVID-19 Lawsuit*, Portland Mercury (June 5, 2020), available at https://www.portlandmercury.com/blogtown/2020/06/05/28510015/inmates-at-portland-prison-accuse-staff-of-retaliation-for-covid-19-lawsuit

[5] *Wood Dec.*, ¶ 4g.

referred to a healthcare provider for evaluation and testing." CDC, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html.

Mr. Wood reports that a person living in his unit tested positive for COVID-19. That person's three cellmates requested tests but were denied. *Wood Dec.*, ¶ 4c–d. Mr. Brown is an AIC at Eastern Oregon Correctional Institution (EOCI), a facility that suffered a significant outbreak of COVID-19 in recent months and where the second highest amount of COVID-19 deaths occurred. His experience summarizes many of the respondents to our inquiries on this metric:

> "The only way to get tested for COVID-19 here at EOCI is to have a fever. But prisoners are scared to go to isolation, so they're not reporting symptoms. There are sick people with COVID-19 symptoms around me in my unit."

*Brown Dec.*, ¶ 4d.

According to Declarant Kambarov, Two Rivers Correctional Institution's testing policy amounts to no one getting tested unless they are a really sick or threaten a lawsuit. *Kambarov Dec.*, ¶ 4i. According to Mr. Yurkovich, who is housed at Snake River Correctional Institution, "approximately 70% of our unit had symptoms," but because they did not have fevers, they "were told by medical staff they were simply experiencing allergies." Mr. Yurkovich takes a medication for allergies and did not experience symptom relief. *Yurkovich Dec.*, ¶ 4e-g. Other gaping holes in testing procedures exist, like Oregon State Correctional Institution nurses only testing temperature but not asking about or recording any other symptoms. *Maney Dec.*, ¶ 4f, g; *McDonald Dec.*, ¶ 7c. Mr. McDonald was told he would not be tested because he did not have a fever. *McDonald Dec.*, ¶ 7d.

These are problems that predated this Court's Order and Opinion on Plaintiffs' Motion for TRO/PI and continue today. The large increase in positive COVID-19 cases and deaths within ODOC show that Defendants are failing the people they are constitutionally obligated to protect.

### C. PPE Inconsistencies

Dr. Dewsnup was aware as early as May and testified that requiring staff to wear masks would help to reduce staff-to-staff transmission, which would reduce infection spread to AICs. Dkt. 117 at 167. It was not until July 13 that Defendant Steward sent an almost apologetic email to staff requiring they wear masks, citing to threatened legal action and OHA guidance, noting she "too need[s] to be more mindful about putting on [her] face covering." Dkt. 116-2 at 1. Based on the tone of the email and the reported disdain many staff feel about wearing masks, it is not surprising that most declarants report staff have not taken mask wearing seriously, either simply refusing to wear masks or not enforcing mask rules.

Many Correctional Officers wear masks improperly. *Yurkovich Dec.*, ¶ 4l; *Wood Dec.*, ¶ 4e; *Sellers Dec.*, ¶ 4k; *Randall Dec.*, ¶ 4l. Correctional Officers continue to move throughout their facilities while not wearing masks, including to and from quarantined units. *Brown Dec.*, ¶ 4k; *Harvey Dec.*, ¶ 4l; *Kambarov Dec.*, ¶ 4a, c; *Doe Dec.* ¶ 4i; *Wood Dec.*, ¶ 4e; *Yurkovich Dec.*, ¶ 4n; *Sellers Dec.*, ¶ 4i; *McDonald Dec.*, ¶5o. According to declarants, many COs treat COVID-19 like it's a "joke." *Harvey Dec.*, ¶ 4k; *Werby Dec.*, ¶ 4d. Between performing tasks, COs and other staff will not change their personal protective equipment, particularly gloves. *Wood Dec.*, ¶ 5c; *Yurkovich Dec.*, ¶ 4m.

Additionally, there are reports of AICs not following masking protocols and staff failures to address the issue. *Brown Dec.*, ¶4l; *Maney Dec.*, ¶4d-e; *McDonald Dec.*, ¶7i. If an AIC

complains to a non-mask wearing CO about their behavior, they are threatened with punishment in solitary confinement. *Wood Dec.*, ¶ 4g.

Mr. Harvey describes an interaction with staff that conveys ODOC's reactionary nature to outbreaks: "I was complaining that it was hypocritical we had to wear masks but officers didn't; that officer said to me 'fuck it, we'll deal with it when it comes.'" *Harvey Dec.*, ¶ 4j.

### D. Dangerous AIC and Staff Movements

According to CDC Guidance, correctional facilities should "[m]ake every possible effort to modify staff assignments to minimize movement across housing units and other areas of the facility.  For example, ensure that the same staff are assigned to the same housing unit across shifts to prevent cross-contamination from units where infected individuals have been identified to units with no infections." Dkt. 116-1 at 8.  Declarants report that staff are regularly moving between quarantined and non-quarantined housing units.

> "There is a massive staffing shortage right now, so COs are working doubles regularly in different units and freely moving around from quarantined units to non-quarantined units. For example, one officer worked a shift in C1, the COVID unit, and then came and worked in my unit for his double shift."

*Sellers Dec.*, ¶ 4l.  This has also been reported about the medical isolation unit at Coffee Creek Correctional Institution.  *McDonald Dec.*, ¶ 4b.  Declarants continue to report that AICs housed in quarantined units are mixing with AICs in non-quarantined units for work.  *Brown Dec.*, ¶ 4l. *Wood Dec.*, ¶ 4e. *Sellers Dec.*, ¶ 4j.

> "When they had a shortage of healthy and non-quarantined AICs they would pull trained kitchen workers from quarantined units. I worked approximately 6 days while on quarantine and was working in close proximity in the kitchen with AICs from other units, including other quarantined units and non-quarantined units."

