IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL MANEY; GARY CLIFT; GEORGE
NULPH; THERON HALL; DAVID HART;
MICAH RHODES; and SHERYL LYNN
SUBLET, individually, on behalf of a class of
others similarly situated,

                Plaintiffs,

       v.

KATE BROWN; COLETTE PETERS;
HEIDI STEWARD; MIKE GOWER; MARK
NOOTH; ROB PERSSON; and KEN JESKE,

                Defendants.

Case No. 6:20-cv-00570-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

       Plaintiffs Paul Maney, Gary Clift, Gary Nulph, Theron Hall, David Hart, Micah Rhodes,

and Sheryl Lynn Sublet (together, "Plaintiffs"), adults in custody ("AIC") at Oregon

Department of Corrections ("ODOC") institutions, filed an amended complaint alleging

constitutional and state law violations against defendants Kate Brown, Colette Peters, Heidi

Steward, Mike Gower, Mark Nooth, Rob Persson, and Ken Jeske (together, "Defendants").

PAGE 1 – OPINION AND ORDER

Before the Court is Defendants' motion for partial summary judgment on Plaintiffs'

Eighth Amendment claim for damages and Plaintiffs' negligence claim. (ECF No. 115.) The

Court has jurisdiction over this matter under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331,

1343(a)(3)-(4), and 1367. All parties have consented to the jurisdiction of a U.S. Magistrate

Judge pursuant to 28 U.S.C. § 636. For the reasons discussed below, the Court grants in part and

denies in part Defendants' motion for partial summary judgment.

## BACKGROUND

### I.    THE PARTIES

Paul Maney is a 62-year-old AIC at Oregon State Correctional Institution ("OSCI") in

Salem, Oregon. (Second Am. Compl. ("SAC") ¶ 3.) Gary Clift is a 76-year-old AIC at OSCI

(SAC ¶ 4), and George Nulph is a 68-year-old AIC at OSCI. (SAC ¶ 5.) Theron Hall is a 35-

year-old AIC at the Oregon State Penitentiary ("OSP") (SAC ¶ 6), and David Hart is a 53-year-

old AIC at OSP. (SAC ¶ 7.) Micah Rhodes has now been released from ODOC custody. (Defs.'

Mot. Partial Summ. J. at 4.) Sheryl Lynn Sublet is a 63-year-old AIC at Coffee Creek

Correctional Facility ("CCCF"). (SAC ¶ 9.)

Kate Brown is the Governor of the State of Oregon (hereinafter, "Governor Brown").

(SAC ¶ 11.) Colette Peters is the Director of ODOC (SAC ¶ 12), and Heidi Steward is the

Deputy Director of ODOC. (SAC ¶ 13.) Mike Gower is ODOC's Assistant Director of

Operations. (SAC ¶ 14.) Mark Nooth is ODOC's Eastside Institutions Administrator and is

responsible for operations at six ODOC institutions (SAC ¶ 15), and Rob Persson is the Westside

Institutions Administrator and is responsible for the remaining eight ODOC institutions. (SAC ¶

16.) Ken Jeske is the Oregon Correctional Enterprises ("OCE") Administrator. (SAC ¶ 17.)

Plaintiffs assert allegations on behalf of a class of similarly situated AICs (SAC ¶ 7), and

propose two classes: the "Injunctive Relief Class" and the "Damages Class." (SAC ¶¶ 19-20.)

Plaintiffs allege that the Injunctive Relief Class consists of all AICs at the highest risk of dying or suffering from severe illness from COVID-19 who are currently or who will be in the future held in ODOC custody. (SAC ¶ 19.) The Damages Class includes all AICs who have been continuously housed at ODOC facilities after February 1, 2020 and who have been diagnosed with COVID-19. (SAC ¶ 20.) To date, Plaintiffs have not sought certification of either class.

## II.    PROCEDURAL HISTORY

Plaintiffs filed this action in April 2020. On June 1, 2020, the Court denied Plaintiffs' motion for a temporary restraining order and preliminary injunction. (ECF No. 108.)

In their Second Amended Complaint, Plaintiffs allege that Defendants (1) violated the Eighth Amendment by subjecting AICs to cruel and unusual punishment by failing to provide adequate healthcare during the COVID-19 pandemic and by operating ODOC facilities without the capacity to treat, test, or prevent the spread of COVID-19, and (2) committed negligence in failing to carry out proper preventative measures. (SAC ¶¶ 148-58.) Defendants now move for partial summary judgment on the damages portion of Plaintiffs' Eighth Amendment claim and on the entirety of Plaintiffs' state law negligence claim.

## III.    COVID-19

The parties agree that COVID-19 is a highly contagious virus that has spread quickly throughout the world. (Defs.' Mot. Partial Summ. J. at 3; SAC ¶ 45.) Vulnerable AICs are subject to serious risks if infected with COVID-19. (Decl. of Marc F. Stern ("Stern Decl.") ¶¶ 9-10.)

As the virus has rapidly spread around the world, COVID-19 has also entered and spread within ODOC facilities. After the Court denied a preliminary injunction in this case, the number of confirmed cases of COVID-19 within ODOC facilities increased. As of June 1, 2020, 157 AICs had tested positive for COVID-19, and one AIC had died while in ODOC custody as a

result of COVID-19. (Op. & Order at 16.) Most recently, as of December 15, 2020, 1,641 AICs have tested positive for COVID-19 and nineteen have died as a result of COVID-19. *See COVID-19 Status at Oregon Department of Corrections Facilities*, OREGON.GOV, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited Dec. 15, 2020). Additionally, 458 ODOC staff have tested positive for COVID-19. *Id.* Only one ODOC facility (South Fork Forest Camp) has not reported any confirmed AIC or staff cases of COVID-19. *Id.*

