**Juan C. Chavez**, OSB #136428
**Brittney Plesser**, OSB #154030
**Franz Bruggemeier**, OSB #163533
**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Tel: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB # 862984
**Nadia Dahab**, OSB # 125630
Sugerman Law Office
707 SW Washington St Ste 600
Portland OR  97205
Tel: 503-228-6474
Facsimile: 503-228-2556

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; MICAH RHODES; and SHERYL LYNN SUBLET, individually, on behalf of a class of other similarly situated,<br>Plaintiffs,<br>v.<br>KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; KEN JESKE; and PATRICK ALLEN<br>Defendants. | Case No. 6:20-cv-00570-SB<br><br>PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER<br><br>EXPEDITED HEARING REQUESTED |

## MOTION FOR TEMPORARY RESTRAINING ORDER

Many have hoped and worked toward an end to this deadly COVID-19 pandemic. A

vaccine has now been developed. In between the vaccine's development and the date that ODOC

suffered its first positive case, 3,084 people have contracted the virus while in ODOC custody.

Thirty-three have died. Nearly a one-third of those deaths occurred in just the last month. And

PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER
Page 1 of 20

757 people who work for ODOC have contracted the virus, further exposing those in its custody and placing them at risk.

The Oregon Health Authority has stated that Oregon vaccine priorities is based on equity and the factors that "put people more at risk for contracting or spreading the virus or experiencing serious health consequences from the virus."[1]. But as of the date of this filing, Defendants have waived forward other less risk-laden categories of people or prioritized those in similar circumstances, like correctional staff and others who live in congregate settings, but not prisoners at ODOC. In effect, despite the ample acknowledgment that by being incarcerated prisoners are at a high risk of contracting COVID-19 and that roughly half of all prisoners are at greater risk of severe infection if contracted, Defendants have cruelly punished them for their status as prisoners. Although ODOC has accidentally taken some steps to vaccinate its more elderly population, Plaintiffs are aware of no plan or timeline regarding the complete vaccination of Oregon prisoners, and Defendants have so confirmed.

Plaintiffs now move this Court to issue an order correcting this ongoing constitutional violation. Defendants cannot allow prisoners to be forgotten in their vaccination plans absent total unavailability of doses. Currently, Defendants have the vaccines, but lack the will to give them to all prisoners. That is, definitionally, deliberate indifference.

Pursuant to Fed. R. Civ. P. 65(a) and (b)(1), Plaintiffs request issuance of a Temporary Restraining Order and Preliminary Injunction. Plaintiffs' application demonstrates that "immediate and irreparable injury, loss, or damage will result to the movant[s]." Fed. R. Civ. P. 65(b)(1)(A).

---

[1]     https://www.oregon.gov/oha/ERD/Pages/Phase1aOfVaccinePlanTargetsWideRangeOfHealthSettings.aspx

As prisoners, Plaintiffs have a constitutional right under the Eighth Amendment to reasonable protection from severe illness or death from COVID-19. Plaintiffs request an order requiring ODOC to offer vaccinations to adults in custody starting immediately, subject to vaccine availability, and to complete the process as promptly as practicable.

## MEMORANDUM OF LAW

### I. INTRODUCTION

This Motion presents several undisputed points of law and fact, and one primary question for the Court: Given the high risk of infection among people incarcerated by ODOC, does it violate the Eighth Amendment to not provide them available vaccine doses in a timely manner? Following the *Heller* decision, the answer is yes.

This Court has heard and resolved many of the mixed questions of law and fact in previous motions and orders:

(1) COVID-19 presents a "high risk of serious harm" to prisoners in Oregon;

(2) Plaintiffs would suffer irreparable harm if infected; and

(3) Clearly established law provides notice to Defendants that deliberate indifference to the prevention of COVID-19 constitutes an Eighth Amendment violation.

The question presented above then turns on the subjective prong of the "deliberate indifference" standard. To issue injunctive relief, the Court must then balance the equities and public interest. To this end, much is clear: after the vaccination of medical workers, high-risk populations must be vaccinated next. The relief that Plaintiffs seek is consistent with that, but Defendants' plan to prioritize non-risk laden classes of individuals does not. Plaintiffs proposed order is in the public interest.

## II. PROCEDURAL HISTORY

Plaintiffs filed this case on April 6, 2020 as representatives of a putative class of medically vulnerable prisoners in the custody of ODOC ("Medically Vulnerable Class"). Plaintiffs sought injunctive relief for the purpose of seeking protection from mass spread of the COVID-19 virus. Plaintiffs moved for a TRO and preliminary injunction on May 12, 2020; after a hearing on those motions, they were denied.

In May 2020, the Oregon State Penitentiary suffered an outbreak, and one person died. Plaintiff David Hart tested positive for COVID-19 on May 15, 2020. Thereafter, Plaintiffs filed an amended complaint adding a second class for persons who had contracted COVID-19 and seek monetary damages ("Damages Class").

After announcements of the development and approval of two vaccines, Oregon began a process of assessing priorities for vaccinations, as discussed *infra*. Earlier today, Plaintiffs requested leave to file a third amended complaint. ECF 153. Plaintiffs' proposed Third Amended Complaint adds as a Defendant the Director of the Oregon Health Authority (OHA) and adds a third class of claims for all persons in ODOC's custody who are medically able to but have not been vaccinated by ODOC ("Vaccine Class"). Also today, Plaintiffs filed a Motion to Provisionally Certify the Vaccine Class.

## III. FACTUAL ALLEGATIONS

### A. The COVID-19 Pandemic

Since 2019, COVID-19 has ravaged the world. The extensive body of evidence demonstrates that COVID-19 is a highly communicable virus that spreads through droplets dispersed through close personal contact or contact with droplet-infected surfaces. It has been

declared a pandemic and has given rise to state and national emergencies.[2] Governments throughout the world, including Oregon, understand the severity of the pandemic and have implemented extreme responses necessary to lessen the devastation.[3] Those responses are primarily focused on preventing contact between people by reducing the number of people in close proximity to one another because that has been recognized and accepted as the best way to prevent transmission.

According to the CDC, 23,839,868 persons living in the United States have contracted COVID-19, and 396,442 have died.[4]

ODOC recognizes the short- and long-term harms wrought by a COVID-19 infection outside of severe oxygen deprivation and death. The disease can present with symptoms of shortness of breath, fever, coughing, chest pain from lung scaring, heart scaring, loss of the senses of smell and taste from nerve damage, and chronic fatigue. Dewsnup Dep. 67:4-68:8; 70:4-16. These can result in lasting problems and quality of life problems for incarcerated people, including the start of or exacerbation of chronic lung or heart conditions. *Id.* at 72:3-23. Reinfection is possible and those who have become infected are not safe from contracting it again. *Id.* at 74:6-13.

## B. The Pandemic within ODOC

The Court has received declarations from adults in custody (AICs) and Defendants' witnesses about the current state of COVID-19 in ODOC's prisons. Those facts highlight the

---

[2] WhiteHouse.gov, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, (Mar 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaringnational-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/; State of Oregon, Governor's Office, *Governor Kate Brown Declares State of Emergency to Address Coronavirus* (Mar 8, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36109.
[3] *See* Office of the Governor, Executive Order No. 20-12 (Mar. 23, 2020), available at https://www.oregon.gov/gov/Documents/executive_orders/eo_20-12.pdf.
[4] *United States COVID-19 Cases and Deaths by State*, Centers for Disease Control and Prevention, available at https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days

danger. The parties to this case are largely in agreement that COVID-19 is a persistent and

dangerous problem for Plaintiffs.

   For the purposes of resolving any factual dispute surrounding the need for the vaccine to

be distributed to AICs, Plaintiffs offer and reincorporate into this motion any previous

declarations made by AICs in support of their previous filings.

   Since those briefings were filed, Plaintiffs have conducted depositions and learned

additional information pertinent to the present motion:

- Dorm housing presents a significant challenge for ODOC. Reducing dormitory
  housing would require an estimated 50 to 60 percent reduction in AIC population.
  Dewsnup Dep. 49:12-16; 50:2-4. The problems presented by dormitory housing is
  "unsolvable." Dewsnup Dep. 98:9-13. Even in non-dormitory housing, ODOC
  has struggled to prevent the spread of the disease. Cain Dep. 67:16-23.

- The "primitive" engineering of some ODOC facilities makes it difficult to control
  COVID spread when it gets into the facility. Dewsnup Dep. 50:19-20.

- ODOC acknowledges that the physiological age of AICs is older than the
  public's, making them more vulnerable to infection. Dewsnup Dep. 64:11-18.

- Staff have been the primary vector of COVID-19 within ODOC. Dewsnup Dep.
  57:7-10; Cain Dep. 65:23-66:5.

- ODOC has a nursing shortage that pre-dated the pandemic. Dewsnup Dep. 81:3-8.
  The pandemic has made it worse. *Id.* at 83:2-5. This nursing shortage, particularly
  at EOCI, might be associated with the high level of infection at that facility. *Id.* at
  84:10-13.

- ODOC continues to operate laundry, food, and facility plant operations staffed by AICs from different units, leading to AIC-to-AIC transmission. Dewsnup Dep. 85:15-25; Cain Dep. 95:11-96:8, 96:19-97:2. OCE facilities also mix units leading to AIC COVID spread. Dewsnup 89:2-15.

- Outbreaks lead to lockdowns, which can have serious effects on the health and well-being of AICs. Cain Dep. 103:25-104:14.

Staff refusal to wear masks has massively contributed to the unacceptable spread of disease in ODOC facilities. Dewsnup 98:14-99:18; Cain Dep. 59:1-8, 113:7-12. Even after sending memorandums to staff in May 2020, mask wearing appeared to Dr. Dewsnup to be at 10% with OSP correctional officers. Dewsnup 134:18-135:7. This was a statewide problem for ODOC, necessitating a statewide masking mandate from ODOC. Dewsnup 136:13-137:13; Cain Dep. 63:3-7. Despite knowing about the problem, ODOC did not act to enforce a disciplinary system for correctional officers until July because of a "COVID Rebellion," or disbelief among the staff that masking was necessary. Dewsnup 136:13-137:13; Cain Dep. 59:1-8. This delay lead to the serious consequences we see in infection rates. Dewsnup 137:7-8, 139:4-7. Even after a statewide mask mandate was put in place, staff non-compliance with mask requirements continued. Cain Dep. 65:4-10.

## C. The Arrival of Vaccines

In late 2020, the U.S. Food and Drug Administration approved two vaccines for general use. These vaccines remain in production, and allocations are being given to the states for distribution. OHA is responsible for distributing, and prioritizing the distribution of, COVID-19 vaccines in Oregon. In that role, OHA determines whether and when prisoners incarcerated in ODOC facilities will receive COVID-19 vaccines.

As currently articulated, OHA has tiered priorities based on a combination of essential services needed and heightened risk for exposure. OHA's vaccination plan "creates a framework for distributing and sequencing COVID-19 vaccines throughout Oregon based on equity, individual, environmental and activity factors that put people more at risk for contracting or spreading the virus or experiencing serious health consequences from the virus."[5]  The first group of people scheduled to be vaccinated, "Priority 1a," include the following: Health Care Professionals (HCP); Residents and workers in Long Term Care Facilities (LTCF); generally, facilities that provide medical and/or personal care to people who cannot live independently, such as the elderly or those with disabilities living in congregate settings; Home care patients and their caregivers; and Correctional workers. Within Priority 1a, additional subgroups determine when within that priority a person is eligible for the vaccine. While OHA released the schedule for Priority 1a on or about December 18, 2020, not long after news broke of the potential FDA approval of the Pfizer vaccine, the next level of priority, Priority 1b, has not been fully formed.

Defendants have relayed that some part of that delay is attributable to delegation of future priority setting to a Vaccine Advisory Committee (VAC). To date, the VAC has developed only a broad set of criteria for prioritization in 1b that includes a huge number of people but does not include any prioritization within 1b; AICs are included in its unprioritized list of Phase 1b recommended groups.

Meanwhile, Defendant Governor Brown has announced priorities that bypass the VAC's alleged decision-making authority. Particularly, the Governor has waived forward K-12 educators and childcare workers. And on January 12, 2021, Governor Brown announced that

---

[5]    OHA, *Health equity drives distribution to ensure vaccine accessibility*, **December 18, 2020,** https://www.oregon.gov/oha/ERD/Pages/Phase1aOfVaccinePlanTargetsWideRangeOfHealthSettings.aspx.

seniors over the age of 65 and childcare, preschool, and K-12 employees to start receiving

vaccinations on January 23, 2021.[6]

On January 15, 2021, Governor Brown announced that the start date for vaccinations for

seniors and school employees would be pushed back to February 8, 2021.[7] Later, Governor

Brown clarified that the start date for teachers would be January 25, 2021.[8] The vaccine

distribution based on age, with begin February 8, starting with those who are aged 80 and over.[9]

OHA has estimated that the four elder age groups will take approximately 12-15 weeks to

vaccinate. *Id.* The general provision of vaccines to AICs appears to be set for some point after

the educators and age groups, totaling approximately 900,000 people, have been vaccinated. *Id.*

There has been no announcement of the start date for vaccinations of adults in custody, other

than those adults in custody who are part of Priority 1a owing to age or essential services

provided in the course of their work within prisons.

On or about January 15, 2021, ODOC offered vaccines to approximately 1,320 adults in

custody who were deemed high risk or who were elderly. Those vaccinations were based on a

miscommunication regarding vaccine eligibility by some vaccine providers at the ODOC

facilities who already had the vaccines.[10] This includes a few, but not all, of the named Plaintiffs

in this case who are still incarcerated. Notwithstanding this early vaccination of a small number

---

[6] Aimee Green, *Oregonians age 65+ and teachers can get vaccinated against COVID-19 starting Jan. 23, governor says*, The Oregonian (Jan. 12, 2021), available at https://www.oregonlive.com/news/2021/01/gov-kate-brown-announces-oregonians-age-65-and-teachers-can-get-vaccinated-against-covid-19-starting-jan-23.html.

[7] Aimee Green, *Oregon to start COVID-19 vaccinations of teachers Jan. 25, seniors 65+ to wait to Feb. 8*, The Oregonian (Jan. 15, 2021), available at https://www.oregonlive.com/news/2021/01/oregon-to-start-covid-19-vaccinations-of-teachers-jan-25-seniors-65-to-wait-to-feb-8.html

[8] Oregon to start COVID-19 vaccinations of teachers Jan. 25, seniors 65+ to wait to Feb. 8 https://www.oregonlive.com/news/2021/01/oregon-to-start-covid-19-vaccinations-of-teachers-jan-25-seniors-65-to-wait-to-feb-8.html

[9] OHA, *Updated Infographic*, January 14, 2021, https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/le3527A.pdf

[10] Defendants have represented to Plaintiffs that a statement about this accidental vaccination is forthcoming and Defendants will stipulate to the information from that upcoming statement.

PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER
Page 9 of 20

of AICs, based on information and belief, the remaining AIC population—an estimated 11,500

people—have not been scheduled for vaccination. As well, based on the Governor's prior

announcements, it appears that teachers and elderly Oregonians will be prioritized for

vaccination AICs.

As of the date of this filing, no plans exist for the broader and necessary vaccination of

AICs, despite promises that they would be vaccinate at some point within the vast Priority 1b,

and behind 900,000 others, and acknowledgment from ODOC's infectious disease doctor that the

vaccine is "highly critical to eventual control" of COVID-19. Dewsnup 157:8-19.

## IV. STANDARD OF LAW

The Court may grant a temporary restraining order or preliminary injunction by finding

one of two sets of criteria are satisfied. *Natural Res. Def. Council, Inc.  v. Winter*, 518 F.3d 658,

677 (9th Cir. 2008). The "traditional" criteria consider four factors: (1) the likelihood of success

on the merits, (2) the likelihood of irreparable harm in the absence of preliminary relief, (3) the

balance of equities, and in some cases, (4) the public interest.  *Id.*; *Winter v. Natural Res. Def.

Council*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008); *Alliance for the Wild Rockies

v. Cottrell,* 632 F.3d 1127, 1131, 1135-38 (9th Cir. 2011).

Ninth Circuit courts, among others, use a "sliding scale" to evaluate these equitable

factors. A strong showing on one of the factors may offset a weak showing on another. *Cottrell*,

632 F.3d at 1131-32.  Thus, for example, "a preliminary injunction is appropriate when plaintiff

demonstrates that serious questions going to the merits were raised and the balance of hardships

tips sharply in the plaintiff's favor."[11]  *Id.* at 1134-35 (internal quotations and citations omitted).

---

[11] The Supreme Court held in *Winter* that a preliminary injunction should not issue if a plaintiff shows only a
possibility of harm rather than a likelihood of harm. *Winter*, 555 U.S. at 21; *see also* 632 F.3d at 1135.  However, it
did not reject the sliding scale or "serious question" frameworks.  632 F.3d at 1132-34.

Alternatively, a court may grant the request for a temporary restraining order if the plaintiff demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised, and the balance of hardships tips sharply in the plaintiff's favor. *Natural Res. Def. Council, Inc.*, 518 F.3d at 677. To succeed under the "serious question" test, Plaintiffs must show that they are likely to suffer irreparable injury and that an injunction is in the public's interest. *Cottrell*, 632 F.3d at 1132. Plaintiffs satisfy both criteria, and this court should issue a Temporary Restraining Order for Plaintiffs' Putative Class.

## V. LEGAL ARGUMENT

Defendants have an affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody. As the Supreme Court has made clear,

> "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment . . ."

*DeShaney v. Winnebago Cty. Dep't. Soc. Servs.*, 489 U.S. 189, 199-200 (1989). "Contemporary standards of decency require no less." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976)). Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass.

**A. Plaintiffs Are Likely To Prevail On The Merits Of Their Eighth Amendment Claim.**

The Eighth Amendment imposes certain duties on prison or jail officials holding persons pursuant to a sentence: (1) to provide humane conditions of confinement; (2) to ensure that inmates receive adequate food, clothing, shelter and medical care; and (3) to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). An Eighth Amendment claim must satisfy both an objective and a subjective component. *Id.* at 834.

### 1. Plaintiffs have a "serious medical need" to be vaccinated for COVID-19.

A prisoner satisfies the objective prong of an Eighth Amendment claim if they have a "serious medical need." *Estelle*, 429 U.S. at 104. This Court has previously found that the Plaintiffs' confinement creates a risk of serious harm from COVID-19. Dkt. 108, pp. 27-28 (summary of cases finding COVID-19 presents a "serious harm"). The Vaccine Class is broader than the Medically Vulnerable Class previously announced in Plaintiffs' Second Amended Complaint that the Court found had a "serious medical need." But fundamentally, all incarcerated persons in ODOC have a serious medical need and interest in being offered the vaccine to prevent their own infection and to help to prevent the transmission within ODOC institutions.

It follows that a vaccination for COVID-19 presents an obvious example of a "serious medical need." *See Patel v. Cty. of Orange*, 2019 WL 4238875, *6 (C.D. Cal. 2019) ("[T]he need for vaccines to prevent the contraction of hepatitis logically is a 'serious' medical need" (citing *Helling*, 509 U.S. at 33 (1993)). Defendants cannot dispute the necessity of the vaccine given the risk of harm to all AICs, Plaintiffs in the proposed Vaccine Class, from COVID-19 infection. *See* Dewsnup Dep. 67:4-68:8; 70:4-16. Too many have already been harmed or killed by this disease. Now that a vaccine, in addition to other measures, could stop the pandemic

within ODOC's walls, Defendants must do what they can to address the virus. Dewsnup 157:8-19 (describing the eventual vaccine as "highly critical" to preventing further COVID spread.)

As with masking, social distancing, and hygiene, ensuring a comprehensive offer of vaccinations to as many AICs as possible as soon as possible is the most effective means to stop the spread of COVID-19. The most health professionals predict that a vaccination rate of approximately 70-90% would be needed to reach some level of "herd immunity."[12] "Herd immunity makes it hard for the disease to spread from person to person, and it even protects those who cannot be vaccinated."[13] At the current level of vaccination, ODOC has achieved approximately a 10.5% rate. Accordingly, the entire Vaccine Class has a serious medical need in having offered the vaccine to prevent ongoing infections and transmission.

If Defendants wish to argue that COVID-19 is innocuous for younger AICs, Plaintiffs can support this argument with further medical evidence demonstrating the extent to which COVID-19 can and has harmed younger persons. Moreover, by ODOC's own admission, more than half of ODOC's incarcerated population already meet a medically vulnerable community standard.[14] There can be no half-measures, or partial responses. We have already seen the harm that brings.

    2. In delaying or preventing vaccines for ODOC prisoners, Defendants are deliberately indifferent

The Eighth Amendment's subjective component requires a showing that in denying a prisoner humane conditions of confinement the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference

---

[12] Donald G. McNeil Jr., *How Much Herd Immunity Is Enough?,* New York Times, Dec. 24, 2020, https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html
[13] CDC, COVID-19 Vaccine FAQ, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html.
[14] Conrad Wilson, *COVID-19 deaths spike in Oregon prisons*, OPB, Jan. 19, 2021, https://www.opb.org/article/2021/01/19/covid-19-deaths-spike-in-oregon-prisons/

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 835. A prison official's deliberate indifference to serious medical needs or serious risk of harm violates the Eighth Amendment. *Estelle*, 429 U.S. at 106. The Eighth Amendment forbids deliberate indifference to conditions that "pose an unreasonable risk of serious damage to . . . future health." *Id.* at 35. In systemic cases such as this, deliberate indifference can be shown by evidence of "systematic or gross deficiencies in staffing, facilities, equipment, or procedures." *Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 152–53, 155 n. 138 (N.D. Cal. 2015) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). The key question in such cases is whether systemic deficiencies "taken as a whole" subject people to a "substantial risk of serious harm." *See Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011).

The "deliberate indifference" standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be demonstrated by the way in which prison officials provide medical care. *Id.* at 1059–60.

Defendants cannot deny that they understand the necessity to vaccinate their population as soon as possible, just as they understood the necessity to enforce mask wearing, social distancing, and effective testing were necessary at the start of the pandemic. As with those important components, Defendants have taken to half-measures and gestures towards complying with the Eighth Amendment. Taking no action to have AICs placed within a timely vaccination window means they have been deliberately indifferent. *McGuckin*, 974 F.2d at 1059–60. More

than just delay, Defendants Brown and Allen have interfered with the delivery of medical care to the Vaccine Class by privileging individuals who do not have the same level of risk as them. (Discussed further *infra*.)

The Eighth Amendment imposes an obligation on Defendants to protect the people in their custody because they cannot protect themselves. People in ODOC custody cannot protect themselves from infection even when they want to do so. *See* MacDonald Decl. Jan. 21, 2021, paragraphs 1-8, (stating that a prisoner was told he could not sit away from his dorm bunk even though he was trying to social distance from two COVID-positive prisoners within a few feet of him because ODOC had kept them and over 10 others in the same dorm after they tested positive). Because they have failed to do so, Plaintiffs will likely succeed on their Eighth Amendment claim.

**B. Plaintiffs Will Suffer Irreparable Harm if Relief is Not Granted**

Plaintiffs require immediate injunctive relief from this court to prevent ongoing and likely future harm to members of the proposed Plaintiff class. Plaintiffs seeking a TRO or preliminary injunction must establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Natural Res. Def. Council, Inc.*,, 518 F.3d at 677. COVID-19 is a serious, and possibly fatal, disease, that has already claimed the lives of 33 people in ODOC's custody and infected over 3,000. Previously, this Court has ruled that a COVID-19 infection would be an "irreparable harm." Dkt. 108, p. 39. The breadth of devastation COVID-19 has brought to incarcerated people in Oregon is not speculative. *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm."). Our analysis then turns on the balance of equities involved. *Natural Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008).

The balance of equities falls overwhelmingly in favor of granting a temporary restraining order in this case.  Plaintiffs have demonstrated that their constitutional rights have been violated and that they face the high likelihood of irreparable harm. Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  The public has no interest in Defendants continuing to place members of the proposed Plaintiff class at risk of serious harm.

We anticipate that the Defendants would argue that, following *Woodford v. Ngo*, 549 U.S. 81, 94 (2006), this Court should "tread lightly" in managing the affairs of ODOC. While this is articulated as conditions of confinement issue under the Eighth Amendment, setting statewide vaccination priorities does not interfere with ODOC's internal management. As discussed in *McGuckin*, "medical care ordinarily does not conflict with competing administrative concerns." 974 F.2d at 1060. Indeed, ODOC likely does not have an administrative interest in the vaccination of teachers before those in their custody to whom they have the duty to provide care.

We could also anticipate that Defendants will argue that they have an interest in not vaccinating a population broader than the persons they either already vaccinated or who fit into a narrower group of "medically vulnerable" people. This argument, as addressed *supra*, ignores the need to achieve herd immunity by vaccinating approximately 70-90% of their population. Early studies in the acceptance rate for a potential COVID-19 vaccine suggests that 67% of respondents believed they would take the vaccine.[15] However, vaccine acceptance varied by demographics.[16] The study suggests that historically disadvantaged communities had lower vaccine acceptance rates. Following known trends in mass incarceration both locally[17] and

---

[15] https://pubmed.ncbi.nlm.nih.gov/32838242/
[16] *Id.*
[17] https://multco.us/file/48681/download

nationally,[18] it should be apparent that casting a smaller vaccine net will far short of what is necessary to achieve a safe margin of vaccination. Lastly, it cannot be discounted that COVID-19 still poses a serious danger to all persons, young or old.

Lastly, Plaintiffs anticipate that Defendants may argue a quasi-discretionary immunity theory that in effect expresses the State's interest in designing any health care policy it so desires, and if that means putting educators ahead of the line then so be it. Even setting aside the Eighth Amendment, no community health standard Plaintiffs have reviewed would support the Defendants' course of action to vaccinate educators and people 65 years or older at the exclusion of vaccinating prisoners when prisoners are both in a high-risk state of confinement and incapable of defending themselves against exposure to the virus. Indeed, even teachers do not support their vaccination priority over seniors and Black, Indigenous, and people of color. As the President of the Portland Association of Teachers said, "Putting everybody in line behind educators is not the safest thing for our community to do."[19] Given the lack of necessity to vaccinate teachers, it can only be interpreted as a matter of mismatched political clout.

OHA's vaccine plan allows many people in living circumstances similar to AICs, with either similar or greater levels of ability to protect themselves from being infected with COVID-19, to be vaccinated right now, during the Phase 1a vaccination. It includes both residents and staff in nursing and memory care facilities, all long-term care facilities and congregate care sites, hospice care sites, group homes for children or adults with intellectual and developmental disabilities, adult foster homes for older adults, behavioral health residential treatment homes and facilities. Corrections officers and other workers in correctional settings are also permitted to

---

[18] https://www.prisonpolicy.org/blog/2020/07/27/disparities/
[19] Jenny Young, 'Putting everybody in line behind educators not safest thing,' KOIN News (Jan. 15, 2021), available at https://www.koin.com/news/health/coronavirus/putting-everybody-in-line-behind-educators-not-safest-thing/

currently receive the vaccines. There is a hole in that list of persons who OHA has determined to be "more at risk for contracting or spreading the virus or experiencing serious health consequences from the virus": adults in the custody and care of ODOC. The public interest does not support this kind of mass punishment.

Furthermore, because ODOC relies on AICs to work many of the day-to-day jobs in Oregon prisons, regardless of the risks of COVID-19 transmission, many AICs have been forced to continue to work despite being sick with COVID-19 symptoms. *See* Decl. MacDonald, January 21, 2021, paragraph 2. ODOC should support the vaccination of all prisoners to both prevent infections and also allow for ongoing operations without putting prisoners at greater risk of infection. *See* Dewsnup Dep. 85:15-25; Cain Dep. 95:11-96:8, 96:19-97:2. OCE facilities also mix units leading to AIC COVID spread. Dewsnup 89:2-15 (ODOC continues to operate laundry, food, and facility plant operations staffed by AICs from different units, leading to AIC-to-AIC transmission).

The public's interest is behind prioritizing the disadvantaged and imperiled, as stated in OHA's vaccine plan. Now that health care workers, people living in assisted living homes, and correctional officers have been offered the much sought-after hope for protection from COVID-19, Defendants need to offer this vaccine to prisoners next.

**C. The Prison Litigation Reform Act Is Not A Bar To Plaintiff's Proposed Terms Of A Temporary Restraining Order.**

　　　1. Plaintiffs do not have available administrative remedies

As discussed in Plaintiffs' previous Motion for a Temporary Restraining Order and the Court's Opinion and Order, ECF 108, Plaintiffs have not had an available administrative remedy to grieve issues with ODOC's broader management of the COVID-19 response.

However, as the Court observed in its Opinion and Order, Dkt. 108 p. 17, "ODOC has denied grievances related to emergency operations relating to Governor Brown's executive order because an AIC cannot grieve any matter outside the jurisdiction of ODOC…" *citing* Dkt. 89, Humphreys Decl. ¶ 12. It would necessarily follow that decisions made by Defendants Brown and Allen could not be grieved as they are outside ODOC's jurisdiction. Defendants had conceded this issue in previous briefing. Plaintiffs have been informed by Counsel for the Defendants that it is true that AICs will not be able to grieve the issues raised in the present motion. Therefore, no administrative remedy is "available" to them.

    2. Plaintiffs' proposed remedy is as narrowly drawn as possible to correct this violation of federal law.

The Prison Litigation Reform Act placed a "limit" on the scope of injunctive relief an incarcerated person can seek and receive from the Federal courts.[20] 18 U.S. Code § 3626(a)(1)(A) provides:

> "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."

Even given this restriction, the scope of the harm suffered by Plaintiffs should overcome any concern that the remedies they seek are too broad. Indeed, Plaintiffs' request is limited to the timing and prioritization of vaccine distribution and not to the availability or unavailability of

---

[20] Plaintiffs raise here and wish to preserve the opportunity to argue that this restriction on the traditionally broad authority of the Federal courts to grant equitable remedies as both a violation of Plaintiffs' due process rights, and is violative of the separation of powers.

vaccine doses. Defendants would only be enjoined to act within the realistic circumstances within their control and would not be held in contempt because of misrepresentations made to them by the Federal government[21] or *force majeure*.

Second, as argued *supra*, Plaintiffs' sought-after remedy does not intrude on the operation of ODOC's prisons. Instead, Plaintiffs seek to enjoin other State apparatuses from denying them access to life-saving medicine, and to protect themselves from being ridden roughshod upon owing to their lack of political clout. Defendants' Eight Amendment obligations are not burdens; they are the marks of a maturing society. *Trop v. Dulles*, 356 U.S. 86, 101 (1958). This Court must act to protect them.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion and issue an order that Defendants start vaccinating adults in custody immediately, subject to vaccine availability, and to complete the process as promptly as practicable.

DATE:  January 21, 2021.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Attorney for Plaintiff

---

[21] Courtney Sherwood and Erin Ross, *Oregon governor: 'There is no federal reserve of doses,' accuses Trump administration of deception,* Oregon Public Broadcasting (Jan. 15, 2021), available at https://www.opb.org/article/2021/01/15/oregon-covid-19-vaccine-governor-brown-trump-administration/