IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL MANEY; GARY CLIFT; GEORGE
NULPH; THERON HALL; DAVID HART;
MICAH RHODES; and SHERYL LYNN
SUBLET, individually, on behalf of a class of
others similarly situated,

              Plaintiffs,

     v.

KATE BROWN; COLETTE PETERS;
HEIDI STEWARD; MIKE GOWER; MARK
NOOTH; ROB PERSSON; KEN JESKE; and
PATRICK ALLEN,

              Defendants.

Case No. 6:20-cv-00570-SB

**OPINION AND ORDER**

BECKERMAN, U.S. Magistrate Judge.

      Plaintiffs Paul Maney, Gary Clift, Gary Nulph, Theron Hall, David Hart, Micah Rhodes,

and Sheryl Lynn Sublet (together, "Plaintiffs"), adults in custody ("AIC") at Oregon

Department of Corrections ("ODOC") institutions, filed a third amended complaint alleging

constitutional and state law violations against defendants Governor Kate Brown, Colette Peters,

Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, and Patrick Allen (together,

"Defendants"). (ECF No. 160.)

PAGE 1 – OPINION AND ORDER

Before the Court is Plaintiffs' motion for provisional class certification (ECF No. 154) and motion for a temporary restraining order and preliminary injunction (ECF No. 156). All parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636, and the Court held a hearing on Plaintiffs' motions on February 2, 2021. For the reasons discussed herein, the Court grants Plaintiffs' motion for provisional class certification and Plaintiffs' motion for a preliminary injunction.

## INTRODUCTION

From the beginning of the COVID-19 pandemic, it was clear that our country's prisons were uniquely vulnerable to the transmission and spread of the virus. To date, over 366,000 incarcerated individuals have tested positive for COVID-19, and over 2,300 have died.[1] Oregon prisons have not been spared from this reality, as COVID-19's toll continues to mount behind bars.

Defendants are aware of the higher risk of COVID-19 exposure and infection to individuals living and working in congregate living facilities, and do not dispute that vaccination is an essential component of protecting against COVID-19 exposure. For these reasons, defendants Governor Brown and Oregon Health Authority ("OHA") Director Patrick Allen ("Allen") have prioritized in Phase 1A of Oregon's COVID-19 Vaccination Plan the vaccination of those living and working in congregate care facilities and those working in correctional settings. Yet, Governor Brown and Allen have excluded from Phase 1A individuals *living* in correctional settings.

///

---

[1] *A State-by-State Look at Coronavirus in Prisons*, Marshall Project (last updated Jan. 29, 2021), available at https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited Feb. 2, 2021).

The Court acknowledges the difficult and unenviable task faced by defendants Allen and Governor Brown: they must determine the order in which Oregon citizens will receive a life-saving vaccine that is limited in supply during a global pandemic. The question of which groups of Oregonians should receive priority is best left to the policymakers, and is not the question before this Court. The narrow question before the Court is whether prioritizing those living and working in congregate care facilities and those working in correctional settings to receive the vaccine, but denying the same priority for those living in correctional settings, demonstrates deliberate indifference to the health and safety of those relying on the state's care.

Our constitutional rights are not suspended during a crisis. On the contrary, during difficult times we must remain the most vigilant to protect the constitutional rights of the powerless. Even when faced with limited resources, the state must fulfill its duty of protecting those in its custody. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("It is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself.") (quotation marks and citation omitted). For the reasons that follow, the Court finds that the law and facts clearly favor Plaintiffs' position, and therefore grants Plaintiffs' request for preliminary injunctive relief.

## BACKGROUND

### I.    THE PARTIES

Paul Maney is a 62-year-old AIC at Oregon State Correctional Institution ("OSCI") in Salem, Oregon. (Third Am. Compl. ("TAC") ¶ 3.) Gary Clift is a 76-year-old AIC at OSCI (TAC ¶ 4), and George Nulph is a 68-year-old AIC at OSCI. (*Id.* ¶ 5.) Theron Hall is a 35-year-old AIC at the Oregon State Penitentiary ("OSP") (*id.* ¶ 6), and David Hart is a 53-year-old AIC at OSP. (*Id.* ¶ 7.) Micah Rhodes was previously an AIC at Columbia River Correctional

Institution and has now been released from ODOC custody. (*Id.* ¶ 8.) Sheryl Lynn Sublet is a 63-year-old AIC at Coffee Creek Correctional Facility. (*Id.* ¶ 9.)

Kate Brown is the Governor of the State of Oregon (hereinafter, "Governor Brown"). (*Id.* ¶ 11.) Colette Peters is the Director of ODOC (*id.* ¶ 12), and Heidi Steward is the Deputy Director of ODOC. (*Id.* ¶ 13.) Mike Gower is ODOC's Assistant Director of Operations. (*Id.* ¶ 14.) Mark Nooth is ODOC's Eastside Institutions Administrator and is responsible for operations at six ODOC institutions (*id.* ¶ 15), and Rob Persson is the Westside Institutions Administrator and is responsible for the remaining eight ODOC institutions. (*Id.* ¶ 16.) Ken Jeske is the Oregon Correctional Enterprises ("OCE") Administrator. (*Id.* ¶ 17.) Allen is the Director of OHA. (*Id.* ¶ 18.)

Plaintiffs assert allegations on behalf of a class of similarly situated AICs (*id.* ¶ 19), and propose three classes: (1) the "Injunctive Relief Class"; (2) the "Damages Class"; and (3) the "Vaccine Class." (*Id.* ¶¶ 20-21.) Plaintiffs allege that the Injunctive Relief Class consists of all AICs at the highest risk of dying or suffering from severe illness from COVID-19 who are currently or who will be in the future held in ODOC custody. (*Id.* ¶ 20.) The Damages Class includes all AICs who have been continuously housed at ODOC facilities after February 1, 2020 and who have been diagnosed with COVID-19 illness. (*Id.* ¶ 21.) The Vaccine Class consists of all prisoners housed in ODOC facilities who have not been offered a COVID-19 vaccine. (*Id.* ¶ 21). Plaintiffs seek only certification of the Vaccine Class at this time. (Pls.' Mot. to Certify Class ("Pls.' Mot.").)

## II.   PROCEDURAL HISTORY

Plaintiffs filed this action in April 2020. On May 12, 2020, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction, alleging that Defendants' response to the

COVID-19 pandemic violated the Eighth Amendment. (ECF No. 14.) On June 1, 2020, the Court denied Plaintiffs' motion. (Prelim. Inj. Op. & Order, ECF No. 108.)

On June 26, 2020, Plaintiffs filed a Second Amended Complaint ("SAC"), alleging that Defendants (1) violated the Eighth Amendment by subjecting AICs to cruel and unusual punishment by failing to provide adequate healthcare during the COVID-19 pandemic and by operating ODOC facilities without the capacity to treat, test, or prevent the spread of COVID-19, and (2) committed negligence in failing to carry out proper preventative measures. (SAC ¶¶ 148-58.) On August 3, 2020, Defendants moved for partial summary judgment on the damages portion of Plaintiffs' Eighth Amendment claim and on the entirety of Plaintiffs' state law negligence claim. (ECF No. 115.)

On December 15, 2020, the Court granted in part and denied in part Defendants' motion. (Mot. Summ. J. Op. & Order, ECF No. 149.) On January 22, 2020, the Court granted Plaintiffs' motion to file a Third Amended Complaint ("TAC"). The TAC proposes a third class of AICs (the Vaccine Class) and adds Allen as a defendant. (TAC ¶¶ 18, 21.) Plaintiffs now seek certification of the Vaccine Class and move for a preliminary injunction.

## III.    STATE OF THE COVID-19 OUTBREAK IN OREGON PRISONS

The parties agree that COVID-19 is a persistent and dangerous risk to Plaintiffs. (Mot. Prelim. Inj. at 5-6; Defs.' Resp. to Mot. Prelim. Inj. ("Defs.' Resp.") at 3.) As of June 1, 2020, when the Court denied Plaintiffs' first motion for a preliminary injunction, 157 AICs had tested positive for COVID-19, and one AIC had died while in ODOC custody as a result of COVID-19. (Prelim. Inj. Op. & Order at 16.) As of December 15, 2020, 1,641 AICs had tested positive for COVID-19 and nineteen had died. (Summ. J. Op. & Order at 4.) Most recently, as of February 1, 2021, 3,392 AICs have tested positive for COVID-19 in 14 of ODOC's 15 facilities, and forty-two AICs have died. *See COVID-19 Status at Oregon Department of Corrections Facilities*,

PAGE 5 – OPINION AND ORDER

OREGON.GOV, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited

Feb. 2, 2021.) Additionally, 806 ODOC staff have tested positive for COVID-19 (and none have

died). (*Id.*; Third Suppl. Decl. of Joe Bugher ("Bugher Third Suppl. Decl.") ¶ 8, ECF No. 166.)

ODOC staff and contractors are the primary vector of COVID-19 within ODOC. (Dep. of

Daniel Dewsnup, M.D. ("Dewsnup Dep.") 57:2-10, ECF No. 157; Dep. of Brad Cain ("Cain

Dep.") 65:23-66:14, ECF No. 157.) Recently, ODOC determined that all but one COVID-19

infection was transmitted through an ODOC staff member. (Dewsnup Dep. 57:2-10.) Despite

continued efforts by ODOC to monitor the illness and implement various safety measures,

including social distancing (Decl. of Heidi Steward ("Steward Decl.") ¶¶ 51-52, ECF No. 83),

mask wearing (Suppl. Decl. of Joe Bugher ("Suppl. Bugher Decl.") Ex. 2, at 1-2, ECF No. 116),

expanded testing (Suppl. Bugher Decl. ¶ 12), and healthcare evaluation for confirmed and

suspected cases (Steward Decl. ¶¶ 37, 40, 54, 61-71), the number of infected AICs in Oregon's

prisons continues to rise.

ODOC administrators acknowledge that current measures are inadequate to stop the

spread of COVID-19. (Dewsnup Dep. 50:5-25.) Primitive structures, older ventilation systems,

crowding, and dormitory-style housing make it difficult to control the spread of the virus. (*Id.*

49:12-16, 49:25-50:5, 97:13-21, 98:9-24.) In addition, social distancing is nearly impossible in

ODOC kitchens, laundry facilities, and dormitories. (*Id.* 49:12-16, 85:10-25; Cain Dep. 95:13-

21, 96:24-97:2.)

Dormitory housing presents a significant challenge for ODOC. (Dewnsup Dep. 49:12-16;

50:17-22.) ODOC administrators have determined that the only way to achieve proper social

distancing in ODOC facilities would be to house all AICs in celled units. (*Id.* 49:12-16.) This

would require an estimated fifty to sixty percent reduction in AIC population. (*Id.* 49:25-50:4.)

While masking remains a primary means of reducing transmission in ODOC facilities, AICs and staff did not readily accept masking recommendations. (*Id.* 97:16-21, 98:14-24, 134-135, 139:10-25; Cain Dep. 59:1-24, 63:3-23, 65:1-10.) To date, non-compliance with masking requirements remains an ongoing problem at ODOC facilities. (Dewsnup Dep. 99:13-18, 134-135, 139:10-11; Cain Dep. 65: 1-10, 113:7-11.)

## IV.    THE ARRIVAL OF VACCINES

On December 11, 2020, the U.S. Food and Drug Administration ("FDA") issued the first emergency use authorization (EUA) for use of the Pfizer-BioNTech vaccine for the prevention of COVID-19.[2] A week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine.[3]

### A.    Oregon's COVID-19 Vaccination Plan

OHA is the entity responsible for determining vaccine priority and allocation of COVID-19 vaccines in Oregon. (Bugher Third Suppl. Decl. ¶ 6; Decl. of Lydia (Mimi) Luther ("Luther Decl.") ¶ 4, ECF No. 167.) In that role, OHA has established a phased sequencing plan for vaccine distribution throughout the state ("Vaccination Plan"). (Bugher Third Suppl. Decl. ¶ 6; Luther Decl. ¶ 4.) OHA's Vaccination Plan "creates a framework for distributing and sequencing COVID-19 vaccines throughout Oregon based on equity, individual, environmental and activity

---

[2] *See FDA Takes Key Action in Fight Against COVID-19 by Issuing Emergency Use Authorization for First COVID-19 Vaccine*, U.S. FOOD & DRUG. ADMIN. (Dec. 11, 2020), available at https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19 (last visited Feb. 2, 2021).

[3] *See FDA Takes Additional Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for Second COVID-19 Vaccine*, U.S. FOOD & DRUG. ADMIN. (Dec. 18, 2020), available at https://www.fda.gov/news-events/press-announcements/fda-takes-additional-action-fight-against-covid-19-issuing-emergency-use-authorization-second-covid (last visited Feb. 2, 2021).

factors that put people more at risk for contracting or spreading the virus or experiencing serious health consequences from the virus."[4]

Both in Oregon and across the country, the supply of the vaccine is limited. (Luther Decl. ¶ 10.) Consequently, it is impossible to provide the vaccine to everyone who wants it. (*Id.* ¶ 10.) In an effort equitably to distribute the vaccine, OHA created tiered priorities in each phase of vaccine distribution. The first phase—Phase 1A—is divided into four subgroups. (*Id.* Att. 1.) As relevant here, Group 2 includes:

- [L]ong-term care facilities, including all paid and unpaid [healthcare personnel], all staff and contractors, including residents [] of:

  - Residential care facilities

  - Adult foster care

  - Group homes for people with intellectual and developmental disabilities

  - Other similar congregate care sites

  - Hospice programs

  - Mobile crisis care and related services

  - Individuals working in a correctional setting

(*Id.*) According to the latest version of the Vaccine Plan, childcare providers and early learning and K-12 educators and staff became eligible for the vaccine as of January 25, 2021. (*Id.* ¶ 7, Att. 1.) Older adults will be eligible based on age beginning on February 8, 2021. (Luther Decl. ¶ 7.)

///

///

---

[4] *Health equity drives distribution to ensure vaccine accessibility*, OREGON.GOV (Dec. 18, 2020), available at https://www.oregon.gov/oha/ERD/Pages/Phase1aOfVaccinePlanTargetsWideRangeOfHealthSettings.aspx (last visited Feb. 2, 2021).

B.    **Vaccine Availability and Delivery to ODOC Staff**

ODOC staff and contractors are included in the highest priority of OHA's phasing. (Bugher Third Suppl. Decl. ¶ 7; Luther Decl. ¶ 5.) ODOC currently has 4,400 staff and contractors. (Bugher Third Suppl. Decl. ¶ 5.) As of January 28, 2021, ODOC has received 4,600 doses of the Moderna COVID-19 vaccine. (*Id.* ¶ 14.) As of January 29, 2021, all ODOC staff and contractors have been offered the first dose of the COVID-19 vaccine. (*Id.* ¶ 16.) ODOC strongly encourages (but does not require) its staff and contractors to be vaccinated. (*Id.* ¶ 15.)

Initially, ODOC estimated that approximately fifty-five percent of staff would accept the vaccine when offered to them. (*Id.* ¶ 17.) To date, ODOC has administered only 1,500 first doses, which constitutes approximately thirty-four percent of its staff and contractors, a lower number than expected.[5] (*Id.* ¶¶ 17-18.)

C.    **Vaccine Priority for AICs**

A limited number of AICs who work in prison health care settings are included in the Phase 1A category. (Bugher Third Suppl. Decl. ¶ 9; Luther Decl. ¶ 6.) To date, 91 AIC health care workers have been vaccinated. (Bugher Third Suppl. Decl. ¶ 21.) AICs with work assignments other than in a health care setting are not included in Phase 1A, despite its priority for "individuals working in a correctional setting." (Luther Decl. ¶ 20; Att. 1.)

On January 16 and 17, 2021, due to an apparent miscommunication regarding eligibility categories, ODOC offered vaccines to 1,558 AICs who were over sixty or who had medical

---

[5] OHA provides vaccines directly to facilities to conduct their own vaccinations, however, ODOC staff and contractors are also eligible to obtain vaccines through local public health providers. (Bugher Third Suppl. Decl. ¶ 18; Luther Decl. ¶ 16.) OHA does not track how many "individuals working in a correctional setting" have received the vaccine to date. (Luther Decl. ¶ 12.) Consequently, ODOC and OHA do not have complete data on the total number of staff and contractors who have received the first dose of the vaccine. (Bugher Third Suppl. Decl. ¶ 18; Luther Decl. ¶ 16.)

vulnerabilities. (Bugher Third Suppl. Decl. ¶¶ 22, 26.) Of those offered the vaccine, 1,343 AICs

chose to be vaccinated, for an acceptance rate of eighty-six percent. (*Id.* ¶ 26.) An additional 316

adults under age sixty received the vaccine because there were leftover doses. (*Id.* ¶ 27.) The

remaining AIC population—an estimated 10,400 people[6]—have not been offered a COVID-19

vaccine and are not scheduled for vaccination within OHA's Vaccination Plan. (*Id.* ¶ 10; Luther

Decl. ¶ 7.)

**D.      Future Vaccination Plans for AICs**

According to OHA guidance, the remaining AICs will be included in the next phase of

the vaccine rollout–Phase 1B. (Bugher Third Suppl. Decl. ¶ 10; Luther Decl. ¶ 7, Att. 1.) OHA

has developed a broad set of eligibility criteria for Phase 1B, but OHA has not yet included any

prioritization within this group. (Luther Decl. Att. 1.) ODOC anticipates that it will prioritize

vaccinating medically vulnerable AICs, which constitutes approximately 7,000 individuals.

(Bugher Third Suppl. Decl. ¶¶ 33-35.) Of those individuals, 1,500 were already vaccinated as a

result of the miscommunication. (*Id.* ¶ 35.) To date, neither ODOC nor OHA have finalized

plans for vaccinating the general population of AICs. (*Id.* ¶ 10; Luther Decl. ¶ 7.)

**DISCUSSION**

**I.      LEGAL STANDARDS**

**A.      Provisional Class Certification**

"Courts in the Ninth Circuit 'routinely grant provisional class certification for purposes of

entering injunctive relief.'" *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 682 (C.D. Cal. 2020)

(citation omitted). Plaintiffs seeking class certification must satisfy the requirements of FED. R.

---

[6] The Court takes judicial notice that, as of December 2020, there are 12,073 adults in
ODOC custody. (Pls.' Unopposed Motion Jud. Notice ¶ 2, ECF No. 168; Order Granting Pls.'
Unopposed Mot. Jud. Notice, ECF No. 171.)

C IV. P. 23(a). *See Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013). Under

F ED. R. C IV. P. 23(a), plaintiffs seeking class certification must satisfy four requirements: (1)

numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Id.* "Class

certification is proper only if the [district] court has concluded, after a 'rigorous analysis,' that

[F ED. R. C IV. P.] 23(a) has been satisfied." *Id.* at 542-43 (quoting *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 351 (2011)).

Plaintiffs seeking class certification must also satisfy the requirements of at least one of

the categories under F ED. R. C IV. P. 23(b). *See Wang*, 737 F.3d at 542. Here, Plaintiffs seek

provisional class certification of their claims under F ED. R. C IV. P. 23(b)(2). (*See* Pls.' Mot. at 2,

seeking an order certifying a class action under Fed. R. Civ. P. 23(b)(2).) Rule 23(b)(2) provides

that class certification is appropriate if "the party opposing the class has acted or refused to act

on grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole." F ED. R. C IV. P. 23(b)(2).

Plaintiffs "bear the burden of demonstrating that each element of [F ED. R. C IV. P.] 23 is

satisfied." *Gessele v. Jack in the Box, Inc.*, No. 3:10-cv-960-ST, 2013 WL 1326563, at *31 (D.

Or. Jan. 28, 2013). Although the Court's analysis under F ED. R. C IV. P. 23 "will entail some

overlap with the merits of the plaintiffs' underling claim[s]," the primary focus of the district

court's analysis is "not on the merits of the plaintiffs' claims." *Id.* In resolving a dispute about

whether class certification is proper, the district court "may consider material beyond the

pleadings and require supplemental evidentiary submissions by the parties." *Id.* (citing *Blackie v.

Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)).

///

///

B.    Preliminary Injunction[7]

A party seeking a preliminary injunction "must demonstrate (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest." *Sovereign v. Deutsche Bank*, 856 F. Supp. 2d 1203, 1217 (D. Or. 2012) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The elements of the test are "balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F. 3d. 1127, 1131 (9th Cir. 2011)). "When the government is a party, [the] last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).[8]

///

---

[7] Although styled as a motion for a temporary restraining order and preliminary injunction, Defendants correctly point out that the relief Plaintiffs seek is a preliminary injunction. (Defs.' Resp. at 5.)

[8] The Ninth Circuit also provides an additional preliminary injunctive relief test: the "serious questions" test. *All. for the Wild Rockies*, 632 F.3d at 1131-32. Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. A court may grant a preliminary injunction "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156 (D. Or. 2018) (quoting *M.R. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012)). However, where, as here, Plaintiffs seek a mandatory injunction, courts decline to apply the "serious questions" standard. *See P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1135 (C.D. Cal. 2015) ("Plaintiffs seek a mandatory injunction, the Court declines to interpret the 'serious questions' standard for purposes of the Motion as inconsistent with the Ninth Circuit's guidance that a mandatory injunction not issue in 'doubtful cases' and not be granted 'unless the facts and law clearly favor the moving party.'"); *Guerra v W. L.A. College*, No. CV 16-6796-MWF (KSx), 2016 WL 11619872, at *4 (C.D. Cal. Nov. 2, 2016) (same).

PAGE 12 – OPINION AND ORDER

### C.    Mandatory Injunction

A "mandatory injunction orders a responsible party to take action" and "is particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (citation and quotation marks omitted). The "already high standard for granting a TRO or preliminary injunction is further heightened when the type of injunction sought is a 'mandatory injunction.'" *Innovation Law Lab*, 310 F. Supp. 3d at 1156 (citing *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)). A plaintiff requesting a "mandatory injunction" must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (quoting *Garcia*, 786 F.3d at 740).

### D.    Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") imposes additional restrictions on a court's ability to grant injunctive relief. Any such "[1] relief must be narrowly drawn, [2] extend no further than necessary to correct the harm the court finds requires preliminary relief, and [3] be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). The PLRA requires that courts "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity[.]" *Id.* Preliminary relief relating to prison conditions "shall automatically expire on the date that is 90 days after its entry, unless the court makes findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.*

## II.    ANALYSIS

### A.    The Vaccine Class

Plaintiffs move for provisional class certification in connection with their motion for a preliminary injunction pursuant to FED. R. CIV. P. 23(a) and 23(b)(2). Plaintiffs seek to

provisionally certify the following class: "All adults in custody housed at Oregon Department of Corrections facilities (ODOC) who have not been offered COVID-19 vaccinations." (Pls.' Mot. at 2.) Defendants argue that the proposed class is overbroad and ask the Court to limit the class to medically vulnerable and elderly AICs. (Defs.' Resp. to Mot. at 2.)

### 1.    Rule 23(a)'s Requirements

The Court begins by addressing whether Plaintiffs have satisfied the four requirements of FED. R. CIV. P. 23(a) (i.e., numerosity, commonality, typicality, and adequacy of representation). The only requirement in dispute is commonality.

### a.    Numerosity

The proposed class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "In the District of Oregon, as in many other districts, there is a 'rough rule of thumb' that 40 class members is sufficient to meet the numerosity requirement." *McKenzie Law Firm, P.A. v. Ruby Receptionists, Inc.*, No. 3:18-cv-1921-SI, 2020 WL 1970812, at *4 (D. Or. Apr. 24, 2020) (citations omitted). Plaintiffs allege that the proposed class consists of approximately 10,400 members. Defendants do not dispute this allegation. Accordingly, Rule 23(a)(1)'s numerosity requirement is satisfied.

### b.    Commonality

To meet the commonality requirement, Plaintiffs "must show that the class members suffered the 'same injury'—that their claims depend upon a 'common contention." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). This common contention must also "'be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Class members, however, need not have *every* issue in common: commonality requires only 'a single

significant question of law or fact' in common." *Id.* (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012), and citing *Wal-Mart*, 564 U.S. at 359).

Defendants argue that Plaintiffs' proposed class is overbroad. Relying on *Walmart v. Dukes*, Defendants contend that medically vulnerable AICs and other AICs do not raise sufficiently common questions of law and fact to satisfy the commonality prong. (Defs.' Resp. at 4.) The Court disagrees. In *Dukes*, the court declined to certify a class consisting of all women Wal-Mart employees who "held a multitude of jobs, at different levels of Wal-Mart's hierarchy for variable lengths of time, in 3,400 stores, sprinkled across 50 states . . . subject to a variety of regional policies that all differed[.]" 564 U.S. at 359-60. Importantly, the *Dukes* court was not only concerned with the breadth of the class and its claims, but rather found that the plaintiffs had failed to demonstrate commonality because they "wish to sue about literally millions of employment decisions at once." *Id.* at 352.

*Dukes* is distinguishable from the present case. Unlike in *Dukes*, Plaintiffs challenge a single decision made by Defendants, about which common questions of law and fact exist. Common questions of fact include: (1) what priority the OHA should give to AICs in light of the limited supply of the COVID-19 vaccine; (2) to what extent the COVID-19 infection and death rate of AICs should impact priority; and (3) whether and to what extent exigencies of a pandemic alter government officials' obligations to individuals in their custody. (*See* Pls.' Mot. at 6; Pls.' Reply at 2-3.) In addition, at least one common question of law exists: whether Defendants' decision not to offer the COVID-19 vaccine to AICs when offered to individuals working in a correctional setting and individuals living and working in other congregate care settings violates the Eighth Amendment. The fact that medically vulnerable and general population AICs experience different levels of risk does not preclude a finding of commonality. *See McKenzie*,

2020 WL 1970812, at *4 (noting that "commonality requires only a single significant question of law or fact in common"); *Baxley v. Jividen*, No. 3:18-1526, 2020 WL 7489759, at *3 (S.D.W. Va. Dec. 21, 2020) (rejecting the defendant's commonality argument for similar reasons and noting that "at least one common question of law exists: whether the Defendant's health care policies or practices evince deliberate indifference to the medical and mental health needs of pretrial detainees and inmates").

Furthermore, federal courts across the country have certified similar classes of detainees bringing claims arising from the COVID-19 pandemic. *See, e.g.*, *Baxley*, 2020 WL 7489759, at *3-5 (rejecting the defendant's overbreadth argument and certifying a "Jail Class" consisting of "[a]ll persons who are, or who will be, admitted to a jail in West Virginia"); *Criswell v. Boudreaux*, No. 1:20-cv-01048-DAD-SAB, 2020 WL 5235675, at *12 (E.D. Cal. Sept. 2, 2020) (provisionally certifying a class defined as "all people who are now, or in the future will be, incarcerated in Tulare County Jails"); *Gayle v. Meade*, No. 20-21553-CIV-COOKE/GOODMAN, 2020 WL 3041326, at *16 (S.D. Fla. June 6, 2020) (certifying a class of "[a]ll civil immigration detained individuals held by Respondents at [three different detention centers] when this action was filed, since this action was filed, or in the future"); *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 39 (N.D. Cal. Apr. 29, 2020) (provisionally certifying a class of all immigrant detainees at the Mesa Verde Detention Facility and the Yuba County Jail); *Roman v. Wolf*, No. 5:20-cv-768 (TJH) (PHV), 2020 WL 1952656, at *12 (C.D. Cal. Apr. 23, 2020), *affirmed in part, vacated in part by* 829 F. App'x 165 (9th Cir. 2020) (issuing preliminary injunctive relief for a class of all noncitizens detained at Adelanto Detention Center); *Savino v. Souza*, 453 F. Supp. 3d 441, 448-452 (D. Mass. Apr. 8, 2020) (certifying a class defined as "[a]ll civil immigration detainees who are now [] held by Respondents-Defendants" at the county jail

and ICE detention center); *Frahait v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709, 736-41 (C.D. Cal. 2020) (provisionally certifying two subclasses consisting of "[a]ll people who are detained in ICE custody who have one of the Risk Factors placing them at heightened risk of severe illness and death upon contracting the COIVD-19 virus" and "[a]ll people who are detained in ICE custody whose disabilities place them at heightened risk of severe illness and death upon contacting the COVID-19 virus"); *but see Torres v. Milusnic*, 472 F. Supp. 3d 713, 746 (C.D. Cal. July 14, 2020) (limiting class to all AICs over the age of 50 and with underlying health conditions); *Wilson v. William*s, No. 4:20-cv-00794, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020), *vacated on other grounds by* 961 F.3d 829 (6th Cir. 2020) (limiting the petitioner's subclass from all inmates to only those identified by the CDC as being at higher risk of complications from COVID-19).

Next, Defendants argue that it is "inconsistent" for Plaintiffs to seek certification for all AICs given that Plaintiffs' allegations in their TAC recognize distinctions between medically vulnerable and other AICs. (Defs.' Resp. at 4.) The Court disagrees for two reasons. First, Defendants do not acknowledge allegations in Plaintiffs' TAC related to the vaccine and the proposed Vaccine Class. (*See* TAC ¶¶ 21, 32-33, 66-67, 152-54.) Second, as Plaintiffs correctly point out, class certification is not resolved solely on the pleadings. *See Gessele*, 2013 WL 1326563, at *31 (noting that, in considering whether class certification is proper, the district court "may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties").

Finally, Defendants assert that "[a]n excessive risk for a vulnerable person may not be excessive for a healthy person, particularly when the underlying issue plaintiffs seek to litigate is priority between different groups." (Defs.' Resp. at 5.) It is true that exposure to the virus poses a

significant danger to older and medically vulnerable AICs. However, here all of the proposed

class members have suffered the same alleged injury—the substantial risk of contracting

COVID-19 while housed in a correctional setting due to the lack of prompt vaccination—and all

class members would benefit from an order requiring that Defendants prioritize vaccines to

AICs. The fact that some class members are at a higher risk than others does not change the

alleged constitutional injury. *See Savino*, 453 F. Supp. at 452 ("[A]lthough a presently existing

risk may ultimately result in different future harm for different inmates—ranging from no harm

at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to

a single statewide [Department of Corrections] policy or practice that creates a substantial risk of

serious harm. Here, too, the otherwise healthy Detainees face a substantial risk of serious harm

from COVID-19." (quoting *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014))); *see also*

*Roman v. Wolf*, 829 F. App'x 165, 173 (9th Cir. 2020) ("We further hold that the district court

did not err by provisionally certifying a class of all Adelanto detainees. The alleged due process

violations exposed *all* Adelanto detainees to an unnecessary risk of harm, not just those who are

release-eligible or uniquely vulnerable to COVID-19.").

The Court finds that the differences between the two groups of AICs does not defeat

commonality. Accordingly, the Court concludes that Plaintiffs have satisfied the commonality

requirement.

### c.    Typicality

To satisfy the typicality requirement, Plaintiffs "must show that the named parties' claims

or defenses are typical of the claims or defenses of the class." *McKenzie*, 2020 WL 1970812, at

*5 (citing FED. R. CIV. P. 23(a)(3)). Under this subsection's "permissive standards," the

"'representative's claims are typical if they are reasonably co-extensive with those of absent

class members; they need not be substantially identical.'" *Id.* (quoting *Hanlon v. Chrysler Corp.*,

150 F.3d 1011, 1020 (9th Cir. 1998)). In assessing "whether claims and defenses are typical, courts often look to 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

The Court finds that class representatives Hall and Sublet's claims are typical of the class. Both representatives are currently AICs, are subject to substantial risk of exposure to COVID-19, and challenge the same process regarding Defendants' failure to prioritize vaccine doses to AICs. *See, e.g.*, *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 451-52 (D. Conn. May 12, 2020) (finding typicality requirement was similarly satisfied because "the process at issue is applicable to all inmates" and "each member's claim arises from the same course of events—the establishment and operation of this process [regarding home confinement and compassionate release]—and each class member makes similar legal arguments to prove the defendant's liability") (internal quotations and citation omitted).

### d.    Adequacy of Representation

"Rule 23(a)(4) states that before a class can be certified, a court must find that 'the representative parties will fairly and adequately protect the interests of the class.'" *McKenzie*, 2020 WL 1970812, at *6 (quoting FED. R. CIV. P. 23(a)(4)). The adequacy of representation requirement "turns on two questions: (1) whether 'the named plaintiffs and their counsel have any conflicts of interest with other class members'; and (2) whether 'the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class.'" *Id.* at 6 (quoting *Hanlon*, 150 F.3d at 1020).

Plaintiffs submit evidence of their counsel's experience litigating class actions and complex cases, including cases on behalf of AICs. (Decl. of David F. Sugerman ("Sugerman

Decl.") ¶¶ 2-11, ECF No. 169.) Defendants do not challenge the adequacy of Plaintiffs' counsel. (Defs.' Resp. to Mot. at 2.) In addition, there is no conflict between Plaintiffs and members of the class. (Pls.' Mot. at 7.) Accordingly, the Court finds that Plaintiffs satisfy the adequacy requirement.

### e.    Conclusion

For these reasons, the Court finds that Plaintiffs have satisfied FED. R. CIV. P. 23(a)'s requirements.

### 2.    Rule 23(b)(2)'s Requirements

Once the requirements of Rule 23(a) are met, "Federal Rule of Civil Procedure 23(b)(2) provides that a class action may be maintained . . . if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Torres*, 472 F. Supp. 3d at 746 (quoting FED. R. CIV. P. 23(b)(2)).

Because Defendants' actions and inaction apply to the class generally, the Court determines that Rule 23(b)(2)'s requirements are satisfied. Defendants' failure to offer available COVID-19 vaccine doses to AICs is applicable to each member of the class so that injunctive relief is appropriate to the class as a whole. Accordingly, the Court finds that Rule 23(b)(2) is satisfied.

### 3.    Conclusion

For the reasons stated, the Court finds that Plaintiffs have met FED. R. CIV. P. 23(a) and 23(b)(2)'s requirements provisionally to certify the Vaccine Class.

///

///

///

### B.    Preliminary Injunction[9]

Plaintiffs assert that Defendants' failure to provide them with the COVID-19 vaccine violates their Eighth Amendment right to reasonable protection from severe illness or death. Plaintiffs ask the Court to require Defendants to "offer vaccinations to adults in custody starting immediately, subject to vaccine availability, and to complete the process as promptly as practicable." (Mot. Prelim. Inj. at 3.) Defendants respond that Plaintiffs cannot establish a likelihood of success on the merits of their claim or that the balance of the equities and public interest in their favor. Defendants also argue that Plaintiffs' proposed remedy is not narrowly tailored.

The Court must evaluate the four factors outlined by the Supreme Court in *Winter* to determine if Plaintiffs have established the need for preliminary injunctive relief: (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of equities, and (4) the public interest. *See Sovereign*, 856 F. Supp. 2d at 1217 (citing *Winter*, 555 U.S. at 20). In addition, because Plaintiffs are requesting a mandatory injunction, the Court must also conclude that "the law and facts *clearly favor* [their] position[.]" *Innovation Law Lab*, 310 F. Supp. 3d at 1156 (quoting *Garcia*, 786 F.3d at 740).

### 1.    Likelihood of Success on the Merits

Plaintiffs allege that Defendants' failure promptly to offer COVID-19 vaccine doses to AICs violates the Eighth Amendment. "A public official's 'deliberate indifference to a prisoner's serious illness or injury' violates the Eighth Amendment ban against cruel punishment." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Estelle*, 429 U.S. at 105). "Deliberate

---

[9] The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 42 U.S.C. § 1997e(a). Defendants do not raise an exhaustion challenge here.

indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Criswell v. Boudreaux*, No. 1:20-cv-01048-DAD-SAB, 2020 WL 7646405, at *21 (E.D. Cal. Dec. 23, 2020) (quoting *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014)). Plaintiffs must establish that they were "confined under conditions posing a risk of 'objectively, sufficiently serious' harm and that the officials had a 'sufficiently culpable state of mind' in denying the proper medical care." *Clement*, 298 F.3d at 904 (citing *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995)). "Thus, there is both an objective and a subjective component to an actionable Eight Amendment violation." *Id.*

To satisfy the objective prong, a plaintiff must "show a serious medical need by demonstrating that failure to treat [the] prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Hopton v. Fresno Cty. Human Health Sys.*, No. 1:20-cv-0141-NONE-SKO, 2020 WL 1028365, at *5 (E.D. Cal. Mar. 3, 2020) (citing *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012)). "The subjective component requires the inmates to show that the officials had the culpable mental state, which is deliberate indifference to a substantial risk of serious harm." *Clement*, 298 F.3d at 904 (citation and quotation marks omitted).

"Deliberate indifference" is established only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A prison official's duty under the Eighth Amendment is to ensure reasonable safety," and "prison officials

who act reasonably cannot be found liable[.]" *Farmer*, 511 U.S. at 844-45 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).

### a.    Objective Prong

Plaintiffs argue that receiving the COVID-19 vaccine is a "serious medical need." (Mot. Prelim. Inj. at 12.) Defendants do not challenge the objective prong (Defs.' Resp. at 5), and the Court agrees that the COVID-19 vaccine is a "serious medical need" for AICs. *Cf. Patel v. Cnty. of Orange*, No. 8:17-cv-01954-JLS-DFM, 2019 WL 4238875, at *6 (C.D. Cal. June 19, 2019) ("*Helling* indicated that the exposure to the risk of contracting hepatitis is enough to state an Eighth Amendment claim. Thus, the need for vaccines to prevent the contraction of hepatitis logically is a 'serious' medical need." (citing *Helling*, 509 U.S. at 33)).

### b.    Subjective Prong

The parties dispute whether Plaintiffs are likely to establish the subjective prong. The Court must determine if Plaintiffs will be able to establish that Defendants are aware of, but are disregarding, an excessive risk to AICs' health or safety by denying them a COVID-19 vaccine.

It is clear that Defendants are aware of the serious risk that COVID-19 poses to AICs, and the critical role that vaccines play in controlling the spread of the virus. (*See Defs.' Resp. at 3*); *see also Awshana v. Adducci*, 453 F. Supp. 3d 1045, 1054 (E.D. Mich. 2020) ("There is no doubt that [defendants] are aware of the grave threat posed by the pandemic and the exacerbated risk caused by the close quarters of the detention facilities."); *see also Valentine v. Collier*, No. 4:20-CV-1115, 2020 WL 1916883, at *10 (S.D. Tex. Apr. 20, 2020) ("The risk of COVID-19 is obvious."); *Farmer*, 511 U.S. at 842 ("[A] fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

The parties disagree, however, whether Defendants have acted with deliberate indifference to the risk posed by COVID-19. Plaintiffs argue that by "[t]aking no action to have

PAGE 23 – OPINION AND ORDER

AICs placed within a timely vaccination window means [Defendants] have been deliberately indifferent." (Mot. Prelim. Inj. at 14.) Defendants counter that "[t]here are simply not enough vaccine doses for everyone to get one immediately" and that Defendants have responded reasonably to the vaccine shortage. (Defs.' Resp. at 8.)

The Eighth Amendment imposes an obligation on Defendants to protect the people in their custody because they cannot protect themselves. *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) ("'[T]he government has an obligation to provide medical care for those whom it punishes by incarceration,' and cannot be deliberately indifferent to the medical needs of its prisoners." (quoting *Estelle*, 429 U.S. at 104 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.")); *Helling*, 509 U.S. at 32 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." (quoting *Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989))).

Courts have also long recognized that prison officials have an Eighth Amendment duty to protect inmates from exposure to communicable diseases. *See, e.g.*, *Helling*, 509 U.S. at 33 (finding prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease"); *Hutto v. Finney*, 437 U.S. 678, 682-83 (1978) (affirming a finding of an Eighth Amendment violation where a facility housed individuals in crowded cells with others suffering from infectious diseases, such as Hepatitis and venereal disease, and the individuals' "mattresses were removed and jumbled together each morning, then returned to the cells at random in the evening"); *Andrews v. Cervantes*, 493 F.3d 1047, 1050 (9th Cir. 2007) (recognizing a cause of action under the Eighth Amendment and 42 U.S.C. § 1983 for an alleged

policy of not screening inmates for infectious diseases—HIV, Hepatitis C, and Heliobacter

pylori—and for housing contagious and healthy individuals together during a known "epidemic

of hepatitis C"); *Trevizo v. Webster*, No. CV 17-5868-MWF (KS), 2018 WL 5917858, at *4

(C.D. Cal. Sept. 6, 2018) ("It is well accepted that such 'substantial risks of harm' include

'exposure of inmates to a serious, communicable disease[,]'" including MRSA (citing *Helling*,

509 U.S. at 33); *see also Loftin v. Dalessandri*, 3 F. App'x 658, 663 (10th Cir. 2001)

(recognizing an Eighth Amendment claim for knowingly housing the defendant in a cell with

individuals who had tested positive for tuberculosis).[10]

Plaintiffs' recent evidence demonstrates that individuals in ODOC custody continue to

lack the means to protect themselves from exposure to COVID-19 and, in some cases, risk being

disciplined in attempting to do so. (*See* Decl. of Bryan MacDonald ("MacDonald Decl.") ¶ 6)

(AIC testified that on January 21, 2021, fifteen AICs in his dorm tested positive for COVID-19

and were not removed from the dorm and that he observed ODOC staff order an AIC to return to

his bunk after he tried to socially distance from his bunkmate who had tested positive for

---

[10] *See also Brigaerts v. Cardoza*, 952 F.2d 1399 (9th Cir. 1992) ("Repeated exposure to contagious diseases may violate the eighth amendment if prison officials show deliberate indifference to serious medical needs."); *Glick v. Henderson*, 855 F.2d 536, 539-40 (8th Cir. 1988) (finding the plaintiff "could have a colorable claim under § 1983 if he could show that there is 'a pervasive risk of harm to inmates' of contracting the AIDS virus and if there is 'a failure of prison officials to reasonably respond to that risk.'") (citation omitted); *Lareau v. Manson*, 651 F.2d 96, 98 (2d Cir. 1981) (affirming the district court's finding that overcrowding and "failure to screen new inmates for communicable diseases" violated sentenced inmates' Eighth Amendment rights); *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974) (affirming the district court's finding of an Eighth Amendment violation in part because "inmates with serious contagious diseases [we]re allowed to mingle with the general prison population"); *Ferguson v. Bd. of Cnty. Commissioners of Sierra Cty.*, No. CV 11-1001 WPL/CG, 2013 WL 12334214, at *8 (D.N.M. Apr. 2, 2013) (recognizing a claim upon which relief could be granted under the Eighth Amendment for knowingly housing the plaintiff in a cell with others infected with the contagious disease MRSA); *Randles v. Hester*, No. 98CV1214, 2001 WL 1667821, at *2 (M.D. Fla. June 27, 2001) (finding an Eighth Amendment violation where the defendants forced the plaintiff to clean up blood without proper gear to prevent HIV infection and contamination).

COVID-19). In addition, despite knowledge that mixing AICs from different housing units presents a high risk of AIC-to-AIC transmission, ODOC continues to operate laundry and kitchen sites staffed by AICs from different units. (Dewsnup Dep. 85:15-25; Cain Dep. 95:11-96;8, 96:19-97:2.)

With respect to the subjective prong, the Court need not address whether it was reasonable for Defendants to prioritize other, unrelated groups before Plaintiffs. Rather, the Court need only address the more narrow question of whether prioritizing those living and working in congregate care settings and those working in correctional settings in Phase 1A, Group 2, without also prioritizing AICs in the same group, demonstrates deliberate indifference to the AICs' health or safety. To that end, Defendants argue that "it is reasonable and important to vaccinate correctional workers before AICs because they are a primary source of infection." (Defs.' Resp. at 11.) Defendants contend that, due to limited vaccine supplies, Oregon has reasonably determined that the most effective means for slowing transmission is first to administer the vaccine to ODOC staff and contractors. (Id. at 11.)

The Court is not persuaded. First, Defendants' argument is belied by their own Vaccination Plan. Defendants Allen and Governor Brown have included in Phase 1A individuals living in (1) "Residential care facilities"; (2) "Adult foster care"; (3) "Group homes for people with intellectual and developmental disabilities"; and (4) "Other similar congregate care sites." (Luther Decl. Att 1.) This is evidence that Defendants are aware of the high risk of COVID-19 exposure and infection to individuals both working *and* living in a congregate setting, and aware of the importance of vaccinating both populations to protect against infection. AICs also live in a congregate care setting, yet they have been excluded from Phase 1A. Indeed, ODOC initially assumed that AICs must be included at this priority level "because ODOC has previously been

PAGE 26 – OPINION AND ORDER

classified as a congregate care setting by OHA[,]" which is why ODOC mistakenly began

vaccinating AICs. (Bugher Third Suppl. Decl. ¶ 24.) In light of this recognition of the risks to

those living in a congregate care environment, and the risk of those working in a correctional

setting, the exclusion of AICs from Phase 1A supports a finding of deliberate indifference on the

part of Defendants. *See McGuckin*, 974 F.2d at 1059-60 (finding that deliberate indifference

"may appear when prison officials deny, delay or intentionally interfere with medical

treatment"); *cf. Patel*, 2019 WL 4238875, at *6 (concluding at the pleading stage that the

plaintiffs had sufficiently alleged that the defendants were deliberately indifferent to their

medical needs after the plaintiffs had been exposed to blood and the defendants "knew that

Plaintiffs needed vaccinations and did not provide them").

Additionally, while Defendants are aware that ODOC staff and contractors are the

primary source of transmission of COVID-19 within ODOC facilities (Defs.' Resp. at 11), they

are also aware that only an estimated fifty-five percent of ODOC staff and contractors will elect

vaccination. (Bugher Third Suppl. Decl. ¶ 17.) As of January 29, 2021, ODOC had administered

1,500 doses to eligible staff and contractors, for a vaccination rate of approximately thirty-four

percent.[11] Thus, even assuming that vaccinated correctional officers cannot spread the virus to

AICs (an assumption public health experts have not yet endorsed), vaccinating only one out of

every two or three correctional staff is inadequate to stop the spread of COVID-19 in the prisons.

Simply put, Defendants are well aware of the risks of serious harm to both correctional staff and

AICs and have chosen to protect only the staff. This inaction indicates deliberate indifference to

---

[11] ODOC staff and contractors are also eligible to obtain the COVID-19 vaccine through
local public health entities. (Bugher Third Suppl. Decl. ¶ 18.) As a result, it is likely that a higher
percent of ODOC staff and contractors have received the first dose of the vaccine. However,
neither OHA nor ODOC know how many "individuals working in a correctional setting" have
received the vaccine to date. (Luther Decl. ¶ 12; Bugher Third Suppl. Decl. ¶ 18.)

a substantial risk of serious harm. *See McGuckin*, 974 F.2d at 1060 (noting that a defendant acts with deliberate indifference when he "purposefully ignore[s] or fail[s] to respond to a prisoner's [] possible medical need").

Further, Defendants' response to the pandemic to date has been ineffective in reducing COVID-19 spread among AICs. With a current AIC population of 12,073 AICS, the known rate of COVID-19 infection among AICs is 28%. That number is sizeable compared to the rate of infection in Oregon's general population, which is about 3.3%.[12] Currently, an individual in ODOC custody is nearly ten times more likely to contract COVID-19 than the average Oregonian. Courts have recognized that "the amount of care required in a prison with no suspected cases is far different than the amount of care required in an institution with hundreds of cases[.]" *Ahlman*, 445 F. Supp. 3d at 691 (granting a temporary restraining order where "the number of confirmed COVID-19 cases [wa]s skyrocketing" and the rate of infection in the jail was 12.4 percent compared to 0.14 percent in the county as a whole); *see also Mays*, 2020 WL 1812381, at *11 (finding that "the significant number of confirmed coronavirus infections among detainees certainly suggests the risk is significant" and concluding based on that risk that "plaintiffs have shown a reasonable likelihood of success on their claim"). Denying the vaccine to AICs in institutions suffering from high infection and death rates indicates deliberate indifference.

Finally, while guidance from outside organizations is not determinative of constitutional requirements, "known noncompliance with generally accepted guidelines for inmate health strongly indicates deliberate indifference to a substantial risk of serious harm." *Shank v. Corizon*

---

[12] As of July 2019, the U.S. Census Bureau reported that Oregon's population was 4,217,737. (Pls.' Unopposed Mot. Jud. Notice ¶ 5.) As of January 28, 2021, the Oregon Health Authority reported a total of 140,063 cases of COVID-19 in Oregon. (*Id.* ¶ 6.)

Case 6:20-cv-00570-SB    Document 178    Filed 02/02/21    Page 29 of 34

*Inc.*, No. CV 19-04638-PHX-ROS (JFM), 2020 WL 5628014, at *4 (D. Ariz. Sept. 2, 2020)

(quoting *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 943 (N.D. Cal. 2015)). "Such

guidelines may include CDC guidance." *Id.* Under current CDC guidance for correctional and

detention facilities, "[j]urisdictions are encouraged to vaccinate staff and incarcerated/detained

persons of correctional or detention facilities **at the same time** because of their shared increased

risk of disease."[13] Defendants' failure to follow these guidelines also supports a finding of

deliberate indifference to a serious risk of harm. *See Ahlman*, 445 F. Supp. 3d at 691 ("An

institution that is aware of the CDC Guidelines and able to implement them but fails to do so

demonstrates that it is unwilling to do what it can to abate the risk of the spread of infection. In

other words, failure to comply demonstrates deliberate indifference toward the health and safety

of the inmates.")

　　　　With the development of a COVID-19 vaccine, a solution to the serious health risks to

AICs now exists. Defendants acknowledge that the most effective means of controlling the virus

in Oregon's prisons is through vaccination. (Defs.' Resp. at 3, 10.) Despite limited supply, the

prioritization of those working in a correctional setting, and those living and working in other

congregate care settings, demonstrates that there is sufficient COVID-19 vaccine available to

address the serious risk to AICs.[14] By prioritizing those working in correctional settings over

---

[13] *COVID-19 Vaccine FAQs in Correctional and Detention Centers*, CDC.GOV (last
updated Jan. 11, 2021), available at https://www.cdc.gov/coronavirus/2019-
ncov/community/correction-detention/vaccine-faqs.html (last visited Feb. 2, 2021).

[14] While Defendants argue that "there are simply not enough vaccine doses," Defendants
also acknowledge that many individuals who are not eligible under Phase 1A have already
received the vaccine. (Defs.' Resp. at 8; Luther Decl. ¶ 23.) For example, due to an apparent
"communication error," many people who come into contact with individuals in custody (i.e.,
criminal defense attorneys, prosecutors, legal staff, judges, court staff, etc.) were advised by their
employers or county public health departments that they were eligible under Phase 1A and
received the vaccine. (*Id.*) OHA did not clarify their lack of eligibility until January 22, 2021.
(*Id.*) Furthermore, OHA does not require that vaccine providers track and maintain an

AICs living in correctional settings, and by prioritizing those living and working in other congregate care settings over AICs living in a congregate care setting, Defendants have demonstrated deliberate indifference to the serious risk of harm faced by AICs. *See McGuckin*, 974 F.2d at 1060 (noting that a defendant acts with deliberate indifference when he "purposefully ignore[s] or fail[s] to respond to a prisoner's [] possible medical need").

The Court finds that, based on the current record, Plaintiffs are likely to establish that Defendants are acting with deliberate indifference by failing to offer the COVID-19 vaccine to AICs at the same time that they offer the vaccine to those working in a correctional setting and to others living or working in congregate care settings, and that that the law and facts clearly favor Plaintiffs' position.

### 2.    Likelihood of Irreparable Harm

Having determined that Plaintiffs are likely to prevail on the merits of their claim, the Court now turns to the second *Winter* factor. The second *Winter* factor "requires plaintiffs . . . to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (noting that the "possibility" of irreparable harm is insufficient).

The parties do not dispute that unvaccinated AICs face a likelihood of irreparable harm.[15] (Mot. Prelim. Inj. at 15; Defs.' Resp. at 10.) COVID-19 is a serious and fatal disease that has already claimed the lives of forty-two and infected over 3,000 people in ODOC custody. In

---

individual's eligibility. (*Id.* ¶ 13.) Defendants explain that "OHA is not requiring verification, has not established standards for verification, and has no plans to request verification documentation from vaccinating providers." (*Id.* ¶ 15.) Defendants' argument that a lack of supply is a reason to withhold the vaccine from AICs is undermined by the absence of safeguards in place to ensure that the limited supply is first distributed in accordance with OHA's own prioritization plan.

[15] This Court previously found that a COVID-19 infection presents a risk of irreparable harm to Plaintiffs. (*See* Prelim. Inj. Op. & Order at 39.)

addition, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Basank v. Decker*, No. 20-cv-2518-AT, 2020 WL 1481503, at *6 (S.D.N.Y. Mar. 26, 2020) (finding that "[t]he risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious" and concluding that "[p]etitioners face irreparable injury—to their constitutional rights and to their health"). Plaintiffs have demonstrated a likelihood of success on the merits of their constitutional claim, as explained above. Accordingly, Plaintiffs satisfy the irreparable harm requirement.

### 3.    Balance of Equities and Public Interest

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman*, 977 F.3d at 940 (citing *Drakes Bay Oyster Co.*, 747 F.3d at 1092).

On the one hand, offering vaccines to AICs will save lives and reduce the risk of spread of COVID-19 within ODOC facilities and among surrounding communities. *See Frazier*, 2020 WL 2110896, at *10 ("[The] public interest is served by protecting plaintiffs . . . from COVID-19 both within [defendants'] facilities and among communities surrounding and interacting with those facilities[.]"); *Martinez*, 459 F. Supp. 3d at 448 (noting that, in assessing the balance of equities and the public interest, "Petitioners' interest in avoiding serious illness or death must weigh heavily on the scales").

On the other hand, "[s]tates have a strong interest in the administration of their prisons[,]" and the Supreme Court has cautioned "that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons[.]" *Frazier*, 2020 WL 2110896, at *9 (quoting *Woodford v. Ngo*, 549 U.S. 81, 94 (2006)). The "public interest also commands respect for federalism and comity" and the "Court should approach intrusion into the core activities of

the state's prison system with caution." *Id.* at *10; *see also* 18 U.S.C. § 3626(a)(2) ("The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity[.]").

Defendants argue that the balance of equities disfavors an injunction because "the prioritization of teachers over AICs supports a compelling public interest in getting children back to school." (Defs.' Resp. at 12.) However, Plaintiffs are not asking the Court to enjoin Defendants from offering the vaccine to teachers. Rather, they request that Defendants allow AICs to stand in the same line.[16] (Mot. Prelim. Inj. at 3.)

Defendants also argue that "Oregon—unlike many other states—has already begun vaccinating AICs and has included them in a higher priority than many other individuals." (Defs.' Resp. at 11.) The Court acknowledges that ODOC has vaccinated the most vulnerable individuals in ODOC custody (albeit due to a misunderstanding), including all AICs over the age of sixty. However, as explained above, there remain thousands of AICs living in close quarters without an ability to socially distance who have not yet received the vaccine. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights."). Finally, ODOC's rush to vaccinate its most vulnerable AICs as quickly as possible reflects that prioritizing the vaccine for additional AICs should not be an unwelcome intrusion into the administration of its prisons.

For these reasons, the Court finds that the balance of equities and public interest weighs in favor of vaccinating AICs as soon as possible.[17] *See, e.g.*, *Banks v. Booth*, 468 F. Supp. 3d

---

[16] According to Defendants, Oregon's teachers have been eligible to receive the vaccine since January 25, 2021. (*See* Decl. of Tracy Ickes ("Ickes Decl.") ¶ 2, Ex. 1; Ex. 2. at 3.)

[17] Defendants also argue that it is important to vaccinate correctional workers before AICs because "they are a primary source of infection." (Defs.' Resp. at 11.) The Court addressed this argument in its discussion of the first *Winter* factor.

101, 124 (D.C. Cir. 2020) (finding that an injunction that "lessens the risk that Plaintiffs will contract COVID-19 is in the public interest because it supports public health," and "ordering Defendants to take precautions to lower the risk of infections for Plaintiffs also benefits the public"); *Carranza* v. *Reams,* --- F. Supp. 3d ---, 2020 WL 2320174, at *11 (D. Colo. May 11, 2020) (concluding that the "high risk of serious illness or death if [plaintiffs] contract COVID-19 while in the Weld County Jail [ ] outweighs the harms identified by the defendant, which include maintaining control over the Jail without Court supervision and the costs of complying with plaintiffs' proposed preliminary injunction") (quotation marks omitted); *Mays*, 2020 WL 1812381, at *13 (rejecting the defendants' arguments that "an injunction requiring him to implement additional health and protective measures would be disruptive to his ongoing efforts to address the spread of coronavirus in the Jail" and "that the court should defer to the Jail's practices and its execution of policies that preserve internal order, discipline, and security in the facility"); *Ahlman*, 445 F. Supp. 3d at 694 ("[M]andating compliance with the CDC Guidelines in the Jail serves the public interest[.]").

### 4.    Weighing the Factors

Weighing all of the *Winter* factors here, the Court concludes that preliminary injunctive relief is warranted. *See Winter*, 555 U.S. at 20 (explaining that a party seeking preliminary injunctive relief must establish all four factors).

### C.    Relief

Having determined that preliminary injunctive relief is warranted, the Court must address the appropriate scope of relief. Plaintiffs ask the Court to direct Defendants to "offer vaccinations to adults in custody starting immediately, subject to vaccine availability, and to complete the process as promptly as practicable." (Mot. Prelim. Inj. at 3.) Defendants respond that Plaintiffs' proposed relief is not narrowly tailored. (Defs.' Resp. at 13.)

Defendants are correct that any injunctive relief must be tailored to resolve the specific injury identified by the Court. The PLRA requires that injunctive relief: (1) "be narrowly drawn"; (2) "extend[] no further than necessary to correct the harm the court finds requires preliminary relief"; and (3) "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

The Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of its Eighth Amendment claim as applied to the Vaccine Class. The Court therefore enters the following preliminary injunction: **Defendants shall offer all AICs housed in ODOC facilities, who have not been offered a COVID-19 vaccine, a COVID-19 vaccine as if they had been included in Phase 1A, Group 2, of Oregon's Vaccination Plan**. The Court waives any bond requirement. *See* FED. R. CIV. P. 65(c).

## CONCLUSION

For the reasons stated, the Court GRANTS Plaintiffs' motion for provisional class certification (ECF No. 154), GRANTS Plaintiffs' motion for a preliminary injunction (ECF No. 156), and ORDERS that Defendants shall offer all AICs housed in ODOC facilities, who have not been offered a COVID-19 vaccine, a COVID-19 vaccine as if they had been included in Phase 1A, Group 2, of Oregon's Vaccination Plan.

**IT IS SO ORDERED.**

DATED this 2nd day of February, 2021.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge