**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
**Alex Meggitt**, OSB No. 174131
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN LAW OFFICE
707 SW Washington St. Ste. 600
Portland, OR 97205
Tel: 503-228-6474
Facsimile: 503-228-2556

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; MICAH RHODES; SHERYL LYNN SUBLET; and FELISHIA RAMIREZ, personal representative for the ESTATE OF JUAN TRISTAN, individually, on behalf of a class of other similarly situated,<br><br>Plaintiffs,<br><br>    v.<br><br>STATE OF OREGON; KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; KEN JESKE; PATRICK ALLEN; JOE BUGHER; and GARRY RUSSELL,<br><br>Defendants. | Case No. 6:20-cv-00570-SB<br><br><br>**PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES AND ALTERNATIVE MOTION TO CERTIFY ISSUE CLASS**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

LOCAL RULE 7-1 CERTIFICATION ........................................................... 1

MOTION.................................................................................................... 1

MEMORANDUM OF LAW ........................................................................ 2

I.    INTRODUCTION ............................................................................. 2

II.   FACTUAL BACKGROUND ............................................................ 5

     A.    Defendants' Response to COVID-19 in Oregon's Prisons.................... 6
     B.    Masks Become ODOC's Primary Control Mechanism........................ 10
     C.    Defendants' Failures Endanger and Cause Harm to Plaintiffs
        and Class Members ............................................................................. 14

III.  ARGUMENT .................................................................................... 15

     A.    The Damages Class and the Wrongful Death Class satisfy Rule 23(a)'s
        prerequisites. ...................................................................................... 16

          1.    The proposed classes are sufficiently numerous........................ 17

          2.    Plaintiffs' claims raise legal and factual issues common to their respective
             classes. ................................................................................ 18

          3.    Plaintiffs' claims are typical of class members' claims........................ 19

          4.    Plaintiffs and their counsel will adequately represent the interests of the
             class.................................................................................... 21

     B.    Plaintiffs' proposed classes may be maintained under Rule 23(b). ...................... 22

          1.    Class members' interests in individually controlling prosecution of
             separate actions weighs in favor of class certification............................ 23

          2.    The extent and nature of existing litigation weighs in favor of class
             certification. ....................................................................... 24

          3.    Concentrating the litigation in this forum is appropriate and desirable.... 26

          4.    Class-wide adjudication of this controversy would be manageable. ........ 26

     C.    In the alternative, Plaintiffs request that the Court certify an issue class under Rule
        23(c)(4). .............................................................................................. 30

IV.   CONCLUSION.................................................................................. 32

# TABLE OF AUTHORITIES

Cases

*Albrecht v. Or. Dep't of Corrections*,
   No. 3:21-cv-001960-SB (D. Or.)........................................................................... 25, 26
*Amchem Prods, Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................ 22, 23
*Ark. Educ. Ass'n v. Bd. of Educ. of Portland, Ark. Sch. Dist.*,
   446 F.2d 763 (8th Cir. 1971) ...................................................................................... 17
*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ...................................................................................... 20
*BMW of N. Am, Inc. v. Gore*,
   517 U.S. 559 (1996) ................................................................................................... 23
*Caput v. NTT Security US Inc.*,
   2019 WL 3308771 (C.D. Cal. Apr. 19, 2019) ........................................................... 19
*Cunningham v. Multnomah Cty.*,
   No. 3:12–cv–01718–ST, 2015 WL 274187 (D. Or. Jan. 20, 2015) ........................... 30
*Franco-Gonzales v. Napolitano*,
   2011 WL 11705815 (C.D. Cal. Nov. 21, 2011) ........................................................ 17
*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ................................................................................................... 19
*Giles v. St. Charles Health Sys., Inc.*,
   294 F.R.D. 585 (D. Or. 2013)............................................................................... 17, 18
*Haley v. Medtronic*,
   169 F.R.D. 643 (C.D. Cal. 1996)............................................................................... 19
*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................ 18, 19, 20, 22
*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ...................................................................................... 19
*Harris v. Palm Springs Alpine Estates, Inc.*,
   329 F.2d 909 (9th Cir. 1964) ...................................................................................... 17
*In re Arizona Theranos, Inc. Litig.*,
   2020 WL 5435299 (D. Ariz. Mar. 6, 2020)............................................................... 24
*In re Dalkon Shield IUD Prods. Litig.*,
   693 F.2d 847 (9th Cir. 1982) ...................................................................................... 24
*In re Hyundai & Kia Fuel Economy Litig.*,
   926 F.3d 539 (9th Cir. 2019) ...................................................................................... 22
*Inland Empire—Immigrant Youth Collective v. Nielsen*,
   2018 WL 1061408 (C.D. Cal. Feb. 26, 2018) .......................................................... 19
*Jordan v. Los Angeles Cty.*,
   669 F.2d 1311 (9th Cir. 1982), *vacated on other grounds by* 459 U.S. 810 (1982)................. 17
*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) .................................................................................... 21
*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ...................................................................................... 16

*McKenzie Law Firm, P.C. v. Ruby Receptionists, Inc.*,
No. 3:18-cv-1921-SI, 2020 WL 1970812 (D. Or. Apr. 24, 2020)................................ 17, 19, 20
*Menefree v. Or. Dep't of Corrections*,
No. 3:20-cv-2024-SB (D. Or.)................................................................................................ 25
*Moore v. Or. Dep't of Corrections*,
No. 3:21-cv-00599-SB (D. Or.)............................................................................................. 25
*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,
188 F.R.D. 365 (D. Or. 1998)......................................................................................... 17, 22
*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ................................................................................................ 20
*Perez-Olano v. Gonzalez*,
248 F.R.D. 248 (C.D. Cal. 2008)........................................................................................... 19
*Philip Morris USA v. Williams*,
549 U.S. 346 (2007) ............................................................................................................. 23
*Rahman v. Mott's, LLP*,
693 F. App'x 578 (9th Cir. 2017) ......................................................................................... 30
*Ramirez v. TransUnion, LLC*,
951 F.3d 1008, (9th Cir. 2020), *cert. granted*, 141 S. Ct. 972 (2020)................................... 20
*Reitman v. Champion USA Petfoods, Inc.*,
830 F. App'x 880 (9th Cir. 2020)......................................................................................... 30
*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ........................................................................................... 16, 21
*Trimble v. Brown*,
6:21-cv-00233-SB (D. Or.).................................................................................................... 25
*True Health Chiropractic, Inc v. McKesson Corp.*,
896 F.3d 923 (9th Cir. 2018) ................................................................................................ 16
*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) ................................................................................................ 30
*Walker v. Life Ins. Co. of Sw.*,
953 F.3d 624 (9th Cir. 2020) ................................................................................................ 15
*Wal-Mart Stores, Inc v. Dukes*,
564 U.S. 338 (2011) ................................................................................................... 15, 16, 18
*Walters v. Reno*,
145 F.3d 1032 (9th Cir. 1998) .............................................................................................. 21
*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) ....................................................................................... passim

<u>Other Authorities</u>

Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and How to "Flatten the
Curve,"* Washington Post (Mar. 14, 2020),
https://www.washingtonpost.com/graphics/2020/world/corona-simulator/ ................................ 3

<u>Rules</u>

Fed. R. Civ. P. 23(a) ..................................................................................................... passim
Fed. R. Civ. P. 23(b) ..................................................................................................... passim
Fed. R. Civ. P. 23(c) ..................................................................................................... passim

<u>Treatises</u>

7A Charles Alan Wright & Arthur R. Miller,
  *Federal Practice & Procedure* § 1779 (3d ed. 2005)............................................................... 23
7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
  *Federal Practice & Procedure* § 1780 (2d ed. 1986)............................................................. 25
William B. Rubenstein,
  2 Newberg on Class Actions 4:90 (5th ed. 2012)...................................................................... 30

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7-1, counsel for Plaintiffs certifies that they conferred telephonically with counsel for Defendants on April 28, 2021, on the issues raised in this motion. Defendants do not consent to the motion.

## MOTION

Plaintiffs respectfully move for an order from this Court certifying Plaintiffs' proposed Damages Class pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(3). Plaintiffs' proposed Damages Class includes all adults incarcerated in Oregon Department of Corrections (ODOC) facilities who: (1) were incarcerated on or after February 1, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19; and (3) if they became incarcerated after February 1, 2020, tested positive or were otherwise diagnosed with COVID-19 at least 14 days after they entered ODOC custody. Additionally, Plaintiffs respectfully move for an order from the Court certifying Plaintiffs' proposed Wrongful Death Class pursuant to Rule 23(b)(3). Plaintiffs' proposed Wrongful Death Class includes the estates of those adults incarcerated at ODOC facilities continuously since February 1, 2020, who died during the Wrongful Death Class period, and for whom COVID-19 caused or contributed to their death. In the alternative, Plaintiffs respectfully seek an order from this Court certifying the common questions of fact and law into an issue class pursuant to Rule 23(c)(4).

Plaintiffs further seek an order from the Court appointing Plaintiffs Paul Maney, Gary Clift, David Hart, and Theron Hall as representatives of the Damages Class, appointing Plaintiff Felisha Ramirez as representative of the Wrongful Death Class, appointing counsel of record as class counsel, and providing court-approved notice to members of the Damages and Wrongful

Death Classes.  This motion is supported by the following memorandum of law and several declarations filed concurrently herewith.

**MEMORANDUM OF LAW**

## I.    INTRODUCTION

This is a class action alleging civil rights and negligence claims against the State of Oregon and Defendants Kate Brown, Collette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Patrick Allen, Joe Bugher, and Garry Russell ("Defendants") for the willful, deliberately indifferent, and/or negligent care afforded to prisoners in Oregon Department of Corrections (ODOC) custody, and Defendants' failure to protect those prisoners from heightened exposure to a serious communicable disease—specifically, COVID-19.  As of the date of this motion, Defendants have reported that over 3600 prisoners in their custody have tested positive for COVID-19.  Defendants have also reported that 42 prisoners have died from the disease.  ODOC officials admit that COVID-19 was brought into the ODOC system by Defendants' own employees.  COVID-19 spread throughout Defendants' prison institutions because Defendants did not take sufficient steps to implement and enforce masking, social distancing, and quarantining as mechanisms to "flatten the curve" of the virus and prevent harm to prisoners in their custody.

One year ago, Plaintiffs appeared before the Court on a motion for a preliminary injunction, requesting that this Court issue an order requiring Defendants to implement and enforce social distancing within and throughout ODOC facilities.  ECF 14.  At that time, 157 prisoners in Defendants' custody had tested positive for COVID-19.[1]  The Court denied Plaintiffs' motion.  ECF 108.  As of the date of this motion, the number of COVID-19-positive

---

[1]    Transcript of Testimony of Daniel Dewsnup, M.D. ("Dewsnup Tr.") at 164 (May 29, 2020).

prisoners in Defendants' custody has multiplied by more than 20 as a result of Defendants'

failure to promptly and effectively respond to the dangers the pandemic presented.

Rather than "flattening the curve"[2] of COVID-19 transmission within and throughout

ODOC's facilities, Defendants' actions and inactions caused the curve to increase

exponentially—resulting, to date, in 3600+ COVID-19 cases and 42 prisoner deaths.

**Table 1: COVID-19 Positive Cases in ODOC AICs Over Time**[3]



Notably, COVID-19 cases amongst prisoners in Defendants' custody did not increase

dramatically from the start.  As shown in Table 1, above, over half of ODOC's COVID-19-

positive cases occurred between late November 2020 and April 2021.  In other words, had

Defendants responded promptly and effectively to the COVID-19 pandemic, they could actually

have "flattened the curve" of the virus across their institutions.  But they did not.

---

[2]    Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and How to "Flatten the Curve,"* Washington Post (Mar. 14, 2020),
https://www.washingtonpost.com/graphics/2020/world/corona-simulator/.
[3]    Declaration of Franz Bruggemeier in Support of Plaintiffs' Motion to Certify Damages and Wrongful Death Classes ("Bruggemeier Decl.") ¶¶ 2–4.

3 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

That is likewise the case with respect to the 42 people diagnosed with COVID-19 who died from COVID-19 while in Defendants' custody. Throughout ODOC's facilities, COVID-19 deaths sharply increased during the second half of the pandemic. Like ODOC's COVID-positive cases, more than half of ODOC's COVID-related deaths occurred between December 2020 and January 2021:

**Table 2: COVID-19 Deaths of ODOC AICs Over Time[4]**



\* \* \* \* \* \* \*

Federal Rule of Civil Procedure ("Rule") 23 provides a tool for the Court, the parties, and counsel to manage the volume and chaos of the 3600 injury claims and 42 wrongful death claims that flow from Defendants' wrongful conduct. Class treatment pursuant to Rule 23 is particularly appropriate here given the number of questions of fact and law that are common among those 3600 cases. A predominant common question, for instance, is whether Defendants in this case—who created and maintained a centralized structure to coordinate and oversee the pandemic response, and who have complete control over the environment in which individuals are imprisoned—acted with deliberate indifference to the health and safety of prisoners in their custody when they failed to enforce mask mandates, failed to implement and enforce social

---

[4]        Bruggemeier Decl. ¶¶ 2–4.

distancing, and failed to otherwise protect prisoners in their custody against a heightened exposure to a serious, easily communicable, and deadly disease—COVID-19.

Certification of Plaintiffs' proposed Damages and Wrongful Death Classes is appropriate. It will allow this Court to resolve common factual and legal questions with respect to all 3600 class members, avoiding the need to address such questions thousands of times through thousands of individual lawsuits. Plaintiffs therefore respectfully request that the Court issue an order certifying the Damages Class, certifying the Wrongful Death Class, appointing Plaintiffs Maney, Clift, Hart, Hall, and Ramirez as representatives of their respective classes, and appointing undersigned counsel as class counsel.

## II.    FACTUAL BACKGROUND

COVID-19 is a serious, highly communicable, and deadly disease that spread throughout the world starting in late 2019 and early 2020. On February 28, 2020, Oregon confirmed its first presumptive COVID-19 case. By March 8, Oregon Governor Kate Brown had declared a state of emergency due to the public health threat posed by the virus, announcing Oregon's goal to "flatten the curve" of COVID-19.[5] By March 11, the World Health Organization had declared COVID-19 a global pandemic. On March 16, Governor Brown issued Executive Order 20-05, immediately implementing Oregon's first statewide social distancing measures and closing Oregon's K-12 schools. By March 23, Governor Brown had issued a statewide order prohibiting the general public from engaging in social or recreational gatherings, even outdoors, in which six feet of distancing could not be maintained; prohibiting the general public from patronizing nonessential business; and ordering workplaces statewide to facilitate telework and work-from-

---

[5]    Declaration of Heidi Steward in Support of Defendants' Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Steward Decl."), ECF 83, ¶ 13.

5 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

home to the maximum extent possible. None of the Governor's emergency orders applied to or were enforced in ODOC facilities. In other words, while the Governor implemented drastic measures to protect non-incarcerated Oregonians, Oregon's prisoner population was left wholly unprotected from the deadly virus.

## A.    Defendants' Response to COVID-19 in Oregon's Prisons

Within and throughout Oregon's prisons, Defendants attempted but failed to implement centralized policies aimed at protecting against widespread outbreaks. On March 4, 2020, Defendants activated ODOC's Agency Operations Center ("the AOC"), a committee of agency officials designated to oversee and make decisions pertaining to ODOC's response to COVID-19.[6] Decision-making and implementation of COVID-19-related policies and practices were centralized through the AOC, including decisions relating to preventative strategies and their implementation.[7] Defendants Joe Bugher and Garry Russell were designated to co-lead the AOC on behalf of ODOC.[8] The Oregon Health Authority (OHA), through Defendant Patrick Allen, coordinated directly and frequently with the AOC to develop and implement COVID-19-related guidance for correctional settings.[9]

Not long after Defendants activated the AOC, in late March 2020, the first major COVID-19 outbreak occurred at the Oregon State Penitentiary (OSP). On April 1, 2020, ODOC confirmed that its first positive staff members presented at OSP.[10] As ODOC's infectious disease physician, Dr. Daniel Dewsnup, confirmed, the OSP outbreak that followed was caused

---

[6]    Steward Decl., ECF 83, ¶ 11.
[7]    Declaration of David F. Sugerman in Support of Plaintiffs' Motion to Certify Damages and Wrongful Death Classes ("Sugerman Decl.") ¶ 3, Ex. 1 (Washburn Depo. at 35–36).
[8]    Sugerman Decl. ¶ 4, Ex. 2 (Steward Depo. at 12).
[9]    Steward Decl., ECF 83, ¶ 17.
[10]    Sugerman Decl. ¶ 5, Ex 3, at MANEY-018109.

by ODOC staff and spread through staff-to-staff transmission.[11]  By Friday, April 3, ODOC had

transferred two AICs, one positive and one presumed positive, from OSP to Coffee Creek

Correctional Institution ("Coffee Creek").[12]  The same day, ODOC ordered 60,000 cloths masks

from Oregon Correctional Enterprises (OCE), to be distributed to staff and AICs.[13]  ODOC

completed contact tracing and quarantined the A-block at OSP,[14] but by May, the OSP positive

tests had become an outbreak, spreading throughout OSP's prisoner population.[15]

From the beginning of the pandemic, ODOC knew and understood that social distancing

was a strategy crucial to reducing transmission and spread of COVID-19.[16]  ODOC studied

social distancing and concluded that it could achieve social distancing systemwide by releasing

approximately 5800 AICs.[17]  ODOC's early release work group met with the Parole Board to

discuss possible criteria for release "if releases are considered due to pandemic."[18]

But Governor Brown, for her part, chose not to order the releases necessary to achieve

social distancing in ODOC facilities.  And Defendants chose not to modify its existing facilities

to create space for social distancing.[19]  Defendants neither studied nor considered the possibility

---

[11]    Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction, ECF 117, at 166–67 (May 29, 2020); Sugerman Decl. ¶ 5, Ex. 5 (Dewsnup Depo. at 57).
[12]    Sugerman Decl., ¶ 5, Ex 3, at MANEY-018109.
[13]    Id.
[14]    Id.
[15]    Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction, ECF 117, at 166–69 (May 29, 2020).
[16]    Steward Decl., ECF 83 ¶ 50; Ex., ECF 83-1, at 115.
[17]    Steward Decl., ECF 83 ¶ 87.
[18]    Sugerman Decl. ¶ 5, Ex. 3, at MANEY-018116.
[19]    Sugerman Decl. ¶ 3, Ex. 1 (Washburn Depo. at 20–21).

of using other state land or property to create space so that it could achieve the social distancing

necessary to protect prisoners from heightened exposure.[20]

COVID-19 testing, another means to protect against the spread of the virus, was also

rationed.  ODOC staff made testing available only to those who showed signs and symptoms of

the flu or COVID-19,[21] and even then, testing occasionally was refused.  *See, e.g.*, Declaration of

Brandon Thornburg in Support of Plaintiffs' Motion for Class Certification ("Thornburg Decl.")

¶ 7 ("I requested numerous COVID-19 tests over multiple days, but I was denied each time" and

later tested positive.).[22]  ODOC's healthcare providers made testing decisions, nominally

following CDC and OHA guidelines, which changed frequently and sometimes not followed at

all.[23]  *See, e.g.*, Declaration of Michael Willingham in Support of Plaintiffs' Motion for Class

Certification ("Willingham Decl.") ¶ 9 (COVID-19 testing not regularly conducted until

December 2020 and is still optional).[24]

---

[20]      Sugerman Decl. ¶ 4, Ex. 2 (Steward Depo at 33).  To the contrary, Defendants appear to
have actively sought to *increase* their prisoner population.  According to internal ODOC
communications, on April 21, 2020, ODOC noted that the State of Washington was releasing
inmates and started picking up inmates released from Washington facilities.  Sugerman Decl. ¶ 5,
Ex. 3, at MANEY-018113.

[21]      Sugerman Decl. ¶ 5, Ex. 3, at MANEY-018114.

[22]      *See also* Declaration of Andrew Cadwallader in Support of Plaintiffs' Motion for Class
Certification ("Cadwallader Decl.") ¶¶ 4–6 (testing refused); Declaration of Jason Beaver in
Support of Plaintiffs' Motion for Class Certification ("Beaver Decl.") ¶ 24 (same).

[23]      Sugerman Decl. ¶ 5, Ex. 3, at MANEY 018115.  AICs also report that ODOC staff
sometimes ignore obvious COVID-19 symptoms.  *See* Declaration of Justin Phillips in Support
of Plaintiffs' Motion for Class Certification ("Phillips Decl.") ¶ 28.

[24]      Even when testing is made available, Defendants' procedures for responding to positive
COVID-19 tests creates disincentives for AICs to request them in the first place.  AICs do not
report their symptoms for fear of the consequences that might flow from their reports, including
quarantining in "the hole," where they are provided less food, less opportunity to move around,
and experience physical, mental, and emotional suffering.  Phillips Decl. ¶¶ 24–26 (AICs do not
report symptoms or seek testing for fear of consequences); Willingham Decl. ¶ 16 (same);
Sellers Decl. ¶¶ 7, 17–18 (declined testing because of fear of consequences); Declaration of
Sheryl Sublet in Support of Plaintiffs' Motion for Class Certification ("Sublet Decl.") ¶ 21

By April 27, 2020, it was apparent to Defendants that social distancing, even of exposed AICs, was impossible or simply not taking place.  Bed shortages apparently precluded Defendants from creating the space that they needed to protect even their most vulnerable prisoners from exposure to the deadly virus.[25]  At several ODOC facilities, social distancing was not enforced even when space was available for ODOC to do so.[26]

Worse, Defendants have allowed, and continue to allow, intra-prison transfers mixing of healthy and COVID-19-exposed AICs and staff members, further exacerbating the risk of harm to prisoners in Defendants' custody.  Symptomatic AICs who are provided COVID-19 tests are forced to return to their units while they await the results, moving freely in non-quarantined areas.[27]  Elsewhere, Defendants have allowed, and continue to allow, mixing of healthy and COVID-19-positive AICs and staff members—in the Chow Hall, the Medline, and at work assignments, among other areas.  *See, e.g.*, Phillips Decl. ¶¶ 8–13 (describing widespread mixing

---

(same); Declaration of Adam Coopersmith in Support of Plaintiffs' Motion for Class Certification ("Coopersmith Decl.") ¶¶ 21–25 (ODOC is disincentivizing COVID-19 testing; "the hole . . . is a mental test that no one should experience"); Thornburg Decl. ¶¶ 7, 23–24 (same); Declaration of Billy Shaffer in Support of Plaintiffs' Motion for Class Certification ("Shaffer Decl.") ¶¶ 15, 23–24 (same); Cadwallader Decl. ¶¶ 27–29 (same).

[25]    Sugerman Decl. ¶ 5, Ex. 3, at MANEY-018115 (prisoners from Shutter Creek Correctional Institution ("Shutter Creek") couldn't be transferred to Snake River Correctional Institution ("Snake River") because of a bed shortage).

[26]    *See, e.g.*, Phillips Decl. ¶ 29 (ODOC has not imposed social distancing protocols); Willingham Decl. ¶ 17 (no social distancing since beginning of the pandemic); Shaffer Decl. ¶¶ 26–28 (same); Declaration of William Sellers in Support of Plaintiffs' Motion for Class Certification ("Sellers Decl.") ¶ 21 (ODOC has made no effort to socially distance prisoners even though there is space to use); Sublet Decl. ¶¶ 22, 25 (ODOC does not impose social distancing even when it is possible); Coopersmith Decl. ¶ 26 (same); Beaver Decl. ¶ 25 (same); Declaration of Jamie Edgtton in Support of Plaintiffs' Motion for Class Certification ("Edgtton Decl.") ¶¶ 29–30 (same); Declaration of Gary Clift in Support of Plaintiffs' Motion for Class Certification ("Clift Decl.") ¶ 9 (same).

[27]    Phillips Decl. ¶¶ 4, 23 (symptomatic AICs are not quarantined while they await test results); Coopersmith Decl. ¶ 12 (same); Thornburg Decl. ¶ 14 (same); Cadwallader Decl. ¶¶ 16, 21 (AICs sent to work before receiving test results).

of healthy and COVID-19 positive AICs); Willingham Decl. ¶¶ 12, 14 (same); Sellers Decl.

¶¶ 8–10, 12 (corrections officers move freely between quarantined and non-quarantined units);

Sublet Decl. ¶ 13 (mixing of healthy and infected AICs is allowed in Chow Hall, medical, and

work assignments); *id.* ¶¶ 15–17 (staff moves freely between quarantined and non-quarantined

units); Coopersmith Decl. ¶¶ 8–11 (same); Beaver Decl. ¶ 10 (mixing of healthy and COVID-

positive AICs occurs through inter-prison transfers and intra-prison operations); Edgtton Decl.

¶ 20 (ODOC mixes healthy and infected AICs); Thornburg Decl. ¶ 13 (same); Shaffer Decl. ¶ 12

(same); Cadwallader Decl. ¶ 13 (same).[28]

### B.    Masks Become ODOC's Primary Control Mechanism

Because social distancing apparently was not possible in ODOC's existing facilities[29]—

and because Defendants and Governor Brown had chosen not to expand ODOC's facilities or

release prisoners from custody—masking became Defendants' primary control strategy.[30]  No

later than April 13, 2020, ODOC knew of and understood the importance of wearing masks.

---

[28]    *See also* Phillips Decl.  ¶¶ 31–32 (mixing occurs in the Chow Hall and the Yard); Sellers
Decl. ¶ 22 (ODOC required distancing in Chow Hall for a few weeks in July 2020 and then
abandoned the practice); Sublet Decl. ¶ 24 (social distancing is rarely enforced in the Chow Hall
or in Medline); Beaver Decl. ¶¶ 14, 26 (mixing and no social distancing occurs in the Chow
Hall); Edgtton Decl. ¶ 8 (sent to work in medical with COVID symptoms); Shaffer Decl. ¶ 20 ("I
am forced to sit roughly a foot and a half from other AICs while in the chow hall."); Cadwallader
Decl. ¶ 30 ("I have witnessed a lack of social distancing at every facility I have been at since the
beginning of the pandemic."); *id.* ¶ 33 ("I am seated within one foot of other AICs when I eat in
the Chow Hall."); Declaration of Devin Butler in Support of Plaintiffs' Motion for Class
Certification ("Butler Decl.") ¶¶ 11–12, 17.
[29]    Sugerman Dec., ¶ 6; Ex. 4 (Cain Depo. at 21 (no social distancing)); Declaration of Ken
Jeske in Support of Defendants' Response to Plaintiffs' Motion for Temporary Restraining Order
or Preliminary Injunction, ECF 86, ¶¶ 29, 34 (no social distancing in workplace).
[30]    Declaration of Daniel Dewsnup in Support of Defendants' Response to Plaintiffs' Motion
for Temporary Restraining Order or Preliminary Injunction ("Dewsnup Decl."), ECF 84, ¶ 56;
Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 53).  In May 2020, Dr. Dewsnup, Defendant's
infectious disease physician, explained that three primary control measures existed to protect
against spread of COVID-19: handwashing, social distancing, and masking.  Dewsnup Decl.,
ECF 84, ¶ 56.

That day, ODOC widely distributed information demonstrating its understanding that masks were essential to prevent transmission and spread of infection.[31]

Again, as Dr. Dewsnup explained, masking across ODOC was its primary means of reducing transmission.[32] Because it was primary, and because ODOC apparently had concluded that social distancing was not possible, 100 percent compliance with masking was crucial—the risk of not masking, according to Dr. Dewsnup, was unacceptable.[33]

By late May, however, it became overwhelmingly evident that ODOC staff, and corrections officers specifically, were not wearing masks. Masking was controversial and politicized.[34] On May 12, the AOC sent a reminder acknowledging that staff members were putting themselves and others at risk by not wearing face coverings.[35] By May 15, Defendant Steward had issued two memos setting expectations that staff would wear masks unless they could maintain six feet of distance.[36] By late May, however, it was apparent that those communications were ineffective: ODOC staff members were flouting masking requirements. Corrections officers at Coffee Creek,[37] Columbia River Correctional Institution,[38] Eastern

---

[31]    Sugerman Decl. ¶ 3, Ex. 1 (Steward Depo. at 71–72, and Depo. Ex. 5).
[32]    Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 98).
[33]    Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 99).
[34]    Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 98); *see also* Coopersmith Decl. ¶ 18 (correctional officers believe that pandemic is a hoax).
[35]    Sugerman Decl. ¶ 5, Ex. 3, at MANEY-018119.
[36]    Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 130–31).
[37]    Declaration of Mari-Teresa Gillespie in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 42, ¶ 5.
[38]    Declaration of Jamahl Maner in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 31, ¶ 9.

11 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

Oregon Correctional Institution,[39] Mill Creek Correctional Institution,[40] OSP,[41] Powder River,[42] Shutter Creek,[43] Snake River,[44] South Fork Correctional Institution,[45] and Two Rivers[46] refused to wear masks.[47]

Remarkably, it was not until July 13, 2020, that Defendants instituted disciplinary measures for employees who refused to wear masks.[48]  *But see* Phillips Decl. ¶¶ 15–16, 18–20 (ODOC staff members, including medical staff, do not wear masks and are not disciplined for not wearing masks); Willingham Decl. ¶ 11 (mask policies are not strictly enforced).  And, inexplicably, it was not until August 12, 2020, after six prisoners had died from COVID-19, that Defendants finally required prisoners in its custody to wear masks.[49]  In dorms, however, AICs are not required to wear masks when they are within three feet of their bunk, but the bunks are 38 inches apart.[50]

---

[39]    Declaration of Mylo Lupoli in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 48, ¶¶ 10–14.

[40]    Declaration of Nathan Adams in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 49, ¶ 15.

[41]    Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction, ECF 117, at 167 (May 29, 2020).

[42]    Declaration of Lisandro Sanchez in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 40, ¶ 5.

[43]    Declaration of Christopher Mitchell in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 21, ¶ 21.

[44]    Declaration of Brandon Borba in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 20, ¶ 5(e) – (f).

[45]    Declaration of Mickey Weis in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 47, ¶ 12.

[46]    Declaration of D. White in Support of Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, ECF 24, ¶¶ 8, 12.

[47]    On one trip into OSP, Dr. Dewsnup observed that less than 10 percent of staff were wearing masks when he entered the facility.  When word circulated of his presence, the staff masking rate went up to approximately 50 percent.  Sugerman Decl., ¶7, Ex. 5 (Dewsnup Depo. at 134–35).

[48]    Sugerman Decl. ¶ 4, Ex. 2 (Steward Depo. Ex. 6).

[49]    Sugerman Decl. ¶ 5, Ex. 3, at MANEY-018145.

[50]    Beaver Decl. ¶ 29.

In September 2020, after ten prisoners had died from COVID-19, Defendants continued to have problems with mask compliance.[51]  Indeed, to this day, Defendants' staff systemwide still do not correctly wear masks, and sometimes do not wear them at all.  *See, e.g.*, Edgtton Decl. ¶ 26 ("I still see some COs walk around without masks on."); Sellers Decl. ¶ 14 (corrections officers do not correctly wear masks); Coopersmith Decl. ¶¶ 13–14 (correctional officers do not properly wear masks); Beaver Decl. ¶ 17 (corrections officers don't wear masks); Thornburg Decl. ¶ 20 (same); Shaffer Decl. ¶¶ 17–20 (same); Declaration of Paul Maney in Support of Plaintiffs' Motion for Class Certification ("Maney Decl.") ¶¶ 15–19 (same); Butler Decl. ¶¶ 21–24.  Defendants continues to fail to strictly enforce their mask policies.  Willingham Decl. ¶ 11 (mask policies are not strictly enforced).  That is so notwithstanding Dr. Dewsnup's warning that full compliance was absolutely necessary to avoid outbreaks and protect prisoners in custody.[52]

Defendants understood the risks.  On April 16, 2020, the AOC approved the "Death in Custody" plan.[53]  Officers in charge at ODOC facilities were directed to notify funeral homes if a deceased prisoner had COVID-19.[54]  COVID-19 plans were put in place with funeral homes.[55]  On May 21, 2020, AOC issued a press release informing AICs and staff about the first AIC death from COVID-19.[56]

---

[51]    Sugerman Decl. ¶ 3, Ex. 1 (Washburn Depo., Ex. 2); *see also* Sublet Decl. ¶ 18 (ODOC staff did not wear masks until September 2020); Cadwallader Decl. ¶ 26 (correctional officers did not start wearing masks until September or October 2020).
[52]    Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 137).
[53]    Sugerman Decl. ¶ 5, Ex. 3, at MANEY-018112.
[54]    *Id.*
[55]    *Id.*
[56]    Sugerman Decl. ¶ 5, Ex. 3, at MANEY-018124.

13 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

C.     **Defendants' Failures Endanger and Cause Harm to Plaintiffs and Class Members**

Over time and across the ODOC system, Defendants endangered and caused harm to Plaintiffs and members of the class by failing to enforce or achieve social distancing, by delaying and failing to enforce mask mandates, by failing to separate contagious inmates from those who were healthy, and by punishing those who complained about COVID safety and those who tested positive for the virus.  As Plaintiffs' evidence submitted throughout this case and in support of this motion establishes, Defendants' failures occurred across the ODOC system.[57]  They were also plainly caused by ODOC's inactions—as Dr. Dewsnup has explained, the COVID-19 virus was able to enter ODOC's facilities only through ODOC's own staff, Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 57) ("The only way to get COVID into the institution is have it come through a staff member."),[58] or through inter-prison transfers of infected inmates.[59]

As a result of Defendants inactions, Plaintiffs and members of the class suffered significant harm, including contracting and suffering from COVID-19 symptoms and side effects, many of which were severe.[60]  For 42 prisoners in Defendants' custody, Defendants' actions and inactions caused their untimely and tragic death.  Mask compliance, as Dr. Dewsnup

[57]     *See, e.g.*, Thornburg Decl. ¶ 3 (Powder River); Cadwallader Decl. ¶ 3 (Shutter Creek); Shaffer Decl. ¶ 3 (Warner Creek Correctional Institution); Beaver Decl. ¶ 4 (Columbia River); Sublet Decl. ¶ 5 (Coffee Creek); Sellers Decl. ¶ 3 (Eastern Oregon Correctional Institution); Willingham Decl. ¶ 3 (Mill Creek Correctional Institution); Coopersmith Decl. ¶ 3 (Two Rivers); Phillips Decl. ¶ 3 (Snake River).
[58]     *See also* Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 119); ¶ 6, Ex. 4 (Cain Depo. at 65–66).
[59]     Sugerman Decl. ¶ 6, Ex. 4 (Cain Depo. at 88).
[60]     *See* Sublet Decl. ¶ 9 (experienced COVID-19 symptoms); Declaration of David Hart in Support of Plaintiffs' Motion for Class Certification ("Hart Decl.") ¶ 7; Declaration of Theron Hall in Support of Plaintiffs' Motion for Class Certification ("Hall Decl.") ¶ 9 (describing symptoms); Clift Decl. ¶ 8; Declaration of Felisha Ramirez in Support of Plaintiffs' Motion for Class Certification ("Ramirez Decl.") ¶ 5 (Juan Tristan died from COVID-19 in Defendants' custody).

14 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

made clear, in light of Defendants' failures to otherwise take meaningful actions in response to the pandemic, may have mitigated the substantial harm that resulted.[61]

## III.  ARGUMENT

Rule 23(a) provides that a case may proceed as a class action "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Under Rule 23(b)(3), Plaintiffs seeking class certification must further demonstrate that a class action is superior and that common questions of fact or law predominate over questions affecting individual class members.[62]  *See generally Wal-Mart Stores, Inc v. Dukes*, 564 U.S. 338, 351–52 (2011); *Walker v. Life Ins. Co. of Sw.*, 953 F.3d 624, 630 (9th Cir. 2020).

Rule 23(b)(3)'s predominance requirement ensures that adjudication of common issues will achieve judicial economy.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th

---

[61]    Sugerman Decl. ¶ 7, Ex. 5 (Dewsnup Depo. at 99).

[62]    Rule 23(b)(3) provides, in full, that a class action may be maintained if:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

15 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

Cir. 2001).  Predominant common questions exist when common questions are significant and

when they can be resolved once and for all with respect to all members of the proposed class.

*True Health Chiropractic, Inc v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) ("When

certification is sought for a litigation class, the predominance inquiry under Rule 23(b)(3) asks

whether 'common questions present a significant aspect of the case and they can be resolved for

all members of the class in a single adjudication'" (alterations omitted) (quoting *Mazza v. Am.

Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012))).  "The common questions must have the

'capacity . . . to generate common answers apt to drive the resolution of the litigation.'"  *Id.*

(quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350).

Before certifying Plaintiffs' proposed classes, this Court must conduct a rigorous analysis

to determine whether Plaintiffs have met the requirements of Rule 23.  *Sali v. Corona Reg'l Med.

Ctr.*, 909 F.3d 996, 1004 (9th Cir.  2018) (so stating).  The Court's order certifying a class, while

important, "is also preliminary: 'An order that grants or denies class certification may be altered

or amended before final judgment.'"  *Id.* (quoting Fed. R. Civ. P. 23(c)(1)(C)).

A.      **The Damages Class and the Wrongful Death Class satisfy Rule 23(a)'s
        prerequisites.**

Plaintiffs' proposed Damages Class consists of over 3600 prisoners who were infected

with COVID-19 while incarcerated in one of Defendants' facilities.  Fourth Amended Complaint

("Compl.") ¶ 24.  The proposed Wrongful Death Class includes the estates of 42 prisoners who

died in Defendants' custody and for whom COVID-19 caused or contributed to their death.

Compl. ¶ 26.  Both classes satisfy Rule 23(a)'s prerequisites that "(1) the class is so numerous

that joinder of all members is impracticable; (2) there are questions of law or fact common to the

class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

### 1.    The proposed classes are sufficiently numerous.

Both of Plaintiffs' proposed classes independently satisfy the requirement that "the class [be] so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class."  *Franco-Gonzales v. Napolitano*, 2011 WL 11705815, at *6 (C.D. Cal. Nov. 21, 2011) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964)).  Most courts, including courts in the Ninth Circuit and this district, presume numerosity where the proposed class contains 40 or more members.  *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 590 (D. Or. 2013); *see also McKenzie Law Firm, P.C. v. Ruby Receptionists, Inc.*, No. 3:18-cv-1921-SI, 2020 WL 1970812, at *4 (D. Or. Apr. 24, 2020) (same).

Plaintiffs' proposed Damages Class readily satisfies Rule 23(a)'s numerosity requirement.  The Damages Class has more than 3600 members.

Plaintiffs' proposed Wrongful Death Class is also sufficiently numerous under Rule 23(a).  The Wrongful Death Class has more than 40 members.  Under this Court's general rule, numerosity may be presumed.  *See Jordan v. Los Angeles Cty.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds by* 459 U.S. 810 (1982) (class of 39 members satisfies numerosity requirement); *Ark. Educ. Ass'n v. Bd. of Educ. of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 765–66 (8th Cir. 1971) (class of 20 satisfies numerosity); *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 188 F.R.D. 365, 373 (D. Or. 1998) (rule of thumb is 40 members; thus, class of 50 members satisfies numerosity requirement).

**2.    Plaintiffs' claims raise legal and factual issues common to their respective classes.**

Both of Plaintiffs' proposed classes also satisfy the requirement that "there [be] questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Rule 23(a)'s commonality requirement "'has been construed permissively.'"  *Giles*, 294 F.R.D. at 590 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).  To meet the commonality requirement, Plaintiffs "must show that the class members suffered the 'same injury'"—in other words, "that their claims depend on a 'common contention.'"  *Wal-Mart Stores, Inc.*, 564 U.S. at 349–50.  Commonality thus requires that the action generate common answers apt to drive the resolution of the litigation.  *Id.*  Commonality is established where, as here, there is a common core of shared legal or factual issues.  *Hanlon*, 150 F.3d at 1019.

The extensive factual record in this case applies to all members of Plaintiffs' proposed classes and makes clear that common questions of law and fact apply with respect to each class.  Such common questions include:

- whether Defendants acted with deliberate indifference to the rights of Plaintiffs and members of the Damages and Wrongful Death Classes,

- whether Defendants were negligent in the manner set forth in Plaintiffs' Fourth Amended Complaint,

- whether Plaintiffs and members of the Damages and Wrongful Death Classes suffered injury,

- whether Defendants' conduct caused the injuries that Plaintiffs and members of the Damages and Wrongful Death Classes suffered,

- whether Defendants acted with callous disregard toward the rights of Plaintiffs and members of the Damages and Wrongful Death Classes, and

- whether Plaintiffs and members of the Damages and Wrongful Death Classes are entitled to an award of punitive damages, and the amount of such an award.

Each of those common questions raises a host of additional common questions, including

admissibility of evidence, testimony, and applicable standards of proof.  And any one of those

common legal or factual issues, standing alone, is enough to satisfy Rule 23(a)(2)'s permissive

standard.  *See Inland Empire—Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *8

(C.D. Cal. Feb. 26, 2018) (citing *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 257 (C.D. Cal.

2008)); *Caput v. NTT Security US Inc.*, 2019 WL 3308771, at *2 (C.D. Cal. Apr. 19, 2019) ("For

the commonality requirement to be met, there must only be one single issue common to the

proposed class." (quoting *Haley v. Medtronic*, 169 F.R.D. 643, 648 (C.D. Cal. 1996) (quotation

marks and alterations omitted)).  Plaintiffs' proposed classes readily meet the commonality

requirement.

### 3.    Plaintiffs' claims are typical of class members' claims.

The claims of the proposed representatives are typical of the claims of their respective

classes.  Typicality requires that "the named parties' claims or defenses are typical of the claims

or defenses of the class."  *McKenzie*, 2020 WL 1970812, at *5 (citing Fed. R. Civ. P. 23(a)(3)).

Under Rule 23(a)(3)'s "permissive standards," the "representative's claims are typical if they are

reasonably co-extensive with those of absent class members; they need not be substantially

identical."  *Id.* (quoting *Hanlon*, 150 F.3d at 1020).  In assessing "whether claims and defenses

are typical, courts often look to 'whether other members have the same or similar injury, whether

the action is based on conduct which is not unique to the named plaintiffs, and whether other

class members have been injured by the same course of conduct.'"  *Id.* (quoting *Hanon v.

Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

The commonality and typicality requirements tend to merge.  *Gen. Tel. Co. of Sw. v.

Falcon,* 457 U.S. 147, 157 & n.13 (1982).  Together, commonality and typicality ensure that the

named plaintiffs' claims and the class claims are so interrelated that class members' interests will be fairly protected by the representatives.  *Id.*

 With respect to Plaintiffs' proposed Damages Class, the claims of the named Plaintiffs are the same or similar to the claims of the members of the proposed class; in other words, they are "reasonably co-extensive with those of absent class members" and therefore satisfy Rule 23(a)(3)'s typicality requirement.  *See McKenzie*, 2020 WL 1970812, at *5 (quoting *Hanlon*, 150 F.3d at 1020).  Notably, differing levels of injury do not defeat typicality—so long as the class representative's claim is similar to and arises from the same course of conduct as the unnamed class members' claims, typicality is satisfied.  *Ramirez v. TransUnion, LLC*, 951 F.3d 1008, 1033 (9th Cir. 2020) (differences in severity of injuries does not defeat typicality), *cert. granted*, 141 S. Ct. 972 (2020); *see also Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries resulted from the same, injurious course of conduct." (citing *Armstrong v. Davis*, 275 F.3d 849, 868–69 (9th Cir. 2001)).

 The same is true with respect to Plaintiffs' proposed Wrongful Death Class.  Plaintiff Ramirez's claim is the same or similar to, and arose from the same course of conduct as, the claims of other estates of individuals who died from COVID-19 while in Defendants' custody. The injuries or severity of damages that each decedent's statutory beneficiary claims is similar to and arose from the same course of conduct as those of unnamed members of the Wrongful Death Class.  *See Parsons*, 754 F.3d at 685 (stating that standard).  The Wrongful Death Class therefore satisfies the typicality requirement.

**4.      Plaintiffs and their counsel will adequately represent the interests of the class.**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Adequacy depends on "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) (quotation marks omitted).  "Determining whether representation is adequate requires the court to consider two questions: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Sali*, 909 F.3d at 1007 (quotation marks omitted).  Plaintiffs' counsel is deemed qualified when counsel possesses experience in previous class actions and cases involving the same area of law. *See Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).  Both Plaintiffs and counsel satisfy these requirements.

Plaintiffs will fairly and adequately protect the interests of the members of the proposed classes.  Plaintiffs do not seek any unique or additional benefit from this litigation that may make their interests adverse to members of the Damages Class or the Wrongful Death Class.  They have no conflicts of interests with members of the proposed classes.  Accordingly, Plaintiffs lack any antagonism with members of the class, and their interests align squarely with unnamed class members.[63]

Class counsel is also able to prosecute this matter vigorously and adequately protect the interests of the absent class members.  Lead counsel has decades of experience in class action

---

[63]      Hall Decl. ¶¶ 3–9; Maney Decl. ¶¶ 3–7; Clift Decl. ¶¶ 1–7; Hart Decl. ¶¶ 1–10; Ramirez Decl. ¶¶ 1–10.

litigation and decades of experience in injury and wrongful death litigation.  Class counsel also

has substantial experience in civil rights litigation, mass tort litigation, and personal injury

litigation.[64]  Plaintiffs and their counsel therefore satisfy the adequacy requirement of Rule

23(a)(4).

### B.      Plaintiffs' proposed classes may be maintained under Rule 23(b).

To maintain a damages class, Plaintiffs must establish that common questions of law or

fact predominate over individual questions, and that a class is superior to other available methods

for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  Judicial

economy and fairness are the focus of the predominance and superiority inquiry.  *Or. Laborers-*

*Employers Health & Welfare Trust Fund*, 188 F.R.D. at 376 (citing *Amchem Prods, Inc. v.*

*Windsor*, 521 U.S. 591, 594 (1997)).  The inquiry "'presumes that the existence of common

issues of fact or law have been established pursuant to Rule 23(a)(2),' and focuses on whether

the 'common questions present a significant aspect of the case and they can be resolved for all

members of the class in a single adjudication'; if so, 'there is a clear justification for handling the

dispute on a representative rather than on an individual basis.'"  *In re Hyundai & Kia Fuel*

*Economy Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (quoting *Hanlon*, 150 F.3d at 1022)).

Rule 23(b)(3) lists four nonexclusive factors "pertinent" to a predominance finding: (1)

the interests of the class members in individually controlling the prosecution or defense of

separate actions; (2) the extent and nature of any litigation concerning the controversy already

begun by or against class members; (3) the desirability or undesirability of concentrating the

litigation of the claims in a particular forum; and (4) the likely difficulties in managing a class

action.  Fed. R. Civ. P. 23(b)(3)(A)–(D).  At bottom, predominance and superiority test whether

---

[64]      Sugerman Decl. ¶¶ 8–10.

the "proposed classes are sufficiently cohesive to warrant adjudication by representation,"
*Amchem*, 521 U.S. at 623, such that adjudication by representation would be both fair and
efficient, 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1779, at
174 (3d ed. 2005); *see also Zinser*, 253 F.3d at 1190 ("A consideration of these factors requires
the court to focus on the efficiency and economy elements of the class action so that cases
allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a
representative basis.").

        In this case, the common questions that Plaintiffs have identified present a significant
aspect of Plaintiffs' case and most appropriately are resolved through a single, class-wide
adjudication.  As explained above, the same liability and causation questions exist with respect to
each of the claims for all 3600 members of the Damages Class.  The same is true with respect to
the 42 members of the Wrongful Death Class.  And whether the Damages and Wrongful Death
Classes are entitled to an award punitive damages—and the amount of that award—is best
resolved through a single adjudication.[65]

> ### 1.    Class members' interests in individually controlling prosecution of separate actions weighs in favor of class certification.

        The first factor that courts often consider in the predominance and superiority inquiry is
"the interest of each member in individual controlling the prosecution or defense of separate
actions."  Fed. R. Civ. P. 23(b)(3)(A).  Where damages suffered by class members are not large,

---

[65]        Indeed, it is *particularly* important to resolve the common issues surrounding Plaintiffs'
and class members entitlement to, and amount of, punitive damages through a class-wide
adjudication.  The assessment of punitive damages raises due process issues, *see BMW of N. Am,
Inc. v. Gore*, 517 U.S. 559, 566–68 (1996), and a jury's determination of punitive damages
requires careful consideration of harm to others for certain purposes, *Philip Morris USA v.
Williams*, 549 U.S. 346, 355 (2007).  When a jury assesses punitive damages once, on a class-
wide basis, the potential for due process problems is mitigated—the jury considers both
reprehensibility and punishment only once, and the issue is settled for all members of the class.

this factor weighs in favor of certification, *Zinser*, 253 F.3d at 1190 (citing *In re Dalkon Shield IUD Prods. Litig.*, 693 F.2d 847, 856 (9th Cir. 1982)), particularly when compared with the litigation costs or other barriers to pursuing individual claims, *In re Arizona Theranos, Inc. Litig.*, 2020 WL 5435299, at *9 (D. Ariz. Mar. 6, 2020).  Courts have also looked to the number of class members likely to opt out of the class.  *See Dalkon Shield*, 693 F.2d at 856.

It is difficult at this juncture to know with certainty the magnitude of damages that class members have suffered in this case.  Consideration of other barriers to pursuing individual claims, however—including the substantial litigation costs that may be required, the complexity of these claims, and the fact that class members are incarcerated—suggests that substantial opt-outs are not likely to occur.  That is consistent with the number of class members who have declined to release their medical records to Plaintiffs' counsel—in response to the more than 3600 notices that counsel has mailed to prisoners in Defendants' custody pursuant to this Court's order, *see* ECF 113, only 90 prisoners have declined to release their records to proposed class counsel.[66]  This factor weighs in favor of class certification.

### 2.    The extent and nature of existing litigation weighs in favor of class certification.

The second—and related—factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class."  Fed. R. Civ. P. 23(b)(3)(B).  This factor "'is intended to serve the purpose of assuring judicial economy and

---

[66]    Sugerman Decl. ¶ 11.  To be sure, Plaintiffs do not believe or concede that a decision by an AIC not to release their medical records to Plaintiffs' counsel necessarily means that the AIC is likely to opt out of any certified class.  The decisions are distinct, and a decision to opt out of a certified class requires notice to the class member before such a decision may take effect.  Plaintiffs refer to these numbers only to suggest that the number of putative class members who have chosen to release their medical records to counsel is predictive of the number who may choose to remain part of the class after notice is issued.

reducing the possibility of multiple lawsuits. . . . If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate . . . .'" *Zinser*, 253 F.3d at 1191 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1780, at 568–70 (2d ed. 1986).

As of the date of this filing, there have been 26 separate COVID-19-related cases filed in this district, two of which are wrongful death cases.[67]  One of those 26 cases, *Albrecht v. Oregon Department of Corrections*, No. 3:21-cv-001960-SB (D. Or.), is a mass action including 158 named plaintiffs and alleging civil rights claims similar to the claims brought by the Damages Class.  *See* Second Amended Complaint, ECF 14, *Albrecht*, No. 3:21-cv-001960-SB (D. Or.). Of the remaining cases, 12 have been stayed, on ODOC's motions, pending the resolution of this motion.  *See, e.g.*, Opinion and Order, ECF 13, *Trimble v. Brown*, 6:21-cv-00233-SB (D. Or.) (granting the defendants' motion to stay and noting that a brief stay could help to conserve judicial resources by avoiding duplicative litigation).  In two other cases, ODOC's motion to stay has been filed but has not yet been decided.  *See Menefree v. Or. Dep't of Corrections*, 3:20-cv-2024-SB (D. Or.), ECF 15 (one plaintiff); *Moore v. Or. Dep't of Corrections*, 3:21-cv-00599-SB (D. Or.), ECF 4 (four plaintiffs).  And in eight of the 26 cases, the defendants have not yet appeared.  Thus, as of the date this motion was filed, there are only 7 other active individual cases in which the defendants have appeared and the litigation is ongoing.  Two may yet be stayed on ODOC's pending motions.  The five remaining cases involve 168 individual incarcerated adults, or less than 5 percent of the proposed Damages Class, and 2 individual estates, or less than 5 percent of the proposed Wrongful Death Class.

---

[67]     The 26 COVID-19-related cases to which Plaintiffs refer do not include habeas cases.

The foregoing makes clear that adjudication on a class-wide basis of the claims of Plaintiffs and members of the proposed classes will serve judicial economy, reduce litigation costs, promote efficiency, and allow the class members' claims to be adjudicated fairly. Where, as here, only 5 percent of the proposed classes are actively pursuing their claims through other actions,[68] while the claims of more than 3400 members of the proposed classes could be resolved through this case, the extent and nature of currently ongoing litigation weighs in favor of class treatment.

### 3.    Concentrating the litigation in this forum is appropriate and desirable.

This Court is also the proper forum for these civil rights cases. The Court is capable of managing the case, and it has been presiding over this litigation since early 2020. Indeed, all of the other individual cases involving claims related to the class claims here have been transferred to this Court, and Defendants have moved to stay 14 other individual cases pending the resolution of this motion. There can thus be little dispute that concentrating the litigation in this forum—through *this* case—is appropriate and desirable for both the parties and the Court.

### 4.    Class-wide adjudication of this controversy would be manageable.

The Ninth Circuit has held that "when the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." *Zinser*, 253 F.3d at 1192. In these circumstances, that is not so. Here, certifying Plaintiffs' proposed classes, including both the Damages Class and the

---

[68]    Most of that 5 percent are individuals who have not actually filed individual actions, but instead have filed a *mass* action with 158 named plaintiffs. *See* Second Amended Complaint, ECF 14, *Albrecht*, No. 3:21-cv-001960-SB (D. Or.) That in and of itself suggests that class-wide resolution, rather than resolution on an individual basis, is a superior method of adjudicating these claims.

26 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

Wrongful Death Class, is the most manageable and straightforward way for all class members' claims to be adjudicated.

Plaintiffs offer below a proposed trial plan demonstrating that class treatment not only is manageable, but also provides a mechanism for the fair, uniform, and efficient resolution of class member claims:

<u>Overview</u>

Plaintiffs' proposed litigation and trial plan focuses on the process and sequence of class-wide adjudication. This case presents the Court with two alternative mechanisms for adjudicating this controversy on a class basis. The first mechanism allows the case to proceed as a conventional class under Rule 23(b)(3). The second allows the Court to certify only an issue class under Rule 23(c)(4).[69] The two mechanisms are largely identical through verdict in the class trial. For the purposes of this proposed trial plan, counsel has made conservative assumptions relating to the timing of certain steps and the mechanisms for adjudicating phase-two issues.

<u>Proposed Two-Phased Approach</u>

Regardless whether the Court certifies a conventional class under Rule 23(b)(3) or an issue class under Rule 23(c)(4), Plaintiffs propose that trial be handled in two phases. In phase one, the parties would try the class representatives' claims and the common questions of fact and law. As explained above, those common questions include liability, causation, punitive damages, and any common defenses. The parties would also try the class representatives' claims for damages.

---

[69]    *See infra* at Part III.C (Plaintiffs' alternative motion to certify issue class pursuant to Rule 23(c)(4)).

Should Defendants prevail pretrial or at trial on common liability questions, the litigation would conclude for the entire class.  Should Plaintiffs prevail on any of their class claims at trial, the litigation would enter phase two.  Plaintiffs' counsel proposes one of two alternatives for phase two: (1) a special master who establishes objective criteria to assess damages for class members based upon results in the class representatives' trials and information from each class member's file (medical records and statement under oath); or (2) bellwether trials of a group of ten representative class members to provide data on the value of the remaining claims.

If the Court and the parties do not adopt alternative procedures for assessing damages, Plaintiffs would propose group trials on damages for the purposes of completely adjudicating each class member's claim.  Even such group trials are far superior—and more manageable—than the prospect of trying 3600 individual claims.

<u>Conventional Class (Rule 23(b)(3)) v. Issue Class (Rule 23(c)(4))</u>

Phase two of these proceedings will look differently depending on whether the Court certifies a conventional class or an issue class.   If the Court certifies the case as a Rule 23(b)(3) class, the litigation may proceed as a single class and the parties may promptly begin class member discovery and preparation for phase two proceedings.  If the Court certifies the case as a Rule 23(c)(4) issue class, the parties may need to send another notice after the phase-one verdict advising class members that they must retain counsel to pursue their individual damage claims in phase two.

Proposed Litigation Plan

If the Court certifies a class for damages, Plaintiffs propose that trial proceed in following stages:

(1)    Mediation (7 days)

(2)    Notice and opt-out period (90 days) + pretrial discovery (class representatives) (120 days)

(3)    Dispositive motions (after opt-out period runs and after discovery is completed) (60 days)

(4)    Mediation (5 days)

(5)    Pretrial Submissions (30 days)

(6)    Phrase I trial (15 days)

(7)    Mediation (3 days)[70]

(8)    Issue class only: post-trial notice and response (180 days)

(9)    Class member discovery (180 days)

(10)    Phase II trial (damages)

(11)    Entry of final judgment

The above-described proposed trial plan demonstrates that class-wide adjudication of Plaintiffs' claims is manageable, and that the complexities of such adjudication do not outweigh class treatment. *See Zinser*, 253 F.3d at 1192. This factor therefore weighs in favor of class certification.

---

[70]    Plaintiffs propose mediation at different stages of trial to assess each party's (often evolving) interest in resolution over the course of the litigation. As of the date of this motion, Plaintiffs' counsel has proposed several times that the parties engage in mediation and/or settlement discussions. Defendants have not yet agreed.

**C.    In the alternative, Plaintiffs request that the Court certify an issue class under Rule 23(c)(4).**

Should the Court determine that the common questions do not predominate over individual questions, Plaintiffs move in the alternative for entry of an order certifying this case as an issue class pursuant to Rule 23(c)(4).  Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues" "[w]hen appropriate."  Fed. R. Civ. P. 23(c)(4).

Certification of an issue class under Rule 23(c)(4) is appropriate when it materially advances the disposition of the litigation as a whole.  *Rahman v. Mott's, LLP*, 693 F. App'x 578, 579 (9th Cir. 2017) (citing William B. Rubenstein, 2 Newberg on Class Actions 4:90 (5th ed. 2012)); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229–30 (9th Cir. 1996) (error for district court not to consider whether certification of issues "would significantly advance the resolution of the underlying case").  Certification of an issue class does not require the Court to conclude that common questions of fact or law predominate.  *See Reitman v. Champion USA Petfoods, Inc.*, 830 F. App'x 880, 882 (9th Cir. 2020).  Certification of an issue class under Rule 23(c)(4) allows the Court to try the common issues first—reserving for later determination questions of individual damages.  *Cunningham v. Multnomah Cty.*, No. 3:12–cv–01718–ST, 2015 WL 274187, at *7 (D. Or. Jan. 20, 2015).

Through this alternative request, Plaintiffs move the Court for an order certifying the following issues for class-wide resolution under Rule 23(c)(4):

(1)    Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to fully implement social distancing as a control strategy;

(2)    Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to promptly implement and enforce mask requirements;

(3)     Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to separate corrections officers and adults in custody who had contracted or been exposed to COVID-19 from those who had not;

(4)     Whether Defendants acted negligently in failing to implement social distancing as a control strategy;

(5)     Whether Defendants acted negligently in failing to promptly implement and enforce mask requirements;

(6)     Whether Defendants acted negligently in failing to separate corrections officers and adults in custody who had contracted or been exposed to COVID-19 from those who had not;

(7)     Whether Defendants' conduct caused injury to Plaintiffs and class members;

(8)     Whether Plaintiffs and members of the class are entitled to recover punitive damages; and

(9)     The amount of punitive damages to which Plaintiffs and class members are entitled.

Under Plaintiffs' proposed trial and litigation plan,[71] the litigation would proceed in a similar manner regardless whether the Court certifies the class under Rule 23(b)(3) or particular issues under Rule 23(c)(4).[72]

---

[71]     *See supra* at Part III.B.4.

[72]     To be sure, in Plaintiffs' view, the class would be easier to manage and control if it were conventionally certified under Rule 23(b)(3).

31 – PLAINTIFFS' MOTION TO CERTIFY DAMAGES AND WRONGFUL DEATH CLASSES

IV.    **CONCLUSION**

This case is particularly appropriate for certification as a damages class under Rule 23(b)(3).  The particular harm that class members suffered—COVID-19 infection—occurred in one system wholly under the centralized control of Defendants.  The parties, counsel, and Court watched the disease spread as they grappled earlier with Plaintiffs' initial request for a preliminary injunction and later issues relating to COVID-19 vaccine priority.  The policies and practices that gave rise to Plaintiffs' injuries are common to the class.  Liability can be resolved in a single proceeding.  For those reasons, and for the further reasons explained above, Plaintiffs respectfully request that the Court enter an order certifying this case as a class action under Rule 23(b)(3) or Rule 23(c)(4), appointing Plaintiffs Hart, Clift, Maney, Hall, and Ramirez as class representatives of their respective classes, and appointing undersigned counsel as class counsel.

DATED this 3rd day of May, 2021.

Respectfully submitted,

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
**Alex Meggitt**, OSB No. 174131
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

/s/ Nadia H. Dahab
**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN LAW OFFICE
707 SW Washington St Ste 600
Portland, OR 97205
Telephone: 503-228-6474
Facsimile: 503-228-2556