**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
**Alex Meggitt**, OSB No. 174131
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN LAW OFFICE
707 SW Washington St Ste 600
Portland, OR 97205
Telephone: 503-228-6474
Facsimile: 503-228-2556

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; MICAH RHODES; SHERYL LYNN SUBLET; and FELISHIA RAMIREZ, personal representative for the ESTATE OF JUAN TRISTAN, individually, on behalf of a class of other similarly situated,<br><br>Plaintiffs,<br><br>   v.<br><br>STATE OF OREGON; KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; KEN JESKE; PATRICK ALLEN; JOE BUGHER; and GARRY RUSSELL,<br><br>Defendants. | Case No. 6:20-cv-00570-SB<br><br><br>FOURTH AMENDED CLASS ACTION COMPLAINT<br><br>Civil Rights Action (42 U.S.C. § 1983); Negligence |

## INTRODUCTION

This is a civil rights and negligence action against the above-named Defendants for the willful and/or deliberately indifferent and/or negligent treatment afforded to prisoners of the Oregon Department of Corrections (ODOC) as a result of Defendants' failure to protect them from heightened exposure to a serious communicable disease. Across Oregon, and across the world, people are suffering from the pandemic spread of COVID-19. This pandemic poses an acute danger to ODOC prisoners, for whom Defendants are responsible.

Although ODOC adopted some policies in response to COVID-19, it largely has neglected critical measures to prevent outbreaks and transmission of the virus at ODOC facilities and the severe illnesses and deaths that have accompanied, and continue to accompany, outbreaks in congregate living facilities. A successful and adequate response to this pandemic could not and cannot be accomplished with half-measures that undermine positive changes. ODOC has willfully and wantonly ignored the public health threat caused by this global pandemic and, as a result, class members have been harmed, and lives have been lost. During the pendency of the lawsuit, thousands of people housed at ODOC facilities have been infected with COVID-19. As of the time of filing this Fourth Amended Complaint, 42 people have died from the disease while in ODOC's custody.

Since the beginning of the pandemic, Defendants have been aware that COVID-19 is most likely to cause serious illness or death to people in congregate living settings. Such risk is greatly increased for those who are not vaccinated and/or are not provided the medical care and facilities to properly treat their infection. And, since the beginning of the pandemic, Defendants have ignored the threats posed by the COVID-19 virus by denying Plaintiffs and class members appropriate access to prevention, testing, and treatment for COVID-19. Because Defendants

continue to make and enforce policies that create a risk of further spread of COVID-19 in all of ODOC's facilities, Defendants are in violation of the U.S. Constitution and Oregon law.

Plaintiffs seek relief on behalf of three classes. The first class, the Damages Class, generally consists of those persons housed at ODOC facilities who have contracted COVID-19. The second class, the Vaccine Class, consists of all adults housed at ODOC facilities who have were not offered a vaccine as of January 1, 2021. The third class, the Wrongful Death Class, consists of the estates of those who have died while they were housed at ODOC facilities, and for whom COVID-19 caused or contributed to their death.

## JURISDICTION

1.      This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (4), and supplemental jurisdiction of the state tort claim under 28 U.S.C. § 1367.

## VENUE

2.      Venue is proper within the District of Oregon because the events giving rise to this claim occurred in this judicial district and all Defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein have occurred and continue to occur in prisons operated by ODOC in many counties across the State of Oregon. The acts pertaining to the named Plaintiffs occurred in Marion County, Washington County, Umatilla County, and Multnomah County, Oregon. The main policy and operational decisions made by ODOC occur in Marion County, Oregon.

## PARTIES

3.      Plaintiff Paul Maney is a prisoner at Oregon State Correctional Institution (OSCI) in Salem, Oregon. Mr. Maney tested positive for COVID-19 during the Damages Class period.

4.      Plaintiff Gary Clift is a prisoner at OSCI in Salem, Oregon.  Mr. Clift tested positive for COVID-19 during the Damages Class period.  Mr. Clift was not offered a vaccine before the Vaccine Class was certified.

5.      Plaintiff George Nulph is a prisoner at OSCI in Salem, Oregon.  Mr. Nulph was not offered a vaccine before the Vaccine Class was certified.

6.      Plaintiff Theron Hall is a prisoner at the Oregon State Penitentiary (OSP) in Salem, Oregon.  Mr. Hall was not offered a vaccine before the Vaccine Class was certified.

7.      Plaintiff David Hart was previously a prisoner at OSP in Salem, Oregon.  Mr. Hart was diagnosed with COVID-19 during the Damages Class period.

8.      Plaintiff Micah Rhodes was previously a prisoner at Columbia River Correctional Institution (hereafter "Columbia River") in Portland, Oregon.

9.      Plaintiff Sheryl Lynn Sublet was previously a prisoner at Coffee Creek Correctional Facility ("Coffee Creek") in Wilsonville, Oregon.  Ms. Sublet was not offered a vaccine before the Vaccine Class was certified.

10.     Plaintiff Felishia Ramirez is the personal representative for the Estate of Juan Tristan.  Mr. Tristan contracted COVID-19 while he was incarcerated at OSP.  Mr. Tristan died of his COVID-19 infection during the relevant class period—that is, COVID-19 caused or contributed to Mr. Tristan's untimely death.  Plaintiff Ramirez was appointed the personal representative of Mr. Tristan's estate on April 19, 2021.

11.     Defendant State of Oregon ("the State") is a sovereign state entity within the United States with the capacity to sue and be sued pursuant to the Oregon Tort Claims Act.  The

Oregon Department of Corrections (ODOC) is a department or division of the State.  The State is liable in a state tort action for the actions or inactions of its agents.

12.    Defendant Kate Brown is the Governor of the State of Oregon and retains ultimate executive authority over ODOC.  Under ORS 401.168(1), "[d]uring a state of emergency, Governor Brown has complete authority over all executive agencies of state government and the right to exercise, within the area designated in the proclamation, all police powers vested in the state by the Oregon Constitution in order to effectuate the purposes of this chapter"; "has authority to suspend provisions of any order or rule of any state agency, if the Governor determines and declares that strict compliance with the provisions of the order or rule would in any way prevent, hinder or delay mitigation of the effects of the emergency"; and "has authority to direct any agencies in the state government to utilize and employ state personnel, equipment and facilities for the performance of any activities designed to prevent or alleviate actual or threatened damage due to the emergency."  Under ORS 401.236, Governor Brown is "authorized to make rules and regulations necessary to carry out the purposes" of the declared emergency and her powers under ORS 401.165 to ORS 401.236.  At all times relevant, Governor Brown was acting under color of law and is sued in her official and individual capacities.

13.    Defendant Colette Peters is the Director of ODOC and is directly responsible for ensuring that ODOC's prison health program complies with state and federal laws.  ODOC operates 14 facilities in Oregon, where prisoners are held after sentencing if the length of their sentence exceeds one year.  At all times relevant, Defendant Peters was acting under color of law and is sued in her official and individual capacities.

14.     Defendant Heidi Steward is the Deputy Director of ODOC and is directly responsible for ensuring that ODOC's prison health program complies with state and federal laws.  At all times relevant, Defendant Steward was acting under color of law and is sued in her official and individual capacities.

15.     Defendant Mike Gower is the Assistant Director of Operations for ODOC and is directly responsible for the operations of ODOC's prisons.  At all times relevant, Defendant Gower was acting under color of law and is sued in his official and individual capacities.

16.     Defendant Mark Nooth is the Eastside Institutions Administrator for ODOC and is directly responsible for the operations of six ODOC prisons: Eastern Oregon Correctional Institution (EOCI), Two Rivers Correctional Institution ("TRCI"), Snake River Correctional Institution ("Snake River"), Powder River Correctional Facility ("Powder River"), Deer Ridge Correctional Institution ("Deer Ridge"), and Warner Creek Correctional Facility ("Warner Creek"). At all times relevant, Defendant Nooth was acting under color of law and is sued in his official and individual capacities.

17.     Defendant Rob Persson is the Westside Institutions Administrator for ODOC and is directly responsible for the operations of eight ODOC prisons: Coffee Creek, CRCI, South Fork Forest Camp ("South Fork"), OSCI, Santiam Correctional Institution ("Santiam"), OSP, Mill Creek Correctional Facility ("Mill Creek"), and Shutter Creek Correctional Institution ("Shutter Creek"). At all times relevant, Rob Persson was acting under color of law and is sued in his official and individual capacities.

18.     Defendant Ken Jeske is the Administrator for Oregon Correctional Enterprises (OCE) and is directly responsible for the operations of OCE's facilities within ODOC.  OCE has

operations in nine ODOC facilities throughout the State: EOCI, TRCI, Snake River, Deer Ridge,

Warner Creek, Coffee Creek, OSCI, OSP, and Mill Creek.  At all times relevant, Defendant

Jeske was acting under color of law and is sued in his official and individual capacities.

19.    Defendant Patrick Allen is the Director of the Oregon Health Authority (OHA).

OHA exercises control over the allocation and distribution of vaccines in the State of Oregon,

including deciding when people incarcerated in ODOC facilities will receive vaccinations.  OHA

also worked closely with ODOC to develop and implement guidance and recommendations for

the management of COVID-19 in ODOC facilities, including through weekly meetings with

ODOC staff.  At all times relevant, Defendant Allen was acting under color of law and is sued in

his official and individual capacities.

20.    Defendant Joe Bugher is the Assistant Director of Health Services for ODOC and

is responsible for the provision of legally mandated medical, dental, behavioral, and mental

health care, and pharmacy services to adults in custody at ODOC facilities.  At all times relevant,

Defendant Bugher oversaw and led ODOC's Agency Operations Center (AOC), which ODOC

activated for the purposes of collaboration and decision making in response to the COVID-19

pandemic.  At all times relevant, Defendant Bugher was acting under color of law and is sued in

his official and individual capacities.

21.    Defendant Garry Russell is the Chief of Security for ODOC and is responsible for

the management and supervision of ODOC security programs, emergency preparedness

programs, transport units, and ODOC's staff deployment system.  At all times relevant,

Defendant Russell oversaw and led the AOC, which ODOC activated for the purpose of

collaboration and decision making in response to the COVID-19 pandemic.  At all times

relevant. Defendant Russell was acting under color of law and is sued in his official and individual capacities.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure (FRCP) 23(b)(1), 23(b)(2), and 23(b)(3), and, in the alternative, FRCP 23(c)(4), on behalf of themselves and a class of similarly situated individuals.

23.     Plaintiffs seek to represent three classes.

24.     The first class ("the Damages Class") consists of all adults incarcerated in ODOC facilities who (1) were incarcerated on or after February 1, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19, and (3) if they became incarcerated after February 1, 2020, tested positive or were otherwise diagnosed with COVID-19 at least 14 days after they entered ODOC custody.  The class period for the Damages Class commences on March 8, 2020.  Specifically excluded from the Damages Class are Defendants and any of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

25.     The second class ("the Vaccine Class") consists of all adults incarcerated in ODOC facilities who had not been offered a COVID-19 vaccine as of January 1, 2021.  On February 2, 2021, the Court provisionally certified the Vaccine Class, appointed Plaintiffs Theron Hall and Sheryl Lynn Sublet as class representatives of the Vaccine Class, and appointed undersigned counsel as class counsel for the Vaccine Class.  The class period for the Vaccine Class commences on January 1, 2021.

26.     The third class ("the Wrongful Death Class") consists of the estates of those adults incarcerated at ODOC facilities continuously since February 1, 2020, who died during the Wrongful Death Class period, and for whom COVID-19 caused or contributed to their death.

The class period for the Wrongful Death Class commences on March 8, 2020. Specifically excluded from the class are Defendants and any of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

27.    With respect to the Vaccine Class, this action has been brought and may properly be maintained as a class action under federal law and satisfies the requirements for maintaining a class action under FRCP 23(a).

28.    Joinder is impracticable because: (1) the class members are numerous; (2) the class is fluid because it includes future members who will later become housed in ODOC facilities; (3) the class members are incarcerated, making their abilities to institute individual lawsuits limited; and (4) class treatment under such circumstances furthers judicial economy. At the time the Vaccine Class was provisionally certified, there were more than 10,000 members of the Vaccine Class.

29.    Common questions of law and fact exist as to all members of the Vaccine Class, in that they all have a right to be administered appropriate and effective COVID-19 prevention, testing, and treatment measures, and including whether Defendants' initial decision not to offer COVID-19 vaccines to Vaccine Class members violated the Eighth Amendment.

30.    Plaintiffs Hall and Sublet's claims are typical of the claims of the Vaccine Class. The harms that Plaintiffs Hall and Sublet have suffered as a result of Defendants' conduct are typical of the harms suffered by Vaccine Class members.

31.    With respect to the Vaccine Class, Plaintiffs seek class certification under FRCP 23(b)(1). To the extent that Plaintiffs seek injunctive and declaratory relief, prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the

class. Further, any injunction requiring Defendants to address their constitutional violations may prevent other litigants from seeking a different injunction. In the alternative, Plaintiffs seek class certification under FRCP 23(b)(2), in that all class members are subject to the same constitutionally deficient conduct by Defendants. In other words, Defendants have acted and will act on grounds generally applicable to all class members.

32.    With respect to the Damages Class and Wrongful Death Class, this action has been brought and may properly be maintained as a class action under federal law and satisfies the requirements for maintaining a class action under FRCP 23(a).

33.    The Damages Class and the Wrongful Death Class each are so numerous that joinder is impracticable. As of the date of this Fourth Amended Complaint, at least 3604 people incarcerated at ODOC facilities have been diagnosed with COVID-19. Due to the highly infectious nature of the virus, and the additional, more infectious variants of the COVID-19 virus that are now circulating globally and within the United States, it is likely that the number of new cases of COVID-19 among individuals incarcerated at ODOC facilities will continue to increase. Also as of the date of this Fourth Amended Complaint, 42 individuals housed in ODOC facilities have died with COVID-19, and COVID-19 caused or contributed to their deaths.

34.    There are one or more questions of fact or law common to members of the Damages Class and the Wrongful Death Class, including legal questions related to Defendants' duties under the Eighth Amendment and liabilities under 42 U.S.C. § 1983. There are also common questions of fact related to notice to Defendants, what steps they took or failed to take to protect people incarcerated at ODOC facilities from COVID-19, medical causation, scientific evidence admissibility, and applicable CDC standards. In this case, Defendants completely control the environment, and there is no other path of infection from outside the facility other

than infection transmitted by agents and employees of Oregon Department of Corrections. Accordingly, causation is a common question of fact among members of the Damages Class and the Wrongful Death Class.

35.    Plaintiffs Maney, Clift, and Hart, and any other Plaintiff who becomes infected and is diagnosed with COVID-19, are adequate representatives of the Damages Class.  Plaintiff Ramirez, as personal representative of the Estate of Juan Tristan, is an adequate representative of the Wrongful Death Class.

36.    The claims of Plaintiffs Maney, Clift, and Hart, and any other Plaintiff who becomes infected and is diagnosed with COVID-19, are typical of the claims of members of the Damages Class, as their claims are based on the same facts and legal theories as those of the Damages Class members.  The claims of Plaintiff Ramirez and any other personal representative of the estate of and individual who dies with COVID-19 while housed in an ODOC facility, and for whom COVID-19 caused or contributed to their death, are typical of the claims of members of the Wrongful Death Class, as their claims are based on the same facts and legal theories of those of the Wrongful Death Class members.

37.    As to the Damages Class and Wrongful Death Class, common questions of fact and law predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that (a) the class members have little interest or ability to individually control the prosecution of separate actions; (b) as the proposed class includes facilities across the Oregon, it is appropriate to concentrate the forum in this district, and the Eugene Division is appropriate under local rules;

and; (c) the difficulties in managing the Damages Class and Wrongful Death Class are significantly less than managing a mass of individual claims.

38.    With respect to all classes—the Vaccine Class, the Damages Class, and the Wrongful Death Class—the representative Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of members of each of their respective classes.  Plaintiffs have no interests adverse to the interests of the class they seek to represent.  Plaintiffs retained counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among class members or between counsel and class members.

39.    As to the Vaccine Class, the Damages Class, and the Wrongful Death Class, Plaintiffs also seek partial certification under FRCP 23(c)(4).  This action may also be maintained as a class action with respect to particular issues, including the following, each of which is also a common question of law or fact under FRCP 23(a)(1):

(a)    Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to fully implement social distancing as a control strategy;

(b)    Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to promptly implement and enforce mask requirements;

(c)    Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to separate corrections officers and

adults in custody who had contracted or been exposed to COVID-19 from

those who had not;

(d)    Whether Defendants acted negligently in failing to implement social

distancing as a control strategy;

(e)    Whether Defendants acted negligently in failing to promptly implement

and enforce mask requirements;

(f)    Whether Defendants acted negligently in failing to separate corrections

officers and adults in custody who had contracted or been exposed to

COVID-19 from those who had not;

(g)    Whether Defendants' conduct caused injury to Plaintiffs and class

members;

(h)    Whether Plaintiffs and members of the class are entitled to recover

punitive damages; and

(i)    The amount of punitive damages to which Plaintiffs and class members

are entitled.

## FACTUAL ALLEGATIONS

40.    Since 2019, the novel coronavirus, or COVID-19, has ravaged the world, country

to country.  The extensive body of evidence regarding COVID-19 demonstrates that it is a

serious highly communicable disease that spreads through close contact with other individuals

who contracted or become exposed to the virus.  COVID has been declared a global pandemic[1]

---

[1]    Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*,
Wall St. J. (Mar. 11, 2020, 11:59 PM), available at https://www.wsj.com/articles/u-s-

and both national and state emergencies.[2]  As of May 20, 2020, just a few weeks after this

lawsuit was filed, 1,341,907 people worldwide had been diagnosed with COVID-19, and more

than 74,470 of those people had died.  As of the date of this Fourth Amended Complaint, over 32

million people in the United States have tested positive for COVID-19, and the number of deaths

has risen to 575,845, including 2,491 in Oregon.[3]  Those numbers are growing rapidly every day.

There is no cure for COVID-19.

COVID-19 Transmission

      41.      The transmission of COVID-19 has increased exponentially since the beginning

of the outbreak in 2020, and it continues to spread.  The United States now has the most

confirmed cases of COVID-19 in the world.  Early projections by the CDC suggested that over

200 million people in the United States could become infected with COVID-19 over the course

coronavirus-cases-top-1-000-11583917794.  Pandemics occur when a new virus emerges to infect people and can sustainably spread between people. Because there is little to no pre-existing immunity against the new virus, it spreads easily amongst humans.

[2]      Derek Hawkins et al., *Trump Declares Coronavirus Outbreak a National Emergency*, Wash. Post (Mar. 13, 2020, 10:46 AM), *available at*
https://www.washingtonpost.com/world/2020/03/13/coronavirus-latest-news/; Lizzy Ackerman, *Gov. Kate Brown declares coronavirus state of emergency, announces 7 new Oregon cases*, The Oregonian, *available at*  https://www.oregonlive.com/coronavirus/2020/03/7-new-coronavirus-cases-in-oregon-officials-say-gov-kate-brown-declaring-state-of-emergency.html (Mar. 9, 2020).

[3]      Johns Hopkins University and Medicine Coronavirus Resource Center, *Coronavirus COVID-19 Global cases by the Center for Systems Science and Engineering*, https://coronavirus.jhu.edu/map.html (last visited Apr. 30, 2021); Centers for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 30, 2021); Oregon Health Authority, *COVID-19 Updates*, https://govstatus.egov.com/OR-OHA-COVID-19 (last visited Apr. 30, 2021).

of the pandemic without effective public health intervention, with as many as 1.5 million deaths in the most severe scenarios.[4]

42.    COVID-19 is a particularly contagious disease.  A March 2020 study showed that the virus could survive for up to three hours in the air, four hours on copper, twenty-four hours on cardboard, and two to three days on plastic and stainless steel.[5]  Another study of an early cluster of COVID-19 cases in Wuhan, China, revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces—in the study, it was a communal mall bathroom.[6]  Research also shows that controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—*i.e.*, transmission by people who are contagious but exhibit limited or no symptoms, rendering ineffective screening tools dependent on identifying symptomatic behavior.[7]

43.    COVID-19 has been especially dangerous in areas of close confinement, like cruise ships and congregate living facilities.  Jails and prisons are particularly vulnerable to outbreak.[8]  In fact, jails and prisons are at an even greater risk than other congregate living

---

[4]    Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), available at https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7mdead.html.

[5]    Marilynn Marchione/AP, *Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show*. TIME, (Mar. 11, 2020), available at https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/.

[6]    Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020*. 26 Emerg Infect Dis. 6, (2020), available at https://doi.org/10.3201/eid2606.200412 (last visited Mar. 20, 2020).

[7]    Chelsea Ritschel, *Coronavirus: Are People Who Are Asymptomatic Still Capable of Spreading COVID-19*? Independent, available at https://www.independent.co.uk/life-style/health-and-families/coronavirus-symptoms-asymptomatic-covid-19spread-virus-a9403311.html (last visited Mar. 20, 2020).

[8]    *See* Matthew J. Akiyama, M.D., Anne Spaulding, M.D., Josiah D. Rich, M.D., *Flattening the Curve for Incarcerated Populations—Covid-19 in Jails and Prisons,* N Engl J Med (Apr. 2, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

settings—prisoners must share cells or dorms, dining halls, common areas, and bathrooms, where opportunities for droplet transmission are plentiful.[9]  Indeed, the use of dining halls contrasts sharply with the statewide restrictions imposed in Oregon on on-premises food consumption at restaurants, bars, taverns, cafes, food courts, or other similar establishments over the course of 2020.  Prisons and jails are also often poorly ventilated, "which promotes the highly efficient spread of diseases through droplets."[10]  Prisons and jails also house a large proportion of medically vulnerable people[11] and offer limited medical resources.

44.     In Chicago, Illinois, within a week of confirming its first coronavirus positive in a correctional officer, Cook County Jail had 134 confirmed cases, with nine negative tests, 93 outstanding tests, and 12 correctional officers also testing positive.[12]  In the Daenam inpatient psychiatric ward in South Korea, where conditions of confinement are similar to those of an American jail, 101 out of 103 inmates became infected with COVID-19, and, as of February 29, 2020, seven patients had died of complications from the disease.[13]

---

[9]     Declaration of Dr. Jaimie Meyer, *Velesaca v. Wolf, et. al.*, Dkt. 42 at ¶ 9, USDC of SDNY Case No. 1:20-cv-01803-AKH (S.D.N.Y. March 16, 2020).

[10]    *Id.*

[11]    *Active case finding for communicable diseases in prison*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lanet/article/PIIS0140-6736(18)31251-0/fulltext. ("People in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.")

[12]    Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, Chicago Sun Times (March 30, 2020). https://chicago.suntimes.com/coronavirus/2020/3/29/21199171/cook-county-jail-coronavirus-positive-134-cases-covid-19.

[13]    Min Joo Kim, *How a South Korean Psychiatric Ward Became a 'Medical Disaster' When Coronavirus Hit*, THE WASHINGTON POST (February 29, 2020) https://www.washingtonpost.com/world/asia_pacific/how-a-south-korean-psychiatric-ward-became-a-medical-disaster-when-coronavirus-hit/2020/02/29/fe8f6e40-5897-11ea-8efd-0f904bdd8057_story.html.

45.    Experts predicted that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[14]  Those predictions have borne out in Oregon where, between December 2020 and the date of this Fourth Amended Complaint, the number of COVID-19 cases in ODOC's facilities has doubled, now exceeding 3,400.

46.    Jails and prisons all over the country and world have released people with the aim of preventing massive outbreaks of severe illness and death from COVID-19.[15]  Although Plaintiffs do not seek the remedy of population reduction through court-ordered release at this time, the fact that release is widely viewed as necessary in other jurisdictions, but there is no indication that it has been or is being considered by Defendants, is relevant to the urgency and necessity of implementing or awarding other remedies for the harm that Defendants' inaction has caused to incarcerated adults

47.    The following U.S. states and counties, among others, are making or have made efforts to reduce their jail and prison populations: Jefferson County Jail in Kentucky,[16] Mobile

---

14    Evelyn Cheng and Huileng Tan, CNBC, n.11 (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).
15    BBC, *US jails begin releasing prisoners to stem Covid-19 infections*, (Mar. 19, 2020), https://www.bbc.com/news/world-us-canada-51947802 (discussing that some US cities have released hundreds of people from their jails and that Iran has released over 85,000 people to combat the pandemic).
16    Andrew Wolfson, *More than 100 pretrial defendants are being released*, Courier Journal (March 17, 2020)  https://www.courier-journal.com/story/news/2020/03/17/kentucky-releasing-some-pretrial-defendants-due-coronavirus/5074206002/.

County Metro Jail[17] and three other counties[18] in Alabama, Spokane, Washington,[19] Mercer

County, Ohio,[20] Jefferson County, Texas,[21] Hillsborough County, Texas,[22] Mecklenburg County,

North Carolina,[23] Cook County Jail in Illinois,[24] Sacramento, California,[25] Alameda County,

---

[17]     Chris Best, *Some inmates to be released from Metro Jail due to coronavirus*, WKRG News (March 18, 2020) https://www.wkrg.com/health/coronavirus/some-inmates-over-65-to-be-released-from-metro-jail-due-to-coronavirus/.

[18]     Marty Roney, *Coronavirus: County jail inmates ordered released in Autauga, Elmore, Chilton counties*, Montgomery Advertiser (Mar. 18,2020) https://www.montgomeryadvertiser.com/story/news/crime/2020/03/18/county-jail-inmates-ordered-released-autauga-elmore-chilton-counties/2871087001/.

[19]     Chad Sokol, *Dozens released from Spokane County custody following Municipal Court emergency order*, The Spokesman Review (March 17, 2020) https://www.spokesman.com/stories/2020/mar/17/dozens-released-from-spokane-county-custody-follow/.

[20]     WFMJ News, *Mercer County Jail releases low-level inmates amid coronavirus pandemic* (March 18, 2020) https://www.wfmj.com/story/41912067/mercer-co-jail-releases-low-level-inmates-to-make-room-for-medical-isolation-cells-amid-coronavirus-pandemic.

[21]     Kiera Sam, Jordan James, *Jefferson County jail cancels visitation, releases some inmates amid coronavirus concerns*, 12News (March 18, 2020) https://www.12newsnow.com/article/news/local/jefferson-county-jail-cancels-visitation-releases-some-inmates-amid-coronavirus-concerns/502-f7e9e268-e131-46af-a478-95553f309bf8.

[22]     Tony Marrero, *Sheriff announced the release of 164 people from his jail*, Tampa Bay Times (March 19, 2020) https://www.tampabay.com/news/hillsborough/2020/03/19/hillsborough-sheriff-releases-164-county-jail-inmates-to-reduce-coronavirus-risk/

[23]     Michael Gordon, Ames Alexander, *Mecklenburg begins releasing jail inmates to avoid cellblock outbreak of COVID-19,* The Charlotte Observer (March 19, 2020) https://www.charlotteobserver.com/news/coronavirus/article241279836.html.

[24]     David Struett, *Cook County Jail releases several detainees who are 'highly vulnerable' to coronavirus*, Chicago Sun Times (Mar 17, 2020) https://chicago.suntimes.com/coronavirus/2020/3/17/21183289/cook-county-jail-coronavirus-vulnerable-detainees-released-covid-19

[25]     Kristopher Hooks & Ja'Nel Johnson, *Some non-violent, low-level inmates being released from Sacramento jails amid coronavirus pandemic*, ABC10 (Mar. 18, 2020), https://www.abc10.com/article/news/health/coronavirus/sacramento-inmates-being-released-from-amid-coronavirus-pandemic/103-d10ab80d-81d6-41e1-bc47-e6643e1e0d7e

California,[26] New York City,[27] Allegheny County, Pennsylvania,[28] Lexington County, South

Carolina,[29] Jefferson County, Colorado,[30] New Jersey,[31] Iowa,[32] North Dakota,[33] Rhode Island,[34]

---

[26]    Da Lin, *Coronavirus Pandemic: Over 300 Alameda County Jail Inmates Approved For Early Release,* KPIX News (March 19, 2020), https://sanfrancisco.cbslocal.com/2020/03/19/coronavirus-pandemic-247-alameda-county-jail-inmates-approved-for-early-release/.

[27]    Julia Marsh, Ben Feuerherd, *NYC to begin releasing inmates amid coronavirus outbreak*, New York Post (March 18, 2020) https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/.

[28]    Bob Mayo, *Release of up to 100 Allegheny County Jail inmates a day underway as coronavirus precaution*, WTAE News (March 19, 2020) https://www.wtae.com/article/release-of-up-to-100-allegheny-county-jail-inmates-a-day-under-way-as-coronavirus-precaution/31787878.

[29]    Meera Bhonslé, *Jail numbers affected by judicial coronavirus directives*, Cola Daily (March 19, 2020) https://www.coladaily.com/communities/lexington/jail-numbers-affected-by-judicial-coronavirus-directives/article_bb2df04e-6a22-11ea-a187-f3aec5c6ac7d.html.

[30]    Jenna Carroll, *Inmates being released early from JeffCo Detention Facility amid coronavirus concerns*, KDVR News (March 19, 2020), https://kdvr.com/news/coronavirus/inmates-being-released-early-from-jeffco-detention-facility-amid-coronavirus-concerns/.

[31]    S.P. Sullivan, *N.J. releasing some non-violent inmates from jail this week to fight coronavirus outbreaks behind bars*, NJ Advance Media (March 23, 2020) https://www.nj.com/coronavirus/2020/03/nj-will-start-releasing-some-non-violent-inmates-from-jail-this-week-in-effort-to-stop-outbreak-behind-bars.html.

[32]    Linh Ta, *Iowa's prisons will accelerate release of approved inmates to mitigate COVID-19*, Times-Republican (March 23. 2020) https://www.timesrepublican.com/news/todays-news/2020/03/iowas-prisons-will-accelerate-release-of-approved-inmates-to-mitigate-covid-19/

[33]    Arielle Zionts, *DOC, Noem not planning special coronavirus releases from prisons*, Rapid City Journal (March 21, 2020) https://rapidcityjournal.com/news/local/crime-and-courts/doc-noem-not-planning-special-coronavirus-releases-from-prisons/article_d999f510-7c7c-5d19-ab3a-77176002ef99.html.

[34]    Katie Mulvaney, *R.I. prisons looking to reduce inmate numbers due to virus*, The Providence Journal (March 25, 2020) https://www.southcoasttoday.com/news/20200325/ri-prisons-looking-to-reduce-inmate-numbers-due-to-virus.

Colorado,[35]  California,[36] and Washington County, Oregon.[37]  As recently as December 2020, a state court in Orange County, California ordered that the county jail population be halved as a means to prevent the spread of the COVID-19 virus.[38]

48.    In early 2020, the US. Department of Justice expedited transfer of federal prisoners to home detention because "'emergency conditions' created by the coronavirus . . . affected the ability of the [Bureau of Prisons] to function."[39]

49.    Courts in other jurisdictions have ordered release to preempt harm to prisoners from COVID-19.  *People ex rel. Stoughton et al. v. Brann*, No. 260154/2020 (Sup. Ct. Bronx Cty. Mar. 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *In re Request to Commute or Suspend County Jail Sentences*, No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any inmate in New Jersey serving a county jail

---

[35]    John Herrick, *Colorado places a moratorium on new prison intakes during pandemic*, The Colorado Independent (March 26, 2020),
https://www.coloradoindependent.com/2020/03/26/colorado-moratorium-prisons-inmates-covid-19-cspii/
[36]    Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, The Los Angeles Times (March 31, 2020),
https://www.latimes.com/california/story/2020-03-31/coronavirus-california-release-3500-inmates-prisons
[37]    Noelle Crombie, *Oregon courts, jails respond to coronavirus: Washington County jail to release 60 inmates; court hearings see widespread delays*, The Oregonian (March 16, 2020),
https://www.oregonlive.com/coronavirus/2020/03/oregon-courts-jails-respond-to-coronavirus-washington-county-jail-to-release-60-inmates-court-hearings-see-widespread-delays.html
[38]    https://www.latimes.com/california/story/2020-12-12/court-orders-orange-county-sheriff-to-cut-jail-population-in-half.
[39]    Katie Benner, *Barr Expands Early Release of Inmates at Prisons Seeing More Coronavirus Cases*, The New York Times (April 3, 2020),
https://www.nytimes.com/2020/04/03/us/politics/barr-coronavirus-prisons-release.html

sentence as a condition of probation or as a result of a municipal court conviction).  In addition,

many courts have ordered release of people from immigration detention.[40]

COVID-19 in Oregon

50.     In Oregon, where testing was slow to begin and has not been readily available,

more than 183,000 people have tested positive and, as of the date of this Fourth Amended

Complaint, 2,491 people have died.[41]  Those numbers continue to grow every day.  Both

nationwide and in Oregon, a large and disproportionate percentage of the people who have tested

positive for the virus have lived in congregate-living facilities.  Because of the greater risk to

persons in congregate living settings, Governor Brown's office initially stated that the state's

second-highest priority for testing, behind only those persons with symptoms who work in

critical infrastructure, was anyone with symptoms in correctional facilities, hospitals, and other

high-risk congregate settings.[42]

---

[40]     On March 23, 2020, a panel of Ninth Circuit judges ordered a detained person released "[i]n light of the rapidly escalating public health crisis." *Xochihua-Jaimes v. Barr*, 18-71460, Doc. No. 53 (9th Cir. Mar. 23, 2020)(unpublished).  *See also Castillo v. Barr*, 20-cv-605 (C.D. Cal. Mar. 27, 2020) (ordering that petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *Jimenez v. Wolf*, Docket No. 507, 18-cv-225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *Coronel v. Decker*, 20-cv-2472 (S.D.N.Y. March 27, 2020) 2020 WL 1487274 (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); *Basank v. Decker*, 2020 WL 1481503 (granting release of ten petitioners who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19" from immigration detention and explaining ""public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions.")*.*
[41]     Oregon Office of the Governor, *Building a Safe and Strong Oregon*, https://coronavirus.oregon.gov/Pages/default.aspx (last visited May 2, 2021 and updated daily with Oregon's COVID-19 statistics).
[42]     Brad Schmidt, *Oregon prioritizes who can be tested for coronavirus -- with the tests it doesn't have*, The Oregonian (Mar. 19, 2020)

51.    On March 8, 2020, Governor Brown declared an emergency under ORS 401.165 due to the public health threat posed by COVID-19.  Since then, Governor Brown has extended that declaration six times.  As of the date of this Fourth Amended Complaint, Governor Brown's sixth extension remains in effect.[43]

52.    On March 10, 2020, based on recommendations from OHA, the Oregon Department of Human Services imposed restrictions and protective measures to limit visitors to long-term care facilities to only essential personnel.

53.    On March 11, 2020, the World Health Organization announced that COVID-19 is a global pandemic.

54.    On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency.  That declaration continues in effect as of the date of this Fourth Amended Complaint.[44]

55.    On March 19, 2020, Governor Brown ordered the postponement of non-urgent health care procedures to conserve personal protective equipment and hospital beds for the state's COVID-19 emergency response efforts.

56.    On March 23, 2020, Governor Brown issued an Executive Order titled "Stay Home, Save Lives."  In it, Governor Brown ordered Oregonians to shelter-in-place and to take precautions to keep a distance of at least six feet between individuals.  Stay Home, Save Lives

---

https://www.oregonlive.com/coronavirus/2020/03/oregon-prioritizes-who-can-be-tested-for-coronavirus-with-the-tests-it-doesnt-have.html

[43]    https://www.oregon.gov/gov/Documents/executive_orders/eo_21-05.pdf

[44]    https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/#:~:text=On%20March%2013%2C%202020%2C%20by,(COVID%2D19)%20pandemic.&text=For%20this%20reason%2C%20the%20national,effect%20beyond%20March%201%2C%202021.

mandated the closure of facilities that provide a transmission environment for COVID-19 similar to prisons.

57.    Between March 17, 2020, and the date of this Fourth Amended Complaint, Governor Brown has issued a series of COVID-19-related emergency orders restricting and/or mandating phased reopening of public buildings, business, restaurants, schools, and other facilities on a county-by-county basis.  Currently, to determine whether a county is eligible for phased reopening, Governor Brown assigns each county a "County Risk Level," which is updated every two weeks in response to the then-existing state of COVID-19 in that county.  As of the date of this Fourth Amended Complaint, 14 of Oregon's 26 counties were designated as "High Risk."[45]

COVID-19 Prevention

58.    The best way to avoid contracting COVID-19 is by avoiding exposure to the virus by avoiding close contact with other people. The virus is transferred through respiratory droplets produced by breathing, speaking, coughing, or sneezing.  To prevent those droplets from exposing a person to the virus, people should wash their hands regularly, clean and disinfect frequently touched surfaces, and stay at least six feet from others.  The virus can be spread by people who are not showing symptoms of infection.[46]

---

[45]    https://coronavirus.oregon.gov/Pages/living-with-covid-19.aspx#countystatus
[46]    Centers for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

59.     By failing to implement appropriate measures in response to and to protect against the spread of COVID-19, ODOC not only put Plaintiffs and other incarcerated adults at risk, but also put at risk the health and lives of the communities surrounding ODOC's 14 prisons.[47]

60.     In late 2020, the Food and Drug Administration approved vaccines for public use.  Defendant OHA is responsible for prioritization and distribution of vaccines.  OHA initially put incarcerated adults in Phase 1B, after teachers and students.[48]  By comparison, OHA put prison staff and residents of other congregate living facilities in Phase 1A.

61.     On January 12, 2021, Defendant Brown announced that seniors over the age of 65 and childcare, preschool, and K-12 employees to start receiving vaccinations on January 23, 2021.[49]  No similar start date was announced for people incarcerated in Oregon DOC facilities. On January 15, 2021, Governor Brown announced that the start date for vaccinations for seniors and school employees would be pushed back to February 8, 2021.[50]  Later, Governor Brown clarified that the start date for teachers would be January 25, 2021.[51]

---

[47]     *See* Amicus Brief of Dr. Mary T. Bassett, et al., Committee for Public Counsel Services and Massachusetts Association of Criminal Defense Lawyers v. Chief Justice of the Trial Court, No. SJ-2020- (Supreme Judicial Court for the County of Suffolk, Mar. 24, 2020), available at https://www.aclum.org/sites/default/files/field_documents/amici_letter_-_public_health_experts_-_cpcs_macdl_v._chief_of_trial_court_1.pdf.

[48]     https://covidvaccine.oregon.gov/#prioritization.

[49]     https://www.oregonlive.com/news/2021/01/gov-kate-brown-announces-oregonians-age-65-and-teachers-can-get-vaccinated-against-covid-19-starting-jan-23.html.

[50]     Oregon to start COVID-19 vaccinations of teachers Jan. 25, seniors 65+ to wait to Feb. 8 https://www.oregonlive.com/news/2021/01/oregon-to-start-covid-19-vaccinations-of-teachers-jan-25-seniors-65-to-wait-to-feb-8.html

[51]     Oregon to start COVID-19 vaccinations of teachers Jan. 25, seniors 65+ to wait to Feb. 8 https://www.oregonlive.com/news/2021/01/oregon-to-start-covid-19-vaccinations-of-teachers-jan-25-seniors-65-to-wait-to-feb-8.html

62.     On January 16 and 17, 2021 Oregon DOC offered vaccines to approximately 1558 adults in custody who were deemed high risk or who were elderly.  Notwithstanding that early vaccination of a small number of adults in custody, the remaining adult in custody population—some 12,000 people—were not scheduled for vaccination at that time.

63.     On February 2, 2021, this Court issued an order provisionally certifying the Vaccine Class and requiring Defendants to offer COVID-19 vaccines to members of the Vaccine Class, as if those individuals had been included in Phase 1A, Group 2, of Oregon's Vaccination Plan.

ODOC's Response to COVID-19

64.     On March 4, 2020, DOC activated the Agency Operations Center (AOC), an entity and/or group of agency officials designated to oversee and make decisions pertaining to the agency's response to COVID-19.  Defendants Bugher and Russell were charged with oversight and leadership of the AOC, and have acted in that role over the course of the COVID-19 pandemic.

65.     On March 8, 2020, Governor Brown declared a state of emergency under due to the public health threat posed by COVID-19, noting that the declaration was made in an effort to "flatten the curve" of the virus.

66.     On or about March 13, 2020, ODOC announced that it was "coordinating with [OHA] and following the [CDC] recommendations to prevent the spread [of] COVID-19."[52] ODOC suspended visiting and limited institution access to essential staff at all 14 facilities.[53]

---

[52]     Oregon Department of Corrections, https://www.oregon.gov/doc/covid19/Pages/default.aspx (last visited Apr. 1, 2020).
[53]     Oregon Department of Corrections, https://www.oregon.gov/doc/covid19/Pages/default.aspx (last visited Apr. 1, 2020).

67.     On March 27, 2020, the CDC issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("the CDC Guidelines").[54]

68.     The CDC Guidelines issued fell far below community standards of preventative medical care.  They fell short of the standards set by Governor Brown (and the governors of neighboring states) to reduce the transmission of COVID-19 among members of the general public.  They also fell short of the CDC's guidelines to reduce transmission among the general public.  And, finally, they fell short of the recommendations of experts in prison healthcare and epidemiology.[55]  These shortfalls were particularly significant due to heightened transmissibility of COVID-19 within prisons.

69.     The first major outbreak of COVID-19 in an ODOC facility occurred at OSP in late March 2020 through staff-to-staff transmission.  On April 1, 2020, ODOC announced that an employee at OSP had tested positive for COVID-19.[56]  On April 2, 2020, ODOC confirmed that an ODOC prisoner housed at Santiam tested positive for COVID-19.[57]  Also on April 1, 2020, Stacy Chamberlain, executive director of the American Federation of State, County and Municipal Employees in Oregon, which represents some ODOC employees, stated that she was

---

[54]     Though issued on March 27, these interim guidelines were based on what was known about the transmission and severity of COVID-19 as of March 23, 2020, two weeks before the filing of this Complaint.  The CDC noted at the beginning of the document that its recommendations might need to be revised as more information becomes available.

[55]     *See supra* n. 19, 56, 57.

[56]     Noelle Crombie, *Prison employee is first confirmed coronavirus case in Oregon Department of Corrections*, The Oregonian (April 1, 2020), https://www.oregonlive.com/coronavirus/2020/04/prison-employee-is-first-confirmed-case-of-covid-19-in-oregon-department-of-corrections.html.

[57]     Jayati Ramakrishnan, *First inmate in the Oregon prison system tests positive for coronavirus*, The Oregonian (April 3, 2020) https://www.oregonlive.com/coronavirus/2020/04/first-inmate-in-the-oregon-prison-system-tests-positive-for-coronavirus.html.

"particularly concerned that the prison system lacks personal protective equipment, calling it 'one of the big issues we have been yelling about for weeks and the lack of it and the supply of it is a concern in prisons.'"[58]

70.     By Friday, April 3, ODOC had transferred two AICs, one confirmed positive and another presumed positive, from OSP to Coffee Creek.

71.     As early as April 2020, Defendants were aware that wearing a mask helps to prevent the spread of COVID-19.  No later than April 13, 2020, ODOC knew of the importance of wearing masks to protect against the spread of COVID-19 and viewed masking as a primary control measure, acknowledging that social distancing in ODOC facilities is infeasible and thus that masks are particularly important.  That day, ODOC distributed widely information showing that it knew that masks were essential to prevent infection and the spread of infection throughout its facilities.

72.     On April 16, 2020, the AOC approved a "Death in Custody" plan, through which officers in charge were directed to notify funeral homes if a deceased had COVID-19.

73.     Notwithstanding Defendants' knowledge and the CDC Guidelines, and based on Plaintiffs' observations, Defendants failed to substantially follow even the minimal standards to protect against the spread of COVID-19:

(a)     Although CDC Guidelines required that "[i]f an individual has symptoms of COVID-19 (fever, cough, shortness of breath): require the individual to wear a face mask, ensure that staff who have direct contact with the symptomatic individual wear recommended PPE, place the individual under medical isolation

---

[58]     *See supra* n.74.

and refer to healthcare staff for further evaluation," Plaintiff Hart had COVID-19

symptoms but was not required to wear a face mask.  Despite repeated requests

for tests and treatment, ODOC also failed to promptly administer a COVID-19

test.  Throughout the course of the COVID-19 pandemic, Defendants, and each of

them, have failed to continuously implement and enforce a mask policy

throughout ODOC.

(b)    Although CDC Guidelines required that "[i]f an individual was in close contact of

a known COVID-19 case (but has no COVID-19 symptoms), quarantine the

individual and monitor for symptoms two times per day for 14 days, inmates in A

Block at OSP were not placed in quarantine for 14 days, despite being in contact

with correctional officers with positive symptoms.  On or about April 1, 2020,

inmates at CRCI saw others being transferred from A Block at OSP not being

placed in quarantine, but instead put into general population.  Throughout the

course of the COVID-19 pandemic, Defendants, and each of them, have failed to

continuously implement and enforce quarantine and/or non-mixing policies to

prevent incarcerates adults from coming into contact from others who had

contracted or otherwise been exposed to COVID-19.

(c)    Although CDC Guidelines provided that social distancing is a cornerstone of

reducing transmission of COVID-19 and recommended that all prisons

"[i]mplement social distancing strategies to increase the physical space between

incarcerated/detained persons," Plaintiffs reported in May 2020 that they had no

reasonable opportunity to increase physical space between each other.  This is the

case in their dormitories, in their chow hall, in the lines to and from the recreation

yard, or to the canteen.  Throughout the course of the COVID-19 pandemic, Defendants, and each of them, have failed to continuously implement and enforce social distancing policies to prevent incarcerates adults from coming into contact from others who had contracted or otherwise been exposed to COVID-19.

(d)     Although CDC Guidelines suggested that ODOC "consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility," ODOC continued to, and continues to as of the date of this Fourth Amended Complaint, require that OCE workers report to and from each facility to work.

(e)     Although CDC Guidelines provided that, "[i]f possible, consider quarantining all new intakes for 14 days before they enter the facility's general population," inmates across institutions reported that new transfers were not initially being quarantined, even though they are coming from facilities with documented COVID-19 infections.  Throughout the course of the COVID-19 pandemic, Defendants, and each of them, have failed to continuously implement and enforce quarantine policies to prevent incarcerates adults from coming into contact from others who had contracted or otherwise been exposed to COVID-19.

(f)     Although CDC Guidelines provided that, "[a]s soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals," despite having symptoms consistent with COVID-19, Plaintiff Hart was not provided a face mask and was not placed under medical isolation.  He was instead returned to his cell.  Plaintiffs observed other

inmates with coughs or flu-like symptoms not being provided face masks. Throughout the course of the pandemic, Plaintiffs and other members of the Vaccine and Damages Classes have observed ODOC staff across all institutions failing or refusing to wear masks.

(g)    Although CDC Guidelines provided that "[i]ncarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days, ODOC routinely failed to place COVID-positive persons in quarantine in compliance with those guidelines.

74.    ODOC has acknowledged that its "institutions were not designed with a pandemic in mind.  We weren't designed to keep people six feet away from each other.  We can't just place people in extra classrooms or corridors to create distance, we're a correctional facility."[59]

75.    On or around May 8, 2020, the AOC decided that ODOC staff were required to wear masks at all institution if they could not maintain 6 feet of distance between other persons.

76.    Thereafter, however, ODOC was aware that many of its staff members refused to wear masks inside ODOC facilities, including at Coffee Creek, Columbia River, EOCI, Mill Creek, OSP, Powder River, Shutter Creek, Snake River, South Fork, and TRCI.

77.    It was not until July 9, 2020, that the AOC and ODOC communicated to ODOC staff about masks requirements.  On July 13, 2020, ODOC sent an email to all staff announcing

---

[59]    Alex Zielinski, *Q&A: Department of Corrections' Chief Medical Officer on Treating COVID-19 in Oregon Prisons*, Portland Mercury (Apr. 1, 2020), https://www.portlandmercury.com/blogtown/2020/04/01/28231039/qanda-department-of-corrections-chief-medical-officer-on-treating-covid-19-in-oregon-prisons.

that staff were required to wear masks if they could not maintain 6 feet of distance between other persons.

78.     Between April 2020 and the date of filing this Fourth Amended Complaint, ODOC, including each of the Individual Defendants, has failed to take meaningful and adequate steps in response to the COVID-19 pandemic.

79.     On Plaintiffs' information and belief, Defendants have failed to take appropriate and prompt steps to adequately prevent, test, and treat COVID-19 across all ODOC facilities, systemwide and at each individual facility, including at OSCI, Coffee Creek, CRCI, Deer Ridge, EOCI, OSCI, Mill Creek, OSP, Powder River, Shutter Creek, Santiam, Snake River, TRCI, and Warner Creek.

80.     Among other things, Defendants have failed to:

(a)     Implement and enforce masks policies, across the ODOC system and at each individual ODOC facility, that meaningfully and adequately protect against the spread of COVID-19;

(b)     Provide adequate space for incarcerated adults or ODOC staff to socially distance from other inmates and staff;

(c)     Implement and enforce quarantine and non-mixing policies, across the ODOC system and at each individual ODOC facility, sufficient to protect against the spread of COVID-19;

(d)     Provide laundry services that are frequent and consistent enough to sanitize cells;

(e)     Provide adequate cleaning materials to clean and sanitize cells;

    (f)     Adequately clean and sanitize public areas, including with CDC recognized disinfectants;

    (g)     Administer medical checks within an hour of an individual showing symptoms of COVID-19; and

    (h)     Screen ODOC staff and other individuals entering ODOC facilities for COVID-19 symptoms.

81.    Plaintiffs have been unable to proceed with administratively grieving ODOC's shortcomings, because ODOC has declined to accept grievances relating to social distancing or other aspects of Governor Brown's emergency orders or Defendants actions or failures to act.

82.    Fearing retaliation, many other ODOC prisoners are afraid to complain about the conditions in their facilities.  Each of the named Plaintiffs recall times when they personally have experienced or witnessed retaliation in the form of transfers to facilities far away from their family members or other relations, loss of privileges, discipline, solitary confinement, curtailment of speech rights, and even physical retribution.

OCE's Response

83.    Upon information and belief, OCE continues to draw workers from ODOC facilities.

84.    These workers have not been trained on how to avoid the spread of COVID-19 while on the job and are not given opportunities to remain outside of close contact from one another.

85.    Workers from different living units are required to share the workplace.  After working in close contact with another, OCE workers are then returned to their living units.

Population reduction is urgent.

86.     Courts, public health experts, and corrections professionals agree that significantly downsizing prison populations is the most important tool to combat the spread of COVID-19 among residents, staff, and the greater community.

87.     Dr. Marc Stern, the former Assistant Secretary of Health Care for the Washington State Department of Corrections put it plainly: "Downsizing jail populations serves two critical public health aims: (1) targeting residents who are at elevated risk of suffering from severe symptoms of COVID-19 and (2) allowing those who remain incarcerated to better maintain social distancing and avoid other risks associated with forced communal living."[60]

88.     After reviewing the specific conditions in numerous jails and prisons Dr. Stern was "firmly convinced that downsizing the inmate population as much as possible will reduce the risk of contraction and transmission of COVID-19 — and the attendant risks of serious harm and death."[61]  In Dr. Stern's expert opinion, downsizing the population of the jail will "help to 'flatten the curve' overall—both within the jail setting and without."[62]  That is because, given the churn of people — residents, staff, visitors — through Defendants' facilities, the outbreak of COVID-19 in the jail will be impossible to confine to the DOC facilities.

89.     Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine and former Infectious Disease physician for York Correctional Institution in Connecticut, also reviewed the spread of COVID-19 in many facilities came to the same conclusion: "Reducing the size of the population in jails and prisons is crucially important to reducing the level of risk

---

[60]     *See supra* n. 55 at ¶ 13.
[61]     *Id.* at ¶ 11.
[62]     *Id.* at ¶ 14.

both for those within those facilities and for the community at large."[63]  Dr. Meyer emphasized

the risks that prisoners like the plaintiffs and proposed class members would contract COVID-

19, and the risk that they would suffer serious illness and death from the infection.[64]  Because of

the "significantly higher risk" to prisoners, Dr. Meyer writes that, "from a public health

perspective," she is "strongly of the opinion that individuals who are already in those facilities

should be evaluated for release."[65]

90.     The New England Journal of Medicine published, "Flattening the Curve for

Incarcerated Populations—Covid-19 in Jails and Prisons," which advocates for "releasing as

many people as possible, focusing on those who are least likely to commit additional crimes, but

also on the elderly and infirm[.]"[66]  Decarceration "will help to flatten the curve of Covid-19

cases among incarcerated populations and limit the impact of transmission both inside

correctional facilities and in the community after incarcerated people are released. Such

measures will also reduce the burden on the correctional system in terms of stabilizing and

transferring critically ill patients, as well as the burden on the community health care system

to which such patients will be sent."[67]  "To promote public health, we believe that efforts to

decarcerate, which are already under way in some jurisdictions, need to be scaled up; and

associated reductions of incarcerated populations should be sustained. The interrelation of

correctional-system health and public health is a reality not only in the United States but

around the world."

---

[63]     *See supra* n. 19 at ¶ 34.
[64]     *Id*. at ¶ 33.
[65]     *Id*. at ¶ 35.
[66]     *See supra* n. 18.
[67]     *Id.* at 3.

91.     Defendants could comply through several mechanisms to ensure that unduly dangerous prisoners remain in custody.  These include establishing selection criteria based on criminal history, disciplinary history, and current physical capacity.  Procedures include early release to supervision of the Board of Parole and Post-Prison Supervision, advancing release dates of prisoners with severe medical conditions or who are elderly and permanently incapacitated pursuant to ORS 144.126, compassionate release, clemency, temporary furlough, and temporary release to house arrest.

92.     To vindicate Plaintiffs' and class members' rights under the Eighth Amendment, this Court may find it necessary, if other relief is insufficient to avoid further harm and provide appropriate and effective prevention and medical care, to request the convening of a three-judge court to determine whether a prisoner release order should be entered. In so doing, the Court would join several other jurisdictions that have recognized what public health experts and correctional professionals have explained is the soundest way to avoid a constitutional and community crisis: to rapidly and thoroughly downsize the populations at correctional institutions.

93.     Across the world, country, and Oregon, extraordinary and unprecedented measures affecting every aspect of life have been or are currently being taken in the name of protecting people from COVID-19.  Because of the particular threats to Plaintiffs' health as members of the groups of people most at risk for severe COVID-19 illness and death, Plaintiffs should be provided the adequate care recommended by health experts, including their release, if safe.  ODOC and the individual Defendants cannot continue to allow people in prisons to suffer and die.

94.    Plaintiffs Maney, Clift, Hart, and members of the Damages Class have either exhausted their claims or have no available administrative remedy.

Vaccines are an urgent priority.

95.    Vaccinations are the single best hope for building herd immunity, slowing the spread, and lessening the severity of the COVID-19 virus.  There is no reasonable dispute about the importance or efficacy of vaccines and the urgent need for prompt vaccination.

96.    On February 2, 2021, on Plaintiffs' emergency motion for preliminary injunction, this Court provisionally certified the Vaccine Class and ordered Defendants to offer vaccines to members of the Vaccine Class as if they had been included in Phase 1A, Group 2, of Oregon's Vaccination Plan.

Deaths resulting from COVID-19

97.    The death toll from COVID-19 in ODOC facilities has accelerated throughout the pendency of this case.  Between May 2020 and January 2021, 42 adults in custody died. COVID-19 caused or contributed to those 42 deaths.

98.    Juan Tristan's COVID-19 disease caused or contributed to his death.  At the time of his death, Mr. Tristan was 58 years old.  He is survived by four adult children, each of whom suffered losses of society and companionship.

## CAUSES OF ACTION

### Claim 1
### Violation of Eighth Amendment
### (42 U.S.C. § 1983)

### All Plaintiffs against Individual-Capacity Defendants

99.     Plaintiffs reallege and incorporate paragraphs 1 through 97 as if fully set forth herein.

100.    The Eighth Amendment to the U.S. Constitution, as incorporated against States through the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and unusual punishment by State actors.  Specifically, prisoners in state custody have a right to be protected from heightened exposure to a serious communicable disease, including COVID-19.  Here, Defendants were deliberately indifferent to the rights of Plaintiffs and members of the class to be protected from such exposure.

101.    Defendants, and each of them, were deliberately indifferent to the rights of Plaintiffs and members of Vaccine Class, Damages Class, and Wrongful Death Class, including to their rights to be protected from heightened exposure to a serious communicable disease like COVID-19.  Defendants therefore acted in violation of the Eighth Amendment.  Among other things, Defendants, and each of them,

> (a)     failed to promptly and continuously implement and enforce a mask mandate with respect to all ODOC employees, OCE employees, ODOC contractors, and incarcerated adults;

> (b)     failed to properly implement and enforce guidelines and/or procedures relating to sanitation and disinfection of areas of ODOC institutions in which individuals could contract and/or become exposed to COVID-19;

(c)     failed to follow CDC Guidelines and implement necessary public health measures to protect against the spread of COVID-19 in ODOC institutions, including by failing to implement and enforce proper quarantines and/or social distancing for individuals who contracted or became exposed to COVID-19 and by allowing mixing between and among adults in custody and ODOC staff and contractors without regard to the risk that adults in custody would or could become exposed to COVID-19; and

(d)     failed initially to prioritize adults in custody for COVID-19 vaccine distribution.

102.    In doing so, Defendants, and each of them, acted with callous disregard for the rights, serious medical needs, and physical safety of Plaintiffs and members of the Vaccine Class, Damages Class, and Wrongful Death Class.

103.    Furthermore, by operating and continuing to operate ODOC facilities that lack the capacity to treat, test, or prevent or protect against a COVID-19 outbreak and/or spread, Defendants, and each of them, as direct participants and the ultimate policy makers for the ODOC facilities and ODOC's response to the COVID-19 pandemic, violated the rights of Plaintiffs and members of the Vaccine Class, the Damages Class, and the Wrongful Death Class to be protected against heightened exposure to COVID-19.   In doing so, Defendants, and each of them, acted with callous disregard for the rights, serious medical needs, and physical safety of Plaintiffs and members of the Vaccine Class, Damages Class, and Wrongful Death Class.

104.    As to the Vaccine Class, Plaintiffs and members of the class are entitled to a preliminary injunction requiring Defendants to vaccinate adults in custody as quickly as they

begin vaccinating teachers and/or elderly Oregonians, subject to vaccine availability, and to complete the process as promptly as practicable.

105.     As to the Damages Class, Plaintiffs Maney, Clift, and Hart, and any other Plaintiff or class member who develops and is diagnosed with COVID-19 while incarcerated is entitled to damages against Defendants, and each of them, for pain and suffering and harms and losses resulting from COVID-19.  Plaintiffs and members of the Damages Class are further entitled to an award of punitive damages in an amount to be proven at trial.

106.     As to the Wrongful Death Class, Plaintiff Ramirez, on behalf of the Estate of Juan Tristan and members of the Wrongful Death Class are entitled to recover additional damages for death.  Plaintiff and members of the Wrongful Death Class are further entitled to an award of punitive damages in an amount to be proven at trial.

107.     Plaintiffs are entitled to recover attorneys' fees.  42 U.S.C. § 1988.

**Claim 2**
**Negligence**
**Damages Class Against All Defendants**

108.     Plaintiffs reallege and incorporate paragraphs 1-106 as if fully set forth herein.

109.     Defendants, and each them, in acting or failing to act in the manner described in this complaint, were acting in the course and scope of their employment with the State of Oregon, ODOC, and/or OHA.

110.     Defendants, and each of the, were negligent in one or more of the following ways that caused harm to Plaintiffs Maney, Clift, Hart, and members of the Damages Class:

(a)     In failing to promptly and continuously ensure that incarcerated adults, employees, OCE employees, and contractors wear masks;

(b)     In failing to adequately screen employees for COVID-19 symptoms and exposure upon entry to ODOC facilities;

(c)     In failing to provide adequate sanitation and disinfection in ODOC facilities;

(d)     In failing to train staff to require adequate sanitation and disinfection in ODOC facilities;

(e)     In failing arrange for alternative housing, transfers, alternative incarceration, or, if necessary, release to achieve necessary social distancing;

(f)     In failing to provide COVID-19 testing to incarcerated adults who presented with symptoms and to incarcerated adults who came into contact with adults who tested positive for or were otherwise exposed to COVID-19.

(g)     In failing to properly quarantine incarcerated adults awaiting COVID-19 testing results;

(h)     In failing to properly quarantine incarcerated adults after transferring them from a facility with confirmed COVID-19 infections to another facility; and

(i)     In allowing mixing between and among incarcerated adults and ODOC staff and contractors without regard to the risk that incarcerated adults would or could become exposed to COVID-19.

111.    Plaintiffs Maney, Clift, Hart, and members of the Damages Class suffered harm as a result of Defendants' negligence, including pain, suffering, disability, and permanent injury resulting in economic and non-economic damages in amounts to be proven at trial.

**Claim 3**
**Wrongful Death – ORS 30.020**
**Wrongful Death Class Against All Defendants**

112.    Plaintiffs reallege and incorporate paragraphs 1-109 as if fully set forth herein.

113.    Defendants, and each them, in acting or failing to act in the manner described in this complaint, were acting in the course and scope of their employment with the State of Oregon, ODOC, and/or OHA.

114.    Defendants, and each of them were negligent in one or more of the ways set forth under ¶ 109.

115.    As a result of Defendants' negligence, Juan Tristan contracted COVID-19 and died.  Juan Tristan's COVID-19 disease caused or contributed to his death.

116.    Juan Tristan's estate has sustained damages as a result.  His estate has been deprived of the society, companionship, support, and services of Mr. Tristan, resulting in noneconomic damages in an amount to be proven at trial.  His estate has further sustained economic loss, including burial, medical, memorial, and funeral expenses, as well as lost future earnings in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows.

A.    Injunctive relief in the following particulars:

      (a)    Order Defendants to provide spacing of at least six feet or more between inmates in ODOC facilities so that social distancing can be accomplished to prevent the spread of the virus;

      (b)    Order Defendants to institute a safety plan to prevent additional COVID-19 outbreaks and spread;

      (c)    Order Defendants to permit adults in custody readily available and reasonable access to disinfecting solutions for the purpose of sanitizing and disinfecting frequently touched objects, cells, common areas, dormitories, laundry, and eating areas;

      (d)    Order Defendants to provide COVID-19 testing for Plaintiffs and members of the Vaccine Class;

      (e)    Order Defendants to waive all medical co-pays for incarcerated adults experiencing COVID-19 symptoms;

      (f)    Order Defendants to waive all charges for medical grievances during the COVID-19 pandemic;

      (g)    enjoin Defendants and their agents from retaliating against adults in custody for reporting symptoms or seeking redress either administratively or from the Court;

      (h)    Order Defendants to provide single-cell quarantine of persons who have come into contact with persons known to have COVID-19, isolation with

proper medical checks for those who are experiencing COVID-19 symptoms, and safe housing for individuals as appropriate and without incorporating disciplinary characteristics to those preventive housing moves;

(i)    Order Defendants to offer Plaintiffs and members of the Vaccine Class vaccinations beginning on the same date that vaccines are offered to teachers and/or elderly Oregonians;

(j)    To the extent that other remedies prove inadequate after the Defendants have had a reasonable time to comply, appoint a three-judge panel for the purpose of reducing the number of prisoners so that adequate social distancing, quarantining of suspected cases, medical isolation of confirmed cases, and safe housing for class members can be accomplished;

(k)    any other remedy the Court sees just and fit to address the constitutional violations outlined above.

B.    On all of Plaintiffs' claims for relief, compensatory damages for pain and suffering and harms and losses in amounts to be proven at trial;

C.    On Plaintiffs' first claim for relief, an award of punitive damages in an amount to be proven at trial;

D.    Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E.    Such other relief as the court deems just and proper.

Respectfully submitted on May 3, 2021.

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
**Alex Meggitt**, OSB No. 174131
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

/s/ Nadia H. Dahab
**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN LAW OFFICE
707 SW Washington St Ste 600
Portland, OR 97205
Telephone: 503-228-6474
Facsimile: 503-228-2556