IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL MANEY; GARY CLIFT; GEORGE
NULPH; THERON HALL; DAVID HART;
SHERYL LYNN SUBLET, and FELISHIA
RAMIREZ, a personal representative for the
ESTATE OF JUAN TRISTAN, individually,
on behalf of a class of others similarly
situated,

               Plaintiffs,

      v.

STATE OF OREGON; KATE BROWN;
COLETTE PETERS; HEIDI STEWARD;
MIKE GOWER; MARK NOOTH; ROB
PERSSON; KEN JESKE; PATRICK
ALLEN; and GARRY RUSSELL,

               Defendants.

Case No. 6:20-cv-00570-SB

**OPINION AND ORDER**

BECKERMAN, U.S. Magistrate Judge.

Plaintiffs Paul Maney, Gary Clift, George Nulph, Theron Hall, David Hart, and Sheryl

Lynn Sublet, adults in custody ("AIC") at Oregon Department of Corrections ("ODOC")

institutions, along with Felishia Ramirez, the personal representative for the Estate of Juan

Tristan (together, "Plaintiffs"), filed a sixth amended complaint ("SAC") alleging constitutional

PAGE 1 – OPINION AND ORDER

and state law violations against defendants Governor Kate Brown ("Governor Brown"), Oregon

Health Authority ("OHA") Director Patrick Allen ("Director Allen"), several ODOC officials,

and the State of Oregon (together, "Defendants"). (ECF No. 282.) Now before the Court is

Plaintiffs' motion for class certification, or in the alternative, issue certification under FED. R.

CIV. P. 23. (ECF No. 203.) All parties have consented to the jurisdiction of a U.S. Magistrate

Judge pursuant to 28 U.S.C. § 636, and the Court held a hearing on Plaintiffs' motion on

February 14, 2022.

 For the reasons that follow, the Court finds that Plaintiffs satisfy the requirements of FED.

R. CIV. P. 23(a) and FED. R. CIV. P. 23(b)(3), and therefore grants Plaintiffs' motion to certify the

proposed classes.

**BACKGROUND**

## I. THE PARTIES

 Paul Maney is an AIC at the Oregon State Correctional Institution ("OSCI") in Salem,

Oregon, who tested positive for COVID-19 while incarcerated. (SAC ¶ 3.) Gary Clift is an AIC

at OSCI who also tested positive while incarcerated. (*Id.* ¶ 4.) George Nulph is an AIC at OSCI.

(*Id*. ¶ 5.) Theron Hall is an AIC at the Oregon State Penitentiary ("OSP") who tested positive

while incarcerated. (*Id.* ¶ 6; Decl. of Theron Hall ("Hall Decl.") ¶ 5, ECF No. 211.) David Hart

was previously an AIC at OSP who was diagnosed with COVID-19 while incarcerated. (SAC ¶

7.) Sheryl Lynn Sublet was previously an AIC at Coffee Creek Correctional Facility who tested

positive while incarcerated. (*Id.* ¶ 8; Decl. of Sheryl Sublet ("Sublet Decl.") ¶ 8, ECF No. 209.)

Felishia Ramirez is the personal representative for the Estate of Juan Tristan. (SAC ¶ 9.) Mr.

Tristan was an AIC at OSP who died while incarcerated, and COVID-19 caused or contributed to

his death. (*Id.)*

///

Defendant State of Oregon (the "State") is a sovereign state entity within the United States, and ODOC is a department or division of the State. (*Id.* ¶ 10.) Governor Brown is the Governor of the State of Oregon. (*Id.* ¶ 11.) Colette Peters is the Director of ODOC, and Heidi Steward is the Deputy Director of ODOC. (*Id.* ¶¶ 12-13.) Mike Gower is ODOC's Assistant Director of Operations. (*Id.* ¶ 14.) Mark Nooth is ODOC's Eastside Institutions Administrator and is responsible for operations at six ODOC institutions, and Rob Persson is the Westside Institutions Administrator and is responsible for the remaining eight ODOC institutions. (*Id.* ¶¶ 15-16.) Ken Jeske is the Oregon Correctional Enterprises ("OCE") Administrator. (*Id.* ¶ 17.) Allen is the Director of OHA. (*Id.* ¶ 18.) Joe Bugher is the Assistant Director of Health Services for ODOC. (*Id.* ¶ 19.) Gary Russell is ODOC's Chief of Security. (*Id.* ¶ 20.)

## II.    PROCEDURAL HISTORY

Plaintiffs filed this action in April 2020. On May 12, 2020, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction, alleging that Defendants' response to the COVID-19 pandemic violated the Eighth Amendment. (ECF No. 14.) On June 1, 2020, the Court denied Plaintiffs' motion. (Prelim. Inj. Op. & Order, ECF No. 108.)

On June 26, 2020, Plaintiffs filed a Second Amended Complaint, alleging that Defendants (1) violated the Eighth Amendment by subjecting AICs to cruel and unusual punishment by failing to provide adequate care during the COVID-19 pandemic and by operating ODOC facilities without the capacity to treat, test, or prevent the spread of COVID-19, and (2) were negligent in failing to carry out proper preventative measures. (Sec. Am. Compl. ¶¶ 148-58, ECF No. 111.) On August 3, 2020, Defendants moved for partial summary judgment on the damages portion of Plaintiffs' Eighth Amendment claim and the entirety of Plaintiffs' negligence claim. (ECF No. 115.) On December 15, 2020, the Court granted in part and denied in part Defendants' motion. (Mot. Summ. J. Op. & Order, ECF No. 149.)

PAGE 3 – OPINION AND ORDER

On January 22, 2021, the Court granted Plaintiffs' motion to file a Third Amended

Complaint ("TAC"). The TAC proposed a third class of AICs (the Vaccine Class) and added

Allen as a defendant. (TAC ¶¶ 18, 21, ECF No. 160.)

On January 21, 2021, Plaintiffs moved for a preliminary injunction requiring ODOC to

offer all AICs housed in ODOC facilities a COVID-19 vaccine, and sought provisional class

certification of the Vaccine Class, which included: "All adults in custody housed at Oregon

Department of Corrections facilities (ODOC) who have not been offered COVID-19

vaccinations." (Pls.' Mot. to Certify Vaccine Class at 2, ECF No. 154; Pls.' Mot. Prelim. Inj.,

ECF No. 156.) On February 2, 2021, the Court granted Plaintiffs' motion for provisional class

certification of the Vaccine Class and motion for a preliminary injunction, ordering Defendants

to "offer all AICs housed in ODOC facilities, who have not been offered a COVID-19 vaccine, a

COVID-19 vaccine as if they had been included in Phase 1A, Group 2, of Oregon's Vaccination

Plan." (Mot. Prelim. Inj. Op. & Order at 34, ECF No. 178.)

On May 3, 2021, Plaintiffs filed a Fourth Amended Complaint. (Fourth Am. Compl.,

ECF No. 223.) Defendants moved to dismiss and to strike portions of the Fourth Amended

Complaint and requested leave to conduct additional discovery. (Defs.' Mot. to Dismiss and to

Strike, ECF No. 245.) Plaintiffs moved for an order dismissing plaintiff Micah Rhodes without

prejudice and asked the Court to compel Defendants to disclose the names of all AICs who had

received positive results on a COVID-19 antibody test. (Pls.' Mot. for Order of Dismissal, ECF

No. 249.)

On September 28, 2021, the Court granted in part and denied in part Defendants' motion

to dismiss, denied Defendants' motion to strike, granted in part Defendants' motion to compel,

granted Plaintiffs' request to compel, and granted Plaintiffs' motion to dismiss plaintiff Rhodes without prejudice. (Op. & Order, ECF No. 272.)

On October 5, 2021, Plaintiffs filed a Fifth Amended Complaint. (Fifth Am. Compl., ECF No. 273.) Following a status conference held on October 19, 2021, Plaintiffs filed the SAC on November 2, 2021. (SAC, ECF No. 282.)

On November 2, 2021, Defendants moved to dismiss Plaintiffs' claim for damages based on Defendants' alleged "fail[ure] to initially prioritize adults in custody for COVID-19 vaccine distribution." (Defs.' Mot. to Dismiss at 4, ECF No. 281; SAC ¶¶ 54-56, 88, 93(d).) On February 8, 2022, the Court denied Defendants' motion to dismiss as to Governor Brown and Director Allen and granted Defendants' motion with respect to the other defendants.[1] (Op. & Order, ECF No. 350.)

Specific to the present motion, Plaintiffs moved to certify the Damages Class and Wrongful Death Class (the "Class Certification Motion") on May 3, 2021. (Pls.' Mot. for Class Cert. ("Pls.' Mot.").) In addition to the declarations of Plaintiffs Hall and Sublet, Plaintiffs included in support of the Class Certification Motion the following documents:

- Declaration of David Sugerman ("Sugerman Decl.," ECF No. 204) (attaching Exs. 1-5);

- Declaration of Franz Bruggemeier ("Bruggemeier Decl.," ECF No. 205);

- Declaration of Felishia Ramirez ("Ramirez Decl.," ECF No. 206);

- Declaration of Gary Clift ("Clift Decl.," ECF No. 207);

- Declaration of Paul Maney ("Maney Decl.," ECF No. 208);

---

[1] On March 9, 2022, Governor Brown and Director Allen filed notices of appeal to the Ninth Circuit with respect to the Court's denial of Defendants' motion to dismiss. (ECF Nos. 367, 370.)

- Declaration of David Hart ("Hart Decl.," ECF No. 210);

- Declaration of Brian Thornburg ("Thornburg Decl.," ECF No. 212);

- Declaration of Adam Coopersmith ("Coopersmith Decl.," ECF No. 213);

- Declaration of Andrew Cadwallader ("Cadwallader Decl.," ECF No. 214);

- Declaration of Billy Shaffer ("Shaffer Decl.," ECF No. 215);

- Declaration of Devin Butler ("Butler Decl.," ECF No. 216);

- Declaration of Jamie Edgtton ("Edgtton Decl.," ECF No. 217);

- Declaration of Justin Phillips ("Phillips Decl.," ECF No. 219);

- Declaration of Michael Willingham ("Willingham Decl.," ECF No. 220); and

- Declaration of William Sellers ("Sellers Decl.," ECF No. 221).

On November 19, 2021, Plaintiffs filed a supplemental memorandum in support of the Class

Certification Motion. (ECF No. 285.)

On December 10, 2021, Defendants filed an opposition to the Class Certification Motion.

(Defs.' Opp'n, ECF No. 290.) In support of their opposition ("Opposition"), Defendants included

the following documents:

- Declaration of Molly Honoré ("Honoré Decl.," ECF No. 292) (attaching Exs. 1-28);

- Declaration of Dr. Rebecca Lubelczyk ("Lubelczyk Decl.," ECF No. 294) (attaching Exs. 1-3);

- Declaration of Dr. Todd Wilcox ("Wilcox Decl.," ECF No. 296) (attaching Exs. 1-3);

- Declaration of Dr. Kevin Cahill ("Cahill Decl.," ECF No. 297);

- Second Declaration of Dr. Kevin Cahill ("Second Cahill Decl.," ECF No. 298);

- Declaration of Julie Martin ("Martin Decl.," ECF No. 299);

- Declaration of Richard Ackley ("Ackley Decl.," ECF No. 301) (attaching Ex.1);

- Declaration of Stephanie Johnson ("Johnson Decl.," ECF No. 303) (attaching Ex. 1);

- Declaration of Christine Popoff ("Popoff Decl.," ECF No. 305) (attaching Ex. 1);

- Declaration of Theron Rumsey ("Rumsey Decl.," ECF No. 307) (attaching Ex. 1);

- Declaration of Douglas Sheppard ("Sheppard Decl.," ECF No. 309) (attaching Ex. 1);

- Second Declaration of Douglas Sheppard ("Second Sheppard Decl.," ECF No. 311) (attaching Ex. 1);

- Declaration of Kimberly Hendricks ("Hendricks Decl.," ECF No. 313) (attaching Ex. 1);

- Declaration of Josh Highberger ("Highberger Decl.," ECF No. 315) (attaching Ex. 1);

- Declaration of Brian Stephen ("Stephen Decl.," ECF No. 317) (attaching Exs. 1-2);

- Declaration of Patrick Mullen ("Mullen Decl.," ECF No. 318) (attaching Ex. 1);

- Declaration of Thomas McLay ("McLay Decl.," ECF No. 320) (attaching Ex. 1);

- Declaration of Tye Stewart ("Stewart Decl.," ECF No. 322) (attaching Ex. 1);

- Declaration of Jamie Miller ("Miller Decl.," ECF No. 324) (attaching Ex. 1); and

- Declaration of Sondra Nolan ("Nolan Decl.," ECF No. 325) (attaching Ex. 1).

On January 14, 2022, Plaintiffs replied to Defendants' Opposition (Pls.' Reply, ECF No. 338), and included the following documents:[2]

- Declaration of Tierra Valentine ("Valentine Decl.," ECF No. 339);

- Declaration of Elyse Kupfer ("Kupfer Decl.," ECF No 340);

- Declaration of Marc Stern ("Stern Decl.," ECF No. 341) (attaching Ex. 1);

- Declaration of Joellen Klohn ("Klohn Decl.," ECF No. 342) (attaching Ex. 1);

---

[2] With the exception of the Declaration of Elyse Kupfer, Plaintiffs filed the declarations in support of their reply under seal.

- Declaration of Mark Leymon ("Leymon Decl.," ECF No. 343) (attaching Ex. 1); and

- Declaration of Nadia Dahab ("Dahab Reply Decl.," ECF No. 344) (attaching Exs. 1-23).

Following oral argument on February 14, 2022, the parties filed supplemental briefing. (*See* Pls.' Mem. in Supp. of Class Cert. ("Pls.' Mem."), ECF No. 356; Defs.' Mem. in Opp'n to Class Cert. ("Defs.' Mem."), ECF No 358.)

## DISCUSSION

## I.    LEGAL STANDARDS

Plaintiffs seeking class certification must satisfy the requirements of FED. R. CIV. P. 23(a). *See Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Id.* (citation omitted). Under FED. R. CIV. P. 23(a), plaintiffs seeking class certification must satisfy four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Id.* "Class certification is proper only if the [district] court has concluded, after a 'rigorous analysis,' that [FED. R. CIV. P.] 23(a) has been satisfied." *Id.* at 542-43 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

Plaintiffs seeking class certification must also satisfy the requirements of at least one of the categories under FED. R. CIV. P. 23(b). *See id.* at 542. Here, Plaintiffs seek class certification of their claims under FED. R. CIV. P. 23(b)(3). (*See* Pls.' Mot. at 1, seeking an order certifying a class action under Fed. R. Civ. P. 23(b)(3).) Rule 23(b)(3) provides that class certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The following matters are "pertinent" to these findings: (1) "the class

members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." *Id.* Ultimately, however, a district court's "predominance analysis" under FED. R. CIV. P. 23(b)(3) "focuses on 'the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang*, 737 F.3d at 546 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*, 564 U.S. 338).

Plaintiffs "bear the burden of demonstrating that each element of [FED. R. CIV. P.] 23 is satisfied." *Gessele v. Jack in the Box, Inc.*, No. 3:10-cv-960-ST, 2013 WL 1326563, at *31 (D. Or. Jan. 28, 2013) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Although the Court's analysis under FED. R. CIV. P. 23 "will entail some overlap with the merits of the plaintiffs' underlying claim[s,]" the primary focus of the district court's analysis is "not on the merits of the plaintiffs' claims." *Id.* In resolving a dispute about whether class certification is proper, the district court "may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties." *Id.* (citing *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)).

## II.    ANALYSIS

### A.    The Proposed Classes

Plaintiffs seek to certify two classes. The Damages Class "includes all adults incarcerated in [ODOC] facilities who: (1) were incarcerated on or after February 1, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19; and (3) if they became incarcerated after February 1, 2020, tested positive or were otherwise diagnosed with

COVID-19 at least [fourteen] days after they entered ODOC custody." (Pls.' Mot. at 1.) The Wrongful Death Class "includes the estates of those adults incarcerated at ODOC facilities continuously since February 1, 2020, who died during the Wrongful Death Class period, and for whom COVID-19 caused or contributed to their death." (*Id.*)

## B.    Rule 23(a)'s Requirements

The Court begins by addressing whether Plaintiffs have satisfied the four requirements of FED. R. CIV. P. 23(a) (i.e., numerosity, commonality, typicality, and adequacy of representation) for the proposed classes.

### 1.    Numerosity

The proposed class must be "so numerous that joinder of all members is impracticable[.]" FED. R. CIV. P. 23(a)(1). "In the District of Oregon, as in many other districts, there is a 'rough rule of thumb' that [forty] class members is sufficient to meet the numerosity requirement." *McKenzie Law Firm, P.A. v. Ruby Receptionists, Inc.*, No. 3:18-cv-1921-SI, 2020 WL 1970812, at *4 (D. Or. Apr. 24, 2020) (citations omitted). Plaintiffs allege that both classes exceed forty members and therefore "numerosity may be presumed." (Pls.' Mot. at 17) (collecting cases).

#### a.    Damages Class

Plaintiffs allege that the proposed Damages Class consists of "over 3600 prisoners who were infected with COVID-19 while incarcerated in one of Defendants' facilities."[3] (Pls.' Mot. at 16.) Defendants do not dispute this allegation. Accordingly, Rule 23(a)(1)'s numerosity requirement is satisfied for the proposed Damages Class.

---

[3] As of April 1, 2022, the number of AICs who have been infected with COVID-19 while in ODOC custody has increased to 5,315. COVID-19 STATUS AT OREGON DEPARTMENT OF CORRECTIONS FACILITIES, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited Apr. 1, 2022).

b.        **Wrongful Death Class**

Plaintiffs allege that the proposed Wrongful Death Class "includes estates of [forty-two] prisoners who died in Defendants' custody and for whom COVID-19 caused or contributed to their death." (*Id.*) As of April 1, 2022, ODOC reports forty-five deaths of AICs who tested positive for COVID-19. (*See* COVID-19 STATUS AT OREGON DEPARTMENT OF CORRECTIONS FACILITIES, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited Apr. 1, 2022)). The Court finds that Plaintiffs have provided reliable evidence to demonstrate that the number of potential members of the class is sufficient to meet the numerosity requirement. *See Fox-Quamme v. Health Net Heath Plan of Or., Inc.*, No. 3:15-cv-01248-BR, 2017 WL 1034202, at \*6 (D. Or. Mar. 9, 2017) (finding that the plaintiff "must provide 'reliable evidence' to show the number of potential members of the class" (quoting *Smith v. City of Corvallis*, No. 6:14-cv-01382, 2016 WL 3193190, at \*10 (D. Or. June 6, 2016))).

Defendants argue that Plaintiffs fail to meet the numerosity requirement for the Wrongful Death Class because, as of November 19, 2021, Plaintiffs produced only twenty-two medical record authorization cards of AICs who died after being diagnosed with COVID-19. (Defs.' Opp'n at 41.) In Defendants' view, the Court's October 20, 2022, Scheduling Order limited the number of class members the Court could consider when determining numerosity to those whose authorization cards Plaintiffs received by November 19, 2021:

> Plaintiffs shall continue to attempt to contact the emergency contacts and family members of the decedents in the proposed Wrongful Death Class, to send them the Court-approved notice and medical records release authorization card, and counsel shall continue to produce any returned medical records authorization cards to counsel for Defendants upon receipt. Only authorization cards received and produced to counsel for Defendants by November 19, 2021 may be referenced in support of or opposition to the pending motion for class certification. However, decedents whose authorization cards are returned after November 19, 2021, shall not be excluded from the Wrongful Death Class, if certified.

(Scheduling Order ¶ 3, ECF No. 280.) Further, Defendants argue that two of those twenty-two potential members are currently pursuing wrongful death claims individually and that Plaintiffs fail to "suggest[] any reason why joinder of the remaining [twenty] decedents would be impractical." (Defs.' Opp'n at 41-42.) Finally, Defendants argue that upon an expert's inspection of the twenty-two sets of medical records, the number of potential members of the Wrongful Death Class is likely as few as seventeen. (Defs.' Mem. at 23.)

Plaintiffs respond that Defendants' arguments "are not consistent with this Court's order," and that the "Wrongful Death Class cannot arbitrarily be limited to the number of authorization cards that have been received and produced . . . by November 19." (Pls.' Reply at 27.) Plaintiffs also argue that joinder of the Wrongful Death Class members would be impracticable because the proposed members (i.e., estate representatives) are difficult to identify and reside in at least ten states. (*Id.*) Plaintiffs argue that the geographic dispersal of proposed class members and the economies of litigating "the issues common to each of the [forty-three] separate wrongful death claims" supports a finding that joinder is impracticable. (*Id.*)

Defendants' reliance on the Scheduling Order to defeat numerosity misinterprets the intent of the Court's order. At a status conference held on October 19, 2021, Defendants asked the Court for additional time to respond to Plaintiffs' Class Certification Motion. Defendants argued that they required sufficient time for an expert to review each decedent's medical records before responding to the motion. Plaintiffs objected to allowing more time for Defendants to respond because the Class Certification Motion had already been pending for nearly six months. The Court's order was a compromise to allow the case to move forward without further delay. It provided that the parties may only reference medical records received by a cutoff date in their support of or opposition to Class Certification Motion, but did not restrict the members of the

Wrongful Death Class based on the cutoff date. Defendants sought the medical records to attempt to show that COVID-19 did not cause the deaths of all forty-five AICs who died while infected with the virus. However, the proposed Wrongful Death class includes AICs who died in ODOC custody "for whom COVID-19 caused or contributed to their death." (Pls.' Mot. at 16.) If there was no other evidence of the number of AICs who died while infected with COVID-19, the Court would necessarily need to restrict the class to those decedents with accessible medical records, but here the Court cannot ignore ODOC's own admission that it has experienced "45 deaths of AICs who tested positive for COVID-19."[4] The parties dispute the primary cause of death for up to four of the twenty-two decedents whose medical records were returned by the cutoff date, but that is not enough to call numerosity into question where ODOC has already acknowledged forty-five deaths of AICs with COVID-19.

In any event, even if the Court limited its consideration to the twenty-two decedents for whom Plaintiffs received medical records authorization cards by the cutoff date, Plaintiffs submit that twenty-one of those twenty-two AICs qualify as members of the Wrongful Death Class under the proposed definition, which allows the Court to "reasonably infer that the size of the proposed class likely exceeds [forty] members." (Pls.' Reply at 26.) The Court agrees that the current record supports a reasonable inference that the number of Wrongful Death Class members is likely to exceed forty. The forty-five AIC deaths based on ODOC's own public reporting, and the records produced demonstrating that COVID-19 caused or contributed to a high percentage of these AIC deaths supports a reasonable inference that the Wrongful Death Class will exceed forty members. *See, e.g.*, *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501 (S.D. Cal.

---

[4] COVID-19 STATUS AT OREGON DEPARTMENT OF CORRECTIONS FACILITIES, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited Apr. 1, 2022).

2013) (finding that when "determining whether numerosity is satisfied, the Court may consider reasonable inferences drawn from the facts before it" (citing *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.5 (9th Cir. 1977))); *see also Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 380 (C.D. Cal. 2016) (finding numerosity met for a 23(b)(3) class and stating "Plaintiffs are 'not required to establish the precise number of class members, as long as common sense and reasonable inferences from the available facts show that the numerosity requirement is met'" (quoting *In re China Intelligent Lighting & Elecs., Inc.*, No. CV 11-2768 PSG SSX, 2013 WL 5789237, at *3 (C.D. Cal. Oct. 25, 2013))).

Further, the relevant factors support a finding that even with a class of fewer than forty members, joinder of the Wrongful Death Class members would be impracticable here. *See Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010) ("To satisfy the numerosity requirement under Rule 23(a), a proposed class must be so numerous that joinder of all members is impracticable." (quoting FED. R. CIV. P. 23(a))). The numerosity requirement "imposes no absolute limitations" and "requires examination of the specific facts of each case." *Gen. Tel. Co. of the Nw., Inc. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Courts may find that the numerosity requirement is met despite the size of the proposed class being less than forty. *See Rannis*, 380 F. App'x at 651 (stating that "[t]he Supreme Court's analysis in *General Telephone Co.* questioned the likelihood that a district court would certify a class of [twenty members]–it did not undermine a district court's discretion to do so" and collecting cases certifying classes with less than forty members).

Other factors that courts commonly consider when analyzing the practicality of joinder include: "ease of identifying and contacting class members, the geographical spread of class members, and the ability and willingness of individual members to bring claims, as affected by

their financial resources . . . and their fear of retaliation in light of the ongoing relationship with the defendant." *J.N. v. Or. Dep't of Educ.*, 338 F.R.D 256, 264 (D. Or. Feb. 5, 2021) (quoting *Chastain v. Cam*, No. 3:13-cv-01802-SI, 2016 WL 1572542, at *5 (D. Or. Apr. 19, 2016)); *see also Rannis*, 380 F. App'x at 651 (affirming the district court's finding that numerosity was satisfied with a class of twenty members and finding that, *inter alia*, the judicial economy of class treatment, financial burden on class members, and size of the plaintiffs' claims supported the finding); *Jordan v. L.A. Cnty.*, 669 F.2d 1311, 1319 (9th Cir. 1982) (finding numerosity satisfied for a class of thirty-nine because "[w]here the class is not so numerous . . . other factors such as geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought, should be considered in determining impracticality of joinder") *vacated on other grounds by* 459 U.S. 810 (1982).

Based on these factors, the Court finds that the judicial economy and efficiency of maintaining a class action for Plaintiffs' wrongful death claims weigh in favor of class treatment. The difficulty in identifying members of the Wrongful Death Class located across at least ten states supports a finding that joinder would be impracticable here. (*See* Kupfer Decl. ¶ 6, contacting emergency contacts or family members of sixteen AICs who died with COVID-19 while in ODOC custody who "reside across the country, including Oregon, Washington, New Mexico, Alabama, and Tennessee"; Valentine Decl. ¶ 4, contacting family members and emergency contacts of eleven AICs who died with COVID-19 who reside in "states including Oregon, Washington, California, Georgia, North Carolina, and Florida"). Other courts have found joinder to be impracticable based on similar geographic diversity. *See, e.g.*, *Tietz v. Bowen*, 695 F. Supp. 441, 445 (N.D. Cal. 1987) (finding proposed class of twenty-seven members sufficiently numerous because class members "are geographically diverse and, as

retirees, may not have the means to bring individual suits"); *McCluskey v. Trs. of Red Dot Corp. Emp. Stock Ownership Plan & Tr.*, 268 F.R.D. 670, 675 (W.D. Wash. 2010) (certifying a class of twenty-seven members and finding that joinder was impracticable because individual cases would overburden the courts, three of the class members lived outside of the forum state, and the class members had limited financial resources); *see also Martinez v. Helzberg's Diamonds Shops*, No. EDCV 20-1085 PSG (SHKx), 2021 WL 4730914, at *2 (C.D. Cal. Apr. 12, 2021) (certifying a class of thirty-one members in part because "requiring the class members to litigate their claims separately would be inefficient and costly, and would likely result in duplicative conflicting proceedings").

Further, a limited ability of the individual estates to file claims is reflected by the small number of estates that have filed wrongful death claims to date. (*See* Defs.' Opp'n at 41, noting that "[t]he estates of two of these [twenty-two] decedents are already pursuing wrongful death claims individually"); *cf. J.N.*, 338 F.R.D at 265 (finding numerosity was satisfied and noting it was a "reasonable inference [that] many families would likely find it difficult or impossible to pursue individual litigation" "due to economic limitations, limited availability of counsel, and other barriers such as lack of knowledge . . . and intimidating process") (quotation marks omitted).

For these reasons, the Court finds that the Wrongful Death Class is sufficiently numerous such that joinder would be impracticable, and Plaintiffs have satisfied the numerosity requirement.

### 2.    Commonality

To meet the commonality requirement, Plaintiffs "must show that the class members suffered the 'same injury'—that their claims depend upon a 'common contention.'" *McKenzie*, 2020 WL 1970812, at *4 (quoting *Wal-Mart*, 564 U.S. at 350). This common contention must

also "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). "Class members, however, need not have *every* issue in common: commonality requires only 'a single significant question of law or fact' in common." *Id.* (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012), and citing *Wal-Mart*, 564 U.S. at 359).

For both classes, Plaintiffs argue that there are several common questions of law and fact, including whether Defendants acted with deliberate indifference, were negligent, caused the Plaintiffs' injuries, or acted with callous disregard toward Plaintiffs' rights, and whether Plaintiffs suffered an injury and are entitled to an award of punitive damages. (Pls.' Mot. at 18.) Plaintiffs further argue that commonality is satisfied with respect to "admissibility of evidence, testimony, and applicable standards of proof." (*Id.*)

Defendants do not directly challenge the commonality requirement for either the Damages Class or the Wrongful Death Class. Instead, Defendants acknowledge that there is "'substantial overlap' between the [23(a)(2)] test for commonality . . . and the predominance test under Rule 23(b)(3)." (Defs.' Opp'n at 17) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010)). Defendants therefore focus their opposition on the predominance requirement, because "predominance is 'far more demanding' than commonality." (*Id.* at 19) (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).

The Court finds that Plaintiffs have met the commonality requirement for both the Damages Class and the Wrongful Death Class. As discussed in more detail in the Court's predominance analysis, common questions of law and fact predominate in this litigation. *See Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 157 (N.D. Cal. 2015) ("[A]ll members of the

putative class . . . have in common their alleged exposure to a substantial risk of serious future harm to which Defendants are allegedly deliberately indifferent, as a result of policies and practices that govern the overall conditions of health care services and confinement. While results of exposure may vary . . . each inmate suffers the same constitutional or statutory injury when exposed to a policy or practice that creates a substantial risk of serious harm."); *Chatman v. Otani*, No. 21-00268 JAO-KJM, 2021 WL 2941990, at *9 (D. Haw. July 13, 2021) ("Central to this lawsuit is Defendants' alleged failure to comply with its [COVID-19] Response Plan, and the resulting harm to DPS inmates/detainees. 'Numerous courts have concluded that the commonalty requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm.'" (quoting *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014))).

### 3.    Typicality

To satisfy the typicality requirement, Plaintiffs "must show that the named parties' claims or defenses are typical of the claims or defenses of the class." *McKenzie*, 2020 WL 1970812, at *5 (citing FED. R. CIV. P. 23(a)(3)). Under typicality's "permissive standards," the "representative's claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729 (9th Cir. 2020) (quoting *Hanlon,* 150 F.3d at 1020). In assessing "whether claims and defenses are typical, courts often look to 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *McKenzie*, 2020 WL 1970812, at *5 (quoting *Hanon*, 976 F.2d at 508).

Plaintiffs argue that the class representatives' claims satisfy the typicality requirement because "the claims of the named Plaintiffs are the same or similar to the claims of the members

of the proposed class[.]" (Pls.' Mot. at 20.) Defendants argue that the proposed class

representatives' claims or defenses cannot be typical of the class because the representatives

"were confined in just two of ODOC's [fourteen] institutions . . . located in a single, urban

county . . . even though the putative class members are housed in facilities located in [ten]

different counties throughout the state." (Defs.' Opp'n at 35-36.) Defendants assert that the

differences between facilities "will give rise to defenses against the claims of the proposed

representatives that may not be applicable to the claims of other members." (*Id.* at 36.)

Defendants rely on an expert report prepared by Dr. Kevin E. Cahill to claim that "statistical

models show that the facility where an AIC was housed is the most significant predictor of a

positive C[OVID]-19 diagnosis." (*Id.*) (citing Cahill Decl. ¶¶ 51-52).

Plaintiffs respond that their claims "are not institution-specific" and "[b]ecause they arise

from centralized decisions, actions, and inaction that affected each ODOC institution in similar

ways, each representative's claim is the same or similar to that of every other class member."

(Pls.' Reply at 29.) Plaintiffs claim that "Defendants were aware of the widespread failures to

implement and enforce [COVID-19 safety] policies, but failed to take meaningful action in

response." (*Id.* at 28.) Further, Plaintiffs argue that the timing and prevalence of COVID-19 in

each institution is irrelevant to the typicality analysis and that Defendants' expert report "suffers

from both legal and analytical flaws[.]" (*Id.* at 29-30.)

The Court finds that the class representatives' claims are "reasonably co-extensive" with

the claims of the putative class members and therefore satisfy the typicality requirement. All

representatives are current or former AICs in ODOC facilities during the relevant period,[5]

---

[5] Or, in the case of the Wrongful Death Class, the class representative represents the
estate of an AIC who was incarcerated at the relevant time.

suffered the same injury of contracting COVID-19, and were all subject to the same alleged

failures to take meaningful action in response to COVID-19. Importantly, the class

representatives, like the rest of the putative class members, are challenging the decisions and

actions taken by the "centralized decision makers," not the individual facilities' policies. (*Id.* at

28.) Thus, typicality is satisfied here. *See, e.g.*, *Hanon*, 976 F.2d at 508 ("Typicality refers to the

nature of the claim or defense of the class representative, and not to the specific facts from which

it arose or the relief sought." (quoting *Weinberger v. Thornton*, 114 F.R.D. 599, 603 (S.D. Cal.

1986))); *see also Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 451-52 (D. Conn. 2020)

(finding typicality requirement was satisfied because "the process at issue is applicable to all

inmates" and "each member's claim arises from the same course of events—the establishment

and operation of this process [regarding home confinement and compassionate release]—and

each class member makes similar legal arguments to prove the defendant's liability") (citation

omitted).

#### 4.    Adequacy of Representation

"Rule 23(a)(4) states that before a class can be certified, a court must find that 'the

representative parties will fairly and adequately protect the interests of the class.'" *McKenzie*,

2020 WL 1970812, at *6 (quoting FED. R. CIV. P. 23(a)(4)). The adequacy of representation

requirement "turns on two questions: (1) whether 'the named plaintiffs and their counsel have

any conflicts of interest with other class members'; and (2) whether 'the named plaintiffs and

their counsel [will] prosecute the action vigorously on behalf of the class.'" *Id.* (quoting *Hanlon*,

150 F.3d at 1020).

Plaintiffs submit evidence of their counsels' experience litigating class actions and

complex cases, including cases on behalf of AICs. (Sugerman Decl. ¶¶ 2-11.) Defendants do not

challenge the adequacy of Plaintiffs' counsels' ability to prosecute this case on behalf of the

proposed classes, and the Court finds that Plaintiffs' counsel satisfies Rule 23(a)(4)'s adequacy requirement. Defendants do, however, challenge the adequacy of the named Plaintiffs' representation of the proposed class members.

### a.    Damages Class

Defendants argue that there are serious conflicts of interest between several class representatives and members of the proposed class that preclude certification. (Defs.' Opp'n at 36.) Defendants claim that representatives Hall, Ramirez, and Maney are not seeking damages, which "raise[s] serious doubt[s] about the ability of these plaintiffs to adequately represent class members seeking compensatory damages." (*Id.* at 36-37.) Further, Defendants argue that representatives Clift and Ramirez have not demonstrated the necessary engagement and familiarity with the claims to adequately represent the class.[6] (*Id.* at 37-38.)

Plaintiffs respond that the class representatives' interests "are not antagonistic to the members of the class." (Pls.' Reply at 33.) Specifically, Plaintiffs argue that representative Hall testified that he is serving as class representative "in part to hold Defendants accountable for their actions." (*Id.* at 32) (citing Dep. of Theron Hall ("Hall Dep.") at 59:5-7, ECF No. 291-1, Ex. 21). Plaintiffs note that under these circumstances, "compensatory and punitive damages . . . are the primary measure of accountability available to [the representatives] and the members of the class." (*Id.* at 32-33.) Plaintiffs argue that Maney is also seeking relief that is consistent with the nature of relief being sought on behalf of the proposed class, namely, "compensatory

---

[6] Plaintiffs did not move to include plaintiff Sublet as a class representative, despite her testimony that she contracted COVID-19 while incarcerated at Coffee Creek Correctional Facility and that she is prepared to represent the Damages Class. (Sublet Decl. ¶¶ 3-8.) Plaintiffs will need to file a separate motion to appoint Sublet if her exclusion was inadvertent. Plaintiffs also did not move to include plaintiff Nulph as a class representative, and there is no evidence in the record that Nulph contracted COVID-19 while incarcerated at an ODOC facility.

damages to recover for harms . . . suffered from Defendants' deliberate disregard of their rights, health, and safety." (*Id.* at 33-34.) Plaintiffs also argue that the class representatives have demonstrated an adequate level of knowledge and engagement to pass the relatively low bar set by Rule 23(a). (*Id.* at 34.)

1)    Conflicts of Interest

"Generally, the adequacy inquiry seeks to ensure that the class representative is 'part of the class and [that he] possess[es] the same interest and injury as the class members.'" *Aldapa v. Fowler Packing Co., Inc.*, 323 F.R.D 316, 328 (E.D. Cal. 2018) (quoting *Amchem*, 521 U.S. at 625-26). When assessing adequacy under Rule 23(a), "[o]nly conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the . . . adequacy requirement." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (quotation omitted). A conflict is considered "fundamental when it goes to the specific issues in controversy." *Id.*

Defendants rely on deposition testimony to argue that several of the proposed class representatives are not seeking monetary relief. (Defs.' Opp'n at 36-37.) Defendants suggest that some representatives are more interested in seeking declaratory or injunctive relief. (*See id.* at 37, stating that Maney "is seeking, essentially, medical monitoring").

 The Court finds that the proposed class representatives do not have a fundamental conflict of interest that would preclude them from adequately representing the interests of the Damages Class.

First, isolated comments in a deposition indicating that money is not the primary motivation for some Plaintiffs' participation as named representatives does not create a fundamental conflict of interest between the representatives and the rest of class. *See Hernandez, 305 F.R.D. at 161* (stating that "minor disagreements between various class representatives'

PAGE 22 – OPINION AND ORDER

individual beliefs regarding appropriate remedies do not render the class representatives inadequate"). Nor do those passing comments sufficiently establish that those representatives are not going to seek the compensatory damages they requested in the SAC. *See id.* ("[I]nconsistent deposition testimony in and of itself will not serve as a ground for denial of class certification.") (citation omitted).

Second, Defendants cite *Tria* in support of their assertion that the deposition testimony creates a "serious conflict between the proposed representatives and the members of the proposed class" (Defs.' Opp'n at 36), but Defendants' reliance on *Tria* is misplaced. In *Tria*, the court addressed and expressly rejected this same argument. *See Tria v. Innovation Ventures, Inc.*, No. CV 11-7135-(GW(PJWx), 2013 WL 12324181, at *5 (C.D. Cal. Feb. 25, 2013). The defendant in *Tria* argued that the plaintiff was not seeking monetary relief because she testified that the case "[was] 'not about the money.'" *Id.* The court declined to adopt the defendants' assertion that those comments demonstrated that the plaintiff was not seeking monetary relief because "the Court view[ed] [the plaintiff's] testimony only to indicate that money is not a primary concern of hers in the action . . . not that she has abandoned her request for it." *Id.* So too here.

Finally, Defendants' assertion that Maney's testimony establishes that he is only seeking "medical monitoring" as in *Amchem* is undermined by the context of his testimony. Maney's answer was in response to a question specifically asking him what he is seeking *other than damages*. (*See* Dep. of Paul Maney ("Maney Dep.") at 30:5-10, ECF No. 291-1, Ex. 17, asking Maney "Is there, aside from damages, put that aside, is there something you are seeking in terms of how the [ODOC], or more specifically how the [OSCI] is operated in order to ensure that you are safe?"). It is by no means an abandonment of Maney's claim for damages that a question

asking about relief other than damages would warrant a response relating to relief other than damages.

For these reasons, the Court finds that the proposed representatives of the Damages Class do not have fundamental conflicts of interest that prevent them from adequately representing the interests of the class.

### 2)    Adequate Knowledge and Engagement

"The threshold of knowledge required of a Class Representative is not particularly high." *Chehalem Physical Therapy, Inc. v. Coventry Health Care Inc.*, No. 09-cv-00320-HU, 2013 WL 12320086, at *10 (D. Or. Apr. 16, 2013) (citing *Morelock Ent., Inc. v. Weyerhaeuser Co.*, No. CV 04-583-PA, 2004 WL 2997526, at *4 (D. Or. Dec. 16, 2004)). A representative is found to be inadequate only if they are "startlingly unfamiliar" with the case. *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004). "Those courts that have found representatives inadequate have done so because the plaintiffs knew nothing about the case and completely relied on counsel to direct the litigation." *Id.* (citing *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994)).

Defendants argue that Clift's understanding of his responsibilities as a class representative and knowledge of the claims are insufficient to adequately represent the absent class members. (Defs.' Opp'n at 37-38.) The Court disagrees.

Clift's testimony reflects a general understanding of the claims and several of the parties involved in this case. (*See* Dep. of Gary Clift ("Clift Dep.") at 26:16-28:25, ECF No. 291-1, Ex. 8, identifying several of the original defendants and describing the claims generally; *see also* Clift Decl. ¶¶ 4-7.) Clift's testimony also demonstrates an intention to stay informed about the case and its developments. (*See* Clift Decl. ¶¶ 4, 6-7, testifying he "understand[s] the claims in the case and [is] keeping informed about the progress of the case," is "willing and able to serve

as a class representative," and "[i]f appointed, . . . will put the interests of the class first"; Clift

Dep. at 114:7, testifying that one of his responsibilities as class representative is to "see what [the

lawyers] are up to"). On this record, the Court finds that Clift has demonstrated sufficient

knowledge and engagement to adequately represent the interests of the members of the proposed

Damages Class. *See Chehalem*, 2013 WL 12320086, at *10 (finding that adequacy was satisfied

because the plaintiff had an "adequate understanding of the facts underlying [the] claim, and has

affirmed his commitment to working with his counsel as class representative"); *Lewis v. First*

*Am. Title Ins. Co.*, 265 F.R.D. 536, 558 (D. Idaho 2010) (finding that adequacy was satisfied

because the plaintiff demonstrated "an adequate understanding of this litigation, the facts that

gave rise to the underlying action and a clear idea of her expectations of resolution"); *In re*

*Worlds of Wonder Sec. Litig.*, No. C 87 5491 SC, 1990 WL 61951, at *3 (N.D. Cal. Mar. 23,

1990) (finding that the named plaintiffs were adequate to represent the class because they

"appear familiar with the basic outline of this action in that they understand the gravamen of the

claims in the Complaint").

The Court finds that the proposed representatives have demonstrated adequate knowledge

and engagement in this case to represent the interests of the Damages Class.

### b.    Wrongful Death Class

Defendants repeat many of the same arguments with respect to the adequacy of the

Wrongful Death Class representative. Defendants argue that Ramirez, representing the estate of

AIC Tristan, is not seeking monetary relief, relying on deposition testimony indicating she is

primarily interested in seeking accountability for her uncle's death. (Defs.' Opp'n at 36-37; *see*

*also* Dep. of Felishia Ramirez ("Ramirez Dep.") at 45:21-24, ECF No. 291-1, Ex. 24.) For the

same reasons explained above, the Court finds that Ramirez's comments do not create a

fundamental conflict of interest.

Defendants also argue that Ramirez has not demonstrated the necessary engagement and familiarity with the claims adequately to represent the interests of the absent Wrongful Death Class members. (Defs.' Opp'n at 36-38.) As previously discussed, the requisite level of knowledge and engagement is "not particularly high." *Chehalem*, 2013 WL 12320086, at \*10. The record reflects that Ramirez has a general understanding of the claims and issues of this case, has declared that she is aware of the claims and her responsibilities as representative, and she is willing and able to serve in that role. (*See* Ramirez Dep. at 64:4-8, testifying that "[Governor Brown]'s the one that makes the executive orders for them to get vaccinated and did not approve that originally. Had she done that, maybe it would have not been so many deaths. Maybe things would have played different"; *see also* Ramirez Decl. ¶¶ 3-4, 8, "[Ramirez has] been informed of the responsibilities of a class representative [and] understand[s] the claims in this case" and is "able and willing to serve as a representative"). The Court finds that Ramirez has the knowledge and engagement necessary to adequately represent the Wrongful Death Class.

Defendants also argue that Ramirez is not an adequate representative of the Wrongful Death Class because she will be subject to unique defenses that "would 'threaten to become the focus of the litigation.'" (Defs.' Opp'n at 38-39) (citing *Hanon*, 976 F.2d at 508). Specifically, Defendants argue that Ramirez's "appointment as personal representative to the Estate of Juan Tristan was potentially improper . . . and thus her standing to pursue a claim for his wrongful death[]is subject to attack[.]" (*Id.*) Plaintiffs respond that Ramirez was properly appointed by the probate court, "[b]ut even if there were irregularities in the probate proceedings, this Court would not be the forum in which to challenge those irregularities; thus, no such 'unique defenses'" threaten this litigation. (Pls.' Reply at 35-36.) Specifically, Plaintiffs argue that the

"probate exception," well recognized by courts within this circuit,[7] "prohibits federal courts from interfering with a state probate proceeding by entertaining challenges to the appointment of the personal representative." (*Id.* at 36-37) (citing *Jones v. Harper*, 55 F. Supp. 2d 530, 533 (S.D. W. Va. 1999)).

The Court agrees that any potential challenge to Ramirez's appointment by estate beneficiaries falls under the probate exception and is outside the jurisdiction of this Court. *See Simmers v. King Cnty.*, No. 2:21-cv-00100-RAJ-JRC, 2021 WL 1907820, at *2 (W.D. Wash. May 12, 2021) ("Appointing a personal representative is clearly administration of the estate" (citing *Jones*, 55 F. Supp. 2d at 533-34)).

In any event, Defendants' arguments are speculative. Defendants have not challenged Ramirez's standing in this litigation, and oppose Ramirez's appointment on the ground that she *might* not have standing in the future *if* Tristan's beneficiaries challenge her appointment *and* secure a favorable judgment removing her as personal representative.[8] (Defs.' Mem. at 24, arguing that "Ms. Ramirez was possibly improperly appointed [as] personal representative and is subject to removal by Juan Tristan's beneficiaries if they decide they would like to have a say in the outcome of this litigation"). The Court finds that Defendants' speculation as to Ramirez's appointment does not preclude her from serving as class representative of the Wrongful Death

---

[7] *See Hassanati ex rel v. Int'l Lease Fin. Corp.*, 643 F. App'x 620, 622 (9th Cir. 2016) ("The district court correctly determined that appointment of a personal representative falls within the probate exception because it, essentially, seeks that a court issue letters of administration." (citing *In re Marshall*, 392 F.3d 1118, 1132-33 (9th Cir. 2004), *rev'd on other grounds* 547 U.S. 293 (2006))).

[8] Plaintiffs dispute Defendants' assertion that Ramirez's appointment was improper. (*See* Pls.' Reply at 35, arguing "[a]s a foundational matter, the state probate court properly appointed Ramirez as personal representative of Juan Tristan's estate") (citing OR. REV. STAT. § 113.085).

Class.[9] *See Ferguson v. Smith*, No. 3:18-cv-00372-SB, 2020 WL 5731821, at *10 (D. Or. Aug. 12, 2020) (finding that speculative attacks on adequacy were insufficient to disqualify the plaintiff from serving as class representative); *see also DVD-Rental Antitrust Litig.*, 779 F.3d at 942 ("[W]e do not favor denial of class certification on the basis of speculative conflicts.") (citation omitted).

In summary, the Court finds that Ramirez has satisfied the adequacy requirement under Rule 23(a)(4).

### 5.    Conclusion

For all of these reasons, the Court finds that Plaintiffs have satisfied FED. R. CIV. P. 23(a)'s requirements for the proposed Damages Class and the proposed Wrongful Death Class.

### C.    Rule 23(b)(3)'s Requirements

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: [c]ommon questions must predominate over any questions affecting only individual members, and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615 (simplified). The inclusion of Rule 23(b)(3) and its "predominance" and "superiority" requirements allows courts to certify cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated,

---

[9] Further, even if this hypothetical sequence of events were to occur, the Court could substitute a new class representative at that time. *See Vaccarino v. Midland Nat'l Life Ins. Co.*, No. CV 11-5858 CAS (MANx), 2013 WL 3200500, at *8 (C.D. Cal. June 17, 2013) (rejecting opposition to certification due to potential statute of limitations defense against class representative and finding that the defendant's "circumstantial showing" would not become "a major focus at trial" because "[i]f in fact this issue becomes unduly preoccupying, a new class representative may be substituted at a later date").

without sacrificing procedural fairness or bringing about other undesirable results." *Id.* (citation omitted).

### 1.    Predominance

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). "'[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016)). However, a district court's predominance inquiry is not "a matter of nose-counting." *Id.* (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165-66 (9th Cir. 2014)). Rather, "more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Id.*

Plaintiffs argue that "the same liability and causation questions exist with respect to each of the claims for all 3600 members of the Damages Class [and] . . . with respect to the [forty-two] members of the Wrongful Death Class." (Pls.' Mot. at 23.) Specifically, Plaintiffs allege that common questions include: (1) whether Defendants acted with deliberate indifference to the rights of Plaintiffs and members of the Damages and Wrongful Death Classes; (2) whether Defendants were negligent in the manner set forth in the Sixth Amended Complaint; (3) whether Plaintiffs and members of the Damages and Wrongful Death Classes suffered injury; (4) whether Defendants' conduct caused the injuries that Plaintiffs and members of the Damages and Wrongful Death Classes suffered; and (5) whether Defendants acted with callous disregard

toward the rights of Plaintiffs and members of the Damages and Wrongful Death Classes. (*Id.* at 18.)

Defendants argue that "questions common to the classes will be incapable of predominating over questions affecting individual members" for numerous reasons, including "the institutions in which [each class member was] confined, the circumstances that resulted in [the class member] contracting C[OVID]-19, and the nature and extent of their injuries." (Defs.' Opp'n at 18.)

### a.    Different ODOC Facilities

Defendants submitted a large volume of evidence detailing the differences at each of ODOC's fourteen facilities, including details such as the year each facility was constructed, inches between bunks, and the structure of the mess-hall and med-line, in an effort to demonstrate the number of individual questions relevant to each proposed class member's claims. (*Id.* at 1-12.) Defendants characterize Plaintiffs' claims as based on "what [Plaintiffs] perceive to be [D]efendants' failure to implement and enforce a diverse and disparate list of evolving policies and protocols at [fourteen] different institutions over the course of the now [twenty]-month pandemic." (*Id.* at 1.) However, as discussed above, Plaintiffs do not base their claims on facility-specific failures, nor do they name individual facility superintendents as defendants. Rather, Plaintiffs' claims are based on Defendants' centralized decision-making regarding COVID-19 policies, procedures, and decisions common to all ODOC institutions. (*See* Pls.' Reply at 2; *see also* SAC ¶¶ 72-73, 93, 101, 105-06.)

Plaintiffs have presented evidence that Defendants were responsible for the creation and implementation of centralized policies and procedures related to ODOC's handling of COVID-19. (*See* Pls.' Mot. at 6-14; Pls.' Reply at 2-3.) Specifically, on March 2, 2020, the "State Emergency Coordination Center" ("ECC") became active and focused on addressing the

statewide response to the COVID-19 pandemic. (Decl. of Heidi Steward ("Steward Decl.") ¶ 10, ECF No. 83.) Two ODOC employees were at the ECC "every day, which ensure[d] that ODOC is connected with the statewide response and, conversely, that the ECC team understands ODOC's daily resource needs." (*Id.*)

On March 4, 2020, ODOC activated the ODOC Agency Operations Center (the "AOC") "to fight the spread of the coronavirus." (*Id.* ¶ 11.) The AOC "work[ed] all day long, sometimes around the clock" and "me[t] with representatives from each of the [ODOC] institutions" "[e]very morning." (*Id.* ¶ 12.) The AOC had bi-weekly meetings with OHA to coordinate the response to COVID-19. (*Id.* ¶ 17.) Superintendents at each ODOC facility communicated with the AOC regarding facility-specific circumstances that affected implementation of the AOC's policies and practices. (*See* Dep. of Susan Washburn at 96:4-6, ECF No. 291-1, Ex. 6 ("When we make changes to our normal operation plans, we have to write those up and funnel them through [the] AOC, and then we get approval[.]"); Dep. of Joshua Highberger at 46:7, ECF No. 291-1, Ex. 7 ("We get plans approved.")). The AOC was ultimately responsible for the decision-making and implementation of the high-level COVID-19 policies and practices across ODOC facilities. (*See* Dep. of Heidi Steward at 12:9-12, ECF No. 291-1, Ex. 2 ("[O]ur [AOC] briefs me regularly. And when they need a high-level policy decision made or information communicated to our employees, I will do that.")). The record reflects that, despite varying levels of implementation, the AOC was the source of all high-level policies and practices related to COVID-19, and any variation to those uniform policies was subject to the AOC's approval. (*See* Dep. of Brandon Kelly at 19:17-20-5, ECF No. 291-1, Ex. 5 ("[The AOC] send[s] out direction, as if there is agency direction that we're all going to adhere to, yes, they make that decision and policy, and we implement it . . . we report back to [the AOC] how we will implement . . . and then they're

the final approver of that operation."); Martin Decl. ¶ 43 ("Shutter Creek developed C[OVID]-19-related health and safety protocols and submitted a plan to ODOC for approval.")).

Defendants argue that Plaintiffs have not presented "sufficient evidence" to support the allegation that each class member's COVID-19 infection was "traceable to a single proximate cause or [is] the result of exposure to 'uniform conduct[.]'" (Defs.' Opp'n at 24.) Defendants claim that the "*only* evidence" to support Plaintiffs' assertion that uniform COVID-19 policies and practices were centralized "is a two-question exchange during the deposition of Susan Washburn, the Superintendent of Eastern Oregon [Correctional Institution]." (*Id.*) Susan Washburn did, in fact, testify that "any decision related to COVID . . . ran through the AOC" and confirmed that the policies and practices were centralized through the AOC. (*See, e.g*., Steward Decl. ¶ 18 ("On April 28, 2020, ODOC finalized its centralized plan for COVID-19.")). However, as discussed above, this testimony is not the only evidence in the record to support Plaintiffs' assertion.

Defendants also argue that courts often refuse to certify classes under Rule 23(b)(3) for claims alleging the improper implementation of uniform policies. (Defs.' Opp'n at 24) (quoting *Smentek v. Sheriff of Cook Cnty.*, No. 1:09-cv-00529, 2014 WL 7330792, at *10 (N.D. Ill. Dec. 22, 2014)). Defendants argue that "implementation and enforcement of policy involves numerous individualized decisions and action that do not result in the type of uniform conduct that is key to satisfying predominance." (*Id.*) (citing *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 559 (9th Cir. 2019)). The Court disagrees.

Courts consistently certify classes where common questions predominate, including where class members' claims are based on a centralized policy or procedure, even when those policies or procedures are filtered down through multiple layers of implementation and

management. *See, e.g.*, *Jimenez*, 765 F.3d at 1162-63 (affirming certification of 800 employees

spread out over thirteen offices that were "individually managed but under centralized

leadership" where allegations were based on common questions including whether defendants

"stood idly by" while management violated company policy); *see also Brown v. Abercrombie &*

*Fitch Co*., No. CV141242JGBVBKX, 2015 WL 9690357, at *11 (C.D. Cal. July 16, 2015)

(certifying classes of employees across all Abercrombie & Fitch stores in California based on the

theory that the parent company defendants had a "formal written policy of not requiring

employees to purchase Abercrombie clothes" but knowingly allowed store managers to violate

the policy). The "uniform conduct" that Defendants argue is missing here is central to Plaintiffs'

claims: that Defendants knew their systemwide COVID-19 policies and practices were

ineffective or were not properly implemented or enforced. A jury will decide whether Plaintiffs

succeed on their theory of the case, but Plaintiffs have sufficiently demonstrated based on their

theory of liability that they could establish liability by common, class-wide proof and that

common questions predominate here.

### b.    Causation

Defendants also argue that individual inquiries will be necessary to determine the specific

cause of each proposed class member's injury. (Defs.' Opp'n at 23.) Defendants claim that

certification is improper because Plaintiffs "do not contend . . . that the putative class members

contracted C[OVID]-19 from a single 'superspreader' event." (*Id.*) Defendants argue that the

class members' injuries are not "attributable to any 'single proximate cause' that 'applies equally

to each potential class member and each defendant.'" (*Id.*) (quoting *In re N. Dist. of Cal., Dalkon*

*Shield IUD Prod. Liab. Litig*., 693 F.2d 847, 853 (9th Cir. 1982)). Defendants claim that "each of

these AICs has a unique story about how they contracted C[OVID]-19, which policies impacted

them, and whether [D]efendants' conduct concerning those policy decisions or implementation

was deficient in light of the information and resources available to [D]efendants at that point in time." (Defs.' Mem. at 9.) At oral argument, Defendants' counsel claimed that expert testimony would likely be necessary for each individual AIC to prove causation.

1)    Deliberate Indifference Claims

Defendants' arguments relating to causation rely on a fundamental misunderstanding of Plaintiffs' claims and the common issues that predominate this litigation. As previously discussed, Plaintiffs do not allege that contracting COVID-19 was related to any single event, but rather that Defendants' policies common to all institutions failed system-wide throughout the proposed class period, not that their policies failed only at a particular institution or during a particular time period. Thus, Defendants' arguments that Plaintiffs must prove which specific policy at a specific institution caused each class member to become infected with COVID-19 at a particular point in time misconstrues Plaintiffs' theory of liability.

Further, Defendants' theory of causation is inconsistent with Eighth Amendment jurisprudence. The law is clear that where a plaintiff alleges an Eighth Amendment violation, "proving direct causation by affirmative action is not necessary[.]" *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)); *see also Farmer*, 511 U.S. at 842 ("[An] Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."). For example, in *Clem*, the Ninth Circuit reversed and remanded a jury's verdict in favor of a defendant prison official because a jury instruction required a finding that the defendant "disregarded" a substantial risk of serious harm to the plaintiff *and* that the defendant took action that directly caused the plaintiff's harm, which "improperly add[ed an] extra element to [the plaintiff's] burden[.]" *Clem*, 566 F.3d at 1182.

The Ninth Circuit recently affirmed a district court's certification of a class of AICs under Rule 23(b)(2) for alleged systemic violations of the AICs' Eight Amendment rights related to healthcare and conditions of confinement by the Arizona Department of Corrections ("ADC"). *See Parsons*, 754 F.3d at 672-73. The district court found that "the evidence [suggested] that the root cause of the injuries and threats of injuries suffered by Plaintiffs is the systemic failures in the provision of health care generally." *Id.* Similar to Defendants here, the *Parsons* defendants argued that the Rule 23 requirements were not satisfied because "a systemic constitutional violation of the sort alleged . . . is a collection of individual constitutional violations, each of which hinges on the particular facts and circumstances of each case." *Id.* at 675. The Ninth Circuit rejected the argument, holding that it was based on a "fundamental misunderstanding of [the Supreme Court's decision in] *Wal-Mart*, Eighth Amendment doctrine, and the plaintiffs' constitutional claims." *Id.* at 675-76 (citing *Wal-Mart*, 564 U.S. 338). The Court reasoned that the defendants' argument "amounts to a sweeping assertion that . . . Eighth Amendment claims can never be brought in the form of a class action"[10] *Id.* at 676; *see also Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 1978) ("The requisite causal connection [for Section 1983 claims] may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms.") (citation omitted). The Ninth Circuit recognized that, contrary to the

---

[10] In related cases that dozens of AICs have recently filed in Oregon state court, ODOC relied on *Parsons* to argue that the individual cases should be consolidated because common issues related to alleged deficiencies in ODOC's handling of the COVID-19 pandemic predominate over individual inquiries. (*See* Decl. of Nathan Riemersma ¶ 5; Ex. 1, ECF No. 366 (Marion County Court Case No. 20CV26588, Defendant's Motion to Consolidate at 4 n.3, 5, arguing that cases related to ODOC's COVID-19 response should be consolidated because "common questions of law and fact predominate" and citing *Parsons* to argue that "Eighth Amendment medical claims such as the ones in this case are frequently heard together")).

defendants' characterization, the plaintiffs' "Complaint [did] not allege that the care provided on any particular occasion to any particular inmate (or group of inmates) was insufficient . . . but rather that ADC policies and practices of statewide and systemic application expose[d] all inmates in ADC custody to a substantial risk of serious harm." *Parsons*, 754 F.3d at 676; *see also Hernandez*, 305 F.R.D. at 157 ("[A]ll members of the putative class . . . have in common their alleged exposure to a substantial risk of serious future harm to which Defendants are allegedly deliberately indifferent, as a result of policies and practices that govern the overall conditions of health care services and confinement. While results of exposure may vary . . . each inmate suffers the same constitutional or statutory injury when exposed to a policy or practice that creates a substantial risk of serious harm."). Similarly here, Plaintiffs allege that Defendants' statewide policies, practices, and decisions exposed all class members to a substantial risk of serious harm.

Defendants rely on *Fraihat v. U.S. Immigration and Customs Enforcement*, 16 F.4th 613 (9th Cir. 2021), characterizing the court as holding that "systemwide injunctive relief could not be granted based on circumstances at individual detention facilities in light of material differences across the facilities" to argue that "anecdotal evidence of individual ODOC employees wearing masks incorrectly cannot justify a finding of systemwide deficiency." (Defs.' Mem. at 7) (citing *Fraihat*, 16 F.4th at 645). In *Fraihat*, the Ninth Circuit reversed a district court's preliminary injunction regarding COVID-19 policies across all Immigration and Customs Enforcement ("ICE") facilities in the country. *Fraihat*, 16 F.4th at 619. Five detainees housed at three of 250 ICE detention centers challenged ICE's nationwide COVID-19 policies and directives, and asked the court "to assume control over the top-level policies governing ICE's efforts to combat the viral outbreak." *Id.* The Ninth Circuit found that to succeed, "plaintiffs

needed to come forward with evidence of constitutional and statutory violations on a programmatic, nationwide level" and that the "plaintiffs ha[d] not shown that ICE acted with deliberate indifference in issuing extensive nationwide directives that sought to mitigate the very health risks that plaintiffs claim ICE recklessly disregarded." *Id.* In contrast here, Plaintiffs have adequately alleged that Defendants acted with deliberate indifference by failing to implement and enforce COVID-19 policies on a statewide basis. *See, e.g.*, *Plata v. Newsom*, No. 01-cv-01351-JST, 2021 WL 5410608, at *1 (N.D. Cal. Nov. 17, 2021) (distinguishing the defendants' reliance on *Fraihat* to challenge an order requiring mandatory COVID-19 vaccines, and finding that "the record in this case now establishes deliberate indifference . . . in ways that were not present in *Fraihat*" including evidence "undercutting Defendants' . . . contention that other COVID-prevention measures [aside from vaccines] are sufficient to reasonably protect Plaintiffs").

Whether Plaintiffs can prove their causation theory will be up to the jury, but Defendants' position on what they believe Plaintiffs cannot prove at trial does not defeat predominance here. *See Amador v. Baca*, 299 F.R.D. 618, 629 (C.D. Cal. 2014), *on reconsideration*, No. CV-10-1649 SVW, 2014 WL 10044904 (C.D. Cal. Dec. 18, 2014) ("The questions of law and fact common to the determination of whether defendants are liable to the proposed class members for constitutional violations, based on the shared characteristics of the [purportedly unconstitutional searches conducted by the defendants], clearly predominate over any questions affecting only individual members.").

### 2)    Negligence Claims

Defendants' arguments that individual inquiries are necessary to prove causation for Plaintiffs' negligence claims rely on the same authorities. (*See* Defs.' Mem. at 3-4, 6-8.) As

discussed above, individual questions of causation do not predominate Plaintiffs' negligence claims.

Under Oregon law, a defendant's conduct is negligent if it "unreasonably created a foreseeable risk of harm" to the plaintiff. *Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987) ("[T]he issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."); *see also Martin for C.M. v. Hermiston Sch. Dist. 8R*, 499 F. Supp. 3d 813, 839 (D. Or. 2020) ("The causation analysis in a § 1983 case 'closely resembles the standard 'foreseeability' formulation of proximate cause.'") (citation omitted).

The Court finds that based on Plaintiffs' theory of the case, they will be able to rely on the same evidence of centralized policies, practices, and decisions to attempt to prove that Defendants' alleged deliberate indifference and negligence caused the class members' injuries. Whether or not Plaintiffs can so prove is a merits question for trial, but these common questions predominate over individual questions for the purpose of class certification.

### 3)    Wrongful Death Claims

Defendants also argue that the standard for proving causation in wrongful death cases is different than the standard required to demonstrate causation in a negligence claim, because "in most cases" the plaintiff would need to prove that the defendant's negligence was a "but-for cause of the decedent's death" or where "'two causes concur' to bring about the decedent's death, a plaintiff must prove that the defendant's conduct was a 'substantial factor[.]'" (Defs.' Opp'n at 30) (citing *Joshi v. Providence Health Sys. of Or. Corp.*, 342 Or. 152, 161, 163-64 (2006)). Defendants further argue that Plaintiffs cannot establish causation for a wrongful death

claim "by showing that defendants' negligent act or omission merely increased the risk of death." (*Id.* at 31) (citing *Joshi*, 342 Or. at 164).

Based on Plaintiffs' theory of their case, common proof of Defendants' negligence would establish one element of Plaintiffs' wrongful death claim, specifically, the "wrongful act or omission" that is required under Oregon's wrongful death statute. *See* OR. REV. STAT. § 30.020(1) (establishing a wrongful death cause of action "[w]hen the death of a person is caused by the wrongful act or omission of another[.]"). However, Defendants are correct that Oregon's wrongful death statute also "requires that a plaintiff prove that a defendant's negligent act or omission caused the decedent's death." *Joshi*, 342 Or. at 163-64. The Court finds that the additional, more individualized element of but-for causation does not defeat predominance but will require individual inquiries. If Plaintiffs are successful on the merits of the Phase One trial, this element of the wrongful death claims would be reserved for the second phase of trial, as discussed in more detail below.[11]

**c.    Timing of Injury**

Defendants argue that "claims for personal injury or death that do not arise from a single event or cause typically do not satisfy predominance because individual questions of damages, liability, and defenses are often present[.]" (Defs.' Opp'n at 21.) Defendants' argument differentiates between "a single incident or single source of harm" and "multiple sources of harm occurring over time." *Id.* (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Inc.*, 241

---

[11] As a practical matter, if a Wrongful Death Class member fails to prove that COVID-19 was the but-for cause of his death, he would remain a member of the Damages Class. *Cf. Sonsteng v. Dominican Sisters of Ontario, Inc.*, No. CIV. 06-476-SU, 2007 WL 2984002, at *2 (D. Or. Oct. 9, 2007) ("Concurrent survivor and wrongful death claims at the pleading stage allow for the possibility that actionable negligence caused harm to a decedent before death, but was not the ultimate cause of death.").

F.R.D. 435, 447 (S.D.N.Y. 2007)). Defendants view the present case as the latter and compare Plaintiffs' claims to tort claims relating to defective intrauterine contraceptive devices ("IUD") and asbestos exposure. (Defs.' Opp'n at 23.) Defendants conclude that "it is evident that [P]lainitffs' motion for class certification must be denied: like many long-term mass tort events, [P]laintiffs' legal claims . . . are too highly individualized and thereby incapable of resolution on a class-wide basis." (*Id.* at 22-23) (citing *Georgine v. Amchem Prod. Inc.*, 83 F.3d 610 (3d Cir. 1996) and *Dalkon*, 693 F.2d 847). Defendants' reliance on these products liability cases is misplaced.

*Dalkon* concerned allegations of a defective medical device inserted in approximately 2.2 million women nationwide between June 1970 and June 1974. *See Dalkon*, 693 F.2d at 848. The plaintiffs' claims were based on various legal theories including negligence and negligent design, strict products liability, breach of express and implied warranty, wanton and reckless conduct, conspiracy, and fraud. *Id.* The Ninth Circuit found that where "[defendant's] overall liability, under some of the theories, cannot be proved unless each plaintiff also proves that [defendant's] breach of its duty proximately caused her particular injury" predominance was not satisfied. *Id.* at 856. As an example, the court noted that "[f]or those plaintiffs who assert a breach of warranty claim, additional individual factual issues will have to be argued and determined." *Id.* In contrast here, all of Plaintiffs' theories of recovery are available to all members of the proposed Damages and Wrongful Death classes, and the concerns in *Dalkon* are not relevant here.

*Georgine,* affirmed by *Amchem,* "sought to settle the claims of between 250,000 and 2,000,000 individuals who ha[d] been exposed to asbestos products against [] twenty companies[.]" *Georgine*, 83 F.3d at 617, *aff'd sub nom. Amchem*, 521 U.S. 591. The Third Circuit found that the *Georgine* plaintiffs' claims did not satisfy predominance for several

reasons, including because "the class members' claims vary widely in character," some class members had only faced exposure to asbestos but were not yet injured, and if they did manifest injury it was unknown "what disease each will suffer." *Id.* at 626. The case also presented additional complications, including that some of the injuries that could manifest from asbestos exposure, such as lung cancer, had other known causes, such as smoking, "a factor that complicates the causation inquiry." *Id.* at 626-27. "Furthermore, because [the court] must apply an individualized choice of law analysis to each of plaintiff's claims . . . the proliferation of disparate factual and legal issues is compounded exponentially." *Id.* In contrast here, Plaintiffs do not seek to include AICs with mere COVID-19 exposure in the proposed classes, there are no allegations that an underlying medical condition caused the COVID-19 infections, and there will be no choice of law analysis.

The Court finds that the disparities among class members and claims in the IUD and asbestos cases are not present here. Unlike the plaintiffs in *Dalkon* and *Georgine/Amchem*, Plaintiffs seek class certification on behalf of class members who were injured in Oregon, pursuant to discrete legal theories available to all class members, and all class members are facing a single common injury (COVID-19) suffered in an environment controlled by Defendants. This case is not a "mass tort event" that is "incapable of resolution on a class-wide basis."[12] (Defs.' Opp'n at 22-23.)

///

///

---

[12] As the Supreme Court noted in *Amchem*, the 1966 Advisory Committee revision to Rule 23 "does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number." *Amchem*, 521 U.S. at 625.

#### d.    Nature and Extent of Injury

Defendants' remaining arguments focus on the inquiries necessary to determine the extent of each class members' individual injury, i.e., damages. Defendants assert that individualized inquiries are necessary to determine: (1) whether a class member had any pre-existing medical conditions that may have affected the severity of symptoms; (2) whether a class member was asymptomatic, experienced mild symptoms, or if symptoms persist; (3) whether a class member purposefully took steps to avoid diagnosis or conceal symptoms, refused vaccination, or otherwise failed to protect themselves, and (4) specific to the Wrongful Death Class, whether the deceased AIC's death was caused by other factors separate from the AIC's COVID-19 diagnosis.

The injuries Plaintiffs allege here is contracting COVID-19, an injury common to every member of the proposed Damages Class and the Wrongful Death Class. Thus, the particular circumstances of each class member are not reflective of whether there was an injury *at all*, but instead reflect the *extent* of the injury and how much, if any, compensatory damages should be awarded to that class member as a remedy. *Cf. Thomas v. Baca*, No. CV 04-08448 DDP SHX, 2012 WL 994090, at *2 (C.D. Cal. Mar. 22, 2012) (rejecting a static *per diem* calculation of damages for AICs who were made to sleep on the floor of a county courthouse because while class members "suffered from the same constitutional violation, the damages at stake likely vary greatly" and noting that "a class member who slept on the floor of a clean cell, with bedding, is unlikely to be entitled to the same physical, mental, and emotional damages as one who slept without bedding on a wet, unsanitary floor at the mercy of vermin").

The Court agrees that determining the amount of compensatory damages due to each class member will require individualized inquiries and is not a common question suitable for class-wide adjudication. However, it is well-settled that individual questions relating to the

extent of injury and amount of damages is not a proper ground for this Court to deny class

certification.[13] *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)

("In this circuit . . . damage calculations alone cannot defeat certification."); *see also Blackie,*

524 F.2d at 905 ("The amount of damages is invariably an individual question and does not

defeat class action treatment."). Thus, individualized questions related to damages do not

predominate the common questions.

Defendants also argue that possible individual affirmative defenses—namely,

comparative fault—also create individual questions sufficient to defeat predominance here.

(Defs.' Opp'n at 32, arguing that "there will be individualized determinations of comparative

fault"). Even if comparative fault or other individualized affirmative defenses are relevant here—

and the Court has not so concluded—those inquiries do not predominate the common issues.[14]

*See, e.g.*, *Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976) (holding that "even

if there exists questions of individual" statutes of limitations defenses, "they are not sufficient, on

---

[13] As explained below, this case is appropriate for bifurcation under FED. R. CIV. P. 42(b), and any individual inquiries necessary to determine damages and any individualized defenses will be addressed after the jury decides the common issues, and only if necessary. *See Ellis v. Costco Wholesale Corp.,* 285 F.R.D. 492, 539 (N.D. Cal. 2012) ("Although this case does present individualized questions with respect to any particular class member's entitlement to relief, Plaintiffs' proposed trial plan addresses these concerns . . . [because] individual class members will present their claims for relief in a second phase of trial if liability is established, and Defendant will have an opportunity to present individualized defenses with respect to each class member.") (citation omitted).

[14] At the time the Court took the Class Certification Motion under advisement on February 28, 2022, Defendants had not yet asserted a comparative fault affirmative defense. However, on March 24, 2022, Defendants filed an answer to the SAC, asserting the affirmative defense. (Defs.' Answer to SAC, ECF No. 374.) Plaintiffs argue that because "Defendants have filed five separate answers in this case [and have] failed to advance the defense at all, they cannot now use it as a basis to foreclose class certification." (Pls.' Mem. at 5.) The Court does not reach Plaintiffs' waiver argument at this time because the availability of comparative fault as a potential affirmative defense does not impact the Court's certification analysis, for the reasons explained.

balance, to negate the predominance of the common issues"); *see also Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) ("We have recognized repeatedly that the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.") (citation omitted).

Plaintiffs have demonstrated that based on their theory of liability, common questions present a significant aspect of this case and those issues are "susceptible to generalized, class-wide proof." *Ruiz Torres*, 835 F.3d at 1134 (quoting *Tyson Foods, Inc.*, 577 U.S. at 454); *see also In re Hyundai*, 926 F.3d at 557 ("[If] the 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication' . . . 'there is clear justification for handling the dispute on a representative rather than on an individual basis.'" (quoting *Hanlon*, 150 F.3d at 1022)). For all of the reasons discussed above, Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement.

### 2.    Superiority

Having concluded that common questions of fact and law predominate over individual questions, the Court must determine whether class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). To determine whether these requirements are met here, the Court considers: (1) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating litigation in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Id.*

There are now more than 5,000 potential Damages Class members, a number that may continue to increase leading up to trial. The vast majority of these individuals have not yet filed a

claim, and many remain in custody. A significant percentage of the class members have only suffered mild symptoms, or no symptoms at all. (Defs.' Opp'n at 42 n.18, "[I]t is almost certainly the case that a substantial number of members of the proposed Damages Class experienced only mild or no symptoms from Covid-19[.]"). Under these circumstances, "[i]f plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover." *Loc. Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc*., 244 F.3d 1152, 1163 (9th Cir. 2001); *see also Murphy v. Precision Castparts Corp*., No. 3:16-cv-00521-SB, 2018 WL 3151426, at \*5 (D. Or. June 6, 2018), *report and recommendation adopted*, 2018 WL 3150675 (D. Or. June 27, 2018) ("In the absence of a class action, it is likely that many of the individual plaintiffs would forgo prosecution of their claims based on a cost/benefit calculus."). The purpose of a Rule 23(b)(3) class action is to "overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."[15] *Amchem*, 521 U.S. at 616 (quotation omitted). That purpose is satisfied here, where individual litigation would be inadequate to satisfy each class member's claims.

Defendants attempt to overcome Rule 23(b)(3) certification by arguing that "[t]o the extent that class members have valid claims for significant personal injury or wrongful death, those claims may be substantial." (Defs.' Opp'n at 34.) Defendants allude to the fact that potential wrongful death damage awards could range from "the low six figures to more than $20 million." (*Id.*) (collecting cases). That "potential value," according to Defendants, suggests that Wrongful Death Class members have a particularly strong interest in controlling their own

---

[15] For example, at oral argument, Defendants' counsel argued that each individual plaintiff would likely need to retain their own expert to prove causation, which is a clear economic barrier for what would mostly be self-represented plaintiffs in custody.

litigation. (*Id.*) As discussed below, bifurcation addresses Defendants' concerns that recovery among potential class members could vary significantly. Individualized determinations of damages due to each class member—from the asymptomatic AIC to the estate of a deceased AIC—would occur only after the common issues that predominate this case are litigated class-wide, and only if Plaintiffs establish liability.

Defendants also argue that "proceeding as a class action will be unfair for the putative Wrongful Death Class because the lack of personal representatives for many potential members of that class will create uncertainty about how those class members can 'opt-out'" of this litigation. (*Id.* at 39.) These concerns do not defeat certification of the Wrongful Death Class at this time. Of course, "due process requires that individual members of a class certified under Rule 23(b)(3) be given an opportunity to opt out of the settlement class to pursue their claims separately." *Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012). Should it become evident at a later date that personal representatives of Wrongful Death Class members' estates are unable individually to assess whether to opt-out of this litigation, the Court will address those issues at that time. *See Dukes*, 603 F.3d at 580 n.4, *rev'd on other grounds by Wal-Mart*, 564 U.S. 338 ("[The court] retain[s] the authority to amend or decertify a class if, based on information not available or circumstances not anticipated when the class was certified, the court finds that either is warranted.").

With respect to the small number of related individual cases already pending, the Court has stayed most of those cases pending certification and they have therefore not progressed, which supports a finding of class action superiority here. *Cf. Zinser v. Accufix Res. Inst.*, 253 F.3d 1180, 1191 (9th Cir. 2001) ("If the court finds that several other actions already are pending . . . a class action may not be appropriate . . . unless the other suits can be enjoined[.]").

As to the other pertinent factor of Rule 23(b)(3) superiority, the parties do not dispute that concentrating litigation in this particular forum is desirable. Indeed, all COVID-19-related cases that AICs have filed in this district have been consolidated on this Court's docket. And, as discussed above, this class action does not pose issues of manageability that would justify denying certification.

There should be no serious dispute that one liability trial for both classes is superior to and more manageable than over 5,000 individual liability trials, even if group or individual trials are later required to determine individualized damages. The Court finds that class treatment is clearly superior to other available methods for the fair and efficient adjudication of this controversy.

### D.    Bifurcation

Plaintiffs propose bifurcation of the trial into two phases upon certification of the classes: a first phase to determine "liability, causation, punitive damages . . . common defenses [and] the class representatives' claims for damages" ("Phase One"), followed by a second phase—should Plaintiffs prevail in the first phase—to determine damages for the individual class members ("Phase Two"). (Pls.' Mot. at 27-28.) Phase Two trials would also address but-for causation for any wrongful death claims, and any affirmative defenses related to individual class members. *See, e.g.*, *Wal-Mart*, 564 U.S. at 366-67 ("Once a plaintiff establishes a pattern or practice . . . a district court must usually conduct additional proceedings to determine the scope of individual relief [and the defendants] can then raise individual affirmative defenses[.]") (simplified).

A court may bifurcate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed. R. Civ. P. 42(b). The district court has "broad discretion" to order separate trials. *See Hangarter v. Provident Life & Acc. Ins.*

*Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) ("Rule 42(b) of the Federal Rules of Civil Procedure confers broad discretion upon the district court to bifurcate a trial[.]").

Defendants have not demonstrated that bifurcation here would result in prejudice, nor that group or individual trials on damages would be any more inconvenient than individual trials on both liability and damages. Further, the Court finds that bifurcating the trial would further Rule 42's purposes of convenience and judicial economy. *See* FED. R. CIV. P. 42(b) (a court may order separate trials "to expedite or economize"). Separate trials for related groups of class members to determine each AIC's damages (e.g., grouped by institution or symptoms),[16] would not result in prejudice to Defendants and would necessarily result in a reduction of the types and amount of evidence to be produced at each phase, which in turn would reduce the risk of jury confusion. *See Bates v. United Parcel Serv.*, 204 F.R.D. 440, 449 (N.D. Cal. 2001) ("[R]educing the types and amount of evidence to be produced in each phase of trial would promote judicial economy and reduce the risk of confusion.").

In any event, should Phase One result in a finding of no liability, individual damages trials would be unnecessary. *See Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 998 (9th Cir. 2001) ("Under Rule 42(b), the district court has broad discretion to bifurcate a trial to permit deferral of costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues.") (citation omitted); *see also Bates*, 204 F.R.D. at 449 ("If the first phase results in no finding of liability to the class by [the defendants], then the second phase to determine individual and class damages would become irrelevant.").

///

---

[16] For example, the 37% of Damages Class members who were asymptomatic (Pls.' Reply at 13) could likely be grouped in one or a few damages trials.

Defendants argue that bifurcation would "all but guarantee that there will be thousands of individual inquiries that would need to be resolved in subsequent trials." (Defs.' Mem. at 2.) Defendants fail to acknowledge that bifurcated trials would dramatically reduce the number of trials on the issue of liability, which could otherwise require Defendants (including Oregon's governor) to attend dozens, if not hundreds, of trials. Defendants also fail to acknowledge that a single liability trial may be the only trial if they are successful, and that class certification may result in an efficient settlement of all class claims. *See Arnold v. United Artists Theatre Cir., Inc.*, 158 F.R.D. 439, 459 (N.D. Cal. 1994) (holding there was no prejudice in bifurcation of a class action into separate individualized damages trials because, "as a practical matter, when liability is found during an initial phase, bifurcated cases often settle, thereby obviating the need for adjudicating issues of class damages"); *Laitram Corp. v. Hewlett-Packard Co*., 791 F. Supp. 113, 117 (E.D. La. 1992) ("It is true that if the Court tries liability first and the jury finds for the plaintiff, the defendant will be likely to redouble its efforts to settle the case rather than risk a highly unfavorable damages verdict.").

The Court finds that trial bifurcation will likely be appropriate here. Phase One will determine the common issues of liability, causation, the availability of punitive damages, common defenses, and the named class members' compensatory damages. Phase Two, if necessary, will determine individualized damages for class members, but-for causation for the wrongful death claims, and whether individualized defenses apply to each class member.

### E.    Punitive Damages

Plaintiffs argue that "whether Plaintiffs and members of the Damages and Wrongful Death Classes are entitled to an award of punitive damages, and the amount of such an award," is a common question that can be decided on a classwide basis. (Pls.' Mot at 18.) Defendants

respond that deciding punitive damages on a classwide basis would violate due process and the

Seventh Amendment's Reexamination Clause. (Defs.' Mem. at 21.)

"Punitive damages . . . are intended to punish the defendant whose conduct is sufficiently

culpable and deter others from acting in a similar manner." *Arch Chemicals, Inc. v. Radiator*

*Specialty Co*., No. CIV. 07-1339-HU, 2011 WL 597042, at *1 (D. Or. Feb. 11, 2011). For an

action brought under 42 U.S.C. § 1983, "punitive damages may be awarded for conduct that is

outrageous, because of the defendant's evil motive or his reckless indifference to the rights of

others." *Bouman v. Block*, 940 F.2d 1211, 1233 (9th Cir. 1991) (quoting *Smith v. Wade*, 461 U.S.

30, 46-47 (1983)). Under Oregon law, "a party may recover punitive damages in a civil action if

it proves by clear and convincing evidence that 'the party against whom punitive damages are

sought has acted with malice or has shown a reckless and outrageous indifference to a highly

unreasonable risk of harm and has acted with a conscious indifference to the health, safety and

welfare of others.'" *Rubicon Glob. Ventures, Inc. v. Chongqing Zongshen Grp. Imp./Exp. Corp*.,

226 F. Supp. 3d 1141, 1153 (D. Or. 2016) (quoting OR. REV. STAT. § 31.730(1)).

As discussed below, the Court finds that whether Plaintiffs and class members are

entitled to punitive damages and the total amount of that award is a common question that can be

adjudicated in Phase One.

### 1.    Due Process

The Supreme Court has recognized that "there are procedural and substantive

constitutional limitations" on punitive damage awards. *State Farm Mut. Auto. Ins. Co. v.*

*Campbell*, 538 U.S. 408, 416 (2003). "It should be presumed a plaintiff has been made whole for

his injuries by compensatory damages, so punitive damages should only be awarded if the

defendant's culpability, after having paid compensatory damages, is so reprehensible as to

warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 419.

PAGE 50 – OPINION AND ORDER

Therefore, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426.

Plaintiffs acknowledge that seeking punitive damages implicates due process concerns, and that "it is *particularly* important to resolve the common issue [of] entitlement to, and amount of, punitive damages" in a class-wide adjudication, because "the jury considers both reprehensibility and punishment only once[.]" (Pls.' Mot. at 23 n.65.) Defendants respond that "because compensatory damages are not susceptible to class-wide determination . . . determining punitive damages on a class-wide basis would preclude the constitutionally required comparison of punitive damages and compensatory damages." (Defs.' Mem. at 22) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)).

A bifurcated trial presents a unique challenge to the requirement that the amount of any punitive damage award must be "both reasonable and proportionate . . . to the general damages recovered" because the amount of a punitive damages award cannot be reviewed for constitutionality without the necessary context of a total compensatory damages amount. *State Farm*, 538 U.S. at 426. Courts have found various ways to address this concern. *See, e.g.*, *Ellis*, 285 F.R.D. at 542 (collecting cases). The Ninth Circuit has endorsed the determination of punitive damages before compensatory damages in bifurcated class action trials. *See, e.g.*, *Hilao v. Est. of Marcos*, 103 F.3d 767, 782 (9th Cir. 1996) (affirming the district court's trifurcation of a class action and holding that "[i]n the absence of any constitutional problems with the district court's decision to hold the exemplary-damage phase of the trial prior to the compensatory-damage phase, the district court did not abuse its discretion by the sequence in which it conducted the proceedings below").

If Plaintiffs' punitive damages claim survives summary judgment, the Phase One trial would determine if punitive damages are warranted, and if so, in what amount. *See, e.g.*, *Equal Emp't Opportunity Comm'n v. Dial Corp.*, 259 F. Supp. 2d 710, 712 (N.D. Ill. 2003) ("[A] determination of an amount of punitive damages for all the persons, as a group, who ultimately are found to be aggrieved by the [defendant's conduct] should be decided by the jury . . . who has heard all the evidence regarding the nature and scope of [that conduct].") (citation omitted). The amount awarded by the Phase One jury will be the amount "reflecting overall reprehensibility, if any, of the defendant's conduct, which is 'the most important indicum of the reasonableness of the punitive damages award[.]'" *Id.* at 715 (citing *BMW*, 517 U.S. at 575). "No jury deciding compensatory damages of an individual . . . can have the same insight on what will be needed to deter the [defendant's conduct] or for punishment as will the [] jury" that determined liability. *Id.* at 712-13.

Second, because due process requires that punitive damages be "reasonable and proportionate" to the harm done to each individual class member, the Court would determine the specific amount of any punitive damages award owed to a class member after the Phase Two damages trials conclude. *See id.* at 713 ("[T]he distribution of [the] punitive damages needs to be proportionate to the harm done to persons aggrieved, and that can best be done after a determination has been made by the Phase III juries of the compensation to be allowed to each individual."). With guidance from both the Phase One and Phase Two verdicts, the Court is best positioned to determine what amount of the total punitive damage award is owed to individual class members, ensuring each such award satisfies the "procedural and substantive constitutional limitations" governing punitive damage awards. *State Farm*, 538 U.S. at 416.

///

For these reasons, due process is not a bar to a classwide determination of the appropriateness and total amount of punitive damages owed to Plaintiffs and class members.

### 2.    Seventh Amendment

The Seventh Amendment's Reexamination Clause provides that "no fact, tried by a jury, shall be otherwise re-examined in any Court of the United States." U.S. Const. amend. VII.

Defendants rely on the Reexamination Clause to argue that "[p]unitive damages and liability are so intertwined in this case that a jury considering one must consider the other." (Defs.' Mem. at 22.) The Court agrees. The Phase One jury will decide the issue of punitive damages along with liability. See Ellis, 285 F.R.D. at 543 (holding that because "the classwide liability question of whether Defendant has engaged in a pattern or practice of intentional discrimination may overlap substantially with the question of whether Defendant acted with malice or reckless indifference to Plaintiffs' protected rights, as Plaintiffs must show in order to obtain punitive damages," "trying these potentially overlapping issues of liability and entitlement to punitive damages before a single jury ensures compliance with the Seventh Amendment's prohibition on reexamination"). Accordingly, the Seventh Amendment is not a bar to class certification here.

### CONCLUSION

For the reasons stated, the Court GRANTS Plaintiffs' Motion for Class Certification (ECF No. 203):

- The Court certifies the following Damages Class with respect to Plaintiffs' Eighth Amendment deliberate indifference and negligence claims:

  - All adults incarcerated in Oregon Department of Corrections facilities who: (1) were incarcerated on or after February 1, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19;

and (3) if they became incarcerated after February 1, 2020, tested positive

or were otherwise diagnosed with COVID-19 at least fourteen days after

they entered Oregon Department of Corrections custody;

- The Court certifies the following Wrongful Death Class with respect to Plaintiffs'

  wrongful death claim:

  - Estates of all adults incarcerated at Oregon Department of Corrections

    facilities continuously since February 1, 2020, who died during the

    Wrongful Death Class period, and for whom COVID-19 caused or

    contributed to their death;

- The Court appoints plaintiffs Paul Maney, Gary Clift, Theron Hall, and David

  Hart as representatives of the Damages Class;

- The Court appoints plaintiff Felishia Ramirez as representative of the Wrongful

  Death Class; and

- The Court appoints counsel of record as class counsel for both the Damages Class

  and Wrongful Death Class.

The parties shall confer regarding a proposed case management schedule, and file a joint

status report by April 15, 2022.

**IT IS SO ORDERED.**

DATED this 1st day of April, 2022.

_Stacie F. Beckerman_
_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge