**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
Telephone: 503-228-6474
Facsimile: 503-228-2556

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; SHERYL LYNN SUBLET; and FELISHIA RAMIREZ, personal representative for the ESTATE OF JUAN TRISTAN, individually, on behalf of a class of other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF OREGON; KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; KEN JESKE; PATRICK ALLEN; JOE BUGHER; and GARRY RUSSELL, <br><br> Defendants. | Case No. 6:20-cv-00570-SB <br><br> **SEVENTH AMENDED CLASS ACTION COMPLAINT** <br><br> Civil Rights Action (42 U.S.C. § 1983); Negligence <br><br> JURY TRIAL DEMANDED |

## INTRODUCTION

This is a civil rights and negligence action against the above-named Defendants for the willful and/or deliberately indifferent and/or negligent treatment afforded to prisoners of the Oregon Department of Corrections (ODOC) as a result of Defendants' failure to protect them from heightened exposure to a serious communicable disease. Across Oregon, and across the world, people were and are suffering from the pandemic spread of COVID-19. This pandemic posed an acute danger to ODOC prisoners, for whom Defendants are responsible.

Although ODOC adopted some policies in response to COVID-19, it largely neglected critical measures to prevent outbreaks and transmission of the virus at ODOC facilities and the severe illnesses and deaths that have accompanied, and continue to accompany, outbreaks in congregate living facilities. A successful and adequate response to this pandemic could not and cannot be accomplished with half-measures that undermine positive changes. ODOC willfully and wantonly ignored the public health threat caused by the COVID-19 pandemic and, as a result, class members have been harmed, and lives have been lost. During the pendency of the lawsuit, thousands of people housed at ODOC facilities have been infected with COVID-19. As of the time of filing this Seventh Amended Complaint, almost 50 people died while infected with the disease while in ODOC's custody during the Class period.

From the beginning of the pandemic, Defendants were aware that COVID-19 was most likely to cause serious illness or death to people in congregate living settings. Such risk is greatly increased for those who are not vaccinated and/or are not provided the medical care and facilities to properly treat their infection. And, from the beginning of the pandemic, Defendants ignored the threats posed by the COVID-19 virus by denying Plaintiffs and class members appropriate access to prevention, testing, and treatment for COVID-19. Indeed, Defendants

increased the risks that COVID-19 posed to class members by reducing the space available for

social distancing, including by failing to consider alternatives for reducing the population or

population densities at ODOC facilities, closing ODOC facilities, and failing to consider

meaningful alternative uses of ODOC or other State-owned space to house adults in custody

(AICs).  Because Defendants made and enforced policies that created a risk of further spread of

COVID-19 in all of ODOC's facilities, Defendants violated the U.S. Constitution and Oregon

law.

Plaintiffs seek relief on behalf of two classes.  The first class, the Damages Class,

generally consists of those persons housed at ODOC facilities who have contracted COVID-19.

The second class, the Wrongful Death Class, consists of the estates of those who have died while

they were housed at ODOC facilities, and for whom COVID-19 caused or contributed to their

death.

## JURISDICTION

1.    This court has jurisdiction over the subject matter of this Complaint under 42

U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (4), and supplemental jurisdiction of the state

tort claim under 28 U.S.C. § 1367.

## VENUE

2.    Venue is proper within the District of Oregon because the events giving rise to

this claim occurred in this judicial district and all Defendants reside in this judicial district.  28

U.S.C. § 1391(b).  The acts and practices alleged herein have occurred and continue to occur in

prisons operated by ODOC in many counties across the State of Oregon.  The acts pertaining to

the named Plaintiffs occurred in Marion County, Washington County, Umatilla County, and

Multnomah County, Oregon.  The main policy and operational decisions made by ODOC occurred in Marion County, Oregon.

**PARTIES**

3.      Plaintiff Paul Maney is a prisoner at Oregon State Correctional Institution (OSCI) in Salem, Oregon.  Mr. Maney tested positive for COVID-19 during the Damages Class period.

4.      Plaintiff Gary Clift was previously a prisoner at OSCI in Salem, Oregon, during the Class period.  Mr. Clift tested positive for COVID-19 during the Damages Class period.

5.      Plaintiff George Nulph is a prisoner at OSCI in Salem, Oregon.

6.      Plaintiff Theron Hall is a prisoner at the Oregon State Penitentiary (OSP) in Salem, Oregon.  Mr. Hall received a "reactive" result from COVID-19 antibody test on or about April 23, 2021.

7.      Plaintiff David Hart was previously a prisoner at OSP in Salem, Oregon.  Mr. Hart was diagnosed with COVID-19 during the Damages Class period.

8.      Plaintiff Sheryl Lynn Sublet was previously a prisoner at Coffee Creek Correctional Facility ("Coffee Creek") in Wilsonville, Oregon.  Ms. Sublet was diagnosed with COVID-19 during the Damages Class period.

9.      Plaintiff Felishia Ramirez is the personal representative for the Estate of Juan Tristan.  Mr. Tristan contracted COVID-19 while he was incarcerated at OSP.  Mr. Tristan died of his COVID-19 infection during the class period—that is, COVID-19 caused or contributed to Mr. Tristan's untimely death.  Mr. Tristan died of COVID-19 on January 22, 2021.  On the day that he died, he was expected to be released from ODOC custody on August 14, 2025.  Plaintiff Ramirez was appointed the personal representative of Mr. Tristan's estate on April 19, 2021.

10.    Defendant State of Oregon ("the State") is a sovereign state entity within the United States with the capacity to sue and be sued pursuant to the Oregon Tort Claims Act. The Oregon Department of Corrections (ODOC) is a department or division of the State. The State is liable in a state tort action for the actions or inactions of its agents.

11.    Defendant Kate Brown was at all times relevant the Governor of the State of Oregon with ultimate executive authority over ODOC. Under ORS 401.168(1), "[d]uring a state of emergency, the Governor has complete authority over all executive agencies of state government and the right to exercise, within the area designated in the proclamation, all police powers vested in the state by the Oregon Constitution in order to effectuate the purposes of this chapter"; "has authority to suspend provisions of any order or rule of any state agency, if the Governor determines and declares that strict compliance with the provisions of the order or rule would in any way prevent, hinder or delay mitigation of the effects of the emergency"; and "has authority to direct any agencies in the state government to utilize and employ state personnel, equipment and facilities for the performance of any activities designed to prevent or alleviate actual or threatened damage due to the emergency." Under ORS 401.236, the Governor is "authorized to make rules and regulations necessary to carry out the purposes" of the declared emergency and her powers under ORS 401.165 to ORS 401.236. At all times relevant, Defendant Brown was acting under color of law and is sued in her official and individual capacities.

12.    Defendant Colette Peters was at all times relevant the Director of ODOC and was directly responsible for ensuring that ODOC's prison health program complies with state and federal laws. During the Class Period, ODOC operated 14 facilities in Oregon, where prisoners

are held after sentencing if the length of their sentence exceeds one year. At all times relevant, Defendant Peters was acting under color of law and is sued in her official and individual capacities.

13.     Defendant Heidi Steward was at all times relevant the Deputy Director of ODOC and is directly responsible for ensuring that ODOC's prison health program complies with state and federal laws. At all times relevant, Defendant Steward was acting under color of law and is sued in her official and individual capacities.

14.     Defendant Mike Gower was at all times relevant the Assistant Director of Operations for ODOC during the Class period and in that capacity was directly responsible for the operations of ODOC's prisons. At all times relevant, Defendant Gower was acting under color of law and is sued in his official and individual capacities.

15.     Defendant Mark Nooth was at all times relevant the Eastside Institutions Administrator for ODOC and is directly responsible for the operations of six ODOC prisons: Eastern Oregon Correctional Institution (EOCI), Two Rivers Correctional Institution ("TRCI"), Snake River Correctional Institution ("Snake River"), Powder River Correctional Facility ("Powder River"), Deer Ridge Correctional Institution ("Deer Ridge"), and Warner Creek Correctional Facility ("Warner Creek"). At all times relevant, Defendant Nooth was acting under color of law and is sued in his official and individual capacities.

16.     Defendant Rob Persson was at all times relevant the Westside Institutions Administrator for ODOC and is directly responsible for the operations of eight ODOC prisons: Coffee Creek, CRCI, South Fork Forest Camp ("South Fork"), OSCI, Santiam Correctional Institution ("Santiam"), OSP, Mill Creek Correctional Facility ("Mill Creek"), and Shutter Creek

Correctional Institution ("Shutter Creek"). At all times relevant, Rob Persson was acting under color of law and is sued in his official and individual capacities.

17.     Defendant Ken Jeske is the Administrator for Oregon Correctional Enterprises (OCE) and is directly responsible for the operations of OCE's facilities within ODOC.  OCE has or had operations in nine ODOC facilities throughout the State: EOCI, TRCI, Snake River, Deer Ridge, Warner Creek, Coffee Creek, OSCI, OSP, and Mill Creek.  At all times relevant, Defendant Jeske was acting under color of law and is sued in his official and individual capacities.

18.     Defendant Patrick Allen was at all times relevant the Director of the Oregon Health Authority (OHA). OHA exercises control over the allocation and distribution of vaccines in the State of Oregon, including deciding when people incarcerated in ODOC facilities will receive vaccinations.  OHA also worked closely with ODOC to develop and implement guidance and recommendations for the management of COVID-19 in ODOC facilities, including through weekly meetings with ODOC staff.  At all times relevant, Defendant Allen was acting under color of law and is sued in his official and individual capacities.

19.     Defendant Joe Bugher was at all times relevant the Assistant Director of Health Services for ODOC and was responsible for the provision of legally mandated medical, dental, behavioral, and mental health care, and pharmacy services to adults in custody at ODOC facilities.  At all times relevant, Defendant Bugher oversaw and led ODOC's Agency Operations Center (AOC), which ODOC activated for the purposes of collaboration and decision making in response to the COVID-19 pandemic.  At all times relevant, Defendant Bugher was acting under color of law and is sued in his official and individual capacities.

20.    Defendant Garry Russell was at all times relevant the Chief of Security for ODOC and was responsible for the management and supervision of ODOC security programs, emergency preparedness programs, transport units, and ODOC's staff deployment system. Defendant Russell oversaw and led the AOC, which ODOC activated for the purpose of collaboration and decision making in response to the COVID-19 pandemic.  Defendant Russell was acting under color of law and is sued in his official and individual capacities.

## CLASS ACTION ALLEGATIONS

21.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure (FRCP) 23(b)(1), 23(b)(2), and 23(b)(3), and, in the alternative, FRCP 23(c)(4), on behalf of themselves and a class of similarly situated individuals.

22.    Plaintiffs seek to represent two classes.

23.    The first class ("the Damages Class") consists of all adults incarcerated in ODOC facilities who were incarcerated at any point on or after February 1, 2020, and who, while incarcerated, tested positive or were otherwise diagnosed with COVID-19.  Class membership based on a positive COVID-19 test may be established by a positive result on a COVID-19 test administered at least 14 days after the adult entered ODOC custody.  Class membership based on a positive (*i.e.*, "reactive") COVID-19 antibody test may be established only for adults who became incarcerated on or before February 1, 2020, who remained continuously incarcerated during the period between February 1, 2020, and the date that their COVID-19 antibody test was administered, and must be established with a positive (*i.e.*, "reactive") result on a COVID-19 antibody test administered before the individual received any dose of any COVID-19 vaccine. Class membership based on any other form of COVID-19 diagnosis may be established through

a written confirmation by a doctor or other medical provider.  The Class Period for the Damages

Class commenced on March 8, 2020, and closed on May 31, 2022.  Specifically excluded from

the Damages Class are Defendants and any of their respective affiliates, legal representatives,

heirs, successors, employees, or assignees.

24.    The second class ("the Wrongful Death Class") consists of the estates of those

adults incarcerated at ODOC facilities continuously since February 1, 2020, who died during the

Wrongful Death Class period, and for whom COVID-19 caused or contributed to their death.

The Class Period for the Wrongful Death Class commenced on March 8, 2020, and closed on

May 31, 2022.  Specifically excluded from the class are Defendants and any of their respective

affiliates, legal representatives, heirs, successors, employees, or assignees.

25.    Joinder is impracticable because: (1) the class members are numerous; (2) , at the

time the class was certified, the class was fluid because it included future members who would

later become housed in ODOC facilities; (3) class members are incarcerated, making their

abilities to institute individual lawsuits limited; and (4) class treatment under such circumstances

furthers judicial economy.

26.    This action has been brought and may properly be maintained as a class action

under federal law and satisfies the requirements for maintaining a class action under FRCP 23(a).

27.    The Damages Class and the Wrongful Death Class each are so numerous that

joinder is impracticable.  As of the close of the Class Period, approximately 5,400 people

incarcerated at ODOC facilities have been diagnosed with COVID-19.  Also as of the date of this

Seventh Amended Complaint, at least 46 individuals housed in ODOC facilities died while

infected with COVID-19.

28.     There are one or more questions of fact or law common to members of the Damages Class and the Wrongful Death Class, including legal questions related to Defendants' duties under the Eighth Amendment and liabilities under 42 U.S.C. § 1983.  There are also common questions of fact related to notice to Defendants, what steps they took or failed to take to protect people incarcerated at ODOC facilities from COVID-19, medical causation, scientific evidence admissibility, and applicable CDC standards.  In this case, Defendants completely control the environment, and there is no other path of infection from outside the facility other than infection transmitted by agents and employees of ODOC.  Accordingly, causation is a common question of fact among members of the Damages Class and the Wrongful Death Class.

29.     Plaintiffs Maney, Clift, and Hart, and any other Plaintiff who becomes infected and is diagnosed with COVID-19, are adequate representatives of the Damages Class.  Plaintiff Ramirez, as personal representative of the Estate of Juan Tristan, is an adequate representative of the Wrongful Death Class.

30.     The claims of Plaintiffs Maney, Clift, and Hart, and any other Plaintiff who becomes infected and is diagnosed with COVID-19, are typical of the claims of members of the Damages Class, as their claims are based on the same facts and legal theories as those of the Damages Class members.  The claims of Plaintiff Ramirez and any other personal representative of the estate of an individual who dies with COVID-19 while housed in an ODOC facility, and for whom COVID-19 caused or contributed to their death, are typical of the claims of members of the Wrongful Death Class, as their claims are based on the same facts and legal theories of those of the Wrongful Death Class members.

31.     As to the Damages Class and Wrongful Death Class, common questions of fact and law predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that (a) the class members have little interest or ability to individually control the prosecution of separate actions; (b) as the proposed class includes facilities across the Oregon, it is appropriate to concentrate the forum in this district, and the Eugene Division is appropriate under local rules; and; (c) the difficulties in managing the Damages Class and Wrongful Death Class are significantly less than managing a mass of individual claims.

32.     With respect to both classes—the Damages Class and the Wrongful Death Class—the representative Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of members of each of their respective classes.  Plaintiffs have no interests adverse to the interests of the class they seek to represent. Plaintiffs retained counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among class members or between counsel and class members.

33.     As to both classes, Plaintiffs also seek partial certification under FRCP 23(c)(4). This action may also be maintained as a class action with respect to particular issues, including the following, each of which is also a common question of law or fact under FRCP 23(a)(1):

    (a)     Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to fully implement social distancing as a control strategy;

(b)     Whether Defendants acted with deliberate indifference to the rights of
Plaintiffs and class members in failing to promptly implement and enforce
mask requirements;

(c)     Whether Defendants acted with deliberate indifference to the rights of
Plaintiffs and class members in failing to separate corrections officers and
adults in custody who had contracted or been exposed to COVID-19 from
those who had not;

(d)     Whether Defendants acted negligently in failing to implement social
distancing as a control strategy;

(e)     Whether Defendants acted negligently in failing to promptly implement
and enforce mask requirements;

(f)     Whether Defendants acted negligently in failing to separate corrections
officers and adults in custody who had contracted or been exposed to
COVID-19 from those who had not;

(g)     Whether Defendants' conduct caused injury to Plaintiffs and class
members;

(h)     Whether Plaintiffs and members of the class are entitled to recover
punitive damages; and

(i)     The amount of punitive damages to which Plaintiffs and class members
are entitled.

## FACTUAL ALLEGATIONS

34.     Since 2019, the novel coronavirus, or COVID-19, has ravaged the world, country to country.  The extensive body of evidence regarding COVID-19 demonstrates that it is a serious highly communicable disease that spreads through close contact with other individuals who contracted or become exposed to the virus.  COVID has been declared a global pandemic[1] and both national and state emergencies.[2]  As of May 20, 2020, just a few weeks after this lawsuit was filed, 1,341,907 people worldwide had been diagnosed with COVID-19, and more than 74,470 of those people had died.  As of the date the Sixth Amended Complaint was filed in this case, over  45.8 million people in the United States have tested positive for COVID-19, and the number of deaths has risen to over 743,000, including 4,377 in Oregon.[3]  There is no cure for COVID-19.

---

[1]     Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, Wall St. J. (Mar. 11, 2020, 11:59 PM), *available at* https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794.  Pandemics occur when a new virus emerges to infect people and can sustainably spread between people. Because there is little to no pre-existing immunity against the new virus, it spreads easily amongst humans.

[2]     Derek Hawkins et al., *Trump Declares Coronavirus Outbreak a National Emergency*, Wash. Post (Mar. 13, 2020, 10:46 AM), *available at* https://www.washingtonpost.com/world/2020/03/13/coronavirus-latest-news/; Lizzy Ackerman, *Gov. Kate Brown declares coronavirus state of emergency, announces 7 new Oregon cases*, The Oregonian, *available at* https://www.oregonlive.com/coronavirus/2020/03/7-new-coronavirus-cases-in-oregon-officials-say-gov-kate-brown-declaring-state-of-emergency.html (Mar. 9, 2020).

[3]     Johns Hopkins University and Medicine Coronavirus Resource Center, *Coronavirus COVID-19 Global cases by the Center for Systems Science and Engineering*, https://coronavirus.jhu.edu/map.html (last visited Apr. 30, 2021); Centers for Disease Control and Prevention, *Cases in U.S.*, https://covid.cdc.gov/covid-data-tracker/?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-updates%2Fcases-in-us.html#cases_casesper100klast7days (last visited Oct. 5, 2021); Oregon Health Authority, *COVID-19 Updates*, https://govstatus.egov.com/OR-OHA-COVID-19 (last visited Oct. 5, 2021).

COVID-19 Transmission

35.    The transmission of COVID-19 has increased exponentially since the beginning

of the outbreak in 2020, and it continues to spread.  The United States now has the most

confirmed cases of COVID-19 in the world.  Early projections by the CDC suggested that over

200 million people in the United States could become infected with COVID-19 over the course

of the pandemic without effective public health intervention, with as many as 1.5 million deaths

in the most severe scenarios.[4]

36.    COVID-19 is a particularly contagious disease.  A March 2020 study showed that

the virus could survive for up to three hours in the air, four hours on copper, twenty-four hours

on cardboard, and two to three days on plastic and stainless steel.[5]  Another study of an early

cluster of COVID-19 cases in Wuhan, China, revealed the dangers of indirect transmission

resulting from infected people contaminating common surfaces—in the study, it was a

communal mall bathroom.[6]  Research also shows that controlling the spread of COVID-19 is

made even more difficult because of the prominence of asymptomatic transmission—*i.e.*,

transmission by people who are contagious but exhibit limited or no symptoms, rendering

ineffective screening tools dependent on identifying symptomatic behavior.[7]

---

[4]    Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), *available at* https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7mdead.html.

[5]    Marilynn Marchione/AP, *Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show*. TIME, (Mar. 11, 2020), *available at* https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/.

[6]    Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020*. 26 Emerg Infect Dis. 6, (2020), *available at* https://doi.org/10.3201/eid2606.200412 (last visited Mar. 20, 2020).

[7]    Chelsea Ritschel, *Coronavirus: Are People Who Are Asymptomatic Still Capable of Spreading COVID-19?* Independent, *available at* https://www.independent.co.uk/life-

37.     COVID-19 has been especially dangerous in areas of close confinement, like cruise ships and congregate living facilities.  Jails and prisons are particularly vulnerable to outbreak.[8]  In fact, jails and prisons are at an even greater risk than other congregate living settings—prisoners must share cells or dorms, dining halls, common areas, and bathrooms, where opportunities for droplet transmission are plentiful.[9]  Indeed, the use of dining halls contrasts sharply with the statewide restrictions imposed in Oregon on on-premises food consumption at restaurants, bars, taverns, cafes, food courts, or other similar establishments over the course of 2020.  Prisons and jails are also often poorly ventilated, "which promotes the highly efficient spread of diseases through droplets."[10]  Prisons and jails also house a large proportion of medically vulnerable people[11] and offer limited medical resources.

38.     In Chicago, Illinois, within a week of confirming its first coronavirus positive in a correctional officer, Cook County Jail had 134 confirmed cases, with nine negative tests, 93 outstanding tests, and 12 correctional officers also testing positive.[12]  In the Daenam inpatient

---

style/health-and-families/coronavirus-symptoms-asymptomatic-covid-19spread-virus-a9403311.html (last visited Mar. 20, 2020).

[8]     *See* Matthew J. Akiyama, M.D., Anne Spaulding, M.D., Josiah D. Rich, M.D., *Flattening the Curve for Incarcerated Populations—Covid-19 in Jails and Prisons,* N Engl J Med (Apr. 2, 2020), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

[9]     Declaration of Dr. Jaimie Meyer, *Velesaca v. Wolf, et. al.*, Dkt. 42 at ¶ 9, USDC of SDNY Case No. 1:20-cv-01803-AKH (S.D.N.Y. March 16, 2020).

[10]     *Id.*

[11]     *Active case finding for communicable diseases in prison*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lanet/article/PIIS0140-6736(18)31251-0/fulltext. ("People in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.").

[12]     Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, Chicago Sun Times (March 30, 2020), https://chicago.suntimes.com/coronavirus/2020/3/29/21199171/cook-county-jail-coronavirus-positive-134-cases-covid-19.

psychiatric ward in South Korea, where conditions of confinement are similar to those of an American jail, 101 out of 103 inmates became infected with COVID-19, and, as of February 29, 2020, seven patients had died of complications from the disease.[13]

39.     Experts predicted that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[14]  Those predictions have borne out in Oregon where, between December 2020 and the end of the Class period, the number of COVID-19 cases in ODOC's facilities exceeded 5,000.

40.     Jails and prisons all over the country and world have released people with the aim of preventing massive outbreaks of severe illness and death from COVID-19.[15]  During the Class period, release was widely viewed as necessary in other jurisdictions, but Defendants largely failed to meaningfully consider it as an option to protect AICs in ODOC custody from COVID-19 risks.  This only increased the urgency and necessity of implementing or awarding other remedies for the harm that Defendants' inaction caused to incarcerated adults.

---

[13]     Min Joo Kim, *How a South Korean Psychiatric Ward Became a 'Medical Disaster' When Coronavirus Hit*, The Washington Post (Feb. 29, 2020), https://www.washingtonpost.com/world/asia_pacific/how-a-south-korean-psychiatric-ward-became-a-medical-disaster-when-coronavirus-hit/2020/02/29/fe8f6e40-5897-11ea-8efd-0f904bdd8057_story.html.

[14]     Evelyn Cheng and Huileng Tan, CNBC, n.11 (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

[15]     BBC, *US jails begin releasing prisoners to stem Covid-19 infections*, (Mar. 19, 2020), https://www.bbc.com/news/world-us-canada-51947802 (discussing that some US cities have released hundreds of people from their jails and that Iran has released over 85,000 people to combat the pandemic).

41.     The following U.S. states and counties, among others, made efforts to reduce their

jail and prison populations: Jefferson County Jail in Kentucky,[16] Mobile County Metro Jail[17]

and three other counties[18] in Alabama, Spokane, Washington,[19] Mercer County, Ohio,[20]

Jefferson County, Texas,[21] Hillsborough County, Texas,[22] Mecklenburg County, North

Carolina,[23] Cook County Jail in Illinois,[24] Sacramento, California,[25] Alameda County,

---

[16]     Andrew Wolfson, *More than 100 pretrial defendants are being released*, Courier Journal (Mar. 17, 2020), https://www.courier-journal.com/story/news/2020/03/17/kentucky-releasing-some-pretrial-defendants-due-coronavirus/5074206002/.

[17]     Chris Best, *Some inmates to be released from Metro Jail due to coronavirus*, WKRG News (Mar. 18, 2020) https://www.wkrg.com/health/coronavirus/some-inmates-over-65-to-be-released-from-metro-jail-due-to-coronavirus/.

[18]     Marty Roney, *Coronavirus: County jail inmates ordered released in Autauga, Elmore, Chilton counties*, Montgomery Advertiser (Mar. 18, 2020), https://www.montgomeryadvertiser.com/story/news/crime/2020/03/18/county-jail-inmates-ordered-released-autauga-elmore-chilton-counties/2871087001/.

[19]     Chad Sokol, *Dozens released from Spokane County custody following Municipal Court emergency order*, The Spokesman Review (Mar. 17, 2020), https://www.spokesman.com/stories/2020/mar/17/dozens-released-from-spokane-county-custody-follow/.

[20]     WFMJ News, *Mercer County Jail releases low-level inmates amid coronavirus pandemic* (Mar. 18, 2020), https://www.wfmj.com/story/41912067/mercer-co-jail-releases-low-level-inmates-to-make-room-for-medical-isolation-cells-amid-coronavirus-pandemic.

[21]     Kiera Sam, Jordan James, *Jefferson County jail cancels visitation, releases some inmates amid coronavirus concerns*, 12News (Mar. 18, 2020), https://www.12newsnow.com/article/news/local/jefferson-county-jail-cancels-visitation-releases-some-inmates-amid-coronavirus-concerns/502-f7e9e268-e131-46af-a478-95553f309bf8.

[22]     Tony Marrero, *Sheriff announced the release of 164 people from his jail*, Tampa Bay Times (Mar. 19, 2020), https://www.tampabay.com/news/hillsborough/2020/03/19/hillsborough-sheriff-releases-164-county-jail-inmates-to-reduce-coronavirus-risk/

[23]     Michael Gordon, Ames Alexander, *Mecklenburg begins releasing jail inmates to avoid cellblock outbreak of COVID-19*, The Charlotte Observer (Mar. 19, 2020), https://www.charlotteobserver.com/news/coronavirus/article241279836.html.

[24]     David Struett, *Cook County Jail releases several detainees who are 'highly vulnerable' to coronavirus*, Chicago Sun Times (Mar. 17, 2020), https://chicago.suntimes.com/coronavirus/2020/3/17/21183289/cook-county-jail-coronavirus-vulnerable-detainees-released-covid-19.

[25]     Kristopher Hooks & Ja'Nel Johnson, *Some non-violent, low-level inmates being released from Sacramento jails amid coronavirus pandemic*, ABC10 (Mar. 18, 2020), https://www.abc10.com/article/news/health/coronavirus/sacramento-inmates-being-released-from-amid-coronavirus-pandemic/103-d10ab80d-81d6-41e1-bc47-e6643e1e0d7e.

California,[26] New York City,[27] Allegheny County, Pennsylvania,[28] Lexington County, South

Carolina,[29] Jefferson County, Colorado,[30] New Jersey,[31] Iowa,[32] North Dakota,[33] Rhode Island,[34]

---

[26]    Da Lin, *Coronavirus Pandemic: Over 300 Alameda County Jail Inmates Approved For Early Release,* KPIX News (Mar. 19, 2020),
https://sanfrancisco.cbslocal.com/2020/03/19/coronavirus-pandemic-247-alameda-county-jail-inmates-approved-for-early-release/.

[27]    Julia Marsh, Ben Feuerherd, *NYC to begin releasing inmates amid coronavirus outbreak*, New York Post (Mar. 18, 2020), https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/.

[28]    Bob Mayo, *Release of up to 100 Allegheny County Jail inmates a day underway as coronavirus precaution*, WTAE News (Mar. 19, 2020), https://www.wtae.com/article/release-of-up-to-100-allegheny-county-jail-inmates-a-day-under-way-as-coronavirus-precaution/31787878.

[29]    Meera Bhonslé, *Jail numbers affected by judicial coronavirus directives*, Cola Daily (Mar. 19, 2020) https://www.coladaily.com/communities/lexington/jail-numbers-affected-by-judicial-coronavirus-directives/article_bb2df04e-6a22-11ea-a187-f3aec5c6ac7d.html.

[30]    Jenna Carroll, *Inmates being released early from JeffCo Detention Facility amid coronavirus concerns*, KDVR News (Mar. 19, 2020),
https://kdvr.com/news/coronavirus/inmates-being-released-early-from-jeffco-detention-facility-amid-coronavirus-concerns/.

[31]    S.P. Sullivan, *N.J. releasing some non-violent inmates from jail this week to fight coronavirus outbreaks behind bars*, NJ Advance Media (Mar. 23, 2020),
https://www.nj.com/coronavirus/2020/03/nj-will-start-releasing-some-non-violent-inmates-from-jail-this-week-in-effort-to-stop-outbreak-behind-bars.html.

[32]    Linh Ta, *Iowa's prisons will accelerate release of approved inmates to mitigate COVID-19*, Times-Republican (Mar. 23, 2020), https://www.timesrepublican.com/news/todays-news/2020/03/iowas-prisons-will-accelerate-release-of-approved-inmates-to-mitigate-covid-19/.

[33]    Arielle Zionts, *DOC, Noem not planning special coronavirus releases from prisons*, Rapid City Journal (Mar. 21, 2020), https://rapidcityjournal.com/news/local/crime-and-courts/doc-noem-not-planning-special-coronavirus-releases-from-prisons/article_d999f510-7c7c-5d19-ab3a-77176002ef99.html.

[34]    Katie Mulvaney, *R.I. prisons looking to reduce inmate numbers due to virus*, The Providence Journal (Mar. 25, 2020) https://www.southcoasttoday.com/news/20200325/ri-prisons-looking-to-reduce-inmate-numbers-due-to-virus.

Colorado,[35] California,[36] and Washington County, Oregon.[37] In December 2020, a state court in Orange County, California ordered that the county jail population be halved as a means to prevent the spread of the COVID-19 virus.[38]

42.    In early 2020, the US. Department of Justice expedited transfer of federal prisoners to home detention because "'emergency conditions' created by the coronavirus . . . affected the ability of the [Bureau of Prisons] to function."[39]

43.    Courts in other jurisdictions ordered release to preempt harm to prisoners from COVID-19. *People ex rel. Stoughton et al. v. Brann*, No. 260154/2020 (Sup. Ct. Bronx Cty. Mar. 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *In re Request to Commute or Suspend County Jail Sentences*, No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any inmate in New Jersey serving a county jail sentence

---

[35]    John Herrick, *Colorado places a moratorium on new prison intakes during pandemic*, The Colorado Independent (Mar. 26, 2020), https://www.coloradoindependent.com/2020/03/26/colorado-moratorium-prisons-inmates-covid-19-cspii/.

[36]    Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, The Los Angeles Times (Mar. 31, 2020), https://www.latimes.com/california/story/2020-03-31/coronavirus-california-release-3500-inmates-prisons.

[37]    Noelle Crombie, *Oregon courts, jails respond to coronavirus: Washington County jail to release 60 inmates; court hearings see widespread delays*, The Oregonian (Mar. 16, 2020), https://www.oregonlive.com/coronavirus/2020/03/oregon-courts-jails-respond-to-coronavirus-washington-county-jail-to-release-60-inmates-court-hearings-see-widespread-delays.html.

[38]    https://www.latimes.com/california/story/2020-12-12/court-orders-orange-county-sheriff-to-cut-jail-population-in-half.

[39]    Katie Benner, *Barr Expands Early Release of Inmates at Prisons Seeing More Coronavirus Cases*, The New York Times (Apr. 3, 2020), https://www.nytimes.com/2020/04/03/us/politics/barr-coronavirus-prisons-release.html

as a condition of probation or as a result of a municipal court conviction). In addition, many courts ordered release of people from immigration detention.[40]

COVID-19 in Oregon

44.     In Oregon, where testing was slow to begin and become readily available, as of the date of the Sixth Amended Complaint, more than 367,000 people had tested positive and 4,377 people had died.[41] Both nationwide and in Oregon, a large and disproportionate percentage of the people who tested positive for the virus lived in congregate-living facilities. Because of the greater risk to persons in congregate living settings, Defendant Brown's office initially stated that the state's second-highest priority for testing, behind only those persons with symptoms who work in critical infrastructure, was anyone with symptoms in correctional facilities, hospitals, and other high-risk congregate settings.[42]

---

[40]     On March 23, 2020, a panel of Ninth Circuit judges ordered a detained person released "[i]n light of the rapidly escalating public health crisis." *Xochihua-Jaimes v. Barr*, 18-71460, Doc. No. 53 (9th Cir. Mar. 23, 2020) (unpublished). *See also Castillo v. Barr*, 20-cv-605 (C.D. Cal. Mar. 27, 2020) (ordering that petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *Jimenez v. Wolf*, Docket No. 507, 18-cv-225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *Coronel v. Decker*, 20-cv-2472 (S.D.N.Y. Mar. 27, 2020) 2020 WL 1487274 (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); *Basank v. Decker*, 2020 WL 1481503 (granting release of ten petitioners who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19" from immigration detention and explaining ""public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions.").

[41]     Oregon Health Authority COVID-19, Oregon COVID-19 Cases Demographics & Disease Severity Statewide (updated Oct. 2021), https://public.tableau.com/app/ profile/oregon.health.authority.covid.19/viz/OregonCOVID-19CaseDemographicsandDisease SeverityStatewide/DiseaseDeathData (last visited Oct. 5, 2021).

[42]     Brad Schmidt, *Oregon prioritizes who can be tested for coronavirus -- with the tests it doesn't have*, The Oregonian (Mar. 19, 2020), https://www.oregonlive.com/coronavirus/2020/03/oregon-prioritizes-who-can-be-tested-for-coronavirus-with-the-tests-it-doesnt-have.html

45.    On March 8, 2020, Defendant Brown declared an emergency under ORS 401.165 due to the public health threat posed by COVID-19.  Defendant Brown extended that declaration eight times.  As of the date of the Sixth Amended Complaint, Defendant Brown's emergency declaration remained in effect.[43]

46.    On March 10, 2020, based on recommendations from OHA, the Oregon Department of Human Services imposed restrictions and protective measures to limit visitors to long-term care facilities to only essential personnel.

47.    On March 11, 2020, the World Health Organization announced that COVID-19 is a global pandemic.

48.    On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency.  That declaration continued in effect as of the date of the Sixth Amended Complaint.[44]

49.    On March 19, 2020, Defendant Brown ordered the postponement of non-urgent health care procedures to conserve personal protective equipment and hospital beds for the state's COVID-19 emergency response efforts.

50.    On March 23, 2020, Defendant Brown issued an Executive Order titled "Stay Home, Save Lives."  In it, Defendant Brown ordered Oregonians to shelter-in-place and to take precautions to keep a distance of at least six feet between individuals.  Stay Home, Save Lives

---

[43]    https://www.oregon.gov/gov/Documents/executive_orders/eo_21-15.pdf (last visited Oct. 5, 2021).

[44]    https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/#:~:text=On%20March%2013%2C%202020%2C%20by,(COVID%2D19)%20pandemic.&text=For%20this%20reason%2C%20the%20national,effect%20beyond%20March%201%2C%202021.

mandated the closure of facilities that provide a transmission environment for COVID-19 similar to prisons.

51.    Between March 17, 2020, and the date of the Sixth Amended Complaint, Defendant Brown issued a series of COVID-19-related emergency orders restricting and/or mandating phased reopening of public buildings, business, restaurants, schools, and other facilities on a county-by-county basis.  To determine whether a county is eligible for phased reopening, Defendant Brown assigned each county a "County Risk Level," which was updated every two weeks in response to the then-existing state of COVID-19 in that county.

COVID-19 Prevention

52.    The best way to avoid contracting COVID-19 is by avoiding exposure to the virus by avoiding close contact with other people. The virus is transferred through respiratory droplets produced by breathing, speaking, coughing, or sneezing.  To prevent those droplets from exposing a person to the virus, people should wash their hands regularly, clean and disinfect frequently touched surfaces, and stay at least six feet from others.  The virus can be spread by people who are not showing symptoms of infection.[45]

53.    By failing to implement appropriate measures in response to and to protect against the spread of COVID-19, ODOC not only put Plaintiffs and other incarcerated adults at risk, but also put at risk the health and lives of the communities surrounding ODOC's 14 prisons.[46]

54.    In late 2020, the Food and Drug Administration approved vaccines for public use.  Defendant OHA is responsible for prioritization and distribution of vaccines.  OHA initially put incarcerated adults in Phase 1B, after teachers and students.[47]  By comparison, OHA put prison staff and residents of other congregate living facilities in Phase 1A.

55.    On January 12, 2021, Defendant Brown announced that seniors over the age of 65 and childcare, preschool, and K-12 employees to start receiving vaccinations on January 23, 2021.[48]  No similar start date was announced for people incarcerated in Oregon DOC facilities.

---

[45]    Centers for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html
[46]    *See* Amicus Brief of Dr. Mary T. Bassett, et al., Committee for Public Counsel Services and Massachusetts Association of Criminal Defense Lawyers v. Chief Justice of the Trial Court, No. SJ-2020- (Supreme Judicial Court for the County of Suffolk, Mar. 24, 2020), available at https://www.aclum.org/sites/default/files/field_documents/amici_letter_-_public_health_experts_-_cpcs_macdl_v._chief_of_trial_court_1.pdf.
[47]    https://covidvaccine.oregon.gov/#prioritization.
[48]    https://www.oregonlive.com/news/2021/01/gov-kate-brown-announces-oregonians-age-65-and-teachers-can-get-vaccinated-against-covid-19-starting-jan-23.html.

On January 15, 2021, Defendant Brown announced that the start date for vaccinations for seniors and school employees would be pushed back to February 8, 2021.[49]  Later, Defendant Brown clarified that the start date for teachers would be January 25, 2021.[50]

56.    On January 16 and 17, 2021 ODOC offered vaccines to approximately 1558 adults in custody who were deemed high risk or who were elderly.  Notwithstanding that early vaccination of a small number of adults in custody, the remaining adult in custody population—some 12,000 people—were not scheduled for vaccination at that time.

ODOC's Response to COVID-19

57.    On March 4, 2020, DOC activated the Agency Operations Center (AOC), an entity and/or group of agency officials designated to oversee and make decisions pertaining to the agency's response to COVID-19.  Defendants Bugher and Russell were charged with oversight and leadership of the AOC, and acted in that role during the Class period.

58.    On March 8, 2020, Defendant Brown declared a state of emergency due to the public health threat posed by COVID-19, noting that the declaration was made in an effort to "flatten the curve" of the virus.

---

[49]    Oregon to start COVID-19 vaccinations of teachers Jan. 25, seniors 65+ to wait to Feb. 8 https://www.oregonlive.com/news/2021/01/oregon-to-start-covid-19-vaccinations-of-teachers-jan-25-seniors-65-to-wait-to-feb-8.html.
[50]    Oregon to start COVID-19 vaccinations of teachers Jan. 25, seniors 65+ to wait to Feb. 8 https://www.oregonlive.com/news/2021/01/oregon-to-start-covid-19-vaccinations-of-teachers-jan-25-seniors-65-to-wait-to-feb-8.html.

59.    On or about March 13, 2020, ODOC announced that it was "coordinating with [OHA] and following the [CDC] recommendations to prevent the spread [of] COVID-19."[51] ODOC suspended visiting and limited institution access to essential staff at all 14 facilities.[52]

60.    On March 27, 2020, the CDC issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("the CDC Guidelines").[53]

61.    The CDC Guidelines issued fell far below community standards of preventative medical care. They fell short of the standards set by Defendant Brown (and the governors of neighboring states) to reduce the transmission of COVID-19 among members of the general public. They also fell short of the CDC's guidelines to reduce transmission among the general public. And, finally, they fell short of the recommendations of experts in prison healthcare and epidemiology.[54] These shortfalls were particularly significant due to heightened transmissibility of COVID-19 within prisons.

62.    The first major outbreak of COVID-19 in an ODOC facility occurred at OSP in late March 2020 through staff-to-staff transmission. On April 1, 2020, ODOC announced that an employee at OSP had tested positive for COVID-19.[55] On April 2, 2020, ODOC confirmed that

---

[51]    Oregon Department of Corrections,
https://www.oregon.gov/doc/covid19/Pages/default.aspx (last visited Apr. 1, 2020).
[52]    Oregon Department of Corrections,
https://www.oregon.gov/doc/covid19/Pages/default.aspx (last visited Apr. 1, 2020).
[53]    Though issued on March 27, these interim guidelines were based on what was known about the transmission and severity of COVID-19 as of March 23, 2020, two weeks before the filing of Plaintiffs' initial complaint. The CDC noted at the beginning of the document that its recommendations might need to be revised as more information becomes available.
[54]    *See supra, e.g.*, n. 9, 45, 46.
[55]    Noelle Crombie, *Prison employee is first confirmed coronavirus case in Oregon Department of Corrections*, The Oregonian (April 1, 2020),
https://www.oregonlive.com/coronavirus/2020/04/prison-employee-is-first-confirmed-case-of-covid-19-in-oregon-department-of-corrections.html.

an ODOC prisoner housed at Santiam tested positive for COVID-19.[56]  Also on April 1, 2020, Stacy Chamberlain, executive director of the American Federation of State, County and Municipal Employees in Oregon, which represents some ODOC employees, stated that she was "particularly concerned that the prison system lacks personal protective equipment, calling it 'one of the big issues we have been yelling about for weeks and the lack of it and the supply of it is a concern in prisons.'"[57]

63.    By Friday, April 3, ODOC had transferred two AICs, one confirmed positive and another presumed positive, from OSP to Coffee Creek.

64.    As early as April 2020, Defendants were aware that wearing a mask helps to prevent the spread of COVID-19.  No later than April 13, 2020, ODOC knew of the importance of wearing masks to protect against the spread of COVID-19 and viewed masking as a primary control measure, acknowledging that social distancing in ODOC facilities is infeasible and thus that masks are particularly important.  That day, ODOC distributed widely information showing that it knew that masks were essential to prevent infection and the spread of infection throughout its facilities.

65.    On April 16, 2020, the AOC approved a "Death in Custody" plan, through which officers in charge were directed to notify funeral homes if a deceased had COVID-19.

---

[56]    Jayati Ramakrishnan, *First inmate in the Oregon prison system tests positive for coronavirus*, The Oregonian (April 3, 2020),
https://www.oregonlive.com/coronavirus/2020/04/first-inmate-in-the-oregon-prison-system-tests-positive-for-coronavirus.html.
[57]    *See supra* n. 55.

66.    Notwithstanding Defendants' knowledge and the CDC Guidelines, Defendants failed to substantially follow CDC standards to protect against the spread of COVID-19.  For example, among other failures,

(a)    Defendants consistently and routinely failed to comply with the CDC's *Guidance on Management of COVID-19 in Correctional and Detention Facilities*, in that Defendants (1) did not assign bunks to provide additional space between AICs, and (2) routinely allowed mixing of AICs from different housing groups and/or units in workplaces, including OCE worksites, prison kitchens, prison laundry, and for the purposes of transfers to, from, and between institutions.  Defendants failed to suspend all non-medical transfers or consistently wear recommended personal protective equipment, including masks.  Defendants also failed to use recommended practices for medical isolation and failed transfer to a facility as a last resort for isolation.  Defendants routinely combined and/or mixed AICs with confirmed cases and AICs with suspected cases in cohorts, again contrary to guidance.

(b)    Apart from that required by OSHA's November 2020 rule, ODOC failed to draft written protocols and procedures for how and when to communicate to staff information related to COVID-19, including how to maintain a basic understanding of the disease symptoms, spread, and measures to prevent transmission.  ODOC also failed to draft written protocols and procedures for consistently and routinely communicating with AICs about the importance of social distancing, the purpose of

quarantine and medical isolation, and steps to address concerns related to reporting symptoms.

(c)    ODOC failed to create consistent, written policies and protocols to minimize the numbers of AICs housed in the same room, failed to implement alternatives to incarceration and other decompression strategies, and failed to create diversion of new intakes to other facilities, at defined thresholds, to minimize crowding.

(d)    ODOC failed to create consistent, written policies for routine testing of asymptomatic staff, failed to create written policies for routine testing of staff identified as a close contact of someone with COVID-19 but allowed to continue to work because of staff shortages, and failed to make COVID-19 testing available to staff on-site at correctional facilities.

(e)    ODOC failed to create consistent, written policies relating to the isolation or quarantine requirements for staff with known COVID-19 exposures or close contacts.

(f)    ODOC failed to develop and maintain written policies relating to (1) the modification of staff assignments to minimize mixing and movement across housing units and other areas; (2) the creation of work detail assignments to assure that each detail included only individuals from a single housing unit supervised by staff assigned to the same housing unit; (3) minimizing interactions between AICs living in different housing units through rearranged schedule movements, telemedicine, staggered

medication lines, or the designation of a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms.

(g)     ODOC failed to establish written protocols and policies for case-contact identification and management, including definitions, instructions, and timelines for identification of close contacts of a known or suspected COVID-19 case; policies regarding COVID-19 viral testing of all identified close contacts; directives and instructions for the conduct of broad-based viral testing in settings where contact tracing may not have been feasible; and mechanisms to ensure that medical isolation or quarantine was distinct from punitive solitary confinement, both in name and in practice.

(h)     ODOC failed to draft written policies and protocols relating to intake and release procedures, including routine intake quarantine in single cells for 14 days prior to AIC entry into a facility, routine release quarantine in single cells for 14 days prior to release date, all associated testing requirements and procedures related to such intakes or releases; failed to establish mechanisms to ensure that re-entry programs included information on accessing housing, social services, mental health services, and medical care within the context of social distancing restrictions and limited community business operations; and failed to create procedures to preferentially link individuals needing shared housing to accommodations with the greatest capacity for social distancing.

(i)     ODOC failed to establish written protocols for COVID-19 ventilation improvements, including installation of MERV-13 or greater central HVAC air filtration, 24/7 maximization of air exchange, use of portable room air cleaners with HEPA filters, and installation of UVGI (ultra-violet germicidal irradiation).

(j)     Defendants failed to incorporate CDC recommendations into ODOC's agency-wide written COVID-19 operational policies and protocols until after its peak of AIC positive COVID-19 cases and deaths.

(k)     ODOC permitted, and in some circumstances encouraged, indifference and hostility toward COVID-19 control and protective measures, increasing risks to AICs.

67.     ODOC has acknowledged that its "institutions were not designed with a pandemic in mind.  We weren't designed to keep people six feet away from each other.  We can't just place people in extra classrooms or corridors to create distance, we're a correctional facility."[58]

68.     On or around May 8, 2020, the AOC decided that ODOC staff were required to wear masks at all institution if they could not maintain 6 feet of distance between other persons.

69.     Thereafter, however, ODOC was aware that many of its staff members refused to wear masks inside ODOC facilities, including at Coffee Creek, Columbia River, EOCI, Mill Creek, OSP, Powder River, Shutter Creek, Snake River, South Fork, and TRCI.

---

[58]     Alex Zielinski, *Q&A: Department of Corrections' Chief Medical Officer on Treating COVID-19 in Oregon Prisons*, Portland Mercury (Apr. 1, 2020), https://www.portlandmercury.com/blogtown/2020/04/01/28231039/qanda-department-of-corrections-chief-medical-officer-on-treating-covid-19-in-oregon-prisons.

70.     It was not until July 9, 2020, that the AOC and ODOC communicated to ODOC staff about masks requirements.  On July 13, 2020, ODOC sent an email to all staff announcing that staff were required to wear masks if they could not maintain 6 feet of distance between other persons.

71.     During the Class Period, ODOC, including each of the Individual Defendants, has failed to take meaningful and adequate steps in response to the COVID-19 pandemic.

72.     Defendants failed to take appropriate and prompt steps to adequately prevent, test, and treat COVID-19 across all ODOC facilities, systemwide and at each individual facility, including at OSCI, Coffee Creek, CRCI, Deer Ridge, EOCI, OSCI, Mill Creek, OSP, Powder River, Shutter Creek, Santiam, Snake River, TRCI, and Warner Creek.

73.     Among other things, and in addition to the failures set forth above, Defendants failed to:

    (a)     Implement and enforce masks policies, across the ODOC system and at each individual ODOC facility, that meaningfully and adequately protect against the spread of COVID-19;

    (b)     Provide adequate space for incarcerated adults or ODOC staff to socially distance from other inmates and staff;

    (c)     Implement and enforce quarantine and non-mixing policies, across the ODOC system and at each individual ODOC facility, sufficient to protect against the spread of COVID-19;

    (d)     Screen ODOC staff and other individuals entering ODOC facilities for COVID-19 symptoms.

74.     Plaintiffs were unable to proceed with administratively grieving ODOC's shortcomings, because ODOC declined to accept grievances relating to social distancing or other aspects of Defendant Brown's emergency orders or Defendants actions or failures to act.

75.     Fearing retaliation, many other ODOC prisoners were afraid to complain about the conditions in their facilities during the Class Period.  Each of the named Plaintiffs recalls times when they personally experienced or witnessed retaliation in the form of transfers to facilities far away from their family members or other relations, loss of privileges, discipline, solitary confinement, curtailment of speech rights, and even physical retribution.

OCE's Response

76.     Upon information and belief, OCE continued to draw workers from ODOC facilities during the Class Period.

77.     These workers were not trained on how to avoid the spread of COVID-19 while on the job and were not given opportunities to remain outside of close contact from one another.

78.     Workers from different living units are required to share the workplace.  After working in close contact with another, OCE workers are then returned to their living units.

Population reduction is urgent.

79.     Courts, public health experts, and corrections professionals agree that significantly downsizing prison populations was the most important tool to combat the spread of COVID-19 among residents, staff, and the greater community.

80.     Dr. Marc Stern, the former Assistant Secretary of Health Care for the Washington State Department of Corrections put it plainly: "Downsizing jail populations serves two critical public health aims: (1) targeting residents who are at elevated risk of suffering from

severe symptoms of COVID-19 and (2) allowing those who remain incarcerated to better maintain social distancing and avoid other risks associated with forced communal living."[59]

81.    After reviewing the specific conditions in numerous jails and prisons, Dr. Stern was "firmly convinced that downsizing the inmate population as much as possible will reduce the risk of contraction and transmission of COVID-19 — and the attendant risks of serious harm and death."[60]  In Dr. Stern's expert opinion, downsizing the population of the jail would have "help[ed] to 'flatten the curve' overall—both within the jail setting and without."[61]  That is because, given the churn of people — residents, staff, visitors — through Defendants' facilities, the outbreak of COVID-19 in the jail would be impossible to confine to the DOC facilities.

82.    Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine and former Infectious Disease physician for York Correctional Institution in Connecticut, also reviewed the spread of COVID-19 in many facilities came to the same conclusion: "Reducing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large."[62]  Dr. Meyer emphasized the risks that prisoners like the plaintiffs and proposed class members would contract COVID-19, and the risk that they would suffer serious illness and death from the infection.[63]  Because of the "significantly higher risk" to prisoners, Dr. Meyer writes that, "from a public health

---

[59]    Expert Declaration of Dr. Marc Stern, *Dawson, et. al. v. Asher, et. al.*, USDC of W.D. Wash. No. 2:20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020), at ¶ 13, *available at* https://www.aclu.org/legal-document/dawson-vasher-expert-declaration-dr-marc-stern
[60]    *Id.* at ¶ 11.
[61]    *Id.* at ¶ 14.
[62]    *See supra* n. 9 at ¶ 34.
[63]    *Id*. at ¶ 33.

perspective," she is "strongly of the opinion that individuals who are already in those facilities should be evaluated for release."[64]

83.     The New England Journal of Medicine published, "Flattening the Curve for Incarcerated Populations—Covid-19 in Jails and Prisons," which advocates for "releasing as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm[.]"[65]  Decarceration "will help to flatten the curve of Covid-19 cases among incarcerated populations and limit the impact of transmission both inside correctional facilities and in the community after incarcerated people are released. Such measures will also reduce the burden on the correctional system in terms of stabilizing and transferring critically ill patients, as well as the burden on the community health care system to which such patients will be sent."[66]  "To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world."

84.     Defendants could have used several mechanisms to ensure that unduly dangerous prisoners remain in custody.  These include establishing selection criteria based on criminal history, disciplinary history, and current physical capacity.  Procedures available for population reduction included early release to supervision of the Board of Parole and Post-Prison Supervision, advancing release dates of prisoners with severe medical conditions or who are

---

[64]     *Id*. at ¶ 35.
[65]     *See supra* n. 9.
[66]     *Id.* at 3.

elderly and permanently incapacitated pursuant to ORS 144.126, compassionate release, clemency, temporary furlough or reprieve, and temporary release to house arrest.

85.    Across the world, country, and Oregon, extraordinary and unprecedented measures affecting every aspect of life were taken in the name of protecting people from COVID-19. Because of the particular threats to Plaintiffs' health as members of the groups of people most at risk for severe COVID-19 illness and death, Plaintiffs should have been provided the adequate care recommended by health experts, including their release, if safe. ODOC and the individual Defendants cannot continue to allow people in prisons to suffer and die.

86.    Plaintiffs Maney, Clift, Hart, and members of the Damages Class have either exhausted their claims or have no available administrative remedy.

Vaccines are an urgent priority.

87.    Vaccinations are the single best hope for building herd immunity, slowing the spread, and lessening the severity of the COVID-19 virus. There is no reasonable dispute about the importance or efficacy of vaccines and the urgent need for prompt vaccination.

Deaths resulting from COVID-19

88.    The death toll from COVID-19 in ODOC facilities accelerated throughout the pendency of this case. Between May 2020 and the end of the Class Period, 46 adults in custody died. COVID-19 caused or contributed to many of those 46 deaths.

89.    Juan Tristan's COVID-19 disease caused or contributed to his death. At the time of his death, Mr. Tristan was 58 years old. He is survived by four adult children, each of whom suffered losses of society and companionship.

## CAUSES OF ACTION

### Claim 1
### Violation of Eighth Amendment
### (42 U.S.C. § 1983)

### All Plaintiffs against Individual-Capacity Defendants

90.     Plaintiffs reallege and incorporate paragraphs 1 through 89 as if fully set forth

herein.

91.     The Eighth Amendment to the U.S. Constitution, as incorporated against States

through the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and

unusual punishment by State actors.  Specifically, prisoners in state custody have a right to be

protected from heightened exposure to a serious communicable disease, including COVID-19.

Here, Defendants were deliberately indifferent to the rights of Plaintiffs and members of the

class to be protected from such exposure.

92.     Defendants were deliberately indifferent to the rights of Plaintiffs and members of

the Damages Class and Wrongful Death Class, including to their rights to be protected from

heightened exposure to a serious communicable disease like COVID-19.  Defendants therefore

acted in violation of the Eighth Amendment.  Among other things, Defendants

> (a)     failed to promptly and continuously implement and enforce a mask
>
> mandate with respect to all ODOC employees, OCE employees, ODOC
>
> contractors, and incarcerated adults.  This allegation applies to all
>
> Individual-Capacity Defendants except Defendant Patrick Allen;
>
> (b)     failed to promptly, consistently, and adequately screen employees for
>
> COVID-19 symptoms and exposure upon entry to ODOC facilities.  This
>
> includes Defendants' failures to timely require necessary and protective

screening measures, including questions and fever checks for ODOC employees working in prisons, and failures to require corrections officers screened at institution entry points to follow social distancing and mask protocols.  This allegation applies to all Individual-Capacity Defendants except Defendant Patrick Allen;

(c)    failed to provide COVID-19 testing to incarcerated adults who presented with symptoms and to incarcerated adults who came into contact with adults who tested positive for or were otherwise exposed to COVID-19. This allegation applies to all Individual-Capacity Defendants except Defendant Patrick Allen;

(d)    failed to follow CDC Guidelines and implement necessary public health measures to protect against the spread of COVID-19 in ODOC institutions, including but not limited to by failing to implement and enforce proper quarantines and/or social distancing for individuals who contracted or became exposed to COVID-19 and by allowing mixing between and among adults in custody and ODOC staff and contractors without regard to the risk that adults in custody would or could become exposed to COVID-19.  Defendants' failures further included, among others, their routine failures to consider, evaluate, or use emergency beds and spaces in other facilities (including but not limited to Deer Ridge Correctional Institution and available portions of Oregon State Penitentiary) to create space for AIC distancing; Defendant Brown's decision to instead *close* facilities, including Mill Creek Correctional

Facility and Shutter Creek Correctional Institution, reducing space available for distancing and increasing the population density at other ODOC facilities; and Defendants' decisions to close portions of facilities temporarily, including Coffee Creek, during the pandemic. The risks that these failures created to the health and safety of AICs was higher in light of Defendant Brown's failure to meaningfully consider and implement options for population reduction as a strategy to protect against COVID-19 transmission within and across ODOC facilities. This allegation applies to all Individual-Capacity Defendants;

(e)     failed to implement additional OSHA guidance to protect against workplace transmission of COVID-19, including by: (1) failing to require masks for employees; (2) failing to require masks for staff during transportation; (3) failing to require a each institution to establish and implement an infection control plan by December 7, 2020; (4) failing to require each institution to conduct a COVID-19 exposure risk assessment by December 7, 2020; (5) failing to require employees to complete COVID-19-related training by December 21, 2020; and (6) failing to timely address ventilation requirements, including updates to optimize HVAC systems, replacement and maintenance of air filters, and cleaning of any air intake ports. This allegation applies to all Individual-Capacity Defendants except Defendant Patrick Allen;

(f)     allowed and implemented a "tier system" for COVID-19 response that was contrary to public health guidance and failed to prevent the spread of

COVID-19 and instead counteracted any efforts at prevention or

transmission by not requiring institutions to enforce stricter COVID-19

prevention measures (as required under a higher "tier") until an AIC or

staff member was confirmed positive through a laboratory-verified test

and recorded in the Oregon Public Health Epidemiology User System.

This allegation applies to all Individual-Capacity Defendants; and

(g)    failed initially to prioritize adults in custody for COVID-19 vaccine

distribution.  This allegation applies to all Individual-Capacity Defendants.

93.    In doing so, Defendants, and each of them, acted with callous disregard for the

rights, serious medical needs, and physical safety of Plaintiffs and members of the Damages

Class and the Wrongful Death Class.

94.    Furthermore, by operating and continuing to operate ODOC facilities that lack the

capacity to treat, test, or prevent or protect against a COVID-19 outbreak and/or spread,

Defendants, and each of them, other than Defendant Patrick Allen, acted as direct participants

and the ultimate policy makers for the ODOC facilities and ODOC's response to the COVID-19

pandemic, violated the rights of Plaintiffs and members of the Damages Class and the Wrongful

Death Class to be protected against heightened exposure to COVID-19.   In doing so, Defendants

acted with callous disregard for the rights, serious medical needs, and physical safety of

Plaintiffs and members of the Damages Class and Wrongful Death Class.

95.    As to the Damages Class, Plaintiffs Maney, Clift, and Hart, and any other Plaintiff

or class member who develops and is diagnosed with COVID-19 during the Class Period is

entitled to damages against Defendants, and each of them, for pain and suffering and harms and

losses resulting from COVID-19.  Plaintiffs and members of the Damages Class are further entitled to an award of punitive damages in an amount to be proven at trial.

96.     As to the Wrongful Death Class, Plaintiff Ramirez, on behalf of the Estate of Juan Tristan and members of the Wrongful Death Class are entitled to recover additional damages for death.  Plaintiff and members of the Wrongful Death Class are further entitled to an award of punitive damages in an amount to be proven at trial.

97.     Plaintiffs are entitled to recover attorneys' fees.  42 U.S.C. § 1988.

## Claim 2
### Negligence
### Damages Class Against All Defendants

98.     Plaintiffs reallege and incorporate paragraphs 1-97 as if fully set forth herein.

99.     Defendants, and each them, in acting or failing to act in the manner described in this complaint, were acting in the course and scope of their employment with the State of Oregon, ODOC, and/or OHA.

100.     Defendants, and each of them, were negligent in one or more of the following ways that caused harm to Plaintiffs Maney, Clift, Hart, and members of the Damages Class:

(a)     In failing to promptly and continuously ensure that incarcerated adults, employees, OCE employees, and contractors wear masks;

(b)     In failing to adequately screen employees for COVID-19 symptoms and exposure upon entry to ODOC facilities;

(c)     In failing to implement and enforce ODOC policies intended to achieve necessary social distancing in ODOC facilities;

(d)     In failing to provide COVID-19 testing to incarcerated adults who presented with symptoms and to incarcerated adults who came into contact

with adults who tested positive for or were otherwise exposed to COVID-19.

(e)     In failing to properly quarantine incarcerated adults awaiting COVID-19 testing results;

(f)     In failing to properly quarantine incarcerated adults after transferring them from a facility with confirmed COVID-19 infections to another facility;

(g)     In allowing mixing between and among incarcerated adults and ODOC staff and contractors without regard to the risk that incarcerated adults would or could become exposed to COVID-19; and

101.    In failing to consider entirely the use of alternative space, including emergency beds and mothballed facilities, to increase the space available for AIC social distancing. Plaintiffs Maney, Clift, Hart, and members of the Damages Class suffered harm as a result of Defendants' negligence, including pain, suffering, disability, and permanent injury resulting in economic and non-economic damages in amounts to be proven at trial.

## Claim 3
### Wrongful Death – ORS 30.020
### Wrongful Death Class Against All Defendants

102.    Plaintiffs reallege and incorporate paragraphs 1-101 as if fully set forth herein.

103.    Defendants, and each them, in acting or failing to act in the manner described in this complaint, were acting in the course and scope of their employment with the State of Oregon, ODOC, and/or OHA.

104.    Defendants, and each of them were negligent in one or more of the ways set forth under ¶ 100.

105.    As a result of Defendants' negligence, Juan Tristan contracted COVID-19 and died.  Juan Tristan's COVID-19 disease caused or contributed to his death.

106.    Juan Tristan's estate has sustained damages as a result.  His estate has been deprived of the society, companionship, support, and services of Mr. Tristan, resulting in noneconomic damages in an amount to be proven at trial.  His estate has further sustained economic loss, including burial, medical, memorial, and funeral expenses, as well as lost future earnings in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows.

A.    Injunctive relief in the following particulars:

(a)    Order Defendants to institute a safety plan to prevent additional COVID-19 outbreaks and spread;

(b)    Order Defendants to provide single-cell quarantine of persons who have come into contact with persons known to have COVID-19, isolation with proper medical checks for those who are experiencing COVID-19 symptoms, and safe housing for individuals as appropriate and without incorporating disciplinary characteristics to those preventive housing moves;

(c)    any other remedy the Court sees just and fit to address the constitutional violations outlined above.

B.    On all of Plaintiffs' claims for relief, compensatory damages for pain and suffering and harms and losses in amounts to be proven at trial;

C.     On Plaintiffs' first claim for relief, an award of punitive damages in an amount to

        be proven at trial;

D.     Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

E.     Such other relief as the court deems just and proper; and

F.     Plaintiffs demand a jury trial for all matters triable of right to a jury.

Respectfully submitted on November 7, 2023.

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Tel: (503) 944-2270
Fax: (971) 275-1839

/s/ Nadia H. Dahab
**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
Tel: (503) 228-6474
Fax: (503) 228-2556