**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
Telephone: 503-228-6474
Facsimile: 503-228-2556

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; SHERYL LYNN SUBLET; and FELISHIA RAMIREZ, personal representative for the ESTATE OF JUAN TRISTAN, individually, on behalf of a class of other similarly situated, | Case No. 6:20-cv-00570-SB <br><br> PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Plaintiffs, | |
| v. | *Oral Argument Requested* |
| STATE OF OREGON; KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; KEN JESKE; PATRICK ALLEN; JOE BUGHER; and GARRY RUSSELL, | |
| Defendants. | |

## CERTIFICATE OF COMPLIANCE WITH L.R. 7-1(A)

The undersigned certifies that on November 27, 2023 and November 29, 2023, counsel for Plaintiffs conferred with Counsels for Defendants about the relief sought. Defendants oppose this motion.

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs and the classes move for Partial Summary Judgment on Defendants Affirmative Defenses. The Court previously adjudicated a number of these defenses. Other defenses were settled by the Ninth Circuit or other courts. These are predominately motions brought on the law. Where facts are involved, they are beyond dispute. Defendants cannot prove nor are entitled to these plead Affirmative Defenses. The Court must GRANT Plaintiffs' Motions.

Plaintiffs and the classes move against the following affirmative defenses from Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Answer to Plaintiffs' Seventh Amended Complaint:

> No. 3: PLRA Failure to Exhaust (Dkt. 486, ¶¶ 68-9)
> No. 4: Three Judge Panel (*Id.* at ¶ 70)
> No. 7: Standing: Failure to Seek Commutation (*Id.* at ¶ 74)
> No. 8: *Heck v. Humphrey* Bar (*Id.* at ¶ 75)
> No. 10: Discretionary Immunity related to ¶¶ (*Id.* at ¶ 77)
> No. 13: Catch-All Exhaustion (*Id.* at ¶ 80)
> No. 16: Tort Claim Notice for the Negligence Class (*Id.* at ¶ 84)
> No. 17: Tort Claim Notice for the Wrongful Death Class (*Id.* at ¶ 86)
> No. 19: Comparative Fault for § 1983 claim (*Id.* at ¶ 90)
> No. 29: Legislative Immunity (*Id.* at ¶ 100)
> No. 30: Judicial or Quasi-Judicial Immunity (*Id.* at ¶ 101)

Plaintiffs and the classes move against the following affirmative defenses from Defendant Patrick Allen's Answer to Plaintiffs' Seventh Amended Complaint:

> No. 2: PLRA Failure to Exhaust (Dkt. 487, ¶ 62)
> No. 3: Three Judge Panel (*Id.* at ¶ 63)
> No. 6: Standing: Failure to Seek Commutation (*Id.* at ¶ 66)

No. 7: *Heck v. Humphrey* Bar (*Id.* at ¶ 67)
No. 10: *Catch-All Exhaustion* (*Id.* at ¶ 70)
No. 12: Comparative Fault for § 1983 claim (*Id.* at ¶ 73)
No. 22: Legislative Immunity (*Id.* at ¶ 83)

Plaintiff supports their motion with the Declaration of Counsel with attached deposition transcripts and a Memorandum of Law. For the reasons stated in their memorandum, Plaintiffs Motion must be **GRANTED**.

## <u>MEMORANDUM OF LAW</u>

## TABLE OF CONTENTS

I.      INTRODUCTION.....................................................................................................8

II.    STANDARDS FOR SUMMARY JUDGMENT .................................................8

III.   MOTIONS AGAINST AFFIRMATIVE DEFENSES ......................................9

   A.   Motions 1 and 2: Against Administrative Exhaustion Affirmative Defenses.............9

     1.   There was no available remedy for the Plaintiffs and Class in this pandemic. .............9

     2.   Catch-all administrative exhaustion .............................................................................13

   B.   Motion 3: Against Three-Judge Panel Affirmative Defense ......................................13

   C.   Motion 4: Against Standing for Failure to Seek Commutation...................................14

   D.   Motion 5: Against Heck Bar Affirmative Defense ......................................................15

   E.   Motion 6: Against Discretionary Immunity Affirmative Defense .............................17

   F.   Motions 7 and 8: Against Tort Claim Notice Affirmative Defenses Related to the

   Negligence and Wrongful Death Claim ........................................................................21

   G.   Motion 9: Against Comparative Fault Affirmative Defense in Relation to Plaintiffs'

   § 1983 Claim ....................................................................................................................24

   H.   Motion 10: Against Absolute Legislative Immunity Affirmative Defense.................26

     1.   Defendants' failure to request additional funding .......................................................28

     2.   Governor Brown's creation of early release criteria....................................................30

   I.   Motion 11: Against Absolute Judicial and Quasi-Judicial Immunity.......................31

IV.   CONCLUSION .................................................................................................33

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) .......................................................... 8

*Baker v. McCollan*, 443 U.S. 137 (1979) ...................................................................................... 25

*Basista v. Weir*, 340 F.2d 74 (3d Cir. 1965) ................................................................................. 25

*Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998)....................................................................... 27, 31

*Brown v. Plata*, 563 U.S. 493 (2011)............................................................................... 15, 17, 30

*Brown v. Portland Sch. Dist. No. 1*, 291 Or. 77 (1981) ................................................................ 24

*Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2004) ............................................................................. 12

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) .............................................................................. 32

*Budden v. Bd. of Sch. Comm'rs of City of Indianapolis*, 698 N.E.2d 1157 (Ind.1998) ............... 23

*Burns v. Reed*, 500 U.S. 478 (1991) .............................................................................................. 27

*Busche v. Burkee*, 649 F.2d 509 (7th Cir. 1981) ........................................................................... 25

*Butz v. Economou*, 438 U.S. 478 (1978)................................................................................... 31, 32

*Celotex Corp. v. Catrett*, 477 U.S. 317, (1986) ............................................................................. 8

*Chateaubriand v. Gaspard*, 97 F.3d 1218 (9th Cir. 1996) ........................................................... 27

*City of San Jose v. Superior Court.*, 12 Cal.3d 447, 525 P.2d 701 (Cal.1974)............................ 23

*Cleavinger v. Saxner*, 474 U.S. 193 (1985) .................................................................................. 32

*Cmty. House v. City of Boise*, 623 F.3d 945 (9th Cir 2010) .......................................................... 29

*Cook v. Kinzua Pine Mills Co.*, 207 Or. 34 (1956) ....................................................................... 26

*Cunningham v. Gates*, 312 F3d 1148 (9th Cir. 2002) ................................................................... 16

*Dennis v. Sparks*, 449 U.S. 24 (1980) ........................................................................................... 31

*Eacret v. Holmes*, 215 Or. 121 (1958) .......................................................................................... 33

*Edwards v. Balisok*, 520 U.S. 641 (1997) ..................................................................................... 16

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................................................... 26, 29

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..................................................................................... 26

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968) ............................................... 9

*Forrester v. White*, 484 U.S. 219 (1988) ....................................................................................... 27

*Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F2d 1103 (9th Cir 1987)............. 27

*Guerrero v. Gates*, 442 F.3d 697 (9th Cir. 2006) ........................................................................ 15

*Gutierrez-Medina*, 365 Or. 79 (2019).................................................................................... 25, 26

*Haugen v. Kitzhaber*, 353 Or. 715 (2013) .................................................................................... 33

*Heck v. Humphrey*, 512 U.S. 477 (1994)................................................................................. 15, 16

*Hughes v. Wilson*, 345 Or. 491 (2008).......................................................................................... 20

*Hurley v. Horzon Project, Inc.*, 2009 WL 5511205 (D. Or. Dec. 3, 2009) ................................. 25

*Hutchinson v. United States*, 838 F.2d 390 (9th Cir. 1988) ......................................................... 26

*Jones v. Allison*, 9 F.4th 1136 (9th Cir. 2021) .............................................................................. 27

*Kaahumanu v. Cnty. of Maui*, 315 F3d 1215 (9th Cir 2003) ....................................... 27, 28, 29, 30

*Kutz v. Lee*, 291 Or. App. 470 (2018) ........................................................................................... 23

*Larry v. Oregon by & Through Oregon Dep't of Hum. Servs.*, No. 3:16-CV-1892-AC, 2019 WL
    692799 (D. Or. Feb. 19, 2019).................................................................................................. 24

*Margulies v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, No. 3:13-CV-00475-PK, 2014 WL
    4419263 (D. Or. Sept. 8, 2014)................................................................................................. 23

*Marteeny v. Brown*, 321 Or. App. 250 (2022) ........................................................................ 30, 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................................... 9

*McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992), ................................................ 26
*McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730 (6th Cir. 2002) ............................. 25
*McKinney v. Benton Cnty.*, No. 6:19-CV-01444-AA, 2020 WL 5026845 (D. Or. Aug. 25, 2020)
................................................................................................................................ 24
*Miller v. Schmitz*, 2013 WL 5754945 (E.D. Cal. Oct. 23, 2013) ................................ 25
*Mosley v. Portland School Dist. No. 1J*, 315 Or. 85 (1992) ............................... 19, 20
*Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) ....................................... 16
*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885 (9th Cir. 2005) ........................................ 8
*Preiser v. Rodriguez*, 411 U.S. 475 (1973) ............................................................... 16
*Quezada v. Cty. of Bernalillo*, 944 F.2d 710 (10th Cir. 1991) ................................. 25
*Ramirez v. Galaza*, 334 F.3d 850 (9th Cir. 2003) .................................................... 16
*Ramirez v. Hawaii T&S Enters., Inc.*, 179 Or. App. 416 (1984) ............................... 19
*Robertson v. Wegmann*, 436 U.S. 584 (1978) .......................................................... 24
*Sellars v. Procunier*, 641 F.2d 1295 (9th Cir 1981) ................................................. 32
*Swift v. California*, 384 F.3d 1184 (9th 2004) .......................................................... 31
*State v. Gutierrez-Medina*, 365 Or. 79 ( .................................................................. 25
*Tenney v. Brandhove*, 341 U.S. 367 (1951) .............................................................. 27
*Trevino v. Gates*, 23 F.3d 1480 (9th Cir. 1994) ....................................................... 27
*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037 (9th Cir. 2016) ........... 16
*Turner v. State ex rel. Dep't of Transp.*, 270 Or. App. 353 (2015) ........................... 20
*Urban Renewal Agency v. Lackey*, 275 Or. 35 (1976) .............................................. 23
*Valenzuela v. City of Anaheim*, 6 F.4th 1098 (9th Cir. 2021) .................................. 24
*Westfall v. Or. Dep't of Corrections*, 355 Or. 144 (2014) ........................................ 19
*Yunker v. Mathews*, 32 Or. App. 551 (1978) ............................................................ 23

**Statutes**
18 U.S.C. § 3626 .................................................................................................. 13, 17
18 U.S.C. § 3626(1)(A) .............................................................................................. 14
28 U.S.C. § 1988(a) .................................................................................................. 24
42 U.S.C. § 1997e(a) ............................................................................................ 11, 13
ORS 144.650 .............................................................................................................. 33
ORS 30.275 ................................................................................................................ 21
ORS 30.275(3)(c) .................................................................................................. 22, 23

**Other Authorities**
Alison M. Mikkor, *Correcting for Bias and Blind Spots in PLRA Exhaustion Law*, 21 GEO.
MASON L. REV. 573 (2014) ................................................................................. 10
Chief Judge Jon O. Newman, *Not All Prisoner Lawsuits Are Frivolous*, Prison Legal News
(April 15, 1996) .................................................................................................... 11
Eugene Novikov, Comment, *Stacking the Deck: Futility and the Exhaustion Provision of the
Prison Litigation Reform Act*, 156 U. PA. L. REV. 817 (2008) ....................... 10, 11
Kermit Roosevelt III, *Exhaustion Under the Prison Litigation Reform Act: The Consequence of
Procedural Error*, 52 EMORY L.J. 1771 (2003) .................................................. 10
Margo Schlanger & Giovanna Shay, *Preserving the Rule of Law in America's Jails and Prisons:
The Case for Amending the Prison Litigation Reform Act*, 11 U. PA. J. CONST. L. 139 (2008)
................................................................................................................................ 10
Giovanna Shay, Exhausted, 24 FED. SENT'G REP. 287 (2012) ............................... 10

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................... 8

OAR 291-109-0205 ...................................................................................................... 11

OAR 291-109-0210(3)(a) ............................................................................................ 9

**Constitutional Provisions**

Or. Const. art V, § 14 ................................................................................................. 31

## I.  INTRODUCTION

For years, public health officials have planned for a surge in pandemic viruses. While COVID 19 was a novel virus that spread across the country and the world, most of Oregon was relatively spared.  Oregon prisons stood as a stark exception to the State's experience of COVID 19.  Over the course of this case, the parties, the Court, and counsel have watched as infections and deaths of those in custody soared. The Plaintiffs in this action bravely brought this case to save lives and honor the rights of their fellow incarcerated Oregonians who with deliberate indifference by the Defendants were subjected to conditions that ensured the rapid, uncontrolled spread of the virus.

The facts presented in this Motion are not meant to be comprehensive of the entire history and potential facts that may be brought in trial. They are presented here to provide context for the specific affirmative defenses Plaintiffs are moving upon. Where any motion raises particularized facts, those will be presented within the context of the motion.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the materials before the court "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986). In considering a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court will not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III. MOTIONS AGAINST AFFIRMATIVE DEFENSES

### A. Motions 1 and 2: Against Administrative Exhaustion Affirmative Defenses

Plaintiffs move against Defendants' affirmative defenses related to "administrative exhaustion."[1] Defendants' first citation to an exhaustion defense directly cites the Prison Litigation Reform Act, while the other defense broadly states that a "doctrine and statute" required "plaintiffs to first exhaust administrative remedies and plaintiffs have failed to do so." Conferral on the latter defense failed to clarify which doctrines or statutes applies here. Plaintiffs will address the PLRA defense then address the "catch all" exhaustion defense.

1. There was no available remedy for the Plaintiffs and Class in this pandemic.

Early in this case, the Court resolved the issue of administrative grievances as required by the PLRA in its Order on Plaintiff's Temporary Restraining Order. "ODOC's administrative grievance procedure is currently unavailable for the relief Plaintiffs seek in this case, and therefore exhaustion is not required for Plaintiffs to proceed on their Section 1983 claims." *Opinion & Order*, Dkt. 108, p. 23. At root for the present motion then is whether the relief sought by the Plaintiffs under § 1983 has changed. It has not. The Court's conclusion should not change either. Plaintiffs still seek a remedy for the very things that Defendants said they could not receive through a grievance: matters of general ODOC policy that go beyond the "misapplication" of a rule. OAR 291-109-0210(3)(a). Defendants' affirmative defense fails and must be dismissed.

---

[1] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Third and Thirteenth Affirmative Defenses, Dkt. 486, ¶¶ 68-9, 80, and Defendant Allen's Second and Tenth Affirmative Defenses, Dkt. 487, ¶¶ 62, 70.

a. <u>The Grievance Requirement</u>

Grieving in ODOC requires a lengthy administrative and one fraught with peril for

Oregon inmates.[2] During a pandemic, it was unworkable. The timeline to grieve in ODOC is as

follows:

> "(1) Grievances must be *received* by the institution grievance
> coordinator or designee within **14 calendar days** from the date of
> the incident or issue being grieved, unless the AIC can
> satisfactorily demonstrate why the grievance could not be timely
> filed… (Emphasis added)
> (2) A grievance response will be *sent* to the AIC within **35
> calendar days from the date the grievance was accepted** by the
> institution grievance coordinator, unless further review is
> necessary to fully respond to the AIC's grievance, in which case
> the AIC will be notified that the department will respond within an
> additional 14 calendar days. (Emphasis added.)
> (3) Initial appeals must be *received* by the institution grievance
> coordinator or designee within **14 calendar days from the date
> the initial grievance response** was *sent* to the AIC unless the AIC
> can satisfactorily demonstrate why the initial appeal could not be
> timely filed... (Emphasis added.)
> (4) A response to the initial appeal will be sent to the AIC within
> **35 calendar days from the date the initial appeal was accepted**,
> unless further review is necessary to fully respond to the AIC's
> initial appeal, in which case the AIC will be notified that the
> department will respond within an additional 14 calendar days.
> (Emphasis added.)
> (5) Final appeals must be *received* by the institution grievance
> coordinator or designee within **14 calendar days from the date
> the initial appeal response** was *sent* to the AIC unless the AIC
> can satisfactorily demonstrate why the final appeal could not be
> timely filed… (Emphasis added.)

---

[2] A considerable amount of legal scholarship has been written about the grievance provision in the PLRA. *See, e.g.*, Margo Schlanger & Giovanna Shay, *Preserving the Rule of Law in America's Jails and Prisons: The Case for Amending the Prison Litigation Reform Act*, 11 U. PA. J. CONST. L. 139 (2008); *see also, e.g.*, Alison M. Mikkor, *Correcting for Bias and Blind Spots in PLRA Exhaustion Law*, 21 GEO. MASON L. REV. 573 (2014); Kermit Roosevelt III, *Exhaustion Under the Prison Litigation Reform Act: The Consequence of Procedural Error*, 52 EMORY L.J. 1771 (2003); Giovanna Shay, Exhausted, 24 FED. SENT'G REP. 287 (2012); Eugene Novikov, Comment, *Stacking the Deck: Futility and the Exhaustion Provision of the Prison Litigation Reform Act*, 156 U. PA. L. REV. 817 (2008). The academic consensus is not that the federal judiciary has been spared a slate of disruptive, frivolous lawsuits by prisoners; but that otherwise meritorious cases spend less time being adjudicated, and more time being dismissed by Kafkaesque grievance systems. Roosevelt III, *supra* at 1775. ("The uncounseled prisoner who makes it through the administrative process without some mistake is rare indeed…") (Internal quotation omitted.)

> (6) A response to the final appeal will be sent to the AIC within **35 calendar days from the date the final appeal was accepted,** unless further review is necessary to fully respond to the AIC's final appeal, in which case the AIC will be notified that the department will respond within an additional 14 calendar days."

OAR 291-109-0205 (Emphasis added).

Assuming that a grievance response does not necessitate "further review," to complete the administrative grievance system, a prisoner may not receive word of the resolution of their grievance for 147 days—a full 107 days after COVID-19 may have killed an AIC.

A prisoner facing novel coronavirus cannot grieve fast enough to satisfy both their serious health needs and the Prison Litigation Reform Act. 42 U.S.C. § 1997e. In debating the PLRA, Congress had concerns about what they deemed "frivolous" lawsuits by prisoners on matters ranging from the availability of legal materials and staff at the prison law library[3] to the infamous, and exaggerated, case involving an inmate receiving chunky peanut butter instead of creamy peanut butter from the canteen.[4] While clearly Congress did not have a disease like COVID-19 specifically in mind when it drafted the PLRA, it did leave a pressure valve in the law to alleviate matters un-addressable by a grievance.

42 U.S.C. § 1997e(a) provides the following:

> "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies *as are available* are exhausted."

(Emphasis added.)

---

[3] Eugene Novikov, *Stacking the Deck: Futility and the Exhaustion Provision of the Prison Litigation Reform Act*, 156 U. Pa. L. Rev. 817, 817 (Jan. 2008).

[4] Notably, the inmate lost $2.50 over the misplaced order, which was and still is a considerable amount of money for a prisoner. Chief Judge Jon O. Newman, *Not All Prisoner Lawsuits Are Frivolous*, Prison Legal News (April 15, 1996) available at https://www.prisonlegalnews.org/news/1996/apr/15/not-all-prisoner-lawsuits-are-frivolous/

Per the Statewide Grievance and Discrimination Complaint Coordinator for ODOC in May 2020, Jacob Humphreys, "[a]ccepting these grievances [related to the policies and strategies adopted by ODOC to mitigate the spread of COVID-19] would have been inconsistent with ODOC's rules." *Dec. Humphreys*, Dkt. 89, ¶ 13. Functionally, both in the time it would take ODOC to process an inmate's grievance as discussed above, and because ODOC stopped processing such grievances early in the pandemic, Plaintiffs had no "available" administrative remedy, and were appropriately excused from the exhaustion requirement. *See Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2004) ("[T]he statutory language [of 42 USC §1997e] does not require exhaustion when *no* pertinent relief can be obtained through the internal process." (emphasis in original)).

Plaintiffs' § 1983 theories of relief remain focused on the policies and strategies adopted by ODOC in the wake of the pandemic's onset.

> (a) Implement and enforce masks policies, across the ODOC system and at each individual ODOC facility, that meaningfully and adequately protect against the spread of COVID-19;
> (b) Provide adequate space for incarcerated adults or ODOC staff to socially distance from other inmates and staff;
> (c) Implement and enforce quarantine and non-mixing policies, across the ODOC system and at each individual ODOC facility, sufficient to protect against the spread of COVID-19;
> (d) Screen ODOC staff and other individuals entering ODOC facilities for COVID-19 symptoms.

*Seventh Am. Compl.*, Dkt. 482, ¶ 73.

Plaintiffs' Seventh Amended Complaint further elaborates on these claims in their claims section for the § 1983 claim. *Id.* at ¶ 92(a)-(g). To date, Defendants have not demonstrated that their grievance system has changed its conclusion that these points of policy error fall within a grievable topic. But any change would have come too late. This case was filed as a class action when exhaustion was impossible. Thus, plaintiffs and class members established as a matter of

law that the PLRA exhaustion does not apply. Finally, as to plaintiff Estate of Juan Tristan and members of the death class, exhaustion is not a defense. 42 U.S. Code § 1997e(a) (The PLRA's restrictions only apply to people "confined" in a prison at the time of case initiation); *see also Jackson v. Fong*, 870 F.3d 928 (9th Cir. 2017). This Affirmative Defense must be dismissed.

2. <u>Catch-all administrative exhaustion</u>

Upon conferral, Defendants could not cite a specific "policy or doctrine" outside of the PLRA that would allow for the dismissal of Plaintiffs' case based on administrative exhaustion. Instead, Defendants cited a belief that the parole process was included within the administrative exhaustion requirement of the PLRA. Plaintiffs could not find legal support for that position. As explained, the PLRA's administrative exhaustion requirement is more narrowly focused on damages cases arising out of § 1983 conditions of confinement cases. The Court has already ruled that those remedies were functionally unavailable to Plaintiffs.

Regardless, such a defense would be inapposite in this case. Plaintiffs are not seeking damages because of the actions or inactions of the parole board. Accordingly, this Affirmative Defense must be dismissed as well.

**B. Motion 3: Against Three-Judge Panel Affirmative Defense[5]**

Plaintiffs are no longer seeking an injunction that could potentially lead to the release of AICs to cure the Defendants' deliberate indifference in this case. Had they, indeed they would have had to seek such a remedy in accordance with the PLRA. 18 U.S.C. § 3626 provides:

(3) Prisoner release order.—

(A)In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless—

---

[5] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Fourth Affirmative Defense, Dkt. 486, ¶ 70, and Defendant Allen's Third Affirmative Defense, Dkt. 487, ¶ 63.

> (i)a court has previously entered an order for less intrusive
> relief that has failed to remedy the deprivation of the
> Federal right sought to be remedied through the prisoner
> release order; and
> (ii)the defendant has had a reasonable amount of time to
> comply with the previous court orders.

> (B)In any civil action in Federal court with respect to prison
> conditions, a prisoner release order shall be entered only by a
> three-judge court in accordance with section 2284 of title 28, if the
> requirements of subparagraph (E) have been met.

This topic was broached early on in this case. As Plaintiffs explained at argument on

their Motion for a Temporary Restraining Order on May 29, 2020, they could not ask for a

prisoner release order until certain findings were made.

> CHAVEZ: "We do concede that at this juncture, at this hearing, we
> can't ask for the release of AICs. However, for the Court's ability
> to even just grasp what the scope of the issue, I think
> understanding overcrowding and understanding what may later
> have to be a remedy is important so that the Court can then
> narrowly tailor an order at this juncture."

TRO Hr. Trans. 9:10-15 (May 29, 2020).

What Plaintiffs were speaking to is the PLRA's restriction on federal judges crafting

injunctive relief that is not "narrowly drawn." 18 U.S.C. § 3626(1)(A). Plaintiffs first needed an

order describing the harm, a plan for amelioration, then, if amelioration was not possible,

Plaintiffs would seek a three-judge panel to craft a prisoner release plan. *Id.* That did not come to

pass. More important, plaintiffs and the class no longer seek injunctive relief. As a consequence,

this Affirmative Defense is moot.

## C. Motion 4: Against Standing for Failure to Seek Commutation[6]

---

[6] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Seventh Affirmative Defense, Dkt. 486, ¶ 74, and Defendant Allen's Sixth Affirmative Defense, Dkt. 487, ¶ 66.

Defendants' Seventh Affirmative Defense fails as a matter of law for at least two reasons. First, Plaintiffs do not seek releases through their claims. Second, nothing requires that Plaintiffs seek commutation or early release before filing a claim for damages. Defendants' Seventh Affirmative Defense is neither applicable in this case nor is it affirmative in nature. Plaintiffs seek damages for harms already suffered; they do not seek release to escape those past actions and harms. While Defendants seek to rewrite Plaintiffs' claims to say that Plaintiffs believe that all class members should have been released, that is not the basis for relief. The Court should grant partial summary judgment on Defendants' Seventh Affirmative Defense.

### D.  Motion 5: Against *Heck* Bar Affirmative Defense[7]

Defendants raise an Affirmative Defense regarding the *Heck* bar announced in the case bearing its name, *Heck v. Humphrey*, 512 U.S. 477 (1994). This too is inapplicable based on the claims raised by the Plaintiffs. This Motion dovetails with the discussion of the "three judge panel" requirement under the PLRA above. Plaintiffs are no longer seeking injunctive relief, and no prisoner relief plan is requested in their Seventh Amended Complaint. Even if Plaintiffs made such a request the *Heck* bar would not apply because such a release order would flow through the same analysis that allowed for the release of California prisoners in *Brown v. Plata*, 563 U.S. 493 (2011).

Under *Heck*, a state prisoner cannot recover damages in a § 1983 suit if a judgment in favor of the prisoner "would necessarily imply the invalidity of his conviction or sentence… unless the [prisoner] can demonstrate that the conviction or sentence has already been invalidated." *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006) (discussing *Heck*). A prisoner

---

[7] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Eighth Affirmative Defense, Dkt. 486, ¶ 75, and Defendant Allen's Seventh Affirmative Defense, Dkt. 487, ¶ 67.

may bring an action under § 1983 for "constitutional questions regarding the... circumstances of [his] confinement[.]" *See Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1043 (9th Cir. 2016) (quoting *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003)) (Both cases predominately focused on the conditions for a pretrial detainee). A prisoner who seeks monetary damages because of an alleged violation of constitutional rights must file a civil rights action pursuant to § 1983. *See Heck*, 512 U.S. at 482–83; *see also Preiser v. Rodrigu*ez, 411 U.S. 475, 494 (1973) ("If a state prisoner is seeking damages, he is attacking something other than the fact or length of his confinement, and he is seeking something other than immediate or more speedy release—the traditional purpose of habeas corpus."). However, "when a state prisoner is challenging the very fact or duration of [the prisoner's] physical imprisonment, and the relief [the prisoner] seeks is a determination that [the prisoner] is entitled to immediate release or a speedier release from that imprisonment, [the prisoner's] sole remedy is a writ of habeas corpus." *Preiser*, 411 U.S. at 500.

The *Heck* bar is meant to act as an extension of *res judicata*, and ties directly to money damages suits that would necessarily knock out a key component of a judgment entered in a criminal proceeding leading to a prison sentence—*e.g.*, in cases where the facts found by jury or admitted by defendant in pleading guilty would necessarily have justified a police use of force, *see Cunningham v. Gates*, 312 F3d 1148 (9th Cir. 2002), or in cases where good time credits were taken pursuant to a prison disciplinary finding. *Edwards v. Balisok*, 520 U.S. 641, 645 (1997); *Ramirez v. Galaza*, 334 F.3d 850, 858 (9th Cir. 2003) ("holding that 'the favorable termination rule [in *Heck*] does not apply to § 1983 suits challenging a disciplinary hearing or administrative sanction that does not affect the overall length of the prisoner's confinement.'").

Even when Plaintiffs' case may have implied the necessity of a release order, that would not "necessarily" implicate the invalidity of the sentence, because it would have centered on the conditions of confinement not the validity of the sentence. It would flow strictly through relief sought in an injunctive relief claim under § 1983 and subject to the strictures of the PLRA. 18 U.S.C. § 3626(3). If a prison deprives prisoners of basic sustenance, including adequate medical care, the courts have a responsibility to remedy the resulting Eighth Amendment violation. *Plata*, 563 U.S. at 511 (citing *Hutto v. Finney*, 437 U.S. 678, 687, n. 9 (1978). Therefore, *Heck* is not implicated in this case, and this Affirmative Defense must be dismissed.

### E.  Motion 5: Against Discretionary Immunity Affirmative Defense[8]

Defendants allege that Plaintiffs' second and third negligence claims are barred by discretionary immunity. Dkt. 486, ¶ 77. The Court's previous rulings on Defendants' first Motion for Partial Summary Judgment, Dkt. 115, and reasoning therein do not support Defendants' position.

In ruling on Defendants' first Motion for Partial Summary Judgment, Dkt. 115, the Court held they were not entitled to discretionary immunity for alleged actions that constituted a failure to enforce or implement high-level policy decisions. Thus, the court concluded that the following allegations, to the extent they allege failures to implement and enforce policies, were not to be dismissed:

> (a) failure to promptly and continuously ensure that incarcerated
> adults, employees, OCE employees, and contractors wear masks;
> (b) failure to adequately screen employees for COVID-19
> symptoms and exposure upon entry to ODOC facilities;
> (c) failure to implement and enforce ODOC policies intended to
> achieve necessary social distancing in ODOC facilities;

---

[8] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Tenth Affirmative Defense, Dkt. 486, ¶ 77.

(d) failure to provide COVID-19 testing to incarcerated adults who presented with symptoms and to incarcerated adults who came into contact with adults who tested positive for or were otherwise exposed to COVID-19.
(e) failure to properly quarantine incarcerated adults awaiting COVID-19 testing results; and
(f) failure to properly quarantine incarcerated adults after transferring them from a facility with confirmed COVID-19 infections to another facility[.]"

*See* Dkt. 482 at 40-41.

The Court did not rule on two of Plaintiff's allegations that were added after the Court's Order on Defendants Partial Motion for Summary Judgments. First, the Court did not rule on the allegation that Defendants allowed "mixing between and among incarcerated adults and ODOC staff and contractors without regard to the risk that incarcerated adults would or could become exposed to COVID-19." Dkt. 482, ¶ 100(g). Nevertheless, in reasoning that discretionary immunity did not apply to Defendants' implementation and enforcement actions, the Court explained that:

> When employees are tasked to implement an otherwise immune governmental policy, several factual scenarios "may affect whether the employee's actions are protected by discretionary immunity." Id. at 159. First, when a policy "does not express a completed thought on how a particular case should be resolved, instead contemplating that the employees will make additional choices within the confines of the policy decisions. . . . liability will depend on whether the choice made by the employee separately qualifies for discretionary immunity." *Id.* Second, if an employee "wrongly fails to apply an otherwise immune policy to a particular case . . . . the actions of the employee generally would not be protected by discretionary immunity." *Id. at 160*. Third, when "[a]n employee applies an otherwise immune policy to inapplicable circumstances[,]" it is not protected by discretionary immunity. *Id.* Finally, "[w]hen an immune policy choice expresses a completed thought that fully controls how the employees should apply the policy to a particular case, and an employee correctly applies the policy to the case[,]" the employee is protected by discretionary immunity. *Id.*"

Dkt. 149 at 15-16. Like the remaining negligence allegations on which the Court previously ruled, Defendants are not entitled to discretionary immunity on this allegation regarding "mixing," to the extent it refers to a failure to enforce or implement policies.

Second, the Court did not rule on Plaintiffs' allegations that Defendants failed "to consider entirely the use of alternative space, including emergency beds and mothballed facilities, to increase the space available for AIC social distancing." Dkt. 482, ¶ 101. Applying the legal standard this Court employed, however, Defendants are neither entitled to discretionary immunity for the policy nor policy implementation of the allegation.

Oregon's discretionary immunity statute protects only those government decisions or actions that "embody 'a choice among alternative public policies by persons to whom responsibility for such policies have been delegated.'" *Ramirez v. Hawaii T&S Enters., Inc.*, 179 Or. App. 416, 419 (1984); *see also Westfall v. Or. Dep't of Corrections*, 355 Or. 144, 157 (2014) ("[T]he decision of a governmental official, employee, or body is entitled to discretionary immunity if a governmental person or entity made a policy choice among alternatives, with the authority to make that choice.").

To be entitled to immunity, the government actor's decision or action must fall within the "range of permissible choices" protected under the statute. The decision must also satisfy three criteria: (1) "[i]t must be the result of a choice, that is, the exercise of judgment"; (2) "that choice must involve public policy, as opposed to day-to-day activities of public officials"; and (3) "the public policy choice must be exercised by a body that has, either directly or by delegation, the responsibility or authority to make it." *Ramirez*, 179 Or. App. at 419. That the statute protects only a "range of permissible choices," *see Mosley v. Portland School Dist. No. 1J*, 315 Or. 85, 92 (1992), means, of course, that its reach is not unlimited. The statute "does not protect a

government's failure to take action where there is a duty to do so." *Turner v. State ex rel. Dep't of Transp.*, 270 Or. App. 353, 363 (2015). In other words, "if the law requires a government to exercise due care, then ORS 30.265 does not immunize its decision not to exercise care at all." *Hughes v. Wilson*, 345 Or. 491, 496 (2008). *See also Mosley*, 315 Or. at 92.

There is no evidence in this case from which a jury could find that Defendants exercised judgment in failing to consider the use of alternate locations, such as emergency beds and mothballed facilities, to increase the available space to allow for more social distancing. In fact, there is evidence to the contrary from high level officials who would have been involved in such decision-making had it taken place.

Gregory Jones, ODOC Office of Population Management General Manager, testified that ODOC had a total of 1,259 inactive beds in April of 2020, including at both Oregon State Penitentiary and Deer Ridge Correctional Facility. *Dec. of Counsel*, Ex. 1, Jones Dep. 88:11-90:6. Though the population fluctuated regularly, the number of beds stays relatively the same. *See id.*

Steve Robbins, former ODOC Chief Financial Officer testified that the question of re-opening the inactive portion of DRCI was an ongoing conversation; he priced out costs associated with re-opening regularly because it was something he needed to present at least on an annual basis. *Dec. of Counsel*, Ex. 2, Robbins Dep. 38:3-20. This was information that had been sought by ODOC's Director, Assistant Director, and the legislature prior to the pandemic. *Id.* at 36:12-14, 38:3-20. Mr. Robbins testified that he was not part of any conversations with the executive team during the pandemic for the purpose of proving space for social distancing. *Id.* at 35:7-17. He further testified that no one made a request of him to provide the costs of re-opening

for the purpose of creating space for social distancing during the pandemic, *Id.* at 39:6-10, and he did not provide any such information to the legislature. *Id.* at 68:14-19.

Defendant Colette Peters, former ODOC Director, testified that she did not specifically recall considering seeking resources to use the inactive beds at DRCI and OSP, nor did she recall seeking that funding from the legislature. *Dec. of Counsel*, Ex. 3, Peters Dep. 64:18-65:9. She testified that she would have been involved in such conversations had they happened. *See id.*

Constantin Severe, Defendant Gov. Brown's Public Safety Advisor, testified that he did not believe he had a conversation with ODOC about using space that had been taken offline or shut down during the pandemic. *Dec. of Counsel*, Ex. 4, Severe Dep. 18:22-19:1. Nik Blosser, Defendant Gov. Brown's former Chief of Staff, also testified that ODOC did not discuss with him the idea of using inactive beds to achieve social distancing. He stated that if ODOC had discussed that with his office it would have been with Mr. Severe or they would have done it without consultation. *Dec. of Counsel*, Ex. 5, Blosser Dep. 92:20-93:11.

Based on the record before the Court that Defendants did not consider the use of available alternative space to provide for more social distancing, Plaintiffs are entitled to patrial summary judgment on affirmative defense 10 to the extent they are being asserted to protect policy implementation and failures to act.

### F. Motions 7 and 8: Against Tort Claim Notice Affirmative Defenses Related to the Negligence and Wrongful Death Claim[9]

Defendants' Sixteenth and Seventeenth Affirmative Defenses fail as a matter of law because Plaintiffs' lawsuit provided Defendants with sufficient notice of claims under the Oregon Tort Claims Act, specifically ORS 30.275. That statute provides, in relevant part:

---

[9] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Sixteenth and Seventeenth Affirmative Defenses, Dkt. 486, ¶¶ 84, 86.

"(1) No [tort] action arising from any act or omission of a public
body or an officer, employee or agent of a public body…shall be
maintained unless notice of claim is given as required by this
section.

(2) Notice of claim shall be given within the following applicable
period of time…:

    (a) For wrongful death, within one year after the alleged
    loss or injury.

    (b) For all other claims, within 180 days after the alleged
    loss or injury.

(3) Notice of claim required by this section is satisfied by:

    (a) Formal notice of claim as provided in subsections (4)
    and (5) of this section;

    (b) Actual notice of claim as provided in subsection (6) of
    this section;

    (c) Commencement of an action on the claim by or on
    behalf of the claimant within the applicable period of time
    provided in subsection (2) of this section; or

    (d) Payment of all or any part of the claim by or on behalf
    of the public body at any time."

In this case, the notice requirement was fulfilled when Plaintiffs filed their complaint that

contained the claims. *See* ORS 30.275(3)(c). The Complaint was filed April 6, 2020, Dkt. 1. The

Second Amended Complaint was filed June 26, 2020, added negligence damages claims on

behalf of a class, Dkt. 111, and provided adequate 180-day notice for tort claims occurring after

December 29, 2019, well before any COVID-19 cases in ODOC facilities. *See* Seventh Amended

Complaint, Dkt. 482, ¶ 62 (first AIC COVID-19 positive was confirmed on April 3, 2020). The

Fourth Amended Complaint was filed May 3, 2021, added wrongful death claims on behalf of a

class, Dkt. 223, and provided adequate notice for wrongful death claims occurring after May 3,

2020, which is before any COVID-19 deaths in ODOC facilities.

Defendants' Sixteenth and Seventeenth Affirmative Defenses state that the notice statute

requires "separate and timely Tort Claims Notices be provided within 180 days of the alleged

actions on which each claim for relief is based" and "that the timely giving of such Tort Claims

Notices must be pleaded in the complaint." Neither are required by the statute when the notice is provided by the commencement of an action.

First, the words of the statute clearly state that commencement of the action by the claimant "or on behalf of the claimant" within the time period provides sufficient notice. Notice by class representatives of class claims are sufficient to meet the notice requirement. *See Margulies v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, No. 3:13-CV-00475-PK, 2014 WL 4419263, at *7 (D. Or. Sept. 8, 2014) ("ORS § 30.275 permits a class representative to provide notice on behalf of a class") (citing *Budden v. Bd. of Sch. Comm'rs of City of Indianapolis*, 698 N.E.2d 1157, 1162 (Ind.1998) and *City of San Jose v. Superior Court.*, 12 Cal.3d 447, 457, 525 P.2d 701, 707 (Cal.1974)). Plaintiffs have provided such sufficient notice.

Second, the words are clear that "[n]otice of claim required by this section is satisfied by…Commencement of an action." ORS 30.275(3)(c). There is no formalistic requirement that the complaint must include an explicit statement that the plaintiff has met the requirements of the notice statute. The commencement of the action is the notice. Some courts, particularly when addressing or citing cases that were addressing former versions of the statute that did not include subsection (3)(c), have stated that a complaint must contain sufficient factual allegations to provide notice of the factual circumstances required by ORS 30.275. *See, e.g.*, *Kutz v. Lee*, 291 Or. App. 470, 479 (2018) (citing *Urban Renewal Agency v. Lackey*, 275 Or. 35, 40 (1976), which addressed former version of statute) ("Plaintiffs were required to plead facts sufficient to constitute notice under ORS 30.275."); *Yunker v. Mathews*, 32 Or. App. 551, 557 (1978) (holding that, under former version of statute, "where the complaint is filed within the 180 days, it is unnecessary and superfluous to plead notice, inasmuch as the complaint on its face satisfies the notice requirement"); *Larry v. Oregon by & Through Oregon Dep't of Hum. Servs.*, No. 3:16-

CV-1892-AC, 2019 WL 692799, at *20 (D. Or. Feb. 19, 2019) ("Commencement of an action within the above-stated time frame also suffices as notice for purposes of the OTCA. Or. Rev. Stat. 30.275(3)(c)."); *McKinney v. Benton Cnty.*, No. 6:19-CV-01444-AA, 2020 WL 5026845, at *12 (D. Or. Aug. 25, 2020) (factual allegations sufficient to establish proper notice must be plead) (citing *Brown v. Portland Sch. Dist. No. 1*, 291 Or. 77, 79 (1981), which addressed former version of statute). "The sufficiency of the notice given must be determined with the object of the statute in mind and technically deficient claims should not be barred where the purpose of the statute is served." *Brown v. Portland Sch. Dist. No. 1*, 291 at 81. Plaintiffs have plead factual allegations sufficient to provide Defendants with notice about the factual circumstances at issue in this matter.

Defendants' Sixteenth and Seventeenth Affirmative Defenses fail as a matter of law.

### G. Motion 9: Against Comparative Fault Affirmative Defense in Relation to Plaintiffs' § 1983 Claim[10]

Defendants Comparative Fault affirmative defense fails as a matter of law as a defense to Plaintiffs' § 1983 claims. Courts across the country have held that principles of comparative fault do not apply to civil rights claims under § 1983, because they undermine the policy goals that § 1983 is intended to serve.

Federal law provides that state law governs the availability of damages in § 1983 cases unless it is "inconsistent" with § 1983's twin goals of compensation and deterrence. 28 U.S.C. § 1988(a); *Valenzuela v. City of Anaheim*, 6 F.4th 1098, 1104 (9th Cir. 2021) (citing *Robertson v. Wegmann*, 436 U.S. 584, 590–91 (1978)). Likewise, the protections afforded under § 1983 were "not intended by Congress to differ from state to state"; thus, federal, not state, common law

---

[10] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Nineteenth Affirmative Defense, Dkt. 486, ¶ 90, and Defendant Allen's Twelth Affirmative Defense, Dkt. 487, ¶ 73.

governs the determination of damages in § 1983 actions. *Busche v. Burkee*, 649 F.2d 509, 518

(7th Cir. 1981) (citing *Basista v. Weir*, 340 F.2d 74, 86 (3d Cir. 1965)). Applying those rules,

courts have concluded that state-law principles of comparative fault do not apply to § 1983

claims: "[t]o apply comparative fault statutes in civil rights actions would result in the protection

afforded under § 1983 to differ from state to state and would be inconsistent with the underlying

policy of deterrence and compensation." *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 736

n.4 (6th Cir. 2002); *see also Quezada v. Cty. of Bernalillo*, 944 F.2d 710, 721 (10th Cir. 1991),

*abrogated on other grounds as recognized in Stuart v. Jackson*, 24 F. App'x 943, 954 n.5 (10th

Cir. 2001) (same); *Miller v. Schmitz*, 2013 WL 5754945, at *5 (E.D. Cal. Oct. 23, 2013) (same);

*Hurley v. Horzon Project, Inc.*, 2009 WL 5511205, at *10 (D. Or. Dec. 3, 2009) ("Assigning

some percentage of fault to [an absent third party] would violate both the compensation and

deterrence policies underlying § 1983.").[11] For that initial reason, Defendants' assertion that

individualized issues of comparative fault predominate this case is incorrect.

        But even if this Court were to conclude otherwise,[12] Oregon's comparative fault statute

would not apply to Plaintiffs' § 1983 claims for a second reason: under *Oregon* law, comparative

fault is not a defense to deliberately indifferent misconduct. *See State v. Gutierrez-Medina*, 365

Or. 79, 94–95 (2019) (so holding).

        "Section 1983 imposes liability for violations of rights protected by the Constitution, not

for violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146

(1979). Thus, to prevail on a claim that prison officials were deliberately indifferent to the

---

[11]     *See also, e.g.*, *Nichols v. Knox Cty.*, 2016 WL 9149585, at *2 (E.D. Tenn. June 13, 2016)
(same); *Blair v. Harris*, 993 F. Supp. 2d 721, 727 (E.D. Mich. 2014) (same).
[12]     Plaintiffs acknowledge that neither the U.S. Supreme Court nor the Ninth Circuit has
resolved the question whether state-law comparative fault statutes undermine the policy goals of
§ 1983.

Eighth Amendment rights of adults in custody, "a showing of something more than mere negligence is required." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997)) (same). Deliberate indifference is analogous to criminal law recklessness; thus, a prison official who is deliberately indifferent must "kno[w] of and disregar[d] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Oregon's comparative fault scheme does not apply as a defense to conduct that is wanton or criminally reckless—*i.e.*, deliberately indifferent. *See Gutierrez-Medina*, 365 Or. at 94–95 (holding that comparative fault is not a defense to "wanton" misconduct, which is akin to criminal recklessness); *see also Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 58–59 (1956) (wanton civil misconduct involves "the doing of an intentional act of an unreasonable character in disregard of a risk known to the actor, or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow, usually accompanied by a conscious indifference to consequences"). It therefore does not apply to Plaintiffs' § 1983 claim in this case.

## H. Motion 10: Against Absolute Legislative Immunity Affirmative Defense[13]

Defendants allege for the first time in the Answer to Plaintiffs' Seventh Amended Complaint that Plaintiffs' § 1983 claims are barred because Defendants are entitled absolute

---

[13] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Twenty-Ninth Affirmative Defense, Dkt. 486, ¶ 100, and Defendant Allen's Twenty-Second Affirmative Defense, Dkt. 487, ¶ 83.

legislative immunity for "acts or omissions [] done in conjunction with their performance of lawmaking functions including legislative activity, discretionary policymaking, and participation in the legislative process."

As the Ninth Circuit has acknowledged, "[t]he Supreme Court 'has generally been quite sparing in its recognition of claims to absolute official immunity.'" *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1220 (9th Cir. 1996) (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)). Although state officials are entitled to some degree of immunity from § 1983 damages actions arising from their official acts, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486–87 (1991); *see also Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F2d 1103, 1107–08 (9th Cir 1987) ("When deciding whether a public official is immune from liability for acts performed in his official capacity, qualified immunity is the general rule and absolute immunity the exceptional case."). Thus, "[t]he burden of proof in establishing absolute immunity is on the individual asserting it." *Trevino v. Gates*, 23 F.3d 1480, 1482 (9th Cir. 1994).

Under the doctrine of legislative immunity, "state legislators are entitled to absolute immunity from civil damages for their performance of lawmaking functions." *Jones v. Allison*, 9 F.4th 1136, 1139–40 (9th Cir. 2021). "Legislative immunity, however, is not limited to officials who are members of legislative bodies." *Id*. (citations omitted). "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) (citation omitted). However, legislative immunity attaches only to actions "in the sphere of legitimate legislative activity." *Kaahumanu v. Cnty. of Maui*, 315 F3d 1215, 1219 (9th Cir 2003) (quoting *Tenney v. Brandhove*, 341 U.S. 367 (1951)).

To determine whether an act is within the sphere of legitimate legislative activity, the court considers four factors: (1) whether the act involves ad hoc decision-making, or the formulation of policy; (2) whether the act applies to a few individuals, or the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears "all the hallmarks of traditional legislation." *Kaahumanu*, 315 F.3d at 1220.

In conferral, Defendants indicated that they believe Defendants are entitled to legislative immunity on two bases: (1) Defendants are immune in not requesting additional funding from the legislature to create conditions that would have prevented the spread of COVID-19 and (2) Defendant Gov. Brown is immune in her use of her commutation power. Defendants are incorrect on both fronts. To the extent Defendants assert legislative immunity protects them in other executive actions that Plaintiffs allege are failures in their handling of the COVID-19 pandemic, they are also incorrect.

1. Defendants' failure to request additional funding

The failure to consider—much less deliberately decide not to submit— a request for funding cannot provide the basis for legislative immunity.[14] It is not an act, and therefore cannot be considered an act "in the sphere of legitimate legislative activity." Even if it were an act, a failure to request funding is only a request of the legislature; it is not in itself legislative in nature. Though Defendants could have requested legislative funding to, for example, open additional beds to allow for social distancing, they could not themselves authorize such funding.

 To the extent Defendants are able demonstrate an affirmative decision not to request additional funding, under the functional comparability analysis, this decision would not fall

---

[14] For example, as discussed in Motion 5, Defendants failed to consider opening closed facilities or using emergency beds to allow for social distancing, and therefore did not make an affirmative decision not to request additional funding for that purpose.

within the sphere of legitimate legislative activity. First, any decision would be, at best, ad hoc. "An ad hoc decision is one "taken based on the circumstances of [a] particular case"; it does not "effectuate policy or create a binding rule of conduct." *Kaahumanu*, 315 F.3d at 1220. "An ad hoc decision is made with a particular end or purpose, as distinguished from a coordinated policy." *Cmty. House v. City of Boise*, 623 F.3d 945, 961 (9th Cir 2010) (citation omitted). Additionally, had Defendants requested funding, that request would have been made in response to the conditions created by COVID-19 and therefore limited to a short-term end or purpose. In other words, the record can reflect, at most, an individual decision, made in response to a particular circumstance, rather than a coordinated and ongoing policy related to any decision to request (or not request) funding.

Additionally, there is no record of any decision related to the failure to request funding that was either formally legislative in character or bore the hallmarks of traditional legislation. There is no record, for example, of a decision that was open to a vote or debate, or underwent any formal rulemaking procedure. *See Cmty. House*, 623 F.3d at 960.

Lastly, legislative immunity should not apply, as a matter of law, in this particular context. Defendants assert high-level failures to request resources in the face of alleged violations of the Eighth Amendment's prohibition against cruel and unusual punishment. As the Supreme Court has acknowledged, the Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" and protects against deliberate indifference to prisoners' serious medical needs. *Estelle*, 429 U.S. at 102, 104. Given the significance of the Eighth Amendment's protections, states cannot abdicate their constitutional responsibility to remedy violations by pointing to—or relying on—a lack of available resources.

*See Plata*, 563 U.S. 493. Thus, in this particular context legislative immunity is incompatible

with, and must fall to, the overriding constitutional concerns of the Eighth Amendment.

   2.  <u>Governor Brown's creation of early release criteria</u>

      Plaintiffs reiterate that they do not claim that they were entitled to release from ODOC

custody. Rather, Plaintiffs allege Defendants were deliberately indifferent in failing to implement

and enforce social distancing for individuals who contracted or became exposed to COVID-19.

Allegations therein include, but are not limited to, Defendant Gov. Brown's failure to

meaningfully consider and implement options for population reduction as a strategy to protect

against COVID-19 transmission across ODOC facilities. Nevertheless, Defendant Gov. Brown is

not entitled legislative immunity in her decision to create temporary clemency release criteria.

      First, in determining early release criteria, Defendant Gov. Brown exercised a uniquely

executive function. The Governor's authority to grant clemency stems directly from the Oregon

constitution and is vested exclusively in the executive branch. Or. Const. art V, § 14. As the

courts have acknowledged, this "clemency power has always been a broad plenary power of the

executive." *Marteeny v. Brown*, 321 Or. App. 250, 280 (2022). In other words, at its core,

clemency is an executive—not legislative—decision, and legislative immunity should not be

applicable to the acts of an executive officer engaging in a purely executive function.

      Second, Governor Brown's creation of release criteria does not meet the "functional

comparability" test. In creating temporary release criteria, she made an ad hoc decision to assist

her in her executive role. "The decision was taken based on the circumstances of the particular

case and did not effectuate policy or create a binding rule of conduct." *Kaahumanu*, 315 F.3d at

1220. Though the decision had an "immediate practical effect" on Plaintiffs, the criteria were for

temporary, emergency use in response to the pandemic.

The act of creating release criteria was not formally legislative and does not bear the hallmarks of traditional legislation. Defendant Gov. Brown lacks legislative authority. Or. Const. art V, § 14. She did not call for a vote or debate, engage in any formal procedure, or participate in any administrative rulemaking process. She did not create the criteria pursuant to, or in furtherance of, statute, rule, or legislative directive. She did not sign a bill into law, or create an administrative process for clemency decisions. *See e.g.*, *Bogan*, 523 U.S. at 55 (signing law into an ordinance was formally legislative act). Though officials outside the legislative branch can be entitled to legislative immunity, Defendant Gov. Brown's actions here were not legislative and are not absolutely immune from suit.

## I.  Motion 11: Against Absolute Judicial and Quasi-Judicial Immunity[15]

Defendants allege that because the "acts or omissions related to clemency decisions and early release criteria are a quasi-judicial function[,]" . . . [p]laintiffs' section 1983 claims challenging defendants' clemency and early release decisions are barred by absolute judicial and quasi-judicial immunity." Defendants are incorrect.

Under the doctrine of judicial immunity, judges are entitled to absolute immunity from civil damages for acts performed in their judicial capacities. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). Under the derivative doctrine of "quasi-judicial immunity," absolute immunity is extended to state officials who perform activities that are "functionally comparable" to that of a judge. *Butz v. Economou*, 438 U.S. 478, 514 (1978); *Swift v. California*, 384 F.3d 1184, 1188 (9th 2004) ("State [o]fficials performing the duties of advocate or judge may enjoy [quasi-judicial] immunity for some functions . . . but that protection does not extend to many of their

---

[15] Defendants State of Oregon, Kate Brown, Colette Peters, Heidi Steward, Mike Gower, Mark Nooth, Rob Persson, Ken Jeske, Joe Bugher, and Garry Russell's Thirtieth Affirmative Defense, Dkt. 486, ¶ 101.

other functions." (internal quotation marks omitted)). This functional approach "looks to the nature of the function performed and not to the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993); *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985). Thus, courts consider the following non-exclusive list of factors in determining whether an officials functions are quasi-judicial in nature: "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Cleavinger*, 474 U.S. at 202 (citing *Butz*, 438 U.S. at 512).

First, Plaintiffs are not challenging individual clemency decisions or alleging that each person identified on ODOC's original list of more than 5,000 people was entitled to clemency. Plaintiffs challenge Defendants' failure to allow for social distancing to prevent the spread of COVID-19, and point out that clemency is a tool that Defendants could have used to ensure appropriate distancing. In other words, Defendants mistake the import of the early release criteria; on its face, Plaintiffs' reference to, or reliance on, these criteria is not relevant to the type of individualized adjudications that courts have found entitled an official to quasi-judicial immunity. *See, e.g.*, *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir 1981) (Parole board officials were granted legislative immunity in performing their "duty" to adjudicate specific cases or controversies.).

Second, even if individual decisions were at issue, Defendant Gov. Brown would not be entitled to quasi-judicial immunity. In Oregon, the decision to grant or deny clemency does not involve an adversarial proceeding. To the contrary, clemency can be initiated by the governor

and decided without input from either the recipient or district attorney. *See, e.g.*, *Marteeny*, 321 Or. App. 250. No procedural safeguards protect applicants' interests: applicants are not, for example, entitled to an attorney; there are no formal or informal hearings to resolve disputes of fact or law; applicants cannot compel witnesses or engage in cross-examination; there is no standard that entitles an applicant to relief (let alone any specific burden of proof). *See, e.g.*, ORS 144.650 (setting forth applicable procedures upon application).  Individual decisions are not subject to appellate review. *Eacret v. Holmes*, 215 Or. 121 (1958). Precedent is not at issue. And, as the courts have recognized, decisions are, in fact, frequently political. *Marteeny*, 321 Or. App. at 254 (*"We are not called here to judge the wisdom of the Governor's clemency of these 953 individuals; that is a political question."*); *Haugen v. Kitzhaber*, 353 Or. 715, 742 (2013) ("Governors and presidents have granted clemency for a wide range of reasons, including reasons that may be political, personal, or 'private[.]'").

## IV. CONCLUSION

Based on the above arguments, Plaintiffs have met their burden under Fed. R. Civ. P. 56. As a matter of law, Plaintiffs are entitled to the relief motioned upon. These Affirmative Defenses must be stricken.

DATED: November 30, 2023

/s/ *Juan C. Chavez*
**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB NO. 862984

**Nadia Dahab**, OSB NO. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
Telephone: 503-228-6474
Facsimile: 503-228-2556