**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**David F. Sugerman**, OSB No. 862984
**Nadia Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
Telephone: 503-228-6474
Facsimile: 503-228-2556

*Attorneys for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PAUL MANEY; GARY CLIFT; GEORGE NULPH; THERON HALL; DAVID HART; SHERYL LYNN SUBLET; and FELISHIA RAMIREZ, personal representative for the ESTATE OF JUAN TRISTAN, individually, on behalf of a class of other similarly situated,<br><br>Plaintiffs,<br><br>    v.<br><br>STATE OF OREGON; KATE BROWN, COLETTE PETERS; HEIDI STEWARD; MIKE GOWER; MARK NOOTH; ROB PERSSON; KEN JESKE; PATRICK ALLEN; JOE BUGHER; and GARRY RUSSELL,<br><br>Defendants. | Case No. 6:20-cv-00570-SB<br><br>**PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>ORAL ARGUMENT REQUESTED<br><br>PUBLIC COPY - SEALED MATERIALS REDACTED |

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

GENERAL OVERVIEW ........................................................................................ 3

FACTUAL BACKGROUND ................................................................................... 7

I.    Plaintiffs' request for preliminary injunctive relief provided Defendants
      with notice of the need to protect AICs from the risk of COVID-19. ......................... 8

II.   Other sources put Defendants on notice of the importance of social distancing
      and the options for population reductions that would allow ODOC to do so. .......... 15

      A.    ODOC's corrections-setting partners recommended "controlled, purposeful
            and public health-oriented population reduction"; ODOC ignored those
            recommendations. ................................................................................. 15

      B.    The States of Washington and California, as well as the Federal Bureau of
            Prisons, immediately took steps to reduce their respective prison populations
            to slow the spread of COVID-19. .......................................................... 17

III.  ODOC and OHA failed to take reasonable steps to prevent serious
      risk of harm to AICs. ...................................................................................... 18

      A.    ODOC centralized its response to the COVID-19 pandemic. ............................. 19

      B.    ODOC and OHA quickly departed from the CDC's corrections-setting
            public health recommendations. ............................................................. 21

            1.    ODOC developed initial guidance separately from CDC's and OHA's
                  initial corrections-setting guidance. ..................................................... 21

            2.    The public health understanding of COVID-19 continued to evolve. ....... 23

            3.    In July and August 2020, the CDC and OHA issued updated
                  corrections-setting COVID-19 guidance. ............................................. 25

            4.    ODOC's July and October 2020 ODOC Centralized Plan
                  Revision were not consistent with OHA or CDC guidance............................. 27

            5.    ODOC ignored OSHA's November 2020 guidance. ............................... 29

      C.    Defendants did not consider reasonable alternative strategies to
            improve social distancing across the ODOC system. ........................................... 31

            1.    DRCM and OSPM stood empty of AICs throughout the pandemic. ......... 31

            2.    ODOC chose not to use emergency beds to achieve
                  maximum social distancing.................................................................... 34

      D.    The steps that ODOC *did* take were either too little, too late, or in
            some respects increased the risk of harm to AICs. ............................................. 35

            1.    AOC's "Tier System" was not consistent with the prevailing
                  public health understanding of COVID-19 transmission.............................. 35

2.    ODOC's COVID-19 Infection Prevention Assessments were not conducted systemwide and were conducted primarily at institutions where COVID-19 was already prevalent. ............................................. 37

3.    ODOC deliberately avoided audits from outside entities, including OHA. ............................................................................ 39

4.    ODOC complied with OSHA's COVID-19 regulations only after it was too late. ................................................................... 40

5.    Once the COVID-19 vaccine became available, ODOC leadership encouraged staff to "circumvent" the statewide vaccine mandate. ..................... 41

E.    ODOC did not ensure compliance with any of its COVID-19 preventative strategies. ............................................................. 43

1.    Across all institutions, ODOC continued to fail to implement social distancing, quarantine, or isolation measures. ..................... 44

2.    Across all institutions, ODOC continued to fail to implement and enforce its mask mandate. ................................. 45

3.    Across all institutions, ODOC continued to fail to implement and enforce protocols relating to mixing. .......................... 46

4.    Across all institutions, ODOC failed to implement screening and testing procedures. ........................................... 47

5.    Across all institutions, ODOC staff at every level acted with deliberate indifference to AICs. .................................. 48

IV.    **OCE failed to take reasonable steps to prevent serious risk of harm to AICs.** ......... 49

V.    **Governor Brown failed to take reasonable steps to prevent serious risk of harm to AICs.** ............................................. 51

A.    Governor Brown was aware of and overseeing ODOC's response to the COVID-19 emergency. ........................................ 51

B.    In the face of ODOC's initial population management scenarios, Governor Brown took no immediate action. ........................... 52

C.    Governor Brown's efforts to reduce the prison population to protect AICs was too little, too late. ................................... 52

D.    Rather than increase space for social distancing, Governor Brown chose to reduce it by closing two ODOC facilities during the COVID-19 pandemic. ........................................................ 57

**LEGAL STANDARD** ............................................................................... **59**

**ARGUMENT** ......................................................................................... **60**

I.    **Defendants violated the Eighth Amendment because they knew plaintiffs faced a serious risk from exposure to COVID-19 and failed to protect them.** ............... 60

A.    When officials fail to take reasonable steps to abate a known risk, they are liable to inmates who suffer harm as a result. ........................ 60

B.   Exposure to COVID-19 posed a substantial risk of serious harm to health, and congregate living substantially increased that risk............................ 62

C.   Defendants knew the risk because countless state and national health authorities, including ODOC itself, warned them of the risk. .................. 64

D.   Because they failed to abate a known risk to Plaintiffs' health, Defendants were deliberately indifferent................................................. 67

E.   Defendants' deliberate indifference caused Plaintiffs to contract COVID-19 and, in some cases, die........................................................ 72

1.   Defendants are liable for creating, implementing, and managing policies that caused Plaintiffs to contract Covid-19............................ 72

2.   Defendants' policies actually and proximately caused Plaintiffs to contract Covid-19. ...................................................................... 74

II.   **Defendants are not entitled to qualified immunity.** ..................................... 78

A.   Qualified immunity applies only when the law is unclear.................................. 78

B.   Plaintiffs' right to protection from heightened exposure to a serious, easily communicable disease had long been clearly established. .................................... 79

III.   **Defendants are not entitled to legislative or quasi-judicial immunity.** ..................... 81

A.   Legislative immunity does not protect Defendants in these circumstances. ........ 81

1.   Defendants are not legislatively immune for their failure to use existing prison infrastructure to maximize social distancing for AICs. .......................... 83

2.   Governor Brown is not legislatively immune for her deliberately indifferent early release program. ............................................................ 86

B.   Nor does quasi-judicial immunity protect the Governor in this case.................... 88

**CONCLUSION** .......................................................................................... **91**

# TABLE OF AUTHORITIES

**Cases**

*A.K.H. ex rel. Landeros v. City of Tustin*,
    837 F.3d 1005 (9th Cir. 2016) ............................................... 78
*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ..................... 59
*Bogan v. Scott-Harris*,
    523 U.S. 44, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998) ............... 82, 84, 88
*British Motor Car Dist., Ltd. v. S.F. Auto. Indus. Welfare Fund*,
    882 F.2d 371 (9th Cir.1989) ................................................ 59
*Brosseau v. Haugen*,
    543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 596 (2004) (per curiam) ......... 78
*Brown v. Plata*,
    563 U.S. 493, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011) .................... 86
*Buckley v. Fitzsimmons*,
    509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993) .................... 89
*Burns v. Reed*,
    500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991) .................... 82
*Butz v. Economou*,
    438 U.S. 478, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978) ..................... 89
*Camreta v. Greene*,
    563 U.S. 692, 131 S. Ct. 2020, 179 L. Ed. 2d 1118 (2011) .................. 78
*Castro v. County of Los Angeles*,
    833 F.3d 1060 (9th Cir. 2016) (en banc) ................................... 67
*Chateaubriand v. Gaspard*,
    97 F.3d 1218 (9th Cir. 1996) .............................................. 82
*Chunn v. Edge*,
    465 F. Supp. 3d 168 (E.D.N.Y. 2020) ...................................... 63
*Cleavinger v. Saxner*,
    474 U.S. 193, 106 S. Ct. 496, 88 L. Ed. 2d 507 (1985) .................... 89
*Clement v. Gomez*,
    298 F.3d 898 (9th Cir. 2002) ............................................. 60
*Cmty. House v. City of Boise*,
    623 F.3d 945 (9th Cir. 2010) ............................................. 86
*Conn v. City of Reno*,
    2007 WL 9725222 (D. Nev. Mar. 8, 2007) .................................. 76
*Conn v. City of Reno*,
    591 F.3d 1081 (9th Cir. 2010) ............................... 74, 75, 76, 77
*Dennis v. Sparks*,
    449 U.S. 24, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980) .................... 88
*Eacret v. Holmes*,
    215 Or. 121, 333 P.2d 741 (1958) ....................................... 90
*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ......................................... 64, 71

iv

*Estate of Clark v. Walker*,
  865 F.3d 544 (7th Cir. 2017) ................................................................. 78
*Estelle v. Gamble*,
  429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ............................ 86
*Farmer v. Brennan*,
  511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) ............... passim
*Forrester v. White*,
  484 U.S. 219, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988) ........................ 82
*Greater L.A. Council on Deafness, Inc. v. Zolin*,
  812 F.2d 1103 (9th Cir. 1987) ............................................................... 82
*Hampton v. California*,
  83 F.4th 754 (9th Cir. 2023) ............................................................ passim
*Haugen v. Kitzhaber*,
  353 Or. 715, 306 P.3d 592 (2013) ......................................................... 90
*Helling v. McKinney*,
  509 U.S. 25, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993) ................... passim
*Hessell v. Dep't of Corr.*,
  280 Or. App. 16, 380 P.3d 16 (2016) ....................................................... 3
*Hines v. Youseff*,
  914 F.3d 1218 (9th Cir. 2019) ........................................................ 61, 67
*Hope v. Pelzer*,
  536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) .................... 79
*Johnson v. Lewis*,
  217 F.3d 726 (9th Cir. 2000) ................................................................. 71
*Jones v. Allison*,
  9 F.4th 1136 (9th Cir. 2021) ............................................. 32, 35, 82, 83
*Jordan v. Gardner*,
  986 F.2d 1521 (9th Cir. 1993) ....................................................... 61, 69, 70
*Kaahumanu v. Cty. of Maui*,
  315 F.3d 1215 (9th Cir. 2003) ...................................................... 83, 86, 87
*Karl v. City of Mountlake Terrace*,
  678 F.3d 1062 (9th Cir. 2012) ............................................................... 60
*Larez v. City of Los Angeles*,
  946 F.2d 630 (9th Cir. 1991) ................................................................. 72
*Lemire v. Cal. Dep't of Corr. & Rehab.*,
  726 F.3d 1062 (9th Cir. 2013) ......................................................... passim
*Marteeny v. Brown*,
  321 Or. App. 250, 517 P.3d 343 (2022) ........................................... 87, 90
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ...................... 59
*Millard v. Or. Dep't of Corr.*,
  2014 WL 2506470 (D. Or. June 3, 2014) ................................................. 3
*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ................................................................. 89
*Mullenix v. Luna*,
  577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (per curiam) ....... 80

*Nicholas v. City of Los Angeles*,
　935 F.3d 685 (9th Cir. 2019) ............................................................ 60
*OSU Student All. v. Ray*,
　699 F.3d 1053 (9th Cir. 2012) .......................................................... 73
*Pearson v. Callahan*,
　555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ................. 78
*Peralta v. Dillard*,
　744 F.3d 1076 (9th Cir. 2014) .......................................................... 71
*Polanco v. Diaz*,
　76 F.4th 918 (9th Cir. 2023) ................................................. 68, 70, 71
*Porter v. Cal. Dep't of Corr.*,
　419 F.3d 885 (9th Cir. 2005) ............................................................ 59
*Pottenger v. Potlatch Corp.*,
　329 F.3d 740 (9th Cir. 2003) ............................................................ 59
*Sellars v. Procunier*,
　641 F.2d 1295 (9th Cir 1981) ........................................................... 91
*Snow v. McDaniel*,
　681 F.3d 978 (9th Cir. 2012) ............................................................ 71
*Starr v. Baca*,
　652 F.3d 1202 (9th Cir. 2011) .................................................... 72, 73
*Swift v. California*,
　384 F.3d 1184 (9th Cir. 2004) .................................................... 89, 91
*Taylor v. Riojas*,
　592 U.S. 7, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020) (per curiam) .......... 79
*Tenney v. Brandhove*,
　341 U.S. 367, 71 S. Ct. 793, 95 L. Ed. 1019 (1951) ........................ 83
*Trevino v. Gates*,
　23 F.3d 1480 (9th Cir. 1994) ............................................................ 82
*Valentine v. Collier*,
　140 S. Ct. 1598 (2020) (mem) ............................................................ 1
*White v. Roper*,
　901 F.2d 1501 (9th Cir. 1990) .......................................................... 77
*Whitley v. Albers*,
　475 U.S. 312, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) ................. 61
*Wilk v. Neven*,
　956 F.3d 1143 (9th Cir. 2020) ................................................... passim
*Wilson v. Seiter*,
　501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) ...... 61, 70, 77
*Wright v. Beck*,
　981 F.3d 719 (9th Cir. 2020) ............................................................ 78

**Statutes**
ORS 144.650 ........................................................................................ 90
ORS 401.165 .......................................................................................... 5
ORS 401.168(1) ...................................................................................... 5
ORS 423.020(1) ...................................................................................... 3
ORS 481.110(7) .................................................................................... 20

ORS 481.120(1) ........................................................................................................ 20

**Other Authorities**

AMEND, About Amend at UCSF, https://amend.us/ .................................................. 16

Cal. Dep't of Corr. & Rehab., *Actions to Reduce Population and Maximize Space*,
https://www.cdcr.ca.gov/covid19/frequently-asked-questions-expedited-releases/ ................ 18

Centers for Disease Control & Prevention, *COVID-19 Timeline*,
https://www.cdc.gov/museum/timeline/covid19.html#:~:text=After%20more%20than%20118
%2C000%20cases,declares%20COVID%2D19%20a%20pandemic ...................................... 64

Centers for Disease Control & Prevention, Morbidity & Mortality Weekly Report,
COVID-19 in Correctional and Detention Facilities–United States, February–April 2020 (May
15, 2020) .................................................................................................................... 8

Colette S. Peters & Heidi Steward, Assessment of Oregon's Prison Footprint: Report to the
Oregon Legislature (Feb. 16, 2021) ...................................................................... 34

Conrad Wilson, *As the Deadline Nears, Oregon Department of Corrections Employees are 50%
Vaccinated*, Oregon Public Broadcasting (Oct. 13, 2021),
https://www.opb.org/article/2021/10/13/oregon-correctional-staff-50-percent-vaccinated-
mandate-nears/ ............................................................................................................ 43

Executive Order 20-03,
*Declaring an Emergency Due to Coronavirus (COVID-19) Outbreak in Oregon* (Mar. 8,
2020) ................................................................................................................... 5, 7

Executive Order 20-12,
*Stay Home, Save Lives: Ordering Oregonians to Stay at Home, Closing Specified Retail
Businesses, Requiring Social Distancing Measures for Other Public & Private Facilities, &
Imposing Requirements for Outdoor Areas and Licensed Childcare Facilities*
(Mar. 8, 2020) ........................................................................................................ 6, 7

Executive Order No. 21-29,
*COVID-19 Vaccination Requirement for State Executive Branch* (Aug 13, 2021) ................. 42

Jim Brunner & Mary Hudetz, *Washington Department of Corrections Names 1,100+ Inmates to
Be Released in Coming Days Due to Coronavirus Concerns, Seattle Times* (Apr. 16, 2020),
https://www.seattletimes.com/seattle-news/law-justice/washington-department-of-corrections-
lists-names-of-hundreds-of-inmates-to-be-released-in-coming-days-due-to-coronavirus-
concerns ................................................................................................................... 18

Lawrence J. Schoen, ASHRAE Journal (May 2020) ................................................. 24

Legislative Fiscal Office 2019-21 Budget Highlights (Sept. 2019) ........................... 85

Memo. from U.S. Att'y Gen. to Director of Bureau of Prisons,
*Prioritization of Home Confinement as Appropriate in
Response to COVID-19 Pandemic* (Mar. 26, 2020) ................................................ 18

Or. Corr. Enters., *OCE/Prison Blues Help Build Utility Masks*,
YouTube.com (Apr. 23, 2020), https://www.youtube.com/watch?v=7qvlQQpcLx0 ............. 50

Or. Dep't of Corr., *About Us: Prison Locations*,
https://www.oregon.gov/doc/about/Pages/prison-locations.aspx ................................... 3

Or. Dep't of Corr., *Assessment of Oregon's Prison Footprint* (Feb. 16, 2021) ........................... 4

Oregon Dep't of Corr., *COVID-19 Response: COVID-19 Tracking*,
https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx .................... 29, 31, 41, 71

Or. Dep't of Corr., ODOC Tableau: COVID-19 Test Result Dates,
    https://public.tableau.com/app/profile/josh4372/viz/ODOCCovid-
    19TestResultDates/ODOCCOVID-19Testing................................................. 38

Or. Dep't of Revenue, Oregon Surplus "Kicker" Credit,
    https://www.oregon.gov/dor/programs/individuals/pages/kicker.aspx ................... 57

Oregon Department of Corrections, *Prison Locations—Deer Ridge Correctional Institution*,
    https://www.oregon.gov/doc/about/pages/prison-locations.aspx .......................... 32

Oregon.gov, The Oregon Safe Employment Act,
    https://osha.oregon.gov/essentials/toolkit/Pages/why-here.aspx ........................... 29

State of Washington, Governor Jay Inslee, *Inslee Issues New Orders to Reduce Prison
Populations During the COVID-19 Outbreak*, https://governor.wa.gov/news/2020/inslee-
    issues-new-orders-reduce-prison-populations-during-covid-19-outbreak............... 18

Steve Gorman & Daniel Trotta, *CDC Chief Warns that Americans Face 'Rough' Winter From
COVID-19 Surge*, Reuters (Dec. 2, 2020),
    https://www.reuters.com/article/idUSKBN28C20Q/ ............................................ 31

**Rules**

Fed. R. Civ. P. 56..................................................................................................... 59

**Constitutional Provisions**

Or. Const. art V, §§ 10–14........................................................................................ 88

> *It has long been said that a society's worth can be judged by taking stock of its prisons. That is all the truer in this pandemic, where inmates everywhere have been rendered vulnerable and often powerless to protect themselves from harm. May we hope that our country's facilities serve as models rather than cautionary tales.*
>
> \-  *Valentine v. Collier*, 140 S. Ct. 1598, 1601 (2020) (mem)
>     (statement of Justice Sotomayor, joined by Justice Ginsburg).

## INTRODUCTION

More than two years ago, when the parties in this case appeared before this Court on Plaintiffs' motion for preliminary injunctive relief, Defendants assured the Court that they were "committed to achieving maximum social distancing within the current population and physical layout of [ODOC's] facilities." ODOC assured the Court that it was following both CDC and OHA recommendations in its emergency COVID-19 response, and that ODOC leadership was "work[ing] closely with OHA," overseen by then-Director Patrick Allen, to develop corrections-setting guidance consistent with those public health authorities. They claimed that they had plans to regularly audit each and every ODOC institution for compliance with COVID-19 measures, and they acknowledged the importance of "not treating [COVID-19 isolation] as a disciplinary segregation unit." They went so far as to promise the Court that "given ODOC's preventive measures, most AICs will not contract COVID-19. And, if they do, they will experience only mild or moderate symptoms."

Here are few things (of the many) that Defendants did *not* tell the Court at that time: they did not tell the Court that they already had begun putting "plans in place with funeral homes" to accommodate additional COVID-19 in-custody deaths. They did not tell the Court that, although they were aware at that time that asymptomatic COVID-19 transmission was widespread, they did not (and would never) test asymptomatic AICs consistently with CDC or OHA guidance. And they did not tell the Court that, although they knew that population management (and social

1 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

distancing) was a cornerstone of any COVID-19 response, while the State of Washington was taking significant steps to reduce its prison population, ODOC was actively seeking to "pick up" those who had been released from Washington's prison facilities.

Meanwhile, Governor Brown made abating the risks presented by COVID-19 even more difficult. By the time of the hearing on Plaintiffs' preliminary motion, she had expressly declined to take meaningful steps to manage the prison population in a way that would create space for social distancing and decrease the COVID-19 risks to AICs. Although she was aware of and actively participating in ODOC's COVID-19 response, she rejected the idea of an intake moratorium, declined even to consider the early release of medically vulnerable inmates on the verge of their scheduled release dates, and failed entirely to consider any alternative options for the use of space to protect the prison population that she oversaw.

Over the next two years, the risks did not abate on their own, and conditions inevitably became dire. ODOC never fully implemented or enforced COVID-19 prevention measures necessary to protect against the significant risk of widespread transmission throughout its institutions. OHA failed to adopt several of the CDC's recommended COVID-19 corrections-setting preventative measures and approved ODOC's lackluster measures as adequate to protect people in prison. Governor Brown, for her part, created an early release program that she knew was designed to fail, and rather than create space for physical distancing, she eliminated it—closing two prisons entirely and allowing two existing prisons to sit empty of AICs. As a result of those actions and inactions, more than 5000 Damages Class members tested positive for COVID-19, many suffering severe illness and injury, and 43 Wrongful Death Class members died with the COVID-19 disease. Seventeen of those Wrongful Death Class members would

have been released by the time of trial in this case.  Defendants are liable for this widespread harm.

## GENERAL OVERVIEW

When a person is sentenced for the commission of a crime in Oregon, they are placed in the care and custody of the Oregon Department of Corrections (ODOC).  Dahab Decl. ¶ 2, Ex. 1 (Peters Depo), at 125:5-8.[1]  Once they are in ODOC's custody, ODOC has statutory and constitutional obligations to provide a safe, secure, and healthy environment in which that person may live.  *See* ORS 423.020(1); *see also Hessell v. Dep't of Corr.*, 280 Or. App. 16, 23–24, 380 P.3d 16 (2016) ("The statutory duty of the Department is clear: provide a secure and healthy environment inside prisons."); *Millard v. Or. Dep't of Corr.*, 2014 WL 2506470, at *1 (D. Or. June 3, 2014) ("The Eighth Amendment of the U.S. Constitution provides a fundamental and essential protection for the incarcerated."). *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) ("[I]t is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.' " (quoting *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)).

When this case was filed three-and-a-half years ago, Oregon's prison system was composed of 14 active prison facilities located across the state.  *See* Or. Dep't of Corr., *About Us: Prison Locations*, https://www.oregon.gov/doc/about/Pages/prison-locations.aspx (Apr. 6, 2020).[2]  Intake of all female and male adults committed to ODOC's custody occurred, and

---

[1]    Unless otherwise stated, all exhibits referred to in this response are attached to the Declaration of Nadia H. Dahab ("Dahab Decl."), filed concurrently herewith.
[2]    Archived at https://web.archive.org/web/20200406194705/https://www.oregon.gov/doc/about/Pages/prison-locations.aspx (last visited Dec. 28, 2023) (reflecting capture dated Apr.

continues to occur, at Coffee Creek Correctional Facility (CCCF), located in Wilsonville. *See id.*

ODOC's remaining facilities, including name and location, are shown below.



*See* Or. Dep't of Corr., *Assessment of Oregon's Prison Footprint* (Feb. 16, 2021), *available at*

https://olis.oregonlegislature.gov/liz/2021R1/Downloads/CommitteeMeetingDocument/232889

(last visited Dec. 28, 2023).[3]

 Defendants in this case are the State of Oregon, former Oregon Governor Kate Brown,

former Director of the Oregon Health Authority Patrick Allen, and several individuals who

comprised ODOC's high-level leadership and executive team during the Class Period. ECF 482

(Seventh Amended Complaint), at ¶¶ 10–20. At all relevant times, Defendant Governor Brown

retained "complete authority over all executive agencies of state government," including the

---

6, 2020). As explained below, Defendant Kate Brown ordered two prison facilities closed during
the Class Period.

[3] Throughout this response, Plaintiffs refer to ODOC's institutions using shorthand, as
shown above, and as follows: Oregon State Penitentiary (OSP); Oregon State Correctional
Institution (OSCI);Santiam Correctional Institution (SCI); Mill Creek Correctional Facility
(MCCF); Coffee Creek Correctional Facility (CCCF); Columbia River Correctional Institution
(CRCI); South Fork Forest Center (SFFC); Shutter Creek Correctional Institution (SCCI); Deer
Ridge Correctional Institution (DRCI); Warner Creek Correctional Facility (WCCF); Two Rivers
Correctional Institution (TRCI); Eastern Oregon Correctional Institution (EOCI); Powder River
Correctional Facility (PRCF); and Snake River Correctional Institution (SRCI).

ODOC.  ORS 401.168(1).  Plaintiffs are six current or former adults in custody (AICs) who

contracted COVID-19 while they were incarcerated in Defendants' corrections institutions, ECF

482, at ¶¶ 3–8, and the personal representative of the Estate of Juan Tristan, a former AIC who

died from COVID-19 while in ODOC custody, ECF 482, at ¶ 9.  Pursuant to this Court's order

of April 1, 2022, Plaintiffs Maney, Clift, Nulph, Hall, and Hart represent a class of persons who

were incarcerated in an ODOC facility during the Class Period and who tested positive for or

were otherwise diagnosed with COVID-19 while in custody.  ECF 377 (Order), at 53–54.

Plaintiff Ramirez, on behalf of the Estate of Juan Tristan, represents a class of persons who were

incarcerated in an ODOC facility continuously since February 1, 2020, who died during the

Class Period, and for whom COVID-19 caused or contributed to their death.  ECF 377, at 54.

     In March 2020, the COVID-19 virus entered the United States, posing a public health

threat for everyone person to whom the virus was exposed.  By March 8, 2020, as a result of that

public health threat, Defendant Governor Brown had declared an emergency under ORS

401.165.[4]  She extended that declaration eight times over the course of the Class Period.  By

March 13, 2020, the World Health Organization had declared COVID-19 as a global pandemic,

and the President of the United States had declared the COVID-19 outbreak a national

emergency.  Within the next 10 days, Defendant Governor Brown had issued additional

directives intended to conserve personal protective equipment and hospital beds for the state's

COVID-19 response, and had ordered all Oregonians to shelter-in-place and socially distance by

---

[4]     Executive Order 20-03, *Declaring an Emergency Due to Coronavirus (COVID-19)
Outbreak in Oregon* (Mar. 8, 2020), *available at* https://www.oregon.gov/gov/eo/eo_20-03.pdf
(last visited Dec. 31, 2023).

5 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

keeping at least six feet between one another.[5]  The purpose of the Governor's shelter-in-place

order was to "reduce person-to-person interaction with the goal of slowing transmission."[6]

Governor Brown's shelter-in-place order also mandated the closure of facilities, including

congregate settings, in which the risk of COVID-19 transmission was increased.[7]  She did not at

that time take any action particularly with respect to prisons.[8]

Plaintiffs' claims in this case arise out of the deliberately indifferent and/or negligent

treatment afforded to members of the certified classes while they were in the custody of the

ODOC during the COVID-19 pandemic.  Throughout the Class Period, Defendants, including

Governor Brown, Director Allen, and ODOC's leadership and executive team members acted or

failed to act in ways that presented increased risks to adults in their care, custody, and control.

As a result of those actions and inactions, more than 5000 AICs, all members of the Damages

Class, contracted COVID-19, with many experiencing severe COVID-19 symptoms and

hospitalization.  Forty-six AICs died with a COVID-19 diagnosis; 43 are members of the

Wrongful Death Class.  Of those who died, 21 were medically vulnerable, and 17 were

scheduled for release before the trial date in this action.  Dahab Decl. ¶¶ 3, 98, Ex. 88.

---

[5]      Executive Order 20-12, *Stay Home, Save Lives: Ordering Oregonians to Stay at Home, Closing Specified Retail Businesses, Requiring Social Distancing Measures for Other Public & Private Facilities, & Imposing Requirements for Outdoor Areas and Licensed Childcare Facilities* (Mar. 8, 2020), *available at* https://www.oregon.gov/gov/eo/eo_20-12.pdf (last visited Dec. 31, 2023).
[6]      *Id.*
[7]      *Id.*
[8]      *See id.*

## FACTUAL BACKGROUND

Plaintiffs initially filed this case on April 6, 2020, on behalf of medically vulnerable adults in ODOC custody at heightened risk of illness or death from COVID-19.  At that time, governments across the United States and around the world had taken swift, significant actions in an effort to "flatten the curve," or slow the spread of the COVID-19 disease and protect against widespread infection.  As noted above, by the time Plaintiffs filed their initial complaint, then-Oregon Governor Kate Brown had declared a state of emergency in an effort to slow the spread of COVID-19,[9] and had issued an executive order directing all Oregonians to "Stay Home, Save Lives."[10]  *See* Executive Order 20-12, Stay Home, Save Lives (Mar. 23, 2020).  Through Executive Order 20-12, Governor Brown directed all Oregonians to socially distance—*i.e.*, remain at least six feet from each other—and directed the closure of congregate commercial facilities, including gyms, indoor and outdoor malls, and theaters.  *Id.* ¶¶ 1(c), 2.

Oregon's prisons are congregate living facilities in which physical distancing, and particularly six feet of distancing, simply is not possible.  ECF 83 (Steward Decl.), at ¶ 51.  Indeed, before COVID-19, OHA previously had categorized ODOC's facilities as congregate settings for the purposes of public health management.  *See* ECF 116 (Third Supplemental Bugher Decl.), at ¶ 24.[11]  Throughout the COVID-19 pandemic, public health officials across the

---

[9]    Executive Order 20-03, *Declaring an Emergency Due to Coronavirus (COVID-19) Outbreak in Oregon* (Mar. 8, 2020), *available at* https://www.oregon.gov/gov/eo/eo_20-03.pdf (last visited Dec. 31, 2023).

[10]    Executive Order 20-12, *Stay Home, Save Lives: Ordering Oregonians to Stay at Home, Closing Specified Retail Businesses, Requiring Social Distancing Measures for Other Public & Private Facilities, & Imposing Requirements for Outdoor Areas and Licensed Childcare Facilities* (Mar. 8, 2020), *available at* https://www.oregon.gov/gov/eo/eo_20-12.pdf (last visited Dec. 31, 2023).

[11]    Importantly, prison conditions also often accelerate the impacts of aging; that is, in prison, one who is between 50 and 60 is considered "elderly."  ECF 16 (Stern Decl.) at ¶ 12 ("It

globe warned of the heightened risk of COVID-19 in prisons in light of their congregate living setting.[12]

## I.    Plaintiffs' request for preliminary injunctive relief provided Defendants with notice of the need to protect AICs from the risk of COVID-19.

In May 2020, Plaintiffs moved this Court for an order directing then-Governor Kate Brown and ODOC officials "to take every action within their power to reduce the risk of COVID-19 from further ravaging [Oregon's] prisoner populations." ECF 14 (Motion for Temporary Restraining Order), at 2 (May 12, 2020). In their motion, Plaintiffs explained that, at that early date, adults in ODOC's custody were being exposed to an unreasonable risk of harm from COVID-19, from which Plaintiffs (then medically vulnerable AICs) had a heightened risk of injury or death. ECF 14, at 1. Plaintiffs also explained that, as congregate living environments that AICs could not leave, prisons posed risks unique from those faced by those living outside of Oregon's prisons—the ability to safely distance oneself from others to avoid becoming infected with COVID-19. ECF 14, at 1.

Of course, at the time that Plaintiffs filed their motion, the public health understanding of COVID-19 was still evolving. But one important thing was clear: those living in congregate settings, *especially* prisons, were at far greater risk of contracting a severe COVID-19 infection than members of the general public. *See* ECF 16 (Dr. Marc Stern Decl.), at ¶¶ 15–17; ECF 17 (Dr. Jeffrey Schwartz Decl.), at ¶ 2. What was likewise clear was the one strategy that all public health experts agreed was necessary to reduce transmission of COVID-19 and protect human

is well known in correctional health sciences that individuals in jails and prison are physiologically comparable to individuals in the community several years older.").

[12]    *See* Centers for Disease Control & Prevention, Morbidity & Mortality Weekly Report, COVID-19 in Correctional and Detention Facilities–United States, February–April 2020 (May 15, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6919e1-H.pdf (last visited Jan. 8, 2024).

health: social distancing.  *See* Dahab Decl. ¶ 4, Ex. 2 (MANEY-493212 (CDC Guidance)).  For

that reason, at that time, CDC had advised, and OHA had agreed, that social distancing was a

"cornerstone" of reducing COVID-19 transmission, and that other strategies exist primarily to

supplement and increase the effectiveness of social distancing.  *See id.*; Dahab Decl. ¶ 5, Ex. 3

(MANEY-528678 (OHA Guidance)), at 2.

       At the hearing on Plaintiffs' motion, public health experts offered by all parties testified

about the manner in which social distancing is best achieved in the prison setting.  As this Court

observed, everyone agreed that "the only meaningful way to save lives in prison during the

pandemic . . .  is to reduce the prison population."  ECF 108 (Opinion & Order), at 2 (citing ECF

16 (Stern Decl. ¶¶ 20, 22); ECF 17 (Schartz Decl. ¶ 7); ECF 51 (Steward Decl. ¶ 51); ECF 84

(Dewsnup Decl. ¶ 56)) (quoting ECF 85 (Decl. of Garry Russell ¶¶ 106–07)).  That, of course,

was not a remedy that the Court could provide, however; "[o]nly the Governor has that power."

*Id.* at 4.

       The Court therefore focused on the other COVID-19 preventative measures that ODOC

had undertaken to adopt and implement at that time.  As to those preventative measures,

Plaintiffs offered widespread evidence that those measures were either insufficient in substance,

inadequately communicated to institution-level administrators, or simply not being implemented

or enforced on the ground.  For instance, although ODOC claimed that its policy was to test all

AICs "showing signs and symptoms of flu/COVID-19," Plaintiffs offered evidence that, across

ODOC's institutions, AICs exhibiting symptoms actually were being denied COVID-19 tests.[13]

---

[13]    *See, e.g.*, Parnell Decl. (ECF 18) ¶ 30 (OSP); Delicino Decl. (ECF 19) ¶ 5(b)–(c) (SRCI);
Patterson Decl. (ECF 32) ¶ 15 (PRCF); Maddox Decl. (ECF 43) ¶ 5(g) (SCCI); Hall Decl. (ECF
60) ¶ 11(d)–(e) (OSP); Plunk Decl. (ECF 92) ¶ 4(a)–(c) (SCI); Curtis Dec. (ECF 96) ¶ 4(b)
(SCI); Walls Decl. (ECF 98) ¶ 4(b) (OSP); McCormack Decl. (ECF 99) ¶ 4(b) (PRCF).

9 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs further offered evidence that although masks at that time were understood as a

necessary COVID-19 protective measure, mask-wearing within ODOC's institution was at best,

inconsistent, and more commonly, openly disregarded.[14]  Plaintiffs also explained that

(1)    Defendants failed at that time to provide adequate quarantine and medical
       isolation measures;[15]
(2)    Prisoners working at Oregon Corrections Enterprises (OCE) faced unsafe working
       conditions;[16]
(3)    Defendants failed to implement or enforce social distancing measures;[17]

---

[14]    *See, e.g.*, Delicino Decl. (ECF 19) ¶ 5(k) (AICs mask during chow, but staff do not)
(SRCI); Constantin Decl. (ECF 22) ¶ 5(n) (staff are not masked, and AIC mask rules are not
enforced); Nielson Decl. (ECF 23) ¶¶ 6–7 (staff do not mask) (SCI); White Decl. (ECF 24) ¶ 6
(staff and OCE not masking) (TRCI); Weaver Decl. (ECF 27) ¶ 5 (70 percent of staff unmasked)
(TRCI); Pritchett Decl. (ECF 29) ¶ 5(l) (staff unmasked) (SCCI); Fereira Decl. (ECF 36) ¶ 6 (30
percent of staff unmasked) (CCCF); McCormack Decl. (ECF 38) ¶ 10 (AICs and staff don't wear
masks) (PRCF); Benson Decl. (ECF 39) ¶ 12 (staff don't socially distance or wear masks)
(DRCI); Gillespie Decl. (ECF 42) ¶¶ 5, 8, 12 (staff and nurses don't wear masks) (CCCF);
Lupoli Decl. (ECF 48) ¶ 12 (staff don't wear masks) (EOCI); Adams Decl. (ECF 49) ¶ 15 (same)
(MCCF); Hoag Decl. (ECF 50) ¶ 16 (same) (TRCI); Kirk Decl. (ECF 51) ¶ 9, 18 (same) (SRCI);
Loreman Decl. (ECF 52) ¶ 4(c) (no one is masking) (SCCI); Smith Decl. (ECF 54) ¶ 8 (staff and
most AICs aren't wearing masks) (WCCF); Cantrell Decl. (ECF 55) ¶¶ 18–19 (few COs wear
masks) (CRCI); Curtis Decl. (ECF 96) ¶ 4(g) (staff do not mask in the kitchen; several COVID-
positive AICs sent to work in kitchen) (SCI); Walls Decl. (ECF 98) ¶ 4(r) (COs aren't masking)
(OSP).

[15]    *See, e.g.*, Nielson Decl. (ECF 23) ¶¶ 2–3 (COVID-positive AICs placed in general
population while awaiting test results) (SCI); Plunk Decl. (ECF 92) ¶ 4(d) (same) (OSP); Hoag
Decl. (ECF 50) ¶ 62 (AICs in quarantine leave their cells to work in OCE laundry or woodshop)
(TRCI); Hall Decl. (ECF 60) ¶ 11(a) (AIC living on D Block with 630 AICs is considered "on
quarantine"); McCormack Decl. (ECF 38) ¶ 11 (new transports from intake or placed in general
population while being "monitored") (PCRF); Sanchez Decl. (ECF 40) ¶ 7 (same) (PCRF);
Taylor Decl. (ECF 46) ¶ 4(g) (sick AICs remain in general population for several days) (CCCF).

[16]    *See, e.g.*, White Decl. (ECF 24) ¶¶ 6, 7 (no masks or social distancing); Walls Decl. (ECF
98) ¶ 4(b) (AIC with symptoms forced to report to work before being tested); Gillespie Decl.
(ECF 42) ¶ 8 (no social distancing at work in kitchen) (CCCF); Hoag Decl. (ECF 50) ¶ 13 (while
working at canteen, AICs from various units, some on quarantine and some not, visit canteen
together) (TRCI);  Cantrell Decl. (ECF 55) ¶ 26 (same) (CRCI); Meeks Decl. (ECF 57)
¶ 8 (AICs from MCCF transfer back/forth to/from OSP laundry every day); Curtis Decl. (ECF
96) ¶ 4(g) (COVID-positive AICs working in the kitchen) (SCI); Horner Decl. (ECF 97) ¶¶ 4(f),
4(h), 4(i) (worked in laundry while showing COVID-19 symptoms).

[17]    *See, e.g.*, Delicino Decl. (ECF 19) ¶ 5(d)–(e) (240–300 AICs from different units on yard
together); Mitchell Decl. (ECF 21) ¶¶ 13–14 ("I am never six feet or more from another
person.") (SCCI); Constantin Decl. (ECF 22) ¶ 5(q)–(t) (100 people at chow from various units;

(4)    Defendants failed to implement or enforce cohorting/mixing measures;[18] and

(5)    The punitive nature of confinement and Defendants' culture of indifference only increased risks to AICs.[19]

*See generally* ECF 14.

In response to Plaintiffs' motion and the evidence that Plaintiffs had presented, Defendants explained that they were "not perfect," and that they were "trying to improve all the things we can improve."  Dahab Decl. ¶ 6, Ex. 4 (Trans. at 173:11–13 (May 29, 2020)); *see id.* at 14–16 ("But I think the overall outcome numbers show that we're doing a good job . . . .").

---

bunkmates are literally an arm's length away) (CRCI); Patterson Decl. (ECF 32) ¶ 7 (AICs sit three feet apart at chow) (PRCF); Preston Decl. (ECF 33) ¶¶ 7–8 (AICs sit 1.5 feet apart at chow) (DRCI); McCormack Decl. (ECF 38) ¶ 12 (AICs sit less than one foot apart at chow; no social distancing in yard) (PRCF); Benson Decl. (ECF 39) ¶ 7, 12 (no social distancing in day room; COs do not socially distance); Gillespie Decl. (ECF 42) ¶ 10, 14 (AICs sleep and eat three feet apart) (CCCF); id. ¶ 13 (no social distancing in line movement) (CCCF); Lupoli Decl. (ECF 48) ¶ 14 (AICs sit two feet apart at chow; line up belly to back; servers work elbow to elbow) (EOCI); Kirk Decl. (ECF 51) ¶¶ 13–14 (chow is shoulder to shoulder) (SRCI); Smith Decl. (ECF 54) ¶ 6 (chow is 2–3 feet apart) (WCCF); Meeks Decl. (ECF 57) ¶¶ 2, 9–10 (chow is shoulder to shoulder; bunks are three feet apart) (MCCF); Jamison Decl. (ECF 58) ¶ 4 (no social distancing at chow or day room) (EOCI); Trans. at 106:8–18 (describing diabetic line and pill line, where "they literally stuff 50 people in an area that can hold maybe 15 to 20 comfortably") (OSP) (May 29, 2020) (testimony of David Hart).

[18]    *See, e.g.*, Larson Decl. (ECF 26) ¶ 6 (staff mix between units while institution is on lockdown) (DRCI);  Weaver Decl. (ECF 27) ¶ 5 (staff mix between units) (TRCI); Pritchett Decl. (ECF 29) ¶ 5(j) (staff move freely between COVID-19 hotspots, quarantine, and other units) (SCCI); Maddox Decl. (ECF 43) ¶ 5(h) (same) (SCCI); McCormack Decl. (ECF 38) ¶ 13 (units mix in the yard) (PCRF); Taylor Decl. (ECF 46) ¶ 5(g) (no rules prohibiting mixing at chow); Lupoli Decl. (ECF 48) ¶ 16 (mixing occurs in yard and TV room) (EOCI); Smith Decl. (ECF 54) ¶ 7 (AICs mix between units; mixing occurs during line movements for yard, chow, and med-line) (WCCF); Richardson Decl. (ECF 59) ¶ 4(m) (COs move freely throughout institution) (SCCI); Lee Decl. (ECF 61) ¶ 5(f) (same) (CRCI).

[19]    *See, e.g.*, Weaver Decl. (ECF 27) ¶ 9 (AICs use ice to cool foreheads to avoid isolation in DSU) (TRCI); White Decl. (ECF 28) ¶¶ 15–21 (squalid conditions in OSP quarantine; staff tell AICs to "go fuck yourself"); Maddox Decl. (ECF 43) ¶ X (COs treat COVID-10 as a laughable crisis); Jamison Decl. (ECF 58) ¶ 6 (staff believes COVID-19 is not a serious threat and make fun of AICs for wearing masks) (EOCI); Curtis Decl. (ECF 96) ¶ 4(h) (nurses say COVID-19 isn't a big deal) (SCI); Nielson Decl. (ECF 23) ¶ 8 (COs joke about AICs having the "butt virus") (SCI); Adams Decl. (ECF 49) ¶ 11 (institution adjusted chow for two days in April to implement social distancing during inspection by Dome Building staff) (MCCF).

Defendants then made a series of assurances that did not reflect reality, and made several additional promises that never were fulfilled.  Defendants assured the Court, for example, that they had "taken tremendous steps in their efforts to prevent and control the spread of COVID-19" in Oregon's prison system, "upend[ing ODOC's] normal process and . . . putting intense focus on the best ways to mitigate this situation."  ECF 82 (Response to Motion for Temporary Restraining Order), at 2; *see also* ECF 83 (Steward Decl.), at ¶ 21 ("ODOC has taken numerous, concrete steps to prevent and control the spread of COVID-19 within its facilities.").  They represented, incorrectly (*see infra* at Section III.B), that they were "following the guidance for correctional institutions issued by the Centers for Disease Control and Prevention (CDC), as well as similar guidance issued by the Oregon Health Authority (OHA)."  ECF 82, at 2; *see also* ECF 83, at ¶¶ 16, 17, 48 ("ODOC follows both the CDC and OHA guidance for correctional facilities on social distancing."), 54.  They explained to the Court that they had developed an assessment tool "to assess the COVID-19 response" across the ODOC system and promised to use the tool to "evaluate each of its facilities."  ECF 83, at ¶¶ 73, 74, 80).[20]  They assured the Court that their efforts had "greatly limited the spread of COVID-19" across the ODOC system, and, remarkably, went so far as to represent that "given ODOC's preventive measures, most AICs will not contract COVID-19.  And, if they do, they will experience only mild or moderate symptoms."  ECF 82, at 2.  Just the month before, ODOC had developed an in-custody death plan and was coordinating with funeral homes in anticipation of additional COVID-19-related deaths.[21]

---

[20]    As explained in more detail below, they did not use the tool to evaluate each facility. *See infra* at Section III.D.2.

[21]    ECF 204 (Sugerman Decl. in Support of Motion to Certify Class), ¶ 6, Ex. 3.

Based on ODOC's assurances, the Court denied Plaintiffs' request for preliminary injunctive relief.  ECF 108.

To be sure, at the time of the preliminary injunction hearing, the need to reduce the prison population had crossed Defendants' minds; they simply had failed to take meaningful steps to accomplish it.  At the hearing, Defendants reported to the Court that they had "worked closely with the Governor's office to provide her with information to make informed decisions regarding clemency."  ECF 83, at ¶ 86.  Thus, in mid-April 2020, apparently in response to the Governor's request, ODOC officials had "presented the Governor with an estimate that 5,800 AICs would need to be released to achieve six feet of social distancing."  ECF 83, at ¶ 87.  ODOC also provided the Governor with "various [population management] scenarios—eight in total—that could be implemented" to reduce the prison population.  ECF 83, at ¶ 87 and Ex. 11, at 1 ("AIC Population Management Scenarios").  In one of those scenarios, ODOC proposed that the Governor issue an "intake moratorium"— the State of Colorado already had done so—and noted that before COVID-19, intakes into the ODOC averaged 370 per month.  ECF 83, Ex. 11, at 9. In another scenario, ODOC identified 2584 individuals who were scheduled for release within six months, most of whom were serving sentences for non-person crimes.  ECF 83, Ex. 11, at 7. As of June 1, 2020, the date that the Court issued its order denying Plaintiffs' motion, there was no intake moratorium in place,[22] and none of those AICs had been granted early release.  ECF 108 (Opinion & Order), at 4; *see also* Trans. at 83:18–84:9 (May 29, 2020) ("[T]he record we

---

[22]    To be clear, at that time Plaintiffs did not request that the Court order the Governor to issue an intake moratorium.  Trans. at 10:24–11:6 (May 29, 2020).

have is the governor requested this information, considered it, and declined to do anything other than consider releases on a case-by-case basis.").[23]

Indeed, not only had the Governor declined to pursue any of the scenarios that ODOC presented, ODOC had not at that time *recommended* that the Governor do so.  *See* ECF 83, at ¶ 83 (noting that ODOC "never recommended the release of AICs as [a] necessary response to the COVID-19 pandemic").  Notwithstanding its "commit[ment] to achieving maximum social distancing with the current population and physical layout of our facilities," ECF 83, at ¶ 51, and notwithstanding ODOC's own infectious disease expert's position that "releasing AICs in order to establish and maintain social distancing . . . has a sound evidentiary basis . . . , resulting in a lesser likelihood of a vulnerable AIC being infected and experiencing severe morbidity and death," ECF 84 (Dewsnup Decl.), at ¶ 56, ODOC never asked at that time—or, as Plaintiffs explain below, *ever*—"for *any* population reduction . . . to achieve social distancing or otherwise," ECF 83, at ¶ 87 (emphasis added).

Nor did ODOC or the Governor consider using alternative spaces within ODOC's existing physical infrastructure to create room for social distancing.  During the hearing on Plaintiffs' motion, Dr. Marc Stern testified that short of reducing the prison population, the best way to achieve the social distancing necessary to protect against rapid COVID-19 transmission was to "spread out"; that is, to the extent that ODOC had unused buildings that could be used for incarceration, to use them.  Trans. at 67:3–13 (May 29, 2020).  In response to that suggestion, Defendants explained that, although ODOC maintains two unused prison facilities in Oregon, *see*

---

[23]    The evidence presented at that time made clear that then-Governor Brown was "personally aware of and supervising" ODOC's COVID19 response.  Trans. 196:1–4 (May 29, 2020); *see also id.* at 195:24–25 ("[T]he governor isn't just letting DOC do its own thing with a hands-off approach.").

14 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ECF 19 (Decl. of Jeffrey Parnell), at ¶ 27, Defendants couldn't simply bring those unused

facilities online overnight.  *See* Trans. at 89:24–90:13 (May 29, 2020) ("[W]e can't just walk into

an unused prison facility and flip the lights on and put people in there.").  Defendants further

explained that, to bring the facilities online, ODOC would "have to think about public safety

impacts that are not just loca[l]."  Trans. at 90:9–13 (May 29, 2020).  Remarkably, since that

hearing—as COVID-19 attacked the prison population, infecting thousands and killing 46

more—neither ODOC nor the Governor ever stopped to "think about" whether it could open its

two unused buildings for purposes of protecting adults in their care and control from COVID-19.

*See infra* at Section III.C.

## II.    Other sources put Defendants on notice of the importance of social distancing and the options for population reductions that would allow ODOC to do so.

Of course, even before Plaintiffs moved this Court for preliminary injunctive relief,

Defendants, including ODOC leadership and Defendant Governor Kate Brown, were aware from

other sources of the importance of social distancing in the corrections setting and the options for

population reduction and/or space management that would allow ODOC to align with public

health guidance.

### A.    ODOC's corrections-setting partners recommended "controlled, purposeful and public health-oriented population reduction"; ODOC ignored those recommendations.

ODOC leadership—and specifically, Defendants Collette Peters and Heidi Steward—

received early guidance from their corrections-setting partners on how best to develop ODOC's

emergency response to the COVID-19 pandemic.  On March 20, 2020, three days before

Governor Brown issued her emergency stay-at-home orders, Dr. Brie Williams, of the University

of California-San Francisco's "Amend" Program,[24] sent ODOC a "list of policies needed during the COVID-19 pandemic."  Dahab Decl. ¶ 8, Ex. 6 (MANEY-242490).  In support of that list, Dr. Williams noted ODOC's constitutional obligations to "take all appropriate actions needed to mitigate the effects of a potential outbreak in correctional facilities."  Ex. 6 (MANEY-242490), at 2.  The policies that Dr. Williams recommended included, among others, policies addressing release, social distancing, cohorting, quarantining, testing, communication, and coordination with local communities and public health agencies.  Ex. 6 (MANEY-242490), at 2-4.

Over the course of the next several days, Dr. Williams wrote to Peters and Steward again, this time to offer guidance addressing the need for "controlled, purposeful and public health-oriented population reduction at Departments of Corrections to optimize the health and safety of patients and staff."  Dahab Decl. ¶ 9, Ex. 7 (MANEY-242497), at 2 (received Mar. 24, 2020).  Dr. Williams explained that

> DOC populations are enriched with medically vulnerable patients (people of older age or with chronic medical conditions) who have the highest risk of serious illness when infected with COVID-19.  This risk is compounded by limited space and few private rooms with solid doors, making effective social distancing . . . virtually impossible.

Dahab Decl. ¶ 10, Ex. 8 (MANEY-242449), at 3 (received Mar. 26, 2020).  She provided ODOC with specific "immediate steps to take to reduce risk of COVID-19 spread" within the Department of Corrections:

---

[24]    *See* AMEND, About Amend at UCSF, https://amend.us/ ("Amend at UCSF is a public health and human rights program that works in prisons to reduce their debilitating health effects on residents and staff, while also joining policy makers and community leaders to advance decarceration strategies and a better, new system of accountability and healing in the U.S.  We focus on health-focused culture-change initiatives, staff training, public education, advocacy, and policy-oriented research.") (last visited Jan. 6, 2024).  At that time, Dr. Brie Williams had worked with ODOC in the preceding two years to "bring in normalizing and humanizing efforts within our prison."  Dahab Decl. ¶ 7, Ex. 5 (Steward Depo.), at 136:1-6.

1. **Close Intake immediately**

2. **Decrease population density - purposeful strategy focusing first on:**
   - **Persons within 1-2 years of a parole or release date.** Accelerate release for all with home to go to and Medicaid/VA health benefits already in place. If triage is necessary, start with eldest and work through to youngest. Increase emergency discharge/reentry preparation staff to support housing and medical care release planning for all in this group.
   - **Those who have already completed compassionate release or medical parole request paperwork with a home to go to and a medical plan in place.** This will free up medical beds in the DOC, lower the risk of exposure to COVID-19 among the seriously ill, and allow healthcare providers to focus attention on COVID-19 patients.

Ex. 7 (MANEY-242498), at 2. Dr. Williams warned that "coordinated, preemptive, thoughtful and decisive action around decreasing the population in prisons with public health at its center will save lives in prisons and in our communities." *Id.*

Dr. Williams also sent Peters and Steward an e-mail updating her prior guidance and observing that "Oregon is one of a handful of states where the governor has 'unencumbered reprieve power'" such that a criminal sentence may temporarily be suspended. Dahab Decl. ¶ 11, Ex. 9 (MANEY-570115).

Defendant Peters never responded to any of Dr. Williams' emails and did not review the guidance at the time she received it. Dahab Decl. ¶ 12, Ex. 10 (Peters Depo.), at 43:19–21, 44:12–20. Defendant Steward did not have any follow-up conversation with anyone about the guidance, and she did not share Dr. Williams' recommendations with anyone else. Steward Depo. at 139:5–16.[25]

    **B.    The States of Washington and California, as well as the Federal Bureau of Prisons, immediately took steps to reduce their respective prison populations to slow the spread of COVID-19.**

Meanwhile, officials in other jurisdictions took immediate steps to reduce their respective prison populations for the purpose of slowing the spread of COVID-19 and protecting adults in

---

[25]    Steward testified that she forwarded the recommendation to the AOC. Steward Depo. at 139:5–16. There is no evidence in the record to support that.

17 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

custody.  In Washington, Governor Jay Inslee immediately issued a proclamation and

commutation order that gave the Washington Department of Corrections greater authority to

release incarcerated persons.[26]  In California, the Department of Corrections and Rehabilitation

immediately expedited the release of almost 3500 incarcerated persons to protect its AICs and

corrections staff.[27]  And at the federal level, the U.S. Attorney General issued a memo in late

March 2020 directing the Federal Bureau of Prisons to prioritize home confinement as an option

to decrease risks to AIC and public health.[28]  ODOC connected regularly with Washington and

California about their COVID-19 response.  Ex. 10 (Peters Depo.), at 89:14–24.[29]

## III.    ODOC and OHA failed to take reasonable steps to prevent serious risk of harm to AICs.

Over the two years, both ODOC and OHA failed miserably to protect adults in their

custody and care.  As explained in more detail below, their centralized response—a coordinated

---

[26]     State of Washington, Governor Jay Inslee, *Inslee Issues New Orders to Reduce Prison Populations During the COVID-19 Outbreak*, https://governor.wa.gov/news/2020/inslee-issues-new-orders-reduce-prison-populations-during-covid-19-outbreak (last visited Jan. 1, 2024); *see also* Jim Brunner & Mary Hudetz, *Washington Department of Corrections Names 1,100+ Inmates to Be Released in Coming Days Due to Coronavirus Concerns*, Seattle Times (Apr. 16, 2020), https://www.seattletimes.com/seattle-news/law-justice/washington-department-of-corrections-lists-names-of-hundreds-of-inmates-to-be-released-in-coming-days-due-to-coronavirus-concerns (last visited Jan. 1, 2024).  Defendant Peters participated regularly in "Western Region" meetings with the directors of other state corrections agencies, including Washington, but has no "specific recollection" relating to Washington's response and does not recall whether she talked to Governor Brown or her office about it.  Ex. 10 (Peters Depo.), at 89:8–90:6.

[27]     Cal. Dep't of Corr. & Rehab., *Actions to Reduce Population and Maximize Space*, https://www.cdcr.ca.gov/covid19/frequently-asked-questions-expedited-releases/ (last visited Jan. 1, 2024).

[28]     Memo. from U.S. Att'y Gen. to Director of Bureau of Prisons, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), *available at* https://www.justice.gov/file/1262731/download (last visited Jan. 1, 2024).

[29]     While Washington was reducing its prison population, ODOC was "picking up" people released from Washington's facilities and increasing Oregon's prison population.  *See* ECF 204 (Sugerman Decl. in Support of Motion to Certify Class) ¶ 5, Ex. 3 (MANEY-018113).

effort between both agencies—was riddled with deficiencies, and they quickly fell behind

national corrections-setting COVID-19 public health guidance.  They did not audit each of their

institutions, avoided audits from outside entities, and they were aware of and allowed widespread

enforcement and implementation failures to persist.  They knew that the cornerstone of any

COVID-19 response was space to socially distance; the space they had, however, they didn't use.

They allowed prison facilities--to determine whether or how that space could be used to better

protect AICs.  ODOC's "Tiering" preventative strategy—approved by OHA—applied only once

COVID-19 existed in a facility, largely undermining its preventative purpose.  And while

COVID-19 cases and deaths in ODOC facilities continued to soar, neither ODOC nor OHA took

a single step to correct course.

**A.      ODOC centralized its response to the COVID-19 pandemic.**

Because Plaintiffs' claims in this case are based on ODOC's centralized COVID-19

policies and decision-making, Plaintiffs address briefly the centralized nature of ODOC's

response.

On March 4, 2020, Defendants activated ODOC's so-called Agency Operations Center

("the AOC"), a committee of agency officials designated to oversee and make decisions relating

to ODOC's COVID-19 response.  ECF 83 (Steward Decl.) ¶ 11; *see also id.* ¶ 16 ("ODOC has a

centralized plan for addressing COVID-19").  Decision-making relating to COVID-19-related

policies and practices were routed through the AOC, including decisions relating to preventative

strategies.  *See, e.g.*, Dahab Decl. ¶ 13, Ex. 11 (Washburn Depo.), at 35–36.[30]  So, too, were

decisions and information relating to implementation.[31]

Defendants Joseph Bugher and Garry Russell were designated to co-lead the AOC on

behalf of ODOC.  Dahab Decl. ¶ 14, Ex. 12 (Steward Depo.), at 12.  OHA, led by Defendant

Patrick Allen, coordinated directly and frequently with the AOC to develop and implement

COVID-19-related guidance for ODOC's institutions.  ECF 83 (Steward Decl.) ¶ 17.  In Oregon,

OHA has "full power in the control of all communicable diseases," ORS 481.110(7), and is

obligated to "[e]nforce the laws, rules and policies of [Oregon] related to health," ORS

481.120(1).

---

[30]    *See also* Declaration of David Sugerman ISO Plaintiffs' Motion to Certify Class, ECF
204, ¶ 3 (Washburn Depo. at 35–36); *see also* Declaration of Nadia H. Dahab in Support of
Plaintiffs' Motion for Class Certify Class ("Dahab Decl. Class Cert.") ¶ 5 (Ackley (DRCI) Depo.
at 24:23–24:21) (discussing AOC direction to implement policies relating to the handling of
COVID-19); ¶ 3 (Stephen (OSP) Depo. at 18:15–19:23) (AOC provided direction to each facility
on necessary COVID-19 response measures); ¶ 7 (Cain (SRCI) Depo. at 18:16–21) (most
directives regarding COVID-19 response came from the AOC; some came directly from
Defendant Peters); ¶ 21 (Jackson (TRCI) Depo. at 22:3–24) (policy guidance and direction came
from the AOC); ¶ 8 (Stewart (EOCI) Depo. at 43:1–44:4) (COVID-19 policies and practices
were centralized through the AOC).
[31]    For instance, institutions were required to submit to the AOC their plans to implement
certain operational changes, and AOC approval was required before the changes could be made.
*See, e.g.*, Dahab Decl. Class Cert. ¶ 9 (Martin (SCCI) Depo. at 48:16–49:5) (visitation plans
require AOC approval); ¶ 10 (Popoff (CCCF) Depo. at 24:1–25:2) (handwashing station plans
submitted to AOC); ¶ 8 (Stewart (EOCI) Depo. at 34:18–25, 41:3–42:25) (respiratory clinic
plans require AOC approval); ¶ 11 (Hendricks (SCI) Depo. at 11) (AOC reviewed and approved
SCI's pandemic plan); ¶ 13 (Rumsey (TRCI) Depo. at 16:20–17:4) (describing AOC as the
"approval authority"; institution would run all changes by the AOC before making them).  Thus,
while the COVID-19 response at each institution changed over time, "it was always at the
direction of the AOC."  Dahab Decl. Class Cert. ¶ 21 (Jackson (TRCI) Depo. at 73:9–16).

**B.** **ODOC and OHA quickly departed from the CDC's corrections-setting public health recommendations.**

At the core of ODOC's and OHA's failures were their decisions to depart significantly from nationally accepted corrections-setting public health recommendations. The following summarizes the evolution of those nationally accepted corrections-setting recommendations and ODOC's responses to those recommendations.

**1.** **ODOC developed initial guidance separately from CDC's and OHA's initial corrections-setting guidance.**

On March 23, 2020, the CDC released a document entitled *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*. Ex. 2 (MANEY-493212) (referred to hereafter as the March 2020 CDC Interim Guidance). The March 2020 CDC Interim Guidance made clear the COVID-19 was of particular concern in the corrections setting. Ex. 2, at 2. Among other reasons, the CDC warned of the many opportunities for COVID-19 to be introduced into a correctional facility—including through daily staff ingress and egress, new arrivals, transfers of AICs between facilities, and visitors—and AICs' increased risk of severe disease from COVID-19. Ex. 2 (MANEY-493212), at 2.

The March 2020 CDC Interim Guidance provided an initial set of COVID-19 prevention and control recommendations for correctional facilities. The CDC's recommendations, generally speaking, sought to prevent introduction of COVID-19 into and out of correctional facilities, limit the spread of COVID-19 within facilities independent of identifying specific cases, and limit the spread of COVID-19 within facilities by on identifying, isolating, and quarantining cases and close contacts. Ex. 2 (MANEY-493212). Primary among its recommendations were

☐     restriction of transfers of AICs between institutions and suspension of work release programs;
☐     pre-intake screening and temperature checks for all new entrants;

- ☐ routine intake quarantine, defined as quarantine for all new intakes for 14 days before entering the facilities general population;
- ☐ social distancing strategies to maximize the space between persons in correctional facilities;
- ☐ quarantine for 14 days of AICs who were close contacts of known COVID-19 cases; and
- ☐ separation of cases under isolation and individuals under quarantine.

Ex. 2 (MANEY-493212), at 9-19; *see also* Ex. 3 (MANEY-528678), at 5 ("although social distancing is challenging in practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19").

On April 5, 2020, about two weeks after the March 2020 CDC Interim Guidance was released, OHA released its own corrections-setting guidance through a document entitled *Coronavirus Disease 2019 (COVID-19) Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correction and Detention Facilities*. *See* Ex. 3 (MANEY-528678). This document ("the April OHA Corrections Guidance") effectively served as Oregon's official guidance and policy for control of COVID-19 in Oregon prisons. *See* ORS 431.110(1), (7) (OHA has "direct supervision of all matters relating to the preservation of life and health" and "full power in the control of all communicable diseases"). The April OHA Corrections Guidance was adopted almost word-for-word from the March 2020 CDC Interim Guidance. *Compare* Ex. 2, *with* Ex. 3.

Meanwhile, ODOC was developing its own guidance, separate from the April OHA Corrections Guidance. On April 17, 2020, ODOC officials released a document entitled *Oregon Department of Corrections Centralized Plan for COVID-19*. Dahab Decl. ¶ 15, Ex. 13 (MANEY-097734). Oregon's Centralized Plan borrowed in part from the April OHA Corrections Guidance, but the prevention approach it detailed was considerably abbreviated. *Compare* Ex. 3, *with* Ex. 13. It also included proposed interventions that did not appear in the CDC's or OHA's guidance, including a "Tiering" protocol dictating an institution's response

22 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

once a COVID-19-positive case was reported in that institution.  *See* Ex. 13, at 6-7.  There were significant flaws in the ODOC's guidance; those flaws will be addressed in greater detail below.

### 2.    The public health understanding of COVID-19 continued to evolve.

In the spring and summer of 2020, as COVID-19 continued to spread, the public health understanding of the disease also continued to evolve.  A new understanding of asymptomatic transmission, the need for mask-wearing, and expanded airborne transmission rates became more clear.

By April 2020, for instance, it had become clear that asymptomatic transmission of COVID-19 was substantial.  Dahab Decl. ¶ 16, Ex 14 (MANEY-478808), at 2-3 (Apr. 13, 2020) ("The importance of asymptomatic COVID-19 is likely to be a factor in large congregate housing situations.") (statement of Dr. Dewsnup); *see also* Dahab Decl. ¶ 17, Ex. 15 (Sulzinski Depo.) at 33:18-21 (asymptomatic spread first recognized in May of 2020, "maybe even a little bit earlier").  Asymptomatic transmission was twofold—it could occur both from individuals who were infected but never experienced symptoms, and from infected individuals during the 24-48 period before they began experiencing symptoms.  Sugerman *Daubert* Decl. ¶ 10, Ex. 9 (Fleming Rep.) at 9.  With that new understanding, prevention strategies that relied on identifying, isolating, and quarantining known cases and close contacts, without more, were unlikely to be effective.  Fleming Rep. at 9.  Likewise, procedures for identifying close contacts and contract tracing needed to be expanded to account for this new information.  Fleming Rep. at 9.

The importance of mask-wearing had emerged as well.  On April 3, 2020, in response to the evolving understanding of asymptomatic transmission, CDC announced mask-wearing guidance recommending that all people wear masks when they are outside their homes.  Centers

for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Recommendation for Cloth Face Covers* (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.[32]  Thereafter, mask-wearing became commonplace across Oregon. But it was not until July, after ODOC requested it, that OHA updated its April Corrections Guidance to include a masking component.  *See* Dahab Decl. ¶ 18, Ex. 16, (MANEY-309293), at 3-4.  And that update did not align with the CDC's recommendations; instead, OHA added only what it believed to be ODOC's preference, *see* Ex. 16, (MANEY-309293), at 2, and stated that "both staff and incarcerated/detained persons should wear a face mask in settings where they cannot maintain six feet of physical distance," *see* Dahab Decl. ¶ 19, Ex. 17 (MANEY-489389) (July 1, 2020).

Likewise, in May 2020, the CDC began referring to a publication entitled *Guidance for Building Operations During the COVID-19 Pandemic* and incorporated its recommendations into the CDC's guidance for COVID-19 building ventilation.[33]  The recommendations addressed improvement of central air filtration to the MERV-13 standard, running ventilation systems 24/7, consideration of portable room air cleaners with HEPA filters, and consideration of ultra-violent germicidal irradiation (UVGI) in high-risk spaces, including prisons.  *See id.*  ODOC did not address or refer to any such standards at that time.

---

[32]    Archived at https://web.archive.org/web/20200409020838/https://www.cdc.gov/ coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html (last visited Jan. 6, 2024) (reflecting capture dated Apr. 3, 2020).

[33]    This was published in May 2020 in the Journal of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE).  *See* Fleming Rep. at 10; *see also* Lawrence J. Schoen, ASHRAE Journal (May 2020), *available at* https://www.ashrae.org/file%20library/technical%20resources/ashrae%20journal/ 2020journaldocuments/72-74_ieq_schoen.pdf.

On May 20, 2020, the first AIC in ODOC custody died with COVID-19.  Dahab Decl. ¶ 20.

### 3.  In July and August 2020, the CDC and OHA issued updated corrections-setting COVID-19 guidance.

On July 14, 2020, two weeks after OHA made limited adjustments to its masking requirements to align with ODOC's request, CDC released a revision of its *Interim Guidance on Management of Coronavirus 2019 (COVID-19) in Correctional and Detention Facilities.  See* Fleming Rep. at 10; Dahab Decl. ¶ 21, Ex. 18 (hereafter referred to as the July 2020 CDC Interim Guidance).[34]  This revision included new recommendations to account for the evolving understanding of COVID-19 and effective prevention and control strategies.  Among the new recommendations were:

- ☐ new strategies for testing of asymptomatic incarcerated/detained persons without known exposure for early identification of SARS-CoV-2 in the facility;[35]
- ☐ new facility options to prevent overcrowding, including diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable;[36] and
- ☐ new recommendations on masking, including a recommendation to "[e]ncourage all staff and incarcerated/detained persons to wear cloth face masks as much as safely possible."  The revised guidance expressly states that "if everyone wears a mask in congregate settings, the risk of exposure to SARS-CoV-2 can be reduced."[37]

Ex. 18 (July 2020 CDC Interim Guidance), at 15–19.  The July 2020 CDC Interim Guidance also set forth an expanded and clearer set of recommendations on social distancing strategies, including:

---

[34]    The July 2020 CDC Interim Guidance was not produced by Defendants in discovery in this case.

[35]    This recommendation was not adopted by OHA.  Dahab Decl. ¶ 22, Ex. 19 (MANEY-768470), at 25.

[36]    This recommendation was also not adopted by OHA.  *Id.*

[37]    OHA did not incorporate this newer CDC language on expanded use of masking and instead repeated its narrower July masking guidance language ("staff and incarcerated/detained persons should wear a face mask in settings where they cannot maintain six feet of physical distance").

25 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- ☐ minimize the number of individuals housed in the same room as much as possible;[38]
- ☐ rearrange scheduled movements to minimize mixing of individuals from different housing areas;[39]
- ☐ modify work detail assignments so that each detail includes only individuals from a single housing unit supervised by the staff who are normally assigned to the same housing unit;[40]
- ☐ minimize interactions between incarcerated/detained persons living in different housing units. For example, stagger mealtime and recreation times and consider implementing broad movement restrictions;[41]
- ☐ consider testing all newly incarcerated/detained persons before they join the rest of the population in the facility;[42]
- ☐ identify opportunities to implement telemedicine and stagger pill line, or stage pill line within individual housing units;[43] and
- ☐ modify staff assignments to minimize movement across housing units and other areas of the facility to prevent cross-contamination from units where there are infected individuals to units with no infections.[44]

Ex. 18 (July 2020 CDC Interim Guidance), at 14–18.

And it contained new recommendations for limiting the spready of COVID-19 based on identification and isolation or quarantine of cases and case contacts:

- ☐ a recommendation for contact tracing, including planning for case-contact identification and management of close contacts. The new CDC document identifies settings in which contact tracing could be especially impactful (for example, settings where there are small numbers of infected individuals, or the infected individual (incarcerated or staff) has had close contact with individuals from other housing units or other staff).[45]
- ☐ a recommendation for all close contacts of cases to undergo COVID-19 viral testing regardless of whether those contacts had symptoms.[46]
- ☐ a recommendation for broad-based viral testing in settings where contact tracing may not be feasible (for example large numbers of cases or open dormitory housing units) and new guidance for how to conduct such testing safely.[47]
- ☐ a recommendation to ensure that medical isolation for COVID-19 was distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and practice through such activities as regular visits by medical staff,

---

[38] This recommendation was not adopted by OHA. Ex. 19 (MANEY-768470), at 25.
[39] This recommendation was also not adopted by OHA. *Id*.
[40] This recommendation was also not adopted by OHA. *Id*.
[41] This recommendation was also not adopted by OHA. *Id*.
[42] This recommendation was also not adopted by OHA. *Id*.
[43] This recommendation was also not adopted by OHA. *Id*.
[44] This recommendation was also not adopted by OHA. *Id*.
[45] This recommendation was also not adopted by OHA. *Id*.
[46] This recommendation was also not adopted by OHA. *Id*.
[47] This recommendation was also not adopted by OHA. *Id*.

26 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

similar access to radio, TV, reading materials, personal property and commissary, and allowing increased telephone privileges A recommendation to reduce the frequency of monitoring of symptoms for individuals in isolation from twice down to once per day.[48]

Ex. 18 (July 2020 CDC Interim Guidance), at 25–30. The July 2020 CDC Interim Guidance also contained several new elements. Those elements included, among others, a precise, operational definition of a "close contact" of someone with COVID-19, *see id.* at 4; updated guidelines to prevent introduction of COVID-19 into and out of institutions, *see id.* at 13; and recommendations cutting across all prevention strategies for communication, information sharing, and training, *see id.* at 8.

About one month later, on August 18, 2020, OHA released an updated version of its own guidance corrections-setting guidance document. Ex. 19 (MANEY-768470), at 25. OHA's new document did not adopt any of the above-described CDC recommendations, and omitted many additional recommendations not listed above. *See supra* nn.35–48.

### 4.    ODOC's July and October 2020 ODOC Centralized Plan Revision were not consistent with OHA or CDC guidance.

For the rest of 2020, ODOC issued two revisions to its Centralized Plan for COVID-19. First, on July 14, 2020, ODOC updated the Centralized Plan to include the limited masking provision to which OHA previously agreed—again, this provision stated that "if six feet of social distancing cannot be maintained, a face covering is required to be word by all staff." Dahab Decl. ¶ 23, Ex. 20 (MANEY-011188), at 7. This recommendation was contrary to CDC guidance at the time, which recommended that "persons . . . wear cloth face masks as much as safely possible." Ex. 18 (July 2020 CDC Interim Guidance), at 15.

---

[48]    This recommendation was also not adopted by OHA. *Id.*

ODOC released another revision of its Centralized Plan on October 20, 2020, three

months after the CDC issued its July 2020 CDC Interim Guidance.  Dahab Decl. ¶ 24, Ex. 21

(MANEY- 078008).  Like the August 2020 revised OHA guidance document, the new ODOC

Centralized Plan made little mention of any newly recommended public health guidance.

Although testing was widely available by that time, ODOC's revised Centralized Plan did not

incorporate CDC's recommendations for testing asymptomatic AICS, testing of close contacts,

or testing asymptomatic staff.  *Id.* It also did not incorporate recommendations to minimize

movement across housing, minimize the number of people housed in the same room, or modify

work detail assignments.  *Id.* And it made no mention of building ventilation or any of the

CDC's latest recommendation relating to communication, information sharing, or training.  *Id.*

Indeed, by October 2020, the ODOC's Centralized Plan had fallen behind the prevailing

understanding of transmission of COVID-19 that had existed in April 2020, six months earlier.

The October Centralized Plan continued to rely primarily on symptom screening for identifying

cases, despite ODOC's own recognition of the substantial impact of asymptomatic spread.  *See*

Ex. 21 (MANEY- 078008), at 7; Ex. 14 (MANEY-478808); Sulzinski Depo. at 33:18-21.  And it

failed entirely to acknowledge the need to consider the two days before the onset of symptoms

when identifying close contacts.  Ex. 21 (MANEY-078008), at 7.

By the end of October, more than 1200 adults in ODOC custody had tested positive for

COVID-19.  Fifteen more AICs had died with a COVID-19 diagnosis.[49]

---

[49]    *See* Or. Dep't of Corrs., COVID-19 Response: COVID-19 Tracking,
https://www.oregon.gov/doc/covid19/pages/covid19-tracking.aspx (Nov. 1, 2020), *archived at*
https://web.archive.org/web/20201101032435/https://www.oregon.gov/doc/covid19/pages/covid
19-tracking.aspx (last visited Jan. 8, 2024) (capture dated Nov. 1, 2020).

28 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT



Dahab Decl. ¶ 25, Ex. 22 (MANEY-186258), at 2

**5.    ODOC ignored OSHA's November 2020 guidance.**

The Oregon Occupational Safety and Health Division (Oregon OSHA) is the state agency division authorized to enforce the Oregon Safe Employment Act.[50]  On November 16, 2020, pursuant to its authority under the OSEA, Oregon OSHA promulgated a new COVID-19-related temporary rule intended to address workplace safety and health risks.  Dahab Decl. ¶ 26, Ex. 23 (MANEY-153804), at 2.  OSHA's temporary rule contained specific requirements for all worksites and an additional set of requirements for "worksites of exceptional risk," which included correctional healthcare areas.  *Id.* at 3.

As relevant here, the new OSHA temporary rule operated to fill certain gaps in OHA and ODOC guidance to date.  For instance, the rule required,

☐    By no later than January 6, 2021, adherence to new worksite building ventilation requirements to optimize the amount of outside air circulating through worksite HVAC systems.  ***Again, neither OHA nor ODOC previously had incorporated the CDC's recommendation relating to building ventilation***.

---

[50]    Oregon.gov, The Oregon Safe Employment Act, https://osha.oregon.gov/essentials/toolkit/Pages/why-here.aspx (last visited Jan. 6, 2024).

☐    By no later than December 7, 2020, worksites were to conduct a "COVID-19 risk assessment" to implement "appropriate controls that provide layered protection from COVID-19 hazards."

☐    By no later than December 7, 2020, worksites were to create an "Infection Control Plan" addressing issues including ventilation, staggered shifts, physical distancing, and personal protective equipment, among others. The Infection Control Plan was also required to include the procedures the employer would use to notify employees exposed to COVID-19 in the worksite identified through contact tracing.

☐    A list of information and training requirements including "the ability of pre-symptomatic and asymptomatic COVID-19 persons to transmit the SARS-CoV-2 virus." ***Again, ODOC previously had not adjusted its guidance to account for pre-symptomatic or asymptomatic COVID-19 transmission.***

Ex. 23 (MANEY-153804), at 2. It also included an appendix specific to correctional facilities that contained additional guidance on masking and masking exceptions in the corrections setting. Specifically, where OHA previously had not done so, OSHA's temporary rule now required that ODOC's masking policy align with CDC recommendations. *See id.* at 104.

As explained in more detail below, ODOC failed to comply with OSHA's temporary rule in the time that OSHA directed. And it did so in face of widespread public health warnings that the fall and winter of 2020 were likely to be "the most difficult time in the public health history of this nation."[51]

Beginning in November 2020, through the end of January 2021, 26 more AICs had died with a COVID-19 diagnosis, bringing the number of COVID-related AIC deaths to 41. COVID-19-positive cases had exceeded 3300.[52]

---

[51]    Steve Gorman & Daniel Trotta, *CDC Chief Warns that Americans Face 'Rough' Winter From COVID-19 Surge*, Reuters (Dec. 2, 2020), https://www.reuters.com/article/idUSKBN28C20Q/ (quoting CDC Director Robert Redfield) (last visited Jan. 6, 2024).

[52]    Oregon Dep't of Corr., *COVID-19 Response: COVID-19 Tracking*, https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (Feb. 1, 2021), *archived at* https://web.archive.org/web/20210201162742/https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (last visited Jan. 6, 2024).

**C.**     **Defendants did not consider reasonable alternative strategies to improve social distancing across the ODOC system.**

At the same time that their COVID-19 preventative strategies fell quickly behind prevailing public health standards, Defendants also failed entirely to consider, or chose not to pursue, reasonable alternative strategies to improve social distancing across the ODOC system. Two existing ODOC facilities—DRCI Minimum and OSP Minimum, which collectively could have housed more than 800 AICs—stood empty.[53]  Likewise, ODOC chose not to maximize its use of so-called "emergency beds," or "e-beds," which would have allowed ODOC to provide AICs otherwise housed in its high-density dormitory space to spread out, increasing their ability to physically distance from one another.  And across the ODOC system, AICs housed in two facilities that Governor Brown chose to close at the height of COVID-19 emergency response were forced to relocate, notwithstanding the fact that, because of ODOC's then-existing AIC population, it's "capacity for placing AICs from closed institutions to a new placement [was] extremely limited."  Dahab Decl. ¶ 28, Ex. 25 (MANEY-122063).

**1.**     **DRCM and OSPM stood empty of AICs throughout the pandemic.**

During the COVID-19 pandemic, two existing ODOC facilities—Deer Ridge Correctional Institution Minimum and OSP Minimum—stood empty of AICs.  Peters Depo. at 63:9-14 ("I recall having two facility structures that were unused.").  DRCI, located in Madras,

---

[53]    With the exception of ODOC's use of DRCI during the 2020 wildfire evacuations.  At that time, they brought DRCI online for the purposes of housing the AICs evacuated from CCCF/CCIC during the fires.  In its after action report from the 2020 wildfires, ODOC concluded that the "mothballed" DRCI facility should be "maintained and kept in a state of readiness."  Dahab Decl. ¶ 27, Ex. 24 (MANEY-765076) (dated Dec. 4, 2020).  ODOC did not thereafter use DRCI to create additional physical distancing for AICs.

Oregon, is Oregon's newest prison institution and opened in 2007.[54]  The minimum-security

facility, DRCM, has never been used.  Dahab Decl. ¶ 29, Ex. 26 (Robbins Depo.), at 29:19-23.

The minimum-security at OSP, located in Salem, also stood empty of AICs, although ODOC

occasionally used it for "training and other purposes."  Peters Depo. at 63:8-64:16.  These

facilities sometimes were referred to by ODOC as "mothballed" facilities.  Peters Depo. at 64:9-

11.  Collectively, the facilities' bed capacity allowed them to house more than 800 AICs.  Dahab

Decl. ¶ 31, Ex. 28 (MANEY-579868).[55]

Remarkably, however, Defendants never considered whether the bed space available at

DRCI or OSPM could be used to house portions of ODOC's existing AIC population—

particularly those AICs living in dorms, where social distancing is never possible, Jones Depo. at

37:23-38:1[56]—and increase the space available for all AICs to socially distancing.  Peters Depo.

at 64:18-24 (Q: "[D]id you ever consider seeking the resources or the staffing to use the space at

DRCI or OSP to expand the usable space to create space for social distancing space for AICs?"

A: "I don't recall specifically having that conversation."); Robbins Depo. at 36:15-20 (Q: "So

---

[54]    Oregon Department of Corrections, *Prison Locations—Deer Ridge Correctional Institution*, https://www.oregon.gov/doc/about/pages/prison-locations.aspx (last visited Dec. 24, 2023).

[55]    ODOC's Office of Population Management is the unit of ODOC charged with managing the overall prison population, including the number of beds needed, within each of ODOC's facilities.  Dahab Decl. ¶ 30, Ex. 27 (Jones Depo.), at 7:14-22.  Each of ODOC's institutions has a so-called "built capacity"; *i.e.*, "the number of beds [for which] the prisons were originally built as capacity."  Robbins Depo. at 25:25-26:11.  Steve Robbins, ODOC's Chief Financial Officer, member of ODOC executive team, and employee charged with development and execution of the agency's budget, Robbins Depo. at 12:16-22, testified that an institution's "built capacity" is not "an OSHA requirement or anything like that"; rather, it's what ODOC "traditionally said was the built capacity for the individual prison."  Robbins Depo. at 26:12-19.  He does not know how the facilities' built capacities were determined.  Robbins Depo. at 26:22-25.

[56]    *See also supra* n.17 (collecting AIC testimony addressing impossibility of social distancing).

32 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

was there ever a conversation among the executive team members about what it might cost to reopen Deer Ridge Minimum for the purpose of creating social distancing for AICs during the pandemic?"  A: "Not that I was aware of.").[57]

To the extent that any ODOC staff (other than Defendants) considered the option, Defendants apparently rejected it.  Early on, Brian Stephen, ODOC's Chief of Security, had suggested an "extreme scenario" for isolating ODOC vulnerable AIC population: "sending them to another facility somewhere (OSPm?)," which would "requir[e] acquiring bunks."  Dahab Decl. ¶ 33, Ex. 30 (MANEY-534263).  About a month later, Paula Myers, then-Superintendent at CCCF, prepared and circulated a proposal to open OSPM "on a limited basis to house the westside male COVID-19 population until DOC is no longer in a state of emergency."  Dahab Decl. ¶ 34, Ex. 31 (MANEY-141471), at 2.  The proposal explained that doing so would help achieve ODOC's goal of "[k]eep[ing] COVID-19 out of our institutions," and would have provided the added benefits of access to critical care for vulnerable AICs, "[r]educed . . . unnecessary transports and risk of exposure," and improve morale.  *Id.* at 3.  Mattresses for AICs housed at OSPM would have been provided by CDC.  *Id.* at 4.  Using OSPM would have also decreased the need to bring "e-beds" online, *see infra*, in already crowded units.  *Id.* at 5.

---

[57]    It's not clear whether and when Governor Brown considered using DRCI of OSPM to house any portion of prison population during the pandemic.  Constantine Severe, the Governor's Public Health Safety Advisor and liaison to ODOC at the time, testified that, although he had discussed the issue previously, he was not sure whether that discussion was before or during the COVID-19 pandemic.  Dahab Decl. ¶ 32, Ex. 29 (Severe Depo.), at 19:8–20:8 ("I'm trying to remember if this was before the pandemic, during the pandemic, they kind of go a little bit together.").  Testimony from Steven Robbins, ODOC's Chief Financial Officer, who provided costs to reopen DRCI during those discussions, suggests that the discussions occurred before the pandemic.  *See* Robbins Depo. at 36:12–20.  Plaintiffs have not been able to depose Governor Brown to resolve this timing of the discussion; in the meantime, at this stage, the Court should resolve the dispute of material fact in Plaintiffs' favor.

Superintendent Myers sent the proposal to Defendants Steward, Russell, Bugher, and Persson. *Id.* at 1. There was no written response, and ODOC never moved forward with the proposal.

### 2.  ODOC chose not to use emergency beds to achieve maximum social distancing.

To manage overcrowding, ODOC maintained so-called "emergency beds," or "e-beds," that were placed online temporarily "due to capacity constraints." Robbins Depo. at 25:25-26:11.[58] "Emergency beds [can] be put on line . . . across the network." Robbins Depo. at 28:8-14. When that happens, the beds can be setup anywhere; ODOC previously has converted day rooms, meeting rooms, and other spaces to use for emergency bed space. Robbins Depo. at 28:13-21. At the institutions, placing emergency beds online during the pandemic meant providing the institution "wiggle room needed to social distance and stage folks." Dahab Decl. ¶ 35, Ex. 32 (MANEY-362530) at 2; *see also* Dahab Decl. ¶ 36, Ex. 33 (MANEY-702693) (emergency beds placed online at SRCM gym; later deactivated).

From the beginning of the pandemic, however, ODOC pushed continuously to take emergency beds *offline*, making clear that the message relating to emergency beds was that they were "not appropriate for managing capacity issues." Dahab Decl. ¶ 37, Ex. 34 (MANEY-147354), at 2. ODOC's position pre-pandemic apparently had been to all but eliminate emergency beds; "there is no more e-bed capacity." *Id.* During the pandemic, that position did not change. *Id.* at 2-3. In fact, as COVID-19 cases and deaths increased, ODOC worked to take

---

[58]    *See also* Colette S. Peters & Heidi Steward, Assessment of Oregon's Prison Footprint: Report to the Oregon Legislature (Feb. 16, 2021), *available at* https://olis.oregonlegislature.gov/liz/2021R1/Downloads/CommitteeMeetingDocument/232889 (emergency beds are "temporary beds deployed to handle the influx and growth of the population beyond the built capacity").

emergency beds offline, rather than placing them online to create space for AICs. *See* Dahab Decl. ¶ 38, Ex. 35 (MANEY-523027), at 2 (explaining that, in October 2020, ODOC was "in the process of deactivating emergency beds and continued to do so until the end of November"). At the institution level, staff followed that guidance; thus, although emergency beds helped to increase physical distancing, ODOC staff did "anything possible to avoid activating . . . e-beds." Dahab Decl. ¶ 39, Ex. 36 (MANEY-357723) (responding to question from Superintendent whether "we need to activate . . . ebeds in the classroom").

In mid-April 2020, ODOC had 1259 inactive beds; that is, unused emergency beds and unused bed space at DRCI and OSPM. Jones Depo. at 88:11–89:21; Ex. 28 (MANEY-579868). By June 2020, that number had increased to 1347. Jones Depo. at 98:3–100:11; Dahab Decl. ¶ 40, Ex. 37 (MANEY-566349). By February 2021, the number was up to 1512 unused AIC beds. Dahab Decl. ¶ 41, Ex. 38 (MANEY-230805).

**D.    The steps that ODOC *did* take were either too little, too late, or in some respects increased the risk of harm to AICs.**

To the extent that ODOC took any steps to protect AICs from the risks of harm created by COVID-19, it did too little, too late.

**1.    AOC's "Tier System" was not consistent with the prevailing public health understanding of COVID-19 transmission.**

In late March and early April 2020, the AOC, with the review and approval of OHA, created and implemented a so-called "Tiering" protocol, which was used to determine which COVID-19 preventions were in place at each institution, depending on the number of confirmed COVID-19 cases that institution had reported. Dahab Decl. ¶ 42, Ex. 39 (MANEY-098506), at 3; Dahab Decl. ¶ 43, Ex. 40 (MANEY-080082–83); Dahab Decl. ¶ 44, Ex. 41 (Second Thomas Depo.), at 9:5–11:16 (describing tier guidelines and OHA review). The Tier protocol was flawed

by design; for instance, it directed facilities to implement COVID-19 *prevention* strategies only *after* COVID-19 cases were confirmed or prevalent in a facility.  Fleming Report at 8–9.[59]  It was also designed to escalate an institution's Tier "status" based on testing and screening for COVID-19 symptoms; by late spring 2020, however, ODOC was well aware that COVID-19 could be transmitted between individuals not exhibiting symptoms.  Second Thomas Depo. at 26:1–27:5.  What is more, ODOC's "Tiers" bore no relation to any OHA COVID-related designations, creating confusion among ODOC staff.  *See, e.g.*, Dahab Decl. ¶ 42, Ex. 42 (MANEY-525729).

The AOC updated ODOC's Tier protocol several times over the course of 2020 and 2021.  *See, e.g.*, Dahab Decl. ¶ 46, Ex. 43, MANEY-008241 (Apr. 22, 2020); Dahab Decl. ¶ 47, Ex. 44, MANEY-857631 (May 5, 2020); Dahab Decl. ¶ 48, Ex. 45, MANEY-826898 (May 13, 2020); Dahab Decl. ¶ 49, Ex. 46, MANEY-892689 (May 21, 2020); Dahab Decl. ¶ 50, Ex. 47, MANEY-874229 (June 10, 2020); Dahab Decl. ¶ 51, Ex. 48, MANEY-787077 (June 23, 2020); Dahab Decl. ¶ 52, Ex. 49, MANEY-737619 (July 2, 2020); Dahab Decl. ¶ 53, Ex. 50, MANEY-745499 (July 6, 2020); Dahab Decl. ¶ 54, Ex. 51, MANEY-845817 (July 13, 2020); Dahab Decl. ¶ 55, Ex. 52, MANEY-113794 (Oct 13, 2020).  Cases continued to rise, but it never reconsidered whether its Tiering protocol worked, or how it might be change to better prevent spread of the virus.

---

[59]    By way of example, the requirement that all symptomatic staff seek medical care and testing (in the community) applied only once a facility was at Tier 3—after a COVID-19 outbreak has already occurred.  Ex. 39 (MANEY-098506).

2.    **ODOC's COVID-19 Infection Prevention Assessments were not conducted systemwide and were conducted primarily at institutions where COVID-19 was already prevalent.**

In May 2020, ODOC also developed a tool for assessing ODOC facilities' responses and ongoing management of COVID-19.  This tool—called ODOC's COVID-19 Prevention Assessment Tool—was reportedly "based on guidance from the Centers for Disease Control (CDC) and the Oregon Health Authority (OHA), as well as guidance from the AOC and DOC leadership." *See, e.g.*, Dahab Decl. ¶ 56, Ex. 53 (MANEY-091935).  It was launched on May 14, 2020 (Dahab Decl. ¶ 57, Ex. 54, MANEY-312582; Dahab Decl. ¶ 58, Ex. 55, MANEY-350652–53) and included direct observation at different areas within an ODOC facility.  Observed activities included temperature checks and other screening activities, availability and use of PPE, social distancing, and signage.  The tool also included a review of specific COVID-19 protocols and policies in subjects like incident command structure, visitor limitations, group activity restrictions, provision of COVID-19 health services, cleaning and disinfection, and PPE availability.  *See* Dahab Decl. ¶ 59, Ex. 56 (MANEY-473600).  Assessments were conducted by ODOC leadership.  *See* Dahab Decl. ¶ 60, Ex. 57 (MANEY-504434); *see also* Dahab Decl. ¶ 61, Ex. 58 (MANEY-187336–67 (email re OSP draft assessment report).

The assessment tool mirrored the COVID-19 prevention and control strategies set forth in ODOC's Centralized Plan; as a result, the deficiencies of ODOC's centralized policies relative to national recommendations—discussed at length above—trickled down to ODOC's oversight and review of individual facilities.  Thus, there was no incorporation, assessment, or review of newer CDC-recommended policies or procedures restricting movement and mixing of asymptomatic staff and AICs, such as modifying staff assignments to minimize movement across housing, minimizing the number of individuals housed in the same room, or modifying work detail

assignments.  Fleming Rep. at 16.  Likewise, none of the new CDC testing strategies were

incorporated or reviewed, including strategies for testing of asymptomatic incarcerated persons

without known exposure; testing of all close contacts of cases regardless of whether those

contacts have symptoms; or testing of asymptomatic staff to identify early introduction of

COVID-19 into a facility.  Fleming Rep. at 16.  And there was no review of building ventilation

(*see infra*), staff training, or ensuring that release programs included COVID-19 specific

information on housing, social services, mental health services and medical care.  Fleming Rep.

at 16.

Notably, as Defendants point out in their motion, ODOC performed these assessments at

only 9 of its (then)-14 institutions.  Motion at 10.[60]  Most were conducted in ODOC-designated

"Tier 4" facilities—that is, facilities in which COVID-19 was already prevalent or an outbreak

already had occurred.[61]  *See* Fleming Rep. at 16 – 17; *also compare infra* n.60 *with* Or. Dep't of

Corr., ODOC Tableau: COVID-19 Test Result Dates, https://public.tableau.com/app/profile/

josh4372/viz/ODOCCovid-19TestResultDates/ODOCCOVID-19Testing (last visited Jan. 8,

2024).  This, again, raises serious questions of the wisdom of ODOC's "Tier" system—as

assessment of prevention practices is arguably as important, if not more important, in facilities

not yet experiencing widespread transmission, when there are still important prevention

---

[60]    Defendants also point out that in February 2021, Defendants "began requiring prisons to
perform internal Covid-19 Assessments . . . to evaluate the institution's compliance with Covid-
19 protocols."  Motion at 10.  By that time, of course, 42 AICs had died from the disease.  Dahab
Decl. ¶ 62.

[61]    Defendants' statement that the first COVID-19 Infection Prevention Assessment was
performed "during the first outbreak at an ODOC prison—which occurred at OSP" is false.  As
ODOC's infectious disease specialist director explained to this Court on May 22, 2020 (the day
after the OSP assessment), by that time there had been four outbreaks at ODOC institutions:
"Santiam Correctional Institution ('SCI'), then Shutter Creek Correctional Institution ('SCCI'),
then Two Rivers Correctional Institution ('TRCI'), and finally the Oregon State Penitentiary
('OSP')."  ECF 84 (Dewsnup Decl.), at ¶¶ 21, 39–32.

opportunities and potentially less incentive to practice them.  Fleming Rep. at 16.  The findings

of the assessments are also noteworthy: in most institutions, even those on Tier 4, mask

compliance was incomplete.[62]

### 3. ODOC deliberately avoided audits from outside entities, including OHA.

Another problem with ODOC's audits was that they were internal; only ODOC staff and

leadership participated in the audits at the institutions where they were conducted.  But that was

no accident—ODOC deliberately avoided outside audits, including from OHA, because any

audit results would be made public, disclosing what was actually going on inside ODOC's

institutions for the world to see.

In early June 2020, just two days after this Court's order on Plaintiffs' motion for

preliminary injunction, and at the height of the outbreak at OSP, ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████     Dahab Decl. ¶ 69, Ex. 65 (MANEY_Imhoff-000074).

Notwithstanding the outbreak, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

█[63]██████████████████████████████████████████████████████████

██████████████. *Id.* ████████████████████████████████████

████████████████████████████████████████████." *Id.*

---

[62]     *See, e.g.*, Ex. 53 (MANEY-091935) (CCCF); Dahab Decl. ¶ 63, Ex. 59 (MANEY-098337) (OSP); Dahab Decl. ¶ 64, Ex. 60 (MANEY-108532) (OSP); Dahab Decl. ¶ 65, Ex. 61 (MANEY-141824) (CRCI); Dahab Decl. ¶ 66, Ex. 62 (MANEY-145516) (SRCI); Dahab Decl. ¶ 67, Ex. 63 (MANEY-146952) (DRCI); Dahab Decl. ¶ 68, Ex. 64 (MANEY-223049) (OSCI).
[63] █████████████████████ Ex. 65 (MANEY_Imhoff-000074), at 2. ████████████████████

[REDACTED]

*Id*. In their view, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED].

### 4.   ODOC complied with OSHA's COVID-19 regulations only after it was too late.

As noted above, Defendants also failed to comply with the new OSHA rule specific to COVID-19.  Again, under that rule, certain workplace facilities–including all ODOC facilities– were required to develop an Infection Control Plan addressing specific components addressed by the rule.  The deadline to complete those Infection Control Plans was December 7, 2020; just before the winter COVID-19 surge.  The December deadline would have enabled staff at every ODOC facility to review and enhance their COVID-19 prevention strategies at a moment when prevention and protection was particularly important.[64]

Unfortunately, ODOC simply failed to comply.  Many of the required ODOC Infection Control Plans were developed weeks or months late and did not address one or more key elements of the Oregon OSHA requirements.  *See infra*; *see also* Fleming Rep. at 19–20 (summarizing dates).  In fact, only three facilities (SCI, OSCI, TRCI) met the December 7 deadline for their Infection Control Plans, but those plans consisted mostly of formulaic templates, presumably sent to all facilities by ODOC.  Two of those three facilities (TRCI and OSCI) eventually developed more complete plans, but not until several months later.  *See* Dahab

---

[64]    Again, the United States, heeding the CDC's warning, knew that the winter surge would occur.  *See supra* n.51.

Decl. ¶ 70, Ex. 66 (MANEY-108863) (TRCI) (dated Feb. 2021); Dahab Decl. ¶ 71, Ex. 67

(MANEY-279814) (OSCI) (dated Mar. 2021).

### 5.    Once the COVID-19 vaccine became available, ODOC leadership encouraged staff to "circumvent" the statewide vaccine mandate.

By the time that a COVID-19 vaccine was developed and became available to adults in

ODOC custody, more than 3300 AICs had tested positive for COVID-19, and 42 AICs had died.

*See* ECF 178 (Opinion and Order on Vaccine Injunction & Class Certification), at 5–6 (citing

*COVID-19 Status at Oregon Dep't of Corrections Facilities*, Oregon.gov,

https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx).[65]  It was clear at that time

that ODOC staff and contractors were the primary vector of COVID-19 within ODOC's

institutions.  ECF 178 (Opinion & Order), at 6 (citing Dewsnup Depo. at 57:2–10 ("The only

way to get COVID into the institution is have it come in through a staff member.  And that has

been the way each of these except—with the exception of one, that's been the way that each of

these outbreaks have started since April.")); Dahab Decl. ¶ 72, Ex. 68 (Cain Depo.), at 65:23–

66:3.  And despite whatever efforts ODOC made with respect to social distancing, mask

wearing, testing, etc.—which, as explained above, were not consistent with public health

recommendations—cases continued to rise.

---

[65]    Archived at https://web.archive.org/web/20210203181709/https://www.oregon.gov/doc/covid19/Pages/covid19-tracking.aspx (visited Jan. 4, 2024) (reflecting capture dated Feb. 3, 2021).



ECF 203 (Motion to Certify), at 3; ECF 205 (Bruggemeier Decl.), at ¶¶ 2–3.

So, when Governor Brown announced later that year that all executive branch employees, including correctional employees, would need to be vaccinated for COVID-19 in order to return to work,[66] one might have expected ODOC's leadership to encourage corrections staff to comply. They did not. Instead, at the direction of Defendant Steward, Deputy Director and member of the ODOC Executive Team, corrections staff was instructed to "circumvent" the vaccine mandate by "get[ting] religion" and taking advantage of the vaccine mandate's religious exemption. *See* Dahab Decl. ¶ 73, Ex. 69 (Frener Depo.), at 161:8–14 ("And, you know, I think that—you know, I remember being on a—being in person with the executive team and Heidi saying yeah, you guys should go out there. You need to tell your people to find religion, get religion. They need to sign the religious form. . . . whether they're religious or not, they need to

---

[66]    Executive Order No. 21-29, *COVID-19 Vaccination Requirement for State Executive Branch* (Aug 13, 2021) ("As the leader of the executive branch of state government, one of * * * Oregon's largest employers, I have a responsibility to do everything I can to protect state workers, their coworkers, and the public that relies on state services.").

sign the form.").[67]  By the time the Governor's deadline for vaccination rolled around, ODOC

had approved religious exemptions for nearly 16 percent of its corrections staff.[68]

### E.    ODOC did not ensure compliance with any of its COVID-19 preventative strategies.

As described above, ODOC implementation and enforcement of its COVID-19

preventative strategies were extremely poor from the beginning.  *See supra* Section I.  Those

failures only continued—systemwide and throughout the Class Period.  That's no surprise,

though; although ODOC's was response was centralized with the AOC, it had not developed a

consistent or reliable way of communicated polices or changes to policies to corrections staff.

Frener Depo. at 41:3–45:24.[69]  Even members of ODOC's executive leadership team were not

allowed to dial in to the daily AOC debrief where changes to policies were announced.  Frener

Depo. at 42:1–20.

---

[67]     Ms. Frener described a later Executive Team meeting as follows: "Gail Levario, who is human resources director, she was on the call, Colette was on a call, talking about the ways that they were trying to circumvent the governor's order regarding staff needing to get [the vaccine]. Heidi was really clear making them go as long as possible to get the investigations done."  Frener Depo. at 162:3–9.

[68]     Conrad Wilson, *As the Deadline Nears, Oregon Department of Corrections Employees are 50% Vaccinated*, Oregon Public Broadcasting (Oct. 13, 2021), https://www.opb.org/article/2021/10/13/oregon-correctional-staff-50-percent-vaccinated-mandate-nears/ (last visited Jan. 4, 2024).

[69]     "Sometimes we would find out by an e-mail that went out. Sometimes it would be announced on – so we had daily – and then they got cancelled as time went on, but there was a while there we had daily executive team phone calls that were, you know, half an hour or so check-in.  I don't recall.  And so sometimes we would find out on those.  Sometimes we would find out through an e-mail that went out.  Sometimes we would find out because our people would tell us, you know, that had already heard it some other ways.

"And so there really – there really wasn't a good – you know, sometimes AOC would send out e-mails, but sometimes that would be days later.  So, you know, I think in the beginning, it was just like trying to figure out this whole thing, because there was just a lot of confusion in the world around it.  And then it felt like it went on a lot longer in that confusion state than it needed to, right, that it would have been helpful as someone leading a division to have had more clarity throughout that process."

43 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**1.    Across all institutions, ODOC continued to fail to implement social distancing, quarantine, or isolation measures.**

Ultimately, across its institutions, ODOC continued to fail to implement social distancing, quarantine, and isolation measures to protect AICs against the spread of COVID-19. Social distancing was not enforced at chow, in medline, at canteen, in the yard, or even in medical.  *See, e.g.*, Harvey Decl. ¶ 4(d) (DRCI) (no social distancing and unit mixing occurred at chow); McCormack Decl. ¶ 11(b) (PCRF) (no social distancing in chow line and AICs eat two feet apart); Hall Decl. ¶¶ 17–19 (OSP) (no social distancing in the yard, chow, or medical); Mosely Decl. ¶ 5(b), (e) (SFFC) (no social distancing at chow or worksites); Eaglespeaker Decl. ¶ 12 (CCCF) (no social distancing in medline or canteen); West Decl. ¶ 8 (CCCF) (no social distancing throughout pandemic); Wood Decl. ¶ 17 (EOCI) (social distancing is impossible; AICs must share tablets, telephones, exercise equipment; frequently touch shared surfaces; form long, tight lines to receive food and medication).  AICs sleep 2–3 feet apart and were not required to wear masks at their bunks.  *See* Lee Decl. ¶ 8 (CRCI) (bunks are two feet apart); Stewart Decl. ¶ 4(c) (CRCI) (same); Wood Decl. ¶ 17 (EOCI) (same); West Decl. ¶ 8 (CCCF) (same).  At Powder River at one point, ODOC increased the density of one dorm unit by *adding* 15 bunks per side, making social distancing even harder.  McCormack Decl. ¶ 14 (PCRF) (in mid-2021, institution increased density of dorm by adding 15 bunks per side).

Quarantining and isolation were inconsistently applied, if at all.  *See, e.g.*, Harvey Decl. ¶ 4(h) (DRCI) (COVID-19-unit quarantine lasted only 4 days and then units allowed to mix); West Decl. ¶ 9 (CCCF) (observed female AICs taken directly from intake to general population without quarantine); Moore Decl. ¶ 5(c) (SRCI) (observed male AIC taken directly from intake to general population without quarantine); Wood Decl. ¶ 9 (EOCI) (quarantine units still walk to chow); Stafford Decl. ¶ 7 (OSCI) (in December 2020, transferred from CCCF and placed directly

44 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

in general population); Evans Decl. ¶ 4 (DRCI) (AICs transferred to DRCI placed directly into

unit on quarantine).

> ### 2. Across all institutions, ODOC continued to fail to implement and enforce its mask mandate.

Nor did ODOC implement or enforce its mask mandate—for AICs or corrections

officers.  *See, e.g.*, Harvey Decl. ¶ 4(d) (DRCI) (COs either refuse to wear masks or wear masks

improperly); Ortega Decl. ¶¶ 8, 9, 16 (TRCI) (COs did not wear masks or wore them improperly

and did not physically distance from one another); Moore Decl. ¶ 6 (SRCI) (no masking in the

infirmary in June 2020); Moore Decl. ¶ 10 (SRCI) (ODOC staff did not wear masks throughout

pandemic); Moffatt Decl. ¶ 12(d) (SCI) (staff unmasked); Stewart Decl. ¶ 3(c) (CCIC) (staff

unmasked); Stewart Decl. ¶ 4(b) (CRCI) (COs not required to mask on unit and most did not don

masks); McCormack Decl. ¶¶ 11(a), 12 (PCRF) (masks not worn properly in the kitchen); Evans

Decl. ¶ 12 (DRCI) (staff did not adhere to mask mandate); Clardy Decl. ¶ 5(a) (OSP) (staff

openly defied mask mandate); Hall Decl. ¶ 13 (OSP) (AIC mask mandate not consistently

enforced); Harvey Decl. ¶ 4(b)(ii) (COs don't wear masks and act like masking and social

distancing is a joke); Eaglespeaker Decl. ¶ 8 (CCCF) (COs not wearing masks or wearing them

improperly); Newland Decl. ¶ 4(c) (DRCI) (staff doesn't wear masks); Mosely Decl. ¶ 8 (SFFC)

(same).  And when staff didn't wear masks, there were no repercussions for their failures to do

so.  Ortega Decl. ¶ 10 (TRCI) (AIC never observed a CO disciplined for failure to wear a mask);

Wood Decl. ¶ 22 (EOCI) (staff do not wear masks with no repercussions); Hall Decl. ¶¶ 8, 14

(OSP) (from March 2020 to April 2021, many COs did not wear masks, with no repercussions).

### 3. Across all institutions, ODOC continued to fail to implement and enforce protocols relating to mixing.

And mixing continued to be commonplace. *See* Stafford Decl. ¶ 6 (CCCF) (not uncommon for AICs to be mixing with those transferred from other institutions; they would watch TV, shake hands, use phones, and mingle). Corrections officers (often unmasked) continued to move freely between units. *See, e.g.*, West Decl. ¶ 10 (CCCF); McCormack Decl. ¶ 17 (PCRF); Wood Decl. ¶ 8(a) (EOCI); Evans Decl. ¶ 4 (DRCI); Lee Decl. ¶ 11 (CRCI); Harvey Decl. ¶ 4(b)(ii). Units mixed in the kitchen, where AICs were forced to work, even if they felt sick. *See, e.g.*, Harvey Decl. ¶¶ 4(e), (f) (DRCI) (mixing COVID-19 positive AICs in kitchen and within unit); Ortega Decl. ¶ 11 (TRCI) (mixing occurred in kitchen); West Decl. ¶ 10, 15 (CCCF) (mixing throughout pandemic, including in kitchen); Stewart Decl. ¶ 4(d)(i) (CRCI) (AICs forced to work in the kitchen even if they felt sick); Wood Decl. ¶ 6 (EOCI) (symptomatic AICs worked in the kitchen; told that they must report to work or go to the hole); Evans Decl. ¶ 10 (DRCI) (AICs on quarantine were forced to work in the kitchen); McCormack Decl. ¶ 12 (PCRF) (AICs forced to work in the kitchen even if they felt sick; units mixed in the kitchen); Newland Decl. ¶ 4(e) (DRCI) (COVID-positive AICs sent to work in kitchen). And AICs mixed at the law library, at chow, at the yard, and at OCE worksites. *See, e.g.*, Moore Decl. ¶ 5(b) (SRCI) (mixing at law library); Wood Decl. ¶ 24 (EOCI) (same); McCormack Decl. ¶ 11(c) (PCRF) (mixing of units in chow); Newland Decl. ¶ 4(d) (DRCI) (same); Eaglespeaker Decl. ¶ 10–11 (CCCF) (mixing in medline, chow, OCE DMV call center).

Indeed, mixing happened even where it was clear that healthy AICs were likely to mix with COVID-19-positive AICs. *See, e.g.*, Stafford Decl. ¶ 8 (DRCI) ("recovered" AIC forced to work in quarantined units where COVID-19 positive AICs were housed); Clardy Decl. ¶ 11 (OSP) (COVID-positive AICs allowed to return to unit and make contact with healthy AICs

before quarantining); *id.* ¶ 14 (AICs from unit with outbreak sent to work); Hall Decl. ¶ 5 (OSP)

(AICs from quarantined units moved freely through the facility, including through non-

quarantined units, to go to work); Harvey Decl. ¶ 4(b) (COVID-19 positive ACIs sent to yard

with everyone else); Eaglespeaker Decl. ¶ 3(a) (CCCF) (after testing, symptomatic AICs

returned to general population while awaiting test results); Newland Decl. ¶ 4(a) (DRCI)

(COVID-positive and healthy AICs mix in unit); Stewart Decl. ¶ 4(a)(i) (CRCI) (AIC would

remain in general population pending COVID test results).

### 4.    Across all institutions, ODOC failed to implement screening and testing procedures.

Testing protocols were likewise inconsistent, and many AIC were denied COVID-19

tests, even when they were exhibiting symptoms.  *See, e.g.*, Harvey Decl. ¶¶ 4(a), 4(b)(i) (DRCI)

(institution not enforcing testing protocols, no tests provided in August 2020); Ortega Decl.

¶ 13(a)–(b) (TRCI) (symptomatic AIC not tested for three days); Moore Decl. ¶ 7(a) (SRCI)

(staff reluctant to provide COVID-19 tests upon request); Steward Decl. ¶ 4(a) (CRCI) (no

testing available in February 2021) ("We were not allowed to say 'I think I have COVID' and

get a test."); McCormack Decl. ¶ 6 (PCRF) (testing provided only to AICs with serious

symptoms); Wood Decl. ¶ 5 (EOCI) (testing declined to symptomatic AICs already on

lockdown); Lee Decl. ¶¶ 4–5 (CRCI) (symptomatic AIC tested but never provided with test

results); Harvey Decl. ¶ 4(a) (OSCI) (symptomatic AICs denied testing and told to return to cell;

later tested positive); Eaglespeaker Decl. ¶ 3 (CCCF) (symptomatic AIC denied testing for two

weeks in December 2020).  Nor were institutions enforcing temperature checks in many

instances, or testing AICs before they were placed in new institutions or the general population.

*See* Keith Decl. ¶ 2(a) (EOCI) (AIC transferred to SRCI from quarantine unit without being

tested first); Harvey Decl. ¶¶ 4(a), (g) (DRC) (institution not enforcing temperature checks)

**5.     Across all institutions, ODOC staff at every level acted with deliberate indifference to AICs.**

And across all institutions, ODOC staff at every level acted with deliberate indifference to AICs.  Corrections officers generally refused to accept the seriousness of COVID-19, making clear that they believed it was a hoax.  Moore Decl. ¶ 10 (SRCI).  Others openly threatened AICs, wishing harm upon them.  Harvey Decl. ¶ 4(j) (DRCI) (CO announced that "If I catch COVID-19, I'm going to bring it in kill everyone one of these mother fuckers.").  And there was no effort, whatsoever, to incentivize testing to protect AICs; instead, ODOC continued to punish AICs who tested positive but placing them in the inhumane conditions of disciplinary segregation.  Harvey Decl. ¶ 4(b) (DRCI) (AICs didn't want to test because of punitive nature of segregation); Moffatt Decl. ¶ 11 (OSP) (quarantine was DSU; cell was disgusting and caused extreme depression); Keith Decl. ¶ 8 (EOCI) (AICs declined to get tested because it felt like punishment); Wood Decl. ¶ 20(a) (EOCI) (AICs refused to test because of isolation and fear of suffering alone); Newland Decl. ¶ 4(b) (DRCI) (AICs didn't want to test because they'd lose privilege and get sent to segregation); Evans Decl. ¶ 9 (DRCI) (many AICs chose not to test to avoid the hole); Hall Decl. ¶ 15 (OSP) (AICs avoided getting tested).

*  *  *  *  *

There are now more than 5000 members of the Damages Class, which includes all AICs who tested positive for or were otherwise diagnosed with COVID-19 between February 2020 and May 2022.  There are 43 members of the Wrongful Death Class, 17 of whom were scheduled to be released before trial in this case.  Dahab Decl. ¶ 74.  Juan Tristan, whose estate is the representative of the Wrongful Death Class, was scheduled to be released next year.  Dahab Decl. ¶¶ 95, 98, Ex. 88 (Defendants' Amended Response to Plaintiffs' Interrogatory No. 11), at Ex. A.  Of those who died of COVID-19, 21 were identified by ODOC at the outset of the

pandemic response as medically vulnerable.  Dahab Decl. ¶ 75.  But rather than protect those

individuals from the harm they ultimately would suffer, ODOC's failures led to their death.

## IV.    OCE failed to take reasonable steps to prevent serious risk of harm to AICs.

Together with ODOC, OCE likewise failed to take reasonable steps to prevent serious

risk of harm to AICs.  Oregon Corrections Enterprises (OCE) is a for-profit, "semi-independent

state agency" that exists within the ODOC.  Dahab Decl. ¶ 76, Ex. 70 (Jeske Depo.) at 13:1–3,

21–22.[70]  Its director, Ken Jeske, sits on the ODOC Executive Team.  *Id.* at 13:6–9.  He reports

to the ODOC Director, who has ultimately authority over the operations of OCE.  *Id.* at 37:4–17.

During ODOC's COVID-19 response, OCE had one representative, and sometimes its Director,

participating in the AOC.  *Id.* at 38:21–24.

Some background on OCE's operations may be useful.  OCE generates revenue totaling

approximately 22 to 32 million each year.  *Id.* at 13:23–14:4.  It manages a metal shop, a sign

shop (at SRCI), a woodshop (at TRCI, OSP, and MCCF), call centers that employ approximately

500 AICs, and laundry services for ODOC and several outside entities in Oregon and

Washington.  *Id.* at 14:25–18:21.  Over the course of a given year, approximately 2600 AICs

work an OCE job in some respect.  *Id.* at 24:7–10.[71]  In 2020, ten of Oregon's 14 prison

institutions had an OCE industries program within the prison.  *Id.* at 9:13–19.

---

[70]    Defendant Jeske explained that "OCE is granted authority through statute to operate
[OCE] programs within DOC facilities to provide programs for the AICs and to comply with the
measures, help DOC with  their compliance of Measure 17.  So DOC has the oversight of –
security oversight of our programs.  They are in control of the buildings.  We operate within
those facilities in our areas.  And – but it is separate and collaborative all at the same time from a
security perspective."  Jeske Depo. at 20:5–14.
[71]    AICs are not paid a wage, but instead receive points under ODOC's Performance
Recognition and Awards System.  *Id.* at 24:11–25:4; *see also* OAR 291-077-0010 (describing
PRAS).  They may also receive meritorious pay at approximately $80 to $500 per month,
depending on the OCE job they work.  Jeske Depo. at 24:23-25:4.

49 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

During ODOC's pandemic response, OCE, much like ODOC's institutions, was required to submit written reports to the AOC and seek approval for any changes to its COVID-19-related policies. *Id.* at 42:21–44:2. Although OCE did not independently track COVID-19-positive AICs, the AOC did so and communicated that information to OCE. *Id.* at 44:7–24. The AOC did not communicate to OCE the names of COVID-19 positive AICs, however; OCE would simply assume an AIC was COVID-19 positive if they did not show up to work. *Id.* at 44:18–24.

Throughout the pandemic, OCE continued to operate, shutting down for short periods of time only at certain locations. *Id.* at 73:8–24; Keith Decl. ¶ 6 (EOCI garment factory continued to operate with COVID-19-positive AIC); Hall Decl. ¶ 5 (OSP laundry operated throughout pandemic and mixing quarantined/unquarantined units occurred in laundry). And they did so by convening AICs to OCE workplaces, without masks and without physical distancing.[72] In fact, a video filmed at OCE's Pendleton "Prison Blues" operation in April 2020,[73] and posted to OCE's YouTube channel, depicts AICs in Eastern Oregon working on OCE's "Utility Mask Project." Only one of the AICs is donning a mask, and none of the AICs pictured is physically distanced from the others. *See* Or. Corr. Enters., *OCE/Prison Blues Help Build Utility Masks*, YouTube.com (Apr. 23, 2020), https://www.youtube.com/watch?v=7qvlQQpcLx0 (last visited Jan. 6, 2024).

AICs also report that COVID-19 preventative strategies were not enforced across OCE workplaces. This was true throughout the pandemic. *See, e.g.*, Ortega Decl. ¶ 3(a) (TRCI) staff in OCE laundry don't wear masks), *id.* ¶ 15 (in early 2022, AICs housed on quarantine units

---

[72]    Physical distancing is not possible in OCE's laundry locations. Jeske Depo. at 63:4–10.
[73]    The Prison Blues garment factory is in Pendleton, where they "make all of the – the majority of the AICs clothing, the jeans and the T-shirts and those types of things. We have our own brand of clothing called Prison Blues, so there is coats and shirts and jeans there. So it's a true garment factory of about 70 workers." Jeske Depo. at 74:13–20.

50 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

allowed to work at OCE laundry during COVID-19 outbreak); Hall Decl. ¶ 5 (OSP) (laundry

operated throughout pandemic and mixing of quarantined/unquarantined units occurred in

laundry through at least February 2021).  Eaglespeaker Decl. ¶ 10(a) (CCCF) (mixing among

known COVID-positive AICs occurred at OCE DMV call center all of through 2021); Keith

Decl. ¶ 6 (EOCI garment factory continued to operate with COVID-19-positive AIC).

     In other words, OCE, much like ODOC and all of its institutions, failed to implement the

necessary preventative measures to protect AICs participating in their workplace programs.

**V.    Governor Brown failed to take reasonable steps to prevent serious risk of harm to AICs.**

     As explained below, Governor Brown knew all of this was happening and was overseeing

ODOC's pandemic response in real time.  Even with that knowledge, she did not take any

meaningful steps to protect the inmates in her care; quite the contrary, she made ODOC's ability

to protect them more difficult.

     **A.    Governor Brown was aware of and overseeing ODOC's response to the COVID-19 emergency.**

     There is no dispute in this case that, beginning as early as March 2020, Governor Brown

was aware of an overseeing ODOC's response to the COVID-19 emergency.  Indeed,

Defendants admitted as much at the hearing on Plaintiffs' motion for preliminary injunction, *see*

Trans. at 195:24–196:4 (May 29, 2020),[74] and later at the hearing on Defendants' early motion

for partial summary judgment, Dahab Decl. ¶ 77, Ex. 71 (Trans. at 24:14–16 (Nov. 13, 2020)).[75]

---

[74]    "In addition, the Governor isn't just letting DOC do its own thing with a hands-off approach.  The Governor is the head of all agencies in the state of Oregon.  She is personally aware of and supervising.  You get that from Heidi Steward's declaration [ECF 83].  The Governor is aware of DOC's response and is getting updated on DOC's response."

[75]    "We have conceded that conceded that each of the individually named defendants have high-level supervisory authority."

51 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

That is also borne out by the facts that Governor Brown requested and received weekly reports reflecting the number of COVID-19 cases within ODOC, *see* Severe Depo. at 150:9–25, and that Defendant Peters reported directly to the Governor on the steps that ODOC was taking in its COVID-19 response, Peters Depo. at 24:23–25:17.[76]

    **B.**    **In the face of ODOC's initial population management scenarios, Governor Brown took no immediate action.**

It is also undisputed that, in the early months of the pandemic, ODOC presented to the Governor certain population management scenarios that ODOC believed would have sufficiently reduced the prison population such that social distancing consistent with public health guidance could be achieved. *See* ECF 83 (Steward Decl.), at ¶ 87, Ex. 11. By June 1, 2020, at the time of this Court's opinion on Plaintiffs' motion for preliminary injunction, the Governor had not taken any action in response to those scenarios. *See* Trans. at 84:2–9 (May 29, 2020); ECF 108 (Opinion & Order), at 4.

    **C.**    **Governor Brown's efforts to reduce the prison population to protect AICs was too little, too late.**

Shortly after this Court's order denying Plaintiffs' motion for preliminary injunction, Governor Brown sent a letter to Defendant Peters requesting that ODOC "perform a case-by-case analysis of adults in custody vulnerable to COVID-19 for possible commutation" based on a set of criteria the Governor had identified.[77] Dahab Decl. ¶ 81, Ex. 75 (MANEY-242522) (letter

---

[76]    "I would keep [Constantin Severe] up to date on our COVID numbers. I would keep him up to date on any CDC guideline changes or OHA guideline changes in the midst of COVID, and just generally kept him aware of the daily operations or communications with the legislature so he could keep the Governor involved and informed." Mr. Severe, for his part, would act as the liaison between Director Peters, Deputy Director Steward, and the Governor. Severe Depo. at 8:9–20.

[77]    At the outset of the pandemic, ODOC staff at each institution created a list of medically vulnerable AICs. The lists expanded over the course of the pandemic. *See* ECF 87 (Bugher

dated June 12, 2020).  In her letter, the Governor acknowledged that "[w]hile DOC acted quickly

to meet the threat presented by COVID-19, there are limits to the department's ability to

implement social distancing in a correctional setting." *Id.*  "Given what we now know about the

disease and its pervasiveness in our communities, it is appropriate to release individuals who

face significant health challenges should they contract COVID-19." *Id.*

> The criteria that Governor had identified at that time were as follows:

- Be particularly vulnerable to COVID-19, as identified by DOC medical staff;
- Not be serving a sentence for a person crime;
- Have served at least 50% of their sentence;
- Have a record of good conduct for the last 12 months;
- Have a suitable housing plan;
- Have their out-of-custody health care needs assessed and adequately addressed; and
- Not present an unacceptable safety, security, or compliance risk to the community.

*Id.*  Those criteria evolved over time; in August 2020, the Governor sent Director Peters a second

letter setting forth similar criteria, but also expanded it to include AICs who were not medically

vulnerable but who were within two months of their scheduled release date.  Dahab Decl. ¶ 82,

Ex. 76 (MANEY-910841).   In her August 2020 letter, the Governor requested that ODOC send

her an updated list every other month thereafter.  *Id.*  In December 2020, after the beginning of

the COVID-19 surge within the ODOC, Governor Brown expanded her criteria to include those

non-medically vulnerable AICs who were within six months of their scheduled release date.

Dahab Decl. ¶ 83, Ex. 77 (MANEY-866919).

> Between June and September 2020, ODOC had identified 135 AICs who, in their view,

met the Governor's criteria.  *See* Dahab Decl. ¶ 84, Ex. 78 (MANEY- 871751) (dated June 22,

---

Decl.), at ¶ 6 (identifying 823 medically vulnerable AICs as of May 20, 2020); ECF 144 (Bugher
Decl. ¶ 39 (more than 5000 AICs identified as medically vulnerable).  *But see* Dahab Decl. ¶ 78,
Ex. 72 (Bajpai Depo.), at 33:5–35:9 & Dahab Decl. ¶ 79, Ex. 73; ¶ 80, Ex. 74 (MANEY-848797;
MANEY-848799) (listing 2299 medically vulnerable AICs as of March 17, 2020).

53 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

2020) (identifying 61 eligible AICs); Dahab Decl. ¶ 85, Ex. 79 (MANEY-907060) (dated Sept.

21, 2020) (identifying 74 eligible AICs, but five declined).[78] By mid-December of the year, the

Governor had approved the release of less than 350 AICs.  Dahab Decl. ¶ 87, Ex. 81 (MANEY-

907106-07).  And by the time the COVID-19 vaccine was made available to AICs, only 380

AICs had actually been released through the Governor's early release program.  Dahab Decl.

¶ 96.

     But this was inevitable in light of the criteria that Governor Brown had chosen to

determine an AIC's eligibility for early release.  The Governor's criteria categorically excluded

those convicted of person crimes from eligibility.  In April 2020, more than 70 percent of

persons incarcerated in Oregon's prisons were serving a sentence for what the Governor had

defined as a "person" crime.[79]  *See* Sugerman *Daubert* Decl. ¶ 2, Ex. 1 (Pfaff Rep.), at 3.  In that

respect, any meaningful attempt at physical distancing would have required the Governor to

consider release for at least some AICs convicted of person crimes.  Pfaff Rep. at 1.

     Recall that, at the Governor's direction in April 2020, ODOC had prepared a handful of

population management scenarios aimed at understanding the changes to the prison population

---

[78]    By the end of September, Governor Inslee had given the Washington Department of
Corrections authority over early release, and Governor Newsom had taken actions leading to the
early release of more than 15,000 incarcerated adults in California.  *See supra* nn.26–27.  In
October 2020, Lisa Hay, then Oregon's Federal Public Defender, wrote to Governor Brown to
explain to her the urgency of taking immediate steps to reduce Oregon's prison population.
Dahab Decl. ¶ 86, Ex. 80 (MANEY-764793), at 2 ("I am writing to urge your office to take heed
of the cautionary lesson from recent events and take immediate and decisive action to reduce the
prison populations.").  At the that she wrote to the Governor, only 123 AICs had been granted
early release, "a shockingly low number given that many low-risk incarcerated adults who have
completed the majority of their sentences suffer from significant health issues that render them
susceptible to serious complications or death from COVID-19."  *Id.*

[79]    ODOC generally looked to the Criminal Justice Commission's definition of "person"
crime to apply the Governor's criteria.  Frener Depo. at 54:23–55:10; 56:24–57:6.  "Person
crime" is a broader category than Oregon's category of "Measure 11" offenses.  Dahab Decl.
¶ 88, Ex. 82 (Gleim Depo.), at 56:12–24; Bajpai Depo. at 58:22–59:2.

54 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

that would need to occur to provide for physical distancing within ODOC's active institutions. ECF 83 (Steward Decl.) ¶ 87, Ex. 11; *see also supra* Section I (describing the context).  At that time, ODOC had determined that, to achieve 6 feet of physical distancing in its current institutions, it would need to release somewhere between 5000 and 6000 AICs.[80]  Unfortunately, though, the Governor's decision to exclude from early release eligibility those convicted of person crimes made it impossible to achieve cuts of even *half* that size.  Pfaff Rep. at 3.

What is even more concerning is that the Governor's exclusion not only foreclosed the possibility of achieving her stated physical distancing goals, *see* Ex. 75 (MANEY-242522), it operated to leave the most medically vulnerable AICs in prison.  ODOC's own population data shows that almost all AICs who were designated by ODOC staff as medically vulnerable had been convicted of person crimes.  *See* Pfaff Rep. at 4; *see also* Dahab Decl. ¶ 89, Ex. 83 (MANEY-PFAFF-000111).  Likewise, almost all older people in prison were serving sentences for person crimes.  *See id.*  That being so, there was simply no way to reduce the prison population and to protect medically vulnerable AICs from COVID-19 without considering AICs convicted of person crimes as potentially eligible for release.  Pfaff Rep. at 4.  And remarkably, the Governor apparently knew that was true.  Severe Depo. at 165:7–20 (Governor knew that she wasn't likely to release many people "given the composition of DOC's population where a significant percentage . . . are there for person crimes").

The results of the Governor's decision were tragic.  More than 90 percent of the members of the Wrongful Death Class were serving time for person crimes and so were categorically ineligible under the Governor's early release program.  Pfaff Rep. at 7.  Of those, three-quarters

---

[80]    ODOC's estimate did not consider using alternative space or unused emergency beds as an alternative to early release.  Bajpai Depo. at 87:12–19; 21:7–13.

were either over 55 or otherwise considered by ODOC to be medically vulnerable to COVID-19. Pfaff Rep. at 7; Dahab Decl. ¶ 90.[81]

The tragic results were also unnecessary. Governor's Office and ODOC staff understood at the time that AICs convicted of person crimes are actually *less* likely to reoffend than those convicted of property crimes. *See, e.g.*, Frener Depo. at 91:18–93:9 (ODOC explained to the Governor's office "numerous times" that those convicted of person crimes are less likely to reoffend); Gleim Depo. at 39:21–25 ("I think in general, if you're looking at the aggregate people who committed property crimes are more likely to offend than people who have committed, in some cases, more severe person crimes . . . ."); Bajpai Depo. at 58:10–16 (same). Notwithstanding that, the Governor pushed forward with her categorical exclusion, even in the face of ODOC's suggestion that some medically vulnerable AICs convicted of person crimes be considered. *See* Frener Depo. 95:11–96:13 (so stating).

Finally, Governor Brown's tragic decision made a difference. Had the Governor not imposed a categorical ban on considering AICs convicted of person crimes for early release, the Governor could have released more than twice the number of AICs and remained consistent with the other criteria she had identified. *See* Ex. 77 (MANEY-866919) (medical vulnerability, six months left to release, good behavior in prison, and low public safety risk); Pfaff Rep. at 8–18 (describing that analysis).

Governor Brown's early release criteria were never intended to meaningfully reduce the prison population. This, in the face of knowledge of the risk of COVID-19 in the corrections setting, the increasing number of cases (and deaths) within ODOC, and her executive oversight

---

[81]    The Governor apparently gave no consideration to an AIC's age when creating her early release criteria. *See* Severe Depo. at 109:15–19.

of ODOC's otherwise poor COVID-19 prevention response, readily constitutes deliberate indifference to inmates in her care.

### D. Rather than increase space for social distancing, Governor Brown chose to reduce it by closing two ODOC facilities during the COVID-19 pandemic.

Remarkably, knowing the risks of COVID-19 inside Oregon's prison, and knowing that her population reduction efforts were unlikely to make a difference, Governor Brown took even further actions that increased those risks and cause harm to AICs. During the pandemic, rather than increase space for AICs to physically distance in ODOC's institutions, Governor Brown chose to reduce it. In December 2020, Governor Brown announced that she intended to close three prisons in July 2021 (MCCF), January 2022 (SCCI), and July 2022 (WCCF). Dahab Decl. ¶ 91, Ex. 84 (MANEY-320701).[82] At the time of that announcement, 17 people had died with a COVID-19 diagnosis in ODOC custody. *See* Or. Dep't of Corrs., COVID-19 Response: COVID-19 Tracking, https://www.oregon.gov/doc/covid19/pages/covid19-tracking.aspx (Dec. 1, 2020).[83] ODOC, for their part, would save money, but would ultimately be required to absorb the populations of MCCF, SCCI, and WCCF into other facilities, where COVID-19 cases were surging and capacity was already "extremely limited." Ex. 25 (MANEY-122063). In the months leading up to the Governor's announcement, legislators were concerned, ODOC had several institutions designated as "Tier 4," and it knew that it could not manage the closures safely. *Id.*; *see also* Dahab Decl. ¶ 92, Ex. 85 (MANEY-261551), at 2.

---

[82]    The Governor's closure announcement came alongside her budget recommendation for the 2021–2023 biennium. Its ostensible purpose was to save money. By the end of the 2021–2023 biennium, Oregon was left with a $5.61 billion surplus that will be distributed to taxpayers in 2024. *See* Or. Dep't of Revenue, Oregon Surplus "Kicker" Credit, https://www.oregon.gov/dor/programs/individuals/pages/kicker.aspx (last visited Jan. 7, 2024).
[83]    Archived at https://web.archive.org/web/20201201065722/https://www.oregon.gov/doc/covid19/pages/covid19-tracking.aspx (visited Jan. 7, 2024) (reflecting capture date of Dec. 1, 2020).

Notwithstanding those concerns, and over the course of the following year, the Governor closed two of the three prisons she previously had recommended.  WCCF remained open; ODOC's Director testified that she does not know why the Governor made that decision.  Peters Depo. at 104:10–17 ("That was a decision the Governor made at the end.").[84]  She also testified that she does not recall ever considering, or discussing with the Governor, whether the closures of MCCF or SCCI would negatively impact AICs during COVID-19 by reducing the space available for physical distancing.  Peters Depo. at 105:2–16.  The Governor's Chief of Staff testified that it likely was not a factor because, at the time the decision was made, "we all hoped and felt like 'maybe COVID will be over any day now' kind of thing."  Blosser Depo. at 81:9–82:10.[85]

In the 60 days following the Governor's announcement, 24 more AICs died with a COVID-19 diagnosis.  Dahab Decl. ¶ 94.

---

[84]    Nor did the Governor's Chief of Staff at the time, Nik Blosser.  Dahab Decl. ¶ 93, Ex. 86 (Blosser Depo.), at 83:16–22.  Plaintiffs have not been able to depose the Governor to understand the reasons for her closure decisions.

[85]    "So I think my assumption at the time was it wasn't a huge factor because we knew it would take time to do this.  And I don't know if we – you know, this was the beginning of a lengthy process to figure out how to do it. And so I don't know. I think maybe at that point we all hoped and felt like 'maybe 6 COVID will be over any day now' kind of thing.").

## LEGAL STANDARD

Summary judgment is appropriate only when, "with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to judgment as a matter of law." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (citation omitted); Fed. R. Civ. P. 56(a). On a motion for summary judgment, this Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The Court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

To withstand summary judgment, a plaintiff's burden of proof is therefore "not high." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003). The plaintiff must (1) "make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof," (2) show that "there is an issue that may reasonably be resolved in favor of either party" and therefore should be resolved by the finder of fact; and (3) "come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible." *British Motor Car Dist., Ltd. v. S.F. Auto. Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir.1989). On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citations and quotation marks omitted).

In the context of qualified immunity, a plaintiff need only show that a reasonable trier of fact could conclude that the officials violated his or her federal constitutional rights, and that

reasonable trier of fact could find those rights to be clearly established. *See Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002); *see also Nicholas v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (on appeal from denial of qualified immunity, review is limited to " 'whether the defendant[s] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor' " (quoting *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012)).

Here, there are genuine disputes on each element of the deliberate-indifference analysis. A jury could reasonably find from the evidence that Plaintiffs faced an objectively serious risk of substantial harm, that Defendants knew of the risk, that they failed to take reasonable steps to abate the risk, and that Plaintiffs suffered severe harm as a result. In other words, resolving the factual disputes in Plaintiffs' favor, Defendants do not prevail "as a matter of law." *Cf. id.* They are not entitled to summary judgment.

## ARGUMENT

**I.    Defendants violated the Eighth Amendment because they knew plaintiffs faced a serious risk from exposure to COVID-19 and failed to protect them.**

Defendants' actions and inactions in this case violated the Eighth Amendment. As set forth above and below, they knew that Plaintiffs and members of the Damages and Wrongful Death Classes faced serious risk of harm through COVID-19. Notwithstanding those risks, Defendants failed to protect them.

### A.    When officials fail to take reasonable steps to abate a known risk, they are liable to inmates who suffer harm as a result.

The Eighth Amendment "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (cleaned up). Thus, prison officials must take "reasonable measures" to guarantee

inmates' safety, including protecting them from exposure to "serious, communicable disease." *Id.* (quotation marks omitted); *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993). Prison officials violate the Eighth Amendment when they are "deliberately indifferent" to a prisoner's safety—that is, when they subjectively know of "a substantial risk of serious harm to an inmate" and "disregard[d] that risk by failing to respond reasonably." *Wilk*, 956 F.3d at 1147 (quoting *Farmer*, 511 U.S. at 837, 844–45). Officials may not turn a blind eye to conditions that are "likely to cause serious illness and needless suffering." *Helling*, 509 U.S. at 33.

The deliberate-indifference inquiry is traditionally split into "objective" and "subjective" elements. *Hampton v. California*, 83 F.4th 754, 766 (9th Cir. 2023). More precisely, it has four parts:

(1)    **Risk.** Objectively, the inmate must be exposed to a substantial risk of serious harm. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1076 (9th Cir. 2013).

(2)    **Knowledge.** Subjectively, the official must know of the risk or the risk must be obvious. *Id.* at 1078. This is the "deliberate" part of deliberate indifference.[86]

(3)    **Indifference.** An official who knows that an inmate faces a substantial risk of serious harm must "take reasonable steps to abate that risk." *Hines v. Youseff*, 914 F.3d 1218, 1235–36 (9th Cir. 2019). If the official fails to do so, the

---

[86]    Defendants emphasize a supposed "wantonness" requirement gleaned from language in early prison-conditions cases. *E.g.*, Motion at 15, 17, 24, 44 (citing *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). The Supreme Court and the Ninth Circuit clarified long ago that in prison-conditions cases, as opposed to excessive-force cases, wantonness means deliberate indifference. *Jordan v. Gardner*, 986 F.2d 1521, 1527–28 (9th Cir. 1993); *Wilson v. Seiter*, 501 U.S. 294, 302–03, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

"indifference" part of deliberate indifference is satisfied, and the official may be held liable under the Eighth Amendment.  *Wilk*, 956 F.3d at 1150.

**(4)**    **Causation.**  Finally, the official's failure to abate the risk must have caused the inmate's injury.  *Lemire*, 726 F.3d at 1074.  When an inmate suffers "precisely the type of harm that was foreseen," a jury can conclude that the harm "could have been prevented" had officials taken steps to abate the risk.  *Id.* at 1080–81.

Plaintiffs' evidence in this case shows that Plaintiffs and members of the Damages and Wrongful Death Classes were at serious risk of contracting COVID-19 and suffering severe COVID-19 injury or illness, that Defendants knew of that serious risk, and that they failed to abate that danger—in other words, that Defendants were deliberately indifferent.  As a result, Plaintiffs fell ill—in some cases severely ill, and in some cases terminally ill.  A jury should decide whether Plaintiffs can hold Defendants liable.

**B.    Exposure to COVID-19 posed a substantial risk of serious harm to health, and congregate living substantially increased that risk.**

To satisfy the objective element of the deliberate-indifference inquiry, Plaintiffs must show that they were incarcerated under conditions that posed a "substantial risk of serious harm" to their health.  *Farmer*, 511 U.S. at 847.  A risk is sufficiently serious and substantial if "society chooses [not] to tolerate" it, so that exposing someone to it against their will would "violate current standards of decency."  *Hampton*, 83 F.4th at 766 (quoting *Helling*, 509 U.S. at 35–36).

COVID-19 easily fits the bill.  By May 2020, a "societal consensus" had emerged that "involuntarily exposing inmates to the disease violated then-current standards of decency."  *Id.* (quotation marks omitted).  State and local governments took "drastic steps" to prevent anyone from being involuntarily exposed to the disease.  *Id.*  For that reason, the Ninth Circuit has held

that exposure to COVID-19 poses a sufficiently serious and substantial risk to satisfy the objective element. *Id.*

Moreover, there is no dispute that living in the close quarters of a congregate setting—such as in a prison or a nursing home—substantially increased the risk of contracting COVID-19. ECF 16 (Stern Decl.), at ¶ 15 ("In [congregate living] environments, infections like COVID-19 can spread more rapidly. . . . . For these reasons, the risks of spread are greatly, if not exponentially, increased in congregate environments . . . .");[87] Trans. at 183:3–7 (May 29, 2020) (same) (testimony of Dr. Dewsnup). Where, as here, inmates face "elevated COVID-19 risks compared to the outside community," courts "have found a substantial risk of serious harm." *Chunn v. Edge*, 465 F. Supp. 3d 168, 200–01 (E.D.N.Y. 2020) (collecting cases).

Of course, "if there is any room for doubt," the question of whether an inmate was exposed to a substantial risk of serious harm "must be decided by a jury." *Lemire*, 726 F.3d at 1075–76. Here, there is scarcely any room for doubt that the risk of exposure to COVID-19, especially in a congregate setting, was substantial and serious. At a minimum, Plaintiffs have shown a triable issue of fact on this point.

---

[87]     *See also* ECF 16 (Stern Decl.), at ¶ 16 ("Prisons can be viewed as 'landlocked cruise ships,' another congregate setting. In such settings, no realistic amount of social distancing, disinfection, and other preventive measures renders the level of risk equal to that in an individual's home. Thus, even if the government is executing all the steps it describes, and is doing so effectively, without flaw or occasional lapse, incarcerated individuals—especially those who are medically at-risk—remain at heightened risk of infection and serious outcome."); ¶ 17 ("Prisons actually have an attribute that makes them more dangerous than cruise ships. Unlike cruise ships, they are not closed systems. Staff, new residents, and inanimate objects—all potential vectors for the virus—are introduced into the system every day.").

### C.      Defendants knew the risk because countless state and national health authorities, including ODOC itself, warned them of the risk.

Plaintiffs must also show that Defendants subjectively knew of the danger Plaintiffs were in.  *Lemire*, 726 F.3d at 1078.  Proof of intent to harm is not required.  *Edmo v. Corizon, Inc.*, 935 F.3d 757, 793 (9th Cir. 2019).  Nor is proof that Defendants knew of a risk to specific Plaintiffs, as long as they knew of a risk to "someone in [Plaintiffs'] position."  *Lemire*, 726 F.3d at 1077–78.  A factfinder may infer subjective awareness either from circumstantial evidence or because the risk was "obvious."  *Id.* at 1078; *Wilk*, 956 F.3d at 1147.  And obviousness, in this context, is measured not in laymen's terms but by prison officials' background understanding of the risks that prisoners face.  *Lemire*, 726 F.3d at 1078.  These are fact-intensive inquiries that "typically should not be resolved at the summary judgment stage."  *Id.* (citing *Farmer*, 511 U.S. at 842).  At summary judgment, an official has subjective knowledge if she has been "exposed to information concerning the risk," because a jury may infer knowledge from that exposure. *Farmer*, 511 U.S. at 842–43.

As ODOC explained to this Court in May 2020, it began monitoring the virus before the illness reached the United States.  ECF 83 (Steward Decl.), at ¶ 7.  By March 2020, countless state and national authorities were warning of the risk posed by Covid-19.[88]  Governor Brown declared a state of emergency and issued a statewide lockdown order in March.[89]  ODOC itself

---

[88]      Centers for Disease Control & Prevention, *COVID-19 Timeline*, https://www.cdc.gov/museum/timeline/covid19.html#:~:text=After%20more%20than%20118%2C000%20cases,declares%20COVID%2D19%20a%20pandemic (last visited Jan. 8, 2024).
[89]      Executive Order 29-03, *Declaring an Emergency Due to Coronavirus (COVID-19) Outbreak in Oregon* (Mar. 8, 2020), *available at* https://www.oregon.gov/gov/eo/eo_20-03.pdf; Executive Order 29-12, *Stay Home, Save Lives: Ordering Oregonians to Stay at Home, Closing Specified Retail Businesses, Requiring Social Distancing Measures for Other Public & Private Facilities, & Imposing Requirements for Outdoor Areas and Licensed Childcare Facilities* (Mar. 8, 2020), *available at* https://www.oregon.gov/gov/eo/eo_20-12.pdf.

64 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

identified hundreds of vulnerable inmates serving non-measure 11 offenses that could be considered for early release.  ECF 83 (Steward Decl.), Ex. 11 at 4-6.  It also estimated that 5800 inmates would need to be released to allow those who remained in ODOC facilities to physically distance adequately, ECF 83 (Steward Decl.) Ex. 11 at 3, at it floated to the Governor the possibility that an intake moratorium may be issued in an effort to reduce prison crowding, *id.*

Again, at the hearing on Plaintiffs' motion for preliminary injunction, all experts had agreed that "the only meaningful way to save lives in prison during the pandemic . . . is to reduce the prison population."  ECF 108 (Opinion and Order), at 2 (citing ECF 16 (Stern Decl. ¶¶ 20, 22); ECF 17 (Schartz Decl. ¶ 7); ECF 51 (Steward Decl. ¶ 51); ECF 84 (Dewsnup Decl. ¶ 56)) (quoting ECF 85 (Decl. of Garry Russell ¶¶ 106–07)).  Yet they had not taken—and still have not taken—meaningful action to do so.  Indeed, notwithstanding the known risks that COVID-19 posed to inmates in their care, ODOC had not recommended the Governor act, and the Governor had declined to do so in any event.  ECF 83 (Steward Decl.), at ¶ 87; Trans. at 83:18–84:9 (May 29, 2020) ("[T]he record we have is the governor requested this information, considered it, and declined to do anything other than consider releases on a case-by-case basis.").  Instead, in the face of those known risks, they implemented COVID-19 policies that failed to heed CDC or OHA guidance, reduced the space available for AICs to physically distance, and began to contact funeral homes to make arrangements for future AICs deaths.  *See supra* at Sections III–V.

The Ninth Circuit's recent decision in *Hampton*, a COVID-19-response case arising in the prison setting, is instructive on this element.  Just as in *Hampton*, public health authorities recommended that, in the corrections setting, "all exposed inmates and staff be required to wear masks, and that staff movement be restricted between different housing units to prevent the spread of COVID-19."  83 F.4th at 759–60; *see supra* Section III.B (describing those authorities,

their recommendations, and OHA and ODOC's swift departure from them). And as in *Hampton*, public health authorities "warned that quarantining inmates with COVID-19 in cells usually used for punishment could backfire by making inmates reluctant to report their symptoms." 83 F.4th at 760; *see supra* Section III.B (same). Just as in *Hampton*, ODOC was well aware—from the outset of the pandemic—that COVID-19 posed substantial risks to those living in the prison setting.

In other words, Defendants knew that under the circumstances prevailing in ODOC's prisons, inmates were exposed to a substantial risk of serious harm from COVID-19. Moreover, they knew that to abate that risk, they would have to do some or all of the following: release some meaningful portion of the number of inmates ODOC had recommended, see ECF 83 (Steward Decl. Ex. 11); create and enforce mask requirements; screen and test inmates and staff consistently and adequately; including those who may be asymptomatic; isolate COVID-19 positive inmates in non-punitive conditions; create and enforce social distancing; prevent mixing of staff and inmates between units, including at worksites; and use as much available space as possible to maximize the ability of AICs to keep themselves safe from harm. *See, e.g.*, Ex. 18 (CDC July 2020 Guidance); Fleming Report.

Of course, even if Defendants did not know all of *that* by June 2020, they certainly knew, as the infection rates and death toll in ODOC prisons skyrocketed from June 2020 to February 2021, that their "wait and see" approach had proven ineffective. *Stewart v. Aranas*, 32 F.4th 1192, 1195–96 (9th Cir. 2022). That knowledge also suffices, because prison officials violate the constitution "when they *persist* in a treatment known to be ineffective." *See id.* (emphasis added).

### D.    Because they failed to abate a known risk to Plaintiffs' health, Defendants were deliberately indifferent.

"State officials cannot shut their eyes to inmate suffering; they are responsible for the safety of the people in their custody." *Hines*, 914 F.3d at 1235–36. Once an official subjectively knows an inmate is in danger, she has a duty to take "reasonable available measures to abate that risk." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).[90] What measures are reasonable depends on the "severity of the risk" and the prevailing "penological circumstances." *Lemire*, 726 F.3d at 1079. This element of deliberate indifference, like the official's subjective knowledge, is a "fact-intensive" inquiry that "typically should not be resolved at the summary judgment stage." *Id.* at 1078 (citing *Farmer*, 511 U.S. at 842).

The above-described facts, *see supra* at Sections I–V, make clear that Defendants were deliberately indifferent to the serious medical needs of Oregon's prisoner population.

First, Defendants ignored national and local public health recommendations—including early recommendations from trusted, corrections-setting partners—making clear the measures necessary for *any* meaningful and effective COVID-19 response. The "cornerstone" among those measures was social distancing; beyond that, public health agencies and medical professionals, including ODOC's own infectious disease specialist, called for mask mandates, limited or no mixing in line movements or between units, consistent and effective quarantine and isolation measures, and isolation in non-punitive conditions. Defendants ignored those calls. *Cf. Hampton*, 83 F.4th at 759–60 (experts provided similar advice and the defendants ignored it).

---

[90] The plaintiff in *Castro* was a pretrial detainee, so formally his claim came under the Fourteenth Amendment. 833 F.3d at 1071. But as the Court explained at length, the Fourteenth Amendment standard for failure-to-protect claims is identical to the Eighth Amendment standard except for the mental state required. *Id.* at 1068–72. Because the availability of reasonable measures to abate the risk is an "objective component[]," the Eighth and Fourteenth Amendments share it in common. *Id.* at 1072; *see Farmer*, 511 U.S. at 847.

67 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Instead, Defendants created a Tiering protocol that failed to serve its preventative aim, did not audit their ODOC system, avoided audits from outside entities, and directed their staff to "get religion" to avoid the statewide vaccine mandate. These actions were deliberately indifferent.

At the same time, Defendants were also aware that mask and other COVID-19 prevention measure noncompliance was widespread, especially among corrections officers, and that their testing protocols—particularly to the extent that they ignored *entirely* the need to test asymptomatic COVID-19 cases—were known to be inadequate. Yet Defendants did not assure compliance and did not change their policies to meet public health needs. *Cf. Hampton*, 83 F.4th at 760 ("Even when inmates and staff had masks, many wore them improperly or failed to wear them at all. The prison's testing protocol, too, was inadequate, suffering from what the memo considered 'completely unacceptable' delays."). This was deliberately indifferent.

Indeed, in several circumstances, Defendants' failure to quarantine resulted in the mixing of healthy AICs with COVID-positive AICs, the transfer of AICs from quarantined units to non-quarantined units, or the placement of potentially exposed AICs directly into a prison's general population. *See supra* nn.15–18 (collecting AIC reports); *see also supra* at Section III.E.1–III.E.5 (same). In other words, "instead of quarantining the inmates upon their arrival at [an ODOC facility], Defendants placed them in" housing that allowed free transmission of the virus from infected inmates to uninfected inmates. *Hampton*, 83 F.4th at 759. This too was deliberately indifferent. Indeed, this was a "textbook case of deliberate indifference," *Hampton*, 83 F.4th at 767 (citing *Polanco*, 76 F.4th at 929)); Defendants were repeatedly aware from public health authorities that their COVID-19 policies were inadequate, yet each and every they chose to disregard that, *cf. id.* (same).

The same is true for the Governor's and ODOC's failures to meaningfully consider either reducing the prison population or implementing alternatives to allow for AICs to adequately protect themselves from harm.  "Except in emergency situations, a failure to consider reasonable alternatives is strong evidence that a prison official's actions were unreasonable." *Lemire*, 726 F.3d at 1079.[91]  Here, the Governor and ODOC knew that population reduction was necessary, knew that cases and deaths continued to rise, knew that people in prison are particularly at risk to COVID-19, and failed entirely to abate those risks.  Instead, the Governor rejected an intake moratorium and instead devised an early release program that, while politically convenient, was designed to fail those whom it ostensibly was created to protect.  *See supra* at Section IV.B–IV.D.[92]  Having done that, and with awareness of the risks of her decisions, she closed two prison facilities, further increasing AICs' risk of harm.  *See supra* at IV.D.  Meanwhile, ODOC was maintaining two empty prisons, failed even to consider what it would take to reopen them, *see supra* at Section III.C, and was doing "anything possible to avoid" bringing unused AIC beds online in new spaces, *see* Ex. 36 (MANEY-357723).  And while Governor Inslee was taking significant steps to empty Washington's prisons, ODOC was picking up those who had recently been released from Washington's facilities.  *See supra* n.29.  This was certainly deliberately indifferent.

Defendants argue they could not have known that each proposed countermeasure, viewed in isolation, was required to mitigate the risk.  For example, they argue that the Eighth Amendment "did not require ODOC to achieve social distancing at all times in all places," did

---

[91]    "Emergency" here means situations where force is needed to maintain order, not a years-long emergency declaration.  *See* Jordan, 986 F.2d 1527–29.
[92]    *Cf. Hampton*, 83 F.4th at 759 ("Governor Newsom issued an executive order suspending the intake of inmates into all state correctional facilities[.]").

69 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

"not require mask mandates," required no more testing than ODOC's test-after-an-outbreak policy, did not require "routine testing of asymptomatic staff," did not require "MERV-13 filtration and 24/7 air exchange," and did not require the release of as many inmates as ODOC estimated would be required to abate the risk of COVID-19 exposure.  Motion at 26, 35–37, 43, 48, 51, 53.  And in a sense they are right, because the Eighth Amendment requires none of these specifically.  What it requires is that officials take reasonable measures to abate a known risk.  *Hampton*, 83 F.4th at 767.  And, importantly, that risk can come from a "combination" of conditions that together "have a mutually enforcing effect."  *Wilson*, 501 U.S. at 304.  Defendants' piecemeal analysis is misplaced, and the Court should reject it.

Relatedly, the Ninth Circuit explained in *Hampton* that even if choices might not rise to deliberate indifference in isolation, they can do so in combination.  *See* 83 F.4th at 767.  If enforcing a mask mandate is unrealistic, for instance, so be it—but that heightens officials' duty to take other protective measures like testing, screening, and isolating COVID-positive inmates.  *Id.*  Similarly, even when there are "competing priorities" and "tradeoff[s]," officials must "afford sufficient weight to the constitutional rights of [inmates]."  *Polanco v. Diaz*, 76 F.4th 918, 929 (9th Cir. 2023); *Jordan*, 986 F.2d at 1529.  So if, for instance, considerations of public safety prevented the release of 5800 inmates, *cf.* Dahab Decl. ¶ 97, Ex. 87 (MANEY-504231), officials needed to implement other policies to allow adequate social distancing and abate the risk of inadequate social distancing, like using non-punitive isolation and improving facilities' ventilation.  *See Hampton*, 83 F.4th at 767.  Put differently, if officials cannot or choose not to take some protective measures then they *must* take others.  Instead, as detailed above, Defendants totally failed to "reasonably protect" Plaintiffs and the Classes.  *See Hampton*, 83 F.4th at 770.

Defendants argue that they did "creat[e some] policies to mitigate the spread of Covid-19." Motion at 4. And it's true that they "created and maintained a centralized plan for state-wide pandemic policies" and "issued policies and guidance in real time." Motion at 5–6. But as explained above, those policies were inadequate: They did not abate the risk to Plaintiffs. It's also true that Defendants issued a full mask mandate in November 2020. Motion at 7. But by then, cases and deaths had already begun to skyrocket; cases had reached 1300, and sixteen AICs had died. ECF 205 (Bruggemeier Decl.) ¶¶ 2–4; *see also* Or. Dep't of Corr., COVID-19 Tracking, https://www.oregon.gov/doc/covid19/pages/covid19-tracking.aspx (last visited Jan. 8, 2024).[93]

More importantly, however, Defendants mistake the Eighth Amendment's requirements when they rely on the meager measures they took. Plaintiffs need not prove that they were "completely denied" protection from exposure to COVID-19. *Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012) (quotation marks omitted), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Half-hearted attempts to mitigate the risk do not "immunize officials from the Eighth Amendment's requirements." *Edmo*, 935 F.3d at 793; *see also Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000) ("Establishing that some needs of some plaintiffs were met at some times" does not establish that officials "provided sufficient protection" from the risk of harm.) Plaintiffs dispute the "extent and adequacy of the protection [they] received," and thus that question must go to a jury. *Johnson*, 217 F.3d at 732–33.

As in *Hampton* and *Polanco*, the facts here describe a "textbook case of deliberate indifference." *Hampton*, 83 F.4th at 767 (quoting *Polanco*, 76 F.4th at 929). "Defendants were

---

[93]    Archived at https://web.archive.org/web/20201116180142/https://www.oregon.gov/doc/covid19/pages/covid19-tracking.aspx (last visited Jan. 8, 2024) (reflecting capture dated Nov. 16, 2020).

repeatedly admonished by experts that their COVID-19 policies were inadequate, yet they chose to disregard those warnings." *Id.*  Not only did they disregard those warnings at the outset, they persisted in disregarding them until it was far too late:  Defendants did not implement the policies recommended by the CDC in June 2020 until 2022, long after Covid-19 had run rampant through Oregon's prisons.  *See* Fleming Report at 51–54.  As the Ninth Circuit has explained, "[a]t some point 'wait and see' becomes deny and delay." *Stewart*, 32 F.4th 1195.  Persisting in an approach that has proven ineffective in abating a known risk is not a reasonable response. *Id.* at 1195–96.  Yet that is just what Defendants did.  They are liable for the resulting harm.

### E.    Defendants' deliberate indifference caused Plaintiffs to contract COVID-19 and, in some cases, die.

Moreover, Defendants' deliberately indifferent conduct caused Plaintiffs and members of the Damages and Wrongful Death Class to contract COVID-19 and, in up to 43 instances, die from the disease.

### 1.    Defendants are liable for creating, implementing, and managing policies that caused Plaintiffs to contract Covid-19.

There is no vicarious liability under § 1983; a plaintiff can recover against a supervisor only if the supervisor "breached a duty to plaintiff which was the proximate cause of the injury." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quotation marks omitted).  But at the same time, the Ninth Circuit has long recognized that even though a supervisor will "rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury," she can still be held liable in her individual capacity. *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).

The requisite causal connection can be established by alleging that the supervisor created, promulgated, advanced, implemented, managed, or in some other way "possesse[d]

responsibility for the continued operation of" a policy under which her subordinates violated constitutional rights. *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012). The supervisor need not have "devised" the policy; it suffices that she was "in charge of" it. *Id.* at 1076–77. The policy may be "unwritten." *Id.* And if it is a custom or practice rather than a policy, then the supervisor is liable if she knew of it, knew or reasonably should have known it would cause injury, and did not put a stop to it. *Starr*, 652 F.3d at 1207–08.

Here, Defendants were all responsible for the creation and implementation of centralized policies and procedures related to ODOC's handling of COVID-19. In early March 2020, the State activated its Emergency Coordination Center to address the statewide response to the Covid-19 pandemic. ECF 83 (Steward Decl.), at ¶ 10. Two ODOC employees were at the ECC "every day, which ensure[d] that ODOC [was] connected with the statewide response and, conversely, that the ECC team under[stood] ODOC's daily resource needs." *Id.*

ODOC also activated its own Agency Operations Center "to fight the spread of the coronavirus." ECF 83, at ¶ 11. The AOC, "work[ed] all day long, sometimes around the clock" and "me[t] with representatives from each of the [ODOC] institutions" "[e]very morning." ECF 83, at ¶ 12. It also met biweekly with OHA to coordinate the response to Covid-19. ECF 83, at ¶ 17. Superintendents at each ODOC facility communicated with the AOC regarding facility-specific circumstances that affected implementation of the AOC's policies and practices. ECF 291-1, Ex. 6 (Washburn Depo. at 96:4–6) ("When we make changes to our normal operation plans, we have to write those up and funnel them through [the] AOC, and then we get approval[.]"); ECF No. 291-1, Ex. 7 Highberger Depo. at 46:7) ("We get plans approved.")).

And as this Court is well aware, the AOC was ultimately responsible for the decisionmaking and implementation of the high-level Covid-19 policies and practices across

ODOC facilities.  ECF 291-1, Ex. 2 (Steward Depo. at 12:9–12) ("[O]ur [AOC] briefs me

regularly.  And when they need a high-level policy decision made or information communicated

to our employees, I will do that.")).  So despite varying levels of implementation, the AOC was

the source of all high-level policies and practices related to COVID-19, and any variation to

those uniform policies was subject to the AOC's approval.  ECF No. 291-1, Ex. 5 (Kelly Depo

at 19:17–20:5), ("[The AOC] send[s] out direction, as if there is agency direction that we're all

going to adhere to, yes, they make that decision and policy, and we implement it . . . we report

back to [the AOC] how we will implement . . . and then they're the final approver of that

operation."); Martin Decl. ¶ 43 ("Shutter Creek developed Covid-19-related health and safety

protocols and submitted a plan to ODOC for approval.")).  That included OHA, which met

continuously with ODOC, issued its corrections-setting guidance, and approved ODOC's other

preventative strategies, including its so-called "Tiering" protocol.  *See supra* at Section III.D.1.

**2.    Defendants' policies actually and proximately caused Plaintiffs to contract Covid-19.**

Plaintiffs who prove that officials were deliberately indifferent to a serious risk of

substantial harm must still prove that the indifference caused the harm they suffered.  *Lemire*,

726 F.3d at 1074.  When the harm a plaintiff suffered was of "precisely the type of harm that was

foreseen," however, a jury can find that the harm could have been prevented had the officials not

been deliberately indifferent.  *Id.* at 1080–81; *see, e.g.*, *Conn v. City of Reno*, 591 F.3d 1081,

1100 (9th Cir. 2010)[94] ("[I]t makes little sense . . . to argue that the failure to provide access to

suicide prevention services has no causal effect on a suicide that transpires less than 48 hours

---

[94]    The Supreme Court vacated and remanded *Conn* for reasons not relevant here in *City of Reno v. Conn*, 563 U.S. 915, 131 S. Ct. 1812 (2011) (Mem).  On remand, the Ninth Circuit reinstated the parts of the original opinion cited here.  *See* 658 F.3d 897 (9th Cir. 2011).

later.").   And when a plaintiff is "exposed to a substantial risk of some range of serious harms," that remains true, even if the harm the plaintiff actually suffered was not "the *most* likely result among this range of outcomes."  *See Lemire*, 726 F.3d at 1076 (emphasis added).

*Conn* is instructive.  There, officers were transporting a "grossly intoxicated" woman to jail to sober up when she wrapped her seatbelt around her neck in an apparent attempt to kill herself.  591 F.3d at 1092.  Believing that her attempt was not serious, the officers did not take her to the hospital or report it to jail staff.  *Id.*  She was released four hours later.  *Id.* at 1093. That night, once again grossly intoxicated, she was taken to the emergency room.  *Id.*  She was released within a few hours.  *Id.*  The next day, she committed another offense and was returned to jail.  *Id.*  Within 24 hours, she hanged herself.  *Id.*

Her family sued the officers, claiming that they could have prevented her suicide by either taking her to the hospital or reporting her attempt to jail staff.  *Id.* at 1099.  The officers countered that any involvement they had was greatly attenuated:  She killed herself not after they took her to jail but on a separate visit; in between the two trips to jail she had been to the ER, which would not have discharged her if she were suicidal, especially since she had been in the ER a day earlier for suicidal ideation; and even if they had told jail staff about her suicide attempt when they dropped her off, jail staff the following day on a separate detention would not have known about it, especially since the previous day's visit ended without incident.  *Id.* at 1099–1100.  In short, the argument that "but for" their inaction she would not have committed suicide was thin indeed.

The Ninth Circuit recognized that the officers' argument "may well succeed" before a jury.  *Id.* at 1100.  But because the officers' failure to report the seatbelt incident meant that no one who evaluated her after the officers took her to jail knew about it, the Court held that a

reasonable jury could also find that their omission "rendered the subsequent medical evaluations ineffectual." *Id.* at 1100. Of course, that is not the same as saying that it caused the ultimate harm—her suicide. On that score, the Court noted that effective medical intervention "would likely" have occurred had the crucial information about the choking incident been known to jail staff or medical personnel, and that such intervention "might well" have prevented her suicide. *Id.* In other words, even though the officers might not have prevented her suicide had they reported the information, their failure to report it prevented others from preventing it. That was enough to deny summary judgment. *Id.*[95]

So too here. Defendants might not have *prevented* Plaintiffs from contracting COVID-19 had they, among other things, promptly and continuously implemented and enforced a mask mandate, promptly and consistently screened employees for COVID-19 symptoms and exposure, followed CDC guidelines to ensure inmates could socially distance, meaningfully managed the prison population in the face of a deadline virus, implement other critical CDC- and OHA-recommended COVID-19 prevention strategies, or prioritized inmates consistently with others in congregate settings for vaccine distribution.[96] But by failing to do any of those things, among others, they made it impossible for Plaintiffs, class members, prison staff, and other personnel to avoid COVID-19.

To be sure, Plaintiffs need not trace each infection to a single particular policy decision. *Cf.* Motion at 64–66. They were deprived of their Eighth Amendment rights by the

---

[95]    *Conn* was a damages case. *See Conn v. City of Reno*, 2007 WL 9725222, at *5 (D. Nev. Mar. 8, 2007). So was *Lemire*. 726 F.3d at 1068. So Defendants' caviling at a supposed difference in standards for injunctive and monetary relief misses the mark. *Cf.* Motion at 59–61.
[96]    Discovery on this issue is stayed pending Defendants' interlocutory appeal. Because that's true, before there is a definitive ruling on their liability for their deliberately indifferent vaccine distribution plan, summary judgment would be improper.

76 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

"combination" of those policies, which together had the "mutually enforcing effect" of forcing

them to live in conditions where they were nearly certain to contract COVID-19.  *Cf. Wilson*,

501 U.S. at 304.  This Court should "leave the jury to its proper function of assessing the weight

and credibility of that evidence as well as that presented by the defendants."  *Id.*

In addition to actual causation, there is the question of proximate causation, or "whether

the defendant should be legally responsible for the injury."  *Id.* at 1100–01 (quoting *White v.

Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990)).  An intervening cause may supersede Defendants'

liability for their failures, but only if it was not "foreseeable."  *Id.*  The Ninth Circuit takes a

broad view of foreseeability.  In *White*, a prison guard attempted to force an inmate into a cell

with a prisoner who had a shank, the inmate fled, and in the ensuing fracas deputies injured him.

901 F.2d at 1502–03.  The inmate's and the deputies' actions were intervening causes, but the

Court held that they were all foreseeably downstream of the guard's actions.  *Id.* at 1506.

Because the inmate's running away was a "foreseeable and normal" result of the guard's

attempting to force him into a dangerous situation, "[t]he question of proximate cause should

have been left to the jury."  *Id.*

So here, again.  Inmates' and guards' failure to weak masks is a foreseeable and normal

result of refusing to enforce a mask mandate.  Inmates' refusal to report symptoms is a

foreseeable and normal result of threatening them with punitive isolation if they test positive.

Free transmission of an airborne virus is a foreseeable and normal result of forcing inmates from

different housing units to work together under such conditions.  A jury should decide whether

those results were foreseeable to Defendants.  *See id.*; *Conn*, 591 F.3d at 1101–02.

**II.      Defendants are not entitled to qualified immunity.**

As this Court held in its earlier decision denying Defendants' partial motion for summary judgment, "there exists a clearly established right for individuals in custody to be free from heightened exposure to a serious, easily communicable disease," and "material issues of disputed facts remain as to the merits of Plaintiffs' Eighth Amendment claim." ECF 149, at 8. That remains true. The Court should again deny Defendants' request for qualified immunity.

**A.      Qualified immunity applies only when the law is unclear.**

Qualified immunity is about "fair notice." *Wright v. Beck*, 981 F.3d 719, 734 (9th Cir. 2020) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 596 (2004) (per curiam)). It shields government agents from liability for violating constitutional rights that weren't "clearly established" at the time of the violation. *Camreta v. Greene*, 563 U.S. 692, 705, 131 S. Ct. 2020, 179 L. Ed. 2d 1118 (2011). It consists of two prongs: Whether the official violated a right and whether that right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

To determine whether an officer violated clearly established law, this Court looks for factually similar cases, "mindful that there need not be a case directly on point." *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (quotation marks omitted). As the Seventh Circuit held in *Estate of Clark v. Walker*, prison officials' duty to protect inmates from infection "need not be litigated and then established disease by disease or injury by injury." 865 F.3d 544, 553 (7th Cir. 2017); *see also Wilk*, 956 F.3d at 1148 (explaining that courts need not "catalogue" each kind of harm that an inmate might suffer before the responsible officials can be held liable). Even in novel factual circumstances, officials are not entitled to qualified immunity if their conduct "obvious[ly]" or "egregious[ly]" violates the Constitution. *Taylor v.*

*Riojas*, 592 U.S. 7, 8–9, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020) (per curiam) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 745, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).

**B.    Plaintiffs' right to protection from heightened exposure to a serious, easily communicable disease had long been clearly established.**

Plaintiffs began falling ill with and dying from COVID-19 in March 2020.  Their right to protection from heightened exposure to a serious, easily communicable disease was clearly established long before that.  The Supreme Court held in 1993 that "prison officials may [not] be deliberately indifferent to the exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33.  Based on that, the Ninth Circuit recently explained that inmates' "right to be free from exposure to a serious disease" has been clearly established "since at least 1993, when the Supreme Court decided *Helling*." *Hampton*, 83 F.4th at 769.

Defendants previously sought qualified immunity on the basis that COVID-19 was "novel."  ECF 115 (Partial MSJ), at 10–11.  This Court rightly rejected that line of argument. ECF 149 (Order Denying Partial MSJ), at 10–11.  It held that "[e]xisting precedent clearly establishes the right of an individual in custody to protection from heightened exposure to a serious communicable disease" and that that clearly established right "extends to protection from COVID-19." *Id.*

In their renewed motion for summary judgment, Defendants advance an argument that is superficially different but structurally the same.  Rather than focus on the specific pathogen, they now focus on specific protective measures.  They argue that no clearly established caselaw would have put them on notice that they had to "ensure six feet of distance between all individuals at all times"; issue "more pardons"; "open new prisons in empty buildings"; enforce a "mask mandate"; "modernize the[ir] HVAC systems"; test, quarantine, and isolate inmates and staff in a way that would prevent the spread of COVID-19; or memorialize any of these efforts in

consistent, written policies.  Motion at 27, 30, 40, 44, 48, 51, 53.  In short, just as before, they

seek a level of specificity in the precedent that goes far beyond what qualified immunity

demands.

     True, the Supreme Court has admonished lower courts for applying prior cases at too

"high [a] level of generality."  *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 193 L. Ed. 2d

255 (2015) (per curiam) (quotation marks omitted).  But what that means is that courts may not

simply reiterate a "general [constitutional] test," hold that it is clearly established, and deny

immunity.  *Id.* at 13 (quotation marks omitted).  Nor may the Court rely on "the general rule that

prison officials cannot deliberately disregard a substantial risk of serious harm."  *Hampton*, 83

F.4th at 760 (quotation marks omitted).

     But this Court's articulation of the right—"protection from heightened exposure to a

serious communicable disease"—is much more specific than that, and easily specific enough.

ECF 149, at 10–11.  And in *Hampton*, the Ninth Circuit confirmed that the correct level of

generality is "an inmate's right to be free from exposure to a serious disease."  83 F.4th at 769.

In other words, while it may be true that no prior case establishes the rule that COVID-19

requires a HVAC system with MERV-13 filtration, *cf.* Motion at 53, that's beside the point.  *See*

*Hampton*, 83 F.4th at 769 ("Plaintiff is not required to point to a prior case holding that prison

officials can violate the Eighth Amendment by transferring inmates from one prison to another

during a global pandemic.").  After *Helling*, officials have a duty to "reasonably protect inmates

from exposure to serious diseases," and Defendants cannot "claim ignorance" of that.  *Id.* at 770;

*Wilk*, 956 F.3d at 1150.

     Nor can they claim ignorance of what it would have taken to reasonably protect

Plaintiffs.  The countermeasures at issue—social distancing, cohorting, screening using testing as

well as self-reported symptoms, ventilation, contact tracing, non-punitive medical isolation, release planning, and training and communication, and more—were in the CDC's guidance by July 2020. *See* Fleming Report at 51–54. Yet Defendants actually implemented and enforced very few of those countermeasures until 2022, long after COVID-19 had run rampant through Oregon's prisons. *See id.* During the "critical pre-vaccine year of 2020," Defendants totally failed to "reasonably protect" Plaintiffs and the plaintiff classes. *See id.*; *Hampton*, 83 F.4th at 770. A "reasonable official" in their shoes would have understood that the choices they made violated Plaintiffs' Eighth Amendment rights. *See Hampton*, 83 F.4th at 769. Defendants are not entitled to qualified immunity.[97]

### III.    Defendants are not entitled to legislative or quasi-judicial immunity.

Nor are Defendants entitled to legislative or quasi-judicial immunity.

#### A.    Legislative immunity does not protect Defendants in these circumstances.

"The Supreme Court 'has generally been quite sparing in its recognition of claims to absolute official immunity.'" *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1220 (9th Cir. 1996) (quoting *Forrester v. White*, 484 U.S. 219, 224, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988)). Although state officials are entitled to some degree of immunity from § 1983 damages actions arising from their official acts, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486–87, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991); *see also Greater L.A. Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1107–08 (9th Cir. 1987) ("When deciding whether a

---

[97]    The same analysis applies to Defendant Patrick Allen. He would like to believe otherwise, but the Ninth Circuit has applied the same standard to non-prison officials so long as they participate in or control the prison conditions. For all the reasons explained above, that is the case here. *See Van Smith v. Franklin*, 286 F. App'x 373, 374–75 (9th Cir. 2008).

public official is immune from liability for acts performed in his official capacity, qualified immunity is the general rule and absolute immunity the exceptional case."). Thus, "[t]he burden of proof in establishing absolute immunity is on the individual asserting it." *Trevino v. Gates*, 23 F.3d 1480, 1482 (9th Cir. 1994).

The doctrine of legislative immunity provides "state legislators . . . absolute immunity from civil damages for their performance of lawmaking functions." *Jones v. Allison*, 9 F.4th 1136, 1139–40 (9th Cir. 2021). Of course, legislative immunity "is not limited to officials who are members of legislative bodies." *Id.* (citations omitted). But legislative immunity to those "outside the legislative branch" is limited; they are entitled to immunity only "when they perform legislative functions." *Bogan v. Scott-Harris*, 523 U.S. 44, 55, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998). In other words, immunity attaches only to actions "in the sphere of legitimate legislative activity." *Kaahumanu v. Cty. of Maui*, 315 F.3d 1215, 1219 (9th Cir. 2003) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S. Ct. 793, 95 L. Ed. 1019 (1951)).

To determine whether an official act falls within the "sphere of legitimate legislative activity," courts take a "functional approach." *Jones*, 9 F.4th at 1140. Under that approach, courts consider four factors: "(1) 'whether the act involves ad hoc decisionmaking, or the formulation of policy'; (2) 'whether the act applies to a few individuals, or the public at large'; (3) 'whether the act is formally legislative in character'; and (4) 'whether it bears "all the hallmarks of traditional legislation.' " *Kaahumanu*, 315 F.3d at 1220 (quoting *Bechard v. Rappold*, 287 F.3d 827 829 (9th Cir. 2002)).

Defendants contend that Defendants are entitled to legislative immunity in two respects. First, they argue that Defendants are immune to the extent they "act[ed] consistently with the legislatively approved budget and closing Miller Creek and Shutter Creek" and to the extent that

Governor Brown "recommend[ed] a budget to the state legislature" that proposed the closure of those two prisons. Motion at 40–42. Second, specifically with respect to Governor Brown, they contend that she is legislatively immune for any acts she took in exercising or failing to exercise her commutation powers. Motion at 30–32. Defendants are incorrect on both scores.

### 1. Defendants are not legislatively immune for their failure to use existing prison infrastructure to maximize social distancing for AICs.

As explained above, the Eighth Amendment required Defendants to protect AICs from the rapid and widespread transmission of COVID-19 in Oregon's prisons. As all public health experts agreed, throughout the pandemic, the "cornerstone" of COVID-19 protection and prevention was social distancing. But rather than use their existing prison infrastructure to maximize social distancing, Defendants did the opposite: they allowed two prison institutions— DRCI and OSPM, which collectively could have housed more than 800 AICs—to stand empty, and they closed two others.

Defendants contend that they were not required to open DRCI or OSPM because there "was no money or staff available" to do so at that time, Motion at 38–39,[98] and that they were not required to delay the closure of MCCF or SCCI because closing the prisons was "consisten[t] with the legislatively approved budget," Motion at 42. Defendants assert, mostly without explanation, that they are shielded from liability for those actions under the doctrine of legislative immunity. *See* Motion at 39 ("[E]xecutive branch officials have absolute legislative immunity for their participation in the legislative process." (citing *Bogan*, 523 U.S. at 55); *id.* at 42 ("[D]efendants are entitled to . . . legislative immunity for acting consistently with the

---

[98]    Defendants suggest that Plaintiffs are requesting that they should have "open[ed] prisons in two vacant buildings." Motion at 38. That's not what Plaintiffs argue. Plaintiffs argue that Defendants should have used two vacant *prisons*, designed to house AICs, to house AICs.

83 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

legislatively approved budget and closing Mill Creek and Shutter Creek.  Governor Brown has absolute legislative immunity for the act of recommending a budget to the state legislature.").

But neither constitutes an act falling within the "sphere of legitimate legislative authority" and thus neither is shielded under the doctrine of legislative immunity.  With respect to the former—allowing two prison buildings to stand vacant of AICs in the face of a deadly respiratory virus for which social distancing was a cornerstone of the nation's emergency response—Defendants do not explain at all how their actions constitute "participation in the legislative process."  *See* Motion at 39–40.  Indeed, quite the opposite: Defendants *did not even consider* approaching the legislature, the federal government, FEMA, or any other source of COVID-19 emergency funding to request the funding necessary to bring those vacant prison facilities online.  *See, e.g.*, Peters Depo. at 64:18–65:2 (Q: "[D]id you ever consider seeking the resources or the staffing to use the space at . . . DRCI or OSP to expand the usable space to create social distancing space for AICs?"  A: "I don't recall specifically having that conversation."  Q: "And if that conversation happened, would you have been involved in it?"  A: "Yes."); *see also id.* at 65:3–9 (Q: "Did you ever, in the early stage of the pandemic, ask the legislature or the Governor for additional funding or staff or reopen those facilities?"  A: "I don't recall, specifically."  Q: "Did you ever consider doing that?"  A: "I don't recall."); Robbins Depo. at 39:6–10 ("Did anyone ever . . . make a request of you for those costs during the pandemic for the purpose of creating space for social distancing for AICs?"  A: "No.").  Their failure to approach the legislature cannot constitute "participation in the legislative process."[99]

---

[99]    And in any event, *of course* the legislature had not budgeted the funds to reopen DRCI or OSP Minimum to aid in ODOC's pandemic response.  ODOC's budget for the 2019–2021 biennium—*i.e.*, the period during the COVID-19 pandemic—was developed by ODOC beginning in April 2018, *see* Robbins Depo. at 13:24-14:2, and adopted by the legislature in

Nor does Defendants' claim of immunity survive under the "functional approach" that the Court must apply. Defendants' conduct in allowing two vacant prison facilities to stand empty, without so much as considering whether or how to bring those facilities online to maximize social distancing, is, at best, an ad hoc decision for the purposes of the ODOC's emergency response, not the formulation of policy. *See Kaahumanu*, 315 F.3d at 1220 (first factor); *see also Cmty. House v. City of Boise*, 623 F.3d 945, 961 (9th Cir. 2010) ("An ad hoc decision is made with a particular end or purpose, as distinguished from a coordinated policy." (quotations omitted)). The decision also would not apply to the public at large, nor is it "formally legislative in character." *See id.* (second and third factors). And Defendants do not (and cannot) contend that their failures bear *any*—let alone *all*—of the "hallmarks of traditional legislation." *See id.* (fourth factor).

The same is true with respect to the Governor's decision to close MCCF and SCCI as the number of COVID-19 cases and deaths were rapidly increasing across ODOC. On this issue, Plaintiffs do not claim that Governor Brown is liable "for the act of recommending a budget to

---

September 2019, *see* Legislative Fiscal Office 2019-21 Budget Highlights (Sept. 2019), available at https://www.oregonlegislature.gov/lfo/Documents/2019-21%20Budget%20Highlights.pdf. In other words, the budget that Defendants claim limited ODOC's ability to take meaningful steps to protect AICs from widespread transmission of the deadly COVID-19 disease was created and approved well before COVID-19 landed in the United States.

The problem, of course, was not the budget itself, but was Defendants wholesale failures to even consider whether using additional space—space that it "had the authority to use but remained unused"—was a possibility. They did not. *See supra*; *see also* Robbins Depo. at 36:15-20 (Q: "So was there ever a conversation among the executive team members about what it might cost to reopen Deer Ridge Minimum for the purpose of creating social distancing for AICs during the COVID-19 pandemic?" A: "Not that I was aware of.").

What is more, it's not as there were no funding sources available. Over the course of the pandemic, ODOC encountered the need for additional funding for several aspects of its pandemic response. Robbins Depo. at 18:15–21. For those needs, ODOC readily requested funding from various sources, including from FEMA and federal COVID-19 relief funding packages. *See* Robbins Depo. at 18:15–24:17 (so describing those funding sources and the requests that ODOC made from them during for pandemic-related expenditures.

85 – PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

the state legislature." *But see* Motion at 42. Instead, they argue that Governor Brown was aware

of the known risks that COVID-19 presented to persons in custody, was presented with options

to manage the risk and declined to do so, and instead took steps to increase the risk by making it

more difficult to physical distance in the corrections setting. Her failure to abate the risk, and her

decision instead to increase it, is deliberate indifference.[100]

### 2. Governor Brown is not legislatively immune for her deliberately indifferent early release program.

Defendants also argue that Governor Brown is entitled to absolute legislative immunity

for her deliberately indifferent early release program. *See* Motion at 31–32.[101] This is also

wrong.

First, in determining early release criteria, Governor Brown exercised a fundamentally

*executive* function, not a legislative one. *Cf. Kaahumanu*, 315 F.3d at 1220 (test is a functional

---

[100]    In all events, legislative immunity should not apply, as a matter of law, in this context. Defendants assert immunity for high-level failures to request resources to remedy alleged violations of the Eighth Amendment's prohibition against cruel and unusual punishment. As the Supreme Court has acknowledged, the Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" and protects against deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). Those fundamental protections cannot fall to the State's claimed "lack of resources." *Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011). Thus, in this particular context legislative immunity is incompatible with, and must fall to, the overriding constitutional concerns of the Eighth Amendment.

[101]    Consistently with their strategy throughout this case, Defendants reprise their argument that Plaintiffs' clemency theory in any event fails because the Eighth Amendment did not require the Governor grant clemency to "nearly six thousand AICs." Motion at 28. But again, that is not what Plaintiffs argue. Plaintiffs repeatedly have explained, they do not claim that they were entitled to release from ODOC custody, nor do they seek damages for Governor Brown's failure to release them from custody. Plaintiffs allege that Defendants were deliberately indifferent in failing to implement and enforce social distancing, among other preventative strategies to reduce COVID-19 transmission, adults in their care and custody. Plaintiffs further allege that, not only did ODOC fail to implement social distancing where possible in its existing prison facilities, it and Governor Brown knew of those failures and failed to take any additional steps—for instance, meaningful consideration of population reduction as a strategy to protect AICs—to prevent further transmission and harm.

one).  In Oregon, the Governor's authority to grant clemency stems directly from the Oregon Constitution and is vested exclusively in the executive branch.  Or. Const. art V, § 14.  As Oregon courts have acknowledged, this "clemency power has always been a broad plenary power of the executive."  *Marteeny v. Brown*, 321 Or. App. 250, 280, 517 P.3d 343 (2022).  Thus, at its core, clemency is an executive, not a legislative, decision; legislative immunity does not apply to the acts of an executive officer engaging in a purely executive function.

Moreover, Governor Brown's creation of her release criteria does not meet the other factors that courts consider under "functional comparability" test.  *See Kaahumanu*, 315 F.3d at 1220.  In creating her early release criteria, she made an ad hoc decision to assist her in her executive role for a particular purpose.  "The decision was taken based on the circumstances of the particular case and did not effectuate policy or create a binding rule of conduct."  *Id.* Although the decision had an "immediate practical effect" on Plaintiffs, the criteria were for temporary: for emergency purposes in response to the COVID-19 pandemic.  *See* Ex. 75 (MANEY- 242522) ("Given what we now know about the disease and its pervasiveness in our communities, it is appropriate to release individuals who face significant health challenges should they contract COVID-19.").

Likewise, the Governor's act of creating release criteria was not formally legislative and does not bear the hallmarks of traditional legislation.  In fact, Governor Brown lacked legislative authority.  *See* Or. Const. art V, §§ 10–14.  And the creation of her early release criteria did not involve any actions that may otherwise bear the characteristics of a legislative function; she did not make recommendations to the legislature, did not call for a vote or debate, did not engage in any formal procedure, and did not convene or commence any administrative rulemaking process.  Nor did she create her early release criteria pursuant to, or in furtherance of, any statute, rule, or

legislative directive.  And she did not sign a bill into law or create an administrative process for her early release decisions.  *Cf. Bogan*, 523 U.S. at 55 (signing law into an ordinance was formally legislative act).  Although officials outside the legislative branch can be entitled to legislative immunity for certain actions, Governor Brown's actions here were not legislative. She is not immune from liability.

**B.    Nor does quasi-judicial immunity protect the Governor in this case.**

As Plaintiffs explained in their motion for partial summary judgment, ECF 510, under the doctrine of judicial immunity, judges are entitled to absolute immunity from civil damages for acts performed in their judicial capacities.  *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980).  Under the doctrine of "quasi-judicial immunity," derivative of that of judicial immunity, absolute immunity is extended to state officials who perform activities that are "functionally comparable" to that of a judge.  *Butz v. Economou*, 438 U.S. 478, 514, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978); *Swift v. California*, 384 F.3d 1184, 1188 (9th Cir. 2004) ("State '[o]fficials performing the duties of advocate or judge may enjoy [quasi-judicial] immunity for some functions . . . but that protection does not extend to many of their other functions.' " (quoting *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003)).

This "functional" approach again "looks to the nature of the function performed and not to the identity of the actor who performed it."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993); *Cleavinger v. Saxner*, 474 U.S. 193, 202, 106 S. Ct. 496, 88 L. Ed. 2d 507 (1985).  Courts therefore consider a non-exclusive list of factors in determining whether an officials functions are quasi-judicial in nature, including "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling

unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Cleavinger*, 474 U.S. at 202 (citing *Butz*, 438 U.S. at 512).

Defendants contend that Governor Brown is entitled to quasi-judicial immunity "for her early release decisions." Motion at 31. But Plaintiffs do not challenge any individual release decision. Nor do they contend that any individual within ODOC's initial release estimate should have been, but was not, granted early release. Instead, Plaintiffs challenge Defendants' failure to take steps to allow for social distancing in ODOC's institutions, for the purposes of preventing the rapid and widespread transmission of COVID-19. Population management (in the form of early release, using alternative space, or otherwise) is one tool that Defendants could have used to provide for that distancing. Indeed, as ODOC's corrections-setting partners made clear from the outset of the pandemic, it was necessary. *See supra* at Section II. But as explained above, Plaintiffs do not seek to hold Defendants liable for failing to reduce the prison population; they contend that Defendants failed entirely to take any meaningful steps to prevent the transmission of COVID-19 in prison, including failing to implement social distancing policies, failing to use alternative spaces to maximize distancing, failing to reduce the prison population, and instead reducing the space available (by closing institutions) for AICs to protect themselves from the deadly COVID-19 illness.

To be sure, even if individual release or clemency decisions were at issue, Defendant Governor Brown would not be entitled to quasi-judicial immunity. In Oregon, the decision to grant or deny clemency does not involve an adversarial proceeding. Instead, clemency may be initiated by the governor and resolved without input from either the recipient or district attorney. *Marteeny*, 321 Or. App. at 279–81. No procedural safeguards protect applicants' interests:

applicants are not, for example, entitled to an attorney; there are no formal or informal hearings to resolve disputes of fact or law; applicants cannot compel witnesses or engage in cross-examination; and there is no standard that entitles an applicant to relief (let alone any specific burden of proof). *See, e.g.*, ORS 144.650 (setting forth applicable procedures upon application). Individual decisions are not subject to appellate review. *See generally Eacret v. Holmes*, 215 Or. 121, 333 P.2d 741 (1958). And, as the courts have recognized, decisions are, in fact, frequently political. *Marteeny*, 321 Or. App. at 254 (*"*We are not called here to judge the wisdom of the Governor's clemency of these individuals; that is a political question."); *Haugen v. Kitzhaber*, 353 Or. 715, 742, 306 P.3d 592 (2013) ("Governors and presidents have granted clemency for a wide range of reasons, including reasons that may be political, personal, or 'private' . . . . ").

*Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir 1981), *holding limited by Swift*, 384 F.3d 1184, is not to the contrary. There, the Ninth Circuit extended absolute immunity to members of Oregon's Parole Board with regard to decisions the Board makes to grant, deny, or revoke parole and for actions "integral to those decisions." Decisions to grant, deny, or revoke parole in individual cases, however, are made in circumstances that absolute immunity was intended to protect—as the Ninth Circuit explained, " "[t]he daily task of both judges and parole board officials is the adjudication of specific cases or controversies." *Id.* at 1303. They "render impartial decisions in cases and controversies," have individual litigants before them, and in that sense are "functionally equivalent to . . . a judge." *Id.* Those are not the circumstances presented here. In arguing otherwise, Defendants mistake the import of the early release criteria; on its face, Plaintiffs' reference to, or reliance on, these criteria is not relevant to the type of individualized adjudications that courts have found entitled an official to quasi-judicial immunity.

## CONCLUSION

For all these reasons, the Court should deny Defendants' motion for summary judgment. With respect to all Defendants, including Defendants Patrick Allen and Governor Kate Brown, summary judgment is also improper to the extent that Defendants seek a ruling on Plaintiffs' vaccine-prioritization claim. Discovery has been stayed with respect to that claim and a ruling on it at this stage would be premature.

DATED this 8th day of January, 2024.

Respectfully submitted,

/s/ Nadia H. Dahab
**David F. Sugerman**, OSB No. 862984
**Nadia H. Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St Ste 600
Portland, OR 97205
Tel: (503) 228-6474
Fax: (503) 228-2556

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Franz Bruggemeier**, OSB No. 163533
OREGON JUSTICE RESOURCE CENTER
P.O. Box 5248
Portland, OR 97208
Tel: (503) 944-2270
Fax: (971) 275-1839