IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL MANEY; GARY CLIFT; GEORGE
NULPH; THERON HALL; DAVID HART;
SHERYL LYNN SUBLET; and FELISHIA
RAMIREZ, a personal representative for the
ESTATE OF JUAN TRISTAN, individually,
on behalf of a class of others similarly
situated,

               Plaintiffs,

      v.

STATE OF OREGON; KATE BROWN;
COLETTE PETERS; HEIDI STEWARD;
MIKE GOWER; MARK NOOTH; ROB
PERSSON; KEN JESKE; PATRICK
ALLEN; JOE BUGHER; and GARRY
RUSSELL,

               Defendants.

Case No. 6:20-cv-00570-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiffs Paul Maney, Gary Clift, Theron Hall, David Hart, and Sheryl Lynn Sublet,[1] adults in custody ("AIC") at Oregon Department of Corrections ("ODOC") institutions, along with Felishia Ramirez, the personal representative for the Estate of Juan Tristan (together, "Plaintiffs"), filed this civil rights class action against the State of Oregon, Colette Peters ("Peters"), Heidi Steward ("Steward"), Mike Gower ("Gower"), Mark Nooth ("Nooth"), Rob Persson ("Persson"), Joe Bugher ("Bugher"), and Garry Russell ("Russell") (together, "Defendants").[2]

Before the Court are three *Daubert* motions and Plaintiffs' motion to strike an expert declaration: (1) Defendants' motion to exclude the testimony of Dr. John Pfaff ("Pfaff") and to limit the testimony of Dr. Homer Venters ("Venters") (Defs.' First *Daubert* Mot. ("Defs.' First Mot."), ECF No. 499), (2) Defendants' motion to exclude the testimony of Dr. David Fleming ("Fleming") and Philip Stanley ("Stanley") (Defs.' Second *Daubert* Mot. ("Defs.' Second Mot."), ECF No. 502), (3) Plaintiff's motion to exclude the testimony of Dr. Kevin Cahill ("Cahill") (Pls.' *Daubert* Mot. ("Pls.' Mot."), ECF No. 508), and (4) Plaintiffs' motion to strike Cahill's declaration filed in response to Plaintiffs' *Daubert* motion (Pls.' Mot. Strike Cahill's Decl. ("Pls.' Mot. Strike"), ECF No. 579). All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. For the reasons that follow, the Court grants Defendants' motion to exclude Pfaff's testimony and to limit Venters' testimony, grants in part and denies in part Defendants' motion to exclude Fleming's and Stanley's testimony, denies

---

[1] Plaintiff George Nulph ("Nulph") dismissed all of his claims against Defendants on March 8, 2024. (Stipulation of Dismissal at 2, ECF No. 624.)

[2] Plaintiffs dismissed all claims against Defendant Patrick Allen on March 15, 2024. (Stipulation of Dismissal, ECF No. 628.) The Court granted summary judgment in favor of Defendants Kate Brown and Ken Jeske. (ECF No. 635.)

Plaintiffs' motion to exclude Cahill's testimony, and denies Plaintiffs' motion to strike Cahill's declaration.

## BACKGROUND

This is a class action against the State of Oregon and various high-level ODOC officials related to Defendants' response to the COVID-19 ("COVID") pandemic in ODOC institutions. Plaintiffs allege that Defendants violated the Eighth Amendment by subjecting AICs to cruel and unusual punishment by failing to protect them from heightened exposure to COVID. (Seventh Am. Compl. at 36-40, ECF No. 482.) Plaintiffs also allege negligence and wrongful death claims. (*Id.* at 40-42.) The Court discussed the relevant facts in its summary judgment opinion. (*See* ECF No. 635.) The case is set for trial in July 2024. (ECF No. 470.)

## LEGAL STANDARDS

Federal Rule of Evidence 702 provides the standards for expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702 (as amended Dec. 1, 2023). In other words, an expert must be qualified, and expert testimony must be both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

First, expert testimony must be relevant. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (quoting 3 Weinstein & Berger ¶ 702[02], p. 702-18); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))).

Second, the testimony must be reliable. The Ninth Circuit applies a flexible test:

> The test of reliability is flexible. The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. But these factors are meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case. The test is not the correctness of the expert's conclusions but the soundness of [the expert's] methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*City of Pomona*, 750 F.3d at 1044 (simplified). The Supreme Court has explained that, when considering non-scientific testimony, courts may consider whether the expert's "preparation is of a kind that others in the field would recognize as acceptable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999); *see also* FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). "It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Rule 702 was recently amended. "Effective December 1, 2023, Rule 702 clarified [that] the proponent of expert testimony must meet all of Rule 702's substantive standards for admissibility by a preponderance of evidence." *Cleaver v. Transnation Title & Escrow, Inc.*, No. 1:21-cv-00031-AKB, 2024 WL 326848, at *2 (D. Idaho Jan. 29, 2024); *see also* FED. R. EVID. 702 (explaining that the proponent of the evidence must demonstrate that it is more likely than not that the expert satisfies the admissibility requirements). The advisory committee cautions that courts had incorrectly "held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." FED. R. EVID. 702 advisory committee's note to 2023 amendment; *see also id.* (explaining that the admissibility standard "does not mean, as certain courts have held, that arguments about the sufficiency of an expert's basis *always* go to weight and not admissibility") (emphasis added). Instead, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements[.]" *Id.* "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.* "Because the rule change was a clarification, and not a change in the standard, the new language does not materially alter the admissibility of expert testimony." *Alivecor, Inc. v. Apple, Inc.*, No. 21-cv-03958-JSW, 2024 WL 591864, at *3 n.2 (N.D. Cal. Feb. 13, 2024) (citation omitted).

## DISCUSSION

Defendants move to exclude the testimony of Pfaff, Fleming, and Stanley, and to limit Venters' testimony. (Defs.' First Mot.; Defs.' Second Mot.) Plaintiffs move to strike Cahill's declaration and to exclude Cahill's testimony. (Pls.' Mot.; Pls.' Mot. Strike.)

///

///

I.    **DEFENDANTS' MOTIONS**

A.    **John Pfaff**

Defendants argue that the Court should exclude Pfaff's testimony in its entirety because the testimony is irrelevant and unreliable. (Defs.' First Mot. at 2, 5-10.) Pfaff opines that Governor Brown's "decision to categorically exclude those convicted of person offenses for clemency consideration during the pre-vaccine Covid epidemic significantly compromised any effort to ameliorate the risk the disease posed to prison populations and staff, if not making it simply impossible." (Decl. Anit Jindal Supp. Defs.' First Mot. Ex. 1, John Pfaff Expert Report at 18, ECF No. 500-1.)

The Court granted Defendants' motion for summary judgment related to Governor Brown's clemency decisions. (ECF No. 635.) Accordingly, the Court concludes that, without Plaintiffs' claim concerning Governor Brown's clemency decisions, Pfaff's analysis of Governor Brown's decision to exclude AICs convicted of person offenses from her clemency considerations no longer addresses "a fact in issue[.]" FED. R. EVID. 702(a). As such, Pfaff's testimony is no longer relevant. *See White v. L.A. Cnty.*, No. 19-cv-4669-DSF-RAOX, 2021 WL 9204238, at *2 (C.D. Cal. Apr. 6, 2021) (granting the defendant's unopposed request to exclude evidence in support of the theories dismissed at summary judgment); *Snyder v. Bank of Am., N.A.*, No. 15-cv-04228-KAW, 2020 WL 6462400, at *2 (N.D. Cal. Nov. 3, 2020) (excluding the expert's opinions because it was "not relevant to the only remaining claims in this case"); *In re: Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, No. 17-cv-06656-AB-FFMX, 2019 WL 7177735, at *2 (C.D. Cal. Nov. 4, 2019) (excluding testimony by two of the plaintiff's experts following the court's partial summary judgment order, which rendered that testimony irrelevant). For these reasons, the Court grants Defendants' motion to exclude Pfaff's testimony.

///

### B.      Homer Venters

Defendants argue that "Venters should not be permitted to testify about ODOC responses to Covid-19 beyond the experiences of the named plaintiffs." (Defs.' First Mot. at 10.) Plaintiffs do not oppose Defendants' motion and clarify that "Plaintiffs do not intend to offer testimony from Dr. Venters on the issues raised in Defendants' motion[,]" *i.e.*, on the experiences of other AICs beyond the named plaintiffs or on ODOC's COVID response generally.[3] (Pls.' First Resp. at 11.) Accordingly, the Court grants Defendants' motion to limit Venters' testimony.

### C.      David Fleming

Defendants argue that the Court should exclude Fleming's testimony in its entirety. (Defs.' Second Mot. at 3-10.) In the alternative, Defendants argue that the Court should limit Fleming's testimony. (*Id.* at 10-17.)

#### 1.      Fleming's Testimony in Its Entirety

Defendants argue that Fleming reviewed only a small amount of information and, thus, has an inadequate understanding of ODOC's response to COVID. (*Id.* at 1, 4-7.) According to Defendants, Fleming's testimony is unreliable because he relied on incomplete facts. (*Id.* at 4.) The Court disagrees and concludes that, as applied to Fleming, Defendants' concerns go to the weight of the evidence and can be addressed through cross examination.

##### a.      Fleming's Testimony

Plaintiffs retained Fleming to answer three questions: (1) "Did ODOC follow national recommendations and standards in the measures it implemented to prevent COVID-19?"; (2) "Did the prevention measures ODOC implemented work to prevent the introduction and spread

---

[3] Plaintiffs reserve the right to seek leave to respond on rebuttal if Defendants open the door on these issues through cross-examination. (Pl.'s Resp. Defs.' First Mot. ("Pl.'s First Resp.") at 11 n.13, ECF No. 566.)

of COVID-19?"; and (3) "Was there more ODOC could have done to prevent COVID-19 infections, hospitalizations, and deaths?" (Decl. Anit Jindal Supp. Defs.' Second Mot. ("Second Jindal Decl.") Ex. 2, David Fleming Expert Report ("Fleming Report") at 2, ECF No. 503-2.)

Appended to his report, Fleming listed the documents that he reviewed and on which he relied, largely identified with Bates numbers. (*Id.* at 130-37.) The list includes approximately one thousand documents.[4] (*Id.*) Because of the Bates number format of the list, the Court cannot ascertain the full scope of documents that Fleming consulted. However, it is clear that Fleming reviewed the following:

- various iterations of Oregon Health Authority ("OHA") guidance (*id.* at 8-10, 18, 132, 134, citing Bates 528678, 489389, 768470);

- various iterations of ODOC's centralized COVID response plan (*id.* at 8, 13, 131-32, 135, citing Bates 097734, 029792, 011188);

- ODOC's statewide COVID plan (*id.* at 51, 132, citing Bates 192058);

- ODOC's Prevention Readiness Assessment Tool and the documented inspections of ODOC's institutions (*id.* at 16-17, 131-32, citing Bates 091935, 098337, 108532, 141824, 145516, 146952, 223049; *see also id.* at 131-32, citing Bates 187337, 473600);

- Facility Infection Control Plans (*id.* at 19, 131, 133, citing Bates 081194, 115835, 026506, 108882, 108913, 084817, 084923, 096318, 025716, 082082, 122997, 108994, 094966, 108863, 279814);

///

---

[4] Several of the Bates-numbered documents are duplicates, listed multiple times.

- ODOC's COVID Infection Prevention, Testing, and De-Escalation Protocol (*id.* at 133-35, citing Bates 113794, 008241, 737619);

- Shutter Creek Correctional Institution's Pandemic Plan (*id.* at 135, citing Bates 103372);

- pictures of facilities (*id.* at 23, 136, citing Bates 035404);

- an assessment of the optimal population level (*id.* at 23, 131, citing Bates 231829);

- spreadsheets documenting ODOC's bed inventory (*id.* at 24, 134, citing Bates 579868, 566349, 230805);

- spreadsheets documenting COVID infections by institution (*id.* at 35, 131, citing Bates 318771);

- an employee count at ODOC institutions (*id.* at 137);

- miscellaneous documents such as documentation of contact tracing (*id.* at 29, 135, citing Bates 731716), ODOC air filter replacement logs (*id.* at 133, citing Bates 122689), and various memos and emails (*id.* at 15, 31, 40, 42, 51, 131-32, 136, citing Bates 491788, 110432, 480020, 539646, 312582; *see also id.* at 131, 134-35, citing Bates 309293, 147354, 242490, 242449, 570115, 242497, 478808);

- various iterations of Center for Disease Control ("CDC") policies (*id.* at 6, 10, 132, 136, Appx. 2, citing, *inter alia*, Bates 493212);

- Oregon Occupational Safety and Health ("OSHA") Division rules (*id.* at 17, 131, 134, citing Bates 153805, 186258);

- OSHA's response to a request for consultation (*id.* at 20, 132, citing Bates 098838);

PAGE 8 – OPINION AND ORDER

- the Governor's executive orders (*id.* at 137);

- the Governor's letter to the President of the Oregon Senate and the Speaker of the House regarding commutations (*id.* at 134, citing Bates 768225);

- Defendants' responses and objections to Plaintiffs' second and third set of interrogatories (*id.* at 130);

- Deposition transcripts and related exhibits of Brad Cain (an ODOC superintendent), Dr. Daniel Dewsnup ("Dr. Dewsnup") (ODOC's infectious disease specialist), Christopher DiGiulio (ODOC's chief medical officer), Greg Jones (ODOC's administrator for the Office of Population Management), Warren Roberts (ODOC's deputy medical director), Defendant Peters (Director of ODOC), Orion McCotter (OHA staff), Ann Thomas (OHA staff), Dean Sidelinger (State Health Officer at OHA), Patrick Allen (Director of OHA), and Devarshi Bajpai (from the Governor's office) (*id.*);

- declarations of Mark Stern and Joellen Klohn (experts retained to support Plaintiffs' motion for class certification) (*id.*);

- Plaintiffs' motion for class certification (*id.*);

- Plaintiffs' declarations filed in support of class certification (*id.*); and

- the Sixth Amended Complaint (*id.*).

In his deposition, Fleming provided a description of his document review process. Plaintiffs' counsel provided Fleming with "a set of documents that they thought were most

relevant[.]" (Depo. David Fleming ("Fleming Depo.") 30:14-15.)[5] Next, Fleming explained,

"as . . . I began to understand a bit more about what I needed to see, I would then ask them for

documents relating to a particular issue." (*Id.* at 30:18-21.) For example, he requested documents

referenced in other materials or entire categories of information, such as "all of the infection

control plans that were submitted by individual ODOC facilities." (*Id.* at 30:22-31:6.)

>           **b.      Analysis**

Defendants fault Fleming for relying on a small subset of documents "hand-selected by

plaintiffs' counsel" out of the 240,000 documents produced in discovery without conducting any

independent investigation. (Defs.' Second Mot. at 5-6.) Defendants further fault Fleming for

"skimm[ing]" some of the documents provided to him. (*Id.* at 7; *see also* Defs.' Reply Pls.' Resp.

Defs.' Second Mot. ("Defs.' Reply") at 2, ECF No. 582.)

Incomplete facts may render an expert opinion unreliable. *See Samuels v. Holland Am.

Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011) (affirming exclusion of an expert opinion

where the expert was "unable to provide any materials . . . to support his statement"); *Arjangrad

v. JPMorgan Chase Bank, N.A.*, No. 3:10-cv-01157-PK, 2012 WL 1890372, at *6 (D. Or. May

23, 2012) (concluding that the proffered expert opinion was unreliable because the expert "was

prevented from considering several key items"). However, an expert need not review every

document produced in discovery for the expert's opinion to be admissible. *See Arjangrad*, 2012

WL 1890372, at *6 ("It is common practice for counsel to select a subset of documents from the

---

[5] Excerpts of Fleming's deposition are available at Second Jindal Decl. Ex. 3, ECF No.
503-3 and Decl. David Sugerman Supp. Pls.' Resp. Defs.' Mots. ("Sugerman Decl.") Ex. 8, ECF
No. 568-8.

case to give to a potential expert, and courts generally permit that practice." (citing *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1260 (N.D. Cal. 1997))).[6]

Here, Fleming reviewed several versions of OHA's COVID-related guidance in correctional facilities, ODOC's centralized COVID plans, ODOC's Prevention Readiness Assessments (ODOC's internal audits of various institutions),[7] other policy documents, and various declarations and deposition transcripts. Defendants argue that, in addition to the documents that Fleming reviewed, Fleming should have reviewed the pleadings and declarations filed by Defendants, such as declarations by Bugher, Steward, Dr. Dewsnup, and management at each institution. (Defs.' Second Mot. at 7-8.) Defendants also argue that Fleming should have reviewed additional policy documents, such as individual facilities' pandemic plans and issue-specific policies communicated by emails and memos. (*Id.* at 8.) However, the Court concludes that Plaintiffs have met their burden of establishing by a preponderance of evidence that Fleming's testimony is based on sufficient facts. *See Gout v. 24HR Homecare LLC*, No. 21-cv-

---

[6] As Plaintiffs point out, Defendants' own experts followed a similar methodology: they relied on a set of documents provided by Defendants' counsel, requesting more documents from counsel when necessary. (*See* Sugerman Decl. Ex. 10, Depo. Michael Sulzinski ("Sulzinski Depo.") 9:16-25, ECF No. 568-10, "The process involved . . . counsel sending me documents. . . . In some cases I would say I would need more information . . . . They would send that information. Sometimes it was useful. Sometimes it was less useful."; Sugerman Decl. Ex. 11, Depo. Todd Wilcox ("Wilcox Depo.") 6:21-7:10, ECF No. 568-11, "[T]he documents are provided to me from counsel . . . then there were a number of things that I had questions about, additional information that I had some queries about, and so I asked the attorneys whether documents existed to answer my questions and I was supplied additional documentation as it existed.") Defendants' experts similarly did not review every declaration and deposition transcript filed by Plaintiffs when forming their opinions, and they "scanned" some of the documents provided by counsel to determine their relevance. (Sulzinski Depo. 54:2-12; Wilcox Depo. 6:8-20.)

[7] In support of their motion to exclude Stanley's testimony, Defendants argue that OHA's three iterations of COVID-related guidance in correctional facilities, ODOC's centralized COVID plans, and ODOC's compliance assessments are important policy documents. (Defs.' Second Mot. at 19; Defs.' Reply at 13.)

00852-PHX-DLR, 2023 WL 6127669, at *2 (D. Ariz. Sept. 19, 2023) ("Defendants fault [the expert] for not reviewing specific medical records . . . . These arguments go to the weight, not the admissibility, of [the expert's] opinion."); *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) ("That [the expert] did not address (or review) deposition testimony where defendants' employees testified to matters that purportedly undermine some of his opinions or assumptions does not make his testimony excludable. Those are grounds for cross-examination.").

The Court understands Defendants to argue that Fleming should have reviewed Bugher's declaration in particular because Bugher was one of two people, together with Russell, heading ODOC's Agency Operations Center in response to COVID. (*See id.* at 7.) The Court agrees that Bugher's declaration provides a concise summary of Defendants' view of their response to COVID. (*See* Anit Jindal Decl. Supp. Defs.' Mot. Summ J. Ex. E, Decl. Joe Bugher, ECF No. 516-1.) However, Fleming reviewed many of the materials summarized in Bugher's declaration. Even though Fleming did not review declarations by Bugher (the Assistant Director of Health Services for ODOC) or Steward (the Deputy Director of ODOC), he did review several versions of OHA's COVID-related guidance in correctional facilities, ODOC's centralized COVID plans, ODOC's Prevention Readiness Assessments, and other policy documents, in addition to deposition transcripts—and the attached exhibits—of Christopher DiGiulio (Chief Medical Officer of ODOC), Warren Roberts (Deputy Medical Director of ODOC), and Peters (Director of ODOC). (Fleming Report at 130-37; *see also* Fleming Depo. at 27:15-25, explaining that he read declarations filed by Defendants, including many of those cited in Defendants' expert report.)

///

Further, although Fleming did not review Dr. Dewsnup's declaration, he did review Dr. Dewsnup's deposition transcript. (Fleming Report at 130, listing Dr. Dewsnup's deposition transcript and attached exhibits among the documents reviewed.) At oral argument, Defendants argued that a declaration is a more comprehensive and reliable source of information because the declarant can include all of the content that they wish to provide without the constraints of the questions asked. While that may be true, the Court concludes that the standard for admission of an expert's testimony is not so exacting, and the expert's review of deposition transcripts over declarations is not grounds for exclusion. *Cf. Butler*, 984 F. Supp. at 1260-61 (concluding that the defendant's argument that the expert had "not read all of the depositions in this matter" and "that she has relied upon plaintiffs' counsel, a non-neutral source, to provide her with 'relevant' materials" was "more appropriately directed at the weight, rather than the admissibility, of this expert"). In addition, although Fleming may not have reviewed the declarations of management at *every* institution, he did review the deposition transcript of at least one of the superintendents (Brad Cain), all of the internal audits of ODOC facilities, and each institution's written infection control plans. (Fleming Report at 130-33.)[8]

Defendants also argue that Fleming was "willfully ignoran[t] of the facts[.]" (Defs.' Second Mot. at 9.) For example, Defendants argue that Fleming "falsely stated that ODOC isolated Covid-19 patients for just 72 hours or until no symptoms were detected." (*Id.*) But, as Plaintiffs note, Fleming correctly described the policy document that his report referenced.

---

[8] Defendants attach one institution's individual pandemic plan which they assert Fleming should have considered. (Second Jindal Decl. Ex. 6, ECF No. 504, attaching Bates 103372.) Yet the list of documents that Fleming reviewed includes that same document. (Fleming Report at 135, listing Bates 103372.) Similarly, Defendants argue that Fleming should have reviewed the Governor's letter to the President of the Oregon Senate and the Speaker of the House, but the list of documents that Fleming reviewed includes that document. (Defs.' Second Mot. at 17, citing Second Jindal Decl. Ex. 13, ECF No. 503-13; Fleming Report at 134, citing Bates 768225.)

(*Compare* Fleming Report at 14, summarizing that "the ODOC document continued to define the duration of medical isolation for an AIC with COVID-19 to be only 72 hours"; *with* Decl. Anit Jindal Supp. Defs.' Mot. Summ. J. Ex. 7 at 4, ECF No. 516-1, "ODOC[] will use medical isolation for 72 hours or until no symptoms of COVID-19 are detected.") Similarly, Defendants characterize Fleming as willfully ignoring ODOC's contact tracing policies and suggest that Fleming misstates ODOC's policies. (Defs.' Second Mot. at 9.) Yet Fleming's report is more narrow. Fleming acknowledged that "some contact tracing apparently was also taking place" but explained that ODOC "did not incorporate into its *Centralized Plan for COVID-19* the new CDC COVID-19 contact tracing recommendations, including recommendations for making testing routinely available to individuals who were contacts of cases or for testing of asymptomatic AICs and staff without known exposures." (Fleming Report at 29.) Although Defendants assert that ODOC later adopted a contact tracing policy by email, they do not dispute Fleming's assessment of the *Centralized Plan*.[9] To the extent Defendants believe the materials on which Fleming relied do not fully support his conclusions, Defendants may challenge the evidentiary support on cross-examination. *See Petersen v. United States*, No. 1:21-cv-00097-AKB, 2024 WL 1116161, at *5 (D. Idaho Mar. 14, 2024) (concluding that the defendant "should challenge the . . . purportedly incorrect information underlying the expert's opinions on cross-examination")

---

[9] Defendants generally disagree with Fleming's opinion that ODOC did not adopt certain policies, and Defendants point to their expert's opinion refuting Fleming's various conclusions. (Defs.' Second Mot. at 4, 10, citing Fleming Report at 11-13 and Second Jindal Decl. Ex. 9, Todd Wilcox Expert Report, ECF No. 503-9.) A genuine issue of fact remains as to whether ODOC adopted many of the listed policies. Regardless, "[t]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [the expert's] methodology." *Primiano*, 598 F.3d at 565 (citation omitted); *see also* FED. R. EVID. 702 advisory committee's note to 2023 amendment ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (simplified).

(citation omitted); *Johnson v. City of San Jose*, No. 21-cv-01849-BLF, 2023 WL 8852489, at \*4 (N.D. Cal. Dec. 21, 2023) ("Defendants' arguments as to the evidentiary support for [the expert]'s opinions go to the weight of his testimony, rather than its admissibility.") (citation omitted).

*Romero-Lorenzo* is instructive. *See Romero-Lorenzo v. Koehn*, 665 F. Supp. 3d 1056 (D. Ariz. 2023). In *Romero-Lorenzo*, pre-trial detainees challenged the defendants' response to COVID in a federal correctional complex. *See id.* at 1062. The plaintiffs and one of the defendants filed *Daubert* motions. *See id.* at 1062-63. The defendant challenged the plaintiffs' proposed expert testimony as unsupported by data and facts and instead consisting of speculative and conclusory opinions. (Def.'s *Daubert* Mot. at 4-9, Romero-Lorenzo v. Koehn, No. 2:20-cv-00901-DJH (D. Ariz. Aug. 5, 2022), ECF No. 189.) The plaintiffs challenged the defendants' proposed expert testimony because the expert had largely relied on information provided by defendants from defendants' employees, had "ignore[d] facts, data, and publicly available information, reports, and investigations that directly undermine his conclusions[,]" and had not attempted to verify the defendants' statements. (Pls.' *Daubert* Mot. at 1, 5, 7-13, Romero-Lorenzo v. Koehn, No. 2:20-cv-00901-DJH (D. Ariz. Aug. 5, 2022), ECF No. 185.) The court admitted both experts' testimony, concluding that the parties' disagreement about the soundness of the experts' methodologies, "as well as the appropriate weight to assign to each expert's opinions, are more properly addressed at trial." *Romero-Lorenzo*, 665 F. Supp. 3d at 1062-63.

Here, Fleming reviewed a significant number of documents in forming his opinion and adequately identified the documents upon which he relied. Unlike in the cases cited by Defendants, Fleming did not misstate *undisputed* facts or rely on inaccurate evidence. Further, the Court will not exclude Fleming's testimony because he reviewed only a subset of discovery.

PAGE 15 – OPINION AND ORDER

*See Arjangrad*, 2012 WL 1890372, at *6 ("[C]ourts generally permit that practice.") (citation omitted). In summary, the Court finds that it is more likely than not that Fleming's testimony "rests on a reliable foundation[.]" *Primiano*, 598 F.3d at 564 (quoting *Daubert*, 509 U.S. at 597).

Accordingly, as applied to Fleming, the Court concludes that Defendants' challenges—that Fleming reviewed an insufficient subset of discovery provided by counsel, skimmed some documents, did not review other relevant documents, and failed to conduct an independent investigation—go to the weight of his opinion, not its admissibility.[10] *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]") (simplified); *Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." (citing *Daubert*, 509 U.S. at 596)); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) ("Although Defendants . . . argued that [the expert]'s selection of documents to review went to the reliability of his 'methodology' as an expert, the district court correctly surmised that questions regarding the nature of [the expert]'s evidence went more to the 'weight' of his testimony—an issue properly explored during direct and cross-examination." (citing *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004))); *see also Palmer v. Cognizant Tech. Sols. Corp.*, No. 17-cv-6848-DMG-PLAX,

---

[10] Plaintiffs object to Defendants' citation to a document entitled "Novel Coronavirus Disease 2019 (COVID-19) Interim Investigation Guidelines December 9, 2020" (Second Jindal Decl. Ex. 10, ECF No. 503-10) as "unidentified and unauthenticated." (Pls.' Resp. Defs.' Second Mot. ("Pls.' Second Resp.") at 11 n.6, ECF No. 567.) The Court need not resolve Plaintiffs' objection because it does not rely on that exhibit herein.

2023 WL 4155403, at *12 (C.D. Cal. June 1, 2023) (concluding that the expert "relied on a substantial number of relevant . . . documents" from the opposing party and "[t]o the extent [the expert] could have consulted different documents to reach a different conclusion, that is a proper basis for cross-examination, not exclusion") (citations omitted); *OWLink Tech., Inc. v. Cypress Tech. Co.*, No. 8:21-cv-00717-SPG-KESX, 2023 WL 4291486, at *1-2 (C.D. Cal. Feb. 16, 2023) (rejecting the defendant's argument that expert testimony should be excluded because the expert "failed to conduct an adequate independent investigation because he relied on summaries of data provided by the parties[,]" and concluding that the defendant's argument goes to the weight of the testimony not its admissibility).

### 2. Fleming's Testimony Related to Clemency

Defendants argue in the alternative for exclusion of Fleming's testimony related to executive clemency. (Defs.' Second Mot. at 10, 15-17.) The Court granted Defendants' motion for summary judgment related to Governor Brown's clemency decisions. (*See* ECF No. 635.) Accordingly, Defendants' actions related to clemency are no longer "a fact in issue[.]" FED. R. EVID. 702(a). Thus, to the extent that Fleming analyzes Governor Brown's actions related to clemency,[11] that testimony is no longer relevant. *See White*, 2021 WL 9204238, at *2 (excluding evidence supporting theories dismissed at summary judgment). The Court grants Defendants' motion to exclude Fleming's testimony related to executive clemency.[12]

///

///

---

[11] For example, Fleming explains that "Oregon stood by and watched as other states took effective steps . . . to decarcerate their prisons[.]" (Fleming Report at 62.)

[12] Similarly, to the extent that Fleming's opinions relate to the sufficiency of OHA's guidelines and Plaintiffs' claims against Patrick Allen, that testimony is no longer relevant.

### 3.        Fleming's Testimony Related to Building Ventilation

Defendants also argue that the Court should exclude Fleming's testimony related to building ventilation because he has no experience, education, or training specifically related to heating, ventilation, and air conditioning systems ("HVAC"), air filtration, or building ventilation generally. (Defs.' Second Mot. at 11.) Defendants argue that Fleming's opinion is unreliable because he mischaracterizes the ventilation guidance documents that he cites and because Fleming had an incomplete awareness of ODOC's ventilation policies. (*Id.* at 11-15.) Plaintiffs respond that ventilation is a COVID prevention measure, and that Fleming is qualified as a public health expert to evaluate what standards and guidance ODOC did and did not adopt. (Pls.' Second Resp. at 17.) Further, Plaintiffs assert that Defendants merely construe the cited guidance differently than Fleming and that is not a basis to exclude the testimony. (*Id.* at 18.) The Court agrees with Plaintiffs.

### a.        Fleming's Qualifications and Testimony

Fleming is a board-certified physician in internal medicine and preventative medicine. (Fleming Report at 65.) He has over forty years of experience in public health practice and epidemiology. (*Id.* at 66-67.) For example, he has served as Oregon's state epidemiologist and as the CDC's deputy director. (*Id.* at 66.) As discussed, Plaintiffs retained Fleming to opine on whether ODOC followed national recommendations and standards in its COVID prevention measures, whether ODOC's prevention measures worked, and whether ODOC could have done more to prevent COVID-related harms. (*Id.* at 2.) Fleming surveyed national recommendations and standards related to numerous COVID prevention measures, including social distancing, masking, contact tracing, viral testing, medical isolation, quarantining, staff and AIC cohorting, training and communication, release planning, and building ventilation. (*Id.* at 3.)

When assessing whether ODOC could have done more to prevent COVID-related harms, Fleming observed that the "2020 CDC recommendations suggest the use of portable [high efficiency particulate air ("HEPA")] filters and [ultra-violet germicidal irradiation ("UVGI")]." (*Id.* at 48.) He surveyed and documented the "[s]ignificant scientific evidence supporting the importance of these recommended ventilation improvements[.]" (*Id.*) He cited articles from the Journal of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers; the American Journal of Public Health; the Pubmed National Library of Medicine; and the Department of Energy, in addition to OSHA rules. (*Id.* at 10, 27, 48.)

Fleming opined that ODOC "did not adopt the national recommendations regarding [minimum efficiency reporting value ("MERV")]-13 filtration standards for H[VA]C or HEPA filters and UVGI approaches, and instead remained silent on ventilation issues in their Covid-19 in Correctional Facilities policy documents." (*Id.* at 48.) He noted that ODOC did not incorporate any "mention of building ventilation" into its *Centralized Plan*. (*Id.* at 14.) He further opined that other states "install[ed] more effective building ventilation" but that ODOC did "not invest in HEPA portable air filters or ultra-violet germicidal irradiation (UVGI), even in their highest risk congregate living settings." (*Id.* at 4, 49.) Instead, ODOC "completely ignored national CDC recommendations . . . [on] building ventilation[.]" (*Id.* at 3.)

### b.    Qualifications

The Court concludes that Fleming is qualified to testify as an expert in this case. Fleming is clearly an expert in matters of public health and epidemiology, and he does not purport to be an expert on building ventilation specifically. Instead, he offers his expert opinion to compare national standards for COVID mitigation with ODOC's own measures. He need not demonstrate a more granular level of expertise in each of the COVID-related measures, such as masking, contact tracing, training and communication, or building ventilation. *See Moribe v. Am. Water*

*Heater Co.*, No. 21-cv-00254 HG-WRP, 2023 WL 8998745, at *6 (D. Haw. Dec. 28, 2023)

("Lack of detailed experience affects credibility rather than admissibility.") (citation omitted);

*JAS Supply, Inc. v. Radiant Customs Servs., Inc.*, No. 2:21-cv-01015-TL, 2023 WL 6366044, at

*2 (W.D. Wash. Sept. 29, 2023) (permitting the defendant's expert to opine on COVID's effect

on the import industry over the plaintiff's objections that the expert had "'no relevant education,

specialized knowledge, or expertise' regarding the COVID pandemic" because of the expert's

expertise on the import industry); *Bixby v. KBR, Inc.*, No. 3:09-cv-632-PK, 2012 WL 12952722,

at *2 (D. Or. Aug. 29, 2012) ("Where a witness' credentials are minimally sufficient to permit

the witness to be qualified as an expert, the courts lack discretion to exclude the witness'

proffered expert opinion on the grounds that the witness is not the best-qualified expert in the

area or that other witnesses had credentials of greater relevance or prestigiousness." (citing

*Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 114, 115-117 (1st Cir. 2010))); *In re*

*Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 889, 894 (C.D. Cal. 2004)

(explaining that "[a] court abuses its discretion when it excludes expert testimony solely on the

ground that the witness's qualifications are not sufficiently specific if the witness is generally

qualified" and concluding that the fact "[t]hat [the expert] specializes in perinatal and psychiatric

epidemiology should not preclude him from offering an opinion regarding cancer

epidemiology") (citation omitted); *Casey v. Ohio Med. Prod.*, 877 F. Supp. 1380, 1383 (N.D.

Cal. 1995) ("The fact that he is not an expert specifically in hematology or toxicology does not,

in view of his other medical experience, disqualify him as an expert on the issue in this case.").

### c.    Reliability

The Court also concludes that Defendants' arguments about the national standards—

including that Fleming did not acknowledge that one of the cited articles also stated that HVAC

upgrades were an unproven COVID mitigation strategy, that Fleming did not acknowledge that

the article indicated that MERV-13 filters are not compatible with every HVAC system, and that

the CDC did not publish its guidance on building ventilation until December 7, 2020[13]—are not

grounds for exclusion. The Court will "not exclude opinions merely because they are

impeachable." *City of Pomona*, 750 F.3d at 1044 (citation omitted). Again, Defendants'

arguments go to the weight of Fleming's testimony not its admissibility. *See Animal Legal Def.*

*Fund v. Olympic Game Farm, Inc.*, No. 3:18-cv-06025-RSL, 2023 WL 3304264, at *4 n.4 (W.D.

Wash. May 8, 2023) ("If, as plaintiff seems to suspect, this assertion of fact is untrue and

underlies one of [the expert]'s opinions, it may make that point on cross-examination."); *Wesco*

*Ins. Co. v. Smart Indus. Corp.*, No. 2:16-cv-01206-JCM-NJK, 2022 WL 3214693, at *3 (D. Nev.

Aug. 8, 2022) (concluding that, in response to the argument that the expert's "opinion was not

supported by sufficient documentation," the opposing party's "recourse is to cross-examine [the

expert] and present contrary evidence at trial").

Defendants correctly note that Fleming did not review two emails related to ODOC's

purchase of air filters. (Defs.' Second Mot. at 14.) One indicates that one ODOC facility, Warner

Creek Correctional Facility, purchased air filters "for use in segregation if needed" in April 2020,

and the other indicates that "portable HEPA filtration units have already been ordered for all

institutions" for use in connection with dental clinics and offices in July 2020. (Second Jindal

Decl. Exs. 16-17, ECF Nos. 503-16, 503-17; *see also* Decl. Julie Martin Opp'n Pls.' Mot. Class

Cert. ¶ 12, ECF No. 299, testifying that "Shutter Creek upgraded to MERV-13 filters in all units

in April 2020.") Accordingly, there is an inadequate basis for Fleming's opinion that ODOC did

"not invest in HEPA portable air filters" at all, although it remains unclear whether ODOC

---

[13] In advance of oral argument, Plaintiffs identified CDC guidance for businesses and
employers on building ventilation, published in May 2020. (Notice Ex. A at 7-8, ECF No. 618-
1.)

installed air filters in all congregate living settings or used UVGI. On the other hand, it is more likely than not that Fleming's other ventilation-related opinion—that ODOC did not incorporate ventilation improvement recommendations into ODOC's written policies for all facilities—is based on sufficient facts. (*See* Decl. Anit Jindal Supp. Defs.' Mot. Summ. J. Ex. 7.) The Court therefore denies Defendants' motion to exclude Fleming's testimony about building ventilation in its entirety, and will resolve through pretrial motions in limine the precise contours of Fleming's permissible ventilation-related testimony, specifically addressing Defendants' objection to Fleming's testimony that ODOC did not invest in HEPA portable air filters. *Cf. Nelson v. Costco Wholesale Corp.*, No. 20-cv-00250-PHX-MTL, 2022 WL 1638838, at *3 (D. Ariz. May 24, 2022) (denying motion to exclude expert testimony without prejudice).

### 4.    Conclusion

The Court denies Defendants' motion to exclude Fleming's testimony in its entirety, denies Defendants' motion to exclude all of Fleming's ventilation-related testimony, and grants Defendants' motion to exclude Fleming's testimony related to clemency.

### D.    Philip Stanley

Defendants argue that the Court should exclude Stanley's testimony in its entirety. (Defs.' Second Mot. at 1-2.) Defendants argue that Stanley relied on incomplete facts and improperly based his testimony on another expert's opinion. (*Id.* at 17-21.)

### 1.    Stanley's Testimony

Stanley has more than fifty years' experience in corrections, including working as a superintendent and a regional administrator. (Second Jindal Decl. Ex. 1, Philip Stanley Expert Report ("Stanley Report") at 19, ECF No. 503-1.) He also has experience overseeing a

settlement agreement, which included observing conditions in a jail during the pandemic. (Depo. Philip Stanley ("Stanley Depo.") at 26:2-11.)[14]

Stanley propounds that Defendants failed to provide leadership in response to COVID, such as by failing to make "definitive, timely decisions." (Stanley Report at 5-8.) He opines that Defendants failed at population management. For example, Stanley noted that in response to wildfires ODOC moved "to save the lives of inmates" by using empty facilities and that "ODOC could have enacted similar measures to increase use of facilities . . . to create more opportunity for social distancing[.]" (*Id.* at 8-10.) Stanley explained that ODOC had a "problem that developed early on in the messaging" around wearing a mask because "the messaging from top administrators" only required masks if six feet of distance could not be maintained. (*Id.* at 11.) He highlighted reports of officers refusing to wear masks and explained, "[n]one of the materials I reviewed showed me that the ODOC administration investigated this concern or took any type of corrective or disciplinary action." (*Id.*) He critiqued a message from Defendant Steward about masking because it did not communicate concern for AICs' health as a rationale for the mandate. (*Id.* at 12-13.) Stanley also evaluated messaging from Defendant Peters about social distancing. (*Id.* at 14.) Further, Stanley acknowledged a "few instances where examples of ventilation efforts were made," but assessed that "[t]here is no documentation" of a universal strategy. (*Id.* at 15.) Stanley also noted that ODOC did not adopt the CDC's recommendations to modify staff movement, minimize interactions between AICs from different housing units, and use telemedicine or staggered medication lines. (*Id.*)

///

---

[14] Excerpts of Stanley's deposition are available at Sugerman Decl. Ex. 21, ECF No. 568-21 and Second Jindal Decl. Ex. 18, ECF No. 503-18.

Stanley based his opinions on ODOC's March 2022 Statewide Plan, ODOC leadership emails and memos, depositions of Dr. Dewsnup, Freeburn, Frener, Imhoff, Jones, Cain, Washburn, and Defendants Gower, Peters, and Steward, letters between Governor Brown and Peters, sixteen of Plaintiffs' declarations, Oregon Wildfires-DOC Institution Evacuation Report, a letter from the Federal Public Defender to Governor Brown, the complaint, and various publications. (*Id.* at 3-4.) Stanley also cited Fleming's expert report several times. For example, Stanley cited Fleming's report for the opinions that (1) ODOC had to develop non-pharmaceutical preventative measures until a vaccine was developed (*id.* at 6), (2) mask noncompliance limited ODOC's attempt to control COVID (*id.* at 13), (3) national recommendations regarding building ventilation as a key non-pharmaceutical intervention were mostly ignored and not memorialized in written guidance (*id.* at 15), (4) none of the other enumerated CDC recommendations were adopted or included as policy in the *Centralized Plans* (*id.*), (5) during the first year of the pandemic when vaccines were not yet available, little was actually functioning in ODOC facilities to protect AICs (*id.* at 17), and (6) there was much more that ODOC could have done to prevent the spread of COVID (*id.* at 18).

In his deposition, Stanley testified that, as a corrections administrator, he "rel[ies] upon experts in their field to provide input." (Stanley Depo. at 137:19-20.) In other words, he does not only rely on data that he independently creates and does not independently verify every dataset to make correctional decisions. (*Id.* at 137:24-138:19; *see also id.* 138:19-25, "I'd never be able to, you know, make decisions if I had to . . . take that kind of time and that kind of effort to independently verify everything that I heard. I have to rely on my experience in corrections. To make a decision today, I have to rely on my experience in the past." (simplified).)

///

### 2.    Documents Reviewed

Defendants do not assert that Stanley's opinion is irrelevant.[15] Instead, as with Fleming, Defendants argue that Stanley reviewed insufficient information and thus has an inadequate understanding of ODOC's response to COVID to render his opinion admissible. (Defs.' Second Mot. at 17-20.) According to Defendants, Stanley's testimony is unreliable because Stanley relied on incomplete facts. The Court disagrees.

Defendants assert that Stanley relied on "a *single* policy document" (a March 2022 Statewide COVID Plan). (*Id.* at 17.) However, Stanley's report reveals that he not only reviewed the March 2022 Plan but also ODOC leadership emails and memos, depositions of Dr. Dewsnup, Freeburn, Frener, Imhoff, Jones, Cain, Washburn, and Defendants Gower, Peters, and Steward, letters between Governor Brown and Peters, sixteen AIC declarations, Oregon Wildfires—DOC Institution Evacuation Report, Fleming's expert report, a letter from the Federal Public Defender to Governor Brown, the complaint, and various publications. (Stanley Report at 3-4; *see also* Defs.' Second Mot. at 18 n.5, so noting.)[16] In connection with Fleming's expert report,

---

[15] However, as with Fleming, to the extent that Stanley opines on Governor Brown's actions related to clemency and the closure of two facilities, that testimony is not relevant. (*See* Stanley Report at 8, 10, explaining that "a shockingly low number" of AICs were released in Oregon and that "[a]nother indication of lack of commitment to population planning that occurred in the latter part of 2021 was when Mill Creek and Shutter Creek prisons were closed[.]")

[16] In reply, Defendants argue that Stanley's opinion should be excluded under Rule 37(c) of the Federal Rules of Civil Procedure because Stanley revealed in his deposition that he also reviewed earlier versions of ODOC's statewide plan, in violation of Rule 26(a)(2)(B)(ii)'s disclosure requirement. (Defs.' Reply at 15.) As discussed in connection with Plaintiffs' motion to strike, experts may clarify their methodology in response to critiques from the opposing party so long as they do not present new evidence or opinions. *See, e.g., Bryant v. Wyeth*, No. C04-1706 TSZ, 2012 WL 11924298, at *3 (W.D. Wash. July 19, 2012). The Court concludes that Stanley's clarification at his deposition was not an untimely expert opinion. Regardless, the Court concludes that Stanley's failure to include earlier versions of the statewide plan in his list of materials reviewed was harmless because Stanley's report did not rely on earlier versions of the plan, Defendants became aware of his reliance before the deadline for expert rebuttal reports,

Defendants argue that declarations from Defendants and management were "relevant statements of ODOC policy[.]" (Defs.' Second Mot. at 8.) Defendants further argue that "ODOC officials issued real-time directives in emails and memorandums[,]" constituting ODOC policy. (*Id.*) The Court therefore disagrees with Defendants' assertion that Stanley relied on a single policy document, but instead concludes that Stanley additionally relied on emails, memos, and depositions, which Defendants acknowledge memorialized ODOC's policy.

Further, Plaintiffs retained Stanley and Fleming to opine on different topics and thus, naturally, the scope of their document reviews differed. Unlike Fleming and because of their different areas of expertise, many of Stanley's opinions comment on specific examples of ODOC's alleged leadership failures, such as ODOC's failure to use empty facilities in response to COVID as it did in response to the wildfires, the wording of ODOC's mask mandate, ODOC's communication with staff about the mask mandate, ODOC's communication about social distancing, and ODOC's lack of universal, documented policy. The Court concludes that it is more likely than not that Stanley's testimony is based on sufficient facts because Stanley reviewed documents supporting those opinions.

Defendants also argue that Stanley's opinion is unreliable because he will testify that ODOC did not adopt COVID safety measures "with any strong effort" or that ODOC "half-heartedly" enacted CDC recommendations prior to March 2022, which Defendants dispute based on the evidence. (Defs.' Second Mot. at 19.) There remains a genuine issue of material fact about

---

the omission is not likely to disrupt trial, and there is no indication of bad faith. *See Enborg v. Ethicon, Inc.*, No. 2:20-cv-02477-AWI-BAK, 2022 WL 1651897, at *7 (E.D. Cal. May 24, 2022) (concluding that the plaintiff's late-filed supplemental expert report was harmless because the defendant knew of the expert's initial report, the supplemental report issued before the close of expert discovery, there was no disruption to trial, and there was no bad faith but merely simple neglect).

those conclusions, and Defendants' view of the evidence to the contrary does not render

Stanley's opinion inadmissible. *Cf. Weedman Ranches, Inc. v. Deere & Co.*, No. 3:08-cv-1090-

HA, 2010 WL 3069447, at *3 (D. Or. Aug. 3, 2010) ("Without question, defendant's arguments

and the declaration of [an opposing expert] cast considerable doubt on [the plaintiff's expert]'s

declaration. However, '[v]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriated means of attacking

shaky but admissible evidence.'" (quoting *Daubert*, 509 U.S. at 596)). Defendants argue that

Stanley will testify that "ODOC did nothing prior to March 2022." (Defs.' Second Mot. at 19.)

The Court agrees that any such testimony would not be based on sufficient facts, but the Court

does not read Stanley's report to so opine, but merely to comment on the strength of ODOC's

efforts. Defendants may renew their objection to portions of Stanley's testimony if Stanley

testifies that ODOC did not take *any* COVID-related actions before March 2022.

As discussed with Fleming's testimony, it is more likely than not that Stanley has a

sufficient basis to support his opinion, and Defendants' arguments go to the weight of the

evidence and are not grounds for exclusion. *See Palmer*, 2023 WL 4155403, at *12 (concluding

that arguments about inaccuracies and the scope of information reviewed could be addressed

through cross examination); *OWLink Tech., Inc.*, 2023 WL 4291486, at *1-2 (same); *Wesco Ins.*

*Co.*, 2022 WL 3214693, at *3 (same); *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d at

931 (same).

### 3.    Reliance on Another Expert

Finally, Defendants argue that Stanley's opinion is inadmissible because he adopted

many of Fleming's opinions without independently verifying them. (Defs.' Second Mot. at 20-

21.) The Court disagrees.

///

PAGE 27 – OPINION AND ORDER

Under some circumstances, Federal Rules of Evidence 702 and 703 "do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash. 2011) (citing *In re Imperial Credit Indus., Inc. Secs. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003)). "[W]hen an expert does not assess the validity of the opinions of another expert that [the expert] relies on and shows 'unblinking reliance' on another's opinions, that 'demonstrates that the methodology [the expert] used to formulate [the expert's] opinion was flawed under *Daubert* as it was not calculated to produce reliable results.'" *Pascal v. Nissan N. Am., Inc.*, No. 8:20-cv-00492-JLS-JDE, 2022 WL 19076763, at *16 (C.D. Cal. Dec. 21, 2022) (quoting *In re TMI Litig.*, 193 F.3d 613, 715 (3d Cir. 1999)); *see also Linares v. Crown Equip. Corp.*, No. EDCV 16-1637 JGB (KKx), 2017 WL 10403454, at *12 (C.D. Cal. Sept. 13, 2017) ("An expert may not present testimony that merely 'parrots' the opinions of others[.]") (citation omitted).

However, it is also "well established that an expert may rely on the opinions of other experts in formulating the expert's own opinions." *Moribe*, 2023 WL 8998745, at *9 (citation omitted). "Experts are permitted to rely on hearsay, including the opinions of other experts, if proper foundation is laid that others in the field would likewise rely on them." *Precision Seed Cleaners v. Country Mut. Ins. Co.*, No. 03:10-cv-01023-HZ, 2013 WL 943571, at *6 (D. Or. Mar. 11, 2013) (quoting *Mesfun v. Hagos*, No. 03-cv-02182, 2005 WL 5956612, at *18 (C.D. Cal. Feb. 16, 2005)); *see also Maples v. 3M Co.*, No. 16-cv-3576-GW(GJSX), 2017 WL 10592131, at *4 (C.D. Cal. May 15, 2017) (same); *Kovary v. Honeywell In'l, Inc.*, No. 10-cv-494-GW(CWX), 2014 WL 12564090, at *4 (C.D. Cal. Mar. 17, 2014) (same). "[E]xpert opinions may find a basis in part 'on what a different expert believes on the basis of expert

knowledge not possessed by the first expert.'" *In re Toyota Motor Corp. Unintended*

*Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal.

2013) (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002));

*see also Jensen v. EXC, Inc.*, 82 F.4th 835, 851 (9th Cir. 2023) (acknowledging that experts may

base their opinions on reports of other experts); *Presidio Components, Inc. v. Am. Tech.*

*Ceramics Corp.*, No. 14-cv-2061-H (BGS), 2016 WL 7319524, at *2 (S.D. Cal. Jan. 12, 2016)

("[E]xperts routinely rely upon other experts hired by the party they represent for expertise

outside of their field.") (citation omitted).

    In *In re Toyota*, the district court explained that relying on other experts is common:

> Indeed, this is common in technical fields. For example, a
> physician may rely for a diagnosis on an x-ray taken by a
> radiologist, even though the physician is not an expert in radiology.
> There is no general requirement that the underlying expert testify
> as well. There are limits to this general rule, however. Where the
> soundness of the underlying expert judgment is in issue, the
> testifying expert cannot merely act as a conduit for the underlying
> expert's opinion. Moreover, more scrutiny will be given to an
> expert's reliance on the information or analysis of another expert
> where the other expert opinions were developed for the purpose of
> litigation.

978 F. Supp. 2d at 1066 (simplified).

    The Court concludes that a corrections expert may rely on public health experts to

identify appropriate non-pharmaceutical measures for communicable disease prevention. Indeed,

if Stanley did *not* rely on public health expertise, his testimony would be vulnerable to challenge

based on Stanley's qualifications. (*See* Defs.' Reply at 17, arguing that Stanley was not qualified

independently to verify the reliability of Fleming's opinion.) Although perhaps some of

Stanley's opinions—such as relying on Fleming's report for the proposition that "precious little

was actually functioning in [ODOC] facilities to protect AICs from COVID-19"—may stray

closer to "unblinking reliance," the Court concludes that Defendants' concerns can be adequately

addressed through cross examination and are not a basis for exclusion. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.") (citing *Daubert*, 509 U.S. at 596); *In re Toyota*, 978 F. Supp. 2d. at 1073 ("[The defendant's] challenges regarding all of the materials that [the expert] did not review go to weight, not admissibility.").

For these reasons, the Court denies Defendants' motion to exclude Stanley's testimony. *See Moribe*, 2023 WL 8998745, at *9 (concluding that one expert may rely on the opinion of another expert and that "[g]aps in her own knowledge or specialization affect the weight of her testimony, not its admissibility"); *McCalla v. ACE Am. Ins. Co.*, No. 20-cv-01561-PHX-JAT, 2022 WL 2290552, at *4 (D. Ariz. June 24, 2022) ("[The expert] is not permitted to parrot the opinions of other experts or to vouch for those experts, but he can rely on the opinions stated by other experts.") (citations omitted); *Self v. FCA US LLC*, No. 1:17-cv-01107-LJO-SKO, 2018 WL 5999613, at *3 (E.D. Cal. Nov. 15, 2018) ("An expert may not merely act as a conduit for another expert's testimony or simply vouch for another expert, but relying on another expert's opinion in formulating her own opinion does not on its own run afoul of Rule 702."); *In re Bard IVC Filters Prod. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6554163, at *2 (D. Ariz. Dec. 22, 2017) ("[T]he Court does not agree with Defendants' assertion that some or all of the doctors' opinions must be excluded because they cite, refer to, or even rely on the opinions of other experts in this litigation. The doctors will not be permitted to parrot the opinions of other experts or to vouch for those experts, but they can rely on opinions stated by other experts.").

## II.    PLAINTIFFS' MOTIONS

### A.    Motion to Strike

Plaintiffs move to strike Cahill's declaration filed in support of Defendants' response to Plaintiffs' *Daubert* motion. (*See generally* Pls.' Mot Strike.) Plaintiffs argue that the declaration

provides untimely and improper expert opinions not previously disclosed, citing Rule 26(a) of the Federal Rules of Civil Procedure and Rule 702 of the Federal Rules of Evidence.[17] (*Id.* at 1-5.) Defendants respond that the Court should not strike Cahill's declaration because it does not alter or correct Cahill's opinions or the reasoning supporting his opinions but instead responds to Plaintiffs' challenges to his qualifications and chosen methodology. (Defs.' Mot. Strike Resp. at 2-6.) The Court agrees with Defendants.

"While Rule 26 demands that expert disclosures be 'complete,' there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might conceivably complain. . . . [A]n expert need not stand mute in response to an opposing party's *Daubert* motion." *Bryant*, 2012 WL 11924298, at *3 (citation omitted). "That is true especially where, as here, [the expert]'s declarations do not alter any of his theories, and instead merely expand upon or clarify initial opinions that the opposing party had an opportunity to test during discovery." *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 3:14-cv-00751GPCAGS, 2019 WL 1369007, at *10 (S.D. Cal. Mar. 26, 2019) (simplified). Here, Cahill's declaration "clarif[ies] the [expert's] methodology" and qualifications in light of Plaintiffs' criticism and does not "present new evidence or opinions."[18] *Bryant*, 2012 WL 11924298, at *3. Plaintiffs also argue that Cahill's declaration is improper because the Court, not Cahill, must determine whether Cahill is qualified as an expert and whether his testimony is

---

[17] At oral argument, Plaintiffs confirmed that they have now received the errata sheet that the reporter of Cahill's second deposition had inadvertently failed to send to Plaintiffs. (*See* Pls.' Mot. Strike at 5 n.3; Defs.' Resp. Pls.' Mot. Strike ("Defs.' Mot. Strike Resp.") at 8 n.1, ECF No. 614.)

[18] Because the Court concludes that Cahill's declaration was not untimely, the Court does not address Plaintiffs' argument that his declaration was neither substantially justified nor harmless. (Pls.' Mot. Strike at 9-10.)

relevant. (Pls.' Mot. Strike at 4-5, 8-9, pointing out that Cahill's declaration states that his analyses are "informative to the facts of this case" (citing Decl. Kevin Cahill Supp. Defs.' Resp. Pls.' Mot. ("Cahill Decl.") ¶ 31, ECF No. 534).) The Court considers Cahill's qualifications and the relevance of his testimony below.

For these reasons, the Court denies Plaintiffs' motion to strike. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316, 1322 (9th Cir. 1995) (considering the experts' affidavits and noting that experts may augment their reports with information about their methods but may not augment the substantive testimony); *see also Bona Fide Conglomerate, Inc.*, 2019 WL 1369007, at *10 (denying motion to strike the expert's supplemental declarations); *Bryant*, 2012 WL 11924298, at *3 (same); *Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 971 F. Supp. 2d 896, 903 (E.D. Mo. 2013) (same); *cf. Star Ins. Co. v. Iron Horse Tools, Inc.*, No. 16-cv-48-BLG-SPW-TJC, 2018 WL 3079493, at *8 (D. Mont. Feb. 7, 2018) (striking one paragraph that provided a new opinion not contained in the original expert report and denying motion to strike the rest of the expert's affidavit), *report and recommendation adopted*, 2018 WL 1378751 (D. Mont. Mar. 19, 2018); *see also In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *16 (N.D. Ill. Mar. 31, 2017) (explaining that "[s]uch clarifying declarations from experts are a routine part of *Daubert* motions" and collecting cases).

### B.  Kevin Cahill

Plaintiffs argue that the Court should exclude Cahill's testimony in its entirety because Cahill is not qualified and because his opinion is unreliable and irrelevant. (Pls.' Mot. at 1.) Plaintiffs argue that Cahill is unqualified because he is a labor economist and has no medical, epidemiologic, or public health expertise or training nor any experience related to correctional settings. (*Id.* at 4-7, 9-10.) Further, Plaintiffs argue that Cahill based his opinion on inaccurate

data and that Cahill's opinions do not relate to issues in Plaintiffs' complaint and otherwise do

not advance the resolution of this case. (*Id.* at 7-9, 11-19.) Defendants respond that Cahill is

qualified to offer opinions involving the application of statistical methods to the data and facts in

this case. (Defs' Resp. Pls.' Mot. ("Defs.' Resp.") at 1, 3-8, ECF No. 533.) Additionally,

Defendants respond that the datasets on which Cahill relied are commonly used by experts in

peer-reviewed publications, the statistical methods Cahill used are also uncontroversial, and

Cahill's opinions will be helpful to the jury. (*Id.* at 8-10.) The Court agrees with Defendants.

### 1. Cahill's Testimony

Cahill has over twenty years of experience in the field of economics. (Decl. Nadia Dahab

Supp. Pls.' Mot. Ex. A, Kevin Cahill Expert Report ("Cahill Report") at 102, ECF No. 509-1.)

He has doctoral-level training in applied econometrics, extensive experience as an economist

specializing in aging and labor economics, and has published work on various topics related to

applied microeconomics. (*Id.* at 1, 102-07; *see also* Cahill Decl. ¶ 5.) Further, he has some

experience with "health outcomes studies" and has given a presentation on the impact of COVID

on labor force participation. (Depo. Kevin Cahill ("Cahill Depo.") 10:2-12, 16:9-20.)[19]

Defendants retained Cahill to address several questions, including to (1) "assess the

extent to which AICs in ODOC facilities differed materially from AICs in other states with

respect to the prevalence of contracting COVID-19 while in custody;" (2) "assess the extent to

which ODOC facilities differed materially from those in other states with respect to COVID-19

policies and the extent to which the adoption of COVID-19 policies impacted COVID-19

outcomes in Oregon and in other states;" (3) "identify the most important factors, from a

---

[19] Excerpts of Cahill's deposition are available at Dahab Decl. Ex. B, ECF No. 509-2, Decl. Anit Jindal Supp. Defs.' Resp. Pls.' Mot. Ex. 1, ECF No. 536-1, and Decl. Anit Jindal Supp. Defs.' Resp. Pls.' Mot. Strike Ex. 1, ECF No. 615-1.

statistical standpoint, affecting whether an AIC would contract COVID-19 while in ODOC

custody[;]" and (4) "assess the extent to which wildfire evacuations in September 2020 impacted

COVID-19 outcomes within affected ODOC facilities[.]" (Cahill Report at 3.)

       Cahill used two primary datasets: an ODOC dataset and a UCLA Law School dataset.

(Cahill Depo. at 36:12-15; Cahill Report Appx. A at 95, 100.) Defendants provided the ODOC

dataset, which contains "individual AIC-level data" with 4,800 AIC-level positive COVID

diagnoses and "with many variables," including the "diagnosis date" as one of the variables.

(Cahill Depo. at 37:13-22.) The UCLA dataset derives from the UCLA School of Law, *UCLA*

*Law COVID Behind Bars Data Project* (2023), which is a compilation of data sourced from

departments of correction around the country. (*Id.* 36:16-23; Cahill Report at 100.) Other experts

have relied on the UCLA dataset, including the Journal of the American Medical Association,

Plaintiffs' expert (Fleming), and other publications. (*See* Cahill Decl. ¶ 18; Fleming Report at

45.)

       Cahill testified that he performed "certain tests" to determine if the data he used "is

accurate." (Cahill Depo. at 38:19-20.) For example, Cahill looked at "the ODOC data relative to

other studies," such as a United States Department of Justice study: Carson, E. A. et al., *Impact*

*of COVID-19 on State and Federal Prisons, March 2020–February 2021* (2022),

https://perma.cc/2WEN-BEFH. (*Id.* at 40:11-41:5; *see also* Cahill Decl. ¶¶ 14-16, explaining that

he validated both datasets by performing standard internal and external validity checks such as

comparing the datasets to data collected by The Marshall Project and researchers at the

University of North Carolina.) Cahill produced the computer programming code reflecting the

results of his internal consistency analyses. (Cahill Decl. ¶ 15.) Cahill "found the data to be

accurate when doing those comparisons." (Cahill Depo. 40:18-19.)

Using the two datasets, Cahill performed statistical analyses such as descriptive analyses, regressions, and hypothesis tests. (Cahill Decl. ¶ 21; *see, e.g.*, Cahill Report at 11, 13.) According to Cahill, "[t]he statistical methods used by econometricians are universal and can be, and routinely are, applied to many different fields, including epidemiology." (Cahill Decl. ¶ 6; *see also* Decl. Ann Thomas Supp. Defs.' Resp. Pls.' Mot. ¶ 4, ECF No. 535, "None of the statistical or econometric analyses described in Dr. Cahill's report and declaration require experience or expertise as an epidemiologist.") For example, Cahill looked at the number and percentage of AICs who tested positive for COVID in Oregon and other states and calculated the median. (Cahill Report at 6-7.) He also assessed the "progression of outcomes over time" by examining the weekly change in number and percentage of AICs testing positive. (*Id.* at 7.) From those statistical analyses, Cahill opined, for example, "a state-level analysis of weekly changes in the number and percentage of AICs testing positive for COVID-19 from February 28, 2020 to May 31, 2022, shows that, for nearly the entire time period, the prevalence of COVID-19 among Oregon's AICs fell below the average for all other states, all Western states, and all states in the Pacific Northwest." (*Id.* at 4.)

By comparing Oregon's policy adoption dates with other states and comparing the number of AICs testing positive for COVID, Cahill opined that "states that adopted legal visitation restrictions and masking policies earlier than others did not experience a lower percentage of AICs who contracted COVID-19 while in custody." (*Id.* at 9-11.) Applying facility-level regression models, he found that "the change in the percentage of AICs testing positive over the previous day, week, two weeks, and month within an AIC's facility [was] the predominant driver of whether an individual AIC tested positive at a given time[.]" (*Id.* at 17, 27.)

2.      **Qualifications**

Plaintiffs argue that Cahill is unqualified because he does not have medical, epidemiologic, or public health expertise or training nor any experience related to correctional settings. (Pls.' Mot. at 4, 10.) The Court disagrees.

The record demonstrates that Cahill is clearly an expert in econometrics and statistical analyses, and he does not purport to be an expert on epidemiology. Instead, he offers his expert opinion to perform statistical analyses on various datasets, and he need not demonstrate epidemiological or correctional-setting expertise to perform statistical analyses. *See JAS Supply, Inc.*, 2023 WL 6366044, at *2 (permitting the defendant's expert to opine on COVID's effect on the import industry over plaintiff's objections that the expert had "no relevant education, specialized knowledge, or expertise regarding the COVID pandemic" because of the expert's expertise on the import industry) (simplified); *Ocampo v. Corizon, LLC.*, No. 1:18-cv-00047-DCN, 2020 WL 6219790, at *6-8 (D. Idaho Oct. 21, 2020) (admitting an expert's report opining on medical care in a correctional facility even though the expert had never worked in a correctional setting nor with patients with the relevant medical condition), *aff'd sub nom.*, No. 20-35990, 2022 WL 229093 (9th Cir. Jan. 25, 2022); *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1151 (N.D. Cal. 2018) (admitting an expert biostatistician's statistical analyses of rodent carcinogenicity studies over the objections that "his research has focused on dementia and other aging-related diseases" and he did not know the difference between two kinds of tumors relevant to the case because the expert was qualified to offer opinions on statistical analysis and his lack of specialized knowledge could be addressed on cross examination), *aff'd sub nom. Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021); *Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1024 (E.D. Cal. 2011) (concluding that an expert in mathematics and statistical analyses may testify, and noting that the fact that the expert "is not an epidemiologist is not at all

decisive, as his understanding of statistical principles and methodology relevant to the design and

interpretation of epidemiological studies is thorough and clear") (citation omitted); *In re Apollo*

*Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 963-64 (D. Ariz. 2007) ("[T]he Court is satisfied that

[the expert]'s published work and expertise in general econometrics meets the requirements of

admissibility under *Daubert I* and its progeny. Defendants' specific objections concern matters

that go to the weight of the evidence and are appropriately addressed on cross-examination.")

(citation omitted); *In re Silicone Gel Breast Implants*, 318 F. Supp. 2d at 889 (explaining that

"[a] court abuses its discretion when it excludes expert testimony solely on the ground that the

witness's qualifications are not sufficiently specific if the witness is generally qualified" and "[a]

lack of specialization affects the weight of the expert testimony, not its admissibility.") (citations

omitted).

### 3.    Reliability

Plaintiffs also argue that the data on which Cahill relied is incomplete and therefore his

opinion is unreliable. (Pls.' Mot. at 11-16.) The Court disagrees.

Plaintiffs argue that Cahill's methodology is unsound because he assumed the accuracy

of the ODOC dataset, does not know how the data was collected, does not understand how

ODOC diagnosed AICs as COVID-positive or negative, does not know how tests were

administered, and does not know whether more AICs contracted COVID but were not

"diagnosed." (*Id.* at 11.) Further, Cahill does not know how other states collected the data found

in the UCLA dataset. (*Id.* at 12.) Plaintiffs point out that the related UCLA website warns that

"testing data are not always made available" and "we know that testing practices vary widely by

carceral agency." (*Id.*) "As a result, true case counts are likely higher than reported[.]" (*Id.*)

Finally, Plaintiffs argue that Cahill's reliance on the two datasets alone is contrary to established

epidemiological methods for the study of disease in a given population as evinced by his opinion

on the "prevalence of COVID" across ODOC institutions.[20] (*Id.* at 13.) Plaintiffs assert that

"prevalence" is an epidemiological term of art and that Cahill's method does not properly

analyze the "presence of disease in a population at a particular point in time." (*Id.*)

Plaintiffs' suggestion that Cahill did not use the term "prevalence" as an epidemiologist

would does not require exclusion. Cahill clarified in his deposition that he used "prevalence" to

mean instances of a positive COVID test (Cahill Depo. at 26:15-23), and Plaintiffs may elicit any

necessary clarification through cross examination. *Cf. Monroe*, 766 F. Supp. 2d at 1024 ("[The

expert's] findings are all reported in the language of a statistician. At no time does [the expert]

attempt to offer a medical or epidemiological opinion.").

Even though Cahill did not know the details about how ODOC diagnosed AICs as

COVID-positive or negative, how tests were administered, or whether more AICs contracted

COVID but were not "diagnosed," it appears that Cahill "used the best available data[.]"

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (citation omitted). The Court

finds that it is more likely than not that other experts would reasonably rely on the same datasets

and that Cahill's testimony "rests on a reliable foundation[.]" *Primiano*, 598 F.3d at 564 (quoting

*Daubert*, 509 U.S. at 597); *see Hardeman*, 997 F.3d at 962 ("[T]he judge should only exclude

the evidence if the flaw is large enough that the expert lacks 'good grounds' for [the expert's]

conclusions." (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2nd Cir.

2002))); *see also Romero-Lorenzo*, 665 F. Supp. 3d at 1062-63 ("The parties disagree about the

soundness of some experts' methodologies, but those disputes, as well as the appropriate weight

---

[20] Cahill opined, for example, that "a state-level analysis of weekly changes in the number and percentage of AICs testing positive for COVID-19 from February 28, 2020 to May 31, 2022, shows that, for nearly the entire time period, the *prevalence of COVID-19* among Oregon's AICs fell below the average for all other states, all Western states, and all states in the Pacific Northwest." (Cahill Report at 4, emphasis added.)

to assign to each expert's opinions, are more properly addressed at trial."); *OWLink Tech., Inc.*, 2023 WL 4291486, at *1-2 (rejecting the defendant's argument that expert testimony should be excluded because the expert "failed to conduct an adequate independent investigation because he relied on summaries of data provided by the parties[,]" and concluding that the defendant's argument goes to the weight of the testimony not its admissibility); *Monroe*, 766 F. Supp. 2d at 1024 (admitting an expert's statistical analysis of epidemiological studies where the expert "did not determine what data would be collected in any of these studies, nor did he collect the data himself").

At oral argument, Plaintiffs explained that they are not arguing that Cahill should not have used these specific datasets but that Cahill did not take into account other relevant considerations. Plaintiffs' challenges go to the weight of Cahill's opinion, not its admissibility. *See Wendell*, 858 F.3d at 1237 ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]") (simplified); *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) ("[O]bjections to a study's completeness generally go to 'the weight, not the admissibility of the statistical evidence,' and should be addressed by rebuttal, not exclusion[.]" (quoting *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995), and citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977))); *Hangarter*, 373 F.3d at 1017 n.14 ("[T]he district court correctly surmised that questions regarding the nature of [the expert]'s evidence went more to the 'weight' of his testimony—an issue properly explored during direct and cross-examination." (citing *Children's Broad. Corp.*, 357 F.3d at 865)); *Hemmings*, 285 F.3d at 1188 ("[I]n most

cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.") (citation omitted).[21]

### 4.    Relevance

Finally, Plaintiffs argue that Cahill's opinion will not assist the trier of fact to understand the evidence or determine a fact in issue. (Pls.' Mot. at 16-19.) The Court disagrees.

Cahill opines that "states that adopted legal visitation restrictions and masking policies earlier than others did not experience a lower percentage of AICs who contracted COVID-19 while in custody." (Cahill Report at 9.) Plaintiffs argue that Cahill's opinion is unhelpful because he only addresses two COVID-related policies (visitation and masking), excluding analysis of quarantine, testing, transfer, or other social distancing policies, and because the analysis does not address whether the policies were actually implemented and enforced. (Pls.' Mot. at 16-17.) Plaintiffs also argue that Cahill's conclusion that "the change in the percentage of AICs testing positive over the previous day, week, two weeks, and month within an AIC's facility [was] the predominant driver of whether an individual AIC tested positive at a given time" will not assist the trier of fact. (*Id.* at 19; Cahill Report at 24.)

The Court cannot conclude that "the exclusion of . . . [other variables] rendered the data set so incomplete 'as to be irrelevant.'" *Hemmings*, 285 F.3d at 1189 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)). Plaintiffs may highlight the limited scope of Cahill's analysis and his arguably circular reasoning related to the "predominant driver" of a positive COVID test to the jury through cross examination. Further, although Plaintiffs argue that their case rests not

---

[21] To the extent that Plaintiffs argue in their motion to strike that Cahill's statistical analyses are not the product of reliable principles and methods (Pls.' Mot. Strike at 3, 7-8), the Court disagrees. Defendants have satisfied their burden of demonstrating that Cahill reliably applied scientific methods: descriptive statistics, hypothesis testing, and regression analyses. (*See* Defs.' Resp. at 15-21.)

on whether Defendants adopted policies in response to COVID but on whether Defendants implemented those policies (Pls.' Reply Defs.' Resp. Pls.' Mot. at 6, ECF No. 581), evidence of the steps that Defendants *did* take in response to COVID is relevant to Defendants' defense. The Court finds that Cahill's opinion satisfies *Daubert*'s relevance standard. *See Bazemore*, 478 U.S. at 400 ("[I]t is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a . . . case."); *Hemmings*, 285 F.3d at 1188 (rejecting the argument that "statistical analysis should have been excluded because it did not 'eliminate all of the possible'" contributing factors).

For all of these reasons, the Court denies Plaintiffs' motion to exclude Cahill's testimony.

## CONCLUSION

For the reasons stated, the Court GRANTS Defendants' first *Daubert* motion (ECF No. 499); GRANTS IN PART and DENIES IN PART Defendants' second *Daubert* motion (ECF No. 502); DENIES Plaintiffs' *Daubert* motion (ECF No. 508); and DENIES Plaintiffs' motion to strike (ECF No. 579) as follows:

- GRANTS:
  - Defendants' motion to exclude Pfaff's testimony and to limit Venters' testimony (ECF No. 499); and
  - Defendants' motion to exclude Fleming's testimony related to clemency (ECF No. 502).

- DENIES:
  - Defendants' motion to exclude Fleming's testimony in its entirety, Fleming's testimony related to building ventilation in the alternative, and Stanley's testimony (ECF No. 502);

- o   Plaintiffs' motion to exclude Cahill's testimony (ECF No. 508); and

- o   Plaintiffs' motion to strike Cahill's declaration (ECF No. 579).

**IT IS SO ORDERED.**

DATED this 19th day of April, 2024.

HON. STACIE F. BECKERMAN
United States Magistrate Judge