IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL MANEY; GARY CLIFT; GEORGE
NULPH; THERON HALL; DAVID HART;
SHERYL LYNN SUBLET; and FELISHIA
RAMIREZ, a personal representative for the
ESTATE OF JUAN TRISTAN, individually,
on behalf of a class of others similarly
situated,

            Plaintiffs,

      v.

STATE OF OREGON; KATE BROWN;
COLETTE PETERS; HEIDI STEWARD;
MIKE GOWER; MARK NOOTH; ROB
PERSSON; KEN JESKE; PATRICK
ALLEN; JOE BUGHER; and GARRY
RUSSELL,

            Defendants.

Case No. 6:20-cv-00570-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiffs Paul Maney ("Maney"), Gary Clift ("Clift"), Theron Hall ("Hall"), David Hart ("Hart"), and Sheryl Lynn Sublet ("Sublet"),[1] adults in custody ("AIC") at Oregon Department of Corrections ("ODOC") institutions, along with Felishia Ramirez ("Ramirez"), the personal representative for the Estate of Juan Tristan ("Tristan") (together, "Plaintiffs"), filed this civil rights class action pursuant to 42 U.S.C. § 1983 against the State of Oregon, Kate Brown ("Governor Brown"), Colette Peters ("Peters"), Heidi Steward ("Steward"), Mike Gower ("Gower"), Mark Nooth ("Nooth"), Rob Persson ("Persson"), Ken Jeske ("Jeske"), Joe Bugher ("Bugher"), and Garry Russell ("Russell") (together, "Defendants").[2]

Several motions are currently pending before the Court: (1) Defendants' motion for summary judgment on all claims (ECF No. 512), (2) Defendants' motion for partial summary judgment on claims against Jeske (ECF No. 494), (3) Defendants' motion for partial summary judgment related to the Oregon Tort Claims Act's ("OTCA") single accident or occurrence limitation (ECF No. 493), (4) Defendants' motion for partial summary judgment related to damages and class certification of Plaintiffs' state law claims (ECF No. 489), (5) Defendants' motion in the alternative to modify the class definition (ECF No. 496), and (6) Plaintiffs' motion for partial summary judgment (ECF No. 510).

All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. For the reasons that follow, the Court (1) grants in part and denies in part Defendants' motion for summary judgment on all claims, (2) grants Defendants' motion for

---

[1] Plaintiff George Nulph ("Nulph") dismissed all of his claims against Defendants on March 8, 2024. (Stipulation of Dismissal at 2, ECF No. 624.)

[2] Plaintiffs dismissed all claims against Defendant Patrick Allen ("Allen") on March 15, 2024. (Stipulation of Dismissal, ECF No. 628.)

partial summary judgment on claims against Jeske, (3) denies with leave to renew post-trial Defendants' motion for partial summary judgment related to the OTCA single accident or occurrence limitation, (4) denies Defendants' motion for partial summary judgment related to damages and class certification of Plaintiffs' state law claims, (5) denies Defendants' motion in the alternative to modify the class definition, and (6) grants in part and denies in part Plaintiffs' motion for partial summary judgment on Defendants' affirmative defenses.

## BACKGROUND[3]

This is a class action against the State of Oregon, the former governor of Oregon, the Oregon Corrections Enterprises ("OCE") Administrator, and various high-level ODOC officials related to Defendants' response to the COVID-19 ("COVID") pandemic in ODOC institutions.

## I.    CONTEXT

ODOC is a State of Oregon executive agency which the governor oversees. *See* OR. REV. STAT. ("ORS") §§ 401.168(1), 423.020. At the beginning of the COVID pandemic and the inception of this case, ODOC had fourteen active facilities across Oregon: Coffee Creek Correctional Facility ("CCCF"), Columbia River Correctional Institution ("CRCI"), Deer Ridge Correctional Institution ("DRCI"), Eastern Oregon Correctional Institution ("EOCI"), Mill Creek Correctional Facility ("MCCF"), Oregon State Correctional Institution ("OSCI"), Oregon State Penitentiary ("OSP"), Powder River Correctional Facility ("PRCF"), Santiam Correctional Institution ("SCI"), Shutter Creek Correctional Institution ("SCCI"), Snake River Correctional Institution ("SRCI"), South Fork Forest Center ("SFFC"), Two Rivers Correctional Institution

---

[3] Many facts included in this background section are undisputed, but some are not. "Where the evidence is in conflict, [the Court] recount[s] it in the light most favorable to . . . the non-moving party." *Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019) (per curiam).

("TRCI"), and Warner Creek Correctional Facility ("WCCF"). (*See* Decl. Nadia Dahab ("Dahab Decl.") Supp. Pls.' Resp. Br. All Claims ("Pls.' Resp. All Claims") Ex. 13 at 5, 9, ECF No. 547-13); *see also* Or. Dep't. of Corr., *About Us: Prison Locations*, https://web.archive.org/web/20200406194705/https://www.oregon.gov/doc/about/Pages/prison-locations.aspx (Apr. 6, 2020). OCE is a semi-independent state agency that runs jobsites for AICs housed in several ODOC institutions. *See* ORS §§ 421.344, 421.354.

## II.    THE PARTIES

Maney is an AIC at OSCI in Salem, Oregon, and Clift was previously incarcerated at OSCI during the Damages Class period. (Seventh Am. Compl. ("SAC") ¶¶ 3-4, ECF No. 482.) Hall is an AIC at OSP in Salem, Oregon, and Hart was previously incarcerated at OSP during the Damages Class period. (*Id.* ¶¶ 6-7.) Sublet was previously incarcerated at CCCF in Wilsonville, Oregon. (*Id.* ¶ 8.) Ramirez is the personal representative for the Estate of Tristan, who contracted COVID while incarcerated at OSP and subsequently died. (*Id.* ¶ 9.)

The State of Oregon is a sovereign state entity with the capacity to sue and be sued pursuant to the OTCA. (*Id.* ¶ 10.) At all relevant times, Governor Brown was the Governor of the State of Oregon (*id.* ¶ 11); Peters was the Director of ODOC (*id.* ¶ 12); Steward was the Deputy Director of ODOC (*id.* ¶ 13); Gower was ODOC's Assistant Director of Operations (*id.* ¶ 14); Nooth was ODOC's Eastside Institutions Administrator and was responsible for operations at six ODOC institutions (*id.* ¶ 15); Persson was ODOC's Westside Institutions Administrator and was responsible for the remaining eight ODOC institutions (*id.* ¶ 16); Bugher was the Assistant Director of Health Services for ODOC (*id.* ¶ 19); Russell was the Chief of Security for ODOC (*id.* ¶ 20); and Jeske was the OCE Administrator (*id.* ¶ 17). Bugher and Russell led ODOC's Agency Operations Center ("AOC") during the relevant time period. (Decl. Anit Jindal Supp.

Defs.' Mot. All Claims ("Jindal Decl.")[4] Ex. D, Decl. Garry Russell ("Russell Decl.") ¶ 11;

Jindal Decl. Ex. E, Decl. Joe Bugher ("Bugher Decl.") ¶ 2; Decl. Heidi Steward Supp. Defs.'

Resp. Pls.' Mot. TRO ("Steward Decl.") ¶ 11, ECF No. 83.)

## III.    THE CLAIMS

Plaintiffs allege that Defendants violated the Eighth Amendment by subjecting AICs to

cruel and unusual punishment by failing to protect them from heightened exposure to COVID.

(SAC ¶ 91.) Among other allegations, Plaintiffs assert that Defendants failed promptly and

continuously to implement and enforce a mask mandate; screen employees for COVID

symptoms and exposure when entering ODOC facilities; provide COVID testing to AICs with

COVID symptoms or those exposed to COVID; follow Centers for Disease Control and

Prevention ("CDC") guidelines and implement necessary public health measures to protect

against the spread of COVID in ODOC institutions; implement and enforce proper quarantine

and social distancing; prevent mixing between and among AICs, ODOC staff, and contractors;

implement additional Oregon Occupational Safety and Health Division ("OSHA") guidance to

protect against workplace transmission of COVID; and allowed and implemented a "tier system"

for COVID response contrary to public health guidance. (*Id.* ¶ 92.) Further, Plaintiffs allege that

Defendants did not consider, evaluate, or use emergency beds or empty spaces to create space for

AIC distancing but instead closed ODOC facilities, which exacerbated the risk from COVID

resulting from Governor Brown's failure meaningfully to consider and implement options for

population reduction. (*Id.*)

///

---

[4] All exhibits to Anit Jindal's declaration in support of Defendants' motion for summary judgment on all claims are available at ECF No. 516-1 unless otherwise noted.

Plaintiffs also allege a negligence claim. (*Id.* at 40.) Specifically, Plaintiffs allege that Defendants failed promptly and continuously to ensure that AICs, employees, OCE employees, and contractors wore masks; failed to screen employees for COVID symptoms and exposure when entering ODOC facilities; failed to implement and enforce social distancing policies; failed to provide COVID testing to AICs with COVID symptoms or those exposed to COVID; failed properly to quarantine AICs awaiting COVID testing results; failed properly to quarantine AICs after transferring them from a facility with confirmed COVID infections to another facility; allowed mixing between and among AICs and ODOC staff and contractors without regard to the risk that AICs would or could become exposed to COVID; and failed to consider the use of alternative space to increase the space available for AIC social distancing. (*Id.* ¶¶ 100-101.)

Finally, Plaintiffs allege wrongful death claims. (*Id.* at 41.) Plaintiffs allege that, as a result of Defendants' negligence, COVID caused or contributed to the death of Tristan, and his estate sustained damages as a result. (*Id.* ¶ 105.)

## IV.    PROCEDURAL HISTORY

The parties are well aware of the extensive course of litigation in this case and therefore the Court provides only a brief summary of the procedural history. Plaintiffs filed this action in April 2020. (Compl., ECF No. 1.) The Court denied Plaintiffs' motion for a temporary restraining order and preliminary injunction in June 2020. (Prelim. Inj. Op. & Order, ECF No. 108.) Following Plaintiffs' Second Amended Complaint, Defendants moved for partial summary judgment on the damages portion of Plaintiffs' Eighth Amendment claim and the entirety of Plaintiffs' negligence claim. (ECF No. 115.) In December 2020, the Court granted in part and denied in part Defendants' motion, entering partial summary judgment on the grounds of discretionary immunity with respect to some parts of Plaintiffs' negligence claim and rejecting

Defendants' assertion of qualified immunity on Plaintiffs' Eighth Amendment claim. (Mot. Partial Summ. J. Op. & Order, ECF No. 149.)

In April 2022, the Court granted Plaintiffs' motion for class certification and certified two classes: the Damages Class and the Wrongful Death Class. (Class Certification Op. & Order, ECF No. 377.) The Damages Class commenced on March 8, 2020, and closed on May 31, 2022, and class members are adults incarcerated in ODOC facilities who were incarcerated at any point on or after February 1, 2020, and who, while incarcerated, tested positive or were otherwise diagnosed with COVID at least fourteen days after the AIC entered ODOC custody. (*Id.* at 53-54; Joint Proposed Class Notice Plan at 2, ECF No. 386; Order, ECF No. 387.) The Wrongful Death Class commenced on March 8, 2020, and closed on May 31, 2022, and includes the estates of those adults incarcerated at ODOC facilities continuously since February 1, 2020, who died during the Wrongful Death Class period, and for whom COVID caused or contributed to their death. (Class Certification Op. & Order at 54; Joint Proposed Class Notice Plan at 5; Order, ECF No. 387.) Defendants petitioned for interlocutory appeal of the Court's class certification order. (ECF No. 384.) The Ninth Circuit denied the petition for permission to appeal. (Notice, ECF No. 388.)

The Court denied Defendants' motion to dismiss Plaintiffs' vaccine priority claim against Governor Brown and Allen based on immunity under the Public Readiness and Emergency Preparedness ("PREP") Act. (Mot. Dismiss Op. & Order, ECF No. 350.) Defendants appealed (ECF No. 367), and the Ninth Circuit concluded that Governor Brown and Allen are immune from suit and liability with respect to Plaintiffs' vaccine prioritization damages claim. *Maney v. Brown*, 91 F.4th 1296, 1303 (9th Cir. 2024). The parties have stipulated to dismissal of the

vaccine prioritization claim against Governor Brown and Allen and all other claims against Allen. (Stipulations of Dismissal, ECF Nos. 624, 628.)

In November 2023, the Court granted Plaintiffs' motion for leave to file a Seventh Amended Complaint. (Order, ECF No. 481.) Now before the Court are the parties' motions for summary judgment. The Court held oral argument on the motions on February 28, 2024, and March 1, 2024. (ECF Nos. 619-20.)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) (citation omitted). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

Defendants move for summary judgment on all claims. (Defs.' Mot. Summ. J. All Claims ("Defs.' Mot. All Claims").) In the alternative, Defendants move for (1) summary judgment on claims against Jeske (Defs.' Jeske Mot. Partial Summ. J. ("Defs.' Jeske Mot.")), (2) partial summary judgment pursuant to the OTCA's single accident or occurrence limitation (Defs.' OTCA Mot. Partial Summ. J. ("Defs.' OTCA Mot.")), (3) partial summary judgment regarding

damages and class certification of state law claims (Defs.' Damages & State Law Claims Mot.
Partial Summ. J. ("Defs.' Damages Mot.")), and (4) modification of the class definition (Defs.'
Mot. Modify Class Definition ("Defs.' Modify Mot.")). Plaintiffs move for summary judgment
on several of Defendants' affirmative defenses. (Pls.' Mot. Partial Summ. J. ("Pls.' Mot.").)

The Court first considers Defendants' motion on all claims. Because the Court largely
denies Defendants' motion for summary judgment on all claims, the Court next considers
Defendants' motions in the alternative and Plaintiffs' motion.

## I.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Defendants move for summary judgment on all claims, arguing that (1) they are entitled
to absolute immunity on some aspects of Plaintiffs' Eighth Amendment claim, there is no
genuine issue of material fact about the constitutionality of their response to COVID in ODOC
institutions, and they are entitled to qualified immunity, and (2) regarding all claims, there is no
genuine issue of material fact that Defendants *caused* harm to the Plaintiffs. (Defs.' Mot. All
Claims at 15, 24-67.)

### A.    Governor Brown

Defendants argue that Governor Brown is entitled to absolute immunity for her clemency
decisions,[5] closure of two facilities, and her alleged failure to consider using two empty prison

---

[5] During the pandemic, Governor Brown continued to process clemency applications
pursuant to her normal clemency process in addition to her COVID-related early release
decisions. (*See* Jindal Decl. Ex. 37, Depo. Kevin Gleim 48:16-49:7.) Her authority to grant early
release in both instances is one and the same. *See* OR. CONST., art. V, §§ 9, 14 (granting the
governor of Oregon the "power to grant reprieves, commutations, and pardons"). For purposes of
this opinion, the Court refers to Governor Brown's COVID-related early release decisions as her
"clemency decisions."

facilities. (*Id.* at 31-32, 38-42.) Defendants move for summary judgment on all of Plaintiffs' claims against Governor Brown. (*See id.*)

### 1.    Background

In March 2020, Governor Brown declared a statewide emergency. (Steward Decl. ¶ 13.) With respect to ODOC, she personally received reports and updates and oversaw ODOC's response to COVID. (*Id.* ¶ 87; Steward Decl. Ex. 11, ECF No. 83-1; Dahab Decl. Ex. 10, Depo. Colette Peters ("Peters Depo.") at 24:23-25:17, Jan. 18, 2023, ECF No. 547-10; Dahab Decl. Ex. 29, Depo. Constantin Severe ("Severe Depo.") at 150:9-25, ECF No. 547-29.) For example, Governor Brown requested and received weekly reports on the number of COVID cases within ODOC, and Peters reported to her on changes to the CDC or Oregon Health Authority ("OHA") guidelines and conveyed information about ODOC's daily operations. (Severe Depo. at 150:9-25; Peters Depo. at 24:23-25:17.)

In April 2020, ODOC presented Governor Brown with an estimate that 5,800 AICs would need to be released to achieve six feet of social distancing. (Steward Decl. ¶ 87.) ODOC provided Governor Brown with various release scenarios that the Governor could implement to achieve a 5,800-person reduction to ODOC institutions' populations. (*See generally* Steward Decl. Ex. 11.) Governor Brown never pursued any of those options. (Pls.' Resp. at 14.)

Instead, in June 2020, Governor Brown requested that ODOC "perform a case-by-case analysis of adults in custody vulnerable to COVID-19 for possible commutation" based on a set of criteria. (Dahab Decl. Ex. 75, ECF No. 547-75.) Governor Brown categorically excluded from her COVID-based clemency considerations any AICs incarcerated for "a person crime." (*Id.*) By

December 2020, Governor Brown had approved the release of fewer than 350 AICs.[6] (Dahab Decl. Ex. 81, ECF No. 547-81.)

During the class period, two ODOC facilities—DRCI Minimum and OSP Minimum—largely remained empty, apart from the temporary use of DRCI during the 2020 wildfire evacuations. (*See* Peters Depo. 64:3-24; Dahab Decl. Ex. 24 at 5, ECF No. 547-24.) The Oregon legislature had set ODOC's budget for the 2019 to 2021 biennium in 2019 and had not included a budget for the two facilities. (*See* Dahab Decl. Ex. 26, Depo. Steve Robbins ("Robbins Depo.") at 13:18-14:3, ECF No. 547-26; Decl. Steve Robbins Supp. Defs.' Mot. All Claims ("Robbins Decl.") ¶ 11, ECF No. 514); Legislative Fiscal Office, *2019-21 Budget Highlights* (Sept. 2019), https://perma.cc/VCV2-MVTW.

Plaintiffs present evidence that Governor Brown and the other Defendants never considered using ODOC's two empty facilities in their response to COVID to facilitate social distancing, and Defendants do not appear to dispute that they took no action to make use of those facilities. (*See, e.g.*, Peters Depo. at 63:8-65:9, testifying that she did not recall discussing using empty facilities; Robbins Depo. at 29:17-22, 36:12-20, suggesting that Defendants did not discuss using empty facilities; Dahab Decl. Ex. 72, Depo. Devarshi Bajpai ("Bajpai Depo.") at 21:7-13, ECF No. 547-72, explaining that ODOC did not take into account space in unused

---

[6] Plaintiffs present evidence of other jurisdictions' early release numbers as comparators. (*See* Jindal Second *Daubert* Mot. Decl. Ex. 2, David Fleming Expert Report ("Fleming Report") at 46-47, ECF No. 503-2, comparing Oregon to New Jersey and North Carolina, among others; SAC at 17-20 nn.16-40, citing sources documenting release numbers in Alabama, California, Colorado, Illinois, Iowa, Kentucky, New Jersey, New York, North Carolina, North Dakota, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas, and Washington); *see* Cal. Dep't of Corr. & Rehab., *Actions to Reduce Population and Maximize Space*, https://perma.cc/JU2D-6PDV (releasing 3,500 AICs in April 2020 and releasing more thereafter). In summary, there is evidence suggesting that Governor Brown granted clemency in response to COVID to far fewer AICs than did numerous other states.

facilities when considering how many AICs would need to be released to achieve social distancing; *cf.* Decl. Anit Jindal Supp. Defs.' Reply Pls.' Resp. All Claims ("Jindal Reply Decl.") Ex. 2, Depo. Paula Myers ("Myers Depo.") 72:3-23, ECF No. 600-2, "I think at one point in time there was discussion about whether or not . . . [OSP Minimum] was an option . . . as a medical unit"; Jindal Decl. Ex. 3 at 5, ECF No. 517, indicating that the AOC approved use of one complex of the four dorms at DRCI Minimum without explanation of why the complex was ultimately not put to use.)

Instead, in December 2020, Governor Brown announced that she intended to close three additional facilities over the next year and a half. (Dahab Decl. Ex. 25, ECF No. 547-25; Dahab Decl. Ex. 84, ECF No. 547-84.) The closures were part of Governor Brown's proposed 2021 to 2023 biennium budget presented to the legislature at the end of 2020. (Dahab Decl. Ex. 84; Jindal Decl. Ex. 41, Depo. Nik Blosser ("Blosser Depo.") 76:12-77:2); *see generally* ORS § 291.200 (describing the requirements applicable to the governor when preparing her budget for the legislative assembly). The state economist had provided Governor Brown with a report forecasting a significant decrease in the number of AICs housed in ODOC facilities. (Blosser Depo. 77:3-13.) Accordingly, Governor Brown proposed closing three facilities. (*Id.* at 76:19-77:17.) Ultimately, the Oregon Legislative Assembly voted on and passed a budget based on Governor Brown's proposal. *See* Or. Laws. 2021, ch. 468, §§ 1-3. Two of the prisons closed within the year. (Peters Depo. at 104:10-13); *see also* Legislative Fiscal Office, *2021-23 Legislatively Approved Budget* at 140 (Nov. 2022), https://perma.cc/HS4V-TLAP (explaining that the 2021 to 2023 legislatively adopted budget was 6.6 percent less than the 2019 to 2021 budget primarily because of the closure of MCCF and SCCI).

///

### 2.    Absolute Immunity

In their answer, Defendants raise absolute legislative immunity and absolute quasi-judicial immunity as affirmative defenses. (Answer ¶¶ 100-101, ECF No. 486.) Before the Court are cross motions for partial summary judgment on those affirmative defenses. (*See* Defs.' Mot. All Claims at 31-32, 38-42; Pls.' Mot. at 26-33.) Specifically, Defendants argue that Governor Brown is entitled to absolute quasi-judicial immunity related to her clemency decisions, or alternatively, that Governor Brown is entitled to absolute legislative immunity for developing criteria for COVID-related early release because it was a legislative function. (Defs.' Mot. All Claims at 31-32.) Defendants also argue that Governor Brown is entitled to legislative immunity for proposing a budget to the legislature resulting in the closure of facilities and for not making use of empty facilities because Governor Brown has absolute legislative immunity for the act of recommending a budget to the state legislature and because utilizing vacant facilities "would have required legislative appropriations." (*Id.* at 38-42.)

### a.    Quasi-Judicial Immunity

#### 1)    Applicable Law

"A judge is absolutely immune from liability for [the judge's] judicial acts[.]" *Stump v Sparkman*, 435 U.S. 349, 359 (1978). Other officials are entitled to immunity "in the performance of quasi-judicial duties." *Sellars v. Procunier*, 641 F.2d 1295, 1301 n.13 (9th Cir. 1981) (quoting *Silver v. Dickson*, 403 F.2d 642, 643 (9th Cir. 1968)); *Burton v. Infinity Cap. Mgmt.*, 862 F.3d 740, 747 (9th Cir. 2017) ("Absolute immunity is not reserved solely for judges, but extends to nonjudicial officers for all claims relating to the exercise of judicial functions.") (simplified).

///

"The justification for absolute immunity is the protection of the judicial process."

*Burton*, 862 F.3d at 747. "It shields independent and impartial adjudication and prevents the

'deflection of [an officer's] energies from [the officer's] public duties.'" *Id.* (quoting *Burns v.*

*Reed,* 500 U.S. 478, 485 (1991)).

When determining whether an act is judicial and quasi-judicial immunity applies, courts

take a "functional approach." *Gay v. Parsons*, 61 F.4th 1088, 1091 (9th Cir. 2023) (applying

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993)). "To qualify for absolute immunity, the

function performed must be a judicial act with 'a sufficiently close nexus to the adjudicative

process.'" *Burton*, 862 F.3d at 747-48 (quoting *Curry v. Castillo*, 297 F.3d 940, 948 (9th Cir.

2002), *as amended* (Sept. 6, 2002)). The Supreme Court has explained that characteristics of the

judicial process include "(a) the need to assure that the individual can perform [the official's]

functions without harassment or intimidation; (b) the presence of safeguards that reduce the need

for private damages actions as a means of controlling unconstitutional conduct; (c) insulation

from political influence; (d) the importance of precedent; (e) the adversary nature of the process;

and (f) the correctability of error on appeal." *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)

(citing *Butz v. Economou*, 438 U.S. 478, 512 (1978)). However, "the 'touchstone' of the doctrine

is the 'performance of the function of resolving disputes between parties, or of authoritatively

adjudicating private rights.'" *Gay*, 61 F.4th at 1092 (quoting *Antoine*, 508 U.S. at 435-36). The

doctrine also requires "the exercise of discretionary judgment[.]" *Burton*, 862 F.3d at 748 (noting

that a court reporter transcribing a transcript verbatim is not entitled to quasi-judicial immunity).

"The Supreme Court has been quite sparing in its recognition of absolute immunity, and

has refused to extend it any further than its justification would warrant." *Id.* at 747 (quoting

*Castillo*, 297 F.3d at 947). "[T]he official seeking absolute immunity bears the burden of

showing that such immunity is justified for the function in question, and the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Gay*, 61 F.4th at 1091 (simplified) (quoting *Burns*, 500 U.S. at 486-87).

### 2)    Analysis

The Court concludes that quasi-judicial immunity bars Plaintiffs' claims against Governor Brown related to her clemency decisions.

The Ninth Circuit has never confronted whether quasi-judicial immunity protects a governor's clemency decisions. The closest comparator is applying quasi-judicial immunity to parole board officials, who are also government officials deciding whether to release an AIC from custody before the expiration of a valid sentence. With respect to parole decisions, the Supreme Court in "*Antoine* adopted a functional approach, under which [courts] must determine not whether an action 'relates to' the decision to grant, deny, or revoke parole . . . but whether an action is taken by an official 'performing a duty functionally comparable to one for which officials were rendered immune at common law.'" *Swift v. California*, 384 F.3d 1184, 1190 (9th Cir. 2004) (quoting *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir. 2003)). The Ninth Circuit has explained that parole board officials, when processing parole applications, "render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake." *Sellars*, 641 F.2d at 1303. Accordingly, like judges, parole board officials "face the same risk of constant unfounded suits by those disappointed by the parole board's decisions." *Id.*

The Ninth Circuit recently held that "a sentencing review board, or a parole board, is generally entitled to quasi-judicial immunity for judicial-related actions." *Fort v. Washington*, 41 F.4th 1141, 1144 (9th Cir. 2022). In *Fort*, the Ninth Circuit concluded that scheduling an Indeterminate Sentencing Review Board hearing was sufficiently intertwined with judicial

decision-making such that absolute immunity applied. *Id.* at 1142-43. The court explained that quasi-judicial immunity can apply to non-judicial officers for acts that are "part of the judicial function[.]" *Id.* at 1145 (simplified). The Ninth Circuit noted that other federal appellate courts uniformly agree. *Id.* For example, "[t]he Seventh Circuit determined that 'activities that are *inexorably connected* with the execution of parole revocation procedures and are analogous to judicial action invoke absolute immunity.'" *Id.* (quoting *Wilson v. Kelkhoff*, 86 F.3d 1438, 1444 (7th Cir. 1996)). The Seventh Circuit had clarified "that it is 'not only the actual decision to revoke parole' that is protected by judicial immunity, 'but also activities that are *part and parcel* of the decision process.'" *Id.* (quoting *Wilson*, 86 F.3d at 1444).

The Court concludes that Governor Brown's exercise of clemency similarly has a sufficiently close nexus to the adjudicative process to receive immunity. *See Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981) ("A commutation decision therefore shares some of the characteristics of a decision whether to grant parole." (citing *Greenholtz v. Neb. Penal Inmates*, 442 U.S. 1, 9-10 (1979))); *Brown v. Cal. Dep't of Corr.*, 554 F.3d 747, 750 (9th Cir. 2009) (noting that a "state prosecutor was absolutely immune for opposing a grant of executive clemency because the determination of executive clemency, like a parole decision, is an extension of the sentencing process" (citing *Lucien v. Preiner*, 967 F.2d 1166, 1167-68 (7th Cir. 1992))); *Waterbury v. Perez*, No. 1:06-cv-0163-LJODLBPC, 2008 WL 4367581, at *4 (E.D. Cal. Sept. 23, 2008) (concluding that the chairperson of the Board of Prison Terms was entitled to absolute immunity "for decisions made on plaintiff's applications for commutation"); *Williams v. Garvey*, No. 05-cv-2287-PHX-SMML, 2006 WL 2456402, at *1 (D. Ariz. Aug. 21, 2006) ("The members of the Board of Executive Clemency are immune from suit because their official actions are comparable to those of judges."), *aff'd*, 255 F. App'x 272 (9th Cir. 2007); *see*

*also Blankenship v. Stitt*, No. CIV-22-00958-PRW, 2024 WL 733654, at *3 (W.D. Okla. Feb. 22, 2024) ("The Court agrees that commutation reviews and recommendations made by the Parole Board pursuant to its legal duties are quasi-judicial functions warranting absolute immunity.");

*Chambers v. Granholm*, No. 1:11-cv-42, 2011 WL 447016, at *2 (W.D. Mich. Feb. 4, 2011) ("The actions for which Plaintiff complains were taken by defendant parole board members in their quasi-judicial role of making a recommendation to the governor regarding an application for commutation. Therefore, the members of the Parole and Commutation Board are entitled to absolute immunity from Plaintiff's claims for monetary damages.").

Clemency decisions authoritatively adjudicate clemency requests and governors "render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake." *Sellars*, 641 F.2d at 1303. Further, the governor exercises discretion in her clemency decisions. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 282 (1998) ("[T]he ultimate decisionmaker, the Governor, retains broad [clemency] discretion."). Finally, like judges, governors "face the same risk of constant unfounded suits by those disappointed by" clemency decisions. *Sellars*, 641 F.2d at 1303; *see also Dumschat*, 452 U.S. at 464 ("[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.") (citation omitted).

Plaintiffs argue that they do not challenge any individual release decision nor do they assert that the Eighth Amendment required Governor Brown to release all 5,800 AICs forecasted by ODOC as necessary to achieve social distancing. (*See* Pls.' Resp. Defs.' Mot. Dismiss at 11, ECF No. 254, "Plaintiffs do not allege a deprivation of their Eighth Amendment rights based on a failure by Governor Brown to release them." (simplified); Pls.' Resp. All Claims at 89, "Plaintiffs do not challenge any individual release decisions.") Instead, they argue that Governor

PAGE 16 – OPINION AND ORDER

Brown's choice to exclude AICs incarcerated for "person crimes" from consideration is evidence of her mental state and her deliberate indifference to the health and safety of AICs during the pandemic. (*See* Pls.' Resp. All Claims at 54-55.) Excluding AICs incarcerated for "person crimes" meant that the vast majority of AICs would not receive early release consideration. (*Id.* at 54; David Sugerman *Daubert* Decl. ("Sugerman Decl.") Ex. 1, John Pfaff Expert Report at 3, ECF No. 568.) In other words, Governor Brown knew of the importance of social distancing, knew ODOC's forecast about the necessary release numbers, and yet chose to limit clemency in a manner that would never achieve adequate social distancing.

The fact that Plaintiffs do not challenge any individual release decisions but rather Governor Brown's decision to exclude the vast majority of AICs from COVID-related clemency consideration does not change the analysis. Her clemency criteria are inexorably connected with her ultimate clemency decisions and part and parcel of the decision-making process. *See Fort*, 41 F.4th at 1146 (concluding that scheduling a sentencing review board hearing was part and parcel of the decision-making process). Thus, challenging Governor Brown's release decisions in the aggregate based on her criteria is not substantively different than challenging the denial of clemency for each of the thousands of AICs she deemed ineligible.

Plaintiffs also argue that quasi-judicial immunity does not apply because, in Oregon, the clemency process does not involve an adversarial proceeding and there are no procedural safeguards in place to protect an AIC's interests, two characteristics of the judicial process. (Pls.' Mot. at 32-33; *see also* Pls.' Reply Br. Defs.' Resp. Pls.' Mot. Summ. J. ("Pls.' Reply") at 18, ECF No. 597.) The Court agrees that many of the factors the Supreme Court discussed in *Cleavinger* and *Butz*, such as adversarial proceedings and procedural safeguards, are not present in the clemency process. *Cf. Greenholtz*, 442 U.S. at 7 (explaining that class action AICs do not

have a constitutional right to release before the expiration of a valid sentence because "the conviction, with all its procedural safeguards, has extinguished that liberty right" (citing *Meachum v. Fano*, 427 U.S. 215, 224 (1976))). However, "the 'touchstone' of the doctrine is the 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.'" *Gay*, 61 F.4th at 1092 (quoting *Antoine*, 508 U.S. at 435-36). Without question, Oregon's governor authoritatively determines whether to grant clemency. *Cf. id.* at 1093 (denying absolute immunity to board of parole hearings psychologists because they were "not decisionmakers"). Further, in light of the liberty interest at stake, it is important for the governor to perform the function of adjudicating clemency applications without harassment or intimidation.[7] *See Sellars*, 641 F.2d at 1303.

For these reasons, the Court grants Defendants' motion and denies Plaintiffs' motion for summary judgment related to Governor Brown's clemency decisions. *See Dumschat*, 452 U.S. at 464 ("[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.") (citation omitted).

///

///

///

---

[7] Plaintiffs also argue that clemency is a political decision, not judicial. (Pls.' Reply at 18.) The result would be no different under that line of reasoning because of the political questions doctrine. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) ("[A] controversy involves a political question where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.") (simplified); *Cavazos v. Smith*, 565 U.S. 1, 9 (2011) ("If the clemency power is exercised in either too generous or too stingy a way, that calls for political correctives, not judicial intervention."); *Marteeny v. Brown*, 517 P.3d 343, 347 (Or. Ct. App. 2022) ("We are not called here to judge the wisdom of the Governor's clemency [granted to specific individuals during COVID] . . . ; that is a political question.").

### b.    Legislative Immunity

### 1)    Applicable Law

"Under the doctrine of legislative immunity, members of Congress and state legislators are entitled to absolute immunity from civil damages for their performance of lawmaking functions." *Jones v. Allison*, 9 F.4th 1136, 1139-40 (9th Cir. 2021) (citing *Tenney v. Brandhove*, 341 U.S. 367, 376-77, 379 (1951)). "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Id.* at 1140 (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998)). "This immunity extends both to claims for damages and claims for injunctive relief." *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 959 (9th Cir. 2010) (citing *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732-33 (1980)).

"[L]egislative immunity does not depend on the actor so much as the functional nature of the act itself." *Jones*, 9 F.4th at 1140 (citing *Bogan*, 523 U.S. at 55). Courts "determine whether an action is legislative by considering four factors: (1) 'whether the act involves ad hoc decisionmaking, or the formulation of policy'; (2) 'whether the act applies to a few individuals, or to the public at large'; (3) 'whether the act is formally legislative in character'; and (4) 'whether it bears all the hallmarks of traditional legislation.'" *Kaahumanu v. Cnty. of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003) (quoting *Bechard v. Rappold*, 287 F.3d 827, 829 (9th Cir. 2002)).

Turning to the first factor, the Ninth Circuit has described ad hoc decisions as those "taken based on the circumstances of the particular case and [that] did not effectuate policy or create a binding rule of conduct." *Id.* "An 'ad hoc' decision is made 'with a particular end or

purpose,' as distinguished from 'a coordinated policy.'" *Cmty. House, Inc.*, 623 F.3d at 961
(quoting *Webster's New International Dictionary, Unabridged* 26 (2002)).

Under the second factor, "[a]n act need not affect a city's entire population in order to be considered legislative." *Id.* at 960. "It is sufficient that the act affects a discrete group of people or places." *Id.* (citing *Kaahumanu*, 315 F.3d at 1220).

Under the third factor, formalities such as "acts of voting," "introduction of a budget[,] and signing into law an ordinance" suggest that an act is formally legislative in character. *Bogan*, 523 U.S. at 55; *see also Schmidt v. Contra Costa Cnty.*, 693 F.3d 1122, 1137 (9th Cir. 2012) (noting that there was "an agenda, minutes were taken and later approved, and certain formal procedures were followed," suggesting that the act was formally legislative in character).

Under the fourth factor, "[t]he hallmarks of traditional legislation include the use of discretion, the making of policy that implicates budgetary priorities and the provision of services, and prospective implications that reach beyond the particular persons immediately impacted." *Schmidt*, 693 F.3d at 1137 (citing *Kaahumanu*, 315 F.3d at 1223); *see also Jones*, 9 F.4th at 1141 ("They bore the hallmarks of legislation—they were binding, policy-implementing rules that operated much as laws passed by a state legislature would."); *Cmty. House, Inc.*, 623 F.3d at 960 (concluding that an ordinance "passed by majority vote, . . . published in a city's official newspaper, and . . . read on three different days" satisfied the third and fourth factors). "Budgetary decisions, such as a decision to eliminate an employment position, typically involve the formation of policy." *Cmty. House, Inc.*, 623 F.3d at 961 (citing *Bechard*, 287 F.3d at 830); *see id.* (concluding that the mayor and members of the city council were "entitled to absolute legislative immunity for their actions in promoting and approving the lease and sale of" a property).

PAGE 20 – OPINION AND ORDER

2)        **Analysis**

The Court concludes that legislative immunity applies to protect Governor Brown from

Plaintiffs' claims regarding the closure of facilities.

Governor Brown's proposed budget and the resulting facility closures are functionally

legislative. Earmarking a budget for ODOC, and the attendant closures, were discretionary

decisions and part of a larger, coordinated policy, prioritizing state funding for other purposes.

*See, e.g.*, Conrad Wilson, *Oregon Gov. Kate Brown reverses course, keeps Warner Creek prison

open*, OPB (May 14, 2021, 4:55 PM), https://perma.cc/VY8U-E88H (explaining that Governor

Brown "ultimately would like to reduce [Oregon]'s reliance on incarceration and invest more

dollars in the program areas that work to prevent people from entering the criminal justice

system, such as behavioral health, education, housing, and substance use disorder recovery and

treatment"); *see also Kissner v. Loma Prieta Joint Union Sch. Dist.*, No. 22-cv-00949-CRB,

2023 WL 5836974, at *17 (N.D. Cal. Sept. 8, 2023) (concluding that "two ordinances bear all

the hallmarks of traditional legislation because they reflect a discretionary decision of the Board

implicating the city's budget and services") (citation omitted); *Thomas v. Baca*, No. 04-cv-

008448 DDP, 2005 WL 1030247, at *3 (C.D. Cal. May 2, 2005) ("Budget decisions bear all the

hallmarks of traditional legislation. They reflect discretionary policymaking that determines the

services the County provides to its citizens. Perhaps, most importantly, they require tradeoffs that

apply to the public at large, and thus inevitably leave some portion of the citizenry dissatisfied.")

(simplified). Governor Brown's decision applied to a large group of people: the AICs housed in

the closing facilities, their families, many ODOC staff, the surrounding communities, and AICs

and staff at the facilities used for housing those who were displaced. *See Cmty. House, Inc.*, 623

F.3d at 960 (concluding that the sale of property that impacted the houseless community applied

to a sufficiently large group of people, explaining that "[i]t is sufficient that the act affects a discrete group of people or places" (citing *Kaahumanu*, 315 F.3d at 1220)); *Allen v. Kramer*, No. 1:15-cv-01609-DAD-JDP, 2019 WL 932029, at *17 (E.D. Cal. Feb. 26, 2019) ("[A] purchase or sale of land can constitute a formation of policy if it pertains to budgetary concerns" and noting that "the annexation affected the public at large: housing civil detainees[.]") (citation omitted), *report and recommendation adopted*, 2019 WL 1370358 (E.D. Cal. Mar. 26, 2019).

Furthermore, the introduction of a budget is a recognized legislative formality. *See Bogan*, 523 U.S. at 55 ("[The mayor]'s introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official."); *see also Bagley v. Blagojevich*, 646 F.3d 378, 394-95 (7th Cir. 2011) (concluding that the governor was entitled to legislative immunity for proposing a state budget to the state legislature and for vetoing a line item in a bill "in order to save money"); *Baraka v. McGreevey*, 481 F.3d 187, 194-96 (3d Cir. 2007) (holding that the governor was entitled to legislative immunity for advocating for and signing a bill abolishing the state-funded position of poet laureate).

For the same reasons, the Court also concludes that Governor Brown is entitled to legislative immunity for her role in Defendants' failure to make use of empty facilities. Because the 2019 legislature had already set ODOC's budget, Governor Brown's role in utilizing empty facilities would have required a request for funding from the legislature. (*See* Dahab Decl. Ex. 84); ORS § 291.200. In this context, legislative immunity protects Governor Brown from suit for

damages relating to budget prioritization, and therefore Governor Brown is immune from liability for her budgetary decisions.[8]

### c.    Conclusion

In summary, the Court concludes that Governor Brown is absolutely immune from Plaintiffs' claims against her related to her clemency decisions, introduction of a budget resulting in facility closures, and ODOC's failure to utilize empty facilities.[9] Because those are Plaintiffs' only remaining claims against Governor Brown, the Court grants summary judgment in Governor Brown's favor on all claims against her. *See Brown*, 554 F.3d at 751 (affirming grant of summary judgment where absolute immunity barred the plaintiff's claim).

### B.    Legislative Immunity: ODOC Defendants

Plaintiffs name various high-level ODOC officials as defendants: Peters, Steward, Gower, Nooth, Persson, Bugher, and Russell (together, the "ODOC Defendants"). (SAC ¶¶ 12-16, 19-20.) The ODOC Defendants argue that they are also entitled to legislative immunity for their failure to make use of the empty prison facilities. (Defs.' Mot. All Claims at 39-40.) The Court disagrees.

First, the Court notes that absolute immunity is complete immunity from suit. *See Cmty. House, Inc.*, 623 F.3d at 959 ("This [legislative] immunity extends both to claims for damages and claims for injunctive relief." (citing *Sup. Ct. of Va.*, 446 U.S. at 732-33)). However, the

---

[8] Because the Court resolves Governor Brown's immunity concerning her clemency decisions based on quasi-judicial immunity, the Court does not address whether legislative immunity bars those claims.

[9] As Defendants acknowledge, the density, layout, and number of AICs that ODOC housed during the time period at issue remain relevant to Plaintiffs' theory of liability and are not the subject of Defendants' absolute immunity argument. (Defs.' Reply Br. Pls.' Resp. All Claims ("Defs.' Reply All Claims") at 24, ECF No. 599.)

Ninth Circuit has made clear that "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (citations omitted). In other words, prison officials cannot claim legislative immunity any time an AIC's medical care or protection would require additional funds. Lack of resources is a factual basis for a defense from liability for damages but not a basis for absolute legislative immunity. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [AICs] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.") (citations omitted); *Willis v. Wash. State Dep't of Soc. & Health Servs.*, No. 16-cv-5113-RBL, 2017 WL 4180416, at *3 (W.D. Wash. Sept. 21, 2017) ("*Peralta* concerned jury instructions on [the defendant's] cost defense; it involved a question of fact for the jury on whether, given the constraints facing [the defendant], he had acted wantonly in delaying care to [the plaintiff]. It did not announce a blanket foreclosure on all § 1983 claims for damages against individual defendants, but gave courts and jurors permission to consider financial and other limiting constraints when evaluating the wantonness of defendants' conduct. It does not offer automatic immunity nor an absolute defense to those faced with budgetary constraints.") (citation omitted).

Second, although Defendants suggest that taking a different course of action would have required requesting additional budget authority, that is a question of disputed fact. Defendants point out that it would have taken at least six months to staff the empty facilities on a longer-term basis and that utilizing the empty facilities would have been expensive. (Robbins Decl. ¶¶ 11, 13-16.) However, ODOC did, in fact, use one of the empty facilities for short-term wildfire evacuations in September 2020. (*See* Dahab Decl. Ex. 24 at 5, noting that ODOC used the empty

PAGE 24 – OPINION AND ORDER

minimum security facility at DRCI for short-term wildfire evacuations in September 2020; Peters

Depo. at 65:11-13; Robbins Decl. ¶ 12; *see also* Peters Depo. at 64:14-15, ODOC used the

empty minimum security facility at OSP for training "and other purposes"; Dahab Decl. Ex. 31

at 1-2, ECF No. 547-31, explaining that OSP minimum was already set up with power, water,

sewer, in-cell cable, single cell housing with solid doors, and a recently serviced fire system.)

The record reflects that Defendants were able to reallocate their existing resources to make use

of the empty facility in an emergency situation. (*See* Peters Depo at 65:10-18.) Drawing

reasonable inferences in Plaintiffs' favor, a question of fact remains as to whether Defendants

could have reasonably utilized the unused facilities on an emergency, short-term basis in

response to the pandemic. (*See* Dahab Decl. Ex. 31 at 2-5, written proposal by the superintendent

of CCCF to make use of OSP Minimum on a limited basis without reference to a need for

legislative appropriations.)

Finally, there is no evidence before the Court that Defendants actually took steps to

request funding related to the empty facilities or that Defendants declined to request funding as a

matter of budgetary priority. Plaintiffs present evidence that the budget for the unused facilities

was set before the onset of COVID and that new funding sources were available during COVID,

but that Defendants never considered requesting or using funding to enable the use of empty

facilities.[10] (*See* Robbins Depo. at 14:1-3, explaining that the budget for 2019 to 2021 was

developed in 2018; *id.* at 18:15-21, 19:17-23:9, describing various COVID-related funding

sources available upon request; *id.* at 39:6-10, stating that no request for funding for the two

---

[10] Defendants argue that Plaintiffs have not met their burden of establishing which federal funding could have fully supported the relevant project. (Defs.' Reply All Claims at 30.) The Court concludes that is a disputed question of fact.

empty facilities was ever made); *see Peralta*, 744 F.3d at 1082 (concluding that the district court did not err by instructing the jury to consider "the context of the personnel, financial, and other resources available to [the defendant] or which [the defendant] could reasonably obtain").

With respect to whether the ODOC Defendants engaged in a legislative function by failing to consider using empty facilities to allow AICs to socially distance, their indecision did not amount to a binding rule of conduct applicable to the public at large marked by the hallmarks of legislation.

The Court concludes that the ODOC Defendants' failure to take any action related to reallocated space is different than Governor Brown's role. Shifting beds and staffing to an existing empty facility or reallocating emergency COVID funding for spacing needs is more akin to an ad hoc decision, in contrast to submitting a budget request to the state legislature. *See Selene v. Legislature of Idaho*, 514 F. Supp. 3d 1243, 1253 (D. Idaho 2021) (concluding that legislative immunity did not apply where "the accommodations provided are not legislative because they are not a policy, but are an ad hoc approach meant to deal with the ongoing effects of this unique global pandemic") (citation omitted); *see also Tohono O'odham Nation v. Ducey*, No. 15-cv-01135-PHX-DGC, 2016 WL 3402391, at *4 (D. Ariz. June 21, 2016) (concluding that a closed council session focusing on a particular real estate and development project was ad hoc); *U.S. ex rel. Teresa Teater v. Schrader*, No. 05-cv-623-HU, 2006 WL 1030165, at *8 (D. Or. Apr. 18, 2006) (concluding that the failure to respond to the plaintiff's medical malpractice complaints was ad hoc).

In sum, Plaintiffs argue that Defendants failed to *consider* making use of the empty prison facilities (Pls.' Resp. All Claims at 84), and the Court concludes that a disputed factual question with respect to whether the ODOC Defendants could have utilized the empty space

without legislative action precludes a finding of legislative immunity on summary judgment. *Cf.*
*Peralta*, 744 F.3d at 1082 (suggesting that prison officials with control over the budget can be
held responsible for the inadequate allocation of resources).

### C.    PREP Act

Defendants argue that the PREP Act bars any challenge to Defendants' prioritization
decisions regarding offering COVID tests during the first year of the pandemic. (Defs.' Reply
All Claims at 48.) Plaintiffs assert that Defendants' argument is barred as untimely and fails on
substantive grounds because Plaintiffs do not challenge Defendants' testing prioritization but
instead assert that Defendants failed to create adequate testing policies and failed to administer
tests pursuant to their own policies. (Pls.' Surreply Br. Defs.' Reply All Claims ("Pls.'
Surreply") at 1-2, ECF No. 607.)

As referenced earlier, the Ninth Circuit recently issued an opinion holding that the PREP
Act bars Plaintiffs' claims related to vaccine prioritization. *See Maney*, 91 F.4th at 1303. The
Ninth Circuit issued its opinion after Defendants filed their motions for summary judgment but
before their reply briefs were due. As a result and for the first time, Defendants argued in reply
that the PREP Act also bars Plaintiffs' claims that implicate testing prioritization. (Defs.' Reply
All Claims at 48.)

The Court concludes that it is appropriate to consider Defendants' PREP Act argument
raised for the first time in Defendants' reply brief in light of the Ninth Circuit's intervening
opinion. Although litigants cannot point to new cases as a work-around to make new arguments
in reply based on well-established doctrines, the Court concludes that the PREP Act's application
in the context of COVID was not clearly defined prior to the Ninth Circuit's guidance in this
case. *See Westerlund v. Murphy Overseas USA Astoria Forest Prod., LLC*, No. 3:15-cv-1296-SI,

2018 WL 614710, at *2 n.4 (D. Or. Jan. 29, 2018) (suggesting that an "intervening change in the case law" could justify consideration of an argument raised for the first time in reply). Further, Plaintiffs had the opportunity to—and did—respond in writing to Defendants' argument. (*See* Pls.' Surreply at 2); *cf. Mattson v. Quicken Loans, Inc.*, No. 3:18-cv-00989-YY, 2020 WL 6365506, at *3 (D. Or. Sept. 2, 2020) (explaining that "[d]istrict courts are not required to consider arguments raised for the first time in reply, particularly when the other party has not had a chance to respond" (citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007)). Accordingly, the Court considers whether the PREP Act bars any of Plaintiffs' claims related to testing.

The PREP Act "gives 'covered person[s]' immunity 'from suit and liability' for claims 'caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure.'" *Maney*, 91 F.4th at 1298 (quoting 42 U.S.C. § 247d-6d(a)(1)). "The Act's immunity lies dormant until the Secretary of Health and Human Services 'makes a determination that a disease . . . constitutes a public health emergency' and 'make[s] a declaration, through publication in the Federal Register,' that the Act's immunity 'is in effect.'" *Id.* (quoting 42 U.S.C. § 247d-6d(b)(1)).

"On March 17, 2020, the Secretary issued a declaration announcing that COVID-19 'constitutes a public health emergency' and that 'immunity as prescribed in the PREP Act' was 'in effect[.]'" *Id.* (quoting Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198, 15201 (Mar. 17, 2020)). The Secretary "broadly defined" a covered countermeasure to include "any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19[.]" *Id.*; Declaration Under the Public Readiness

and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198, 15202 (Mar. 17, 2020)).

In *Hampton v. California*, the Ninth Circuit explained that the PREP Act did not apply to the defendants' failure to test AICs for COVID because "the PREP Act provides immunity only from claims that relate to 'the administration to or the use by an individual of' a covered countermeasure—not such a measure's *non*-administration or *non*-use." *Hampton v. California*, 83 F.4th 754, 763 (9th Cir. 2023) (citing 42 U.S.C. § 247d-6d(a)(1)). In *Hampton*, the defendants invoked a hypothetical from a Department of Health and Human Services advisory opinion which "illustrates the fact that, for a countermeasure with limited availability, administering the countermeasure to one person could mean withholding it from another." *Id.* However, the Ninth Circuit distinguished the hypothetical from the facts of *Hampton* because "[t]he Complaint nowhere suggests (and Defendants do not argue) that tests were in short supply and that Defendants saved the limited tests for others." *Id.* In *Maney*, the Ninth Circuit discussed *Hampton* and reaffirmed the distinction between "prioritization of a scarce countermeasure" and "non-administration or non-use." 91 F.4th at 1301. Ultimately, in *Maney*, the Ninth Circuit concluded that PREP Act immunity extends to policy-level prioritization decisions. *Id.* at 1301-02.

Applied here, the parties do not appear to dispute that Defendants are covered persons under the Act or that COVID tests are a covered countermeasure. *See Hampton*, 83 F.4th at 763 ("[A]ll agree that COVID tests are 'covered countermeasures.'"). Thus, the Court agrees with Defendants that, to the extent AICs did not receive a COVID test as a result of scarcity and attendant prioritization, PREP Act immunity applies. However, as a factual matter, the Court cannot evaluate the availability of COVID tests throughout the class period on the limited

summary judgment record before it, in part because Defendants raised the issue for the first time in their reply.

In reply, Defendants argue that PREP Act immunity applies to testing prioritization during the first *year* of the pandemic. (Defs.' Reply All Claims at 46-48.) It is undisputed that testing supplies were limited in the very early days of the pandemic. (*See* Jindal Reply Decl. Ex. 8 at 2, ECF No. 600-7, indicating that test availability was limited on April 13, 2020; Jindal Decl. Ex. 3 at 7, documenting that Defendants ordered 2,500 tests on April 22, 2020; Jindal Reply Decl. Ex. 9 at 2, ECF No. 600-8, indicating that the lab was processing only thirty tests daily on April 29, 2020; Jindal Reply Decl. Ex. 10 at 13, ECF No. 600-9, noting that Defendants will receive "limited access to rapid testing in about 2 weeks" on May 1, 2020; *cf.* Jindal Decl. Ex. 49, indicating that testing after transfer was "contingent on sufficient testing supplies" in July 2020.)

However, Defendants also argue that, at some point, they adopted a policy of testing all symptomatic AICs. (Defs.' Mot. All Claims at 8, 47; *see* Jindal Decl. Ex. 3 at 8, indicating that "[i]f an adult in custody is showing signs and symptoms of flu/COVID-19, . . . they will be tested as healthcare providers direct" on April 24, 2020; Jindal Decl. Ex. 18 at 1, indicating that ODOC's testing strategy was to test symptomatic AICs in November 2020; *see also* Jindal Decl. Ex. C, Decl. Daniel Dewsnup ("Dewsnup Decl.") ¶ 41, explaining that "ODOC follows OHA and CDC guidance on appropriate criteria for testing AICS for COVID" including "offering testing [to] AICs who meet the CDC case definition of symptomatic, targeted testing of asymptomatic AICs who are identified as having been in close contact with an AIC that has tested positive for the virus via concentric contact testing, . . . mass testing when there are concerns about a widespread outbreak at a particular facility[,]" and testing "upon intake into its

facilities, before transfers and certain outside medical appointments, and prior to release.") In

their motion, Defendants asserted that by fall 2020, tests were available to all AICs who

requested a test, even asymptomatic AICs. (Defs.' Mot. All Claims at 47; *see* Jindal Decl. Ex.

47, indicating that all AICs who requested a test would receive one on September 25, 2020; *cf.*

Jindal Decl. Ex. 48 at 3, signaling a nationwide shortage of PCR tests but confirming that all

AICs who request a test should receive one as of September 24, 2020.)

Defendants do not explain how the Court could find that testing scarcity lasted for one

year and then ended one year into the pandemic. The Court cannot conclude on the current

record that AICs did not receive COVID tests during the entire first year of the pandemic as a

result of scarcity as opposed to other factors such as non-administration or non-use, to which

PREP Act immunity might not apply. The Court anticipates resolving the contours of

Defendants' PREP Act immunity and any resulting evidentiary issues on pre-trial motions if the

parties present undisputed facts on the scarcity of COVID testing supplies during a specific time

period.

### D.    Eighth Amendment

Defendants argue that there is no genuine issue of material fact on the constitutionality of

their response to COVID and that they are entitled to qualified immunity. (Defs.' Mot. All

Claims at 15.) The Court first turns to Defendants' argument that there is no genuine issue of

material fact about the constitutionality of their response to COVID.

### 1.    Applicable Law

To establish an Eighth Amendment claim, a plaintiff must demonstrate (1) an

"objectively, sufficiently serious" deprivation and (2) that the defendants acted with a

"sufficiently culpable state of mind," *i.e.*, "deliberate indifference." *Farmer*, 511 U.S. at 834

(simplified). "[P]laintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citation omitted).

In the context of a conditions of confinement claim based on exposure to a hazard, the objective component of an Eighth Amendment claim requires a plaintiff to demonstrate "that it is 'contrary to current standards of decency for anyone to be . . . exposed against his will' to the relevant hazard." *Hampton*, 83 F.4th at 766 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

The subjective component requires a plaintiff to demonstrate that a defendant "knows of and disregards an excessive risk to [AIC] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Farmer*, 511 U.S. at 837.[11] Put differently, to be

---

[11] In situations where prison officials make decisions "in haste, under pressure, and . . . without the luxury of a second chance," a plaintiff must show that the defendant acted "maliciously and sadistically for the very purpose of causing harm[.]" *Farmer*, 511 U.S. at 835 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). That standard applies in certain excessive force cases, *Hudson*, 503 U.S. at 7, or in emergency circumstances such as a prison uprising, *Johnson v. Lewis*, 217 F.3d 726, 733 (9th Cir. 2000), or a prison riot and hostage situation, *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). Defendants argue that the higher standard should apply to Plaintiffs' challenges to policies created in the first days of the pandemic because the class period began five days before the federal government declared a national COVID emergency. (Defs.' Mot. All Claims at 17 n.6; Defs.' Reply All Claims at 4 n.2; Defs.' Jeske Mot. at 11 n.4.) However, the Supreme Court has explained that the exigent circumstances standard does not apply to prison cases challenging the conditions of confinement or failure to attend to medical needs. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). Instead, the deliberate indifference standard applies. *Id.* at 303. As a result, other courts have rejected the application of the higher mental state in the context of COVID-related Eighth Amendment claims. *See Nelson v. Allison, No.* 3-22-cv-00377-CAB-AHG, 2023 WL 5004487, at *6 (S.D. Cal. Aug. 4, 2023) (rejecting the "maliciously and sadistically" standard and instead applying the deliberate indifference standard to the plaintiff's Eighth Amendment claim against prison officials), *report and recommendation adopted*, 2023 WL 5538294 (S.D. Cal. Aug. 28, 2023); *Williams v. Pollard*, No. 21-cv-0055-CAB (BGS), 2022 WL 184552, at *8 n.3 (S.D. Cal. Jan. 19, 2022) ("The subjective prong of an Eighth Amendment violation requires a showing defendants

liable, "a person must 'consciously disregard' a substantial risk of serious harm." *Id.* at 839

(simplified). Accordingly, a plaintiff must demonstrate that officials "kn[ew] that [AIC]s face[d]

a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable

measures to abate it." *Id.* at 847; *see also id.* at 844 ("[P]rison officials who actually knew of a

substantial risk to [AIC] health or safety may be found free from liability if they responded

reasonably to the risk, even if the harm ultimately was not averted.").

### 2.    Analysis

#### a.    Objective Prong

Courts have consistently concluded that the involuntary exposure to COVID satisfies the

Eighth Amendment's objective prong. *See Hampton*, 83 F.4th at 766 ("Plaintiff has thus

sufficiently alleged that a 'societal consensus' had emerged by May 2020 that the risk of

contracting COVID-19 was 'intolerably grave' such that involuntarily exposing [AICs] to the

disease violated then-current standards of decency." (quoting *Hines v. Youseff*, 914 F.3d 1218,

1232 (9th Cir. 2019))); *see also Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (noting

the plaintiffs' evidence of the substantial risk of serious harm from "[t]he transmissibility of the

COVID-19 virus in conjunction with [the correctional institution's] dormitory-style housing" and

concluding that the Eighth Amendment's "objective prong is easily satisfied").

The Court concludes that Plaintiffs have presented sufficient evidence that exposure to

COVID against Plaintiffs' will was contrary to the standards of decency during the class period,

and Defendants do not argue otherwise. (*See* Defs.' Mot. All Claims at 1; *see generally* Dahab

---

acted maliciously or sadistically to cause harm only where prison officials are accused of use of
excessive force, not, as here, where they allegedly failed to protect a prisoner." (citing *Hudson*,
503 U.S. at 6-7, and *Farmer*, 511 U.S. at 837)). The Court concludes that the deliberate
indifference standard applies here.

Decl. Ex. 2, ECF No. 547-2; Dahab Decl. Ex. 8, ECF No. 547-8); *see also* Executive Order 20-03, *Declaring an Emergency Due to Coronavirus (COVID-19) Outbreak in Orego*n (Mar. 8, 2020), https://perma.cc/TNQ4-ZXDL; Executive Order 20-12, *Stay Home, Save Lives: Ordering Oregonians to Stay at Home, Closing Specified Retail Businesses, Requiring Social Distancing Measures for Other Public & Private Facilities, & Imposing Requirements for Outdoor Areas and Licensed Childcare Facilities* (Mar. 8, 2020), https://perma.cc/6BFE-SDUA.

### b.    Subjective Prong

Defendants do not argue that they did not know, during the class period, that AICs faced a substantial risk of serious harm from COVID. (*See* Defs.' Mot. All Claims at 1.) Further, Plaintiffs have presented evidence that Defendants *knew* of the risks. (*See* Dahab Decl. Ex. 2; Dahab Decl. Ex. 3, ECF No. 547-3; Dahab Decl. Ex. 7, ECF No. 547-7); *see also* Executive Order 20-03; Executive Order 20-12.[12]

---

[12] To the extent Defendants argue they did not know that AICs faced a substantial risk of serious harm because they did not know that ODOC's policies were not being implemented or enforced, the Court concludes that is a disputed question of fact. Plaintiffs have presented evidence that Defendants knew of problems with policy implementation. (*See, e.g.*, Jindal Decl. Ex. 14 at 1, Steward emailing all staff stating that "[w]e are facing legal action for not following our face covering protocol"; Jindal Decl. Ex. 62, Depo. Joseph Bugher 194:20-23, 196:2-4, indicating that Bugher and Russell likely helped Steward draft the email indicating that staff were not masking and acknowledging that not all staff wore masks; Dahab Decl. Ex. 65 at 2, ECF No. 548-1, Bugher opposing an audit by OHA because the results would become public; Jindal Decl. Ex. 20 at 1, 4, audit report sent to Peters, Steward, and the AOC documenting that it "was a normal scenario" for staff and AICs not to wear masks while preparing food where social distancing was not possible; Jindal Decl. Ex. 26, Russell receiving a report of a correctional officer ("CO") not wearing a mask on four different days; Jindal Decl. Ex. 45 at 1, email from Russell indicating that the AOC has been "seeing staff . . . not wearing a face covering"; Jindal Decl. Ex. 64, Depo. Michael Gower ("Gower Depo.") 42:8-25, 69:15-70:17, indicating that Gower was made aware that some staff were not wearing masks; Russell Decl. ¶¶ 34, 53, 58, 66, 74, 76, 81, acknowledging reports of social distancing and masking problems; Bugher Decl. ¶ 113, acknowledging shortcomings in the implementation of policy, including, *inter alia*, social distancing and masking; Dahab Decl. Ex. 16 at 4, ECF No. 547-16, email to Bugher that, among staff and AICs, "[s]ome do" and "[s]ome don't" wear masks and socially distance; Jindal Decl. Ex. 3 at 27-29, 337, 350, 426, AOC documenting that various staff had not worn personal

Instead, Defendants argue that there is no genuine issue of material fact about the constitutionality of their response to COVID. (Defs.' Mot. All Claims at 15.) In the context of a conditions of confinement claim related to a defendant's response to COVID, "the key inquiry is not whether prison officials perfectly responded, complied with every CDC guideline, or whether their efforts ultimately averted the risk; instead, the key inquiry is whether they responded reasonably to the risk." *Jones v. Pollard*, No. 21-cv-162-GPC(BGS), 2023 WL 4728802, at *7 (S.D. Cal. July 24, 2023) (collecting cases) (simplified). Accordingly, the Court summarizes some of the key evidence of Defendants' response to COVID in the summary judgment record.

### c.    Summary Judgment Evidence

As a preliminary matter, the Court addresses the parties' dispute about what evidence the Court may consider at summary judgment.

Defendants argue that the Court cannot consider Plaintiffs' declarations, accompanying Plaintiffs' response to Defendants' motion for summary judgment, from AICs who are not class members nor from AICs who are class members but not named plaintiffs. (Defs.' Reply All Claims at 52-53.) Defendants argue that the declarations are irrelevant and inadmissible under Federal Rules of Civil Procedure 23, 26, 37(c), and 56 and the principle of judicial estoppel. (*Id.*)

---

protective equipment while around prolonged close contacts; *id.* at 39, "8/12/20 start date for AICs required to wear approved masks/face coverings whenever 6' of social distancing cannot be maintained."; Fleming Report at 42, explaining that ODOC's antibody testing in 2020 revealed that the prevalence of COVID greatly exceeded the number of reported COVID cases from testing; *cf.* Dahab Decl. Ex. 69, Depo. Nathaline Jean Frener ("Frener Depo.") 161:8-14, ECF No. 547-69, explaining that Steward directed the executive team to "tell your people to find religion" and sign the religious exemption form to avoid Governor Brown's vaccine mandate; Jindal Decl. Ex. 3 at 6, AOC approved a "Death in Custody plan" and put in place plans with funeral homes; Fleming Report at 35, explaining that Defendants knew of the explosive May 2020 COVID outbreak at OSP but never conducted an epidemiological investigation to determine what went wrong.)

Specifically, Defendants argue that at summary judgment the Court can rely only on evidence that could be presented in an admissible form at trial, and that defendants generally cannot obtain discovery from absent class members unless the proposed deponents have been identified as potential witnesses or otherwise injected themselves into the litigation. (*Id.*) Further, Defendants argue that Plaintiffs did not identify the sixteen[13] new declarants in discovery as relevant to their class-wide liability theory, and Plaintiffs previously opposed Defendants' request to depose AICs other than the named plaintiffs and the declarants from the class certification briefing. (*Id.* at 53.)

Plaintiffs argue that the proffered declarations are relevant to their claims, the testimony is admissible at trial, and that Defendants have not requested to depose AICs or conduct interviews with non-class members since the class certification stage of this litigation. (Pls.' Surreply at 3-6.) Plaintiffs also argue that they were not required specifically to identify the sixteen declarants in discovery as relevant to their theory because neither party served initial disclosures in this case and trial witness lists are not yet due. (*Id.* at 6 n.6.)

As background, after Plaintiffs filed a motion for class certification and before the Court certified the classes, Defendants sought to depose up to seventy absent class members who provided declarations in support of Plaintiffs' earlier briefing (*i.e.*, Plaintiffs' motion for a preliminary injunction and Plaintiffs' response to Defendants' motion for partial summary judgment). (Op. & Order at 16, ECF No. 272.) The parties had agreed upon sixteen depositions at that time, and Plaintiffs argued that the request for seventy additional depositions was unduly burdensome and that Defendants had failed to demonstrate that more depositions were necessary at the class certification stage. (*Id.* at 18.) The Court concluded that Defendants had met their

---

[13] Plaintiffs have withdrawn the seventeenth filed declaration. (Notice, ECF No. 633.)

burden of demonstrating the need to depose three AICs whose sworn statements arguably

conflicted with the factual assertions in Plaintiffs' motion for class certification. (*Id.*) At that

stage in litigation, the Court concluded that Defendants could adequately defend the class

certification motion with the nineteen total depositions discussed and that additional depositions

would be cumulative and not proportional to the needs of the case at that time. (*Id.* at 19.)

Defendants also had requested leave to interview non-class member AICs (*i.e.*, unrepresented

AICs), which the Court allowed on the condition that defense counsel confer with Plaintiffs'

counsel on certain details. (*Id.* at 19, 22.)

As an initial matter, the Court concludes that Plaintiffs' new declarations are relevant.

*See Negrete v. Allianz Life Ins. Co. of N. Am.*, No. 05-cv-6838 CAS MANX, 2013 WL 6535164,

at *21 (C.D. Cal. Dec. 9, 2013) (denying the defendant's motion to preclude testimony of absent

class members and concluding that the testimony may be relevant). Plaintiffs seek to establish

Defendants' widespread failures to implement COVID protective measures. The Court concludes

that the AIC declarations reporting, for example, widespread masking noncompliance or sick

AICs housed with healthy AICs across ODOC's facilities are relevant evidence of Defendants'

policies and practices. *See Parsons v. Ryan*, 754 F.3d 657, 672 (9th Cir. 2014) ("[T]he plaintiffs

also submitted declarations describing their experiences with [the Arizona Department of

Corrections'] policies and practices governing health care and conditions of confinement. These

declarations by the named plaintiffs were not submitted to support individual Eighth Amendment

claims; rather, the plaintiffs submitted these declarations as evidence of the defendants' unlawful

policies and practices, and as examples of the serious harm to which all inmates in [the

defendants'] custody are allegedly exposed."). The declarations contain reports of Defendants'

failure to implement COVID protective measures, and thus are relevant to Plaintiffs' claims.

To the extent Defendants argue that, in general, absent class members or non-class members cannot testify at trial and thus Rule 56(c)(2) bars the evidence at summary judgment, the Court disagrees. *See Negrete*, 2013 WL 6535164, at *21 (denying motion to preclude trial testimony of absent class members).

To the extent Defendants argue that the evidence is not admissible in this case specifically because of the Court's previous discovery order at the class certification stage, the Court also disagrees. Defendants argue that ten of the new declarations come from non-class members. (Defs.' Reply All Claims at 53.) The Court's previous opinion granted Defendants leave to interview non-class member AICs on the condition that defense counsel confer with Plaintiffs' counsel on certain details. (Op. & Order at 22, ECF No. 272.) Thus, Defendants were not precluded from pursuing discovery from non-class member AICs.

Regarding the declarations from absent class members, the Court's prior opinion did not opine on the relevance or admissibility of other absent class member testimony for dispositive motions or at trial but merely on whether Defendants had met their burden of showing that the requested discovery from seventy absent class members was appropriate at that time, *i.e.*, to defend against class certification. *See Peterson v. Alaska Commc'ns Sys. Grp., Inc.*, No. 3:12-cv-00090-TMB, 2020 WL 13228683, at *4 (D. Alaska Mar. 12, 2020) ("Because that order [denying the defendant's request to take additional depositions of putative class members] was issued prior to Plaintiffs' class action being certified, however, that conclusion was made exclusively in reference to [the defendant]'s anticipated motion to decertify Plaintiffs' collective action. The District Court has made no statements regarding the sufficiency of the discovery [the defendant] has already received as it pertains to [the defendant]'s anticipated Rule 23 decertification motion, dispositive motions, or trial preparation. That is the issue this court now

addresses."); *see also Bernstein v. Virgin Am., Inc.*, No. 15-cv-02277-JST, 2017 WL 7156343, *1 (N.D. Cal. Aug. 25, 2017) (noting that the court's denial of the defendant's request to seek depositions from all class members was without prejudice to seek the discovery later). Accordingly, the Court concludes that judicial estoppel does not bar consideration of the declarations at summary judgment.

Finally, Defendants have not demonstrated that Plaintiffs were required to identify these sixteen declarants in discovery as relevant to their class-wide liability theories.[14] (*See* Decl. Nadia Dahab Supp. Pls.' Surreply ¶ 6, ECF No. 608, declaring that neither party served initial disclosures.) This Court did not require initial disclosures in this case, and other courts have "declined to preclude . . . declarations simply because initial disclosures were not exchanged." *James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 870 (N.D. Cal. 2014) (citation omitted); *Peterson v. AT & T Umbrella Ben. Plan No. 1*, No. 10-cv-03097 JCS, 2011 WL 5882877, at *6 (N.D. Cal. Nov. 23, 2011) (concluding that, where the court did not issue an order requiring initial disclosures and the parties represented that they had produced all of the documents required in the court's more specific discovery orders, "the initial disclosure requirements of Rule 26 do not apply"). Further, the parties' trial witness lists are not yet due. Accordingly, the Court concludes that Rules 23, 26, and 37(c) do not bar the Court's consideration of the declarations.

Separately, Defendants characterize Plaintiffs' evidence as limited to the sixteen new declarations filed in response to Defendants' motion for summary judgment. (Defs.' Reply All

---

[14] Defendants have not demonstrated that Plaintiffs were required specifically to identify these sixteen declarants in response to Defendants' interrogatory asking Plaintiffs to identify and describe the actions and inactions giving rise to their claims. (*See* Decl. Molly Honoré Supp. Defs.' Reply All Claims ¶¶ 5-6, ECF No. 601.)

Claims at 41.) However, Plaintiffs cite to declarations in the record filed in connection with previous motions in this case beyond the sixteen new declarations. (*See, e.g.*, Pls.' Resp. All Claims at 10-11 nn.14-19; *see also* Defs.' Reply All Claims at 2 n.1, incorporating by reference Defendants' declarations filed at other stages of litigation.) Defendants have not provided the Court with authority explaining why the Court should not consider declarations in the record from earlier stages in the litigation. *See* FED. R. CIV. P. 56(c)(1)(A) (explaining that a party must support their factual position by "citing to particular parts of materials in the record"). The Court concludes that it may consider other declarations in the record beyond the sixteen new declarations. *See Hood v. King Cnty.*, No. C15-828RSL, 2017 WL 979024, at *1 n.1 (W.D. Wash. Mar. 14, 2017) (relying on materials incorporated by reference and filed in support of a prior motion), *aff'd sub nom.* 743 F. App'x 79 (9th Cir. 2018); *Dex Media W., Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1280 n.3 (W.D. Wash. 2011) (noting that both parties incorporated by reference the declarations filed in support of a different motion).

Accordingly, the Court will consider the declarations that Plaintiffs submitted in support of their response to Defendants' motion for summary judgment, in addition to the declarations Plaintiffs previously filed in connection to other stages of this litigation.

### d. ODOC Defendants' Response to COVID During the Class Period

The Court next summarizes some of the relevant evidence regarding the ODOC Defendants' COVID response.

It is undisputed that, in accordance with a pre-pandemic plan for emergency operations, ODOC activated the AOC to oversee ODOC's operational plan during the pandemic. (Jindal Decl. Ex. 2.) The AOC met each weekday. (Russell Decl. ¶ 26.)

///

In March 2020, ODOC suspended all in-person visitations and staff trainings, closed staff gyms and wellness centers, and provided AICs with two five-minute phone calls per week. (Jindal Decl. Ex. 3 at 2; Jindal Decl. Ex. 4 at 1.) Plaintiffs present evidence that, at that time, Defendants did not adopt, implement, or enforce:

- adequate quarantine and isolation measures (*see, e.g.*, Decl. Aaron Delicino Supp. Pls.' Mot. TRO ("Delicino Decl.") ¶ 5(b), ECF No. 19, describing no medical quarantine for a sick AIC who remained in general housing for fifteen days; Decl. George Gardea Supp. Pls.' Mot. TRO ("Gardea Decl.") ¶ 4(a), (e), ECF No. 93, explaining that AICs remained in their cells with their cellmates awaiting test results; Decl. Theron Hall Supp. Pls.' Mot. TRO ("First Hall Decl.") ¶ 11(a), (h), ECF No. 60, noting that 630 people "quarantined" in one block; Decl. Norman Hoag Supp. Pls.' Mot. TRO ("Hoag Decl.") ¶¶ 6, 14, ECF No. 50, explaining that "quarantine" meant remaining in their cells when they are not at work, showering, or using the phone);[15]

---

[15] *See also, e.g.*, Decl. Althea Seloover Supp. Pls.' Mot. TRO ("First Seloover Decl.") ¶¶ 6(e), 7(b)-(e), 8(e), 10(b)-(c), 11(b)-(c), 12(f), ECF No. 15, documenting reports by Gregory Coffman, James Bogosian, Roger Bradford, James Barton, Michael Gutierrez, and Abraham Schworak; Decl. Jeffrey Parnell Supp. Pls.' Mot. TRO ("Parnell Decl.") ¶¶ 16, 30, ECF No. 18; Decl. Corey Constantin Supp. Pls.' Mot. TRO ("Constantin Decl.") ¶ 5(b), ECF No. 22; Decl. Daniel Nielson Supp. Pls.' TRO ("Nielson Decl.") ¶¶ 4, 6, ECF No. 23; Decl. Daniel White Supp. Pls.' TRO ("Daniel White Decl.") ¶¶ 5, 14-15, ECF No. 24; Decl. Francis Weaver Supp. Pls.' Mot. TRO ("Weaver Decl.") ¶ 6, ECF No. 27; Decl. Frankie White Supp. Pls.' Mot. TRO ("Frankie White Decl.") ¶¶ 8-10, 27, ECF No. 28; Decl. Jacob Strock Supp. Pls.' Mot. TRO ("Strock Decl.") ¶ 5, ECF No. 30; Decl. Jamahl Maner Supp. Pls.' Mot. TRO ("Maner Decl.") ¶ 12, ECF No. 31; Decl. Jesse Patterson Supp. Pls.' Mot. TRO ("Patterson Decl.") ¶¶ 9, 16, ECF No. 32; Decl. Kelly Fereira Supp. Pls.' Mot. TRO ("Fereira Decl.") ¶¶ 9, 11, ECF No. 36; Decl. Kerry Crockett Supp. Pls.' Mot. TRO ("Crockett Decl.") ¶ 5(d)-(f), (m), ECF No. 37; Decl. Kevin McCormack Supp. Pls.' Mot. TRO ("First McCormack Decl.") ¶ 11, ECF No. 38; Decl. Leland Benson Supp. Pls.' Mot. TRO ("Benson Decl.") ¶ 9, ECF No. 39; Decl. Lisandro Sanchez Supp. Pls.' Mot. TRO ("Sanchez Decl.") ¶ 7, ECF No. 40; Decl. Matthew Maddox Supp. Pls.' Mot. TRO ("Maddox Decl.") ¶ 5(a), (d), ECF No. 43; Decl. Micah Rhodes Supp.

- social distancing measures (*see, e.g.*, Delicino Decl. ¶ 5(e), (i), testifying that
  COs did not practice social distancing with AICs; Decl. Christopher Mitchell
  Supp. Pls.' Mot. TRO ("Mitchell Decl.") ¶ 13, ECF No. 21, "I am never six
  feet or more from another person"; Constantin Decl. ¶ 5(o), (q), (t), (x), noting
  that bunk mates were not told to sleep head-to-toe and that 100 AICs ate
  together in the dining hall);[16] or

---

Pls.' Mot. TRO ("Rhodes Decl.") ¶ 13, ECF No. 44; Decl. Michael Garrett Supp. Pls.' Mot. TRO ("Garrett Decl.") ¶ 5(g), ECF No. 45; Decl. Michaela Taylor Supp. Pls.' Mot. TRO ("Taylor Decl.") ¶ 4(g)-(h), ECF No. 46; Decl. Mickey Weis Supp. Pls.' Mot. TRO ("Weis Decl.") ¶ 15, ECF No. 47; Decl. Mylo Lupoli Supp. Pls.' Mot. TRO ("Lupoli Decl.") ¶¶ 5, 8, 15, ECF No. 48; Decl. Nathan Adams Supp. Pls.' Mot. TRO ("Adams Decl.") ¶ 5, ECF No. 49; Decl. Patrick Kirk Supp. Pls.' Mot. TRO ("Kirk Decl.") ¶ 8, ECF No. 51; Decl. Paula Prosch Suppl Pls.' Mot. TRO ("Prosch Decl.") ¶ 11, ECF No. 53; Decl. Ronald Cantrell Supp. Pls.' Mot. TRO ("Cantrell Decl.") ¶¶ 9, 21, ECF No. 55; Decl. Skyler Floro Supp. Pls.' Mot. TRO ("Floro Decl.") ¶¶ 10-12, ECF No. 56; Decl. Stephen Meeks Supp. Pls.' Mot. TRO ("Meeks Decl.") ¶ 13, ECF No. 57; Decl. Steven Richardson Supp. Pls.' Mot. TRO ("Richardson Decl.") ¶ 4(d), ECF No. 59; Decl. Tyrone Lee Supp. Pls.' Mot. TRO ("First Lee Decl.") ¶¶ 5(b)-(d), ECF No. 61; Decl. Wayne Houff Supp. Pls.' Mot. TRO ("Houff Decl.") ¶ 5(j), ECF No. 62; Decl. David Hart Supp. Pls.' Mot. TRO ("Second Hart Decl.") ¶ 4(e)-(f), ECF No. 63; Decl. Brandon Plunk Supp. Pls.' Mot. TRO ("Plunk Decl.") ¶ 4(a), ECF No. 92; Decl. Jose Sanchez Astorga Supp. Pls.' Mot. TRO ("Sanchez Astorga Decl.") ¶ 4(d), (h), ECF No. 94; Decl. Robert Horner Supp. Pls.' Mot. TRO ("Horner Decl.") ¶ 4(h), ECF No. 97; Decl. Tracy Walls Supp. Pls.' Mot. TRO ("Walls Decl.") ¶ 4(a)-(b), ECF No. 98; Decl. Kevin McCormack Supp. Pls.' Mot. TRO ("Second McCormack Decl.") ¶ 4(a), ECF No. 100; Decl. Theron Hall Supp. Pls.' Mot. Class Cert. ("Second Hall Decl.") ¶¶ 9-10, ECF No. 211; Decl. Andrew Cadwaller Supp. Pls.' Mot. Class Cert. ("Cadwaller Decl.") ¶ 37, ECF No. 214; Decl. Justin Phillips Supp. Pls.' Mot. Class Cert. ("Phillips Decl.") ¶¶ 9-10, ECF No. 219; Decl. James Moffatt Supp. Pls.' Resp. All Claims ("Moffatt Decl.") ¶ 4, ECF No. 554; Decl. Theron Hall Supp. Pls.' Resp. All Claims ("Third Hall Decl.") ¶ 3, ECF No. 562; Decl. Tyrone Lee Supp. Pls.' Resp. All Claims ("Second Lee Decl.") ¶¶ 4-7, ECF No. 563.

[16] *See also, e.g.*, First Seloover Decl. ¶ 11(e), documenting reports by Michael Gutierrez; Parnell Decl. ¶¶ 5-7, 21; Decl. Brandon Borba ("Borba Decl.") ¶ 5(e), (g), ECF No. 20; Decl. John Preston II Supp. Pls.' Mot. TRO ("Preston Decl.") ¶¶ 7-8, ECF No. 33; Daniel White Decl. ¶ 9; Decl. Erik Larson Supp. Pls.' Mot. TRO ("Larson Decl.") ¶ 13, ECF No. 26; Frankie White Decl. ¶ 29; Decl. Gavin Pritchett Supp. Pls.' Mot. TRO ("Pritchett Decl.") ¶ 5(c), ECF No. 29; Strock Decl. ¶ 8; Maner Decl. ¶ 9; Patterson Decl. ¶ 7; Decl. Joshua Brown Supp. Pls.' Mot. TRO ("Joshua Brown Decl.") ¶ 3, ECF No. 34; Fereira Decl. ¶¶ 5, 7; First McCormack Decl. ¶¶ 6, 12; Benson Decl. ¶¶ 7, 12; Sanchez Decl. ¶¶ 4-6; Decl. Luis Polanco Supp. Pls.' Mot. TRO

- measures to prevent AIC unit or staff mixing (*see, e.g.*, Delicino Decl. ¶ 5(d),

  (i)-(j), testifying that units mixed with up to 300 people on the yard together;

  Larson Decl. ¶ 6, explaining that staff mixed between units while one housing

  unit was quarantined; Weaver Decl. ¶ 5, "Staff go all over the place within the

  prison and interact with different units" and "can work on three to four

  different units in one night."; Pritchett Decl. ¶ 5(j), testifying that staff moved

  freely between COVID hotspots, quarantine, and other units).[17]

Further, there is evidence in the record that any isolation due to sickness was punitive in nature.

(*See, e.g.*, Weaver Decl. ¶¶ 7, 9-12, testifying that AICs used ice to cool their foreheads to avoid

disciplinary segregation; Frankie White Decl. ¶¶ 15-21, describing dirty disciplinary segregation

cells with no soap or cleaning supplies or access to personal property; Decl. Brookey West Supp.

Pls.' Resp. All Claims ("West Decl.") ¶ 4, ECF No. 551, describing quarantine in disciplinary

---

("Polanco Decl.") ¶¶ 4-5, 16, ECF No. 41; Decl. Mari-Teresa Gillespie Supp. Pls.' Mot. TRO
("Gillespie Decl.") ¶¶ 8, 13-14, ECF No. 42; Maddox Decl. ¶ 5(f), (i); Rhodes Decl. ¶¶ 4, 10, 13,
18; Garrett Decl. ¶ 5(a); Taylor Decl. ¶ 4(c); Weis Decl. ¶ 13; Lupoli Decl. ¶¶ 14, 16; Adams
Decl. ¶¶ 6, 19; Kirk Decl. ¶¶ 13-14, 16; Decl. Patrick Loreman Supp. Pls.' Mot. TRO ("Loreman
Decl.") ¶ 4(b)-(c), ECF No. 52; Cantrell Decl. ¶¶ 10, 24; Floro Decl. ¶¶ 6-8; Meeks Decl. ¶¶ 7,
10-11; Decl. Steve Jamison Supp. Pls.' Mot. TRO ("Jamison Decl.") ¶ 4, ECF No. 58; Houff
Decl. ¶ 5(m); Decl. Richard Curtis Supp. Pls.' Mot. TRO ("Curtis Decl.") ¶ 4(e)-(f), ECF No. 96;
Second McCormack Decl. ¶ 4(i).

[17] *See also, e.g.*, First Seloover Decl. ¶ 11(f), documenting reports by Michael Gutierrez;
Parnell Decl. ¶ 26; Borba Decl. ¶ 5(k); Constantin Decl. ¶ 5(g); Nielson Decl. ¶¶ 5, 7; Decl.
David Hart Supp. Pls.' Mot. TRO ("First Hart Decl.") ¶ 11(j), ECF No. 25; Joshua Brown Decl.
¶¶ 6-7; Decl. Joshua Hedrick Supp. Pls.' Mot. TRO ("Hedrick Decl.") ¶¶ 6-11, ECF No. 35;
Crockett Decl. ¶ 5(h), (k)-(l); First McCormack Decl. ¶¶ 11, 13; Gillespie Decl. ¶¶ 5, 7, 9;
Maddox Decl. ¶ 5(h); Rhodes Decl. ¶¶ 18, 20-21, 23; Garrett Decl. ¶ 5(b)-(d); Taylor Decl.
¶ 4(g); Weis Decl. ¶ 15; Lupoli Decl. ¶ 16; Adams Decl. ¶ 13; Kirk Decl. ¶ 8; Loreman Decl.
¶ 4(a), (d); Decl. Rian Smith Supp. Pls.' Mot. TRO ("Smith Decl.") ¶¶ 6-7, ECF No. 54; Cantrell
Decl. ¶¶ 4-5, 7-8, 25-26; Floro Decl. ¶ 8; Richardson Decl. ¶ 4(l)-(m); First Lee Decl. ¶ 5(e)-(f);
Houff Decl. ¶ 5(l), (s); Curtis Decl. ¶ 4(g); Walls Decl. ¶ 4(r); Preston Decl. ¶ 8.

segregation; Moffatt Decl. ¶¶ 4(d), 10-11, recounting a dirty cell with no access to a phone, electric plug, flushing toilet, or hot water.)[18] It is undisputed that at that time Defendants did not impose masking requirements and it is unclear if Defendants had adopted testing policies yet.

In April 2020, ODOC issued its first centralized COVID response plan. (*See generally* Dahab Decl. Ex. 13.) The plan introduced a "tiered" protocol that did not appear in the CDC's or OHA's guidance related to COVID in correctional facilities.[19] (*Compare id.* at 6-7, *with* Dahab Decl. Ex. 2; Dahab Decl. Ex. 3.) Under the tiered protocol, heightened COVID precautions were implemented once a certain level of outbreak occurred at that institution. (Dahab Decl. Ex. 13 at 6-7.) For example, staff temperature checks were not required at tier one institutions and staff were required to wear utility masks inside the institution at all times only if the COVID infection level reached tier four. (Jindal Decl. Ex. 3 at 22, 25.) The same month, ODOC presented Governor Brown with various options of actions necessary to achieve social distancing, including, for example, an "intake moratorium" like the State of Colorado had already undertaken. (Steward Decl. Ex. 11 at 9.) Oregon never adopted an intake moratorium. Instead, there is evidence that, while other states began releasing AICs, ODOC "pick[ed] up" people released as part of Washington's COVID response. (Jindal Decl. Ex. 3 at 7.)

---

[18] *See also, e.g.*, First Seloover Decl. ¶ 8(e), documenting reports by Roger Bradford; Parnell Decl. ¶¶ 12, 26; Constantin Decl. ¶ 5(b), (h); Daniel White Decl. ¶ 18; First Hart Decl. ¶ 11(o); Pritchett Decl. ¶ 5(b); Maner Decl. ¶ 12; Preston Decl. ¶ 4; First McCormack Decl. ¶ 15; Sanchez Decl. ¶ 9; Rhodes Decl. ¶ 24; Garrett Decl. ¶ 5(f); Adams Decl. ¶ 16; Kirk Decl. ¶ 7; Smith Decl. ¶ 9; Cantrell Decl. ¶ 22; Floro Decl. ¶ 17; Richardson Decl. ¶ 4(c)-(f); First Hall Decl. ¶ 11(d), (i)-(j); Houff Decl. ¶ 5(a); Sanchez Astorga Decl. ¶ 4(a), (f), (h); Curtis Decl. ¶ 4(c); Walls Decl. ¶ 4(e)-(f), (u); Decl. David Hart Supp. Pls.' Mot. TRO ("Third Hart Decl.") ¶¶ 23, 45-50, ECF No. 99; Second McCormack Decl. ¶ 4(g).

[19] As Defendants acknowledge (Defs.' Mot. All Claims at 46), the CDC guidelines are not themselves a constitutional requirement but help illuminate the relevant standards of decency.

In May 2020, this Court held a hearing on Plaintiffs' motion for a temporary restraining order. (ECF No. 107.) Plaintiffs argued that Defendants had failed to take reasonable actions to mitigate the risk of COVID transmission (*see* Pls.' Mot. TRO at 2, ECF No. 14), including suggesting that Defendants should consider the possibility of transferring AICs into unused buildings. (*See* Parnell Decl. ¶ 27, noting that a refurbished minimum-security facility and half of DRCI remained empty; Test. Marc Stern, Tr. 67:5-10, ECF No. 117, explaining that short of reducing institutions' populations through release, Defendants could "spread out" by utilizing unused buildings; *see also* Dahab Decl. Ex. 2 at 11, CDC guidance recommending that "[i]f space allows," prison officials should "reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions.") As discussed, there is no evidence that Defendants ever utilized ODOC's two empty facilities. On the current record before the Court, there is a genuine dispute of fact as to whether Defendants *considered* using ODOC's two empty institutions in their response to COVID. (*See, e.g.*, Robbins Depo. at 29:17-22, 36:12-20; Peters Depo. at 63:8-65:9; Bajpai Depo. at 21:7-13; Myers Depo. 72:3-23.)

Further, there is a question of fact concerning the availability of other spaces or "emergency beds" to facilitate social distancing. (*See, e.g.*, Bajpai Depo. at 21:7-13, explaining that ODOC did not take into account space in unused facilities or emergency beds when considering the steps necessary for social distancing; Depo. Gregory Jones ("Jones Depo.") 35:4-7,[20] testifying that there was never a policy requiring use of all available beds to achieve maximum social distancing; Dahab Decl. Ex. 34 at 2, ECF No. 547-34, "Knowing that there is a lot of attention paid to our e-beds . . . I want to make sure we are messaging that these e-beds are

---

[20] Excerpts of Jones' deposition are available at Sugerman Decl. Ex. 14, ECF No. 568-14, and Dahab Decl. Ex. 27, ECF No. 547-27.

not appropriate for managing capacity issues."; Dahab Decl. Ex. 35 at 2, ECF No. 547-35, "We

were in the process of deactivating emergency beds[.]"; Dahab Decl. Ex. 36 at 1, ECF No. 547-

36, "I would like to do anything possible to avoid activating those e-beds."; Decl. Shyanna

Eaglespeaker Supp. Pls.' Resp. All Claims ("Eaglespeaker Decl.") ¶ 14, ECF No. 565, testifying

that open cells at CCCF remained unoccupied; Decl. Sheryl Sublet Supp. Pls.' Mot. Class Cert.

("Sublet Decl.") ¶ 25, ECF No. 209, "In November and December of 2020, approximately 70

women were released from the Minimum side on commutation. As a result, there was all this

empty space. There were about 42 women left on the 200 unit. Instead of using this empty space

to social distance, they closed 200 unit entirely, and packed those 42 women into bunks across

the 100, 300, and 400 units, which nearly filled each to unit to capacity."; Preston Decl. ¶ 14,

reporting that two units remained empty; Decl. Michael Willingham Supp. Pls.' Mot. Class Cert.

("Willingham Decl.") ¶ 19, ECF No. 220, explaining that when AICs were transferred out of the

facility, the remaining AICs were moved to "the bottom dorm instead of spreading the remaining

AICs out between the top and bottom dormitories"; Decl. William Sellers Supp. Pls.' Mot. Class

Cert. ("Second Sellers Decl.") ¶ 22, ECF No. 221, explaining that a multi-purpose building was

used to serve meals to quarantine units for a few weeks but then the practice was discontinued

and all units received meals in the same dining hall; *compare with* Dahab Decl. Ex. 25,

indicating that vacant beds "does not mean these e-beds are empty, this means institutions are

spreading folks out as best as possible for social distancing or are using them to more safely

manage their populations"; Dahab Decl. Ex. 37, ECF No. 547-37, indicating that some e-beds

were used for "COVID Distancing"; Decl. Greg Jones Supp. Defs.' Reply All Claims ¶ 8, ECF

No. 603, "During the pandemic, superintendents in ODOC facilities across the state used

emergency beds to increase social distancing"; Jindal Decl. Ex. 3 at 7, indicating that AICs were

PAGE 46 – OPINION AND ORDER

moved around at SCI "due to the[] empty bunk situation.")[21] Indeed, Plaintiffs present evidence

that Defendants removed emergency beds from use during the class period. (Jones Depo. 88:11-

14, 100:1-11.)

Regarding masks, on April 3, 2020, the CDC recommended that everyone wear masks in

public settings where other social distancing measures were difficult to maintain. Centers for

Disease Control & Prevention, *Recommendation Regarding the Use of Cloth Face Coverings,*

*Especially in Areas of Significant Community-Based Transmission* (Apr. 3, 2020),

https://web.archive.org/web/20200409020838/https://www.cdc.gov/coronavirus/2019-

ncov/prevent-getting-sick/cloth-face-cover.html. In May 2020, ODOC required AICs and staff to

wear masks at all times in "Health Services, culinary, and physical plant" and otherwise to wear

masks where maintaining six feet of distance was not possible. (Jindal Decl. Ex. 8.)

In July 2020, the CDC released updated guidance on COVID management in correctional

facilities, recommending everyone wear masks "as much as safely possible." (Dahab Decl. Ex.

18 at 15, ECF No. 547-18.) In July 2020, Steward sent an email to all staff stating, "we each

have—and are entitled to—our own thoughts and opinions on face coverings[,] . . . [w]e are

facing legal action, . . . [i]t is becoming difficult to stand our ground on our current directive,"

and staff found not wearing a mask when required would be reminded of the requirement. (Jindal

Decl. Ex. 14 at 1.) If staff refused to wear a mask when within six feet of others and after being

---

[21] Defendants argue that using more emergency beds would have increased population density and decreased social distancing. (*See* Defs.' Reply All Claims at 33.) At oral argument, Plaintiffs argued that using emergency beds necessarily takes an AIC out of a bunk bed and creates more space for distancing while sleeping. (*See also* Pls.' Resp. All Claims at 34-35.) Defendants also argue that they did not have sufficient funding for emergency beds. (Defs.' Reply All Claims at 30 n.12.) These are disputed questions of fact and are not appropriate for the Court to resolve at summary judgment.

reminded, they would be sent home for the day without pay, and "progressive discipline" would

begin. (*Id.* at 2.)

In August 2020, another email stated that all AICs were required to have a mask with

them whenever they left their cell and to wear a mask when within six feet of others. (Jindal

Decl. Ex. 15.) According to the email, AICs who refused to wear a mask would receive a "daily

fail" or progressive discipline. (*Id.*; *see also* Jindal Decl. Ex. 3 at 39, "8/12/20 start date for AICs

required to wear approved masks/face coverings whenever 6' of social distancing cannot be

maintained.") In November 2020, ODOC began requiring that everyone wear masks at all times

when indoors. (Jindal Decl. Ex. 16 at 1.)

Plaintiffs argue that ODOC's mask policies were incongruent with CDC guidelines

because masks were only required when maintaining six feet of distance was not possible instead

of "as much as safely possible." (Pls.' Resp. All Claims at 27.) Further, Plaintiffs present

extensive evidence that ODOC failed to implement and enforce its mask policy, particularly

against COs. (*See, e.g.*, Decl. Anthony Ortega Supp. Pls.' Resp. All Claims ("Ortega Decl.")

¶¶ 3, 8-10, 16, ECF No. 550, describing COs not wearing masks or incorrectly wearing masks

and never observing supervisors instructing otherwise; Decl. Gregory Moore Supp. Pls.' Resp.

All Claims ("Moore Decl.") ¶¶ 6, 10, ECF No. 552, noting no masks worn in Health Services by

AICs or staff; Third Hall Decl. ¶¶ 8-14, describing COs consistently not wearing masks through

April 2021 without enforcement or repercussions.)[22] There is no evidence in the record that any

---

[22] *See also, e.g.*, Decl. James Keith Supp. Pls.' Resp. All Claims ("Keith Decl.") ¶ 9, ECF
No. 553; Decl. Jeffrey Lee Stewart Supp. Pls.' Resp. All Claims ("Stewart Decl.") ¶¶ 3(c), 4(b),
ECF No. 555; Decl. Lance Wood Supp. Pls.' Resp. All Claims ("Second Wood Decl.") ¶ 22,
ECF No. 557; Decl. Michael Newland Supp. Pls.' Resp. All Claims ("Newland Decl.") ¶ 4(c),
ECF No. 558; Decl. Shawn Evans Supp. Pls.' Resp. All Claims ("Evans Decl.") ¶ 12, ECF No.
560; Decl. William Harvey Supp. Pls.' Resp. All Claims ("Second Harvey Decl.") ¶ 4(b), ECF
No. 564; Eaglespeaker Decl. ¶¶ 6-8; Decl. David Brown Supp. Pls.' Resp. Defs.' Mot. Partial

staff ever faced repercussions for not wearing a mask. (*Cf.* Jindal Decl. Ex. 26, ECF No. 518,

requesting an explanation why a CO did not wear a mask on four days in December 2020 and

January 2021; Jindal Decl. Ex. 27, ECF No. 518, letter indicating that staff are expected to wear

a mask.)

ODOC's centralized plan for social distancing indicated that ODOC closed its facilities to

visitors and volunteers, modified line movements to limit the number of AICs in common areas,

eliminated group activities in the yard, and stated that "AICs are staying together by unit."[23]

(Dahab Decl. Ex. 13 at 5-6; *see also* Dahab Decl. Ex. 21 at 6, ECF No. 547-21; Bugher Decl.

¶ 65, noting that ODOC keeps "AICs together by unit where possible.") There is also some

evidence that several of ODOC's individual institutions took additional steps toward social

distancing, although the timing and details of those steps are not entirely clear. (*See* Jindal Decl.

---

Summ. J. ("David Brown Decl.") ¶ 4(f), (j), ECF No. 128; Decl. William Harvey Supp. Pls.'
Resp. Defs.' Mot. Partial Summ. J. ("First Harvey Decl.") ¶ 4(b), (d), (j), ECF No. 129; Decl.
Rashid Kambarov Supp. Pls.' Resp. Defs.' Mot. Partial Summ. J. ("Kambarov Decl.") ¶ 4(a)-(b),
ECF No. 130; Decl. Paul Maney Supp. Pls.' Resp. Defs.' Mot. Partial Summ. J. ("First Maney
Decl.") ¶ 4(d), (j)-(l), ECF No. 131; Decl. Bryan McDonald Supp. Pls.' Resp. Defs.' Mot. Partial
Summ. J. ("McDonald Decl.") ¶¶ 5(k), (o), 7(i), ECF No. 132; Decl. Mitchell Randall Supp. Pls.'
Resp. Defs.' Mot. Partial Summ. J. ("Randall Decl.") ¶ 4(b), (f)-(h), ECF No. 133; Decl. Althea
Seloover Supp. Pls.' Resp. Defs.' Mot. Partial Summ. J. ("Second Seloover Decl.") ¶ 6(f), ECF
No. 135; Decl. Matthew Yurkovich Supp. Pls.' Resp. Defs.' Mot. Partial Summ. J. ("Yurkovich
Decl.") ¶ 4(k)-(n), ECF No. 138; Decl. Gary Clift Supp. Pls.' Mot. Class Cert. ("Clift Decl.") ¶ 9,
ECF No. 207; Decl. Paul Maney Supp. Pls.' Mot. Class Cert. ("Second Maney Decl.") ¶¶ 15-16,
ECF No. 208; Sublet Decl. ¶ 18; Second Hall Decl. ¶ 15; Decl. Brian Thornburg Supp. Pls.' Mot.
Class Cert. ("Thornburg Decl.") ¶ 20, ECF No. 212; Cadwallader Decl. ¶¶ 25-26; Decl. Billy
Shaffer Supp. Pls.' Mot. Class Cert. ("Shaffer Decl.") ¶¶ 17-20, ECF No. 215; Decl. Devin
Butler Supp. Pls.' Mot. Class Cert. ("Butler Decl.") ¶¶ 21, 23-24, ECF No. 216; Decl. Jamie
Edgtton Supp. Pls.' Mot. Class Cert. ("Edgtton Decl.") ¶¶ 25-26, ECF No. 217; Phillips Decl.
¶¶ 15-20; Willingham Decl. ¶ 11; Second Sellers Decl. ¶ 13.

[23] Defendants' position on whether they had a policy of separating AICs by unit is
unclear because Defendants also argue in response to Plaintiffs' motion for partial summary
judgment that Plaintiffs have not identified any policy related to "mixing." (Defs.' Resp. Br. Pls.'
Mot. Summ. J. ("Defs.' Resp.") at 16, ECF No. 537.)

Ex. A, Decl. Julie Martin ¶ 22, SCCI placed dots on the floor and kept dorm units together while

waiting in the medicine line; Jindal Decl. Ex. B, Decl. Douglas Sheppard ¶¶ 28, 30, 32, CRCI

limited the amount of seating in each unit's dayrooms, put markers on the floor, limited capacity

in the dining hall, and staggered housing unit mealtimes; Jindal Decl. Ex. 17 at 2, DRCI placed

markers on the floor for the medicine line, staggered seating and tables in the dining hall, and

limited the number of AICs at dayroom tables; *cf.* Jindal Decl. Ex. 20 at 1, noting that AICs are

"not expected to socially distance . . . within their own housing unit"; Dahab Decl. Ex. 11, Depo.

Susan Washburn ("Washburn Depo.") 36:20-25, ECF No. 547-11, confirming that there was no

social distancing in housing; Decl. Jermaine F. Brown Supp. Defs.' Jeske Mot. ("Jermaine

Brown Decl.") Ex. 7, Depo. Paul Maney 71:4-6, ECF No. 495-7, testifying about no social

distancing in housing units.)

There is evidence that Defendants did *not* adopt policies such as minimizing the number

of individuals housed in the same room,[24] minimizing mixing of individuals from different

---

[24] *See e.g.*, Mitchell Decl. ¶ 13, "I am never six feet or more from another person";
Eaglespeaker Decl. ¶ 14, describing units filled to capacity; Sublet Decl. ¶ 24, describing dorms
with 108 beds each less than three feet apart; Decl. Adam Coopersmith Supp. Pls.' Mot. Class
Cert. ("Coopersmith Decl.") ¶¶ 28-29, ECF No. 213, explaining that the dorm housing 128
people is almost always full; *see also* Decl. Nathan Mosely Supp. Pls.' Resp. All Claims
("Mosely Decl.") ¶ 5(a), ECF No. 549 ; West Decl. ¶¶ 4(a), 8; Moore Decl. ¶ 5(b); Stewart Decl.
¶ 4(c); Second Wood Decl. ¶¶ 5, 17; Second Lee Decl. ¶ 8; Clift Decl. ¶ 9; Thornburg Decl. ¶ 26;
Edgtton Decl. ¶ 36; Second Sellers Decl. ¶ 24; Preston Decl. ¶ 7; Decl. Kevin McCormack Supp.
Pls.' Resp. All Claims ("Third McCormack Decl.") ¶ 14, ECF No. 556.

housing units,[25] implementing broad movement restrictions,[26] or modifying staff assignments to

minimize movement across housing units or between units with and without known COVID

infections.[27] (*See* Dahab Decl. Ex. 13; Dahab Decl. Ex. 21, attaching ODOC's centralized plan,

---

[25] *See e.g.*, Jindal Decl. Ex. 20 at 4, noting that AICs from different units interact while working at the Physical Plant and the kitchen; Ortega Decl. ¶ 11, noting that different housing units worked in the kitchen together; Decl. Robert Stafford Supp. Pls.' Resp. All Claims ("Stafford Decl.") ¶¶ 8-9, ECF No. 559, describing AICs from different units mixing at work; Third Hall Decl. ¶¶ 5, 7, describing AICs moving throughout the facility until February 2021; Second Lee Decl. ¶¶ 9, 11, testifying that dining hall workers mixed across units and that different units went to yard and chow hall together; Eaglespeaker Decl. ¶¶ 10-11, describing AICs from different units working together, interactions with AICs in "isolation," and "a great deal of unnecessary inter-unit contact"; Delicino Decl. ¶ 5(i), noting that units mixed with up to 300 people on the yard together; Thornburg Decl. ¶¶ 13, 17, observing mixing of healthy and sick AICs; Coopersmith Decl. ¶¶ 10, 16, 27, explaining that AICs from different units worked together even when units were on quarantine status; *see also* Third McCormack Decl. ¶¶ 11(c), 12(c), (f); Mosely Decl. ¶ 5(e); West Decl. ¶ 15; Second Wood Decl. ¶ 24; Second Harvey Decl. ¶ 4(d); Second Maney Decl. ¶ 13; Sublet Decl. ¶¶ 13-14; Cadwaller Decl. ¶ 13; Butler Decl. ¶ 20; Edgtton Decl. ¶¶ 21-22; Phillips Decl. ¶¶ 8, 32; Second Sellers Decl. ¶ 9; Decl. Lance Wood Supp. Pls.' Resp. Defs.' Mot. Partial Summ. J. ("First Wood Decl.") ¶ 5(a), ECF No. 137.

[26] *See e.g.*, Jindal Decl. Ex. 3 at 142, 168, 181, 197, 202, 225-27, 241, 246, 252, 255, 285-87, documenting AICs who tested positive for COVID following transfers; Mosely Decl. ¶ 6, describing transports between facilities; Evans Decl. ¶ 4, "AICs get moved around often"; Third Hall Decl. ¶¶ 5, 7, describing AICs moving throughout the facility until February 2021; Keith Decl. ¶ 2, describing transfer from a unit on quarantine; Second Wood Decl. ¶ 9, explaining that quarantine units still moved around the facility to pick up food from chow hall; Stafford Decl. ¶¶ 4(a), 6, describing transfer for approximately a week of quarantine at one facility, transfer for three days of quarantine at another facility, and then transfer back to the third facility; *see also* Third McCormack Decl. ¶ 8; West Decl. ¶¶ 9, 13-14; Moore Decl. ¶ 5; Stewart Decl. ¶ 4; Second Lee Decl. ¶ 12; Second Harvey Decl. ¶ 4(c); Eaglespeaker Decl. ¶ 14; Second Hall Decl. ¶ 14; Thornburg Decl. ¶¶ 15, 18; Coopersmith Decl. ¶¶ 8-11, 27; Butler Decl. ¶¶ 12, 15; Edgtton Decl. ¶ 24; Phillips Decl. ¶¶ 11-13.

[27] *See e.g.*, Russell Decl. ¶ 89, indicating that there are no restrictions on staff movement or assignment; Second Wood Decl. ¶ 8, testifying that COs moving freely between an isolation unit and the rest of the facility; Stewart Decl. ¶ 3(a)(ii), (d), describing that COs would walk back and forth between quarantine and non-quarantine units; Sublet Decl. ¶¶ 15-16, observing that staff move between units and facilities during outbreaks; Shaffer Decl. ¶ 19, describing COs walking between a quarantine and non-quarantine unit; *see also* Third McCormack Decl. ¶ 17; West Decl. ¶¶ 11-13; Second Lee Decl. ¶ 11; Phillips Decl. ¶ 14; Willingham Decl. ¶ 14; Second Sellers Decl. ¶ 12; David Brown Decl. ¶ 4(k); First Harvey Decl. ¶ 4(k); Decl. William Sellers

which did not include those policies; *see also* Dahab Decl. Ex. 18 at 13-14, 17-18, CDC

guidance recommending "[m]inimiz[ing] the number of individuals housed in the same room as

much as possible," "minimiz[ing] mixing of individuals from different housing units,"

"[l]imit[ing] transfers of [AICs] to and from other jurisdictions and facilities unless necessary for

medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns,

release, or to prevent overcrowding," and making "every possible effort to modify staff

assignments to minimize movement across housing units and other areas of the facility".)

There is also evidence that, to the extent that Defendants adopted social distancing

policies, Defendants did not implement or enforce those measures. (*See, e.g.*, Delicino Decl.

¶ 5(e), explaining that COs did not practice social distancing with AICs; Constantin Decl. ¶ 5(o),

(q), (x), testifying that bunk mates were not told to sleep head-to-toe; Mosely Decl. ¶ 5,

describing no enforcement of social distancing in chow hall or onsite workplaces; Stafford Decl.

¶ 5, observing AICs who transferred from other institutions shaking hands and mingling with

their new unit; Newland Decl. ¶ 4(f), (k), noting "no set standards" and social distancing not

enforced; Third Hall Decl. ¶¶ 18-19, after June 2020, little attempts made at social distancing

and the policy of limiting the number of AICs per table abandoned; Eaglespeaker Decl. ¶ 12,

testifying that social distancing was not enforced; *cf.* Jindal Decl. Ex. 3 at 368, 388, 462,

conducting contact tracing after six to ten staff members ate lunch together.)[28]

---

Supp. Pls.' Resp. Defs.' Mot. Partial Summ. J. ("First Sellers Decl.") ¶ 4(l), ECF No. 134;
Second Seloover Decl. ¶ 6(i); First Wood Decl. ¶ 4(e).

[28] *See also, e.g.*, Second Wood Decl. ¶ 17; Clift Decl. ¶ 9; Second Maney Decl. ¶¶ 20-21;
Sublet Decl. ¶¶ 22-23; Second Hall Decl. ¶ 23; Thornburg Decl. ¶ 25; Coopersmith Decl. ¶¶ 17,
26; Cadwaller Decl. ¶¶ 16, 21, 30-34, 35; Shaffer Decl. ¶¶ 26-28; Edgtton Decl. ¶¶ 29, 34;
Phillips Decl. ¶¶ 29, 31; Willingham Decl. ¶¶ 17-19; Second Sellers Decl. ¶¶ 21-22; David

Regarding testing, there is some evidence that at some point ODOC had a policy of testing symptomatic AICs and symptomatic close contacts of AICs with confirmed COVID cases. (*See* Dahab Decl. Ex. 21 at 7, "test according to symptom presentation"; Jindal Decl. Ex. 18 at 1; Dewsnup Decl. ¶ 41.) There is also some evidence that ODOC had a policy of isolating most confirmed cases and symptomatic close contacts of confirmed cases. (Dewsnup Decl. ¶ 52; Dahab Decl. Ex. 21 at 7, "Suspected COVID-19 go into respiratory isolation/distancing."; *see also* Jindal Decl. Ex. 12, informing the superintendents that AICs should be isolated for ten days after symptom onset.) However, Plaintiffs present evidence that any quarantine and isolation remained punitive. (*See, e.g.*, Randall Decl. ¶ 5(a); Second Hall Decl. ¶¶ 20-21; Thornburg Decl. ¶ 10; Coopersmith Decl. ¶¶ 22-23; Cadwaller Decl. ¶ 29; Shaffer Decl. ¶¶ 24-25; Willingham Decl. ¶ 16; Second Sellers Decl. ¶ 7; Keith Decl. ¶ 8; Second Wood Decl. ¶ 20; Newland Decl. ¶ 4(b); Evans Decl. ¶¶ 7, 9; Ortega Decl. ¶ 13; *cf.* Jindal Reply Decl. Ex. 11 at 1, 3, ECF No. 600-10, noting that some institutions used disciplinary segregation units for quarantine but that the majority of AICs with COVID were housed in a general population or infirmary beds; Jindal Reply Decl. Ex. 12, ECF No. 600-11, noting that AICs should receive their property while quarantined in disciplinary segregation units; *see also* Dahab Decl. Ex. 18 at 25, CDC guidelines recommending that prison officials "[e]nsure that medical isolation for COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice.")

It appears to be undisputed that ODOC did not adopt or implement a policy of testing asymptomatic close contacts—AICs and staff—as the CDC recommended. (*Compare* Dahab

---

Brown Decl. ¶ 4(f); Second Harvey Decl. ¶ 4(b)(ii); Kambarov Decl. ¶ 4(k); McDonald Decl. ¶ 5(d); Randall Decl. ¶ 4(e); Yurkovich Decl. ¶ 4(n); Third McCormack Decl. ¶¶ 11(b), 14.

Decl. Ex. 18 at 7, 13, 19, CDC guidance recommending testing asymptomatic individuals, *with* Dahab Decl. Ex. 21, ODOC's Centralized Plan only required testing of symptomatic AICs; *see also* Jindal Decl. Ex. 3 at 276, 305, 312, 316, 324, 338, 453-54, 459-60, 462, staff who were close contacts with confirmed COVID case "will self-monitor for symptoms" or "[w]ill quarantine at work, monitor symptoms, and wear masks"; *id.* at 354-55, AICs who were cellmates with COVID positive AICs "monitored for COVID symptoms"; Second Wood Decl. ¶¶ 5, 7, three cellmates of AIC who tested positive not given tests.)

There is also evidence that symptomatic AICs were denied COVID tests or that testing was delayed. (*See, e.g.*, Jindal Decl. Ex. 3 at 354, noting that an AIC had been sick a week prior to testing in August 2021; Ortega Decl. ¶ 13, explaining that a symptomatic AIC had to request a test and the test was administered seven days after symptom onset in January 2021; Stewart Decl. ¶ 4(a), testifying that "[i]t wasn't until you felt like you were dying that staff would allow you to get tested" in February 2021; Second Wood Decl. ¶ 10, observing a symptomatic AIC denied a test in August 2020; Newland Decl. ¶ 4(a)-(b), (e), explaining that testing was not enforced and no tests were provided in August 2020; Eaglespeaker Decl. ¶¶ 3, 9, explaining that symptomatic AICs were not tested for over two weeks in December 2020; *cf.* Jindal Decl. Ex. 3 at, *inter alia*, 69, 73-74, 78-80, 85, 89, 91-92, 97, 99, 103, 108, documenting symptomatic staff coming to work and staff testing several days to up to two weeks after symptom onset.)[29]

---

[29] *See also, e.g.*, Mosely Decl. ¶ 4, sometime before December 2021; Moore Decl. ¶ 7, end of June 2020; Thornburg Decl. ¶¶ 6-7, December 2020 and January 2021; Coopersmith Decl. ¶ 12, December 2020; Cadwaller Decl. ¶ 4, "I experienced a lack of testing and treatment at every facility I have been to since the beginning of the pandemic"; Edgtton Decl. ¶ 4, December 2020; David Brown Decl. ¶ 4(d), September 2020; First Harvey Decl. ¶ 4(f)-(g), end of September 2020; Kambarov Decl. ¶ 4(i), September 2020; McDonald Decl. ¶¶ 5(m)-(n), 6(b)-(d), end of September 2020; Second Seloover Decl. ¶ 6(g), middle of September 2020; First Wood Decl. ¶ 4(c)-(d), August 2020; Yurkovich Decl. ¶ 4(b), July 2020; Maddox Decl. ¶ 5, March 2020; Third Hall Decl. ¶ 3(a), April 2020; Parnell Decl. ¶ 30, April 2020; Delicino Decl.

There is also evidence that Defendants did not implement their quarantine policy. (*See, e.g.*, Ortega Decl. ¶¶ 13(c), 15, explaining that symptomatic AICs were not isolated while awaiting test results, and AICs from quarantine units were still required to go to work; Moore Decl. ¶¶ 5(c), 7-8, testifying that AICs with confirmed COVID cases were transported and placed into general population without quarantine and that AICs with symptoms remained in the unit; Keith Decl. ¶¶ 2(a), 3, describing transfer to a different facility while on quarantine and without being tested; Stewart Decl. ¶¶ 3(a)(iv), 4(a), noting that symptomatic AICs waited in their dorm for test results and that cells in general population were used for medical isolation; Second Wood Decl. ¶¶ 6, 9, describing sick AICs forced to go to work or face discipline and that AICs in quarantine units picked up their own food at the chow hall; Newland Decl. ¶ 4(a), (e), testifying that COVID positive AICs were allowed to mingle throughout the unit; Stafford Decl. ¶ 8, testifying that he was forced to work maintenance jobs in quarantine units; Second Lee Decl. ¶¶ 4-6, noting that a symptomatic AIC was never quarantined; Eaglespeaker Decl. ¶¶ 14(d), 15, describing that symptomatic AICs were not quarantined and that general population was exposed to symptomatic AICs with known COVID exposure; *see also* Eaglespeaker Decl. ¶ 15(b), describing that some quarantines only lasted three days; Cadwaller Decl. ¶ 19, describing a one-week quarantine; McDonald Decl. ¶ 4(d), describing four- or five-day quarantine; *cf.* West Decl. ¶ 9, observing AICs moved directly into general population without quarantine after arrival at the institution; *cf.* Jindal Decl. Ex. 3 at 373, documenting that a symptomatic staff member worked pending COVID test results.)[30]

---

¶ 5(b)-(c), April 2020; Moffatt Decl. ¶¶ 4, 8, 12, March to May 2020; Plunk Decl. ¶ 4, May 2020; Constantin Decl. ¶ 5(b), middle of March 2020.

[30] *See also, e.g.*, Clift Decl. ¶ 8; Second Hall Decl. ¶ 12; Coopersmith Decl. ¶¶ 8, 10, 12; Thornburg Decl. ¶¶ 6-7, 9, 14, 19; Third McCormack Decl. ¶¶ 7, 12(c)-(d); Newland Decl.

There is some evidence that ODOC communicated COVID policies through emails, newsletters, television messages, and individual conversations, although the specific substance and frequency of much of those communications is unclear from the record. (*See* Russell Decl. ¶¶ 29-31.) There is also evidence that ODOC inconsistently communicated information surrounding policy changes. (*See, e.g.*, Frener Depo. 42:21-45:22, explaining that policy changes often were not communicated to executive team members or staff and that she would often find out about policy changes much later; Jindal Decl. Ex. 20 at 4, noting that staff desired "more communication from . . . the AOC"; Eaglespeaker Decl. ¶ 16, testifying that AICs "felt out of the loop regarding COVID-19 policies and procedures" and "COs did not know what was going on either and there was no clear line of communication"; *see also* Dahab Decl. Ex. 2 at 5, 12, CDC guidance recommending that prison officials "communicat[e] clearly with staff and [AICs,]" "[c]ommunicate clearly and frequently with [AICs] about changes to their daily routine and how they can contribute to risk reduction[,]" "[p]rovide up-to-date information about COVID-19 to [AICs] on a regular basis," and "[p]rovide staff with up-to-date information about COVID-19 and about facility policies on a regular basis[.]")[31]

In May 2020, the AOC launched an internal assessment tool, intended to evaluate ongoing management of COVID. (Jindal Decl. Ex. 19 at 1.) ODOC also established an Infection

---

¶ 4(k); Evans Decl. ¶ 10; Second Maney Decl. ¶ 12; Cadwaller Decl. ¶ 24; Shaffer Decl. ¶¶ 6, 12; Butler Decl. ¶¶ 11, 14-15, 18-19; Edgtton Decl. ¶¶ 8, 20-21; Phillips Decl. ¶¶ 4-5, 11, 13, 23, 28; Willingham Decl. ¶¶ 12-13; Second Sellers Decl. ¶¶ 8-9; First Maney Decl. ¶ 4(h); McDonald Decl. ¶¶ 5(m), 6(d), 7(a)-(b); Randall Decl. ¶ 5(b)-(c); First Sellers Decl. ¶ 4(c), (j), (m); First Wood Decl. ¶ 5(a); Yurkovich Decl. ¶ 4(d)-(f).

[31] *See also, e.g.*, West Decl. ¶ 17; Parnell Decl. ¶ 11; Constantin Decl. ¶ 5(o), (aa); Rhodes Decl. ¶ 17; Lupoli Decl. ¶ 7; Gardea Decl. ¶ 4(l); Walls Decl. ¶ 4(l); Hedrick Decl. ¶ 14; Second Harvey Decl. ¶ 4(e); Second Sellers Decl. ¶ 16.

Prevention Team to perform unannounced site visits to ODOC institutions. (*Id.* at 2; Jindal Decl. Ex. 20 at 1.) The team assessed eight or nine of ODOC's fourteen institutions between May 2020 and March 2021, with varying results. (*See* Dahab Decl. Ex. 59, ECF No. 547-59, OSP in May 2020; Jindal Decl. Ex. 20, SCI in June 2020; Dahab Decl. Ex. 62, ECF No. 547-62, SRCI in August 2020; Dahab Decl. Ex. 53, ECF No. 547-53, CCCF in October 2020; Dahab Decl. Ex. 63, ECF No. 547-63, DRCI in October 2020; Dahab Decl. Ex. 64, ECF No. 547-64, OSCI in October 2020; Dahab Decl. Ex. 61, ECF No. 547-61, CRCI in December 2020; Jindal Decl. Ex. 22, TRCI in March 2021.) The team provided "audit response action sheets" noting any observed deficiencies. (Jindal Decl. Ex. 21.) It is undisputed that ODOC did not conduct an internal audit at all of its institutions. There is some evidence that, although Defendants conducted some internal audits, Defendants also sought to avoid external audits. For example, in the midst of a COVID outbreak at OSP, Bugher stated that "OHA wants to audit OSP [because] of the outbreak" and "their audits are publicly shared info" and that he is "trying to keep [OHA] out of our world."[32] (Dahab Decl. Ex. 65 at 2; *see also* Jindal Reply Decl. Ex. 1 at 2, ECF No. 600-1, Bugher stating that Defendants should avoid "being told by OHA how to run our business.") In February 2021, the AOC also introduced an internal COVID assessment conducted by an AIC with a staff member.[33] (*See* Jindal Decl. Ex. 23.)[34]

---

[32] Defendants argue that this conversation should be interpreted as evidence of Defendants' care and concern in response to COVID. (Defs.' Reply All Claims at 14.) The Court must draw reasonable inferences in Plaintiffs' favor on Defendants' motion for summary judgment.

[33] Staff and AICs completed "hundreds of these walkthroughs." (Decl. Joe Bugher Supp. Defs.' Reply All Claims ¶ 6, ECF No. 602.)

[34] The Court separately summarizes the facts and legal arguments relevant to Jeske below.

e.      **Summary**

The Court concludes that a genuine issue of material fact remains about whether Defendants took reasonable measures to abate the COVID-related risk of harm to Plaintiffs or whether Defendants consciously disregarded a substantial risk of harm. Both parties agree that Defendants took some measures. The record before the Court is extensive, and the Court does not purport to identify each action Defendants took in response to COVID nor all of Plaintiffs' evidence suggesting that Defendants did not take reasonable measures but merely highlights some of the genuine issues of material fact.

In summary, genuine questions of fact remain as to whether the ODOC Defendants implemented and enforced their masking policies and whether their masking policies were consistent with public health guidance; whether Defendants implemented and enforced social distancing policies; whether Defendants adopted policies such as minimizing the number of individuals housed in the same room, minimizing mixing of individuals from different housing units, implementing broad movement restrictions, or modifying staff assignments to minimize movement across housing units or between units with and without known COVID infections; whether Defendants implemented their policy of testing symptomatic AICs and symptomatic close contacts of confirmed COVID cases; whether Defendants adopted and implemented a policy of testing asymptomatic close contacts, as recommended by the CDC; whether Defendants implemented and enforced their quarantine policy; and whether Defendants considered using empty facilities or spaces to allow AICs to spread out. The parties also do not dispute that Defendants did not use empty facilities to improve social distancing.

The risk of harm that COVID posed to AICs was severe, and although Defendants took some important steps to mitigate that risk, factual questions remain, and Plaintiffs have identified

several alternative actions that Defendants could have taken. *See Lemire*, 726 F.3d at 1079 ("A prison official's justification for exposing [AICs] to a substantial risk of harm is reasonable only if it represents a proportionate response to the penological circumstances in light of the severity of the risk to which the [AICs] are exposed. Except in emergency situations, a failure to consider reasonable alternatives is strong evidence that a prison official's actions were unreasonable.") (citation omitted). Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that it is a question for the jury whether Defendants' COVID mitigation measures in ODOC institutions, viewed as a whole and in the context of other available mitigation measures, were reasonable under the circumstances.[35] *See Egberto v. Nev. Dep't of Corr.*, 678 F. App'x 500, 503 (9th Cir. 2017) (reversing grant of summary judgment on the plaintiff's Eighth Amendment claim for deliberate indifference to a serious medical need and noting that the defendants' "competing evidence . . . only creates a factual question for the jury to resolve"); *Thomas v. Ponder*, 611 F.3d 1144, 1152, 1156 (9th Cir. 2010) ("We therefore hold that the district court erred in ruling that there was insufficient evidence to raise a genuine issue of material fact as to whether the prison officials acted reasonably" and "the issue is one of fact that must be presented to a fact-finder."); *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) ("While the defendants produced contrary evidence, . . . claiming a state-of-the-art ventilation system kept the air clean . . . [the plaintiff] produced sufficient evidence to make his ventilation claim a disputed issue of material fact not subject to summary judgment."), *op. am. on denial of reh'g*,

---

[35] For similar reasons, the Court concludes that a material issue of fact remains as to whether Defendants violated their duty of care that foreseeably resulted in harm. *See Two Two v. Fujitec Am., Inc.*, 325 P.3d 707, 714 (Or. 2014) (reversing the trial court's grant of summary judgment and concluding that testimony from the plaintiff's retained expert would create a question of fact on all relevant negligence claim issues, "including the element of causation").

135 F.3d 1318 (9th Cir. 1998); *Romero-Lorenzo v. Koehn*, 665 F. Supp. 3d 1056, 1082-84 (D. Ariz. 2023) (denying in part the correctional defendant's motion for summary judgment, concluding that even where the defendants implemented numerous COVID-related protective measures, a question of fact remained regarding the systems in place for identifying high-risk or immunocompromised individuals, whether the defendants used appropriate educational materials, and whether the defendants' COVID vaccine booster policies were inadequate); *cf. Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (affirming issuance of a preliminary injunction where the facility was "so crowded that social distancing to combat the spread of the novel coronavirus was impossible, detainees had inadequate access to masks, guards were not required to wear masks, there was not enough soap or hand sanitizer to go around, detainees were responsible for cleaning the facility with only dirty towels and dirty water, detainees were compelled to sleep with less than six feet of distance between them, and not all new arrivals were being properly quarantined or tested"); *Fuller v. Amis*, No. 5:21-cv-00127-SSS (AS), 2023 WL 3822057, at *5 (C.D. Cal. Apr. 13, 2023) (denying the defendant's motion to dismiss and concluding that the defendant's "alleged failure to move Plaintiff to cell housing or otherwise mitigate the serious harms posed by crowded dormitory housing amounts to deliberate indifference"), *report and recommendation adopted*, 2023 WL 3819181 (C.D. Cal. June 2, 2023).[36]

---

[36] *See also Burton v. Fonseca*, No. 3:20-cv-00190-ART-CLB, 2023 WL 4687847, at *6 (D. Nev. June 23, 2023) ("Here, the Court finds genuine issues of material fact exist as to whether Defendants failed to take reasonable steps to protect [the plaintiff] . . . . Because there is . . . room for doubt, this claim must be decided by the jury." (citing *Lemire*, 726 F.3d at 1075)), *report and recommendation adopted*, 2023 WL 4683289 (D. Nev. July 21, 2023); *Duvall v. Idaho Dep't of Corr.*, No. 1:18-cv-00080-BLW, 2020 WL 6449167, at *5 (D. Idaho Nov. 3, 2020) (denying summary judgment because a genuine issue of material fact remained "whether [the defendant] took reasonable measures to guarantee [the plaintiff's] safety and well-being").

### f.    Defendants' Legal Arguments

Defendants argue that other courts have rejected challenges to "comprehensive Covid-19 responses even when a prison could have done more to stop the spread of the virus." (Defs.' Mot. All Claims at 21.) Defendants assert that successful COVID-related Eighth Amendment claims have been limited to cases involving "discrete events where prison officials failed to make *any* serious effort to protect against the virus." (*Id.* at 23.)

The Court agrees with Defendants' general premise that, across the country, courts have dismissed many COVID-related Eighth Amendment claims at various stages of litigation. However, it does not follow that the Court must grant summary judgment here because, as discussed, ODOC's response differed from responses in correctional institutions in other states, the parties have developed a different factual record before the Court, and material issues of fact remain.

Contrary to Defendants' assertion, these other cases do not stand for the proposition that summary judgment is appropriate in any case where a defendant took *some* COVID-related mitigation steps. Instead, the inquiry remains whether Defendant took *reasonable* measures to abate the risk, *Farmer*, 511 U.S. at 847, a question for the jury. *See Peralta*, 744 F.3d at 1082 ("What is reasonable depends on the circumstances[.]"). In other words, the question is not whether Defendants instituted measures to mitigate the risk of COVID, but whether those measures satisfy the Eighth Amendment's protections. *See Polanco v. Diaz*, 76 F.4th 918, 929 (9th Cir. 2023) (noting that inadequate COVID policies can constitute deliberate indifference).

For example, Defendants point to *Dykes-Bey v. Washington*. (Defs.' Mot. All Claims at 21.) In *Dykes-Bey*, the Sixth Circuit affirmed the dismissal of the plaintiff's Eighth Amendment claim because the plaintiff had not alleged facts indicating that the defendants were deliberately

indifferent such as "for example, that [the correctional facility] had enough physical space to implement social distancing, and that the defendants deliberately chose not to use that space" or that "defendants knowingly housed COVID-19-positive inmates alongside any plaintiff, or even that a COVID-19 outbreak occurred in [the correctional facility]." *Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *3 (6th Cir. Oct. 14, 2021). By contrast here, Plaintiffs have pointed to evidence presenting a factual question as to all three scenarios. (*See* Robbins Depo. at 29:17-22, 36:12-20, suggesting that Defendants did not discuss using empty facilities; Peters Depo. at 64:18-24, conceding that she did not recall discussing using empty facilities; Eaglespeaker Decl. ¶ 14, testifying that open cells at CCCF remained unoccupied; Sublet Decl. ¶ 25, explaining that when AICs were released, empty portions of the facility were closed and remaining AICs were condensed into one area; Ortega Decl. ¶ 13(c), explaining that symptomatic AICs were not isolated until they tested positive, and AICs from quarantine units were still required to go to work; Moore Decl. ¶ 5(c), 8, describing AICs with confirmed COVID cases transported and placed into general population without quarantine; Keith Decl. ¶¶ 2(a), 3, describing transfer to a different facility while on quarantine and without being tested; Stewart Decl. ¶ 4(a), observing symptomatic AICs waiting in their dorm for test results; Second Wood Decl. ¶¶ 6, 9, testifying that sick AICs were forced to go to work or face discipline and AICs in quarantine units moved throughout the facility; Newland Decl. ¶ 4(a), (e), observing that COVID positive AICs were allowed to mingle throughout the unit; Stafford Decl. ¶ 8, testifying that he was forced to work maintenance jobs in quarantine units; Second Lee Decl. ¶¶ 4-6, noting that a symptomatic AIC was never quarantined; Eaglespeaker Decl. ¶¶ 14(d), 15, describing symptomatic AICs who refused tests and were not quarantined and that the general population was exposed to symptomatic AICs with known COVID exposure; Dahab Decl. ¶ 74, noting that

COVID caused or contributed to the death of more than forty AICs during the class period.)

Thus, *Dykes-Bey* is distinguishable.

In *Swain v. Junior*, the district court entered a preliminary injunction relying

"overwhelmingly" on two facts alone: the increased infection rate and the fact that adequate

social distancing was impossible. *Swain v. Junior*, 961 F.3d 1276, 1286 (11th Cir. 2020). The

Eleventh Circuit clarified that the deliberate indifference inquiry should not focus on those

isolated facts "but rather on the defendants' entire course of conduct" and whether the

defendants' COVID "response was reckless[.]" *Id.* at 1287-88. The Eleventh Circuit reviewed

the measures that defendants had taken (such as requiring staff and AICs to wear masks at all

times), noted that there were "no findings that the[] measures hadn't been implemented,"

acknowledged an expert report opining that the defendants had made their best efforts, and

concluded that the plaintiffs had not demonstrated a substantial likelihood of success on the

merits in that case. *Id.* at 1289.

This Court denied Plaintiffs' motion for a preliminary injunction in this case based on

Defendants' efforts to combat COVID as of June 2020. (Prelim. Inj. Op. & Order.) At summary

judgment, the legal standard is different, the record is more fully developed, and a genuine

dispute of material fact remains. Unlike in *Swain*, Plaintiffs' theory of deliberate indifference is

not so narrow. (*See generally* Pls.' Resp. All Claims, arguing that Defendants failed to follow

public health recommendations, did not consider reasonable alternative strategies to improve

social distancing, deliberately avoided external audits, encouraged staff to circumvent the

vaccine mandate, and failed to implement a mask mandate and protocols related to mixing,

screening, testing, social distancing, quarantine, and isolation.) On the present record, a genuine

issue of fact remains as to whether Defendants took reasonable measures to abate the risk of

COVID, a genuine issue of fact remains as to whether Defendants implemented their COVID policies, and the experts dispute whether Defendants made "best efforts." (*See* Decl. Brittney Plesser ("Plesser Decl.") Supp. Pls.' Resp. Defs.' Damages Mot. Ex. A, Homer Venters Expert Report ("Venters Report") at 15, ECF No. 543-1, noting "serious deficiencies in how [ODOC] responded to COVID-19, including deficient approaches to social distancing, mask wearing and quarantine"; Decl. Anit Jindal Supp. Defs.' Second *Daubert* Mot. ("Jindal Second *Daubert* Mot. Decl.") Ex. 1, Phil Stanley Expert Report ("Stanley Report") at 18, ECF No. 503-1, opining that ODOC failed to take significant action in response to COVID while "[o]ther states were able to mount a more robust response to the pandemic"; Fleming Report at 6, 51, opining that ODOC "did not follow national recommendations and standards in the measures it implemented" and "could easily have done more"); *cf. Kersh v. Gastelo*, No. 2:21-cv-01921-CAS-JDE, 2022 WL 17548074, *5 (C.D. Cal. Aug. 23, 2022) (concluding that the defendant "instituted reasonable measures" by establishing *and* implementing measures such as quarantine, testing, and dorm-reconfiguration), *report and recommendation adopted*, 2022 WL 16783847 (C.D. Cal. Nov. 4, 2022); *Jones*, 2023 WL 4728802, at *8 ("Plaintiff provides no evidence that [the warden's] efforts to comply with [California Correctional Health Care Service's] Guidelines in designating isolation/quarantine cells were improperly administered or carried out, or that he implemented them in a way that demonstrates a deliberate indifference to a risk to his safety and health.").

The Court also disagrees with Defendants' suggestion that a successful COVID-related challenge under the Eighth Amendment must be limited to "discrete events." (Defs.' Mot. All Claims at 23.) To the contrary, there should be no dispute that policies, practices, and customs are subject to an Eighth Amendment challenge. *See Helling*, 509 U.S. at 36 (instructing the court below to consider the facility's policy and whether it "will be administered in a way that will

minimize the risk" to the plaintiff); *Parsons*, 754 F.3d at 677 ("[W]e have repeatedly recognized that prison officials are constitutionally prohibited from being deliberately indifferent to policies and practices that expose [AIC]s to a substantial risk of serious harm.") (citations omitted); *Andrews v. Cervantes*, 493 F.3d 1047, 1050 (9th Cir. 2007) (recognizing a cause of action under the Eighth Amendment for an alleged policy of not screening AICs for infectious diseases— HIV, Hepatitis C, and Heliobacter pylori—and for housing contagious and healthy individuals together during a known "epidemic of hepatitis C"); *see also Jordan v. Gardner*, 986 F.2d 1521, 1522-23 (9th Cir. 1993) (en banc) (holding that the correction center's policy violated the Eighth Amendment). Nothing about COVID changes that. *See Polanco*, 76 F.4th at 929 ("Taking the allegations in the Complaint as true, this is a textbook case of deliberate indifference: Defendants were repeatedly admonished by experts that their COVID-19 policies were inadequate, yet they chose to disregard those warnings.").

Defendants also parse out Plaintiffs' Eighth Amendment claim "theory" by "theory." (*See* Defs.' Mot. All Claims at 24-56.) For example, Defendants argue that they are entitled to summary judgment on "Plaintiffs' masking theories" because "[t]he Eighth Amendment does not require mask mandates[.]" (*Id.* at 43.) As Plaintiffs point out (Pls.' Resp. All Claims at 70), however , "[*s*]*ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson*, 501 U.S. at 304 (citations omitted).

Here, Plaintiffs have alleged a single Eighth Amendment claim. (*See* SAC at 36.) The Court does not understand Plaintiffs to raise different theories of liability in the alternative.

Instead, consistent with *Wilson*, Plaintiffs assert that Defendants' actions and inactions related to social distancing policies, masking policies, testing policies, etc. had a mutually enforcing effect that in combination violated Plaintiffs' right to protection from heightened exposure to a serious communicable disease, contravening the Eighth Amendment when viewed in concert. (*See* Pls.' Resp. All Claims at 70, "If enforcing a mask mandate is unrealistic, for instance, so be it—but that heightens officials' duty to take other protective measures like testing, screening, and isolating COVID-positive inmates. . . . Put differently, if officials cannot or choose not to take some protective measures then they *must* take others." (citations omitted)); *see Hampton*, 83 F.4th at 767 ("If masks and personal protective equipment were not available, Defendants would have understood that it was particularly important to avoid transferring COVID-positive inmates to San Quentin, where the architecture would make difficult isolating inmates to prevent COVID's spread. The absence of masks also would have made even clearer the importance of properly testing and screening inmates prior to any transfer."); *see also Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources[.]"). Therefore, the Court declines to evaluate the ODOC Defendants' discrete actions in isolation.[37]

### 3.    *Wal-Mart*

Defendants argue that, under *Wal-Mart Stores, Inc. v. Dukes*, Plaintiffs have not presented sufficient evidence to establish class-wide misconduct. (Defs.' Reply All Claims at 41); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

In *Wal-Mart*, the Supreme Court reviewed the district court's order certifying a class of women who were current and former employees of Wal-Mart alleging claims of discrimination

---

[37] Thus, for example, the Court does not address the sufficiency of Plaintiffs' evidence related to building ventilation or implementation of OSHA guidance herein.

under Title VII. *See Wal-Mart*, 564 U.S. at 342. The Supreme Court held that the plaintiffs had not satisfied the commonality requirement of class certification because the plaintiffs had not presented significant proof that Wal-Mart operated under a general policy of discrimination. *Id.* at 349, 353. Considering the plaintiffs' anecdotal evidence, the Supreme Court concluded that it was "too weak" to raise an inference of an unlawful policy. *Id.* at 358.

The Court agrees with Defendants that an individual incident of one line staff's noncompliance with COVID policies is insufficient to demonstrate that Defendants did not implement or enforce their COVID policies on a systemic basis. *See Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 647 (9th Cir. 2021) ("There is considerable distance between imperfect implementation of a policy, or even knowledge of the imperfect implementation of a policy, and deliberate indifference in the constitutional sense.") (citations omitted). However, as Defendants acknowledge, if offered in a sufficiently representative amount, individual testimony may establish unconstitutional conduct on a class-wide basis. (Defs.' Jeske Reply at 17, ECF No. 585); *see Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) ("*Wal-Mart* does not stand for the broad proposition that a representative sample is an impermissible means of establishing classwide liability."); *Parsons*, 754 F.3d at 672 ("[T]he plaintiffs also submitted declarations describing their experiences with [the Arizona Department of Corrections'] policies and practices governing health care and conditions of confinement. These declarations by the named plaintiffs were not submitted to support individual Eighth Amendment claims; rather, the plaintiffs submitted these declarations as evidence of the defendants' unlawful policies and practices, and as examples of the serious harm to which all inmates in [the defendants'] custody are allegedly exposed."); *Plata v. Schwarzenegger*, No. 01-cv-1351 TEH, 2005 WL 2932253, at *6 (N.D. Cal. Oct. 3, 2005) (recounting "just a few representative examples from the testimonial

and documentary evidence" and finding that the class action plaintiffs—AICs in California institutions—provided sufficient evidence of inadequate medical care).

Defendants characterize Plaintiffs' evidence as sixteen declarations containing unrelated COVID concerns. (Defs.' Reply All Claims at 41.) As discussed, the Court's inquiry is not limited to Plaintiffs' sixteen new declarations but also includes declarations from earlier stages in the litigation. Further, the declarations are not unrelated but instead contain anecdotes of the lack of implementation of various COVID-related policies at different institutions.

The parties do not dispute that there are approximately 5,000 members of the Damages Class and forty-two members of the Wrongful Death Class in this case. (Pls.' Resp. All Claims at 2; Defs.' OTCA Mot. at 2; Dahab Decl. ¶ 74.) Plaintiffs presented fifty-five declarations in support of their motion for a preliminary injunction (ECF Nos. 15, 18-63, 92-100), including one declaration containing reports from seven AICs. (ECF No. 15.) In opposition to Defendants' motion for partial summary judgment, Plaintiffs presented eleven additional declarations. (*See* ECF Nos. 128-138.) In support of their motion for class certification, Plaintiffs presented fifteen declarations. (*See* ECF Nos. 206-17, 219-21.) In opposition to Defendants' motion for summary judgment, Plaintiffs presented sixteen additional declarations. (*See* ECF Nos. 549-60, 562-65.) In total, Plaintiffs have filed ninety-seven declarations, including reports from approximately ninety-one different individuals.[38] Plaintiffs have presented multiple declarations from each ODOC facility, and numerous declarant AICs have been transferred and housed at multiple facilities, thus providing testimony about several facilities. (*See, e.g.*, Thornburg Decl.; Cadwaller Decl.; Shaffer Decl.; Keith Decl.; Moffatt Decl.; Stafford Decl.)

---

[38] Plaintiffs' declarations consist of one declaration from a CO, one declaration from the class representative of the Wrongful Death Class, and reports from eighty-nine AICs.

The precise ratio of anecdotal evidence compared to class size that is sufficient to support class certification under *Wal-Mart* is not entirely clear, but the Supreme Court has provided some guidance on both ends of the spectrum. As Defendants argue, in *Wal-Mart*, the Supreme Court held that the evidence did *not* raise an inference of an unlawful policy on a class-wide basis where the plaintiff presented one affidavit for every 12,500 class members from 235 of the defendant's 3,400 locations. (Defs.' Jeske Reply at 18); *Wal-Mart*, 564 U.S. at 358. In *International Brotherhood of Teamsters v. United States*, by contrast, the Supreme Court concluded that forty accounts from a class of 334 people *was* sufficient. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 338 (1977).

This case falls in the middle of those Supreme Court bookends.[39] The Court concludes that Plaintiffs have provided sufficient evidence of the non-implementation of policies on a class-wide basis. *See Davis v. Baldwin*, No. 3:16-cv-600-MAB, 2021 WL 2414640, at *4, *22 (S.D. Ill. June 14, 2021) (concluding that evidence from six of the department of corrections' twenty-five facilities in combination with evidence of the department's formal policies was a sufficiently representative sample); *Lucero-Gonzalez v. Kline*, No. 2:20-cv-00901-PHX-DJH-DMF, 2020 WL 8258216, at *7 (D. Ariz. Nov. 3, 2020) (certifying a class based on declarations from each of the named plaintiffs, a declaration from an Assistant Federal Public Defender who

---

[39] The Court also notes that this case is distinguishable from *Wal-Mart* because, here, Plaintiffs do not rely solely on anecdotal evidence but also challenge some of Defendants' written policies such as their masking policy and the policy of only testing symptomatic AICs. *See Wal-Mart*, 564 U.S. at 358; *Owino v. CoreCivic, Inc.*, No. 17-cv-1112 JLS (NLS), 2021 WL 120874, at *5 (S.D. Cal. Jan. 13, 2021) ("The Court instead agrees with Plaintiffs that *Wal-Mart* is distinguishable, given that, here, Plaintiffs presented proof of a written company-wide policy.") (citation omitted), *aff'd*, 36 F.4th 839 (9th Cir. 2022), *opinion amended and superseded on denial of reh'g*, 60 F.4th 437 (9th Cir. 2022), *and aff'd*, 60 F.4th 437 (9th Cir. 2022). Plaintiffs also present expert testimony opining on Defendants' policies.

had knowledge of hundreds of clients detained at the correctional complex, and an expert physician opining on the heightened risk of contracting COVID in detention facilities); *Braggs v. Dunn*, 317 F.R.D. 634, 646-47 (M.D. Ala. 2016) (concluding that one example for every eighty class members provided sufficient proof of a department of corrections' policy); *Scott v. Clarke*, 61 F. Supp. 3d 569, 584-85 (W.D. Va. 2014) (certifying a class of 1,200 based on the declarations from seventeen AICs in addition to nine named plaintiffs); *Poplawski v. Metroplex on the Atl., LLC*, No. 11-cv-3765 (JBW), 2012 WL 1107711, at *6-7 (E.D.N.Y. Apr. 2, 2012) (concluding that three affidavits from a class of between forty to 160 was sufficient for conditional class certification); *cf. Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2018 WL 3328418, at *25 (W.D. Wash. June 25, 2018) (concluding that one declaration for every 959 class members was insufficient), *aff'd*, 799 F. App'x 459 (9th Cir. 2019).

The Court concludes that Plaintiffs have identified sufficient examples of ODOC's failures to implement its COVID policies to create a genuine issue of material fact with respect to Defendants' class-wide liability.

### 4.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity on Plaintiffs' Eighth Amendment claim. (Defs.' Mot. All Claims at 15, 19-20.) Plaintiffs respond that existing law clearly established the right of individuals in custody to be free from heightened exposure to a serious, easily communicable disease and therefore Defendants are not entitled to qualified immunity for their COVID response. (Pls.' Resp. All Claims at 78-81.)

#### a.    Applicable Law

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Hampton*, 83 F.4th at 765 (simplified). The existing

precedent at the time of the conduct must have placed the constitutional question "beyond

debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation omitted). "[T]he clearly established law

must be 'particularized' to the facts of the case," *id.* (citation omitted), and must give "fair

warning." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741

(2002)). However, "officials can still be on notice that their conduct violates established law

even in novel factual circumstances." *Hope*, 536 U.S. at 741.

The Supreme Court has repeatedly warned courts not to define clearly established law "at

a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted). "[T]he

farther afield existing precedent lies from the case under review, the more likely it will be that

the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at

least arguably constitutional." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016). If the

conduct falls within this permissible zone, qualified immunity applies. *See id.* Whether there

exists a clearly established right applicable to the conduct at issue is "a question of law" for the

Court to decide. *Morales v. Fry*, 873 F.3d 817, 819 (9th Cir. 2017).

### b.    Analysis

As Defendants acknowledge (Defs.' Mot. All Claims at 20), the Court has previously

considered the question of qualified immunity in this case.[40] (*See* Mot. Partial Summ. J. Op. &

Order.)

---

[40] The Court revisits its prior qualified immunity ruling in light of the more developed
factual record and because Plaintiffs have amended their complaint. *See Marulanda v. U.S.
Marshals Serv.*, No. 2:04-cv-2798-HRH, 2010 WL 11523852, at *4 (D. Ariz. Apr. 8, 2010)
(considering the defendant's renewed summary judgment motion raising the qualified immunity
defense after the parties had conducted discovery); *Turner v. Rupf*, No. 05-cv-2297 MHP, 2010
WL 889859, at *2 (N.D. Cal. Mar. 9, 2010) (considering the defendants' successive motion for

In December 2020, the Court concluded that existing precedent clearly established the right of an individual in custody to protection from heightened exposure to a serious communicable disease. *See, e.g.*, *Helling*, 509 U.S. at 33 (concluding that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment); *see also Hutto v. Finney*, 437 U.S. 678, 682-83 (1978) (affirming an injunction and award of attorney's fees following a finding of an Eighth Amendment violation where a facility housed individuals in crowded cells with others suffering from infectious diseases, such as Hepatitis and venereal disease, and the individuals' "mattresses were removed and jumbled together each morning, then returned to the cells at random in the evening"); *Andrews*, 493 F.3d at 1050 (recognizing a cause of action under the Eighth Amendment for an alleged policy of not screening inmates for infectious diseases—HIV, Hepatitis C, and Heliobacter pylori—and for housing contagious and healthy individuals together during a known "epidemic of hepatitis C"); *Trevizo v. Webster*, No. CV 17-5868-MWF (KS), 2018 WL 5917858, at *4 (C.D. Cal. Sept. 6, 2018) ("It is well accepted that such 'substantial risks of harm' include 'exposure of inmates to a serious, communicable disease[,]'" including MRSA (citing *Helling*, 509 U.S. at 33)); *see also Loftin v. Dalessandri*, 3 F. App'x 658, 659, 663 (10th Cir. 2001) (recognizing an Eighth Amendment claim for knowingly housing the defendant in a cell with individuals who had tested positive for tuberculosis); *cf. Farmer*, 511 U.S. at 843 ("The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health[.]'"

---

summary judgment based on qualified immunity where "the factual record ha[d] been expanded with filings by both plaintiff and defendants").

(citing *Helling*, 509 U.S. at 35)).[41] "For purposes of qualified immunity, that legal duty need not

be litigated and then established disease by disease or injury by injury." *Est. of Clark v. Walker*,

865 F.3d 544, 553 (7th Cir. 2017).

The Ninth Circuit recently considered California prison officials' qualified immunity

argument in the context of an Eighth Amendment claim challenging their response to COVID in

California prisons. *See Hampton*, 83 F.4th at 769. In *Hampton*, the Ninth Circuit reiterated that

"a right is clearly established when the contours of the right are sufficiently clear that a

reasonable official would understand that what he is doing violates that right." *Id.* (simplified).

Considering the Supreme Court's instruction and prior Ninth Circuit guidance for the proper

level of generality at which to articulate the right at issue, the court concluded that an AIC's

"right to be free from exposure to a serious disease . . . has been clearly established since at least

1993, when the Supreme Court decided *Helling v. McKinney*[.]" *Id.* The Ninth Circuit explained

that a plaintiff "is not required to point to a prior case holding that prison officials can violate the

Eighth Amendment by transferring inmates from one prison to another during a global

---

[41] *See also Glick v. Henderson*, 855 F.2d 536, 539-40 (8th Cir. 1988) (finding that the plaintiff "could have a colorable claim under § 1983 if he could show that there is 'a pervasive risk of harm to inmates' of contracting the AIDS virus and if there is 'a failure of prison officials to reasonably respond to that risk'") (citation omitted); *Lareau v. Manson*, 651 F.2d 96, 98, 109 (2d Cir. 1981) (affirming the district court's finding that overcrowding and "failure to screen new inmates for communicable diseases" violated pretrial detainees' constitutional rights); *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974) (affirming the district court's finding of an Eighth Amendment violation in part because AICs "with serious contagious diseases [we]re allowed to mingle with the general prison population"); *Ferguson v. Bd. of Cnty. Comm'rs of Sierra Cnty.*, No. 11-cv-1001 WPL/CG, 2013 WL 12334214, at *8 (D.N.M. Apr. 2, 2013) (recognizing a claim upon which relief could be granted under the Eighth Amendment for knowingly housing the plaintiff in a cell with others infected with the contagious disease MRSA); *Randles v. Hester*, No. 98-cv-1214, 2001 WL 1667821, at *2 (M.D. Fla. June 27, 2001) (finding an Eighth Amendment violation where the defendants forced the plaintiff to clean up blood without proper gear to prevent HIV infection and contamination).

pandemic." *Id.*; *see also id.* at 760 (describing that, in *Hampton*, many AICs and staff wore

masks "improperly or failed to wear them at all," the prison's testing suffered from significant

delays, "[p]rison staff were not regularly tested," and "Defendants placed sick inmates in solitary

confinement, which discouraged inmates from reporting their symptoms"). The Ninth Circuit

emphasized that "[b]inding caselaw 'need not catalogue every way in which' prison conditions

can be constitutionally inadequate 'for us to conclude that a reasonable official would understand

that his actions violated' an [AIC's] rights." *Id.* (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060,

1067 (9th Cir. 2016) (en banc)); *see also Wilk v. Neven*, 956 F.3d 1143, 1148-49 (9th Cir. 2020)

("Once an official is subjectively aware of a substantial risk of serious harm, 'clearly established'

law requires 'only that the [official] take reasonable measures to mitigate the substantial risk.'"

(citing *Castro*, 833 F.3d at 1067)). Consistent with the Ninth Circuit's recent guidance, the Court

concludes that an AIC's right to be free from exposure to a serious disease was clearly

established at all relevant times.

     Despite the Ninth Circuit's recent instruction that binding case law need not catalogue

every way in which prison conditions are constitutionally inadequate, Defendants attempt to

point to the lack of such cataloguing here and argue that they were not on notice that each of

their discrete actions in response to COVID violated the constitution. For example, they argue

that prior cases did not put them on notice that transferring AICs during COVID violated the

Eighth Amendment. (Defs.' Mot. All Claims at 49, arguing that ODOC's prison transfer

"policies did not violate the Eighth Amendment and no clearly established caselaw would have

put defendants on notice that they did.") Defendants' approach to qualified immunity is clearly

foreclosed by *Hampton*. *See* 83 F.4th at 769 (explaining that a plaintiff "is not required to point

to a prior case holding that prison officials can violate the Eighth Amendment by transferring

inmates from one prison to another during a global pandemic"); *see also Bennett v. Burton*, No. 2:21-cv-1340-WBS-KJNP, 2024 WL 1007311, at *8 (E.D. Cal. Mar. 8, 2024) (rejecting the defendants' argument "that plaintiff cannot demonstrate that there is clearly established authority that would inform reasonable prison officials that their decision not to isolate 17 inmates with negative COVID-19 test results from 34 infected inmates, all of whom had been living in close quarters for at least 2.5 days since the test samples were collected, would violate the Eighth Amendment"); *Sams v. Cal. Dep't of Corr.*, No. 5:21-cv-00493-ODWJDE, 2023 WL 4291459, at *11 (C.D. Cal. May 30, 2023) (rejecting the defendants' argument that "there were no published cases from the Ninth Circuit or the Supreme Court prohibiting inmates at medium or high risk of COVID-19 complications from being double celled or requiring that they be single celled"), *report and recommendation adopted sub nom.*, 2023 WL 8702716 (C.D. Cal. Dec. 15, 2023); *In re CIM-SQ Transfer Cases*, No. 22-MC-80066-WHO, 2022 WL 2789808, at *7 (N.D. Cal. July 15, 2022) (rejecting the defendants' argument that qualified immunity applied to the plaintiffs' claims that the defendants transferred AICs in a manner that exposed them to heightened risk of contracting COVID), *aff'd sub nom. Harris v. Allison*, No. 22-15921, 2023 WL 6784355 (9th Cir. Oct. 13, 2023); *Nelson*, 2023 WL 5004487, at *19 (rejecting the defendants' argument that "there was no clearly established law that prohibited the transfer of COVID-positive inmates from one prison to another"); *Jones v. Pollard*, No. 21-cv-162-MMA (RBM), 2022 WL 706926, at *9 (S.D. Cal. Mar. 9, 2022) (rejecting the defendant's argument that there is no binding precedent "establishing that state prisoners have an Eighth Amendment right to a particular COVID-19 response").

In any event, there was clearly established case law to put Defendants on notice that their actions in response to COVID were constitutionally inadequate. *See, e.g., Hutto*, 437 U.S. at 682-

83 (affirming a finding of an Eighth Amendment violation where a facility housed individuals in crowded cells with others suffering from infectious diseases, such as Hepatitis and venereal disease, and the individuals' "mattresses were removed and jumbled together each morning, then returned to the cells at random in the evening"); *Andrews*, 493 F.3d at 1050 (recognizing a cause of action under the Eighth Amendment for, among other things, an alleged policy of not screening AICs for infectious diseases and not segregating AICs with communicable diseases during a known "epidemic of hepatitis C"); *Lareau*, 651 F.2d at 98 (affirming the district court's finding that overcrowding and "failure to screen new [AIC]s for communicable diseases" violated pretrial detainees' constitutional rights); *Gates*, 501 F.2d at 1300 (recognizing an Eighth Amendment claim where "[s]ome [AIC]s with serious contagious diseases are allowed to mingle with the general prison population"); *see also Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) ("[N]o reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."); *Hope*, 536 U.S. at 741 ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful[.]" (simplified) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))).[42]

///

---

[42] As discussed, Plaintiffs argue that Defendants' actions had a mutually enforcing effect that in combination violate Plaintiffs' right to protection from heightened exposure to a serious communicable disease. Courts analyze conditions of confinement with a mutually enforcing effect in combination for the purpose of the qualified immunity analysis. *See, e.g.*, *Chappell v. Mandeville*, 706 F.3d 1052, 1061 (9th Cir. 2013) (considering whether clearly established law provided notice of the unconstitutionality of the contraband watch, considering the conditions in combination).

For these reasons, the Court concludes that Defendants were on notice that individuals in custody have a clearly established constitutional right to protection from heightened exposure to a deadly disease, despite the novelty of the COVID virus, and a factual question remains regarding Defendants' alleged deliberate indifference. Accordingly, Defendants are not entitled to qualified immunity.

**E.    Causation**

Defendants argue that they are entitled to summary judgment on all claims—Plaintiffs' Eighth Amendment and state law claims—because there is no genuine issue of material fact that Defendants *caused* the alleged harm because Plaintiffs "have not adduced any method of proving class-wide causation." (Defs.' Mot. All Claims at 57.)

On claims for damages under the Eighth Amendment, "plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries." *Lemire*, 726 F.3d at 1074 (citation omitted); *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) ("The second [Eighth Amendment] prong requires showing: (a) a purposeful act or failure to respond to a[n AIC]'s pain or possible medical need and (b) harm caused by the indifference." (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006))).

Defendants' actions or inactions are "an actual cause of [the] injury only if the injury would not have occurred 'but for' that conduct." *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990) (citing W. Prosser & W. Keeton, The Law of Torts § 41, at 266 (5th ed. 1984)). "The requisite causal connection [for Section 1983 claims] may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d

1175, 1183 (9th Cir. 1978) (citing *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)); *see also Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation.") (citations omitted).

"Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for the injury." *White*, 901 F.2d at 1506 (citation omitted). A defendant's conduct "is not the proximate cause of [the plaintiff's] alleged injuries if another cause intervenes and supersedes [the defendant's] liability for the subsequent events." *Id.* (citing Restatement (Second) of Torts §§ 440-53 (1965)). "Where defendant's actions are a 'moving force' behind a series of events that ultimately lead to a foreseeable harm, defendant is not relieved of liability on account of the intervening acts." *Conn v. City of Reno*, 572 F.3d 1047, 1061 (9th Cir. 2009) (citations omitted), *as amended*, 591 F.3d 1081 (9th Cir. 2010), *as reinstated on remand*, 658 F.3d 897 (9th Cir. 2011).

"As a practical matter, plaintiffs who have already demonstrated a triable issue of fact as to whether prison officials exposed them to a substantial risk of harm, and who actually suffered precisely the type of harm that was foreseen, will also typically be able to demonstrate a triable issue of fact as to causation." *Lemire*, 726 F.3d at 1080-81 (citations omitted). "'If reasonable persons could differ' on the question of causation then 'summary judgment is inappropriate and the question should be left to a jury.'" *Id.* at 1080 (citations omitted).

Similarly, Plaintiffs' negligence and wrongful death claims require proof of causation. "When a defendant's negligence is a factual cause of harm to the plaintiff, the defendant is subject to liability to the plaintiff as long as the harm that the plaintiff suffered was a reasonably

foreseeable result of the defendant's negligence." *Haas v. Est. of Carter*, 525 P.3d 451, 455 (Or. 2023) (quoting *Lasley v. Combined Transp., Inc.*, 261 P.3d 1215, 1219 (Or. 2011)). Oregon's wrongful death statute also "requires that a plaintiff prove that a defendant's negligent act or omission *caused* the decedent's *death*." *Joshi v. Providence Health Sys. of Or. Corp.*, 149 P.3d 1164, 1170 (Or. 2006).

Defendants accurately point out that because Plaintiffs only seek damages and no longer seek injunctive relief, Plaintiffs must demonstrate that Defendants' conduct caused actual injury, not merely a risk of harm. (Defs.' Mot. All Claims at 58.) Defendants are also correct that in a class action, "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) (quoting *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987-88 (9th Cir. 2015)). "If the plaintiffs cannot prove that damages resulted from the defendant's conduct, then the plaintiffs cannot establish predominance." *Id.* (citing *Pulaski & Middleman, LLC*, 802 F.3d at 987-88).

Plaintiffs have presented evidence that Defendants' statewide policies, practices, and decisions exposed all class members to a substantial risk of serious harm and that Plaintiffs suffered precisely the type of harm that was foreseen. *Cf. Norbert v. City & Cnty. of S.F.*, 10 F.4th 918, 935 (9th Cir. 2021) (affirming denial of a preliminary injunction where the AIC plaintiffs had not demonstrated a risk of material harm from the challenged conditions). Plaintiffs have presented evidence of the CDC's evolving recommendations concerning the response to COVID in correctional facilities, evidence regarding the policies that Defendants instituted, evidence suggesting that those policies were reckless, evidence highlighting other actions Defendants could have taken, and evidence suggesting that Defendants did not implement or

enforce all of their COVID policies. Plaintiffs have also presented evidence that the

representatives of the Damages Class contracted COVID, and that Tristan contracted COVID

and died. (*See, e.g.*, Venters Report at 4-9; Decl. Anit Jindal Supp. Defs.' Damages Mot. ("Jindal

Damages Decl.") Ex. 2, Rebecca Lubelczyk Expert Report ("Lubelczyk Report") ¶ 12, ECF No.

491; *see also* Second Maney Decl. ¶ 8; Third Hall Decl. ¶ 3; Clift Decl. ¶ 8; Decl. David Hart

Supp. Pls.' Mot. Class Cert. ("Fourth Hart Decl.") ¶ 7, ECF No. 210; Decl. Felisha Ramirez

Supp. Pls.' Mot. Class Cert. ("Ramirez Decl.") ¶ 5, ECF No. 206.)

       Construing the evidence in the light most favorable to Plaintiffs, the Court concludes that

a material issue of fact remains on the issue of causation. A reasonable jury could conclude that

Plaintiffs' harm could have been prevented with adequate COVID-related policies and

implementation. (*See* Venters Report at 13-16, opining that "[f]ailure to ensure consistent mask

wearing contributes to the spread of COVID-19 even when the practice is mostly or often

observed[,]" "[t]he failure to implement effective quarantine . . . was a serious contributor to

preventable death that I observed in my dozens of inspections and COVID-19 monitoring

roles[,]" and the "failure to monitor affirmative high-risk patients results in some of them

becoming so severely ill . . . that they die a preventable death"; Fleming Report at 4, opining that

"ODOC could have done much more to prevent COVID-19 infections, hospitalizations, and

deaths"; Jindal Decl. Ex. 59, David Fleming Rebuttal Expert Report ("Fleming Rebuttal Report")

at 42, opining that "the massive and explosive COVID-19 outbreaks" were avoidable); *see*

*Lemire*, 726 F.3d at 1081 ("Just as the jury could conclude that [the defendants] were

deliberately indifferent to the risks that an [AIC] would be seriously harmed during a three-hour-

plus period without supervision, so too could the jury conclude that such harm could have been

prevented with adequate supervision."); *Conn*, 572 F.3d at 1060 ("It makes little sense, however,

PAGE 80 – OPINION AND ORDER

to argue that the failure to provide access to suicide prevention services has no causal effect on a suicide that transpires less than 48 hours later. If suicide intervention is expected to have no impact on whether someone attempts suicide, why would the City ever bother with the Legal 2000 procedure?"); *see also Lopez v. State of Nev.*, No. 2:21-cv-01161-ART-NJK, 2023 WL 9056866, at *8 (D. Nev. Dec. 29, 2023) ("Regarding actual cause, construing all the evidence in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that if the wardens had developed procedures and training related to suicide prevention, then [the decedent]'s suicide could have been prevented."); *Coleman v. Schwarzenegger*, No. 01-cv-1351 TEH, 2008 WL 4813371, at *6 (E.D. Cal. Nov. 3, 2008) (denying the defendants' motion for summary judgment in a three-judge proceeding seeking a release order to remedy constitutional violations arising from overcrowding and finding that the class action AIC plaintiffs "presented sufficient evidence to create a genuine issue of material fact as to" causation) (citations omitted); *Plata*, 2005 WL 2932253, at *3 (concluding that the defendants' failure to provide constitutionally adequate medical care caused harm to class action plaintiffs across the State of California).[43]

Defendants' citation to *Castillo v. Bank of America* is not availing here because in *Castillo*, the plaintiffs presented no proof that the proposed class action plaintiffs had been exposed to the unlawful policy and had suffered an injury. *See Castillo v. Bank of Am., NA*, 980 F.3d 723, 732 (9th Cir. 2020). Here, Plaintiffs are proceeding to trial on a theory that Defendants' statewide COVID mitigation measures were constitutionally inadequate and

---

[43] Ultimately, the three-judge panel in the related *Coleman* and *Plata* cases ordered the state to reduce overcrowding in its prisons, and the Supreme Court affirmed that order. *See Brown v. Plata*, 563 U.S. 493, 500-02 (2011).

negligent, and therefore all class members were subject to those measures in light of their status as AICs during the class period. *Cf. Parsons*, 754 F.3d at 678 ("[M]any inmates can simultaneously be endangered by a single policy.") (citations omitted); *Lucero-Gonzalez,* 2020 WL 8258216, at *5 ("Plaintiffs' core contention [is] that all prospective class members, by virtue of their confinement at [the correctional complex], are subject to the same policies and conditions of confinement, which are, themselves, deliberately indifferent to the substantial risk of serious harm associated with the spread of COVID-19.").

Further, a reasonable jury could conclude that Defendants were a moving force behind a series of events that ultimately led to a foreseeable harm, as COVID infection and death are foreseeable harms from the nonenforcement of COVID mitigation policies. *See Conn*, 572 F.3d at 1062 ("[Plaintiffs] have presented sufficient evidence of foreseeability that the question of proximate cause must be decided by a jury."); *cf. Lopez,* 2023 WL 9056866, at *8 ("A reasonable jury could conclude that [the decedent]'s suicide was a 'foreseeable and normal result' of the wardens' lack of suicide prevention measures and training." (citing *White*, 901 F.2d at 1506)).

Defendants argue that Plaintiffs have presented no evidence that the outcome would have been better if they had done anything differently because Defendants' expert found that states that adopted additional policy interventions did not have a lower percentage of AICs testing positive for COVID over time compared with Oregon. (Defs.' Mot. All Claims at 66; *see* Jindal Decl. Ex. 60, Kevin Cahill Expert Report ¶ 21.) That remains a disputed question of fact. (*See* Stanley Report at 16, opining that ODOC "ranked in the lower third in terms of testing of the inmate population and yet ranked among the highest in a positive rate of COVID-19 tests . . . [and t]he Oregon statewide death rate for all citizens was 0.51 per 1,000 people, yet within the

ODOC, the death rate was 3.07 per 1,000 people. Only seven states had a higher death rate per

1,000 people"; Fleming Rebuttal Report at 42, opining that "the massive and explosive COVID-

19 outbreaks" were avoidable; *cf.* Fleming Report at 4, 33, 46, noting that the COVID death rate

in ODOC facilities was fifteen times greater than in the rest of the state, "a difference worse than

any other state in the entire country[,]" recounting that during the first year of the COVID

pandemic "the rate of reported COVID-19 illness in Oregon prisoners was more than seven times

higher than the rest of the state," and explaining that Oregon was "one of only three states" to

receive the worst possible score in an external evaluation of COVID infection and death rates

(emphases omitted)); *see Arellano v. Dean*, No. 15-cv-2247 JLS (JLB), 2020 WL 1157190, at *4

(S.D. Cal. Mar. 10, 2020) (rejecting the defendant's argument that "there is no evidence that

Plaintiff would have had any better outcomes if [the defendant] had done anything differently,

and therefore no evidence of causation of harm" because the plaintiff had presented sufficient

evidence of actual and proximate causation to defeat summary judgment) (simplified).

       Defendants further argue that Plaintiffs have not established causation for each individual

defendant. (*See* Defs.' Reply All Claims at 8.) To be sure, "liability may not be imposed based

on a team effort theory that would allow the jury to lump all the defendants together, rather than

require it to base each individual's liability on [the individual's] own conduct." *Peck v. Montoya*,

51 F.4th 877, 890 (9th Cir. 2022) (simplified). As a result, the Ninth Circuit has explained "that

an actor may be deemed to have caused a plaintiff to be subjected to a constitutional violation,

42 U.S.C. § 1983, and thus to be an integral participant in the violation, only if (1) the defendant

knew about and acquiesced in the constitutionally defective conduct as part of a common plan

with those whose conduct constituted the violation, or (2) the defendant set in motion a series of

acts by others which the defendant knew or reasonably should have known would cause others to

inflict the constitutional injury." *Id.* at 891 (simplified). Defendants have not attempted to establish here that each defendant was not personally involved in the alleged conduct at issue. To the contrary, the record reflects that the ODOC Defendants were each involved in ODOC's policy formation and implementation, setting in motion a series of acts by others. (*See, e.g.*, Dahab Decl. Ex. 71 at 4, ECF No. 547-71, Defendants conceding that Peters, Steward, Gower, Nooth, and Persson each had high-level supervisory authority for the challenged policymaking; Russell Decl. ¶ 11, indicating that Russell and Bugher led the AOC; Bugher Decl. ¶¶ 2, 102, testifying that Bugher and Russell ran the AOC and, for example, "I have been closely involved with ODOC's decision-making with respect to masking for both AICs and staff"; Washburn Depo. 35:17-21, confirming that COVID policies and practices were centralized through the AOC.)[44] A question of fact remains as to whether each defendant knew or reasonably should have known that their series of acts would cause others to inflict constitutional injury.

Defendants also suggest that Plaintiffs must identify which defendant caused which infection. (*See* Defs.' Reply All Claims at 9-10.) Plaintiffs have dismissed their claims against Allen, and, as discussed in more detail herein, the Court grants summary judgment in favor of Governor Brown and Jeske. Thus, Plaintiffs' only remaining claims are against the ODOC

---

[44] *See also, e.g.*, Jindal Decl. Ex. 2 at 1-2, Peters and Steward informing all staff of ODOC's response to COVID; Jindal Decl. Ex. 49, Persson communicating ODOC's testing policy to superintendents; Gower Depo. 42:8-44:24, Gower stating he was responsible for investigating disciplinary matters and was notified if corrective action was taken; Dahab Decl. Ex. 12, Depo. Heidi Steward 12:9-25, ECF No. 547-12, explaining that the AOC regularly briefed Steward, including twice weekly, and that Steward communicated policy decisions to staff; Steward Decl. ¶ 11, explaining that Steward was the policy advisor to the AOC; Jindal Decl. Ex. 4 at 2, Russell providing all staff with an update from the AOC; Jindal Decl. Ex. 12 at 1, Russell providing information to superintendents; Jindal Decl. Ex. 14, Steward communicating policy to all staff; Dahab Decl. Ex. 31 at 1, Persson, Gower, and Nooth discussing potential options for quarantine; Jindal Reply Decl. Ex. 1, Gower, Bugher, Persson, and others discussing masking policy.

Defendants based on ODOC's policies and implementation. The record does not reflect that some defendants were responsible for some policies while other defendants were responsible for others. Instead, it appears to be undisputed that all ODOC Defendants had supervisory authority over all of the remaining COVID policies at issue in this case. Accordingly, Plaintiffs need not show which of the policy failures caused each of them to contract COVID, so long as a jury concludes that at least one of the policies was the actual and proximate cause of Plaintiffs' harm. See *Farmer*, 511 U.S. at 843 (holding that "it does not matter whether the risk comes from a single source or multiple sources" and explaining that "it would obviously be irrelevant to liability" that the officials could not guess in advance the precise source that ultimately caused the harm) (citations omitted); *cf. Monroe v. Meeks*, 335 F.R.D. 201, 205 (S.D. Ill. 2020) ("The Court finds that Plaintiffs have repeatedly identified [department of corrections] policies and practices that have allegedly resulted in inadequate medical treatment for Plaintiffs and apply to all those in the proposed class.").

Defendants also argue that COVID infection in ODOC's facilities was inevitable (*see* Jindal Decl. Ex. 58, Michael Sulzinzki Expert Report at 40; Fleming Rebuttal Report at 42) and thus Plaintiffs are required to offer evidence of an increase in COVID cases attributable to Defendants' policy failures. (*See* Defs.' Reply All Claims at 6-7.) The Court concludes that a question of fact remains with respect to the delta of inevitable COVID cases and those caused by Defendants' alleged failures. (*See, e.g.*, Fleming Rebuttal Report at 42, opining that "the massive and explosive COVID-19 outbreaks" were avoidable; Fleming Report at 4, opining that "more than nine in ten of Oregon COVID-19 deaths in prisoners would not have occurred" if the death rate had been the same as the rest of the state; *id.* at 38, comparing the rate of infection per 10,000 people in Oregon to the rate of infection per 10,000 people in each ODOC facility during

ODOC's outbreaks; *id.* at 33, explaining that during the first year of the pandemic "the rate of reported COVID-19 illness in Oregon prisoners was more than *seven times* higher than the rest of the state.") *Conn* is informative.

In *Conn*, the decedent had "long struggled with mental health problems and suicidal ideation." 572 F.3d at 1051. The two defendants—police officers—found the decedent passed out on the sidewalk from intoxication. *Id.* at 1052. During transport to the jail, the officers observed the decedent wrap her seatbelt around her neck in an apparent attempt to choke herself and yell, "You lied to me. Just kill me. I'll kill myself then." *Id.* The officers did not report the incident. *Id.* The decedent was held for four hours and then released. *Id.* at 1053. That evening, the decedent was taken to the emergency room while intoxicated, readmitted, and then released. *Id.* The following day, the decedent was again picked up and taken to the same jail, where she was placed in the mental health unit because she had been on suicide watch during a previous detention. *Id.* The following morning, the decedent died by suicide. *Id.* The Ninth Circuit agreed with the plaintiffs that the plaintiffs had presented sufficient evidence that a jury could conclude that the officers' failure to respond appropriately to the decedent's attempted choking and suicide threat "set in motion a sequence of events in which [the decedent] did not receive the medical treatment she urgently needed." *Id.* at 1059. In other words, the Ninth Circuit has made clear that the question of causation goes to the jury even if there is disputed evidence about whether the harm at issue was inevitable absent the alleged misconduct. *Id.* at 1060 (explaining that the decedent's "suicide might well have been prevented by effective medical intervention"); *see also Lopez*, 2023 WL 9056866, at *8 ("Regarding actual cause, construing all the evidence in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that if the

wardens had developed procedures and training related to suicide prevention, then [the decedent]'s suicide could have been prevented.").

The Court finds that Plaintiffs have presented sufficient evidence to create a triable question of fact with respect to causation. Whether Plaintiffs can prove their causation theory by a preponderance of the evidence on both their Eighth Amendment and state law claims will be up to the jury. *See Lemire*, 726 F.3d at 1081 ("To be sure, a jury could reasonably find in favor of these Defendants, but at this stage, it matters only that there is a genuine issue of material fact as to these claims, such that summary judgment should not have been granted."); *see also Conn*, 572 F.3d at 1058 ("We are satisfied, nonetheless, that the [plaintiffs] presented sufficient evidence of actual and proximate causation to defeat summary judgment and give rise to a jury question whether the officers' omissions caused [the decedent]'s eventual suicide.").

### F.    Conclusion

For the reasons discussed above, the Court grants Defendants' motion for summary judgment as to Governor Brown and denies the remainder of Defendants' motion for summary judgment on all claims.

## II.    DEFENDANT JESKE

Defendants also move for partial summary judgment on all claims against Jeske. (*See generally* Defs.' Jeske Mot.)

### A.    Factual and Procedural Background

OCE is a semi-independent state agency that runs jobsites for AICs housed in ODOC institutions. *See* ORS §§ 421.344, 421.354. At the beginning of the class period, OCE operated

jobsites in ten of Oregon's prisons. (Depo. Ken Jeske ("Jeske Depo.") 9:15-19.)[45] OCE does not

operate worksites at ODOC kitchens, physical plants, or canteens. (Decl. Ken Jeske Supp. Defs.'

Jeske Reply ¶ 6, ECF No. 604; *see generally* Jermaine Brown Decl. Ex. 2, ECF No. 495-2.)[46]

OCE generates revenue of up to $32 million per year. (Jeske Depo. at 13:21-14:4.) It is

undisputed that, at all relevant times, Jeske was the OCE Administrator. (*Id.* at 9:22.)

    Plaintiffs have not identified any evidence demonstrating that Jeske had authority over

ODOC's testing, masking, quarantining, or other COVID-related policies in ODOC's housing

units. At oral argument, Plaintiffs acknowledged that Jeske was not a member of the AOC.

Instead, Plaintiffs base their claims against Jeske primarily on the fact that he continued to

operate OCE worksites during the class period. (SAC ¶ 76.) According to Plaintiffs, Jeske

routinely allowed mixing of AICs from different housing groups or units at OCE worksites (*id.*

¶ 66(a)), workers were not trained on how to avoid the spread of COVID while on the job (*id.*

¶ 77), workers were not given the opportunity to avoid close contact with one another (*id.*), and

workers were required to work in close contact with AICs from other housing units (*id.* ¶ 78).

Plaintiffs also assert general allegations against all Defendants, such as the failure to implement

and enforce adequate mask policies. (*Id.* ¶ 73(a).)

    At all relevant times, Jeske sat on an "executive team," which made decisions about

OCE's continued operations during COVID. (Jeske Depo. 37:4-17.) Jeske or one of his staff also

---

    [45] Excerpts of Jeske's deposition are available at Dahab Decl. Ex. 70, ECF No. 547-70 and Jermaine Brown Decl. Ex. 1, ECF No. 495-1.

    [46] Accordingly, Plaintiffs' citation to reports of alleged failures to implement COVID policies in the kitchen or canteen are irrelevant to their claims against Jeske. (*See, e.g.*, Gillespie Decl. ¶ 8, Hoag Decl. ¶ 13; Cantrell Decl. ¶ 26; Curtis Decl. ¶ 4(g); Walls Decl. ¶ 4(b).)

participated in AOC meetings, and OCE submitted written reports about its COVID response to the AOC. (*Id.* at 38:21-24, 42:21-25.)

The record reveals that, during the class period, OCE largely continued to operate its jobsites, with closures of certain sites only for limited periods of time. (*See id.* at 73:8-24; Jermaine Brown Decl. Ex. 5, Decl. Ken Jeske ("Jeske Decl.") ¶¶ 13-39, ECF No. 495-5; Keith Decl. ¶ 6; Third Hall Decl. ¶ 5.) Jeske described various actions taken in response to COVID at different OCE worksites, including frequent sanitizing of surfaces, AICs ate sack lunches at their workstations, AICs who worked at OCE received temperature checks and symptom screenings, construction of plexiglass barriers at certain locations, and certain workstations were moved six feet apart. (Jeske Depo. at 51:16-22; 63:1-4; Jeske Decl. ¶¶ 13-14, 18-21, 24; Jermaine Brown Decl. Ex. 6, Depo. Gary Clift ("Clift Depo.") 29:6-23, ECF No. 495-6; Frankie White Decl. ¶¶ 4-5.) Only two AICs were permitted in the bathroom at any given time. (Jeske Decl. ¶¶ 14, 21.) OCE built plexiglass barriers at call centers, and some workers at call centers had individual, six-foot wide cubicles. (*Id.* ¶¶ 14, 19, 25; Jeske Depo. at 63:1-4.)

At laundry worksites, COVID-related measures differed slightly at each facility. According to Jeske, the measures often included increased cleaning and disinfecting, adding six-foot markings on the floor where possible, reducing the number of workers and the number of workers assigned to each laundry cart, disinfecting AICs' boots before they left the work area, screening AICs with temperature checks as they reported to work, providing sack lunches for consumption at AICs' workstations, and increasing the number of bus trips to and from the worksite to allow for social distancing in transport. (Jeske Decl. ¶¶ 29-30, 33-38.) Even before COVID, AICs working in the "soiled" section of the laundry had to wear personal protective equipment—gowns, gloves, masks, and eye protection—to prevent against communicable

diseases. (*Id.* ¶ 37; Jeske Depo. at 64:9-16, 66:16-18.) That practice continued during the class

period. (Jeske Decl. ¶¶ 29, 33-37; *but see* Constantin Decl. ¶ 5(i)-(j), "The only protective gear I

have when doing laundry are the same re-usable green gloves we use when we clean the toilets.

Wearing gloves isn't mandatory for laundry orderlies. . . . Otherwise I don't have a smock or

anything like that. I'm wearing my own clothes while I do laundry.")

      As Jeske acknowledges, social distancing was not possible at all worksites, specifically at

the laundry worksites. (Jeske Decl. ¶¶ 20, 22, 29; Jeske Depo. at 63:4-10.) Further, there are a

few reports that efforts to maintain six feet of distance at OCE worksites, such as standing on

markers on the floor, and other COVID precautions "didn't last too long" or were not

implemented. (Clift Depo. 28:21-29:1; Daniel White Decl. ¶¶ 3-7, explaining that in April 2020

there was no social distancing, everyone ate lunch together, they remained "shoulder to

shoulder," did not have masks, and handwashing was not enforced; Horner Decl. ¶ 4(j),

explaining that, in April 2020, AICs who worked in the "soiled" section could move freely into

the clean areas and ate lunch with the other AICs;[47] Adams Decl. ¶ 14, testifying that in April

2020 AICs working at the laundry did not receive showers or a change of clothes at the end of

their shifts.)

      In May 2020, OCE implemented a mask mandate for everyone at all OCE worksites.

(Jeske Depo. at 52:10-21; Jermaine Brown Decl. Ex. 4, ECF No. 495-4; Clift Depo. 28:16-20,

143:19-22.) After the implementation of a mask mandate, AICs not wearing a mask would

receive two warnings and be sent home with no pay; after two warnings, they could lose their

---

[47] Defendants point out that a subsequent policy change may have altered the practice of
all AICs from both sections of the laundry eating lunch together. (*See* Jindal Decl. Ex. 3 at 11,
"Lunch breaks will be split up to ensure proper social distancing and chairs removed in break
room to ensure only 3 AICs can sit at each table.")

job. (Jeske Depo. 68:20-25.) AICs could also receive warnings or a misconduct report for not

social distancing. (*Id.* at 69:14-24.) According to Jeske, OCE staff could also be disciplined for

not wearing a mask, but "no corrective action" was ever found necessary for staff. (*Id.* at 69:25-

70:11; *but see* Ortega Decl. ¶ 3(a), observing staff in OCE laundry not wearing masks.)

There is some evidence that AICs worked only with their housing unit. (*See* Jermaine

Brown Decl. Ex. 8, Depo. Andrew Coopersmith 64:16-23, ECF No. 495-8.) There are also some

reports that AICs from different units worked together. (*See* Eaglespeaker Decl. ¶ 10, describing

AICs from different units working together, including when one of the units had known COVID

exposure; Ortega Decl. ¶ 14, explaining that AICs from four different units worked together in

an OCE laundry; David Brown Decl. ¶ 4(l), "[T]here are still AICs mingling in the OCE

industries shops where AICs from all different units work."; Sublet Decl. ¶ 14, "I worked in

OCE hangers and worked with women from all other units on the minimum side.")

Jeske described that "quarantined" units would still go to work so long as they did not

mix with another unit. (Jeske Depo. at 51:2-12; *see also* Third Hall Decl. ¶ 5, describing AICs

from quarantined units working until February 2021; Daniel White Decl. ¶ 12, recounting that an

AIC "asked to be sent back to the unit because he was too sick to work"; Hoag Decl. ¶¶ 10, 14,

"A friend of mine who has cancer, and therefore a weakened immune system, has been sent back

to work in the laundry where the suspected COVID-19 case came into the facility. When he is

not working, he is back in his cell, quarantined with his cellmate."; Coopersmith Decl. ¶ 9,

describing a unit "on quarantine but they were still sending AICs to work in OCE Laundry";

Weaver Decl. ¶ 6; Clift Depo. 37:3-9.) There is some evidence that quarantine units *did* interact

with other units. (*See* Eaglespeaker Decl. ¶ 10, describing AICs from different units working

together, including when one of the units had known COVID exposure; Ortega Decl. ¶¶ 14-15,

explaining that four units worked together, that one unit had many AICs who tested positive, but that the unit continued to go to work; David Brown Decl. ¶ 4(l), "While quarantine status has most AICs isolated by unit, there are still AICs mingling in the OCE industries shops where AICs from all different units work."; *cf.* Keith Decl. ¶ 6, "I am aware of at least one AIC that worked in the garment factory and tested positive, but the work at the factory continued, even though they were making masks for children at the time."; Coopersmith Decl. ¶ 9, describing that other units would work directly after the units on lockdown.)

### B. Eighth Amendment Claim

Defendants move for summary judgment on Plaintiffs' Eighth Amendment claim against Jeske. (Defs.' Jeske Mot. at 17-24.) To establish an Eighth Amendment claim, Plaintiffs must demonstrate (1) an "objectively, sufficiently serious" deprivation and (2) that the defendants acted with a "sufficiently culpable state of mind," *i.e.*, "deliberate indifference." *Farmer*, 511 U.S. at 834 (simplified). To establish deliberate indifference, a plaintiff must demonstrate that officials "kn[ew] that [AIC]s face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Id.* at 847.

Defendants do not argue that Jeske did not know of the serious risk of harm to Plaintiffs or that Jeske was not personally involved in OCE's response to COVID. (*See* Defs.' Jeske Mot. at 1.) Instead, Defendants argue that OCE's policies were reasonable and were reasonably implemented. (*Id.* at 4.) Plaintiffs respond that Jeske failed to take reasonable measures to abate the serious risk of harm to AICs by continuing to operate OCE workplaces where physical distancing was not possible and where preventative strategies were not enforced. (Pls.' Resp. All Claims at 50-51.)

///

Plaintiffs suggest that Jeske acted unreasonably by continuing to operate OCE's laundry facilities where social distancing was not possible. However, continued operation during the COVID pandemic where social distancing is not always possible, without more, does not rise to deliberate indifference. *See Kersh*, 2022 WL 17548074, at *4 ("To state a cognizable Eighth Amendment claim regarding COVID-19 prison conditions, a complaint must contain more than generalized allegations that a warden has not done enough to enforce six-feet social and living distancing.") (citations omitted); *Hernandez v. Covello*, No. 2:21-cv-01948 DB P, 2022 WL 1308194, at *4 (E.D. Cal. May 2, 2022) ("A generalized claim that defendants have not done enough to permit social distancing in prisons is insufficient to establish the more culpable state of mind of deliberate indifference.") (citations omitted).

Further, Plaintiffs have not presented sufficient evidence to demonstrate on a class-wide basis that OCE had a policy or practice of nonenforcement of its COVID-prevention strategies at OCE worksites. Plaintiffs have pointed to only a few isolated accounts of quarantine units mixing with non-quarantine units throughout the class period (*see* Eaglespeaker Decl. ¶ 10, Ortega Decl. ¶¶ 14-15(b); David Brown Decl. ¶ 4(l)) and have not presented evidence that Jeske was aware of the alleged mixing. And, although there is some evidence that in March and April of 2020, OCE did not enforce social distancing measures or other COVID precautions (*see* Daniel White Decl. ¶¶ 3-7; Adams Decl. ¶ 14; Horner Decl. ¶ 4(j)), Plaintiffs have not pointed to evidence in the record supporting a policy or practice of nonenforcement throughout the class period. Finally, after OCE implemented a mask mandate in May 2020, there appears to be only one report in the record of OCE staff not wearing a mask. (*See* Ortega Decl. ¶ 3(a); *cf.* Clift Depo. 28:9-20, explaining that Jeske "made them do the best effort they could under the

circumstances" and that "the mask was just cast in stone . . . because you wear it all the time . . . management and AIC[s].")

Accordingly, the Court concludes that Plaintiffs have not presented sufficient evidence to create an issue of material fact with respect to whether Jeske was deliberately indifferent in his role as OCE administrator. Because Plaintiffs have also not identified evidence of Jeske's involvement in the formation, implementation, and enforcement of ODOC's other COVID policies more generally, the Court grants summary judgment in Jeske's favor on Plaintiffs' Eighth Amendment claim.

### C.    Negligence and Wrongful Death Claims

Defendants also move for summary judgment on Plaintiffs' negligence and wrongful death claims against Jeske. (Defs.' Jeske Mot. at 24-27.)

#### 1.    Applicable Law

"Although . . . [Oregon courts] generally analyze a defendant's liability for harm that the defendant's conduct causes another in terms of the concept of reasonable [foreseeability], rather than the more traditional duty of care, if the plaintiff invokes a special status, relationship, or standard of conduct, then that relationship may create, define, or limit the defendant's duty to the plaintiff[.]" *Stewart v. Kids Inc. of Dall., Or*, 261 P.3d 1272, 1277 (Or. Ct. App. 2011) (simplified). "However, even 'when a plaintiff alleges a special relationship as the basis for the defendant's duty, the scope of that particular duty may be defined or limited by common-law principles such as foreseeability.'" *Id.* (quoting *Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 329 (Or. 2004)). Oregon courts turn to the Restatements for "useful guidance regarding the duty imposed as the result of a special relationship or status[.]" *Id.* at 1279 (collecting cases).

The Second Restatement of Torts provides, "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to" "protect them against unreasonable risk of physical harm[.]" Restatement (Second) of Torts § 314A (1965). The comments provide that "[t]he duty . . . is only one to exercise reasonable care under the circumstances[,]" and the custodian "is not required to take any action beyond that which is reasonable under the circumstances." Comments (e), (f), § 314A. Prison officials are also "under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to [the AIC], if the actor (a) knows or has reason to know that [the actor] has the ability to control the conduct of the third persons, and (b) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 320 (1965). "One who has taken custody of another may not only be required to exercise reasonable care for the other's protection when [the actor] knows or has reason to know that the other is in immediate need of it, but also to make careful preparations to enable [the actor] to give effective protection when the need arises, and to exercise reasonable vigilance to ascertain the need of giving it." Comment (d), § 320.

##    2.    Analysis

The Court concludes that Jeske had a special relationship to Plaintiffs. *See Crane v. United States*, No. 3:10-cv-00068-AC, 2013 WL 1453166, at *5 (D. Or. Mar. 21, 2013) ("In summary, the court concludes Oregon law imposes a special relationship which here required the [United States Marshals Service] deputies to care for the [AICs] in their custody and generally

protect them from harm."), *findings and recommendation adopted*, 2013 WL 1437816 (D. Or. Apr. 9, 2013).

For the same reasons discussed above, the Court concludes that Plaintiffs have not presented sufficient evidence to create a genuine dispute of material fact with respect to whether Jeske failed to exercise reasonable care to protect AICs from harm. Accordingly, Jeske is entitled to summary judgment on Plaintiffs' state law claims.[48]

### D.    Conclusion

The Court concludes that Plaintiffs have not established a genuine issue of material fact with respect to Jeske's deliberate indifference or negligence. Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiffs' claims against Jeske.

## III.    OTCA'S SINGLE ACCIDENT OR OCCURRENCE LIMITATION

The OTCA provides a single damages cap for "all claimants for claims" that "[a]rise out of a single accident or occurrence[.]" ORS § 30.271(1)(c), (3); *see also* Oregon Judicial Dep't, Tort Claims Table of Liability Limits, https://perma.cc/ZEB8-RC4L (setting the damages cap for actions against the state between $4,494,000 and $4,695,300 for claims by multiple claimants during the class period).

In their answer, Defendants raise the OTCA's limitations as an affirmative defense. (Answer ¶¶ 84-87.) Defendants move for partial summary judgment on Plaintiffs' state law claims, requesting that the Court enter an order finding that Plaintiffs' state law claims arise out of a single accident or occurrence within the meaning of the OTCA. (Defs.' OTCA Mot. at 2.)

---

[48] Because the Court concludes that Plaintiffs have not established a genuine issue of material fact with respect to Jeske's deliberate indifference or negligence, the Court does not address Defendants' argument about causation. (*See* Defs.' Jeske Mot. at 27-30.)

Plaintiffs argue that the issue is not yet ripe for adjudication, that Plaintiffs' claims do not arise out of a single accident or occurrence, and that, if the limitation applies here, it would violate Article I, section 10, of the Oregon Constitution. (Pls.' Resp. Br. Defs.' OTCA Mot. ("Pls.' OTCA Resp.") at 2-7, ECF No. 544.) In reply, Defendants argue that the Court should not wait to decide whether Plaintiffs' state law claims arise out of a single accident or occurrence because Defendants are not yet asking the Court to *apply* the cap. (Defs.' Reply Br. Pls.' OTCA Resp. ("Defs.' OTCA Reply") at 5, ECF No. 589.)

The Court agrees with Plaintiffs that Defendants' motion is premature because a jury has not yet reached a verdict awarding damages that exceed the cap. A dispute is constitutionally ripe when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1086 (9th Cir. 2015) (quoting *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 671 (9th Cir. 2005)). "A claim is not ripe if it involves 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *United States v. Streich*, 560 F.3d 926, 931 (9th Cir. 2009) (quoting *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985)). The injury must be "*certainly* impending[.]" *Id.* (quoting *18 Unnamed John Smith Prisoners v. Meese*, 871 F.2d 881, 883 (9th Cir. 1989)).

Courts have consistently deferred the question of whether a damages cap applies until after trial. *See, e.g.*, *Hodges v. United States*, No. 19-cv-46-GF-BMM, 2022 WL 73962, at *2 (D. Mont. Jan. 6, 2022) ("[The plaintiff]'s motion for summary judgment is not yet ripe, because the Cap has [not] yet been triggered. The parties have not yet gone to trial and so a jury has yet to make any findings regarding whether [the plaintiff] suffered any injuries or, if they did, what caused those injuries."); *Nikolaychuk v. Nat'l Cas. Co.*, No. 3:17-cv-00921-JE, 2018 WL

3946529, at *2 n.1 (D. Or. Aug. 16, 2018) ("Because [at summary judgment] . . . there has been no determination as to what, if any, damages Plaintiff is entitled, this issue [of a noneconomic damages cap] is not yet ripe for decision."); *Williams v. Invenergy, LLC*, No. 2:13-cv-01391-AC, 2016 WL 11779712, at *1 (D. Or. Oct. 28, 2016) ("[T]he Defendants' motion to apply the statutory cap [on noneconomic damages] . . . is premature. Unless and until a jury reaches a verdict awarding noneconomic damages that exceeds the statutory cap, the court need not address or decide whether the cap is constitutional and, if so, whether it should be applied in this case."); *Osborne v. Billings Clinic*, No. 14-cv-126-BLG-SPW, 2015 WL 13466113, at *1 (D. Mont. Dec. 16, 2015) ("[The plaintiff]'s motion [to find the statutory cap unconstitutional] rests upon contingent future events that may not occur as anticipated or at all. Based on the cascade of events that need to occur before this question must be answered, the court cannot say that [the plaintiff]'s injury is 'certainly impending.' As such, his motion is not ripe.") (citations omitted); *Anderson v. Molenda*, No. 3:09-cv-513-CWD, 2010 WL 11646747, at *2 (D. Idaho July 29, 2010) (concluding that the plaintiff's motion was not yet ripe because Idaho law "would apply once a jury issued a verdict finding Plaintiff entitled to noneconomic damages, and then, only if the noneconomic damage award exceeded the cap") (citation omitted); *Jeffries v. United States*, No. 08-cv-1514-RSL, 2009 WL 3151030, at *6 (W.D. Wash. Sept. 28, 2009) (concluding that the defendants' request that the court limit the non-economic damages that the plaintiff may seek was not yet ripe for adjudication and that the fact finder could consider damages above the cap); *see also Busch v. McInnis Waste Sys., Inc.*, 468 P.3d 419, 423-24 (Or. 2020) ("Following the verdict, the defendants filed a motion to reduce the plaintiff's total damages award to $3,000,000

pursuant to ORS 30.265 and ORS 30.271(3)(a), provisions of the Oregon Tort Claims Act.")

(citation omitted).[49]

 For these reasons, the Court denies Defendants' motion for an order finding that

Plaintiffs' state law claims arise out of a single accident or occurrence within the meaning of the

OTCA, with leave to renew post-trial.

## IV. DAMAGES AND CLASS CERTIFICATION OF STATE LAW CLAIMS

 Defendants move for summary judgment on Maney's claim for mental and emotional

injury because he has not demonstrated physical injury within the meaning of the Prison

Litigation Reform Act ("PLRA"). (Defs.' Damages Mot. at 2, 4-8.) Defendants also move for

summary judgment on Plaintiffs' state law claims because Plaintiffs have not demonstrated that

---

[49] Defendants also suggest that an opinion on the applicability of the OTCA caps might allow the parties to evaluate the settlement value of the case more precisely. (*See* Defs.' OTCA Mot. at 9.) The Court does not disagree, but this Court lacks authority to issue an advisory opinion. *See generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (noting that federal courts lack authority to issue advisory opinions). Of course, any settlement requires the parties to evaluate a range of litigation risks and discount the potential recovery accordingly. Here, the settlement calculus will necessarily require consideration of whether this Court would find that the OTCA cap applies and if so, whether the cap violates the Oregon constitution, and whether the Ninth Circuit would agree. This Court's evaluation of whether any eventual settlement is fair, reasonable, and adequate, would include the same evaluation of litigation risks. *See, e.g.*, *In re Myford Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2019 WL 1411510, at *9-10 (N.D. Cal. Mar. 28, 2019) (noting that "[i]n accordance with Rule 23(e)(2)'s instruction to evaluate 'the costs, risks, and delay of trial and appeal,' courts assess 'the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of maintaining class action status throughout the trial[,]" and approving proposed class action settlement as fair, adequate, and reasonable after evaluating the risks faced by the plaintiffs, including potential difficulty proving their claims, challenges to their damages model, and risks arising from the "inherent complexity of trying class claims" (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998))). In any event, not all of the pending claims are subject to the OTCA, which provides the parties with flexibility to negotiate a settlement value not subject to the OTCA caps. *See Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1131 (D. Or. 1998) ("[Section] 1983 claims against public bodies are exempt from the damages cap established by the OTCA." (citing *Rogers v. Saylor*, 760 P.2d 232, 238 (Or. 1988))).

they suffered economic harm and, accordingly, the Court should modify the class certification order to remove the state law claims. (*Id.* at 2, 9-11.)

## A.    Maney's Claim for Mental and Emotional Injury

Defendants request summary judgment on Maney's claim for mental and emotional injury, arguing that Maney has not established that he suffered a physical injury.[50] (*Id.* at 2-8.) Specifically, Defendants argue that Maney's "mild cold or flu-like symptoms" from his COVID infection are not more than a *de minimis* physical injury. (*Id.* at 4.) Plaintiffs respond that contracting COVID alone suffices to establish physical injury within the meaning of the PLRA and, regardless, Maney suffered physical symptoms from his infection. (Pls.' Resp. Defs.' Damages Mot. ("Pls.' Damages Resp.") at 3-8, ECF No. 542.) Plaintiffs also argue that the PLRA's physical injury requirement does not apply to Plaintiffs' Eighth Amendment claim. (*Id.* at 4 n.3.)

### 1.    Applicable Law

The PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]" 42 U.S.C. § 1997e(e). In passing the PLRA, Congress intended to limit frivolous lawsuits. *See Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002) (so noting); *see also Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (explaining that the PLRA "was intended to 'reduce the quantity and improve the quality of prisoner suits'" (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002))).

///

---

[50] The parties have stipulated to dismissal of Nulph's claims, and thus the Court denies as moot Defendants' motion related to Nulph's claims. (Stipulation of Dismissal, ECF No. 624.)

The Ninth Circuit has construed the PLRA to require a showing of physical injury "that need not be significant but must be more than *de minimis*." *Oliver*, 289 F.3d at 627. That does not mean that "'any' physical injury is sufficient[.]" *Id.* at 628. However, the Ninth Circuit has rejected as "overly restrictive" the standard for *de minimis* injuries espoused by the Northern District of Texas in *Luong v. Hatt*, 979 F. Supp. 481 (N.D. Tex. 1997), "which requires an observable or diagnosable medical condition requiring treatment by a medical care professional, which would cause a free world person to seek such treatment." *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1224 (9th Cir. 2008) (simplified).

In *Oliver*, the Ninth Circuit concluded that a painful canker sore and back and leg pain from sitting and sleeping on benches and the floor were *de minimis*. 289 F.3d at 629; *see also Jackson v. Monterey Cnty. Jail*, 407 F. App'x 119, 119 (9th Cir. 2010) (affirming dismissal of a claim arising from asbestos exposure because the plaintiff did not allege injury). In *Pierce*, the court concluded that recurrent bladder infections and bed sores were more than *de minimis*. 526 F.3d at 1224; *see also Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (concluding that the plaintiff was entitled to amend his complaint to plead physical injury where the plaintiff had developed chronic hypertension, contracted hepatitis B, and developed lumps behind his ear because of an untreated ear infection).

In analyzing the scope of the PLRA's physical injury requirement, the Ninth Circuit has held that "[t]o the extent that [a plaintiff] has actionable claims for compensatory, nominal or punitive damages—premised on violations of [constitutional] rights, and not on any alleged mental or emotional injuries . . . the claims are not barred by § 1997e(e)." *Oliver*, 289 F.3d at 630 (holding that "§ 1997e(e) applies only to claims for mental and emotional injury"). Where an AIC's complaint "seeks broader forms of redress for the underlying constitutional violations

alleged[,]" such as nominal or punitive damages, Section 1997e(e) does not bar such relief. *Id.* at 629-30 (holding that punitive and nominal damages are available to redress constitutional violations even in the absence of physical injury).

### 2. Analysis

The parties do not dispute that Maney contracted COVID. (*See* Venters Report at 7; Lubelczyk Report ¶ 12.) His symptoms included a two-day long headache and a cough that lasted for more than two days. (Lubelczyk Report ¶ 12; Plesser Decl. Ex. B, Depo. Paul Maney 16:22-17:7, ECF No. 543-2; *see also* Second Maney Decl. ¶ 10, describing a "hacking cough".) There is also evidence in the record suggesting that his cough lasted six days or longer. (*See* Jindal Damages Decl. Ex. 3 at 2, Homer Venters Rebuttal Expert Report, ECF No. 492, noting that Maney began coughing more than two days before December 25, 2020, and that Maney's records document an ongoing cough on December 28, 2020.) Plaintiffs also present evidence that new COVID symptoms or exacerbation of preexisting conditions can emerge months or years after an infection. (*See id.* at 3, noting "growing evidence that numerous chronic diseases can worsen after COVID-19 infection, including hypertension"; *see also* Decl. Marc F. Stern Supp. Pls.' Mot. Class Cert. ¶ 18, ECF No. 341.) The evidence also supports that contracting COVID is not the same as catching a common cold. (Dahab Decl. Ex. 2 at 4, "COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood"; *see also* Centers for Disease Control & Prevention, *Long COVID or Post-COVID Conditions* (updated July 20, 2023), https://perma.cc/MRT5-BT47 (summarizing the potential for post-COVID conditions).

///

The Court cannot conclude as a matter of law that Maney's injury was *de minimis* when he contracted COVID and suffered symptoms for more than two days. Maney was diagnosed with a serious disease, and the physical injury requirement does not demand a condition requiring treatment by a medical care professional, which would cause a free world person to seek such treatment. *See Pierce*, 526 F.3d at 1224. The Court does not read the cases cited by the parties to require more. *See, e.g.*, *Jones*, 2022 WL 706926, at *10 ("Plaintiff alleges that he contracted COVID-19, suffered from chest pains, and racing heartbeats necessitating medication. This is sufficient at this stage to allege a physical injury that is more than *de minimis*.") (citations omitted); *Livingston v. Unified Gov't of Wyandotte Cnty.*, No. 23-3032-JWL, 2023 WL 5672201, at *2 (D. Kan. Sept. 1, 2023) ("The Court did not say that suffering from COVID is not a physical injury. Rather, because such injury is not traceable to any constitutional violation, it does not meet the requirements of § 1997e(e)."); *Arnold v. St. Clair Cnty. Intervention Ctr.*, No. 20-cv-11410, 2020 WL 4700812, at *4 (E.D. Mich. Aug. 13, 2020) ("Unlike Plaintiff Smith, who asserts that he was infected with COVID-19, Plaintiff Arnold has alleged no physical injury and will be dismissed from the Complaint with prejudice."); *cf. Bratton v. Broomfield*, No. 20-cv-03885 BLF, 2023 WL 4748838, at *3 (N.D. Cal. July 25, 2023) (dismissing an Eighth Amendment claim where the plaintiff alleged that he was infected with COVID but had not alleged that he suffered any symptoms "even temporarily"); *Ingram v. McDowell*, No. 2:22-cv-03787-DOC-PD, 2023 WL 2575588, at *16 (C.D. Cal. Feb. 21, 2023) ("He does not allege that he contracted COVID-19, and he does not allege any physical injury."), *findings and recommendation adopted*, 2023 WL 2574565 (C.D. Cal. Mar. 20, 2023); *Ramos v. Cal. Dep't of Corr.*, No. 2:22-cv-0004 DB P, 2022 WL 4292379, at *3 (E.D. Cal. Sept. 16, 2022) (dismissing complaint where the plaintiff implied that he was exposed to and tested positive for COVID, but

"to the extent plaintiff describes himself as asymptomatic, there is no indication he suffered actionable harm in the form of a physical injury as a result of the housing placement"); *Canell v. Multnomah Cnty.*, 141 F. Supp. 2d 1046, 1052-54 (D. Or. 2001) (concluding that the plaintiff had not alleged a physical injury because the "plaintiff did not get any diseases, did not get the stomach flu and did not get lice").[51]

Because it is undisputed that Maney contracted COVID and suffered several days of symptoms, the Court concludes that a question of fact remains with respect to whether he suffered more than *de minimis* injury. *See Howard v. Klicka*, 242 F. App'x 416, 420 (9th Cir. 2007) (concluding that the question of *de minimis* physical injury was a question of fact and inappropriate for summary judgment because "[i]t is impossible to tell on the state of the record . . . how [the plaintiff's injuries] should be characterized"); *Preayer v. Ryan*, No. 15-cv-00069-PHX-DGC, 2017 WL 2351601, at *5 (D. Ariz. May 31, 2017) ("Because Plaintiff will be free to present more information at trial, the Court cannot conclude at this time that he will be unable to prove more than a de minimis injury.").

For these reasons, the Court denies Defendants' motion for summary judgment on Maney's claims for mental and emotional harm.

## B.    Economic Harm

Defendants move for partial summary judgment on Plaintiffs' state law negligence claim. (Defs.' Damages Mot. at 9-11.) Defendants argue that because there is no evidence that Plaintiffs

---

[51] *See also Chung v. Carnival Corp.*, 553 F. Supp. 3d 775, 781 (C.D. Cal. 2021) (concluding that in the context of the zone of danger test, "Plaintiffs who allege that they tested positive or that they exhibited symptoms of COVID-19 necessarily allege physical injury—contracting the disease and injury from the disease" (footnote omitted) (citing *Archer v. Carnival Corp. & PLC*, No. 2:20-CV-04203-RGK-SK, 2020 WL 7314847, at *7 (C.D. Cal. Nov. 25, 2020))).

have suffered economic damages, under ORS § 30.650, Plaintiffs may not recover non-economic damages on their negligence claim. (*Id.*) Plaintiffs respond, first, that ORS § 30.650 does not apply to named Plaintiffs Clift, Hart, Sublet, or the Estate of Tristan because they are no longer "adults in custody." (Pls.' Damages Resp. at 9-11.) Second, Plaintiffs argue that if ORS § 30.650 eliminates entirely Plaintiffs' right to a remedy, the statute violates Article I, section 10, of the Oregon Constitution. (*Id.* at 11-19.)

### 1.    ORS § 30.650

ORS § 30.650 provides that "[n]oneconomic damages, as defined in ORS 31.705, may not be awarded to an adult in custody in an action against a public body unless the adult in custody has established that the adult in custody suffered economic damages, as defined in ORS 31.705." ORS § 30.650. For purposes of ORS § 30.650, "'[a]dult in custody' means a person incarcerated or detained in a correctional facility who is accused of, convicted of or sentenced for a violation of criminal law or for the violation of the terms and conditions of pretrial release, probation, parole, post-prison supervision or a diversion program." *Id.* § 30.642(2).

The Oregon legislature enacted ORS § 30.650 in 1999. Or. Laws 1999, ch. 657, § 6. The legislation began as House Bill ("HB") 2256. The legislation was in response to Congress' passage of the PLRA in 1996, which aimed to reduce the number of frivolous lawsuits. (Staff Measure Summary, HB 2256, May 6, 1999.) The Oregon legislation similarly sought to disincentivize frivolous lawsuits. *See Alexander v. State*, 390 P.3d 1109, 1111 n.3 (Or. Ct. App. 2017) (citing Testimony, House Civil Judiciary Committee, HB 2256, Feb. 15, 1999, Ex. C (statement of David Schuman, Deputy Attorney General)). The purpose of HB 2256 was to put state AIC lawsuits on "the same footing" with AIC lawsuits in federal courts. (Staff Measure Summary, HB 2256, May 6, 1999.) For example, the legislation adopted a "three strikes" rule for

frivolous lawsuits and a requirement that AICs pay their own costs if they have available funds.

Or. Laws 1999, ch. 657, §§ 2-3. The legislation did not mirror the PLRA in its entirety, though,

excluding requirements such as exhaustion and physical injury, and including the economic

damages requirement. *Compare* Or. Laws 1999, ch. 657, *with* 42 U.S.C. § 1997e(a), (e).

**2.      Statutory Construction**

Defendants argue that because there is no evidence that Plaintiffs have suffered economic

damages, Plaintiffs may not recover non-economic damages on their negligence claim. (Defs.'

Damages Mot. at 9.) Plaintiffs do not dispute that they have not suffered economic damages.

(*See* Jindal Damages Decl. Ex. 4 at 2-3, ECF No. 490-4); *see also Alexander*, 390 P.3d at 1112

("For his part, plaintiff does not appear to dispute that, under ORS 30.650, proof of economic

damages is a necessary predicate to the recovery of noneconomic damages."). Instead, Plaintiffs

argue that Plaintiffs Clift, Hart, Sublet, and the Estate of Tristan are not "adults in custody" as

that phrase is defined by statute because Clift, Hart, and Sublet have now been released and

Tristan has passed away, and they will not be "in custody" at the time any "award" of damages is

entered. (Pls.' Damages Resp. at 10-11.)

The Court applies Oregon's method of statutory construction to interpret Oregon statutes.

*See Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1209 (9th Cir. 2010) (a federal court

interpreting Oregon law should "interpret the law as would the Oregon Supreme Court")

(simplified). The goal of statutory construction in Oregon "is to ascertain the legislature's

intent." *Ingle v. Matteucci*, 537 P.3d 895, 902 (Or. 2023). "To do so, [Oregon courts] look to the

statute's text, context, and legislative history, as well as . . . prior [Oregon Supreme Court]

constructions of the statute." *Id.* (citing, *inter alia, State v. Gaines*, 206 P.3d 1042, 1050 (Or.

2009)).

The Court is not aware of any appellate state court opinion addressing the instant question. Federal courts are split. In *VanValkenburg v. Oregon Department of Corrections*, a district judge concluded that "the most natural reading of the text of § 30.650 is that the statute does not apply to a plaintiff who was an [AIC] when the case was filed but was released before the action reached the stage at which damages might be awarded because § 30.650 appears to focus on the time at which damages are awarded rather than when any such action is instituted." *VanValkenburg v. Or. Dep't of Corrs.*, No. 3:14-cv-00916-BR, 2016 WL 2337892, at *10 (D. Or. May 2, 2016) (citing ORS § 30.650). However, other judges in this district have come to the opposite conclusion. *See Quesnoy v. Oregon*, No. 3:10-cv-1538-ST, 2011 WL 5439103, at *4 (D. Or. Nov. 4, 2011) ("Although [the plaintiff] is no longer an [AIC], she was an [AIC] at all times during which she allegedly suffered emotional distress. However, she neither alleges nor submits any evidence that she suffered any economic damages. Thus, defendants' motion to dismiss this claim is granted."); *Deffenbaugh v. Linn Cnty.*, No. 09-cv-6347-TC, 2011 WL 1337097, at *4 (D. Or. Apr. 6, 2011) ("The claim is barred under ORS 30.650 as plaintiff has no economic damages and was an [AIC] when the alleged claims arose."); *cf. Lyons v. Multnomah Cnty.*, No. 3:14-cv-01793-YY, 2017 WL 9049864, at *10 n.5 (D. Or. July 27, 2017) ("[The plaintiff] was apparently a pretrial detainee at all times during which he allegedly suffered emotional distress and has submitted no evidence that he suffered any economic damages. However, this claim fails on other grounds and the court, therefore, does not rely on this issue."), *findings and recommendation adopted*, 2017 WL 4270627 (D. Or. Sept. 25, 2017), *aff'd*, 743 F. App'x 137 (9th Cir. 2018).[52]

---

[52] *See also Mounce v. Vitt*, No. 3:22-cv-00914-HZ, 2024 WL 52999, at *13 (D. Or. Jan. 4, 2024) (granting summary judgment against a former AIC on claims without economic

The Court concludes that, considering the text alone, it is ambiguous whether

ORS § 30.650 applies to all claims that accrue when the plaintiff is an AIC, all cases initiated by

an AIC, or only to those claims where the AIC remains in custody through a damages award.

Although the statute references an award, it also refers to "an action." *See* ORS § 30.650 (stating

that "[n]oneconomic damages . . . may not be awarded to an adult in custody in an action against

a public body").[53]

Plaintiffs rely on *Voth v. State*. *See Voth v. State*, 78 P.3d 565 (Or. Ct. App. 2003). In

*Voth*, the plaintiff argued that ORS § 30.650 subjected him to "civil death." *Id.* at 567. Under

Oregon's civil death statute, civil death means lacking the "legal *capacity* to maintain [an]

action," *id.* at 568 (quoting *Boatwright v. State Indus. Acc. Comm'n*, 416 P.2d 328, 329 (Or.

1966)), or, quite literally, "that one is considered dead under the law." *Id.* (citation omitted). The

court concluded that ORS § 30.650 "does not prevent an [AIC] from having the *capacity* to bring

a claim against a public body for negligence . . . ; rather, it imposes a condition on the recovery

of noneconomic damages in those kinds of actions." *Id.* "In fact, ORS 30.650 recognizes

implicitly the capacity of an inmate to sue for both economic and noneconomic damages." *Id.*

The court concluded that "[t]he statute merely operates to bar the *award* of noneconomic

damages unless the [AIC] also establishes that [the AIC] suffered economic damages." *Id.*

*Voth* does not resolve the instant question. Consistent with *Voth*, Plaintiffs had the

capacity to bring their negligence claim, but the capacity to sue does not relieve them of the

---

damages where the plaintiff did not raise the issue of release from custody); *Orr v. Peterson*, No.
3:14-cv-00898-AC, 2015 WL 2239635, at *6 (D. Or. May 12, 2015) (same).

[53] Thus, the Court disagrees with the interpretation that the text's reference to a damages
award, in isolation, resolves the matter. *See Knopp v. Griffin-Valade*, 543 P.3d 1239, 1245 (Or.
2024) ("The text of the amendment does not unambiguously support either interpretation.").

requirement that they must show economic damages to receive an award of noneconomic damages. *Voth* does not resolve whether an AIC must remain in custody throughout the course of litigation to be subject to the condition on recovery.

Considering the text in context and the legislative history, the Court determines that the economic damages requirement applies to all claims that accrue when the plaintiff is an AIC. The overall thrust of the statutory scheme is to add restrictions to AIC lawsuits. In other words, the legislature sought to impose barriers to suit, such as requiring that AICs pay costs when able and adding review and dismissal of frivolous claims. *See* Or. Laws 1999, ch. 657, §§ 2-3. The Court concludes that a uniform requirement of economic damages for all negligence claims that accrue in custody aligns most closely with this legislative intent. The Court cannot discern any intent by the legislature to allow those AICs whose sentences happen to expire before a final adjudication to recover damages unique from those AICs who remain in custody. The Court further notes that such a construction would incentivize AICs close to the end of their sentence to draw out litigation until their release and could result in two AICs harmed on the same date while in custody to receive vastly different remedies if one were released before trial and the other remained incarcerated.[54]

///

---

[54] Further, as Defendants point out, it is difficult to know if someone will be in custody on the date of a jury award until that day arrives. (Defs.' Reply Br. Pls.' Resp. Defs.' Damages Mot. ("Defs.' Damages Reply") at 9, ECF No. 593.) For example, Clift has been released from custody, reentered custody, and been released again during the pendency of this case. (*See* Decl. Heidi King Supp. Defs.' Damages Reply Ex. 1 at 1-15, ECF No. 595.) Additionally, Plaintiffs' construction would preclude recovery by a plaintiff without economic damages bringing a claim against a non-carceral public body (such as Tri-Met or Oregon Health and Science University ("OHSU")) who unrelatedly enters custody at the time of the award. (Defs.' Damages Reply at 9-10.)

Accordingly, the Court concludes that ORS § 30.650 applies to all Plaintiffs. *See Quesnoy*, 2011 WL 5439103, at *4; *Deffenbaugh*, 2011 WL 1337097, at *4; *cf.* LA. STAT. ANN. § 15:1181 (1997) ("'Prisoner' means any person subject to incarceration, detention, or admission to any prison who is accused of, convicted of, sentenced for, or adjudicated delinquent for a violation of criminal law or the terms or conditions of parole, probation, pretrial release, or a diversionary program. Status as a 'prisoner' is determined as of the time the cause of action arises. Subsequent events, including post trial judicial action or release from custody, shall not affect such status."). Thus, the Court turns to Plaintiffs' argument that if ORS § 30.650 precludes a remedy here, the statute violates Article I, section 10, of the Oregon Constitution.

### 3.    Article I, Section 10, of the Oregon Constitution

Article I, section 10, of the Oregon Constitution—otherwise known as the "remedy clause"—provides, in part, "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." OR. CONST., art. I, § 10.

In 2001, the Oregon Supreme Court construed Article I, section 10. *See Smothers v. Gresham Transfer, Inc.*, 23 P.3d 333 (Or. 2001). In *Smothers*, the court "tied the meaning of the remedy clause to Oregon common law in 1857[.]" *Horton v. Or. Health & Sci. Univ.*, 376 P.3d 998, 1005 (Or. 2016).

In the wake of *Smothers*, the Oregon Court of Appeals concluded that ORS § 30.650 does not violate the remedy clause. *See Voth*, 78 P.3d at 569. The court applied *Smothers*' two-step analysis. *Id.* at 568. First, "when the drafters wrote the Oregon Constitution in 1857, did the common law of Oregon recognize a cause of action for the alleged injury?" *Id.* (quoting *Smothers*, 23 P.3d at 356). "If the answer to that question is yes, and if the legislature has abolished the common-law cause of action for injury to rights that are protected by the remedy

clause, then the second question is whether it has provided a constitutionally adequate substitute remedy for the common-law cause of action for that injury." *Id.* (quoting *Smothers*, 23 P.3d at 356). Accordingly, the court explained, "[i]n order for plaintiff to succeed, he must demonstrate that he could have otherwise brought an action for negligence . . . against the State of Oregon at the time of adoption of the constitution." *Id.* Because of the doctrine of sovereign immunity, the Oregon Court of Appeals concluded that the plaintiff "could not have sued the State of Oregon at common law for negligence," rejecting the plaintiff's Article I, section 10, challenge. *Id.* at 569.

Fifteen years after *Smothers*, the Oregon Supreme Court reexamined the remedy clause and overruled *Smothers*. *See Horton*, 376 P.3d at 1005 ("[W]e overrule *Smothers*[.]").[55] In *Horton*, the court explained that the remedy clause "is plainly concerned with the administration of justice." *Id.* at 1006 (quoting Hans A. Linde, *Without "Due Process": Unconstitutional Law in Oregon*, 49 OR. L. REV. 125, 136 (1970)). *Smothers* had improperly "tied the meaning of the remedy clause to Oregon common law in 1857[.]" *Id.* at 1005. Ultimately, the court concluded, "[w]e find no basis in the text of the remedy clause, its context, or its history from which we can conclude that the framers intended to limit the meaning of that clause to the concept of injury as it was defined in 1857." *Id.* at 1008. The court explained that "Article I, section 10, did not freeze rights and remedies as they existed in 1857." *Id.* at 1010. Instead, the court held that the remedy clause "limits the legislature's substantive authority to alter or adjust a person's remedy for injuries to person, property, and reputation." *Id.* at 1002.

In surveying other remedy clause opinions, the Oregon Supreme Court identified "three general categories of legislation":

---

[55] The Oregon Supreme Court declined to overrule its other remedy clause cases. *See Horton*, 376 P.3d at 1003.

First, when the legislature has not altered a duty but has denied a person injured as a result of a breach of that duty any remedy, our cases have held that the complete denial of a remedy violates the remedy clause. Similarly, our cases have held that providing an insubstantial remedy for a breach of a recognized duty also violates the remedy clause. Compare *Clarke* [*v. Or. Health Sci. Univ.*, 175 P.3d 418 (Or. 2007)] . . . ($200,000 capped damages not substantial in light of $12,000,000 in economic damages and $17,000,000 in total damages), *with Howell* [*v. Boyle*, 298 P.3d 1 (Or. 2013)] . . . ($200,000 capped damages substantial in light of $507,500 in total damages).

Second, the court has recognized that the reasons for the legislature's actions can matter. For example, when the legislature has sought to adjust a person's rights and remedies as part of a larger statutory scheme that extends benefits to some while limiting benefits to others, we have considered that *quid pro quo* in determining whether the reduced benefit that the legislature has provided an individual plaintiff is "substantial" in light of the overall statutory scheme.

Third, the legislature has modified common-law duties and, on occasion, has eliminated common-law causes of action when the premises underlying those duties and causes of action have changed. In those instances, what has mattered in determining the constitutionality of the legislature's action is the reason for the legislative change measured against the extent to which the legislature has departed from the common law. That is, we have considered, among other things, whether the common-law cause of action that was modified continues to protect core interests against injury to persons, property, or reputation or whether, in light of changed conditions, the legislature permissibly could conclude that those interests no longer require the protection formerly afforded them.

*Id.* at 1027 (citations omitted).

The court further opined, "the substantiality of the legislative remedy can matter in determining whether the remedy is consistent with the remedy clause." *Id.* at 1028. "When the legislature does not limit the duty that a defendant owes a plaintiff but does limit the size or nature of the remedy, the legislative remedy need not restore all the damages that the plaintiff sustained to pass constitutional muster, but a remedy that is only a paltry fraction of the damages

that the plaintiff sustained will unlikely be sufficient[.]" *Id.* (citations omitted). "*Horton* therefore provides the framework for [the] analysis of the constitutionality of" a statute under Article I, section 10. *Busch*, 468 P.3d at 423.

*Horton* was a medical malpractice case against OHSU considering the constitutionality of a damages cap under the OTCA. The Oregon Supreme Court concluded that the case fell into the second category of cases: "the legislature did not alter the duty that . . . doctors owe their patients to exercise due care." *Horton*, 376 P.3d at 1028. "However, the Tort Claims Act, as amended, limits a plaintiff's remedy for a breach of that duty as part of a comprehensive statutory scheme intended to extend benefits to some persons while adjusting the benefits to others." *Id.* "[T]he Tort Claims Act seeks to accommodate the state's constitutionally recognized interest in sovereign immunity with a plaintiff's right to a remedy." *Id.* "Those factors bear on [the] evaluation of the substantiality of the remedy that the Tort Claims Act provides." *Id.*

Ultimately, the court upheld the damages cap. The court explained, "[w]e recognize that the damages available under the Tort Claims Act are not sufficient in this case to compensate plaintiff for the full extent of the injuries[.]" *Id.* at 1030. However, the remedy clause does "not deny the legislature authority to adjust, within constitutional limits, the duties and remedies that one person owes another." *Id.* "Our holding today is limited to the circumstances that this case presents, and it turns on the presence of the state's constitutionally recognized interest in sovereign immunity, the *quid pro quo* that the Tort Claims Act provides, and the tort claims limits in this case." *Id.*

More recently, in *Busch*, the Oregon Supreme Court applied *Horton* to a $500,000 statutory cap on noneconomic damages that a plaintiff may recover for injuries resulting from a

PAGE 113 – OPINION AND ORDER

private party's breach of a common-law duty. 468 P.3d at 421. The court concluded that, as

applied to the plaintiff, the cap violated the remedy clause. *Id.*

     The Oregon Supreme Court summarized the *Horton* analysis as follows: "we began by

recognizing that doctors owe their patients a duty of due care, that patients have a right to a

remedy for a breach of that duty, and that the legislature had not altered the duty imposed on

doctors but had limited the remedy available to patients." *Id.* at 428. "We then inquired whether

the legislature's reasons for imposing those limits were sufficiently weighty to counterbalance

the Article I, section 10, right to remedy." *Id.* (citation omitted). Put succinctly, the "task under

*Horton* is to determine whether a plaintiff's remedy is constitutionally sufficient, considering

'the extent to which the legislature has departed from the common-law model measured against

its reasons for doing so.'" *Id.* at 431 (quoting *Horton*, 376 P.3d at 1028).

     The Oregon Supreme Court concluded that the statute fell into the first category of

legislation: "the legislature did not alter the common-law duty of reasonable care and it did not

alter a plaintiff's common-law right to bring a claim for breach of that duty." *Id.* at 432. The

court rejected the defendants' suggestion that the remedy clause is more protective of economic

damages compared to noneconomic damages and should be treated differently in the remedy

clause analysis. *Id.* at 429-30.

     Next, the court noted that the legislation did not provide a *quid pro quo*. *Id.* at 431. The

court concluded that the remedy clause does not require the existence of a *quid pro quo*. *Id.* For

example, the court had "upheld statutes that modify common-law duties, or even, on occasion,

eliminate common-law causes of action 'when the premises underlying those duties and causes

of action have changed' [considering] . . . 'whether the common-law cause of action that was

modified continues to protect core interests against injury to person, property, or reputation or

whether, in light of changed conditions, the legislature permissibly could conclude that those interests no longer require the protection formerly afforded to them.'" *Id.* (quoting *Horton*, 376 P.3d at 1027). Ultimately, the court concluded that the noneconomic damages cap violated the remedy clause. *Id.* at 421.

### 4.    Constitutional Analysis

Plaintiffs argue that, as applied, ORS § 30.650 violates Article I, section 10, of the Oregon Constitution. (Pls.' Damages Resp. at 9, 11-19.) Plaintiffs argue that the statute would completely deny them a remedy even though they suffered noneconomic damages as a result of an alleged breach of a duty. (*Id.* at 18.) Defendants respond that the Oregon Court of Appeals has rejected the argument that ORS § 30.650 violates the remedy clause and that the statute does not violate the remedy clause because it is part of a statutory *quid pro quo* scheme. (Defs.' Damages Reply at 10-19.) The Court agrees with Plaintiffs.

### a.    *Voth v. State*

The Court concludes that *Voth*'s remedy clause analysis is no longer good law, given its application of the *Smothers* framework. Defendants argue that the Oregon Court of Appeals in *Voth* has already answered the instant question and that *Voth* remains good law. (*Id.* at 10-16.) Defendants argue that, under *Horton*, common law claims and remedies still form the baseline for assessing whether legislation runs afoul of the remedies clause and that, under common law, AICs would not have any remedy here. (*Id.* at 11-18.)

According to Defendants, at common law, individuals convicted of felonies could not file civil suits. Defendants argue that, through three separate pieces of legislation, the Oregon legislature has modified that common law prohibition (1) by abolishing civil death and permitting felons to bring civil actions, Or. Laws 1975, ch. 781, § 1 (codified at ORS § 137.275),

(2) by partially waiving the State's sovereign immunity through the OTCA, and (3) by requiring

AICs to prove economic damages under ORS § 30.650.

In *Voth*, the Oregon Court of Appeals explained, "[i]n order for plaintiff [AIC] to

succeed, he must demonstrate that he could have otherwise brought an action for negligence and

intentional infliction of emotional distress against the State of Oregon at the time of adoption of

the constitution." 78 P.3d at 568. The court concluded that "plaintiff could not have sued the

State of Oregon at common law for negligence or intentional infliction of emotional distress

because of the doctrine of sovereign immunity[,]" thus ending the analysis. *Id.* at 569.

Defendants argue that *Voth* is still good law after *Horton* because the remedy clause analysis

considers the extent to which the legislature altered or adjusted a person's common law remedy

and AICs would not have a common law remedy without the trio of legislation.

However, *Horton* also involved suit against a state entity, OHSU, and the Oregon

Supreme Court did not limit its analysis to the analysis applied in *Voth*. In *Horton*, the analysis

did not start and end because the plaintiff could not have sued the State of Oregon at common

law because of sovereign immunity, as the *Voth* court concluded. *See Horton*, 376 P.3d at 1028

(warning courts to take cases that "turn on the bright line rule that *Smothers* drew . . . with a

grain of salt"); *see also Schutz v. La Costita III, Inc.*, 406 P.3d 66, 71 (Or. Ct. App. 2017)

(explaining that the Oregon Court of Appeals had previously "addressed and rejected" the

plaintiff's argument that the statute at issue violated the remedy clause "but we agree with

plaintiff that the question is properly before us again in light of [*Horton*], in which the Supreme

Court overruled in part its earlier opinion in [*Smothers*], on which we relied in [the previous

case]."), *aff'd on other grounds*, 436 P.3d 776 (Or. 2019). Although *Voth* also discussed civil

death because the plaintiff argued that ORS § 30.650 subjected him to civil death, *Voth* did not

undergo the analysis that Defendants offer—an analysis of the three pieces of legislation and if and how they implemented a *quid pro quo* and altered an AIC's common law remedy. *See* 78 P.3d at 567-68. Accordingly, the Court concludes that Oregon's appellate courts have not answered the instant question given the Oregon Supreme Court's post-*Horton* remedy clause framework.[56]

### b.    *Horton* Analysis

The Court agrees with Plaintiffs that ORS § 30.650 does not alter Defendants' common-law duty of reasonable care. Defendants do not argue that, under Oregon common law, prison officials do not owe a duty of care to AICs, and the Court concludes that they do. *See* Restatement (Second) of Torts § 314A (1965); *id.* § 320. As discussed herein, prison officials hold a special relationship to AICs and have a duty to protect AICs against an unreasonable risk of harm. *See Crane*, 2013 WL 1453166, at *5 (so concluding).

Instead, Defendants argue that AICs do not have a common-law right as persons convicted of a felony to bring civil claims. (Defs.' Damages Reply at 14.) However, Defendants have not offered support for the assertion that civil death was a function of common law in Oregon at the time the relevant legislation was enacted. *Cf. Horton*, 376 P.3d at 1007 (explaining that Oregon "modif[ied] common-law rights to meet conditions unique to this state" and that "by 1820 the legal landscape in America bore only the faintest resemblance to what existed forty years earlier when the original colonies first adopted English common law") (simplified); *Schutz*, 406 P.3d at 71 (explaining that "it is the common-law causes of action and remedies that exist *at*

---

[56] The other two cases cited by Defendants do not provide otherwise because the parties did not raise a remedy clause challenge in those cases. *See Huskey v. Dep't of Corr.*, 542 P.3d 66 (Or. Ct. App. 2023); *Alexander*, 390 P.3d 1109.

*the time legislation is enacted* that provide the baseline for measuring the extent to which that legislation conforms to the basic principles of the remedy clause") (simplified). To the contrary, the origin of civil death in Oregon was statutory. *See former* ORS § 137.240 (suspending all the civil rights of a person convicted of a felony); *Boatwright*, 416 P.2d at 329 (explaining that *former* ORS § 137.240 had "been the law of Oregon since the state's inception"); *Harris v. Craig*, 697 P.2d 189, 190 (Or. 1985) (citing the Deady Code, Gen. Laws of Oregon, ch. 53, § 701 (Deady 1845-64), as the source of civil death in Oregon); *Padgett v. Kowanda*, No. 3:08-cv-00087-HU, 2009 WL 2216581, at *1 (D. Or. July 22, 2009) ("[A]t common law in 1857, a prisoner in Oregon could sue the individual defendants for his injuries, and was even provided additional time in which to file suit under the 1854 tolling provision."); *see also Padgett v. Kowanda*, No. 3:08-cv-00087-HU, 2009 WL 2216584, at *7-11 (D. Or. Apr. 29, 2009) (examining Oregon's and Iowa's common law at the time of adoption of Oregon's constitution and concluding that civil death was not part of Oregon common law), *findings and recommendation adopted in relevant part*, 2009 WL 2216581 (D. Or. July 22, 2009); *Holmes v. King*, 113 So. 274, 275 (Ala. 1927) ("In the absence of statute, the doctrine of 'civil death' has been generally denied in this country." (citing, *inter alia*, *Byers v. Sun Sav. Bank*, 139 P. 948 (Okla. 1914) (collecting cases))); *Schmidt v. N. Life Ass'n*, 83 N.W. 800, 801 (Iowa 1900) ("Civil death, growing out of a sentence of imprisonment for life, is not generally recognized in this country.") (citations omitted); Jan C. Leventer, *Civil Death Statutes and the Convict's Right to Bring Civil Suit*, 4 CAP. U. L. REV. 123 (1974) (surveying statutes imposing civil death across the United States); *cf. Chesapeake Util. Corp. v. Hopkins*, 340 A.2d 154, 155 (Del. 1975) (concluding that civil death was not part of Delaware's common law because it would be

PAGE 118 – OPINION AND ORDER

inconsistent with Delaware's remedy clause).[57] Accordingly, the Court concludes that civil death was not and is not the common law in Oregon and is not relevant to the instant analysis.

Defendants accurately point out that, at common law, a plaintiff has no right to bring a claim against the State because of sovereign immunity. *See Clarke*, 175 P.3d at 434. The OTCA provides a limited waiver of the State's immunity, while also implementing damages caps. *See Horton*, 376 P.3d at 1029. At the same time, ORS § 30.650 requires an AIC to incur economic damages in order to recover noneconomic damages.[58] In an abundance of caution, the Court considers the OTCA and ORS § 30.650 together as part of a larger statutory scheme. *See Crandall v. State*, 538 P.3d 212, 218 (Or. Ct. App. 2023) (examining the OTCA and the Workers' Compensation Act together when considering the extent that the legislature altered the common law and concluding that immunity from liability under the OTCA does not violate the remedy clause because a plaintiff has a remedy for an injury under the Workers' Compensation Act).[59] In summary, the OTCA and ORS § 30.650 in tandem eliminate noneconomic damages in the absence of economic damages as a *quid pro quo* for the State's waiver of sovereign immunity.

///

---

[57] Defendants argue that *Voth* stands for the proposition that civil death was part of Oregon common law, but *Voth* cited *former* ORS § 137.240 as the source of civil death in Oregon. *See* 78 P.3d at 567-68.

[58] The same legislation also provided AICs with a limited waiver or deferral of fees and costs in actions against a public body. *See* ORS § 30.643. However, as discussed, the legislature that enacted ORS § 30.650 largely intended to reduce frivolous lawsuits and add restrictions to lawsuits filed by AICs, not extend benefits.

[59] The Court notes that if the OTCA is not an appropriate part of the Court's remedy clause analysis of ORS § 30.650, the result would be the same.

The Court "must consider the extent to which the legislature has departed from the common-law model measured against its reasons for doing so." *Horton*, 376 P.3d at 1028. "[W]hen the legislature has sought to adjust a person's rights and remedies as part of a larger statutory scheme that extends benefits to some while limiting benefits to others, [the Oregon Supreme Court] ha[s] considered that *quid pro quo* in determining whether the reduced benefit that the legislature has provided *an individual plaintiff* is 'substantial' in light of the overall statutory scheme." *Id.* at 1027 (emphasis added) (citing *Hale v. Port of Portland*, 783 P.2d 506, 514-15 (Or. 1989)). "When the legislature does not limit the duty that a defendant owes a plaintiff but does limit the size or nature of the remedy, the legislative remedy need not restore all the damages that the plaintiff sustained to pass constitutional muster, but a remedy that is only a paltry fraction of the damages that the plaintiff sustained will unlikely be sufficient[.]" *Id.* at 1028 (citations omitted).

This case confronts the constitutionality of ORS § 30.650 in a peculiar posture compared to statutory cap cases, which consider the remedy clause's application after a damages award has already been reached. Here, however, the Court must decide the issue before any damages have been awarded because application of ORS § 30.650 would dispose of Plaintiffs' state law claims at summary judgment by eliminating Plaintiffs' ability to recover damages, an element of Plaintiffs' negligence claim. As applied here, Plaintiffs argue that Defendants' actions have caused Plaintiffs to suffer injuries. However, applying ORS § 30.650, Defendants argue that Plaintiffs cannot prevail on their negligence claim because Plaintiffs cannot recover any damages because Plaintiffs have not suffered economic damages and therefore cannot recover noneconomic damages. (Defs.' Damages Mot. at 9.) In other words, applying ORS § 30.650 to this case, Plaintiffs would have no remedy under state law for their injuries.

Taking into account the *quid pro quo* offered by the statutory schemes—the elimination of noneconomic damages in the absence of economic damages in exchange for the waiver of sovereign immunity—the Court concludes that the complete denial of a remedy to Plaintiffs here violates the remedy clause. *See Horton*, 376 P.3d at 1027 ("[W]hen the legislature has not altered a duty but has denied a person injured as a result of a breach of that duty any remedy, our cases have held that the complete denial of a remedy violates the remedy clause." (citing *Noonan v. City of Portland*, 88 P.2d 808, 812-16 (Or. 1939)); *cf. Mattson v. City of Astoria*, 65 P. 1066, 1066-67 (Or. 1901) (explaining that the legislature may exempt a party from liability so long as "the injured party is not wholly without remedy"); *Crandall*, 538 P.3d at 216 (concluding that precluding tort remedies against a particular party does not violate the remedy clause where a plaintiff has an alternative remedy). Applying ORS § 30.650 here, Plaintiffs would not be able to recover *any* amount of damages on their state law claims, not even a "paltry fraction" of any noneconomic damages awarded. *Cf. Horton*, 376 P.3d at 1030 (concluding that $3,000,000 capped damages was a substantial remedy in light of the *quid pro quo* of the waiver of sovereign immunity compared to $12,000,000 in total damages and explaining that its holding turned on the "tort claims limits in this case"); *Howell*, 298 P.3d at 2-3 (concluding that $200,000 capped damages was a substantial remedy in light of the $507,500 in total damages); *Clarke*, 175 P.3d at 421 (concluding that $200,000 capped damages was *not* a substantial remedy in light of the $17,000,000 in total damages); *Hale*, 783 P.2d at 511, 515 (concluding that $100,000 capped damages was a substantial remedy in light of the *quid pro quo* of widening the class of plaintiffs who can seek a remedy and the $600,000 in total damages). Although the exact amount of noneconomic damages is unknown at this stage of litigation, application of ORS § 30.650 would invariably render the amount recoverable by Plaintiffs to zero. Accordingly, the Court concludes

that ORS § 30.650 violates the remedy clause as applied to Plaintiffs' negligence and wrongful death claims at this stage of the litigation.

###### C.    Class Modification

In the alternative, Defendants argue that the Court should modify its order certifying the classes to remove Plaintiffs' state law claims. (Defs.' Damages Mot. at 11-14.) Defendants argue that even if application of ORS § 30.650 violates the remedy clause under *Horton*, the Court should still modify the class because each plaintiff will have to demonstrate that the remedy resulting from the application of ORS § 30.650 is insubstantial as applied to them. (Defs.' Damages Reply at 20.) The Court disagrees because the parties agree that no plaintiff has suffered economic damages and therefore ORS § 30.650 would deprive all Plaintiffs of any remedy, in violation of the remedy clause. *See Horton*, 376 P.3d at 1024 (explaining that "recognizing a duty while denying a remedy entirely would raise constitutional problems") (citations omitted); *see also Noonan*, 88 P.2d at 812-16 (surveying Oregon Supreme Court cases so holding); *Mattson*, 65 P. at 1066-67 (explaining that the legislature may exempt a party from liability so long as "the injured party is not wholly without remedy").

###### D.    Conclusion

In summary, the Court denies as moot Defendants' motion for summary judgment on Nulph's claim for mental and emotional harm, denies Defendants' motion for summary judgment on Maney's claim for mental and emotional harm, denies Defendants' motion for summary judgment on Plaintiffs' state law claims, and denies Defendants' motion to modify the class definitions.

///

///

PAGE 122 – OPINION AND ORDER

## V.    MODIFY CLASS DEFINITIONS

Defendants move, in the alternative, to modify the class definitions to shorten the class period. (Defs.' Modify Mot. at 3.) Plaintiffs argue that the record reflects that Defendants' unlawful conduct spanned beyond Defendants' proposed modified definition. (Pls.' Resp. Br. Defs.' Modify Mot. ("Pls.' Modify Resp.") at 2-4, ECF No. 569.)

### A.    Applicable Law

"An order that grants or denies class certification may be altered or amended before final judgment." FED. R. CIV. P. 23(c)(1)(C); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."); *Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 473-74 (S.D. Cal. 2015) ("[C]ourts retain discretion to revisit class certification throughout the legal proceedings, and may rescind, modify, or amend the class definition in light of subsequent developments in the litigation.") (citations omitted); *Cruz v. Dollar Tree Stores, Inc.*, 270 F.R.D. 499, 502 (N.D. Cal. 2010) ("A previously certified class is subject to modification at the Court's discretion.") (citations omitted).

"The standard applied by the courts in reviewing a motion to decertify is the same as the standard used in evaluating a motion to certify; namely, whether the requirements of Rule 23 are met." *Cruz*, 270 F.R.D. at 502 (citing *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 410 (C.D. Cal. 2000)). Under Rule 23(a) of the Federal Rules of Civil Procedure, plaintiffs seeking class certification must satisfy four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013). Class certification must also satisfy the requirements of at least one of the categories under Rule 23(b). *See id.* Here, class certification rests on Rule 23(b)(3). Rule

23(b)(3) provides that class certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

The party resisting class decertification bears the burden of demonstrating that the requirements of Rule 23 are met. *See Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) ("[A]s to the class-decertification issue, [the plaintiff], as the party seeking class certification, bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met.") (simplified); *but see Maldonado v. Apple, Inc*, No. 3:16-cv-04067-WHO, 2021 WL 1947512, at *2 (N.D. Cal. May 14, 2021) ("[T]he burden of showing why [the court] should consider decertification falls squarely on the shoulders of defendants. The defendant must make some showing of changed circumstances or law. Once this initial burden is met, the plaintiff must demonstrate that the class action should be maintained under Federal Rule of Procedure 23." (quoting, *inter alia*, *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2018 WL 1456618, at *2 (N.D. Cal. Mar. 23, 2018))) (simplified). "[T]o the extent the decertification issues overlap with the merits, . . . the standard on a post-discovery decertification motion is effectively the summary judgment standard." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1119 (9th Cir. 2018) (citation omitted). "If it were otherwise, a decertification motion could become an end run around the submission of factual disputes to the trier of fact." *Id.*

### B.     Analysis

Defendants argue that Plaintiffs can no longer satisfy the predominance requirement because there is no evidence of Defendants' deficient policies across the class period. (Defs.' Modify Mot. at 5-8.) Defendants argue that the Court should modify the existing class period—

currently commencing on March 8, 2020, and closing on May 31, 2022—to classes commencing in July 2020, and closing on March 31, 2021.[60] (*Id.* at 3.)

Defendants argue that there is no evidence that Defendants did not implement reasonable COVID mitigation measures before July 14, 2020. (*Id.* at 6.) Specifically, Defendants point to one of Plaintiffs' expert reports, which focuses on the deficiencies in ODOC's policies following the CDC's updated July 14, 2020, guidelines. (*Id.*, citing Fleming Report at 10.)

As discussed, Plaintiffs may present a series of examples to demonstrate Defendants' policies and Plaintiffs have presented a sufficiently representative sample of examples through their declarations. The Court finds that Plaintiffs have satisfied their burden of demonstrating Rule 23's requirements and that a genuine issue of material fact remains about the constitutional sufficiency of Defendants' policies before July 14, 2020, given the testimonial evidence about Defendants' policies throughout the original class period. (*See supra* nn.15-18, laying out evidence from March to May 2020 suggesting Defendants lacked adequate quarantine and

---

[60] Specifically, Defendants request an order modifying the classes as follows:

> Damages Class: All adults incarcerated in Oregon Department of Corrections facilities who: (1) were incarcerated on or after July 14, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19 during the period beginning July 14, 2020 and ending March 31, 2021; and (3) if they became incarcerated after July 14, 2020, tested positive or were otherwise diagnosed with COVID-19 at least fourteen days after they entered Oregon Department of Corrections custody;

> Wrongful Death Class: Estates of all adults incarcerated at Oregon Department of Corrections facilities continuously since February 1, 2020, who died during the period beginning July 28, 2020 and ending March 31, 2021, and for whom COVID-19 caused or contributed to their death.

(*See* Defs.' Modify Mot. at 3.)

isolation measures, social distancing measures, and measures to prevent AIC unit or staff mixing and suggesting that any isolation was punitive in nature.) Accordingly, the Court concludes that a common question of fact predominates over any questions affecting only individual members from the start of the existing class period.

Plaintiffs have also identified sufficient evidence to demonstrate that a common question predominates regarding Defendants' response to COVID beyond March 31, 2021. (*See, e.g.*, Clift Decl. ¶ 9, reporting lack of social distancing and mask noncompliance in May 2021; Second Maney Decl. ¶¶ 15-20, reporting mask noncompliance and lack of social distancing in May 2021; Second Hall Decl. ¶¶ 15-16, 24, reporting COs not wearing masks in April 2021 and consistent lack of social distancing in medical through May 2021; Thornburg Decl. ¶¶ 20-27, describing COs not wearing masks, AICs seeking to avoid testing to avoid solitary confinement if they test positive, and lack of social distancing in May 2021; Coopersmith Decl. ¶¶ 26-29, testifying to "lack of effort to take advantage of opportunities to social distance," among other problems, in May 2021; Cadwaller Decl. ¶¶ 31, 35-36, describing lack of social distancing and mixing units in April and May 2021; Shaffer Decl. ¶¶ 26-30, describing lack of social distancing, such as sitting a foot and a half from another AIC in the chow hall, in May 2021; Butler Decl. ¶¶ 16, 19, 21, 29, 33, describing AICs from different units serving food to other units, units with known COVID cases in chow hall with no restrictions, mask noncompliance, and asymptomatic AICs refused tests upon request in April and May 2021; Edgtton Decl. ¶¶ 26, 29-30, reporting mask noncompliance and lack of social distancing in May 2021; Phillips Decl. ¶¶ 14-20, 23-32, reporting regular mask noncompliance, sick AICs returning to their unit awaiting test results, AICs under-reporting symptoms to avoid confinement in the disciplinary segregation unit if they test positive, staff "turn[ing] a blind eye to inmates with extremely obvious COVID-19

symptoms," lack of social distancing, units mixing in April and May 2021; Willingham Decl.

¶¶ 11-12, 14-18, reporting mask noncompliance, mixing infected and healthy AICs, COs moving

freely across units, disincentivizing testing and AICs avoiding testing so they will not be put in

disciplinary segregation, and lack of social distancing in May 2021; Mosely Decl. ¶¶ 3-5,

describing lack of enforcement of social distancing through December 2021; Ortega Decl. ¶¶ 15-

17, testifying that he was required to go to work while on lockdown with other workers from

quarantine units in early 2022 and describing a lack of mask compliance until the requirement

was dropped; West Decl. ¶¶ 3, 8-12, 17, describing lack of social distancing, medical staff and

COs moving freely across units, and lack of clear policy and procedures through December

2021; Newland Decl. ¶ 4(h), describing a four-day quarantine following a COVID outbreak, then

AICs were forced back to work mingling with different units, which spread COVID to others in

September 2021; Third Hall Decl. ¶ 8, testifying that COs did not wear masks in April 2021;

Eaglespeaker Decl. ¶¶ 9-10, 14-15, describing AICs from different units working together even

with known COVID exposures in the units from December 2020 to December 2022, mixing with

AICs from isolation units in June 2021, sick AICs remaining in their unit in July 2021, and mass

movements of AICs without testing in September 2021.)

Defendants also argue that the Court should modify the class period to end on March 31,

2021, because the COVID vaccine was generally available by that time and the dangers imposed

by COVID had sharply declined. (Defs.' Modify Mot. at 6-7.) At oral argument, Defendants

clarified that they are not arguing that Defendants could have constitutionally halted the

implementation and enforcement of all COVID mitigation measures on March 31, 2021, but that

the class should be modified because the expert evidence reveals that the nature of the necessary

countermeasures and accordingly the nature of the claims would change at that time. However,

the Court concludes that Plaintiffs need not file separate class actions to challenge Defendants'

evolving response to COVID as the danger from the disease declined, so long as COVID still

posed a substantial risk of serious harm to Plaintiffs. The Court does not understand Defendants

to argue that the substantial risk had dissipated by March 2021 but merely that some facts had

changed. Plaintiffs continue to challenge Defendants' creation and implementation of centralized

policies and procedures related to ODOC's handling of COVID beyond March 31, 2021, and the

Court declines to modify the class definitions. *See Chatman v. Otani*, No. 21-cv-00268 JAO-

KJM, 2021 WL 2941990, at *12 (D. Haw. July 13, 2021) (declining to exclude vaccinated AICs

from the classes of pretrial detainees and post-conviction AICs); *cf. Romero-Lorenzo*, 665 F.

Supp. 3d at 1079 (concluding that the pre-trial detainees' class action challenge to the

defendants' COVID policies was not moot following the vaccine rollout).

Defendants also argue that there is insufficient evidence that Defendants *knew* of

implementation or enforcement problems.[61] (Defs.' Reply Br. Pls.' Modify Resp. at 11-12, ECF

No. 590.) The Court concludes that there is sufficient evidence in the record to create a question

of fact as to whether or not, to what extent, and when Defendants knew of policy implementation

and enforcement problems. (*See supra* n.12, identifying evidence in the record suggesting that

Defendants knew of policy implementation and enforcement problems.)

For these reasons, the Court denies Defendants' motion to modify the class definitions.

///

---

[61] Defendants have not attempted in their motion to differentiate between which
Defendants knew what and when. For example, there does not appear to be any evidence in the
summary judgment record that Nooth was a member of the AOC, but Defendants did not raise
defendant-specific arguments in their summary judgment motions (with the exception of
Governor Brown and Jeske and, separately, Allen).

## VI.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for summary judgment on several of Defendants' affirmative defenses:
(1) failure to exhaust pursuant to the PLRA, (2) failure to exhaust generally, (3) three-judge
panel requirement, (4) lack of standing for failure to seek commutations, (5) *Heck v. Humphrey*
bar, (6) discretionary immunity, (7) tort claim notice, and (8) comparative fault on Plaintiffs'
Eighth Amendment claim. (Pls.' Mot. at 2.) Defendants oppose the motion. (Defs.' Resp. at 1-2.)

### A.    Exhaustion

Plaintiffs move for summary judgment on Defendants' affirmative defense based on
Plaintiffs' failure to exhaust administrative remedies. (Pls.' Mot. at 9-13; Answer ¶¶ 68-69, 80.)
Plaintiffs argue that an administrative remedy was not reasonably available to Plaintiffs. (Pls.'
Mot. at 9-12.) Defendants argue that the prison grievance procedure and the option of filing a
clemency application were available to Plaintiffs during the class period, and, thus, the Court
should deny Plaintiffs' motion for summary judgment. (Defs.' Resp. at 1, 3-9.)

Plaintiffs' Eighth Amendment claim is subject to the PLRA. The PLRA requires AICs
"to exhaust available administrative remedies prior to filing a § 1983 lawsuit challenging prison
conditions."[62] *Draper v. Rosario*, 836 F.3d 1072, 1078 (9th Cir. 2016) (citations omitted).

This Court addressed the question of exhaustion early in this litigation. In June 2020,
when the Court denied Plaintiffs' motion for a temporary restraining order and preliminary
injunction, the Court considered evidence of the availability of ODOC's grievance process at that

---

[62] The PLRA's exhaustion requirement only applies to those plaintiffs who remained in
custody at the time of Plaintiffs' seventh amended complaint. *See Jackson v. Fong*, 870 F.3d
928, 931 (9th Cir. 2017) ("We hold that a plaintiff who was in custody at the time he initiated his
suit but was free when he filed his amended operative complaint is not a 'prisoner' subject to a
PLRA exhaustion defense.").

time and concluded, "Plaintiffs have demonstrated that ODOC's grievance process is currently unavailable to grieve the systemic COVID-19 issues that Plaintiffs challenge in this case." (Prelim. Inj. Op. & Order at 23.)

Under the law of the case doctrine, "a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (citing *Jeffries v. Wood*, 114 F.3d 1484, 1488-89 (9th Cir. 1997) (en banc)); *see also Giraldes v. Prebula*, No. CIV. S-01-2110 LKK, 2013 WL 1876500, at *6 (E.D. Cal. May 3, 2013) ("Issues that a district court determines during pretrial motions become law of the case." (citing *United States v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004))). The doctrine is "a judicial invention designed to aid in the efficient operation of court affairs." *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (citing *Lockert v. U.S. Dept. of Labor*, 867 F.2d 513, 518 (9th Cir. 1989)). "A decision on a factual or legal issue must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Pit River Home and Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1096-97 (9th Cir. 1994) (simplified).

The Court concludes that the law of the case doctrine precludes reconsideration of the question of exhaustion. Defendants have not argued that any of the reasons for reconsideration apply, and the Court concludes that none do. *See Navarro v. Herndon*, No. 2:09-cv-1878 KJM KJN, 2015 WL 521508, at *7 (E.D. Cal. Feb. 9, 2015) ("[I]t is the law of the case that plaintiff exhausted administrative remedies with respect to the claims on which he has been permitted to

proceed. Defendants are therefore not entitled to summary judgment on this basis."), *findings and recommendation adopted*, 2015 WL 1285365 (E.D. Cal. Mar. 19, 2015), *and corrected*, 2015 WL 2128601 (E.D. Cal. May 6, 2015); *Giraldes*, 2013 WL 1876500, at *7 ("A dismissal based on Plaintiff's failure to exhaust at this belated point in the litigation would be unjust because proper exhaustion would now be futile . . . , and Plaintiff would be prejudiced from having his claims litigated on their merits due to Defendants' years of inaction and this court's prior findings that Defendants had waived their affirmative defense of nonexhaustion."); *Pogue v. Woodford*, No. CIVS051873 MCE GGHP, 2009 WL 2777768, at *2 (E.D. Cal. Aug. 26, 2009) ("In this case, the court has decided that plaintiff exhausted administrative remedies. That order is ultimately a ruling on the law, and should not be upset absent satisfactory reasons. Here, defendants posit no reasons to be relieved of the law of the case doctrine. Hence, the motion to dismiss claims 5 and 6 based on lack of exhaustion should be denied."), *findings and recommendation adopted*, 2009 WL 3211406 (E.D. Cal. Sept. 30, 2009).

When considering Plaintiffs' motion for a temporary restraining order and preliminary injunction, this Court found that ODOC was not accepting grievances relating to COVID emergency operations, nor "general grievances regarding social distancing, isolation, and quarantine of other AICs, or modified operations such as the visiting shutdown" because doing so was "inconsistent with ODOC's rules." (Prelim. Inj. Op. & Order at 23 (quoting Decl. Jacob Humphreys ("Humphreys") ¶ 13, ECF No. 89); *see also* Floro Decl. ¶ 16, "Any grievance related to COVID, social distancing, or CDC guidelines was denied."; Benson Decl. ¶ 9, testifying that around April 2020 he filed two grievances about staff working while sick, which were denied.) Defendants now present a new declaration from Humphreys seeking to clarify what the court "misunderstood" from his previous declaration, arguing that the grievance procedure was

unavailable to challenge ODOC's existing policies but that AICs nonetheless could grieve Defendants' failure to implement and enforce their policies. (*See* Decl. Jacob Humphreys Supp. Defs.' Resp. ¶ 5, ECF No. 538; Defs.' Resp. at 4-5.) This is the first time since the Court's prior ruling over three and a half years ago that Defendants have attempted to supplement the factual record and ask the Court to revisit the law of the case.

At oral argument, Defendants argued that Plaintiffs' request for preliminary relief was the only question at issue in the Court's prior order but that here, by contrast, Plaintiffs pursue a claim for damages based in part on Defendants' nonenforcement of their COVID mitigation policies. In other words, Defendants argue that this Court's prior ruling is not controlling because the relief Plaintiffs now seek is different. However, at the time of the Court's prior opinion, Plaintiffs requested damages in the operative complaint (Am. Compl. at 47, ECF No. 81), and the Court considered "whether Plaintiffs may proceed on their claims without satisfying the PLRA's exhaustion requirement." (Prelim. Inj. Op. & Order at 20.) Put differently, the Court did not limit its analysis to whether Plaintiffs could exhaust claims seeking injunctive relief.

Defendants also argue that, at the time of Plaintiffs' request for preliminary relief, Plaintiffs did not challenge Defendants' failure to enforce their COVID policies, but that Plaintiffs later amended their complaint to add a nonenforcement claim. (Defs.' Resp. at 5; *see* Second Am. Compl., ECF No. 111.) The Court agrees that Plaintiffs have added new allegations but concludes that Plaintiffs continue to challenge "systemic COVID-19 issues."[63]

---

[63] At oral argument, Defendants cited *Orr v. Peters*. *See Orr v. Peters*, No. 3:21-cv-00342-SB, 2023 WL 6160794 (D. Or. Sept. 21, 2023). *Orr* is distinguishable. In *Orr*, the parties agreed that the grievance process was available. *Id.* at *4. The only question was whether the plaintiff had used that process to exhaust available administrative remedies with respect to the plaintiff's claims against a specific defendant. *Id.*

The Court's conclusion that ODOC was not accepting grievances relating to COVID emergency operations or general grievances regarding social distancing, isolation, and quarantine of other AICs is the law of the case. "If this court is to take the goal of efficient and improved litigation seriously, it would be grossly inappropriate to dismiss this entire action for non-exhaustion on the eve of trial, and to foreclose the Plaintiff from litigation of the merits of his claim at this stage in the proceedings." *Giraldes*, 2013 WL 1876500, at *7. The Court grants Plaintiffs' motion for partial summary judgment on Defendants' exhaustion affirmative defense.[64]

### B.    Three-Judge Panel

Plaintiffs move for summary judgment on Defendants' affirmative defense that only a three-judge panel may enter a prison release order under 18 U.S.C. § 3626(a)(1). (Pls.' Mot. at 13-14; Answer ¶ 70.) Plaintiffs argue that because Plaintiffs no longer seek injunctive relief that could potentially lead to the release of AICs, Defendants' affirmative defense is moot.[65] (Pls.' Mot. at 13-14.) Defendants agree that their request for a three-judge panel is moot.[66] (Defs.' Resp. at 10.) The Court grants Plaintiffs' motion for partial summary judgment on Defendants' three-judge panel affirmative defense.

---

[64] Because the Court grants summary judgment in Governor Brown's favor herein, the Court does not address Defendants' argument that clemency applications were an available administrative remedy to challenge Governor Brown's actions related to clemency. (Defs.' Resp. at 9.) To the extent that Defendants raise exhaustion as an affirmative defense under another "doctrine and statute" beyond the requirements of the PLRA (Answer ¶ 80), the Court also grants Plaintiffs' motion for partial summary judgment in that regard. (Pls.' Mot. at 9, 13.)

[65] The parties have stipulated to the dismissal of all requests for injunctive relief by Plaintiffs and the classes. (Stipulation of Dismissal, ECF No. 624.)

[66] The Court need not decide at this juncture whether and to what extent 18 U.S.C. § 3626(a)(1) provides substantive legal limitations on any nominal or punitive damages that the jury may award. (*See* Defs.' Resp. at 10-11.)

**C.**     **Lack of Standing for Failure to Seek Commutations**

Plaintiffs move for summary judgment on Defendants' affirmative defense that Plaintiffs lack standing for failure to seek clemency. (Pls.' Mot. at 14-15; Answer ¶ 74.) Plaintiffs argue that because they do not seek release, they need not have sought clemency before filing a claim for damages. (Pls.' Mot. at 15.) Defendants argue that because Plaintiffs challenge Governor Brown's early release criteria and her choice not to consider releasing more AICs during the pandemic, Plaintiffs lack standing to raise those theories because the claims "depend on speculation about hypothetical clemency applications that were never filed[.]" (Defs.' Resp. at 12.)

Defendants' affirmative defense relates to Governor Brown's clemency decisions. The Court has granted Defendants' motion for summary judgment on all claims against Governor Brown. Accordingly, the Court denies as moot Plaintiffs' motion.

**D.**     ***Heck v. Humphrey* Bar**

Plaintiffs move for summary judgment on Defendants' affirmative defense that *Heck* bars Plaintiffs' claim for damages tied to Governor Brown's failure to release AICs during the pandemic. (Pls.' Mot. at 15-17; Answer ¶ 75; Defs.' Resp. at 12-15.) The Court has granted summary judgment on all claims against Governor Brown. Accordingly, the Court denies as moot Plaintiffs' motion.

**E.**     **Discretionary Immunity**

Plaintiffs move for summary judgment on Defendants' affirmative defense that discretionary immunity bars Plaintiffs' allegations that Defendants allowed "mixing between and among incarcerated adults and ODOC staff and contractors without regard to the risk that incarcerated adults would or could become exposed to COVID" and that Defendants failed "to

consider entirely the use of alternative space, including emergency beds and mothballed facilities, to increase the space available for AIC social distancing." (SAC ¶¶ 100(g), 101; *see* Pls.' Mot. at 17; Answer ¶ 77.)

As discussed, following Plaintiffs' Second Amended Complaint, Defendants moved for partial summary judgment, arguing, in part, that discretionary immunity barred Plaintiffs' negligence claim. (ECF No. 115.) In December 2020, the Court granted in part and denied in part Defendants' motion, entering partial summary judgment on the ground of discretionary immunity with respect to some of Plaintiffs' negligence claim. (Mot. Partial Summ. J. Op. & Order.) Subsequently, Plaintiffs amended their complaint, adding the allegations of mixing and failure to consider the use of alternative space. The parties agree that the Court has not yet addressed whether discretionary immunity bars Plaintiffs from pursuing those allegations in support of their negligence claim.

Plaintiffs argue that the Court's reasoning denying Defendants' motion in part— concluding that discretionary immunity does not bar Plaintiffs' allegations that Defendants failed to implement and enforce certain policies—applies to Plaintiffs' allegation of staff and AIC mixing. (Pls.' Mot. at 17-18.) Plaintiffs also argue that discretionary immunity does not apply to Defendants' failure to consider the use of alternative space because the failure to consider is not the result of an exercised judgment and policy choice. (*Id.* at 19-20.) Defendants argue that they are entitled to discretionary immunity because Plaintiffs have not alleged a failure to implement and enforce policies prohibiting mixing but that Plaintiffs have alleged that Defendants failed to adopt such a policy. (Defs.' Resp. at 16.)

///

///

PAGE 135 – OPINION AND ORDER

### 1.    Applicable Law

The OTCA provides the Defendants with an affirmative defense of discretionary immunity:

> Every public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for:
>
> . . . .
>
> (c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

ORS § 30.265(6).

Discretionary immunity requires three elements: "The decision must be the result of a choice involving the exercise of judgment; the decision must involve public policy as opposed to the routine day-to-day decision-making of public officials; and the decision must be exercised by a body or person that has the responsibility or authority to make it." *Verardo v. Or. Dep't of Transp.*, 510 P.3d 983, 987 (Or. Ct. App. 2022) (citing, *inter alia*, *Turner v. State*, 375 P.3d 508, 513 (Or. 2016)). Summary judgment is appropriate if a defendant establishes all three elements of discretionary immunity as a matter of law. *Id.* (citing *Robbins v. City of Medford*, 393 P.3d 731, 733 (2017)); *see also Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1229 (D. Or. 2017) (applying discretionary immunity under Oregon law), *aff'd*, 758 F. App'x 582 (9th Cir. 2018).

"[I]f the law requires a government to exercise due care, then ORS 30.265 does not immunize its decision not to exercise care at all." *Hughes v. Wilson*, 199 P.3d 305, 307 (Or. 2008). However, when a public body holds a duty of care, it "has wide policy discretion in choosing the means by which to carry out that duty." *Mosley v. Portland Sch. Dist. No. 1J*, 843 P.2d 415, 419 (Or. 1992) (citations omitted). "Once a discretionary choice has been made, the

immunity follows the choice." *Westfall v. State ex rel. Or. Dep't of Corr.*, 324 P.3d 440, 449 (Or. 2014). "It protects not only the officials who made the decision, but also the employees or agents who effectuate or implement that choice in particular cases." *Id.*

When employees are tasked to implement an otherwise immune governmental policy, several factual scenarios "may affect whether the employee's actions are protected by discretionary immunity." *Id.* at 448. First, when a policy "does not express a completed thought on how a particular case should be resolved, instead contemplating that the employees will make additional choices within the confines of the policy decisions . . . liability will depend on whether the choice made by the employee separately qualifies for discretionary immunity." *Id.* (citations omitted). Second, if an employee "wrongly fails to apply an otherwise immune policy to a particular case . . . the actions of the employee generally would not be protected by discretionary immunity." *Id.* at 449 (citations omitted). Third, when "[a]n employee applies an otherwise immune policy to inapplicable circumstances[,]" it is not protected by discretionary immunity. *Id.* Finally, "[w]hen an immune policy choice expresses a completed thought that fully controls how the employees should apply the policy to a particular case, and an employee correctly applies the policy to the case[,]" the employee is protected by discretionary immunity. *Id.*

### 2. Analysis

Plaintiffs allege that Defendants allowed "mixing between and among incarcerated adults and ODOC staff and contractors without regard to the risk that incarcerated adults would or could become exposed to COVID[.]" (SAC ¶ 100(g).) Plaintiffs also allege that Defendants "failed to substantially follow CDC standards to protect against the spread of COVID" such as by "routinely allow[ing] mixing of AICs from different housing groups and/or units in workplaces, including OCE worksites, prison kitchens, prison laundry, and for the purposes of

transfers to, from, and between institutions" and by "mix[ing] AICs with confirmed cases and

AICs with suspected cases in cohorts[.]" (*Id.* ¶ 66.) Further, Plaintiffs allege that ODOC failed to

develop and maintain written policies on mixing:

> ODOC failed to develop and maintain written policies relating to
> (1) the modification of staff assignments to minimize mixing and
> movement across housing units and other areas; (2) the creation of
> work detail assignments to assure that each detail included only
> individuals from a single housing unit supervised by staff assigned
> to the same housing unit; (3) minimizing interactions between
> AICs living in different housing units through rearranged schedule
> movements, telemedicine, staggered medication lines, or the
> designation of a room near each housing unit for healthcare staff to
> evaluate individuals with COVID-19 symptoms.

(*Id.* ¶ 66(f).) Plaintiffs also allege that Defendants failed "to consider entirely the use of

alternative space, including emergency beds and mothballed facilities, to increase the space

available for AIC social distancing." (*Id.* ¶ 101.)

In their motion for summary judgment on all claims, Defendants argued that the AOC

reviewed and approved individual prisons' plans for social distancing, such as "staggered

housing unit mealtimes[.]" (Defs.' Mot. All Claims at 6, 8.) There is also evidence that

Defendants issued policies regarding social distancing and required AICs to "stay[] together by

unit." (Dahab Decl. Ex. 13 at 6; *see also* Dahab Decl. Ex. 21 at 6; Bugher Decl. ¶ 65.)

Accordingly, to the extent that the evidence reveals a failure to implement or enforce any ODOC

policies prohibiting mixing between and among incarcerated adults and ODOC staff and

contractors, discretionary immunity does not bar that theory.

However, discretionary immunity bars Plaintiffs' negligence claim to the extent that

Plaintiffs allege that ODOC should have developed and maintained different social distancing

policies, such as a written policy creating work detail assignments with only individuals from a

single housing unit supervised by staff assigned to the same housing unit. Discretionary

immunity also bars Plaintiffs' allegation that Defendants failed to consider using empty institutions to facilitate social distancing. Plaintiffs' allegations of negligence with respect to Defendants' failure to adopt the specific policies described are based on a failure to adopt more effective measures, not an absolute failure to act. *See Rush v. Corvallis Sch. Dist. 509J*, 419 P.3d 746, 749-50 (Or. Ct. App. 2018) (distinguishing discretionary decisions about security allocations from the failure to take "any security precautions whatsoever"). Defendants had wide policy discretion in the means adopted to protect AICs from harm. *See Mosley*, 843 P.2d at 419 ("A public body that owes a particular duty of care (such as that owed by a school district to its students who are required to be on school premises during school hours) has wide policy discretion in choosing the means by which to carry out that duty.") (citations omitted). Their choice between alternative policies is entitled to discretionary immunity with respect to Plaintiffs' negligence and wrongful death claims.

For these reasons, the Court grants in part and denies in part Plaintiffs' motion for summary judgment on Defendants' discretionary immunity affirmative defense.

### F.    OTCA's Tort Claim Notice

With respect to Plaintiffs' negligence and wrongful death claims, Plaintiffs move for summary judgment on Defendants' affirmative defense that Plaintiffs must separately and timely provide tort claim notices pursuant to the OTCA and plead notice in the complaint. (Pls.' Mot. at 21-24; Answer ¶¶ 84-87.) Plaintiffs argue that this lawsuit provided Defendants with sufficient notice as required by the OTCA and that the complaint need not affirmatively plead notice. (Pls.' Mot. at 21-24.) Defendants respond, first, that Plaintiffs' early pleadings did not provide notice because Plaintiffs have changed their theories of liability throughout this litigation. (Defs.' Resp. at 19-20.) Second, Defendants argue that the Court should decline to adopt the reasoning of

another judge in this district and should instead conclude that each of the more than 5,000 class

members must individually satisfy the OTCA's formal notice requirement. (*Id.* at 21-23.)

### 1.    Applicable Law

The OTCA provides, in relevant part,

> (1) No action arising from any act or omission of a public body or an officer, employee or agent of a public body . . . shall be maintained unless notice of claim is given as required by this section.

> (2) Notice of claim shall be given within the following applicable period of time . . . :

>> (a) For wrongful death, within one year after the alleged loss or injury.

>> (b) For all other claims, within 180 days after the alleged loss or injury.

> (3) Notice of claim required by this section is satisfied by:

>> (a) Formal notice of claim as provided in subsections (4) and (5) of this section;

>> (b) Actual notice of claim as provided in subsection (6) of this section;

>> (c) *Commencement of an action on the claim by or on behalf of the claimant* within the applicable period of time provided in subsection (2) of this section; or

>> (d) Payment of all or any part of the claim by or on behalf of the public body at any time.

> (4) Formal notice of claim is a written communication from a claimant or representative of a claimant containing:

>> (a) A statement that a claim for damages is or will be asserted against the public body or an officer, employee or agent of the public body;

>> (b) A description of the time, place and circumstances giving rise to the claim, so far as known to the claimant; and

PAGE 140 – OPINION AND ORDER

(c) The name of the claimant and the mailing
address to which correspondence concerning the claim may
be sent.

ORS § 30.275 (emphasis added).

"[A]n important purpose of the notice requirement is 'to give the public body timely notice of the tort and allow its officers an opportunity to investigate the matters promptly and ascertain all the necessary facts.'" *Moore v. Portland Pub. Sch.*, 537 P.3d 544, 553 (Or. Ct. App. 2023) (quoting *Urb. Renewal Agency of City of Coos Bay v. Lackey*, 549 P.2d 657, 660 (Or. 1976)). The Oregon legislature amended ORS § 30.275 in 1981, adopting Senate Bill 86 and adding the relevant notice requirements. Or. Laws 1981, ch. 350, § 1. "The [1981] amendments came about as a result of 'concern that the notice requirements of the OTCA were too complicated and formalistic and had caused unwary claimants to be deprived of their claims.'" *Cannon v. Or. Dep't of Just.*, 322 P.3d 601, 605 (Or. Ct. App. 2014) (quoting *Perez v. Bay Area Hosp.*, 846 P.2d 405, 408 (Or. 1993)); *see also Hughes v. City of Portland*, 296 P.3d 642, 647 (Or. Ct. App. 2013) ("The current notice provisions in ORS 30.275 were enacted as part of Senate Bill (SB) 86 in 1981, which was introduced in response to the perception that public bodies were using technical defects in tort claim notices as an excuse to reject meritorious claims.").

A judge in this district has previously concluded that a class representative may provide notice on behalf of a class under ORS § 30.275. *See Margulies v. Tri-Cnty. Metro. Transp. Dist. of Or.*, No. 3:13-cv-00475-PK, 2014 WL 4419263, at *7 (D. Or. Sept. 8, 2014); *but see Castro v. State*, No. 22-cv-19373 (Marion Cnty. May 11, 2023) (concluding that a plaintiff cannot satisfy the formal notice requirement under ORS § 30.275(4) for putative class members before class certification).

2.    **Analysis**

The Court concludes that Plaintiffs' commencement of this action provided the OTCA's required notice.

When construing an Oregon statute, courts look "to the statute's text, context, and legislative history, as well as . . . prior [Oregon Supreme Court] constructions of the statute." *Ingle*, 537 P.3d at 902 (citing, *inter alia*, *Gaines*, 206 P.3d at 1050).

Turning first to the text, the Court notes that section four—describing the requirements for formal notice of a claim—does not apply when a plaintiff provides notice through the commencement of a claim. The statute's disjunctive use of "or" makes clear that Plaintiffs must satisfy *either* the formal notice requirement *or* notice through commencement of an action (or through actual notice or payment of any part of the claim). *See Cannon*, 322 P.3d at 606 (rejecting the defendants' argument that *service*, within the statutory period for commencing an action, was necessary to satisfy the notice requirement's purpose of permitting a defendant to investigate a claim, explaining that "'commencement of an action' is set forth as an *alternative* to 'actual notice' under ORS 30.275(3)(c), and it is that act—commencement—that must occur within 180 days, not receipt of actual notice"). Accordingly, Plaintiffs may satisfy the OTCA's notice requirement through "[c]ommencement of an action on the claim by or on behalf of the claimant within the applicable period of time[.]" ORS § 30.275(3)(c).

The Oregon Supreme Court has explained that "[t]he term 'claim,' as used in . . . the OTCA . . . has a fairly well-established, if broad, meaning." *Vasquez v. Double Press Mfg., Inc.*, 437 P.3d 1107, 1113 (Or. 2019). "It is . . . 'a demand for compensation, benefits, or payment[.]'" *Id.*

///

The Court concludes that Plaintiffs' early pleadings sufficiently raised Plaintiffs' "claims," given that term's broad meaning. Plaintiffs filed this putative class action in April 2020. (*See* Compl.) Plaintiffs alleged an Eighth Amendment claim based on Defendants' response to the COVID pandemic. (*Id.* at 42-43.) On June 26, 2020, Plaintiffs amended their complaint to add a claim for negligence, similarly based on Defendants' response to COVID in ODOC facilities. (Second Am. Compl. at 45-46.) In light of the timing and substance of Plaintiffs' original and amended complaints, the Court concludes that Plaintiffs presented the relevant claims within the statutory time period, and the Court rejects Defendants' argument that Plaintiffs' claims are now barred because Plaintiffs have added new facts and "theories" to their complaint.[67] *See Hughes*, 296 P.3d at 647 (explaining that the 1981 amendment's "liberalized notice requirements do not, contrary to defendant's implicit suggestion, require a claimant to give the public body such detailed information that the public body can determine the extent of its potential liability from the face of the notice" and explaining that even notice through commencement of an action "does not necessarily allow a public body to determine its potential liability exposure without further investigation"); *cf. Clark v. Univ. of Or.*, 512 P.3d 457, 463 (Or. Ct. App. 2022) ("[D]efendants contend[] . . . that not every fact relevant to the negligent

---

[67] At oral argument, Defendants cited *Baumgarner v. Community Services*. *See Baumgarner v. Cmty. Servs., Inc.*, 992 F. Supp. 2d 1081 (D. Or. 2014). *Baumgarner* is distinguishable. In *Baumgarner*, the plaintiff alleged claims for violations of the state and federal family leave acts, sex discrimination, religious discrimination, discrimination based on marital status, and wrongful termination. *Id.* at 1085. After filing her complaint, the plaintiff sent the defendants a letter demanding payment on a final paycheck. *Id.* at 1089. The defendants paid the plaintiff the demanded wages due on her final paycheck. *Id.* The court concluded that the payment did not satisfy ORS § 30.275(3)(d) because the payment was not on a claim ultimately asserted against the public body. *Id.* at 1090. The plaintiff never asserted a wage claim of any kind. *Id.* Here, the facts are different, and since June 2020, Plaintiffs have consistently alleged Eighth Amendment and negligence claims.

supervision claim was stated in plaintiff's tort claim notice. Defendants cite no legal authority for the proposition that a plaintiff must state in the tort claim notice every single fact within the plaintiff's knowledge that may prove relevant to the plaintiff's claim, and we are aware of none.") (citation omitted); *Kutz v. Lee*, 422 P.3d 362, 368 (Or. Ct. App. 2018) ("Plaintiffs [a]re required to plead facts sufficient to constitute notice under ORS 30.275." (citing *Urb. Renewal Agency of City of Coos Bay*, 549 P.2d at 660)).

Further, the Court concludes that the statutory text does not suggest that Plaintiffs must explicitly plead compliance with the OTCA's notice requirement in the complaint if notice is achieved under ORS § 30.275(3)(c). *See Yunker v. Mathews*, 574 P.2d 696, 700 (Or. Ct. App. 1978) ("We hold that where the complaint is filed within the 180 days, it is unnecessary and superfluous to plead notice, inasmuch as the complaint on its face satisfies the notice requirement.").

Finally, the statute requires "commencement of an action . . . by or on behalf of the claimant" within the applicable period of time. ORS § 30.275(3)(c). Defendants argue that it is insufficient for named plaintiffs to file a putative class action, but that each class member must individually satisfy the OTCA's notice requirement. (Defs.' Resp. at 21-22.) Defendants assert that, before class certification, named plaintiffs do not yet represent other class members and thus cannot commence an action on their behalf. (*Id.* at 22.) Under Defendants' reading, a class action would "commence" for unnamed class members at class certification. The Court understands the practical effect of Defendants' reading to be that commencement of an action pursuant to ORS § 30.275(3)(c) could never provide notice of a class action for unnamed class members because of the time it usually takes for a court to certify a class action, and thus unnamed class members must individually comply with ORS § 30.275(3)(a), (b), or (d) to satisfy

the OTCA's notice requirement. However, under the statute's most natural reading, an action commences when it is filed, not later upon class certification.[68] *See Cannon*, 322 P.3d at 602 (concluding that "the action . . . shall be deemed to have been commenced upon the date on which the complaint in the action was filed" for notice purposes (quoting ORS § 12.020(2)); *see also Margulies*, 2014 WL 4419263, at *8 ("[W]ith the exception of the limitations outlined in the OTCA, the legislature sought to place public bodies on equal footing with all other tortfeasors, Thus, just as a private tortfeasor may be subject to a class action, so too can a public body."); FED. R. CIV. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members" if the requirements of Rule 23(a) are satisfied).[69]

For these reasons, the Court grants Plaintiffs' motion on Defendants' tort claim notice affirmative defense. *See, e.g.*, *Magliacane v. City of Gardner*, 138 N.E.3d 347, 361-62 (Mass. 2020) (concluding that a presentment letter on behalf of a putative class satisfied the tort claim notice requirement and explaining that "[i]f, as the city contends, each member of the class must serve a letter of presentment to participate in the class action, we would have to conclude, for all practical purposes, that the Legislature intended to permit class actions in theory, but not in fact"); *City of Phx. v. Fields*, 201 P.3d 529, 534 (Ariz. 2009) ("If a class is later certified, the notice of claim will serve as a representative notice for other class members.") (citation omitted);

---

[68] Here, notice was particularly sufficient because the putative class members were readily identifiable in the early complaints so as to allow Defendants to investigate the class claims and evaluate liability.

[69] "If ambiguous, 'a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.'" *Bird v. Or. Comm'n for the Blind*, 22 F.4th 809, 814 (9th Cir. 2022) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). The Court concludes that the OTCA's tort claim notice requirement is not ambiguous considering the text in context.

*Price v. City of Seattle*, No. C03-1365L, 2006 WL 8454921, at *4 (W.D. Wash. July 27, 2006) ("[W]hen a tort action against the State is properly initiated by a plaintiff who has timely filed a notice of claim as required by RCW 4.92.100-110, additional plaintiffs later added to the action when it is certified for class treatment need not separately fulfill the claim filing requirement." (quoting *Oda v. State*, 44 P.3d 8, 10 (Wash. Ct. App. 2002))); *Budden v. Bd. of Sch. Comm'rs of City of Indianapolis*, 698 N.E.2d 1157, 1162-63 (Ind. 1998) (finding that "[t]he availability of a claim by a named plaintiff on behalf of a class is consistent with the language of the [Tort Claims] Act" and explaining that "the Act is intended to give the political subdivision notice, not to create barriers to claims"); *City of San Jose v. Superior Ct.*, 525 P.2d 701, 707 (Cal. 1974) ("We conclude 'claimant,' as used in [the California claims statute], must be equated with the class itself and therefore reject the suggested necessity for filing an individual claim for each member of the purported class.").

### G.    Comparative Fault

Plaintiffs move for summary judgment on Defendants' comparative fault affirmative defense as it applies to their Eighth Amendment claim. (Pls.' Mot. at 24-26; Answer ¶¶ 90-91.) Defendants agree that comparative fault is not an affirmative defense to Plaintiffs' Section 1983 Eighth Amendment claim. (Defs.' Resp. at 24.) Accordingly, the Court grants Plaintiffs' motion for partial summary judgment on Defendants' comparative fault affirmative defense as it applies to Plaintiffs' Eighth Amendment claim. Defendants may nonetheless raise the affirmative defense of comparative fault against Plaintiffs' state law claims.[70]

---

[70] As discussed, the Court grants in part and denies in part Plaintiffs' motion for partial summary judgment on Defendants' quasi-judicial immunity and legislative immunity affirmative defenses. The Court denies as moot Plaintiffs' motion for partial summary judgment on Allen's affirmative defenses.

### H.    Conclusion

In summary, the Court grants Plaintiffs' motion for partial summary judgment on several of Defendants' affirmative defenses but denies Plaintiffs' motion on Defendants' lack of standing for failure to seek commutations affirmative defense, *Heck v. Humphrey* bar affirmative defense, and discretionary immunity affirmative defense as it relates to Defendants' failure to develop different social distancing policies, including different policies about mixing and using empty space.

### CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART Defendants' motions for summary judgment as follows:

- GRANTS:

    - Defendants' Motion for Partial Summary Judgment on Claims Against Jeske (ECF No. 494); and

    - Defendants' Motion for Summary Judgment related to Governor Brown (ECF No. 512).

- DENIES:

    - Defendants' Motion for Partial Summary Judgment Regarding Damages and Class Certification of State Law Claims (ECF No. 489);

    - Defendants' Motion in the Alternative to Modify the Class Definitions (ECF No. 496); and

    - Defendants' Motion for Summary Judgment on All Claims (ECF No. 512).

///

///

PAGE 147 – OPINION AND ORDER

- DENIES WITH LEAVE TO RENEW POST-TRIAL:

  o Defendants' Motion for Partial Summary Judgment Pursuant to the OTCA's

    Single Accident or Occurrence Limitation (ECF No. 493).

The Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for partial

summary judgment (ECF No. 510) as follows:

- GRANTS:

  o Plaintiffs' motion for summary judgment on Defendants' exhaustion affirmative

    defense;

  o Plaintiffs' motion for summary judgment on Defendants' three-judge panel

    affirmative defense;

  o Plaintiffs' motion for summary judgment on Defendants' discretionary immunity

    affirmative defense as it relates to Defendants' nonenforcement of policies;

  o Plaintiffs' motion for summary judgment on Defendants' tort claim notice

    affirmative defense;

  o Plaintiffs' motion for summary judgment on Defendants' comparative fault

    affirmative defense related to Plaintiffs' Eighth Amendment claim; and

  o Plaintiffs' motion for summary judgment on Defendants' legislative immunity

    affirmative defense related to the ODOC Defendants' failure to make use of

    empty facilities.

- DENIES:

  o Plaintiffs' motion for summary judgment on Defendants' discretionary immunity

    affirmative defense as it relates to Defendants' failure to develop different social

distancing policies, including different policies about mixing and using empty

space;

o   Plaintiffs' motion for summary judgment on Defendants' quasi-judicial immunity

affirmative defense;

o   Plaintiffs' motion for summary judgment on Defendants' legislative immunity

affirmative defense related to Governor Brown's failure to make use of empty

facilities; and

o   Plaintiffs' motion for summary judgment on Defendants' legislative immunity

affirmative defense related to the closure of two facilities.

- DENIES AS MOOT:

o   Plaintiffs' motion for summary judgment on Defendants' lack of standing

affirmative defense;

o   Plaintiffs' motion for summary judgment on Defendants' *Heck* bar affirmative

defense; and

o   Plaintiffs' motion for summary judgment on Allen's affirmative defenses.

The seven-week jury trial is scheduled to commence on July 22, 2024.

**IT IS SO ORDERED.**

DATED this 10th day of April, 2024.

*Stacie F. Beckerman*

HON. STACIE F. BECKERMAN
United States Magistrate Judge