IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL MANEY; GARY CLIFT; GEORGE
NULPH; THERON HALL; DAVID HART;
SHERYL LYNN SUBLET; and FELISHIA
RAMIREZ, a personal representative for the
ESTATE OF JUAN TRISTAN, individually,
on behalf of a class of others similarly
situated,

Plaintiffs,

v.

STATE OF OREGON; KATE BROWN;
COLETTE PETERS; HEIDI STEWARD;
MIKE GOWER; MARK NOOTH; ROB
PERSSON; KEN JESKE; PATRICK
ALLEN; JOE BUGHER; and GARRY
RUSSELL,

Defendants.

Case No. 6:20-cv-00570-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiffs Paul Maney, Gary Clift, Theron Hall, David Hart, and Sheryl Lynn Sublet,

adults in custody ("AIC") at Oregon Department of Corrections ("ODOC") institutions, along

with Felishia Ramirez, the personal representative for the Estate of Juan Tristan (together,

"Plaintiffs"), filed this civil rights class action against the State of Oregon, Colette Peters, Heidi

PAGE 1 – OPINION AND ORDER

Steward, Mike Gower, Mark Nooth, Rob Persson, Joe Bugher, and Garry Russell (together, "Defendants").

Before the Court are two motions: (1) Plaintiffs' motion to limit the expert testimony of Lawrence J. Schoen, PE ("Schoen") (Pls.' Mot. Exclude Expert Op. ("Pls.' Mot."), ECF No. 649) and (2) Defendants' motion to strike Plaintiffs' subsequent expert report by Dr. David Fleming ("Fleming") (Defs.' Mot. Strike Pls.' Supp. Expert Report ("Defs.' Mot."), ECF No. 651). All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. For the following reasons, the Court denies both motions.

## BACKGROUND

This is a class action against the State of Oregon and various high-level ODOC officials related to Defendants' response to the COVID-19 ("COVID") pandemic in ODOC institutions. Plaintiffs allege that Defendants violated the Eighth Amendment by subjecting AICs to cruel and unusual punishment by failing to protect them from heightened exposure to COVID. (*See* Seventh Am. Compl. at 36-40, ECF No. 482.) Plaintiffs also allege negligence and wrongful death claims. (*See id.* at 40-42.) The Court discussed the relevant facts in its summary judgment opinion. *See Maney v. Oregon*, No. 6:20-cv-00570-SB, 2024 WL 2288807, at *2-4, *17-25 (D. Or. Apr. 10, 2024).

## I.    FLEMING'S INITIAL REPORT

In July 2023, the parties exchanged expert reports. (*See* Scheduling Order, ECF No. 467.) Plaintiffs retained Fleming to answer three questions: (1) "Did ODOC follow national recommendations and standards in the measures it implemented to prevent COVID-19?"; (2) "Did the prevention measures ODOC implemented work to prevent the introduction and spread of COVID-19?"; and (3) "Was there more ODOC could have done to prevent COVID-19 infections, hospitalizations, and deaths?" (*See* Decl. Allison Rothgeb ("Rothgeb Decl.") Supp.

Defs.' Mot. Ex. 1, David Fleming Expert Report ("Fleming Initial Report") at 2, ECF No. 652-1.)

In his initial report, Fleming opined on issues related to heating, ventilation, and air conditioning systems ("HVAC"), one of the non-pharmaceutical interventions available to ODOC before the COVID vaccine rollout, among other topics. (*See, e.g.*, *id.* at 3.) Specifically, when answering question one (did ODOC follow national recommendations and standards in the measures it implemented to prevent COVID), Fleming opined that ODOC "completely ignored national [Centers for Disease Control and Prevention ("CDC")] recommendations" in various areas, including building ventilation. (*Id.*)

In chronological order, Fleming reviewed CDC guidance from March 2020, the Oregon Health Authority's ("OHA") initial guidance from April 2020, and ODOC's initial response in late April 2020. (*Id.* at 6-9.) Fleming then laid out the "[e]volution of [p]ublic [h]ealth [u]nderstanding of COVID" followed by July 2020 CDC guidance and August 2020 OHA guidance. (*Id.* at 9-10.)

As part of the evolution of public health understanding of COVID, Fleming described the accumulating evidence of COVID's "airborne transmission." (*Id.* at 10.) He described a May 2020 publication in the Journal of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE"), authored by Schoen and entitled *Guidance for Building Operations During the COVID-19 Pandemic*. (*Id.*) Fleming explained that the article's "[c]ore recommendations" included (1) improving central air filtration to the minimum efficiency reporting value thirteen ("MERV-13") standard, (2) keeping systems running as long as possible, (3) considering portable room air cleaners with high efficiency particulate air ("HEPA") filters, and (4) considering ultra-violet germicidal irradiation ("UVGI"), particularly in high-risk spaces

such as prisons. (*Id.*; *see also id.* at 27, reiterating the four recommendations.) Fleming stated

that the "CDC began referencing this document and its recommendations in its COVID-19

guidance *Ventilation in Buildings*." (*Id.* at 10.) Fleming then observed that ODOC's internal

audit tool, developed in May 2020, for assessing its facilities' responses and management of

COVID, did not include a review of building ventilation. (*Id.* at 15-16.) Fleming further opined

that ODOC did not adopt the "new ventilation guidance" in its July 2020 guidance. (*Id.* at 12-

14.)

Fleming reviewed November 2020 regulations from the Oregon Occupational Safety and

Health Division ("Oregon OSHA"), including a ventilation-related rule. (*Id.* at 17.) The rule

required worksites to optimize the amount of outside air circulating through HVAC systems and

create Infection Control Plans addressing issues including ventilation. (*Id.*) Fleming surveyed

individual ODOC facilities' Infection Control Plans, many of which "ignored" Oregon OSHA's

HVAC rule "and were silent on ventilation[.]" (*Id.* at 20.) Fleming acknowledged that three

Infection Control Plans mentioned MERV-13 filters, but noted, for example, a delay of up to

ninety days for the filters' arrival after their order. (*Id.* at 20-21.) He further noted that ODOC

did not incorporate any mention of building ventilation into its centralized plan. (*Id.* at 20; *see

also id.* at 27.)

When answering question three (was there more ODOC could have done to prevent

COVID infections, hospitalizations, and deaths), Fleming observed that the "2020 CDC

recommendations suggest the use of portable HEPA filters and UVGI." (*Id.* at 48.) He

documented "[s]ignificant scientific evidence supporting the importance of these recommended

ventilation improvements[.]" (*Id.*) He cited articles from the American Journal of Public Health,

the Pubmed National Library of Medicine, and the Department of Energy and surveyed

ventilation upgrades in other states. (*Id.*) Fleming again opined that ODOC "did not adopt the national recommendations regarding MERV-13 filtration standards for H[VA]C or HEPA filters and UVGI approaches, and instead remained silent on ventilation issues in their Covid-19 in Correctional Facilities policy documents." (*Id.*) He further opined that other states "install[ed] more effective building ventilation" but that ODOC did "not invest in HEPA portable air filters or [UVGI], even in their highest risk congregate living settings." (*Id.* at 4, 49.)

Finally, Fleming observed that, many months later, ODOC's 2022 plan did include several references to ventilation but continued to remain silent on adoption of the MERV-13 standard in correctional facility HVAC systems and noted that "there is no mention of potential benefits of either HEPA filters or UVGI." (*Id.* at 52.)

In support of his opinions, Fleming cited, *inter alia*, various iterations of CDC policies, including the CDC's *Ventilation in Buildings* publication—dated December 7, 2020; December 21, 2020; March 2021; June 2021; and 2021 generally—and the *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*. (*Id.* at 6, 10, 136-37, Appx. 2.)

## II.    THE COURT'S ORDER

In September 2023, Plaintiffs moved for leave to file a Seventh Amended Complaint. (*See* Pls.' Mot. Leave File Seventh Am. Compl., ECF No. 473.) Defendants opposed Plaintiffs' motion, arguing that the proposed amendments raised new theories of liability after the close of discovery. (*See* Defs.' Resp. Pls.' Mot. Leave File Seventh Am. Compl., ECF No. 475.)

In November 2023, the Court held a hearing on the motion. (*See* Minutes of Proceedings, ECF No. 481.) The Court concluded that the proposed amended complaint included more specific factual allegations about, *inter alia*, HVAC in support of Plaintiffs' existing claims. (*See*

Tr. 32:4-8, 38:23, ECF No. 483.)[1] The Court granted Plaintiffs' motion for leave to file the

Seventh Amended Complaint. (*See id.* 31:9-10; *see also* Order, ECF No. 481.)

At the hearing, the Court discussed Defendants' request for additional expert designations

and expert reports. (*See* Tr. 14:1-31:2, 34:15-38:22.) The Court asked Defendants whether they

would need a new expert to opine on HVAC topics. (*Id.* 21:8-15.) Defendants responded that,

although they retained experts "well versed in correctional facilities and correctional health

care," because Plaintiffs did not include any facts related to HVAC in their Sixth Amended

Complaint, Defendants had not retained "someone who could explain the technical aspects of an

HVAC system." (*Id.* 21:18-22.) Defendants further explained that their retained experts could

not opine on "the feasibility" of different options for air filtration "given supply chain issues

during the time frame" and the amount of time it would have taken to make the changes. (*Id.*

29:9-21.) The Court permitted Defendants to designate a new expert on the topic of HVAC.

(*Id.* 36:9-11.)

Plaintiffs' counsel asked, "is the Court allowing defense an initial expert report on HVAC

or a rebuttal expert report on HVAC issues?" (*Id.* 36:25-37:2.) Plaintiffs' counsel explained, "I

don't want to misquote the scope of our expert's testimony, but there are certain aspects of what

[Defendants' counsel] mentioned earlier, which is the feasibility and the cost or the supply

chains that are not within the scope of our expert's initial opinions." (*Id.* 37:7-11.) Plaintiffs'

counsel clarified that Plaintiffs' "experts do address the failure to develop written policies and

respond to the requirements from [Oregon] OSHA and elsewhere to upgrade facility HVAC

---

[1] Excerpts of the hearing transcript are also available at Rothgeb Decl. Ex. 2, ECF No. 652-2.

systems to help protect against COVID transmission." (*Id.* 37:11-14.) The Court then engaged in the following exchange with Plaintiffs' counsel about a potential rebuttal report from Plaintiffs:

> THE COURT: So if the defense to [the failure to develop written policies, follow Oregon OSHA's requirements, and upgrade systems] theory of the case is we didn't do it because it was too expensive, would you consider that to be a rebuttal expert or another expert?

> [PLAINTIFFS' COUNSEL]: I think that would probably be a rebuttal expert, although if it addresses new issues that we could not address, I wonder if we could also get an opportunity to rebut any of . . . their expert's report. I want to make sure that we have an opportunity to respond if it's new issues we haven't already addressed.

> THE COURT: [I will] allow defendants to designate an expert on HVAC. . . . [I]t sounds to me like it's not a rebuttal, in the sense that it will be constrained to the plaintiffs' HVAC issues, because [the] defense has . . . different, maybe unrelated issues on why this didn't happen. To the extent you raise issues that are outside the scope of the HVAC issues in plaintiffs' report, plaintiffs will have a chance to file a rebuttal report to any new expert report, or I guess supplement whatever expert report you already have to respond to any new expert issues.

(*Id.* 37:15-38:10; *see also* Order, ECF No. 481, "Defendants' new expert report (HVAC) . . . [is] due by 1/16/2024. Plaintiffs' expert rebuttal report(s) in response are due by 2/16/2024.") The Court also explained that the parties could file *Daubert* motions related to the new experts beyond the Court's original *Daubert* motion deadline. (*Id.* 36:19-22.)

Following the Court's order, Defendants produced an expert report prepared by Schoen, and Plaintiffs responded with a report by Fleming.

///

///

///

///

III.    **SCHOEN'S REPORT**

Following the Court's November 2023 order, Defendants retained Schoen to provide an

overview of ventilation in indoor spaces and to respond to Fleming's assertions and opinions on

ventilation. (*See* Lawrence Schoen Expert Report ("Schoen Report") at 1.)[2]

Schoen is a licensed professional engineer with over forty years of experience with

HVAC systems. (*Id.* at 1, 29-31.) He is an ASHRAE fellow, was the chair of ASHRAE's

Environmental Health Committee in 2010 and 2011, and published the article *Guidance for*

*Building Operations During the COVID-19 Pandemic* in the May 2020 ASHRAE Journal. (*Id.* at

1-2, 31-34.)

Schoen provided numerous HVAC-related opinions, explaining that (1) "Fleming

mischaracterize[d his] ASHRAE article by overstating the utility and ability of HVAC systems

to mitigate disease spread in mechanically or naturally ventilated buildings[;]" (2) "Fleming

misinterpret[ed] the timeline of the [CDC] guidance for ventilation in buildings[;]" (3) neither

Schoen's "ASHRAE article nor the CDC guidance document entitled 'Ventilation in Buildings'

characterized ventilation as a key non-pharmaceutical intervention to prevent the spread of

COVID[;]" (4) "ODOC purchased MERV-13 filters for the health care areas at its facilities in

late 2020 and early 2021" and took other action to address ventilation concerns related to

COVID; (5) "[d]ilution ventilation provided by HVAC cannot significantly mitigate close

personal exposure . . . to a person infected with COVID[;]" (6) "indoor spaces like those in

ODOC facilities already achieve a significant level of dilution ventilation and there are

diminishing returns to additional ventilation measures[;]" (7) "HVAC systems have not been

---

[2] Schoen's Report is available at Decl. Nadia Dahab ("Dahab Decl.") Ex. A, ECF No. 650-1, and Rothgeb Decl. Ex. 3, ECF No. 652-3.

shown to spread COVID-19 infections from one room to another[;]" (8) "[i]n HVAC systems that utilize 100% outdoor air and do not recirculate air through the system, filters provide no additional utility in preventing or mitigating spread of airborne contaminants within a ventilated space, including viruses[;]" (9) "[r]ecommendations to open system dampers to increase the volume of outside air in an HVAC system generally provide little utility in HVAC systems that utilize 100% outdoor air since no mixing of fresh air and recirculated air occurs within these systems[;]" and (10) "[s]upply chain disruptions and increased demand created difficulty in obtaining MERV-13 filters during much of 2020 and beyond." (*Id.* at 2-4.)

Schoen began with an overview of the two kinds of "dilution ventilation": the use of fans to (1) supply outdoor air or (2) recirculate filtered air that contains less or no contaminants or odors. (*Id.* at 5-6.) He then provided an overview of the role of HVAC and dilution ventilation in mitigating the spread of airborne contaminants. (*Id.* at 7-9.) He explained that dilution ventilation has little ability to mitigate exposure to a person who is between three to six feet from a person infected with COVID "because the manner in which HVAC systems move air through indoor spaces, often from the ceiling, is too remote and too slow to significantly impact aerosol transmission at the close range." (*Id.* at 7.) Beyond the close range, ventilation can assist in mitigating exposure, but with diminishing returns, and ventilation could be part of an infection control bundle but should not solely be relied upon significantly to reduce the risk of infection. (*Id.* at 7-8.) According to Schoen, "there is no scientific consensus quantifying the extent to which increases in outdoor air exchange rates or increased levels of air filtration in HVAC systems reduces the transmission of infectious aerosols." (*Id.* at 9.)

Next, Schoen reviewed the differences between infectious aerosols in recirculating HVAC systems versus fresh air systems. (*Id.*) Schoen explained that systems that introduce one

hundred percent outdoor air do not require high level filtration such as MERV-13 because the system is not recirculating air from the occupied space but is merely drawing in outdoor air. (*Id.*) Further, "conditioning" outdoor air requires energy, such as to moderate the temperature of the air coming in to match the indoor temperature. (*Id.* at 10.) Accordingly, the strategy of increasing outdoor air intake has limits. (*Id.*)

Schoen described particle filtration—the most common type of air cleaning used in HVAC systems. (*Id.*) Filters are tested for removal efficiency by particle size, ranging from MERV-1 to MERV-16. (*Id.*) Before April 2020, MERV-13 filters were less widely known and less commonly used. (*Id.* at 10-11.) According to Schoen, because the COVID virus commonly traveled "in a particle with salts, moisture[,] and mucous[,]" MERV-7 to MERV-12 filters also provide some COVID-related benefit in filtering. (*Id.* at 11.) Further, "facilities had difficulties obtaining MERV-13 filters, due to their limited availability, which was exacerbated in 2020 and beyond by supply chain disruption and higher demand due to the pandemic." (*Id.*)

Schoen then summarized his May 2020 ASHRAE Journal article. (*Id.* at 11-13.) The article acknowledged other non-ventilation methods to mitigate disease spread (such as social distancing, disinfecting, and good hygiene), and suggested HVAC-related actions secondarily to other strategies. (*Id.* at 12.)

Next, Schoen reviewed the CDC's guidance entitled *Ventilation in Buildings* and discussed the chronology of COVID guidance mentioned "in Dr. Fleming's report." (*Id.* at 13-18.) Schoen ultimately concluded that "Fleming misidentifie[d] the timing of [the] CDC's guidance on 'Ventilation in Buildings' relative to the other sources of guidance discussed in his report." (*Id.* at 15.)

///

Finally, Schoen offered his opinions disagreeing with several of Fleming's other ventilation opinions. (*Id.* at 18-27.) Schoen disagreed that ventilation is a key, non-pharmaceutical intervention for preventing the spread of COVID; opined that the record shows ODOC's diligence in achieving ventilation recommendations; explained that ODOC personnel worked to comply with the Oregon OSHA ventilation rule; explained that Fleming misunderstood the utility of MERV-13 rated filters in non-recirculating HVAC systems; and disputed Fleming's statement that the use of MERV-13 filters was a nationally recognized standard. (*Id.*) For example, Schoen explained that his article included other suggestions related to ventilation beyond the four on which Fleming focused (improving central air filtration to the MERV-13 standard, keeping systems running as long as possible, considering portable room air cleaners with HEPA filters, and considering UVG particularly in high-risk spaces such as prisons). (*Id.* at 20.) Schoen's article also suggested opening minimum outdoor dampers, and Schoen explained that the record reveals that a Facility Energy Technician at Oregon State Penitentiary had noted that the facility was doing just that but that "with the cold nights our heating system may not keep up[.]" (*Id.* at 20-21.) Schoen noted that some of ODOC's facilities use one hundred percent fresh air systems and do not recirculate air, so implementing MERV-13 filters would not have meaningfully impacted the spread of COVID in those facilities. (*Id.* at 21, 25.) Finally, Schoen responded to Fleming's observation that at least one ODOC facility ordered MERV-13 filters but that the orders were delayed, explaining that the filters were in high demand and there were supply chain disruptions in late 2020 and early 2021. (*Id.* at 25.)

## IV.    FLEMING'S SUBSEQUENT REPORT

Fleming subsequently authored a report in response to Schoen's. (*See* Rothgeb Decl. Ex. 4, David Fleming Subsequent Expert Report ("Fleming Subsequent Report"), ECF No. 652-4.)

Fleming critiqued Schoen for not linking the information in his report "in a systemic and comprehensive way back to the actual ventilation systems in operation at all ODOC facilities in 2020." (*Id.* at 3.) Fleming asserted that Schoen appeared to agree that, after the CDC issued guidance, OHA and ODOC "should be held accountable for recognizing and incorporating . . . ventilation interventions as a COVID prevention strategy[.]" (*Id.*) Fleming then pointed to a May 2020 publication from the CDC titled *Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19), May 2020*, which recommended improving engineering controls such as by increasing ventilation rates, ensuring ventilation systems operate properly, increasing outdoor air ventilation, improving central air filtration to the MERV-13 or the highest compatible with the filter rack, and keeping systems running longer hours. (*Id.* at 4.) Fleming explained that the May 2020 publication was a precursor to the CDC's *Ventilation in Buildings* guidance. (*Id.*) Fleming further observed that even after the CDC's December 7, 2020, guidance titled *Ventilation in Buildings*, OHA's December 16, 2020, interim guidance on management of COVID in correctional facilities failed to address HVAC operations. (*Id.* at 5-6.)

Fleming reiterated that Oregon OSHA's rule mandated that ODOC "establish and implement infection control plans that implemented controls including ventilation[,]" which most facilities did not do. (*Id.* at 6, emphasis omitted.) Fleming asserted that Schoen's report is "internally inconsistent" where it "objects to describing COVID-19 building ventilation interventions as 'key non-pharmaceutical interventions'" while also "validat[ing] their routine consideration and use as a necessary part of any overall strategy for COVID-19 prevention[.]" (*Id.* at 7.) Fleming pointed out that even before Schoen's ASHRAE Journal article, "ASHRAE as an organization had already affirmed the importance of including building ventilation as an

element of a COVID-19 control strategy" with an April 2020 statement from ASHRAE's COVID Epidemic Task Force. (*Id.* at 8.)

Finally, Fleming disputed Schoen's conclusion that "ODOC leadership was consistently taking the appropriate steps regarding building ventilation to decrease the risk of COVID-19 transmission in ODOC facilities." Fleming instead concluded that ODOC's leadership was ineffective. (*Id.* at 9-11.) He opined that "Schoen provide[d] no evidence that any systematic analysis of COVID-19 risk reduction and HVAC system operation was ever ordered, conducted, or acted upon by ODOC leadership in real time during the critical first year of the COVID-19 pandemic." (*Id.* at 10, emphasis omitted.)

## V.    PROCEDURAL HISTORY

In April 2024, the Court denied Defendants' motion to exclude Fleming's initial report and Defendants' narrower request to exclude Fleming's testimony related to building ventilation contained therein. *See Maney v. Oregon*, No. 6:20-cv-00570-SB, 2024 WL 1695083, at *6-10 (D. Or. Apr. 19, 2024). The Court concluded that Defendants' arguments about the national standards—including that Fleming did not acknowledge that Schoen's article also stated that HVAC upgrades were an unproven COVID mitigation strategy, that Fleming did not acknowledge that the article indicated that MERV-13 filters are not compatible with every HVAC system, and that the CDC did not publish its guidance on building ventilation until December 7, 2020—are not grounds for exclusion. *Id.* at *10. However, the Court noted that there is an inadequate basis for Fleming's opinion that ODOC did "not invest in HEPA portable air filters" at all because the record reveals some HEPA filter purchases, explaining that the Court will resolve through pretrial motions in limine the precise contours of Fleming's permissible ventilation-related testimony, specifically addressing Defendants' objection to Fleming's testimony that ODOC did not invest in any HEPA portable air filters. *Id.*

Also in April 2024, the Court stayed proceedings in this case pending resolution of Defendants' appeal of the Court's summary judgment opinion, which, *inter alia*, denied Defendants qualified immunity. (*See* Order, ECF No. 647); *Maney*, 2024 WL 2288807, at *31-33. The Court permitted the parties to file discovery-related motions to the extent they would otherwise be permitted under the Federal Rules of Civil Procedure, and to the extent that they relate to the claims over which the Court retains jurisdiction pending the appeal. (*See* Order, ECF No. 647.)

Plaintiffs now move to limit Schoen's testimony (*see* Pls.' Mot.), and Defendants move to strike Fleming's subsequent report (*see* Defs.' Mot.).

**DISCUSSION**

Plaintiffs move to limit Schoen's testimony related to the timeline of CDC guidance for ventilation in buildings, arguing that he is not qualified, his opinions lack any basis in reliable principles and methods, and his opinions will not assist the trier of fact. (*See* Pls.' Mot. at 1, 4-6.) Defendants move to strike Fleming's subsequent report as an improper surrebuttal report or a supplemental report following Schoen's rebuttal report. (*See* Defs.' Mot. at 13-22.)

**I.    JURISDICTION**

As a preliminary matter, the Court considers whether it has jurisdiction to decide the parties' motions during the pendency of Defendants' appeal. The parties do not directly brief the issue, but Defendants suggest that "it is not clear that this Court has jurisdiction to resolve these motions to strike and order additional discovery regarding a claim that is currently on appeal." (Defs.' Reply Defs.' Mot. ("Defs.' Reply") at 12 n.2, ECF No. 661.)

"Ordinarily, a notice of appeal divests the district court of jurisdiction 'over those aspects of the case involved in the appeal.'" *Christian v. Rhode*, 41 F.3d 461, 470 (9th Cir. 1994) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)). "An order denying a

motion for summary judgment is usually not an immediately appealable final decision." *Est. of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021) (citing, *inter alia*, *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014)). "But that general rule does not apply when the summary judgment motion is based on a claim of qualified immunity, because pretrial orders denying qualified immunity generally fall within the collateral order doctrine." *Id.* (simplified).

Here, the Court granted in part and denied in part Defendants' various motions for summary judgment. *See Maney*, 2024 WL 2288807, at *65. Defendants have appealed the Court's denial of qualified immunity pursuant to the collateral order doctrine. (*See* Notice of Appeal, ECF No. 640.) Because Plaintiffs have alleged Eighth Amendment, negligence, and wrongful death claims (*see* Seventh Am. Compl. at 36-42) and qualified immunity applies only to Plaintiffs' Eighth Amendment claim, the Court retains jurisdiction over Plaintiffs' negligence and wrongful death claims. *See Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013) ("[T]he doctrine of qualified immunity does not shield defendants from state law claims.") (citations omitted); *Shen v. Albany Unified Sch. Dist.*, 436 F. Supp. 3d 1305, 1309 (N.D. Cal. 2020) ("Because qualified immunity is a federal doctrine, it does not bar potential state law liability.") (citations omitted). Schoen's and Fleming's testimony relate to Plaintiffs' state law claims—over which the Court retains jurisdiction—and therefore the Court may decide the instant motions. *See Castaneda v. Molinar*, No. 07-cv-07241 DDP JCX, 2008 WL 9449576, at *1 (C.D. Cal. May 20, 2008) ("'Because discovery and other pretrial matters are not relevant to the subject of the appeal—[the defendants'] claim of immunity,' the Court may continue to oversee discovery in this case." (quoting *Schering Corp. v. First DataBank, Inc.*, No. C 07-01142 WHA, 2007 WL 1747115, at *4 (N.D. Cal. June 18, 2007))); *cf. Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) ("We conclude that the district court

possessed jurisdiction to modify the injunction while the consolidated appeal was pending, because the changes preserved the status quo and did not materially alter the status of the case on appeal."); *J. P. by & through Villanueva v. County of Alameda*, No. 17-cv-05679-YGR, 2018 WL 3845890, at *3 (N.D. Cal. Aug. 13, 2018) (rejecting the defendants' motion to stay discovery during the pendency of the appeal of the court's denial of qualified immunity).

## II.   PLAINTIFFS' MOTION

Plaintiffs argue that Schoen is not qualified to opine on the timing of the CDC's HVAC-related COVID guidance, that Schoen's opinions lack any basis in reliable principles and methods, and that his opinions will not assist the trier of fact. (*See* Pls.' Mot. at 1, 3-6.)

### A.   Applicable Law

Federal Rule of Evidence 702 provides the standards for expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702 (as amended Dec. 1, 2023). In other words, an expert must be qualified, and expert testimony must be both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

///

PAGE 16 – OPINION AND ORDER

First, expert testimony must be relevant. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (quoting 3 Weinstein & Berger ¶ 702[02], p. 702-18); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))).

Second, the testimony must be reliable. The Ninth Circuit applies a flexible test:

> The test of reliability is flexible. The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. But these factors are meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case. The test is not the correctness of the expert's conclusions but the soundness of [the expert's] methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*City of Pomona*, 750 F.3d at 1044 (simplified). The Supreme Court has explained that, when considering non-scientific testimony, courts may consider whether the expert's "preparation is of a kind that others in the field would recognize as acceptable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999); *see also* FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). "It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Rule 702 was recently amended. "Effective December 1, 2023, Rule 702 clarified [that] the proponent of expert testimony must meet all of Rule 702's substantive standards for admissibility by a preponderance of evidence." *Cleaver v. Transnation Title & Escrow, Inc.*, No. 1:21-cv-00031-AKB, 2024 WL 326848, at *2 (D. Idaho Jan. 29, 2024); *see also* FED. R. EVID. 702 (explaining that the proponent of the evidence must demonstrate that it is more likely than not that the expert satisfies the admissibility requirements). The advisory committee cautions that courts had incorrectly "held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." FED. R. EVID. 702 advisory committee's note to 2023 amendment; *see also id.* (explaining that the admissibility standard "does not mean, as certain courts have held, that arguments about the sufficiency of an expert's basis *always* go to weight and not admissibility") (emphasis added). Instead, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements[.]" *Id.* "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.* "Because the rule change was a clarification, and not a change in the standard, the new language does not materially alter the admissibility of expert testimony." *Alivecor, Inc. v. Apple, Inc.*, No. 21-cv-03958-JSW, 2024 WL 591864, at *3 n.2 (N.D. Cal. Feb. 13, 2024) (citation omitted).

    **B.**    **Analysis**

        **1.**    **Qualifications**

Plaintiffs suggest in passing that Schoen is not qualified to opine on the timing of the CDC's HVAC-related COVID guidance but do not further support their argument. (*See* Pls.' Mot. at 1.)

///

Schoen is a licensed professional engineer with over forty years of experience with HVAC systems, and he has health-related experience such as serving on ASHRAE's Environmental Health Committee. (*See* Schoen Report at 1, 29-30.) Schoen is clearly an expert in ventilation and HVAC. The Court concludes that Schoen need not demonstrate a more granular level of expertise in a combination of CDC, HVAC, and COVID knowledge, skill, experience, training, or education. *See Moribe v. Am. Water Heater Co.*, No. 21-cv-00254 HG-WRP, 2023 WL 8998745, at *6 (D. Haw. Dec. 28, 2023) ("Lack of detailed experience affects credibility rather than admissibility.") (citation omitted); *Shafer v. C.R. Bard, Inc.*, No. 20-cv-1056RSM, 2021 WL 4305216, at *3 (W.D. Wash. Sept. 22, 2021) (concluding that the expert was qualified and explaining that "Defendants are splitting hairs as to the particularized expertise required for an expert to opine on this issue, and a lack of particularized expertise goes to the weight of the testimony, not its admissibility"); *Bixby v. KBR, Inc.*, No. 3:09-cv-632-PK, 2012 WL 12952722, at *2 (D. Or. Aug. 29, 2012) ("Where a witness' credentials are minimally sufficient to permit the witness to be qualified as an expert, the courts lack discretion to exclude the witness' proffered expert opinion on the grounds that the witness is not the best-qualified expert in the area or that other witnesses had credentials of greater relevance or prestigiousness." (citing *Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 114, 115-117 (1st Cir. 2010))); *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) (explaining that "[a] court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified") (citation omitted).

### 2. Reliability

Plaintiffs argue that Schoen's testimony related to the timing of CDC guidance is unreliable because he does not know when the CDC first referred to his ASHRAE Journal article

in its COVID guidance, does not know when the CDC first addressed building ventilation in its COVID guidance, and did not conduct any independent research to understand when the CDC first issued guidance related to building ventilation in response to COVID. (*See* Pls.' Mot. at 5-6.) Plaintiffs cite Schoen's deposition as support, where Schoen testified that he did not "have any understanding as to when the CDC first referred to [his article,]" "have any understanding of when the CDC first addressed building ventilation in its COVID-19 guidelines[,]" nor "conduct[ed] any independent research . . . of when the CDC initially issued guidance relating to building ventilation in response to COVID-19[.]" (Dahab Decl. Ex. B, Lawrence Schoen Depo. ("Schoen Depo.") 48:19-23, 49:8-23, 52:1-6, ECF No. 650-2.)

Defendants respond that Schoen merely points out a discrepancy in Fleming's own testimony. (*See* Defs.' Resp. Pls.' Mot. at 2-6, ECF No. 658.) Schoen's report documents that, in Fleming's initial report, Fleming did not cite to any CDC guidance about building ventilation authored prior to December 2020. (*See id.*)

The Court agrees with Defendants. Schoen opines that "Fleming mischaracterize[d] the timeline of CDC's guidance for ventilation in buildings" and, specifically, that "Fleming misidentifie[d] the timing of CDC's guidance on 'Ventilation in Buildings' relative to the other sources of guidance discussed in his report." (Schoen Report at 15, 21.) Schoen explains that the "CDC did not issue its guidance entitled 'Ventilation' or 'Ventilation in Buildings' until December 7, 2020." (*Id.* at 21.) Schoen does not opine as to when the CDC first referred to his ASHRAE Journal article or first addressed building ventilation in any of its guidance. Accordingly, Schoen's opinion is more narrow than Plaintiffs construe it to be.[3]

---

[3] Accordingly, Plaintiffs' argument that Defendants cannot offer opinions from a purported expert on matters to which the expert disclaims expertise are unavailing. (*See* Pls.' Reply Pls.' Mot. at 2-3, ECF No. 663, citing, *inter alia*, *Droplets, Inc. v. Yahoo! Inc.*, No. 12-

The Court concludes that Schoen's testimony has a reliable basis, and Plaintiffs' challenges go to the weight of Schoen's opinion, not its admissibility.[4] *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]") (simplified); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) ("Although Defendants . . . argued that [the expert]'s selection of documents to review went to the reliability of his 'methodology' as an expert, the district court correctly surmised that questions regarding the nature of [the expert]'s evidence went more to the 'weight' of his testimony—an issue properly explored during direct and cross-examination." (citing *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004))); *OWLink Tech., Inc. v. Cypress Tech. Co.*, No. 8:21-cv-00717-SPG-KESX, 2023 WL 4291486, at *1-2 (C.D. Cal. Feb. 16, 2023) (rejecting the defendant's argument that expert testimony should

_____

CV-03733-JST, 2021 WL 11701485, at *5 (N.D. Cal. Nov. 29, 2021).) Here, Schoen's disclaimer of the limits of his expertise merely clarified the narrow scope of his testimony. (*See* Schoen Depo. 50:20-51:11, "I'm not an expert in what [the] CDC said and when they said it. . . . I was asked as an expert in this case to do several things . . . and one of them was to respond to Flem[]ing's assertions . . . that ODOC and OHA ignored advice. And I used the documents that Flem[]ing listed in his report. And so when I make a statement, [the] CDC issued its guidance entitled 'Ventilation in buildings in the year 2020,' that should be viewed in the context of the whole of this particular bullet which is talking about Flem[]ing's report.")

[4] Plaintiffs also state that Schoen's testimony is based in part on declarations that Plaintiffs "have never seen before." (Pls.' Resp. Defs.' Mot. ("Pls.' Resp.") at 5, ECF No. 659, citing Schoen Report Appx. C, listing declarations from Hammonds, Davis, Bruns, and Stark; *see also* Schoen Report at 21 n.73.) It is unclear whether Plaintiffs imply that Defendants should have disclosed the names and testimony of those individuals as part of discovery or whether Plaintiffs believe that Rule 37's exclusionary sanction should apply to any testimony from Schoen that relies on those declarations. The Court concludes that Plaintiffs' passing critique of Schoen's reliance on those declarations is too vague for the Court to resolve the objection.

be excluded because the expert "failed to conduct an adequate independent investigation because he relied on summaries of data provided by the parties[,]" and concluding that the defendant's argument goes to the weight of the testimony not its admissibility).

### 3. Relevance

To the extent Plaintiffs argue that Schoen's testimony will be of limited assistance to the trier of fact because the CDC *did* promulgate guidance related to building ventilation before December 2020, or because Fleming based his opinion about national standards not just on CDC guidance but also on Schoen's article, other publications, and actions taken by other states, those arguments go to the weight of the evidence, not its admissibility.

For all of these reasons, the Court denies Plaintiffs' motion to limit Schoen's testimony.

## III. DEFENDANTS' MOTION

Defendants argue that Schoen's report was a rebuttal report to Fleming's initial report and that Fleming's subsequent report is an improper surrebuttal or supplemental report. (*See* Defs.' Mot. at 13-22.)

### A. Applicable Law

"Rule 26's only constraint on [a] rebuttal expert . . . defines a rebuttal report as one 'intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)[.]'" *Century Indem. Co. v. Marine Grp., LLC*, No. 3:08-cv-1375-AC, 2015 WL 5521986, at *2 (D. Or. Sept. 16, 2015) (quoting FED. R. CIV. P. 26(a)(2)(D)(ii)). "Rebuttal expert reports necessitate a showing of facts supporting the opposite conclusion of those at which the opposing party's experts arrived in their responsive reports." *Meyer v. Mittal*, No. 3:21-cv-00621-HZ, 2024 WL 378743, at *1 (D. Or. Feb. 1, 2024) (quoting *Century Indem. Co.*, 2015 WL 5521986, at *3). "They may be used to 'explain, repel, counteract

or disprove evidence of the adverse party,' but should not be used to present new arguments." *Id.* (quoting *Century Indem. Co.*, 2015 WL 5521986, at *3).

"The phrase 'same subject matter' should be read narrowly because a broad reading that encompasses *any* possible topic that *relates* to the subject matter at issue will blur the distinction between affirmative expert and rebuttal expert." *Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, No. 20-cv-5486-DSF-ADSX, 2023 WL 9659943, at *8 (C.D. Cal. July 26, 2023) (simplified). "The court must carefully analyze the initial expert's proposed testimony and the corresponding expert's rebuttal testimony to determine the propriety of the rebuttal testimony." *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, No. 15-cv-0595-BAS-MDD, 2016 WL 795888, at *1 (S.D. Cal. Mar. 1, 2016) (citing *HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-cv-2884-BAS-MDD, 2015 WL 1879428, at *1 (S.D. Cal. Apr. 17, 2015)).

Federal Rule of Civil Procedure 26(e) mandates that, where an expert provides a written report, the party has a duty to supplement incorrect information included in the report and information given during the expert's deposition. *See* FED. R. CIV. P. 26(e). "A supplemental report that seeks to strengthen or deepen opinions expressed in the original expert report is improper under Rule 26(e) and subject to exclusion under Rule 37(c)." *Andrews v. Plains All Am. Pipeline, L.P.*, No. 15-cv-4113-PSG-JEMX, 2019 WL 6647928, at *4 (C.D. Cal. Nov. 22, 2019) (simplified).

Rule 26 requires parties to make expert "disclosures at the times and in the sequence that the court orders." FED. R. CIV. P. 26(a)(2)(D). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). A court has "particularly wide

latitude" when exercising its "discretion to issue sanctions under Rule 37(c)(1)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (citing *Ortiz–Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 248 F.3d 29, 34 (1st Cir. 2001)). District courts consider "[s]everal factors to guide the determination of whether substantial justification and harmlessness exist, including (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022) (quoting *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 242 (D. Nev. 2017)). Plaintiffs bear the burden of proving that the delay was substantially justified or harmless. *See R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012); *Yeti*, 259 F.3d at 1107; *Amos v. Makita U.S.A., Inc.*, No. 2:09-cv-01304-GMN, 2011 WL 43092, at *3 (D. Nev. Jan. 6, 2011).

> **B.      Analysis**

Defendants argue that Schoen's report is a rebuttal to Fleming's initial report because it responds exclusively to Fleming's HVAC opinions. (*See* Defs.' Mot. at 13, 16-18.) Relatedly, Defendants argue that Fleming's subsequent report is an improper attempt to buttress his opinions in his initial report and is not a proper surrebuttal or supplemental expert report. (*See id.* at 18-19.) Plaintiffs agree that Fleming's subsequent report is proper under the Court's November 2023 order only if Schoen's report raises new issues, but Plaintiffs respond that Schoen's report did just that. (*See* Pls.' Resp. at 4-8.) Plaintiffs argue that Schoen's report opines on the different types of HVAC systems, compares the mitigation effects of ventilation efforts for close personal exposure compared to exposure beyond the close range, discusses limitations on systems that maximize outside air based on the capacity of the system to heat or cool the air,

opines about the effectiveness of differently rated filters, mentions supply chain limitations, and discusses his ASHRAE article. (*See id.* at 4-5.)

Defendants argue that the Court should strike Fleming's subsequent report because the failure to comply with Rule 26 is neither substantially justified nor harmless. (*See* Defs.' Mot. at 20-22.) Defendants argue that the opinions expressed in Fleming's subsequent report could have been expressed in his initial report, and thus the subsequent report is not substantially justified. (*Id.* at 21.) Defendants also argue that the opinions are not harmless because it gives Plaintiffs an opportunity to attempt to rehabilitate an expert. (*Id.*) Plaintiffs respond that even if Fleming's subsequent report is not a proper rebuttal report, Rule 37 sanctions are not warranted here because the report is substantially justified and harmless. (*See* Pls.' Resp. at 8-10.) Plaintiffs argue that the Court authorized a supplemental report and that the report is harmless because there was sufficient notice and time before trial given that there is currently no scheduled trial date. (*Id.*)

The Court concludes that even if Schoen's report qualifies as a rebuttal report only, Fleming's subsequent report is substantially justified and harmless. The Court's order specified Plaintiffs' ability to file a rebuttal report should Defendants' expert opine on any new issues. Schoen's report touches on some of the precise issues that the Court discussed with the parties in November 2023 that may constitute new issues to which Plaintiffs could have an opportunity to respond, such as the technical aspects of HVAC systems and the feasibility of different options for air filtration considering, for example, supply chain issues. (*See, e.g.*, Schoen Report at 2-111, discussing specific technical aspects of HVAC systems and supply chain issues.) Further, Defendants did not label Schoen's report as a rebuttal report. Although Fleming's subsequent report does not directly respond to those new issues but instead responds to Schoen's critiques of

his initial report, Schoen's testimony beyond the scope of Fleming's initial report is only admissible to the extent that Schoen's report is an affirmative expert report.

The majority of Fleming's subsequent report reflects Fleming's opinions set out in his original report, and the Court has already decided the parties' motions for summary judgment. In other words, regardless of the Court's ruling on Defendants' current motion, Fleming will be allowed to testify at trial to his opinion that building ventilation is a key, non-pharmaceutical COVID prevention measure, that ODOC did not timely adopt ventilation guidelines, and that ODOC leadership did not take appropriate steps to address ventilation concerns during the first year of the pandemic.[5] The parties' key dispute appears to be whether Fleming may reference a May 2020 CDC publication that he did not cite in his initial report.

Defendants argue that Plaintiffs have consistently identified the CDC's *Guidance on Management of COVID in Correctional and Detention Facilities* as the basis for their claims. (*See* Defs.' Reply at 3-9; *see also* Decl. Anit Jindal Supp. Defs.' Reply Ex. 1, ECF No. 662-1, attaching Plaintiffs' amended and supplemental response to Defendants' interrogatory asking Plaintiffs to "[i]dentify and describe all [CDC] guidelines that You contend [D]efendants failed to follow, . . . including the date any guideline was first published by the CDC" to which Plaintiffs responded that "Defendants consistently and routinely failed to comply with the CDC's *Guidance on Management of COVID-19 in Correctional and Detention Facilities*[.]") Defendants argue that Fleming's delayed reliance on an entirely different guidance applicable to businesses and employers is harmful because Defendants' expert did not get an opportunity to

---

[5] Defendants argue that Fleming raises a new opinion by critiquing Schoen's failure to point to any evidence or documentation of a systematic analysis of HVAC-related COVID risk reduction throughout ODOC in 2020. (*See* Defs.' Mot. at 12.) However, the thrust of Fleming's initial report is just that. (*See* Fleming Initial Report at 12-16, explaining that Defendants did not adopt ventilation guidance into its centralized plan nor into its internal audit tool.)

respond to the document, Defendants "would have made additional arguments at summary judgment if they understood that [P]laintiffs' ventilation theories were based on a document that makes no mention of correctional facilities[,]" and Defendants expended time and energy deposing Fleming and tailoring their questions to the materials in Fleming's initial report. (Defs.' Reply at 8.) In the alternative to striking Fleming's subsequent report, Defendants request that the Court permit Defendants to take an additional deposition of Fleming on his ventilation opinions and permit Defendants' experts to provide testimony at trial regarding ventilation without limiting their testimony to the contents of their expert reports. (*Id.* at 12.)

Defendants have known about Fleming and the substance (although not this one particular source) of his testimony since July 2023. They also appear to have known about the weakness of this aspect of his testimony for many months (*see id.* at 5, arguing that Defendants' expert pointed out the factual error in September 2023), and they have already deposed Fleming about his testimony. Defendants have known about the May 2020 CDC publication since at least February 2024 (although Plaintiffs point out that Defendants should have known about it much earlier given their litigation position that they implemented all relevant CDC guidance since the beginning of the pandemic (*see* Pls.' Reply at 3)), there is little likelihood of disruption of trial because no trial date has yet been set because of Defendants' appeal, and there is no indication of Plaintiffs' willfulness or bad faith.[6] In sum, the Court finds that there is little surprise to

---

[6] Defendants argue that Plaintiffs willfully made the delayed disclosure as a tactical decision to minimize Fleming's omission at summary judgment and to survive Defendants' *Daubert* challenge to Fleming's initial report. (*See* Defs.' Reply at 9.) However, as Defendants acknowledge, Plaintiffs cited and disclosed the *Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19), May 2020* in advance of oral argument and before this Court's decision on Defendants' summary judgment and *Daubert* motions. (*See* Defs.' Mot. at 12; Notice in Advance of Oral Argument, ECF No. 618.)

Defendants, no likelihood of disruption of trial, and no bad faith or willfulness in not citing the May 2020 CDC guidance in Fleming's initial report.

However, the Court agrees with Defendants that taking steps to mitigate any potential prejudice is appropriate here. Accordingly, Schoen may testify at trial about the *Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19), May 2020* and rebut Fleming's related testimony without limiting his testimony to the contents of Schoen's report.

For these reasons, the Court concludes that Plaintiffs have satisfied their burden of demonstrating that any Rule 26 violation was harmless and denies Defendants' motion to strike. *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) ("Not only was [the expert]'s anticipated testimony not a 'surprise' to appellants, they were obviously able to take steps they thought necessary to contend with his testimony at trial."); *Amos*, 2011 WL 43092, at *4 ("A party is not harmed where, even though an expert disclosure fails to satisfy [Rule] 26, the party knew about the expert, knew about the content of the expert's testimony, and had an opportunity to depose the expert." (citing *Ricks v. BMEzine.com, L.L.C.*, 727 F. Supp. 2d 936, 950 (D. Nev. 2010) and *Frontline Med. Assocs. v. Coventry Health Care*, 263 F.R.D. 567, 570 (C.D. Cal. 2009))).

## CONCLUSION

For the reasons stated, the Court DENIES Plaintiffs' motion (ECF No. 649) and DENIES Defendants' motion (ECF No. 651).

**IT IS SO ORDERED.**

DATED this 5th day of September, 2024.

HON. STACIE F. BECKERMAN
United States Magistrate Judge