*Id.* at ¶4c.  AICs have also been reportedly intermixing among quarantined and non-quarantined units while in the law library. *Wood Dec.*, ¶ 5a.

### E. Out of the Petri Dish and Into the Fires

Historic fires raged in the Willamette Valley during the first half of September 2020. These fires threatened many and necessitated an evacuation of four prisons in total: Oregon State Correctional Institution (OSCI), Mill Creek Correctional Facility, Coffee Creek Correctional Facility (CCCF), and Santiam Correctional Institution.[6]  What followed were harms that would have been mitigated and made more manageable had ODOC not been deliberately indifferent in the months preceding the evacuation. Paths taken when the AICs arrived at their respective evacuee facilities show that ODOC made no attempts at "enforcement or acknowledgement of COVID-19 precaution efforts," *McDonald Dec.*, ¶ 5k, and speak to Defendants' severe disregard for the human lives and dignity of those in its custody.

Women transported from CCCF to Deer Ridge Correctional Institution described unbearable conditions.  "Tammy sat on a bus for eight-and-a-half hours," [a relative of an AIC] said. "Everyone was told by the officers to go to the bathroom in their pants. Women were peeing in cups and throwing tampons and feces out the windows of the bus, because they could not leave the bus to use the bathroom." Conrad Wilson, *Oregon prisoners describe 'insane' fire evacuation, looming COVID-19 threat*, OPB (Sept. 16, 2020), available at: https://www.opb.org/article/2020/09/16/oregon-wildfires-evacuation-prison-coronavirus/.

Mr. Randall and Mr. Harvey are two OSCI inmates who were evacuated to OSP. Both Mr. Randall and Mr. Harvey felt completely healthy prior to their evacuation.  *Harvey Dec.*, ¶

---

[6] Plaintiffs do not dispute the necessity of the evacuation. However, Defendants placed the vulnerable persons in their care into greater danger through their deliberate indifference, as argued below.

4e; *Randall Dec.*, ¶ 4a.  Since their return to OSCI, they have both tested positive for COVID-19 and are currently residing in the CCCF quarantine unit.  *Harvey Dec.*, ¶ 4n; *Randall Dec.*, ¶ 5c. They are cellies and stayed together through most of this ordeal.

Mr. Randall and Mr. Harvey were packed into vans with other OSCI AICs and moved to OSP. When they arrived, they were forced to stand in a football-field sized yard with the nearly thousand other OSCI inmates until five or six in the morning.  *See Randall Dec.*, ¶ 4b.  They were close to one another, choking on the fire smoke for many hours.  *Id.*  When taken inside, Mr. Randall and Mr. Harvey were placed in the "barn," which hosts an indoor basketball court. There were 350 people packed into this area and given mere inches to be separate from the person sleeping next to them.  Sanitation became a severe problem.  *See Harvey Dec.*, ¶ 4b; *see also Randall Dec.*, ¶ 4c.

Correctional Officers and ODOC staff came in and out of this area. Many had stopped wearing masks, including the Captains and Sergeants. Some worked at OSP and not OSCI.  AICs from OSP came in and out of their sleeping area to deliver food and other items. They were not wearing masks, either.  *See Harvey Dec.*, ¶ 4b.

Mr. Randall and Mr. Harvey are gang dropouts and lived in relative safety at OSCI. *Harvey Dec.*, ¶ 4c; *Randall Dec.*, ¶ 4a.  When they learned they were being moved to OSP, they had immediate apprehension because OSP is well-known to be the prison where gangs are allowed to thrive. They were right to be fearful: their food, which was prepared by OSP AICs, arrived contaminated and tampered. Mr. Harvey found a bloody band-aid in the food served to OSCI inmates. *Harvey Dec.*, ¶ 4c; *Randall Dec.*, ¶ 4d.

Mr. McDonald was also sent to OSP.

> "I was housed on the education floor for the first four days at OSP.
> There were approximately 104 AICs housed there. There was one

bathroom for all of us. We had no access to medical and no access
to grievance forms."

*McDonald Dec.*, ¶ 5c. Plaintiff Maney was sent to OSP as well, where he rarely witnessed

anyone wearing masks. "There was no mention of COVID precautions or even that we were

living with a pandemic." *Maney Dec.*, ¶ 4e.

Plaintiffs submit the above facts to educate the Court on the continued factual disputes in

this case. Plaintiffs do not concede that ODOCs efforts have been "valiant."

## III. STANDARDS FOR SUMMARY JUDGMENT

For a grant of summary judgment, Defendants must establish the absence of any "genuine

issue as to any material fact." FRCP 56(c). The inquiry is "whether there is the need for a trial—

whether, in other words, there are any genuine factual issues that properly can be resolved only

by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

When overcoming a defendant's motion for summary judgment, a plaintiff's burden of

proof "is not high." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003). The

following qualifications need to be satisfied:

> (1) "[M]ake a showing sufficient to establish a genuine issue of
> fact with respect to any element for which it bears the burden of
> proof" at trial;
> (2) Show that "there is an issue that may reasonably be resolved in
> favor of either party," and that the issue should therefore be
> resolved by the finder of fact; and
> (3) "[C]ome forward with more persuasive evidence than would
> otherwise be necessary when the factual context makes the
> nonmoving party's claim implausible."

*British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882

F.2d 371, 374 (9th Cir. 1989); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002)

("If the moving party shows the absence of a genuine issue of material fact, the non-moving

party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))).

As explained below, the factual disputes cut in Plaintiffs' favor, and summary judgment is inappropriate and unwarranted at this stage of litigation.

## IV. ARGUMENT

### A. Qualified Immunity Is Legally Impermissible In This Context.

Recognizing this Court's binding legal authority, Plaintiffs respectfully submit that the defense of qualified immunity is a legally impermissible defense in this context.  Plaintiffs seek to modify existing law, and thus preserve their argument in opposition to the defense for purposes of appellate review.  Fundamentally, there is no circumstance quite like a pandemic to illustrate the constitutional and moral bankruptcy of an idea like the doctrine of qualified immunity.

Qualified immunity cannot be applied except as to state actors protected by immunity in 1871, when § 1983 was enacted.  Defendants cannot show that this would include the named Defendants—largely policy makers and implementers of a state prison system. As applied to persons not immunized under common or statutory law in 1871, the defense of qualified immunity is untethered to any cognizable legal mandate and contravenes the plain meaning and language of 42 U.S.C. § 1983. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870–72 (2017) (Thomas, J., concurring); *see also Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("As I have observed earlier, our treatment of qualified immunity under 42 U.S.C. § 1983 has not

purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume.")[78]

### B. Qualified Immunity Does Not Bar Plaintiffs' Suit.

Qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is immune, courts undertake a two-pronged analysis: 1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right"; and 2) whether the rights were reasonably known at the time the defendant acted. *Pearson v. Callahan*, 555 U.S. 223, 232, 234 (2009).

Under the first prong, the court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The facts are taken in the might most favorable to the plaintiffs as alleged or shown because the "driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims

---

[7] An analysis of the baselessness and disutility of the current judge-created qualified immunity defense appears at William Baude, *Is Qualified Immunity Unlawful*, 106 Cal. L. Rev. 101 (2018); *see also* Stephen Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219, 1244–1250 (2015).

[8] Additionally, qualified immunity cannot be justified as an alleviation of burdensome litigation. As a Yale Law Journal study explained:

> Although qualified immunity terminated only 3.9% of the 979 cases in my dataset in which qualified immunity could be raised, the defense was in fact raised by defendants in more than 37% of these cases--and was sometimes raised multiple times, at the motion to dismiss stage, at summary judgment, and through interlocutory appeals. Each time qualified immunity is raised, it must be researched, briefed, and argued by the parties and decided by the judge…

> [I]n the five districts in my study, just 8.6% of qualified immunity motions brought by defendants in my docket dataset resulted in case dismissals. The remaining 91.4% of qualified immunity motions brought by defendants required the parties and judges to dedicate time and resources to briefing, arguing, and deciding the motions without shielding defendants from discovery and trial.

Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 60–61 (2017).

against government officials will be resolved prior to discovery." *Pearson*, 555 U.S. at 231

(internal quotation marks and brackets omitted).

Under the second prong, qualified immunity does not protect government officials who

violate clearly established statutory or constitutional rights of which a reasonable person would

have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is not a requirement for the

action to have been previously held unlawful; rather, for the immunity to apply, a party need

only show that in light of pre-existing law the unlawfulness is apparent. *Hope v. Pelzer*, 536 U.S.

730, 739 (2002); *see also Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (stating the

analysis is whether the status of the law gave "fair warning" to officials that their *conduct* was

unconstitutional) (emphasis added).  "[E]xisting precedent must have placed the statutory or

constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal

quotation marks omitted). "[G]eneral statements of the law are not inherently incapable of giving

fair and clear warning to officers." *Id.* at 552 (internal quotation marks omitted). "[O]fficials can

still be on notice that their conduct violates established law even in *novel* factual circumstances."

*Hope*, 536 U. S. at 741 (emphasis added).

While true that the Supreme Court has admonished lower courts for treating decisions

such as *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985)[9] as

particular enough to create "clearly established" law, *White*, 137 S. Ct. at 552 (*citing Brousseau

v. Haugen*, 543 U.S. 194, 199 (2004)), it has not concluded that the principles and guideposts

announced in those decisions could not give the type of "fair warning" countenanced in their

qualified immunity cases. As the Court explained in *Harlow*, qualified immunity shields

---

[9] *Graham* and *Garner* are watershed cases holding that police lethal use of force, and violations thereof, are subject to a Fourth Amendment analysis and actionable pursuant to 42 U.S.C. § 1983.

government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Even cases like *Graham* and *Garner* can give warning to government actors in "obvious cases." *White*, 137 S. Ct. at 552.

Applying the two prongs, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Brousseau*, 543 U.S. at 195, n.2 (2004) (per curiam)); *Saucier*, 533 U.S. at 201; *Hope v. Pelzer*, 536 U.S. 730, 733 n.1 (2002). It is crucial for courts to draw "inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong of the standard." *Tolan*, 572 U.S. at 657. Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions when determining what "clearly established law" is dispositive on a claim. *Id.*; *See Brousseau*, 543 U.S. at 195, 198 (inquiring as to whether conduct violated clearly established law "in light of the specific context of the case" and construing "facts . . . in a light most favorable to" the nonmovant).

As discussed above, Plaintiffs emphasize that it is not the name of the disease that must be announced in prior caselaw to clearly establish a constitutional concern, but the conduct of the governmental actor. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011); *Brousseau*, 543 U.S. at 198) ("The dispositive question is 'whether the violative nature of particular *conduct* is clearly established'" and "[t]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'") (emphasis added). Diseases like COVID-19 are not uncommon in many respects. As Dr. Baskerville testified, we have had ideas of how to combat a coronavirus for as long as we have understood the common cold, see Dkt. 117 at 20:1-8, and as argued below, prison managers have

known for a long time that they have an obligation to prevent easily communicable diseases. Defendants cannot wash their hands[10] clean of liability merely because this disease imposes higher burdens on them to combat. In fact, acknowledging that the only unsurpassable hurdle in fighting this disease is the effort it would take to do so is the definition of deliberate indifference.

### 1. Qualified Immunity Was Developed To Protect Officials Making Split-Second Decisions—Not in Deliberative Processes like Addressing a Pandemic.

Much of the Supreme Court's qualified immunity jurisprudence has developed in cases involving the actions of police officers, whose jobs require "split-second judgments—in circumstance that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. For this reason, qualified immunity was meant to protect an officer who must question whether "acting under a statute that he reasonably believed to be valid but that was later held unconstitutional on its face or as applied" from facing liability for their action or inaction. *Pierson v. Ray*, 386 U.S. 547, 555 (1967).

The actions taken by the named Defendants—high level officials with final decision-making authority charged with directing ODOC's coronavirus response—are not subject to the same demands and do not call for split-second decision-making. Decision-makers having to pause and consider whether their actions were constitutional is a feature, not a bug. The Supreme Court cautioned the United States Attorney General of this very thing in *Mitchell v. Forsyth*: "[An Attorney General] may on occasion have to pause to consider whether a proposed course of action can be squared with the Constitution and laws of the United States . . . [which is] precisely the point of the *Harlow* standard: Where an official could be expected to know that his conduct

---

[10] Unlike COVID-19, liability is not defeated with handwashing.

would violate statutory or constitutional rights, he should be made to hesitate . . ." 472 U.S. 511, 524 (1985) (internal quotation marks omitted). Here, too, constitutional law would have cautioned hesitation. As argued below, the law has clearly established that Defendants must protect the AICs in ODOC's care from being harmed by COVID-19, so they deliberated, and chose to act in ways that demonstrate indifference to preventing that harm.

### 2. Clearly Established Law Gave Defendants Fair Warning To Protect People In Their Custody From Heightened Exposure To COVID-19.

Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)). Plaintiffs, thus, have a right to be free from heightened exposure to COVID-19. The Supreme Court has made clear,

> "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment . . ."

*DeShaney v. Winnebago County Dep't. Soc. Servs.*, 489 U.S. 189, 199–200 (1989).

"Contemporary standards of decency require no less." *Helling*, 509 U.S. at 32 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).

An Eighth Amendment claim must satisfy both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prisoner satisfies the objective prong of an Eighth Amendment claim if he has a "serious medical need." *Estelle*, 429 U.S. at 104. A serious

medical need is present when, for example, the "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002). The objective component draws from the "contemporary standards of decency" standard embedded in the Eighth Amendment and asks whether the condition is "sufficiently serious." *Hines v. Youseff*, 914 F.3d 1218, 1228–29 (9th Cir. 2019); *Clement*, 298 F.3d at 904 (citations omitted).

The objective prong includes the protection of prisoners from future harm to their health:

> "That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.' . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet has happened."

*Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200). More specifically, a risk of being infected with a life-threatening communicable disease, such as COVID-19, could constitute such an "unsafe, life-threatening condition":

> "In *Hutto v. Finney*, 437 U.S. 678, 682 [] (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed . . . . Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms."

*Id*. at 33; *see also id*. at 34 (citing with approval *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), holding that prisoners were entitled to relief under the Eighth Amendment when they showed, among other things, "the mingling of inmates with serious contagious diseases with other prison

inmates"). The Supreme Court has also acknowledged that the "increased, substantial risk for transmission of infectious illness" as a result of prison overcrowding could justify the reduction of prison populations. *Brown v. Plata*, 563 U.S. 493, 503 (2011); *see also Hunter v. Yates,* 2009 WL 233791, *3 (E.D. Cal. Jan. 30, 2009) (failure to transfer California prisoners susceptible to Valley Fever fungal infections out of prisons located in high risk areas amounted to "deliberate indifference"); *see also Hines*, 914 F.3d at 1232 (finding exposure to Valley Fever fungal infections not "clearly established" as a violation of the Eighth Amendment in the qualified immunity context because millions of free individuals choose to live with the risk of infection and reasonable officials could infer that the risk of exposure is one that society tolerates).

Understanding the unifying principle *Helling* brings to its progeny of cases, Defendants had considerable, fair warning about the necessity to reasonably respond to COVID-19, an infectious and deadly disease.  Courts must ask "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk," meaning that the risk "is not one that today's society chooses to tolerate." *Id.* at 36.  Undoubtedly, Defendants state that they understood and continue to understand the gravity of situation.  *See* Dkt. 115 at 9.  Defendants also understood and continue to understand what the "standards of decency" society demanded.  Though the symptoms and treatment of COVID-19 are novel, measures to be taken to prevent a heightened risk of exposure to the disease are not.  *See* Dkt. 117 at 20:6–11, Testimony of Mark Baskerville ("[C]oronavirus is . . . everything from the common cold to what we saw with the SARS outbreak . . . [patient] symptoms and their progression of disease is all new."). Medical experts resoundingly agree on how to prevent a heightened risk of exposure to COVID-19, and based on those recommendations, governmental, civic, faith, and commercial institutions around the world have

issued orders to shut down civil society in ways that few could imagine only months ago. Indeed, Defendants' attorneys even threatened to sue the City of Oregon City for signaling a lift of Defendant Brown's Stay at Home Executive Order.[11]  Defendants knew what they needed to do to meet their constitutional obligation.

No prison warden, director of a prison system, or governor of a state could plausibly argue that they had no constitutional duty to act to prevent prisoners from being infected and seriously harmed in the midst of a pandemic. Again, what needs to be "clearly established" in the law is not the exact circumstances of the harm being addressed, like the name of a disease, but that the right that a plaintiff claims to have been violated is a clearly established right. The caselaw is clear that Plaintiffs' have an Eighth Amendment right to be free from conditions that pose an unreasonable risk to their future health.  *See, e.g.*, *Helling v. McKinney*, 509 U.S. at 33.

This Court need not look much further than *Farmer* to find the clearly established law Defendants violated, as the Court in the *Valentine* case in Texas did. After a three-week trial for a permanent injunction, citing *Farmer*, the district court concluded that the defendants had been deliberately indifferent to the plaintiffs' medical needs by "recklessly disregarding obvious and known risks to inmate health and safety." *Valentine v. Collier*, 2020 WL 5797881 at 29, 31 (S.D. Texas 2020). The court acknowledged that the defendants have taken a number of steps to address the spread of COVID-19, including initial consultations with medical experts and the adoption and implementation of a written policy. *Id*. at 30. But the court viewed those measures as the most basic steps that the prison "could have taken to prevent mass death within the prison walls on an unimaginable scale." *Id*. "Designing a policy and

---

[11] Tess Riski, *State Attorney General Threatens Oregon City Mayor With Legal Action If He Violates Governor's Stay-Home Order*, WILLAMETTE WEEK (April 26, 2020), available at https://www.wweek.com/news/2020/04/26/state-attorney-general-threatens-oregon-city-mayor-with-legal-action-if-he-violates-governors-stay-home-order/

implementing some of the measures therein does not automatically satisfy Defendants'

constitutional obligations, especially in the face of an unprecedented public health crisis." *Id*. In

particular, the court found that the defendants' "lack of a systematic and sustainable approach to

slow the spread of COVID-19" and found a "failure to abide by basic public health guidance

including but not limited to the steps outlined in [their written policy]." *Id.* at 31. The court

concluded that, "[i]n sum, Plaintiffs have identified a pattern of policy failures coupled with

implementation and enforcement failures in response to COVID-19 that constitute deliberate

indifference to the medical needs of inmates" and ordered a permanent injunction. *Id* at 34.

Defendants have spent the intervening months since the start of this pandemic assuring

the public and this Court that they have acted to stem the tide of COVID-19 infections in their

prisons, and that they have done so valorously. They paused and deliberated, then acted, because

they had a constitutional obligation to do so. What is left then for this lawsuit, and a jury, to

determine is whether they fell below the constitutional standard of a "maturing society." *Trop v.

Dulles*, 356 U.S. 86, 101 (1958).

### 3. Defendants Continue To Violate Plaintiffs' Constitutional Rights To Be Free From Harm From Exposure To COVID-19.

The quality of Defendants' handling of the COVID-19 pandemic is not "undisputed."[12]

The nine COVID-19 deaths and the more than 1,000 COVID-19 AIC cases were preventable.

The deaths and infections that will occur in the future are also preventable.  ODOC continues to

fail to meet its constitutional obligation to provide adequate preventative care for highly

contagious diseases.  While ODOC claims that its policies and procedures follow CDC

guidelines, Dkt. 116, both Defendants', *see* Dkt. 116, and Plaintiffs' declarants state clearly the

---

[12] *See* MSJ, Dkt. 115 at 3.

areas in which they have observed ODOC staff blatantly breaking their own policies at no consequence to Defendants but at great harm to AICs.  Plaintiffs have alleged and shown throughout this case the facts from which a reasonable trier of fact could conclude that Defendants have failed to reasonably protect AICs from serious injury.  At this time, Defendants' continued failings include issues with screening and testing, staff movements, mask-wearing, and social distancing.

Declarants report that because of poor screening and contact tracing, testing remains unattainable for many, causing greater risks and instances of outbreaks than AICs would face with better policies and implementation.  CDC Guidelines state that the following are critical to prevent transmission and outbreaks:

> "Because many individuals infected with SARS-CoV-2 do not display symptoms, the virus could be present in facilities before infections are identified. Good hygiene practices, vigilant symptom screening, wearing cloth face coverings (if able), and social distancing are critical in preventing further transmission.
> "Testing symptomatic and asymptomatic individuals and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2."

Dkt. 116-1 at 8. Defendants, however, have either a policy or widespread practice of only screening for, asking about, and testing AICs who have fevers or are extremely sick, despite CDC and OHA guidance describing, and AICs asking for tests who have, other symptoms that would require or allow for testing.  *See, e.g.*, *Brown Dec.*, ¶ 4d.; *Kambarov Dec.*, ¶ 4i; *Yurkovich Dec.*, ¶ 4e-g; *Maney Dec.*, ¶ 4f, g; *McDonald Dec.*, ¶ 7c, d.  Defendants also either have a policy or practice of failing to test cellmates of COVID-19-positive AICs.  *See Wood Dec.*, ¶ 4c-d.  It appears that testing is performed differently depending on how far an outbreak has spread, with Defendants choosing to test fewer people before a large outbreak is reported, contrary to the

logic of testing to *prevent* outbreaks, then testing more only after they suspect a large outbreak has already spread through the population in their care.

Defendants were late to implement mandatory masks for staff—the people who bring COVID-19 into the facilities and infect AICs—despite knowing that masks help prevent the spread and that staff-to-staff transmission is critical to preventing and stopping outbreaks among AICs.  *See* Testimony of Dr. Dewsnup, Dkt. 117 at 167. Moreover, Defendants have put AICs at extreme risk of harm by failing to implement and enforce a mask policy that is in line with common knowledge and medical recommendations for preventing the spread of COVID-19.  *See Yurkovich Dec.*, ¶ 4l,n; *Wood Dec.*, ¶ 4e; *Sellers Dec.*, ¶ 4i,k; *Randall Dec.*, ¶ 4l; *Brown Dec.*, ¶ 4k; *Harvey Dec.*, ¶ 4l; *Kambarov Dec.*, ¶ 4a, c; *Doe Dec.* ¶ 4i; *McDonald Dec.*, ¶5o.

Correctional Officers continue to move throughout their facilities while not wearing masks, including to and from quarantined units. *Brown Dec.*, ¶ 4k; *Harvey Dec.*, ¶ 4l; *Kambarov Dec.*, ¶ 4a, c; *Doe Dec.* ¶ 4i; *Wood Dec.*, ¶ 4e; *Yurkovich Dec.*, ¶ 4n; *Sellers Dec.*, ¶ 4i; *McDonald Dec.*, ¶5o. And many COs treat COVID-19 like it's a "joke." *See, e.g.*, *Harvey Dec.*, ¶ 4k; *Werby Dec.*, ¶ 4d.

According to the CDC Guidelines, Defendants should "Make every possible effort to modify staff assignments to minimize movement across housing units and other areas of the facility," which includes "ensur[ing] that the same staff are assigned to the same housing unit across shifts to prevent cross-contamination from units where infected individuals have been identified to units with no infections."  Dkt. 116-1 at 8.  Declarants report that staff are regularly moving between quarantined and non-quarantined housing units.  *See Sellers Dec.*, ¶ 4l, *McDonald Dec.*, ¶ 4b.  And declarants continue to report that AICs housed in quarantined units

are mixing with AICs in non-quarantined units for work.  *Brown Dec.*, ¶ 4*l*.  *Wood Dec.*, ¶ 4e, 5a.

*Sellers Dec.*, ¶ 4c, j.

Furthermore, Defendants' actions during the fire evacuations put thousands of AICs in

danger of being infected and failed to provide even some basic, simple means of protection like

masks, access to handwashing, preventing mixing or AICs and staff from other units and prisons.

*See* Randall, Harvey, MacDonald, and Maney Decs, throughout.

### a. This Court's Preliminary Injunction Ruling Does Not Preclude A Ruling Denying Qualified Immunity.

Defendants argue that, because this Court found they were not likely deliberately

indifferent under a preliminary injunction standard as of May 29, 2020, it would be illogical to

determine Defendants violated Plaintiffs' constitutional rights under a summary judgment

standard.  *See* Dkt. 115 at 10. First, this Court made no conclusions of law that would prohibit

Plaintiffs from going forward or that Qualified Immunity would be granted later in this

case.  This Court also did not conclude that clearly established law did not exist that would have

left Defendants with nothing to guide them, nor was that a question for this Court. Rather, this

Court found that, as of June 1, "Plaintiffs are … unlikely to succeed in demonstrating that

Defendants acted with deliberate indifference," *see* Dkt. 108, Opinion and Order at 38. That

finding is not a conclusion that the Eighth Amendment right that Plaintiffs allege have been

violated is not a clearly established right. It is merely a statement that this Court believed at the

time that it was unlikely that Defendants acted unreasonably to violate that right. Whatever

Defendants read into that ruling does not have any bearing on what this Court is now asked to

decide: do Plaintiffs allege facts that describe a violation of a constitutional right and is that

constitutional right clearly established.  Whether the right is clearly established is a question of

law.  As is whether the facts alleged in the light most favorable to the Plaintiffs would constitute

a violation of that constitutional right.  The question before the court is not a question on the

merits of whether Plaintiffs have already *proven* that Defendants have acted deliberately

indifferent.

Second, this Court's conclusion that Plaintiffs were unlikely to meet their burden to prove

deliberate indifference at the time of the preliminary injunction hearing does not mean that at

trial a reasonable finder of fact could not, as a matter of law, conclude that Defendants have been

deliberately indifferent. The preliminary injunction standard does not, and could not, ask a court

to conclude that a plaintiff could not and would not, as a matter of law, be able to prove a

constitutional violation regardless of the facts alleged, shown, or uncovered in discovery.

Defendants' contention that "it would be illogical to find that the defendants violated any clearly

established rights of which they should have known" confuses the standards and questions before

the court on Plaintiffs' preliminary injunction motion and on their current summary judgment

motion.

To dismiss Plaintiffs' Eighth Amendment claims due to qualified immunity in a motion

for summary judgment, this Court must conclude that the facts alleged or shown by Plaintiffs,

viewed most favorably to them, *cannot* make out a claim for a constitutional violation as a matter

of law. That is not what this Court concluded in its June 1 order, and that is not true now.

### b. Ongoing Factual Disputes Render A Ruling Allowing Qualified Immunity Premature.

Defendants' Motion for Summary Judgment rests primarily on the question of whether

they violated clearly established law, or, in other words, whether they had fair notice that being

deliberately indifferent to the serious risk posed by a deadly communicable disease would violate

the Constitution.  However, it is too soon in this litigation to make such a determination.  The

facts in this case have evolved and will continue to evolve until the close of discovery that has

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 29 of 37

been scheduled for March 31, 2021. As detailed above, facts do inform what "context" of clearly established law the Court must consider. To the degree there are disputed facts, which Plaintiffs detail above, they must either be resolved in our favor for the purposes of this motion or be left to a jury. Nevertheless, proceeding on this prong only ends in the conclusion that there is clearly established law dictating the conduct that is constitutional proscribed and was broken, as described above.

Based on the forgoing and the disputed material facts available at this time, qualified immunity is not available to Defendants and summary judgment should not be granted. Defendants violated Plaintiffs' rights to be free from an increased risk of transmission of an infectious disease, and that is a question for a jury to determine.

**C. Defendants Have Not Satisfied Their Burden To Establish A Discretionary Immunity Defense.**

Nor have Defendants satisfied their burden to establish a discretionary immunity defense. First, Defendants have an affirmative duty—indeed, a constitutional obligation—to provide individuals in their custody with conditions of reasonable health and safety, and to protect those individuals from contracting a highly infectious and deadly disease. Defendants cannot invoke ORS 30.265 to protect them liability flowing from their failure to fulfill that affirmative duty. Second, even if Defendants' decision to issue other guidance aimed at preventing the spread of COVID-19 within and throughout their facilities generally would give rise to immunity, their employees' later decisions not to implement that guidance do not.

ORS 30.265, Oregon's discretionary immunity statute, protects only those government decisions or actions that "embody 'a choice among alternative public policies by persons to whom responsibility for such policies have been delegated.'" *Ramirez v. Hawaii T&S Enters., Inc.*, 179 Or. App. 416, 419 (1984); *see also Westfall v. Or. Dep't of Corrections*, 355 Or. 144,

157 (2014) ("[T]he decision of a governmental official, employee, or body is entitled to discretionary immunity if a governmental person or entity made a policy choice among alternatives, with the authority to make that choice.").  To be entitled to immunity, the government actor's decision or action must fall within the "range of permissible choices" protected under the statute.  The decision must also satisfy three criteria: (1) "[i]t must be the result of a choice, that is, the exercise of judgment"; (2) "that choice must involve public policy, as opposed to day-to-day activities of public officials"; and (3) "the public policy choice must be exercised by a body that has, either directly or by delegation, the responsibility or authority to make it." *Ramirez*, 179 Or. App. at 419.

That the statute protects only a "range of permissible choices," *see Mosley v. Portland School Dist. No. 1J*, 315 Or. 85, 92 (1992), means, of course, that its reach is not unlimited. Indeed, Oregon courts have identified at least three limitations on its application.  First, the statute does not apply to "'routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action.'" *Westfall*, 355 Or. at 157 (quoting *Lowrimore v. Dimmitt*, 310 Or. 291, 296 (1990)).  Second, the statute "does not protect a government's failure to take action where there is a duty to do so." *Turner v. State ex rel. Dep't of Transp.*, 270 Or. App. 353, 363 (2015).  In other words, "if the law requires a government to exercise due care, then ORS 30.265 does not immunize its decision not to exercise care at all." *Hughes v. Wilson*, 345 Or. 491, 496 (2008).  Although the public body "has discretion in choosing the means by which it carries out that duty," "'[t]he range of permissible choices does not . . . include the choice of not exercising care.'" *Id.* (quoting *Mosley*, 315 Or. at 92) (alterations and omissions in original).  Third, even where the statute protects a policy decision, it does not protect an employee's failure to apply the otherwise

immune policy in a particular case. *Westfall*, 355 Or. at 160; *see also id.* ("In that scenario, the actions of the employee generally would not be protected by discretionary immunity (unless the employee's decision not to apply the policy itself somehow separately qualified as a discretionary policy choice entitled to immunity.)").

The burden is on the State to establish its immunity. *Stevenson v. Dep't of Transp.*, 290 Or. 3, 15 (1980). To do so, the State must submit evidence establishing that each of the three criteria has been met, *see Ramirez*, 179 Or. App. at 419, and that the discretion the government actor exercised was within the range of permissible choices that ORS 30.265 protects. Here, Defendants' decision not to implement social distancing measures within and throughout ODOC's facilities, in the face of known risk of what might otherwise occur, simply cannot meet that burden. Nor is Defendants' decision to issue certain guidance to prevent the spread of COVID-19 throughout those facilities protected, because the evidence establishes that Defendants' employees failed to actually implement that guidance.

### 1. Defendants' Decision Not To Implement Social Distancing Measures In ODOC Facilities Is Not Protected By The Discretionary Immunity Statute.

Defendants' failure to act to protect the individuals in their custody from the dangers attendant to COVID-19 is not protected under ORS 30.265. As a matter of law, Defendants cannot invoke ORS 30.265 to shield them from liability for failures to fulfill their constitutional obligations. As explained above, Defendants have an affirmative duty—and under the Eighth Amendment, a constitutional obligation—to provide individuals in their custody with conditions of reasonable health and safety. That obligation includes an affirmative duty to protect those individuals from contracting a highly infectious disease, *Helling*, 509 U.S. at 33, particularly in the face of known risks of what might result if they failed to do so. *See* Dkt. 117 at 63:5–7 ("[T]he only way of reducing that risk is by downsizing."); *id.* at 67:19–22 ("social distancing is

[very necessary] in preventing the spread of COVID-19 in the correctional setting"); *id.* at

183:3–14 ("individuals in jails and prisons are at higher risk for infection from COVID-19" and

"releasing [individuals] in order to establish and maintain social distancing has a sound

evidentiary basis").  Defendants cannot invoke ORS 30.265 to protect them from liability in

those circumstances.  *See Hughes*, 345 Or. at 496 ("[I]f the law requires a government to

exercise due care, then ORS 30.265 does not immunize its decision not to exercise care at all.").

### 2. ORS 30.265 Does Not Protect The Subsequent Decisions Of Defendants' Employees And Agents.

Defendants' decisions to issue other guidance aimed at preventing the spread of COVID-

19 likewise are not protected by ORS 30.265, for two separate but related reasons.  First, with

respect to those decisions, Defendants have not satisfied their evidentiary burden to support their

claim of immunity.  Second, Defendants' otherwise-immune discretionary policy decisions

generally cannot be protected when their employees make later decisions not to apply

Defendants' policy.  *Westfall*, 355 Or. at 160.

At this juncture, the only evidence Defendants have offered to satisfy their evidentiary

burden to establish their claim for immunity is the conclusory statement of Joe Bugher, ODOC's

Deputy Director for Health Services, that "[t]o the best of [Mr. Bugher's] knowledge," ODOC's

decisions relating to COVID-19 "are being made by high-level officers at ODOC" and "not

being made at the institution or line staff level."  *Supplemental Dec. of Joe Bugher*, Dkt. 116, at ¶

17.  Mr. Bugher broadly declares that all of those policy decisions "require a great deal of

judgment and discretion in determining how [to] care for our AICs while still meeting our

statutory obligation to carry out the sanctions of incarcerated individuals."  Dkt. 116, at ¶ 17.

Mr. Bugher does not purport to be an individual with authority to exercise that discretion or

judgment, however, nor does he even assert that the updated CDC "Interim Guidance on

Management of Coronavirus Disease 2019 (COVD-19) in Correctional and Detention Facilities," on which Defendants rely in their motion, has actually been implemented by ODOC.  Mr. Bugher's declaration merely confirms Defendants' continued failure to comply with the CDC's standards. *See* Dkt. 116, at ¶¶ 9–10 (identifying recommendations that ODOC has opted not to follow), and Defendants' remarkable delay in simply implementing a mandatory masking policy throughout its facilities, *id.* ¶ 6.[13]

That evidence does not suffice to fulfill the State's burden to establish that the decisions it made in response to the COVID-19 pandemic, and to prevent the spread of COVID-19 throughout ODOC's facilities, constituted an exercise of judgment involving "'both the determination of facts and simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation of relative effective and risks, and a choice among competing goals and priorities,'" *Mosley*, 315 Or. at 90 (quoting *McBride v. Magnuson*, 282 Or. 433, 436–37 (1978)) (describing the nature of a "discretionary" decision), rather than a simple failure by ODOC to protect the individuals held in its custody.

But even if Defendants' decisions are somehow protected under ORS 30.265, the later decisions of Defendants' employees and agents, to the extent that those decisions are inconsistent with Defendants' discretionary action, preclude immunity in this case.  The record before the Court establishes that lower-level actors at ODOC's institutions chose not to follow the guidance that ODOC's high-level officials had adopted through those otherwise-immune discretionary

---

[13] Mr. Bugher confirms that Defendants implemented a mandatory mask policy in ODOC facilities on July 13, 2020—almost three months after Defendant Brown's "Stay Home, Save Lives" order, and several weeks after Defendant Brown began issuing mandatory mask orders in certain Oregon counties. State of Oregon Newsroom, *Governor Kate Brown Issues Face Covering Requirements for Indoor Public Spaces* (June 19, 2020), available at: https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36824 (stating the Governor first announced indoor mask mandates in a June 17, 2020 video in an order that was effective June 24, 2020).

actions.  "[W]here an employee, for whatever reason, wrongfully fails to apply an otherwise

immune policy to a particular case, . . . the actions of that employee generally would not be

protected by discretionary immunity."  *Westfall*, 355 Or. at 160.

As Plaintiffs' evidence demonstrates, ODOC employees at institutions across the state

have made decisions not to implement the policies that Defendants have adopted.  Thus, at many

institutions, COs who work in the institutions simply choose not wear masks or comply with

social distancing measures. *Yurkovich Dec.* ¶ 4l–n; *McDonald Dec.* ¶ 5o (only 60 percent of COs

are wearing masks); *Randall Dec.* ¶ 4h.  Some lower-level ODOC staff have decided not to

require entire units to wear masks or comply with social distancing measures.  *Kambarov Dec.* ¶

4d; *see also Maney Dec.* ¶ 4d ("My whole time housed at OSP, I do not recall any OSP AICs

wearing masks with the exception of a handful who wore masks in the dorm . . . .").  When units

are placed in "quarantine," lower-level ODOC staff has permitted AICs in those units to work.

*Sellers Dec.* ¶ 4(j); *Wood Dec.* ¶ 5b (AICs placed in quarantine are still working at law libraries).

Elsewhere, mask requirements and social distancing measures are not enforced in the

institution's workplaces.  *See, e.g.*, *Randall Dec.* ¶ 4i (kitchen workers do not wear masks while

working).

Staff has also decided not to implement standing testing protocols that Defendants have

adopted.  AICs experiencing symptoms are not being tested, *Wood Dec.* ¶ 5b, and those

experiencing symptoms who request COVID-19 tests have been denied, *McDonald Dec.* ¶¶ 5n,

6b.  Indeed, at some locations, AICs may be tested for COVID-19 only if they "get really sick"

or "know enough about the law to threaten them with a lawsuit," *Kambarov Dec.* ¶ 4j.

At the very least, the evidence in this summary judgment record establishes a genuine

dispute of fact as to whether lower-level actors at ODOC's institutions have chosen not to follow

the guidance that ODOC's high-level officials had adopted through those otherwise-immune discretionary actions.

Again, it is the State's burden to establish that it is entitled to discretionary immunity. The State has failed to meet that burden.  First, it has failed to offer sufficient evidence that its initial failure to implement social distancing measures within and throughout ODOC facilities across the state was the product of an exercise of judgment, rather than an outright failure to protect the individuals within its custody.  And even if discretionary immunity attaches to certain later guidance issued by ODOC's high-level officials in response to the COVID-19 pandemic, it does not attach to the day-to-day decisions of ODOC staff not to follow that guidance.[14]

## CONCLUSION

For the reasons above, this Court should deny Defendants' Motion. Material facts are in dispute. Plaintiffs have alleged and shown facts that Defendants have violated their Eighth Amendment right to be free from conditions that pose an unreasonable risk to their future health; that right is clearly established.  Additionally, Defendants have not met their burden to establish a discretionary immunity defense. Accordingly, Defendants' Motion must be **DENIED**.

DATED October 3, 2020.

Respectfully submitted,

/s/ *Juan C. Chavez*
Juan C. Chavez
Email: jchavez@ojrc.info

---

[14] Plaintiffs' specifications of negligence are not limited to the policy decisions of ODOC's high-level officials, but instead apply generally to Defendants' failure to take specific actions, through its employees and agents in particular cases, to protect the individuals in its custody by implementing well-established public health measures.  *See* SAC ¶ 154.  Defendants' discretionary immunity defense, by contrast, applies only to its discretionary policy choices, and does not apply to any subsequent (in this case, inconsistent) choice made by Defendants' employees or agents.  *See Westfall*, 355 Or. at 161 ("Once a discretionary choice has been made, the immunity follows the choice.").  Thus, if anything, it is the actions of Defendants' employees and agents, not Plaintiffs' specifications of negligence, that limits the scope of the State's immunity.  *See* Motion at 14.

## CERTIFICATE OF COMPLIANCE

This brief contains 10,541 words, excluding the items exempted by LR 7-2(b). The brief's type

size and typeface comply with LR 10-1(c). I certify that that this Brief complies with the rules set

out in LR 7-2.

DATED October 3, 2020.

Respectfully submitted,

/s/ *Juan C. Chavez*
Juan C. Chavez
Email: jchavez@ojrc.info