## IV.    DEFENDANTS' RESPONSE TO COVID-19

### A.    Defendants' Evidence

In response to COVID-19, Governor Brown declared a state of emergency and issued several executive orders. (Decl. of Heidi Steward ("Steward Decl.") ¶ 13.) In early April 2020, ODOC identified 73 "most vulnerable" AICs, 269 "vulnerable" AICs, and 324 AICs age sixty or older, all of whom are serving sentences for non-measure 11 offenses. (Steward Decl. Ex. 11 at 4-6.) ODOC estimated that 5,800 AICs, or forty percent of the AIC population, would need to be released to accomplish adequate social distancing for the remaining AICs. (Steward Decl. Ex. 11 at 3.) On June 25, 2020, Governor Brown announced she will commute the sentences of fifty-seven AICs to reduce the facilities' population. (Supp. Decl. of Joe Bugher ("Supp. Bugher Decl.") ¶ 16.) In September, Governor Brown commuted the sentences of an additional sixty-six AICs, for a total of 123 early releases. (Pls.' Resp. at 8.)

ODOC began monitoring the virus before the illness reached the United States (Steward Decl. ¶ 7), purchased cloth masks for staff and AICs (Steward Decl. ¶ 33), distributed educational material (Steward Decl. ¶ 23; Decl. of Garry Russell ("Russell Decl.") ¶ 30), prohibited visitors (Steward Dec. ¶ 52(a)), provided AICs with a supply of soap (Steward Decl. ¶ 31), increased cleaning practices (Steward Decl. ¶ 28), established respiratory clinics (Steward Decl. ¶ 60), and implemented various social distancing measures. (Steward Decl. ¶¶ 51-52.)

PAGE 4 – OPINION AND ORDER

ODOC also established a tiered screening protocol (Steward Decl. ¶¶ 61-71), and has conducted interviews with AICs presenting COVID-19 symptoms (Steward Decl. ¶ 37), traced contacts after an AIC tests positive (Steward Decl. ¶ 40), and housed AICs testing positive for COVID-19 in negative pressure rooms or medical isolation (Steward Decl. ¶ 54). In medical isolation, ODOC provides portable DVD players (Russell Decl. ¶ 48) and "amenities of regular housing to the extent possible consistent with the purpose of quarantine or medical isolation and the resources of the particular institution." (Steward Decl. ¶ 55.) ODOC also conducts unannounced audits of its facilities. (Steward Decl. ¶¶ 76-78.)

On July 13, 2020, ODOC mandated mask-wearing for all staff and AICs when social distancing is not feasible. (Supp. Bugher Decl. Ex. 2 at 1-2.) ODOC has also expanded testing, and offers but does not require a COVID-19 test to all AICs upon intake. (Supp. Bugher Decl. ¶ 12.) ODOC continues to consider whether to update any additional recommendations in light of updated CDC guidance. (Supp. Bugher Decl. ¶ 10.)

At ODOC job sites, AICs are required to wear masks (Steward Decl. ¶ 33(b)), are provided hand soap and sanitizing materials (Decl. of Ken Jeske ("Jeske Decl.") ¶ 10) and sack lunches (Jeske Decl. ¶¶ 14, 17), and social distance when possible. (Jeske Decl. ¶¶ 14-25, 29.)

## B.    Plaintiffs' Evidence

AICs report an ongoing inability to socially distance themselves from other AICs. (*See, e.g.*, Decl. of Brandon A. Borba ¶ 5(e); Decl. of Christopher Mitchell ¶ 13; Decl. of Daniel White ¶ 23.) Many AICs report that ODOC's medical response to COVID-19 has been inadequate. (*See, e.g.*, Decl. of Aaron Delicino ("Delicino Decl.") ¶ 5(b); Decl. of Mathew Maddox ¶ 5(a); Decl. of Michael Garrett ¶ 5(g).) AICs allege that testing for COVID-19 has been denied or delayed despite widespread COVID-19 symptoms and illness. (*See* Decl. of Gavin Pritchett ("Pritchett Decl.") ¶ 5; Decl. of Kerry Crockett ¶ 5(g); Decl. of David Brown

PAGE 5 – OPINION AND ORDER

("Brown Decl.") ¶ 4(d); Decl. of Bryan McDonald ("McDonald Decl.") ¶ 7(c)-(d); Decl. of

Rashid Kambarov ("Kambarov Decl.") ¶ 4(i); Decl. of Matthew Yurkovich ("Yurkovich Decl.")

¶ 4(e)-(g); Decl. of Lance Wood ("Wood Decl.") ¶ 4(c)-(d).)

Many AICs expressed reluctance to get tested, or to report that they are experiencing

COVID-19 symptoms. AICs believe that if they test positive, they will be quarantined in a

segregation unit, which they view as a punitive measure. (*See, e.g.*, Decl. of Corey Constantin ¶

5(b); Pritchett Decl. ¶ 5(b); Decl. of John L. Preston II ¶ 4.)

AICs report that ODOC staff wear masks incorrectly and inconsistently, even after the

July 13, 2020 mask mandate. (*See* Yurkovich Decl. ¶ 4(l); Wood Decl. ¶ 4(e); Decl. of William

Sellers ("Sellers Decl.") ¶ 4(k); Decl. of Mitchell Randall ("Randall Decl.") ¶ 4(i).) Additionally,

AICs report that other AICs fail to comply with masking protocols without reprimand. (*See*

Brown Decl. ¶ 4(l); Decl. of Paul Maney ("Maney Decl.") ¶ 4(d)-(e); McDonald Decl. ¶ 7(i).)

Because of a staffing shortage, correctional officers work shifts in both quarantined and

non-quarantined units. (*See* Sellers Decl. ¶ 4(l).) Officers move in and out of quarantined units

and throughout the facilities without masks. (*See* Brown Decl. ¶ 4(k); Decl. of William Harvey

("Harvey Decl.") ¶ 4(k); Kambarov Decl. ¶ 4(a), (c); Decl. of Althea Seloover ("Seloover

Decl.") ¶ 6(i); Wood Decl. ¶ 4(e); Yurkovich Decl. ¶ 4(n); Sellers Decl. ¶ 4(l); McDonald Decl. ¶

5(o).) AICs housed in quarantined units also mix with AICs in non-quarantined units at work

placements. (*See* Brown Decl. ¶ 4(l); Wood Decl. ¶ 5(a); Sellers Decl. ¶ 4(j).) Further, ODOC

staff perform searches of all cells in a unit without changing gloves or personal protective

equipment. (Wood Decl. ¶ 5(c); Yurkovich Decl. ¶ 4(m).)

In September 2020, four Oregon prisons evacuated due to wildfires. According to

Plaintiffs, 1,431 people from three of the prisons were relocated to OSP. (Pls.' Resp. at 8.) AICs

allege that ODOC failed to enforce or acknowledge COVID-19 protocol or precautions during

the evacuations. (*See, e.g.*, McDonald Decl. ¶ 5(k); Maney Decl. ¶ 4(e).) AICs were transported

in groups in vans, congregated with hundreds of other AICs upon arrival, and slept with up to

350 other AICs spaced several inches apart. (*See* Randall Decl. ¶ 4(b)-(c); Harvey Decl. ¶ 4(b).)

The evacuated AICs were exposed to ODOC staff and AICs from OSP, many of whom were not

wearing masks. (Harvey Decl. ¶ 4(b).) After returning from evacuation, more AICs tested

positive for COVID-19. (Harvey Decl. ¶ 4(n); Randall Decl. ¶ 5(c).)

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion

for summary judgment, the court must view the facts in the light most favorable to the non-

moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of

Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses,

weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v.

Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

### II.    DISCUSSION

Defendants seek partial summary judgment on the damages portion of Plaintiffs' Eighth

Amendment claim and on the entirety of Plaintiffs' negligence claim. Defendants argue that: (1)

qualified immunity bars Plaintiffs' Eighth Amendment claim for damages, and (2) discretionary

immunity bars Plaintiffs' negligence claim. (Defs.' Mot. Partial Summ. J. at 6, 12.) The Court

denies Defendants' motion for summary judgment on the ground of qualified immunity, but enters partial summary judgment on Plaintiffs' negligence claim.

### A.    Qualified Immunity

Defendants assert that they are protected by qualified immunity because there exists no clearly established precedent on the appropriate constitutional response to COVID-19 in our prisons. (Defs.' Mot. Partial Summ. J. at 6.) The Court disagrees, and finds that there exists a clearly established right for individuals in custody to be free from heightened exposure to a serious, easily communicable disease, and that material issues of disputed facts remain as to the merits of Plaintiffs' Eighth Amendment claim.

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is "an immunity from suit rather than a mere defense to liability" and should be decided "at the earliest possible stage in litigation." *Id.* at 231-32 (citations omitted).

Courts determine whether qualified immunity applies by analyzing "whether there has been a violation of a constitutional right[,]" and, if so, "whether that right was clearly established at the time of the [official's] alleged misconduct." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019), *cert. denied sub nom. Jessop v. City of Fresno, California*, 140 S. Ct. 2793 (2020), *reh'g denied*, 2020 WL 4429721 (Aug. 3, 2020) (citation omitted). The Supreme Court has instructed that courts retain the "discretion to decide the order in which to engage these two prongs" of the analysis. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Exercising this discretion, the Court first addresses whether Plaintiffs' constitutional rights are clearly established here.

///

1.        **Clearly Established Right**

Defendants argue that due to the novelty of the COVID-19 pandemic, no prior case has

clearly established the appropriate constitutional response to the pandemic. (Defs.' Mot. Partial

Summ. J. at 10-11.) Plaintiffs respond that precedent need not announce a constitutional right

with respect to a specific virus. (Pls.' Resp. at 19.) Rather, Plaintiffs argue that existing law

provided Defendants with fair warning of their responsibility to protect individuals in their

custody from heightened exposure to a highly communicable disease. (Pls.' Resp. at 20-21.) For

the reasons discussed herein, the Court agrees with Plaintiffs.

Qualified immunity requires "clearly established statutory or constitutional rights of

which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017)

(citation omitted); *see also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1078 (9th Cir. 2011)

("The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct

in the particular case at hand."). The existing precedent at the time of the conduct must have

placed the constitutional question "beyond debate." *White*, 137 S. Ct. at 551 (citation omitted).

"[T]he clearly established law must be 'particularized' to the facts of the case," *id.* at 552

(citation omitted), and must give "fair warning." *Tolan*, 572 U.S. at 656 (quoting *Hope v. Pelzer*,

536 U.S. 730, 741 (2002)). However, "officials can still be on notice that their conduct violates

established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

The Supreme Court has repeatedly warned courts not to define clearly established law "at

a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted).

"[T]he farther afield existing precedent lies from the case under review, the more likely it will be

that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is

at least arguably constitutional." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016). If

the conduct falls within this permissible zone, qualified immunity applies. *See id.* Whether there

exists a clearly established right applicable to the conduct at issue is "a question of law" for the

Court to decide. *Morales v. Fry*, 873 F.3d 817, 819 (9th Cir. 2017).

Existing precedent clearly establishes the right of an individual in custody to protection

from heightened exposure to a serious communicable disease. *See, e.g.*, *Helling v. McKinney*,

509 U.S. 25, 33 (1993) (finding prison officials may not "be deliberately indifferent to the

exposure of inmates to a serious, communicable disease" under the Eighth Amendment); *see also*

*Hutto v. Finney*, 437 U.S. 678, 682-83 (1978) (affirming a finding of an Eighth Amendment

violation where a facility housed individuals in crowded cells with others suffering from

infectious diseases, such as Hepatitis and venereal disease, and the individuals' "mattresses were

removed and jumbled together each morning, then returned to the cells at random in the

evening"); *Andrews v. Cervantes*, 493 F.3d 1047, 1050 (9th Cir. 2007) (recognizing a cause of

action under the Eighth Amendment and 42 U.S.C. § 1983 for an alleged policy of not screening

inmates for infectious diseases—HIV, Hepatitis C, and Heliobacter pylori—and for housing

contagious and healthy individuals together during a known "epidemic of hepatitis C"); *Trevizo*

*v. Webster*, No. CV 17-5868-MWF (KS), 2018 WL 5917858, at *4 (C.D. Cal. Sept. 6, 2018) ("It

is well accepted that such 'substantial risks of harm' include 'exposure of inmates to a serious,

communicable disease[,]'" including MRSA) (citing *Helling*, 509 U.S. at 33); *see also Loftin v.*

*Dalessandri*, 3 F. App'x 658, 663 (10th Cir. 2001) (recognizing an Eighth Amendment claim for

knowingly housing the defendant in a cell with individuals who had tested positive for

tuberculosis); *cf. Farmer v. Brennan*, 511 U.S. 825, 843 (1994) ("The question under the Eighth

Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to

a sufficiently substantial 'risk of serious damage to his future health[.]'" (citing *Helling*, 509 U.S.

at 35))[3] "For purposes of qualified immunity, that legal duty need not be litigated and then established disease by disease or injury by injury." *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017).

Thus, the law is clearly established that individuals in government custody have a constitutional right to be protected against a heightened exposure to serious, easily communicable diseases, and the Court finds that this clearly established right extends to protection from COVID-19. It is undisputed that COVID-19 is easily communicable. (*See* Defs.' Mot. Partial Summ. J. at 3; SAC ¶ 45.) In addition, based on the known mortality rate, hospitalizations, and medical consequences, there can be no dispute that COVID-19 exposes AICs to a sufficiently substantial risk of serious harm. (*See* Defs.' Reply at 7; Stern Decl. ¶¶ 9-10.) The law does not support a finding of qualified immunity for government officials who fail to protect individuals in their custody from a new serious communicable disease, as opposed to a serious communicable disease of which they were previously aware. To hold otherwise as a matter of law would provide qualified immunity to Defendants even if they had done nothing in response to the COVID-19 pandemic.

---

[3] *See also Glick v. Henderson*, 855 F.2d 536, 539-40 (8th Cir. 1988) (finding the plaintiff "could have a colorable claim under § 1983 if he could show that there is 'a pervasive risk of harm to inmates' of contracting the AIDS virus and if there is 'a failure of prison officials to reasonably respond to that risk.'") (citation omitted); *Lareau v. Manson*, 651 F.2d 96, 98 (2d Cir. 1981) (affirming the district court's finding that overcrowding and "failure to screen new inmates for communicable diseases" violated pretrial detainees' Eighth Amendment rights); *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974) (affirming the district court's finding of an Eighth Amendment violation in part because "inmates with serious contagious diseases [we]re allowed to mingle with the general prison population"); *Ferguson v. Bd. of Cty. Commissioners of Sierra Cty.*, No. CV 11-1001 WPL/CG, 2013 WL 12334214, at *8 (D.N.M. Apr. 2, 2013) (recognizing a claim upon which relief could be granted under the Eighth Amendment for knowingly housing the plaintiff in a cell with others infected with the contagious disease MRSA); *Randles v. Hester*, No. 98CV1214, 2001 WL 1667821, at *2 (M.D. Fla. June 27, 2001) (finding an Eighth Amendment violation where the defendants forced the plaintiff to clean up blood without proper gear to prevent HIV infection and contamination).

Defendants suggest this Court's denial of Plaintiffs' motion for a preliminary injunction

order precludes a finding that the Plaintiffs' constitutional rights here were previously

established "beyond debate." (Defs.' Mot. Partial Summ. J. at 10 (citing *White,* 137 S. Ct. at

551).) Defendants also argue that *Hines v. Youseff* forecloses a finding of a clearly established

right. 914 F.3d 1218 (9th Cir.), *cert. denied sub nom. Smith v. Schwarzenegger*, 140 S. Ct. 159

(2019). The Court disagrees.

Whether a clearly established right exists is a question of law. *See Morales*, 873 F.3d at

819. This Court's prior order was a factual determination based on the evidence before the Court

at that time. In its prior order, the Court found that Plaintiffs had not established as of June 1,

2020 that Defendants were responding to the COVID-19 risks with deliberate indifference. (Op.

& Order at 26, 28-38.) The Court did not reach a legal conclusion regarding whether Plaintiffs

had a clearly established right to protection from COVID-19, and nothing in the Court's prior

order precludes a finding of a clearly established right. *See, e.g.*, *DeGidio v. Pung*, 920 F.2d 525,

528-30 (8th Cir. 1990) (finding an Eighth Amendment violation for failure to protect individuals

in custody from the spread of tuberculosis after previously denying injunctive relief).

The Ninth Circuit's decision in *Hines v. Youseff* does not require a different result. In

*Hines*, the Ninth Circuit found that individuals in custody had no clearly established right to be

free from heightened exposure to Valley Fever spores. 914 F.3d at 1228. Notably, the court

found that "[s]ince the prisoners are confined together, it is especially important that Valley

Fever is not contagious." *Id.* at 1226. The court noted that "no societal consensus has emerged

that the risk [of contracting Valley Fever] is intolerably grave," such that a reasonable officer

would not necessarily know that housing individuals together in a region known for Valley Fever

violated the Constitution. *Id.* at 1232. In contrast here, COVID-19 is highly contagious, is not

bound to a geographic area, and a societal consensus has emerged regarding its danger. There is no dispute that this virus presents a sufficiently substantial risk of harm to AICs, and it should have come as no surprise to Defendants that they have a duty to protect AICs from exposure to COVID-19.

For these reasons, the Court finds that Defendants had fair warning that individuals in custody have a clearly established constitutional right to protection from a heightened exposure to COVID-19, despite the novelty of the virus.

## 2.    Deliberate Indifference

Defendants also argue that they have satisfied the first prong of qualified immunity because Plaintiffs have not established that Defendants acted with deliberate indifference here. (Defs.' Mot. Partial Summ. J. at 8.) Plaintiffs respond that material factual disputes remain as to Defendants' response to COVID-19 within their facilities. (Pls.' Resp. at 25, 29.) In light of the fact that discovery is ongoing, COVID-19 continues to impact our state correctional institutions, and AICS continue to die, the Court agrees that evaluating the merits of Plaintiffs' Eighth Amendment claim is premature at this stage of the litigation.[4]

---

[4] To the extent Defendants argue that judgment should enter now because they cannot be held liable for the actions of their subordinates under a theory of *respondeat superior*, the Court finds that Plaintiffs have sufficiently alleged each of the defendants' direct involvement in the challenged actions here. *See Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011) (holding that "[a] defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation'" and "[t]he requisite causal connection can be established . . . by setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury") (alteration in original, citations and quotation marks omitted); *see also Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) ("[S]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of a constitutional violation.'" (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

B.      **Discretionary Immunity**

The State also seeks entry of summary judgment on Plaintiffs' negligence claim, on the ground that discretionary immunity protects it from liability because Plaintiffs' allegations challenge policy decisions based on the exercise of judgment, involving public policy, and made by individuals with authority. (Defs.' Mot. Partial Summ. J. at 12.) Plaintiffs respond that the State is not protected by discretionary immunity because it has affirmative duties that it failed to fulfill, and because the State's employees failed to execute and implement the relevant policies. (Pls.' Resp. at 30.) The Court agrees that discretionary immunity protects the State from negligence liability for public policy decisions made by policymakers with authority, but Plaintiffs' negligence claim here challenges more than just high-level policy decisions.

The Oregon Tort Claims Act provides the State with an affirmative defense of discretionary immunity:

> Every public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for:
>
> . . .
>
> (c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

OR. REV. STAT. § 30.265(6)(c). The defendant has the burden of establishing the affirmative defense. *See John v. City of Gresham*, 214 Or. App. 305, 311 (2007).

Discretionary immunity requires three elements: it results from "a *choice*, that is, the exercise of judgment; that choice must involve public *policy*, as opposed to the routine day-to-day activities of public officials; and the public policy choice must be exercised by a body or person that has, either directly or by delegation, the *responsibility* or authority to make it." *Ramirez v. Haw. T & S Enters., Inc.*, 179 Or. App. 416, 419 (2002). Summary judgment is appropriate if a defendant establishes all three elements of discretionary immunity as a matter of

PAGE 14 – OPINION AND ORDER

law. *See John*, 214 Or. App. at 312; *see also Murrell v. Union Pac. R. Co.*, 544 F. Supp. 2d 1138, 1157-59 (D. Or. 2008) (applying discretionary immunity under Oregon law).

The Oregon Tort Claims Act "does not protect a government's failure to take action when there is a duty to do so." *Turner v. State ex rel. Dep't of Transp.*, 270 Or. App. 353, 364 (2015); *see also Hughes v. Wilson*, 345 Or. 491, 496 (2008) ("[I]f the law requires a government to exercise due care, then ORS 30.265 does not immunize its decision not to exercise care at all."). However, when a public body holds a duty of care, it "has wide policy discretion in choosing the means by which to carry out that duty." *Mosley v. Portland Sch. Dist. No. 1J*, 315 Or. 85, 92 (1992). "Once a discretionary choice has been made, the immunity follows the choice. It protects not only the officials who made the decision, but also the employees or agents who effectuate or implement that choice in particular cases." *Westfall v. State ex rel. Or. Dep't of Corr.*, 355 Or. 144, 161 (2014).

When employees are tasked to implement an otherwise immune governmental policy, several factual scenarios "may affect whether the employee's actions are protected by discretionary immunity." *Id.* at 159. First, when a policy "does not express a completed thought on how a particular case should be resolved, instead contemplating that the employees will make additional choices within the confines of the policy decisions. . . . liability will depend on whether the choice made by the employee separately qualifies for discretionary immunity." *Id.* Second, if an employee "wrongly fails to apply an otherwise immune policy to a particular case . . . . the actions of the employee generally would not be protected by discretionary immunity." *Id.* at 160. Third, when "[a]n employee applies an otherwise immune policy to inapplicable circumstances[,]" it is not protected by discretionary immunity. *Id.* Finally, "[w]hen an immune policy choice expresses a completed thought that fully controls how the employees should apply

the policy to a particular case, and an employee correctly applies the policy to the case[,]" the employee is protected by discretionary immunity. *Id.*

Plaintiffs allege ten categories of allegedly negligent actions that resulted in harm to the proposed Damages Class. (SAC ¶¶ 156-60.) Although Plaintiffs target several of the State's COVID-19 policy decisions, Plaintiffs also challenge the failure to implement and enforce those policies, and therefore it is necessary to analyze each of Plaintiffs' allegations to evaluate the State's discretionary immunity here. *See Rush v. Corvallis Sch. Dist. 509J*, 291 Or. App. 252, 254 (2018) (granting summary judgment based on discretionary immunity on two of seven negligence allegations); *see also John*, 214 Or. App. at 312 ("Case law makes clear that, although the overall design of a government project may entail the type of decisions that implicate discretionary immunity, that does not mean that every aspect of the project is subject to that defense.").

### 1.    Claim (a): In Failing To Ensure That Incarcerated Adults And Employees Wear Masks

Plaintiffs' claim includes two theories of liability: (1) the State failed to create an effective mask-wearing policy, and (2) the State failed to implement its mask-wearing policy and ensure that both AICs and employees wear masks when required.

Discretionary immunity protects the State from liability under the first theory. The State's mask-wearing directives resulted from an exercise of judgment, and the State had to choose how to apply CDC and Oregon Health Authority ("OHA") guidelines within its facilities. (*See* Supp. Bugher Decl. Ex. 1 at 1 ("The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."); *see also* Steward Decl. ¶¶ 16-17.) The record evidence to date demonstrates that Defendants initially instituted a policy requiring AICs and staff to wear masks while at Health Services, OCE job

sites, and when social distancing was not possible. (Steward Decl. Ex. 5 at 3; Steward Decl. Ex. 6 at 1.) In July 2020, the State expanded its mask-wearing requirements. (Supp. Bugher Decl. ¶ 5; Pls.' Resp. at 9.)

Plaintiffs' allegations of negligence with respect to the State's mask policy are based on a failure to adopt more effective measures, not an absolute failure to act. *See Rush*, 291 Or. App. at 258 (distinguishing discretionary decisions about security allocations from the failure to take "any security precautions whatsoever"). The State has wide policy discretion in the means adopted to protect AICs from harm. *See Mosley*, 315 Or. at 92 ("A public body that owes a particular duty of care (such as that owed by a school district to its students who are required to be on school premises during school hours) has wide policy discretion in choosing the means by which to carry out that duty."). The State's choice of a particular mask policy, and changes to the policy, include a deliberative exercise of judgment made by someone with authority, namely defendant Steward. (Steward Decl. Ex. 6 at 1; Bugher Decl. Ex. 9 at 1; Bugher Decl. Ex. 10 at 1; Bugher Decl. Ex. 11 at 1.) Insofar as Plaintiffs argue that the State was negligent in adopting a particular mask policy, discretionary immunity bars Plaintiffs' claims and the Court enters partial summary judgment.

However, discretionary immunity does not protect the State from liability under the second theory of liability, i.e., that the State failed to implement and enforce its mask policy to ensure that AICs and staff wear masks when required. The record does not support a finding that the State chose not to enforce its mask-wearing requirements as a matter of policy. *See Garrison v. Deschutes Cty.*, 334 Or. 264, 275 (2002) (finding that the plaintiffs made a policy choice when "they evaluated the relative effectiveness, safety and risks, as well as the relative costs and benefits"). Insofar as Plaintiffs can demonstrate that the State failed to implement or enforce its

mask-wearing policies, these actions are not protected by discretionary immunity. (*See, e.g.*, Delicino Decl. ¶ 5(e) ("COs aren't wearing masks and are regularly right up in our faces."); Pls.' Resp. at 9 ("Staff mask-wearing was inconsistent, even after Defendant Steward's July 13 masking mandate.")) Thus, whether the State was negligent by not ensuring that AICs and staff complied with its mask policy is a question for the jury. *See Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 22 (1987) (leaving for the jury the question of whether defendants failed to act when they had a duty to act).

> **2.      Claim (b): In Failing To Adequately Screen Employees For COVID-19 Symptoms And Exposure Upon Entry To The Facilities**

Plaintiffs' claim includes two theories of liability: (1) the State's screening policy failed adequately to screen employees for COVID-19 symptoms and exposure upon entry to the facilities, and (2) the State failed to screen employees for COVID-19 symptoms and exposure upon entry to the facilities.

Discretionary immunity protects the State from liability under the first theory of liability. The State made a choice about how to screen ODOC staff entering correctional facilities. (Steward Decl. ¶ 61 ("ODOC is screening all staff and others entering the facilities for symptoms of COVID-19, including checking temperatures. Staff exhibiting symptoms of COVID-19 or a temperature over 100 degrees are not permitted to enter the institutions.")) Defendant Steward's declaration and ODOC's screening form demonstrate that the State considered which symptoms to screen and who to exclude from the facilities as a matter of policy. (*See* Steward Dec. Ex. 8 (listing symptoms and conditions to monitor). Someone with authority necessarily made that judgment call. (*See* Supp. Decl. of Dr. Daniel H. Dewsnup ("Supp. Dewsnup Decl.") ¶¶ 3, 14 ("I work closely with ODOC's Medical Director, Dr. Christopher DiGiulio, the Deputy Medical Director, Dr. Warren Roberts, and with individual practitioners on prevention and treatment of . .

. COVID-19.").) Insofar as Plaintiffs allege negligence in the policy choice itself, discretionary immunity bars the claim and the Court enters partial summary judgment. (*See, e.g.*, SAC ¶ 77 (asserting that screening tools that are based on identification of symptoms are ineffective).)

However, discretionary immunity does not bar liability under the second theory of liability, i.e., that the State failed to conduct screening of employees for COVID-19 symptoms consistent with its policy. Plaintiffs assert that "Defendants have failed to require the screening of correctional staff and other individuals entering the institutions for COVID-19 symptoms." (SAC ¶¶ 92, 102; Seloover Decl. Att. 1 at 27 ("no screening has or is being done[,] not even for the guard").) Defendants acknowledge that "ODOC briefly stopped temperature screening at some Tier 1 institutions because it was not resulting in any staff identifications[.]" (Supp. Bugher Decl. ¶ 14.) Aside from this statement by defendant Bugher, the State has not presented evidence to support a finding that the State decided, as a matter of policy, to suspend staff testing at all institutions. *See Stevenson v. State Dep't of Transp.*, 290 Or. 3, 14 (1980) (explaining that in situations where it is not clear that the decision was made as a matter of policy, "no determination about immunity will be possible until it is known how the particular decision was made"). The State may be able to present additional information in support of discretionary immunity as the record develops, but as the record stands, a material issue of fact remains. Insofar as Plaintiffs allege a failure to screen all employees entering correctional facilities, the Court denies summary judgment.

### 3.    Claim (c): In Failing To Provide Adequate Sanitation And Disinfection In The Facilities

Discretionary immunity does not protect the State from liability under claim (c). The State has a duty to protect AICs from heightened exposure to a dangerous virus and to maintain a certain standard of cleanliness. *See infra* Section II(A)(1); *see also Farmer*, 511 U.S. at 832.

There is no evidence in the record that the State considered the relative risks and benefits of the different cleaning protocols and chose the one used at correctional facilities as a matter of public policy. *See Garrison*, 334 Or. at 275; *see also Stevenson*, 290 Or. at 10-11 (describing the decisions made in road maintenance as "decisions which do not involve the making of public policy; for example, the decision whether to make a safety fence two feet rather than three feet high or the decision to first remove the snow from Street A rather than from Street B" and noting that "[t]hese decisions involve the use of 'discretion' in the sense that a choice must be made but they do not involve the use of 'discretion' in the sense that a policy decision is required"). The State has not satisfied its burden of establishing discretionary immunity with respect to Plaintiffs' claims about inadequate sanitation and disinfection in the facilities, and therefore the Court denies summary judgment on this claim.

### 4.    Claim (d): In Failing To Train Staff To Require Adequate Sanitation And Disinfection In The Facilities

Similarly, discretionary immunity does not protect the State from liability for negligence under claim (d). Defendants have not identified any evidence in the record to support a finding that the State engaged in a deliberative policy process with respect to training staff on adequate sanitation and disinfection to prevent the spread of COVID-19. If proven, a failure to train staff on adequate sanitation and disinfection could constitute a failure to act. *See Mosley*, 315 Or. at 92 ("The range of permissible choices does not, however, include the choice of not exercising care."). The Court denies Defendants' motion for summary judgment with respect to whether the State failed to train staff to require adequate sanitation and disinfection. *See Fazzolari*, 303 Or. at 22.

///

///

    **5.**      **Claim (e): In Failing To Arrange For Alternative Housing, Transfers, Alternative Incarceration, Or, If Necessary, Release To Achieve Necessary Social Distancing**

Plaintiffs' claim includes two theories of liability under claim (e): (1) the State failed to release or relocate AICs to allow for adequate social distancing, and (2) the State failed to ensure adequate social distancing in its facilities.

Discretionary immunity protects the State from the first theory of liability. The State's relocation or release of AICs to achieve necessary social distancing and its general policy on social distancing are deliberative policy decisions. (*See* Steward Decl. ¶¶ 16-17 (reflecting that Defendants made decisions about how best to apply the CDC and OHA guidelines within the facilities to achieve social distancing).) Plaintiffs have not alleged that the State failed to take any action. *See Rush*, 291 Or. App. at 258 (distinguishing discretionary decisions about security allocations from the failure to take "any security precautions whatsoever"). The record reflects that ODOC evaluated AICs for release, and Governor Brown selected a (very) limited number of AICs for commutation. (Steward Decl. Ex. 11 at 4-6; Supp. Bugher Decl. ¶ 15.) The State also developed other social distancing policies applicable to its institutions. (*See, e.g.*, Supp. Dewsnup Decl. ¶ 22 (describing his role in advising ODOC on implementing the social distancing plan).) The State does not have a duty to select a specific policy. *See Turner*, 270 Or. App. at 360 ("When a public body owes a duty of care, that body has discretion in choosing the means by which it carries out that duty.") (citation omitted); *see also Stevenson*, 290 Or. at 10 (describing discretion as "the responsibility for deciding 'the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued'") (citation omitted).

However, discretionary immunity does not protect the State to the extent Plaintiffs allege that the State failed to implement and enforce its policies regarding social distancing in its facilities. Therefore, the Court grants summary judgment on Plaintiffs' claim that the State failed

to release or relocate AICs to allow for adequate social distancing, but denies summary judgment

on Plaintiffs' claim that the State failed to implement and enforce its social distancing policies.

> **6.      Claim (f): In Failing To Provide COVID-19 Testing To Incarcerated**
> **Adults Who Presented With Symptoms And To Incarcerated Adults**
> **Who Came Into Contact With Adults Who Tested Positive For**
> **COVID-19**

Plaintiffs' claim includes two parts: (1) failing to provide COVID-19 testing to AICs with

symptoms, and (2) failing to provide COVID-19 testing to AICs who came into contact with

others who tested positive for COVID-19.

The record reflects that the State's testing policy with respect to symptomatic AICs

includes "testing of all symptomatic AICs, as determined by health care providers[.]" (Steward

Decl. ¶ 38; *see also* SAC ¶ 79 ("ODOC stated that if someone has flu or COVID-10 symptoms,

'they will be tested as healthcare providers direct.'").) With respect to screening and testing those

who have come into contact with an AIC who tests positive, the State policy requires tracing and

additional testing:

> If an AIC tests positive for COVID-19, ODOC will conduct targeted concentric
> contact tracing of asymptomatic AICs. This involves testing the close contacts of
> the positive AICs to determine the extent of the infection and removing COVID-19
> positive AICs from the congregate living area. ODOC will then strengthen the
> social distancing, hygiene, and other infection control practices within the
> remaining population in the congregate living area. To date, this method of testing
> has been conducted at four institutions.

(Steward Decl. ¶ 40.) To the extent Plaintiffs are challenging these policies, the State is entitled

to discretionary immunity.

However, to the extent that Plaintiffs are alleging that employees are failing to implement

or enforce these otherwise immune policies,[5] the State is not protected by discretionary

---

[5] *See, e.g.,* Seloover Decl. Att. 1 at 135 (referencing a COVID-19 newsletter received by
AICs explaining ODOC's policy of "testing close contacts of a positive case" and describing this

immunity. *See, e.g.*, *Westfall*, 355 Or. at 156 (finding that when an employee wrongly fails to apply an otherwise immune policy, "the actions of the employee generally would not be protected by discretionary immunity"); *see also W.S. v. Mollala River Sch. Dist.*, No. 3:17-CV-01732-SB, 2019 WL 7630946, at *7 (D. Or. Sept. 30, 2019)*, report and recommendation adopted,* No. 3:17-cv-01732-SB, 2019 WL 7633162 (D. Or. Nov. 15, 2019) (finding that when "Plaintiffs assert that they are not challenging school policies, . . . but rather the individual school employees' failure to execute those policies," summary judgment based on discretionary immunity is not appropriate); *Stevenson*, 290 Or. at 15 (contrasting officials' policy decision regarding criteria for where to install cattle guards with an employee's "failure to determine that those conditions did in fact exist at that location"). Therefore, the Court grants in part and denies in part the State's motion for summary judgment on this claim.

### 7.    Claim (g): In Failing To Properly Quarantine Incarcerated Adults Awaiting COVID-19 Testing Results

Similarly, the State's quarantine policy requires "[p]lacing AICs in medical isolation (as defined by the CDC and OHA guidance) pending the results of COVID-19 testing." (Steward Decl. ¶ 54(c); *see also* SAC ¶ 79 ("Dr. DiGiulio also stated that if someone develops COVID-19, they will be isolated and those awaiting results are held in 'respiratory isolation conditions.'").) To the extent Plaintiffs challenge the State's quarantine policy, the State is protected by discretionary immunity.

However, to the extent Plaintiffs allege that employees failed to implement or enforce its otherwise immune policy (*see, e.g.*, Randall Decl. ¶ 5(b)-(c) ("After being tested I was put back in my cell"); Sellers Decl. ¶ 4(f), (h)-(i) ("While the tests were pending, they left all of those

---

asserted policy as "wholly false" and not being implemented); *see also* Pls.' Resp. at 10; SAC ¶¶ 108-09; Brown Decl. ¶ 4(g); Delicino Decl. ¶ 5(b)-(c); McDonald Decl. ¶ 5(m)-(n).

AICs on the unit.")), discretionary immunity offers no protection. *See Westfall*, 355 Or. at 156;

*see also W.S.*, 2019 WL 7630946, at *7.

> **8.      Claim (h): In Failing To Properly Quarantine Incarcerated Adults
> After Transferring Them From A Facility With Confirmed COVID-
> 19 Infections To Another Facility**

Similarly, the State's policy requires "screening and quarantining all new or transferred

AICs at Coffee Creek Intake Center for fourteen days prior to releasing to other facilities."

(Steward Decl. ¶ 63.) Out-of-institution transfers are not permitted for facilities in Tier 3 and

above, except for public health or safety. (Steward Decl. Ex. 3 at 7.) To the extent Claim (h)

challenges these policies, the State is protected by discretionary immunity.

However, to the extent Plaintiffs allege that employees are failing to implement this

otherwise immune policy,[6] discretionary immunity does not protect the State. *See Westfall*, 355

Or. at 156; *see also W.S.*, 2019 WL 7630946, at *7.

> **9.      Claim (i): In Canceling Drug And Alcohol Treatment And Other
> Programs That Provided A Means For Earlier Release That Would
> Increase Social Distancing, Without Making Accommodations Or
> Otherwise Providing Alternative Treatment**

Discretionary immunity protects the State from liability under claim (i). The State's

decision to cancel certain programming to protect against the spread of COVID-19 was a

deliberative policy decision. (*See* Russell Decl. ¶ 20 ("ODOC limited who had access to our

institutions to mitigate some of the ways a virus could come inside. While we were confident in

---

[6] *See, e.g.*, SAC ¶¶ 77, 106 ("Inmates at CRCI have observed inmates being transferred
from A Block at OSP not being placed in quarantine, but they were instead put into general
population, on or about April 1, 2020."); Decl. of Jeffrey Parnell ¶ 30 ("[P]risoners transferred to
OSP from other institutions, including institutions with confirmed cases of COVID-19, were not
being tested for the virus before being allowed into general population. New transfers were not
being quarantined. Instead, transfers were sent directly to general population.").

the decision, it was not made lightly. We understand the importance of programming, treatment, and connectivity with family and friends. However, during this State of Emergency, we knew it was critical we take appropriate precautions to protect our employees and those in our care and custody.")) Plaintiffs disagree with the State's policy, but do not allege a failure to act nor a failure to implement the policy. *See Rush*, 291 Or. App. at 258 (distinguishing discretionary decisions about security allocations from the failure to take "any security precautions whatsoever"). Accordingly, the Court enters summary judgment for the State on claim (i).

> **10.    Claim (j): In Using Disciplinary Segregation Units To House Incarcerated Adults Who Are Diagnosed With COVID-19, Thereby Creating Disincentives For Incarcerated Adults To Report Symptoms Or Seek Testing And Treatment**

Discretionary immunity protects the State from liability under claim (j). The State's decision to use segregation units to house AICs with COVID-19 was a deliberative policy decision. (Steward Decl. ¶ 56 ("ODOC has a centralized plan for addressing COVID-19. This plan has identified housing areas to use as medical isolation on both the east and west sides of the state for medical isolation of COVID-19 positive adults in custody."); Steward Decl. ¶ 55 ("We recognize that it is essential to treat quarantine and medical isolation are [sic] nondisciplinary. ODOC is providing amenities of regular housing to the extent possible consistent with the purpose of quarantine or medical isolation and the resources of the particular institution.").) Plaintiffs do not allege a complete failure to act, nor a failure to implement the challenged policy. Accordingly, the Court enters summary judgment for the State on this claim.

In summary, the Court enters partial summary judgment for the State on the ground of discretionary immunity with respect to on Plaintiffs' negligence claims (i) and (j), denies summary judgment on Plaintiffs' claims (c) and (d), and grants in part and denies in part summary judgment on Plaintiffs' claims (a), (b), (e), (f), (g) and (h).

## CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART

Defendants' motion for partial summary judgment (ECF No. 115).

DATED this 15th day of December, 2020.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge